**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Accrediting Council for Independent Colleges and Schools,**<br><br>     Plaintiff,<br><br> v.<br><br>**John King, Jr., in his official capacity as Secretary of the Department of Education,**<br><br>and<br><br>**United States Department of Education,**<br><br>     Defendants. | Civil Action No. 16-2448<br><br>**DECLARATION OF ALLYSON B. BAKER** |

Pursuant to 28 U.S.C. § 1746, I, Allyson B. Baker, declare as follows:

1. I am an attorney at Venable LLP, which represents Plaintiff Accrediting Council for Independent Colleges and Schools ("ACICS") in the above-captioned action (the "Action").

2. I am fully familiar with the facts and circumstances related to the Action.

3. I make this Declaration in support of ACICS's Motion for Temporary Restraining Order and Preliminary Injunction ("TRO Motion").

## **EXHIBITS**

4. Attached as **Exhibit 1** is a true and correct copy of ACICS's Petition for recognition to the Department of Education, dated January 8, 2016.

5. Attached as **Exhibit 2** is a true and correct copy of ACICS's Comments to the Senior Department Official following the NACIQI Recommendation, dated July 5, 2016 ("ACICS's July Comments").

6. Attached as **Exhibit 2a** is a true and correct copy of Exhibit B to ACICS's July

Comments, an Executive Summary and Detailed Background of ACICS's Resolution of 21 Residual Findings of the Department's Staff Report, dated July 5, 2016

7.      Attached as **Exhibit 2b** is a true and correct copy of Exhibit C to ACICS's July Comments, a chart summarizing the 70 re-recognition renewal petitions that have been before NACIQI since December 2010 in which an agency was found to have one or more violations of the federal standards.

8.      Attached as **Exhibit 2c at 10-15** is a true and correct copy of Exhibit D to ACICS's July Comments, an email from Herman Bounds to Albert C. Gray dated March 3, 2016.

9.      Attached as **Exhibit 2c at 8** is a true and correct copy of Exhibit D to ACICS's July Comments, an email from Albert C. Gray to Herman Bounds, dated March 10, 2016.

10.      Attached as **Exhibit 2c at 7** is a true and correct copy of Exhibit D to ACICS's July Comments, an email from Herman Bounds to Albert Gray, dated March 15, 2016.

11.      Attached as **Exhibit 2c at 2** is a true and correct copy of Exhibit D to ACICS's July Comments, a letter from Herman Bounds to Anthony Bieda, dated June 3, 2016.

12.      Attached as **Exhibit 2c at 3** is a true and correct copy of Exhibit D to ACICS's July Comments, an email from Herman Bounds to Anthony Bieda, dated May 18, 2016.

13.      Attached as **Exhibit 3** is a true and correct copy of ACICS's responses to Section I of the Department's March 3 Supplemental Request, dated April 1, 2016.

14.      Attached as **Exhibit 4** is a true and correct copy of ACICS's responses to Section II of the Department's March 3 Supplemental Request, dated May 16, 2016.

15.      Attached as **Exhibit 5** is a true and correct copy of the Final Staff Report to the SDO on Recognition Compliance Issues, dated June 15, 2016.

16. Attached as **Exhibit 6** is a true and correct copy of an excerpt from the transcript of the June 22, 2016 NACIQI Meeting.

17. Attached as **Exhibit 7** is a true and correct copy of the transcript of the June 23, 2016 NACIQI Meeting.

18. Attached as **Exhibit 8** is a true and correct copy of the Comments on behalf of the Office of Postsecondary Education regarding ACICS's petition for re-recognition (the "OPE Letter,") dated July 15, 2016.

19. Attached as **Exhibit 9** is a true and correct copy of ACICS's Response to the OPE Letter, dated July 25, 2016.

20. Attached as **Exhibit 10** is a true and correct copy of the Decision of the SDO, dated September 22, 2016.

21. Attached as **Exhibit 11** is a true and correct copy of ACICS's Request for Reconsideration of the Decision of the SDO, dated October 4, 2016.

22. Attached as **Exhibit 12** is a true and correct copy of the Department Staff's Response to ACICS's Request for Reconsideration, dated October 17, 2016.

23. Attached as **Exhibit 13** is a true and correct copy of a letter from Emma Vadehra to Roger J. Williams denying ACICS's Request for Reconsideration, dated October 18, 2016.

24. Attached as **Exhibit 14** is a true and correct copy of ACICS's Appeal to the Secretary of Education of the Decision of the SDO, dated October 21, 2016.

25. Attached as **Exhibit 15** is a true and correct copy of the Brief on Behalf of the SDO in Opposition to ACICS's Appeal and in Support of Decision to Deny Renewal of Recognition, dated November 11, 2016.

26. Attached as **Exhibit 16** is a true and correct copy of ACICS's Response to the

SDO's Brief in Opposition to ACICS's Appeal, dated November 30, 2016.

27.      Attached as **Exhibit 17** is a true and correct copy of the Supplement to ACICS's Response to the SDO's Brief in Opposition to ACICS's Appeal, dated December 2, 2016.

28.      Attached as **Exhibit 18** is a true and correct copy of the Decision of the Secretary, dated December 12, 2016.

29.      Attached as **Exhibit 19** is a true and correct copy of "Rubber Stamps: ACICS and Troubled Oversight of College Accreditors," prepared by Staff of Sen. Elizabeth Warren.


Under penalty of perjury, I declare pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 15th day of December, 2016 at Washington, D.C.


/s/ Allyson B. Baker
Allyson B. Baker

# EXHIBIT 1

To Declaration of Allyson B. Baker

| Step 1 - Contact Information |
|:---:|

**Identifier:**        ACICS
**Name:**        Accrediting Council for Independent Colleges and Schools
**Meeting Date:**    06/2016

**Address**

750 First Street, NE, Suite 980
Washington, DC   20002-4223

**Accrediting Agency Administrator**

Title:              President and CEO
Name:             Dr. Albert C Gray
Phone Number:    202-336-6778
Fax Number:      202-842-2593
Email:              agray@acics.org

**Point of Contact (POC) for the Content of the Submission**

Name:             Mr. Anthony S Bieda
Phone Number:    202.336.6781
Email:              abieda@acics.org

| Step 2 |
|:---:|

**Type of Submission:** Renewal Petition **This is the current scope of recognition for your agency which was granted by the Secretary of Education:**

The accreditation of private postsecondary institutions offering certificates or diplomas, and postsecondary institutions offering associate, bachelor's, or master's degrees in programs designed to educate students for professional, technical, or occupational careers, including those that offer those programs via distance education.

**Criteria:** 602.10 Link to Federal programs

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.11 Geographic scope of accrediting activities.

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.12(b) Expansion of Scope

**Response:**

ACICS seeks recognition for the expansion of its scope of accreditation to include "professional doctoral degrees" for two credentials: Doctor of Business Administration (DBA) and Doctor of Computer Engineering (DCE). ACICS' current recognized scope of accreditation does not include professional doctorate degrees. The requested expansion statement of scope would read: "For the accreditation of private postsecondary institutions offering certificates or diplomas, and postsecondary institutions offering associate's, bachelor's, master's or professional doctoral degrees in programs designed to educate students for professional, technical, or occupational careers, including those that offer those programs via distance education."

The Council describes the nature and scope of professional doctoral degrees, such as the DBA and DCE, as "degrees … designed to make students experts in their fields and in the workplace. As such, the outcomes for those earning a professional doctoral degree involve using knowledge and techniques to purposefully address problems and opportunities in their workplace (Exhibit 1: Accreditation Criteria, Title III, Chapter 7, Introduction and Section 3-7-100, p. 71)."

ACICS considers the requested expansion of scope to be responsive to student needs and a natural extension of its organizational emphasis on assuring the quality of career education. The professional (sometimes referred to as a practitioner's) doctorate qualifies an individual for employment in a given profession or increases one's skills within that profession. The degree is terminal in that it is the highest degree awarded in a particular field of study. In essence, it is frequently required or preferred in order for a student's professional advancement and enhancement.

ACICS has reviewed empirical evidence that supports the pursuit of education as a means to employment. A survey by the National Association of Colleges and Employers (n= 44,000) indicates that 58 percent of 2014 graduates identify themselves with a career-oriented major like business administration or computer science. ACICS considers professional doctoral degrees, such as those in business or computers, to be the terminal degree of choice for a more career-minded generation of students.

Among 70 ACICS institutions offering master's degree programs, 15 indicated an interest in offering accredited professional doctoral programs in various disciplines, especially in Business Administration, during the next five years. Two-thirds indicated that graduates from their master's degree programs had indicated an interest in pursuing a professional doctoral program, which also reflected interest on the part of employers in their service areas (Exhibit 2: Professional Doctoral Degrees Reference Document).

Students enrolled in professional doctoral programs at institutions accredited by ACICS typically range in age from 30 to 39 years; are from economically and ethnically diverse backgrounds; have completed from 5 to 10 years in the workplace before enrolling in doctoral-level studies (62 percent); are completing additional education to advance professionally; and predominantly hold citizenship

status in international countries (81 percent). International students are generally placed in appropriate work settings either under externship arrangements or under appropriate work visa status. Of the graduates of the Doctor of Business Administration and Doctor of Computer Engineering programs at ACICS-accredited institutions for the years 2011 through 2015, 41 percent were not available for employment in the United States due to their visa status. About 54 percent are currently working in the field for which they received their credentials. (Exhibit 3: Profile of Doctoral Students and Graduates, 2011-2015.)

ACICS has reviewed doctorate-level programs at eight institutions since 2005 outside of its formal scope of recognition. Those institutions and their programs serve a variety of communities primarily in California, Minnesota and Virginia (Exhibit 4: Table of ACICS Accredited doctorate programs).

ACICS attaches special significance to the awarding of doctoral degrees: "The student has attained specialized and practical competence which qualifies… for opportunities and additional responsibilities beyond the master's degree level." Council's published expectations are that the doctoral degree "heightens the level of professional expertise," affords the student an opportunity to "apply technologies, knowledge, or concepts in a new way to a workplace problem. This provides the student an opportunity to apply knowledge to a high-level issue in the same way he or she might operate at work," and that the coursework "enables graduates to function/perform in the area or field of study sought (Exhibit 1: Accreditation Criteria, Title III, Chapter 7, Introduction and Section 3-7-100, p. 71)."

In addition, ACICS' requirements for doctoral-level education include research, mastery of subject, theory and methodology, as well as evidence of formal plans that addresses program purpose and measures of effectiveness (Ibid). The standards and policies governing the evaluation and approval of doctoral programs were developed in comparison to those of other institutional accrediting agencies (Exhibit 5: Accrediting Agency Doctoral Standards Crosswalk).

Council requires an institution offering doctoral-level programs to demonstrate compliance with standards for organizational and administrative capacity; educational activities including qualified faculty; scope and sequence of curriculum; instructional resources including library and technology; and authority to confer doctoral degrees by the state. It requires the curriculum to "quantitatively and qualitatively" approximate standards at other institutions offering comparable degrees. It also requires that instructional procedures, texts, materials, and technology "be appropriate" for collegiate institutions, and that the curriculum demonstrate "the appropriate use of research and library resources (Exhibit 1: Accreditation Criteria, Sections 3-7-200 thru 3-7-800, ps. 71-76)."

The Council applies those standards through program review procedures that are customized to the rigor and professional expectations of doctoral-level credentials. Those procedures include the evaluation of the organization's capacity prior to a quality assurance site visit (Exhibit 49: Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter) as well as the review applied during the site visit (Exhibit 7: Team Report Template, Doctorate Level Program, ps. 105-118).

The reviews produce written feedback to the institution regarding the deficiencies in its doctoral level programs, an opportunity to respond to those areas of concern, and considerations of both by

the Council in reaching a decision regarding the inclusion of the program under the ACICS grant of accreditation (Exhibit 8: Lincoln University Renewal Team Report, p. 11, School Response, p. 144, Council Action Deferral letter, p. 526).

## Exhibit(s) Linked to this Criterion

| Exhibit Title | File Name |
| --- | --- |
| Exhibit 8 - Lincoln University Renewal Report, Response, Deferral Letter, Deferral Response, Approval Letter | Exhibit 8 - Lincoln University Renewal Report, Response, Deferral Letter, Deferral Response, Approval Letter.pdf |
| Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted | Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 2 - Professional Doctorate Degrees Reference Document | Exhibit 2 - Professional Doctorate Degrees Reference Document.docx |
| Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015 | Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015.docx |
| Exhibit 4 - Table of ACICS Accredited doctorate programs | Exhibit 4 - Table of ACICS Accredited doctorate programs.pdf |
| Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk | Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk.xlsx |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.13 Acceptance of the agency by others.

**Response:**

The broad acceptance of ACICS accreditation by the education community, licensure authorities, employers and others is a priority of the organization. The acceptability of ACICS accreditation standards is articulated in several sections of the published standards, including for purposes of participation in federal student aid programs (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, Section 2-2-501, p. 22); the ratios of students to teachers in instructional settings (Ibid, Title III, Chapter 2, Section 3-2-106, p. 54); teaching assignments of faculty (Ibid, Title III, Chapter 3, Section 3-3-302 (b), p. 56); admissions requirements; and the assignment of credit hours (Ibid, Appendix G, pgs. 114-115).

To fortify the acceptance by the education community, educators and practitioners from a wide array of fields reflected in all categories of programs offered by ACICS institutions are recruited and enlisted to lead and conduct on-site evaluations (Exhibit 9: ACICS Roster of Evaluators); and to serve as members of the Council, Board of Directors and Review Board for Appeals (Exhibit 10: Commissioner Roster and Resumes; Exhibit 11: ACICS Review Board Roster since 2013 and Sample Resumes).

Members of the Council, including public members and those with primarily academic qualifications, have the authority and responsibility to review program and institutional alignment with standards of quality (Exhibit 1: Accreditation Criteria, Appendix A, Article III, Section 2, items (b)(c)(d)(g)(i), pgs. 92- 93). They also have the responsibility to participate in the development, adoption and implementation of standards and practices that best fulfill ACICS' mission of assuring the quality of education designed to "advance educational excellence" at independent, non-public colleges and schools and the "value of a quality educational experience for all students" (Exhibit 12: www.acics.org-About Us-Mission Statement, Value) (Exhibit 1: Accreditation Criteria, Appendix A, Article III, Section 2, items (a)(e)(f), p. 92).

ACICS's program of accreditation, including policies and criteria, is recognized and acknowledged throughout the United States and internationally by state approval authorities, programmatic accrediting agencies, regionally-accredited institutions and foreign ministries of education as a reliable authority on quality and integrity. Since 2011, ACICS has voluntarily subjected its accreditation authority to the independent review and approval of the Council for Higher Education Accreditation (Exhibit 13: CHEA ACICS recognition granted Sep. 2012); the American Registry of Radiologic Technologists (Exhibit 14: ACICS Recognition by ARRT, January 27, 2015); and more than 13 foreign ministries of education (Exhibit 15: International Ministries of Higher Education, Notification of Accreditation, December 2015). When establishing the eligibility of any college or school for accreditation by ACICS, the institution must demonstrate that is has the authority to operate as such by the local government and operate according to applicable laws and regulations (Exhibit 1: Accreditation Criteria, Title I, Chapter 2, Section 1-2-100 (b) and (f), pgs. 2-3).

The acceptance of ACICS accreditation by members of the education community is further

demonstrated by the transferability of course credits earned at ACICS colleges and schools to other institutions. More than half (55 percent) of ACICS institutions have established articulation agreements with institutions accredited by regional and national accrediting agencies, and nearly half (48 percent) have "at least one agreement with a regionally accredited institution. (Exhibit 16: Transfer Policy and Student Experience Survey Report, Pg. 4).

At the doctoral level, graduates of programs at member institutions have been successful in finding acceptance by employers and the professional community. More than 35 graduates of DBA and DCE programs at ACICS accredited institutions between 2011 and 2015 are currently working in the field for which they received their credentials (Exhibit 3: Profile of Doctoral Students and Graduates, 2011-2015).

The acceptance of ACICS by employers is demonstrated by the placement performance for graduates reported on the annual Campus Accountability Report. The average percentage of students placed in their field or related field of study for all ACICS institutions was 66% in 2012, 72% in 2013 and 74% in 2014, based on self-reported data that is subject to episodic verification during full team visits (Exhibit 17: 2014 Summary of Key Operating Statistics, pg. 11).

Finally, ACICS executive staff members are regularly invited to give presentations, sit on panels, and participate in meetings and conferences where accreditation standards, practices and issues are discussed (Exhibit 18: ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST).

## Exhibit(s) Linked to this Criterion

| Exhibit Title | File Name |
| --- | --- |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015 | Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015.docx |
| Exhibit 9 - ACICS Roster of Evaluators | Exhibit 9 - ACICS Roster of Evaluators.xlsx |
| Exhibit 10 - Commissioner Roster and Sample Resumes | Exhibit 10 - Commissioner Roster and Sample Resumes.pdf |
| Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes | Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes.pdf |
| Exhibit 12 - www.acics.org-About Us-Mission Statement, Value | Exhibit 12 - www.acics.org-About Us-Mission Statement, Value.JPG |
| Exhibit 13 - CHEA ACICS recognition granted Sep. 2012 | Exhibit 13 - CHEA ACICS recognition granted Sep. 2012.pdf |
| Exhibit 14 - ACICS Recognition by ARRT, January 2015, and ACICS Continued Recognition for 5 years, Aug 2015 | Exhibit 14 - ACICS Recognition by ARRT, January 2015, and ACICS Continued Recognition for 5 years, Aug 2015.pdf |
| Exhibit 15 - International Ministries of Higher Education, Notification of Accreditation, December 2015 | Exhibit 15 - International Ministries of Higher Education, Notification of Accreditation, December 2015.docx |

| | |
|---|---|
| Exhibit 16 - Transfer Policy and Student Experience Survey Report | Exhibit 16 - Transfer Policy and Student Experience Survey Report.pdf |
| Exhibit 17 - 2014 Summary of Key Operating Statistics | Exhibit 17 - 2014 Summary of Key Operating Statistics.pdf |
| Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST | Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST.pdf |

**Criteria:** 602.14(a) Category of Agency

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.14(b) Separate and Independent

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.14(c) Joint Use of Personnel

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.14(d)(e) Separate & Independent Waiver

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.15(a)(1) Staffing/Financial Resources

**Response:**

ACICS recognizes that the development and application of quality standards to post-secondary education institutions is a resource-intensive enterprise, that requires sufficient levels of funding, staffing, facilities, materials, supplies and expertise. The Board of Directors has primary responsibility for ensuring that the accreditation program is adequately funded, staffed and led by professionals with appropriate experience and knowledge to support the Council's development and application of accreditation standards. This responsibility extends to the assurance of quality at institutions offering doctorate level programs.

To apply those standards effectively, ACICS has developed a pool of evaluators with qualifications appropriate to evaluate doctoral-level programs. The ACICS evaluator pool includes six individuals qualified to evaluate DBA programs and five individuals qualified to evaluate DCE programs (Exhibit 19: Doctoral Programs Evaluators & Resumes_Redacted). In addition, seven members of the Council and two senior administrators at ACICS hold doctoral-level degrees from accredited institutions; most of the accreditation staff holds graduate degrees (Exhibit 20: www.acics>About Us-Meet Our Commissioners and Staff Directory).

ACICS' capacity to review institutions offering doctorate level programs includes financial resources and infrastructure. The primary sources of revenue for the agency are sustaining fees derived from member institutions, program and activity fees, and investments. (Exhibit 21: ACICS Budget 2015-2016). When an increased need in technological or employee resources is identified, senior management responds quickly and decisively to meet this new need. Financial data comes from an integrated financial system, which facilitates the effective management of the Council's financial transactions through timely and accurate communication of this financial data.

The Council's 2015-2016 operating budget is included in Exhibit 21. ACICS is financially stable and through careful budgeting and administration is able to cover costs with the above identified revenue resources, and by accessing its reserves for strategic investments in information technology.

During the past three years, ACICS has invested in excess of $2 million for information technology infrastructure development and upgrades. Its capacity is also derived from a long history of accrediting programs related to business administration and computer science.
Employees are well trained in their areas of responsibility and have sufficient resources available to them to perform with a high standard of professionalism. Specifically, all employees who are responsible for the development and application of ACICS standards are required to successfully complete formal training, observe evaluation site visits, and pass three month and six month performance reviews (Exhibit 22: Accreditation Evaluation Training Manual 2015_Redacted; Exhibit 20: www.acics>About Us-Meet Our Commissioners and Staff Directory).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |

Exhibit 21 - ACICS Budget 2015-2016

Exhibit 21 - ACICS Budget 2015-2016.docx

Exhibit 22 - Accreditation Evaluation Training Manual 2015

Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf

Exhibit 19 - Doctoral Programs Evaluators & Resumes_Redacted

Exhibit 19 - Doctoral Programs Evaluators & Resumes_Redacted.pdf

Exhibit 20 - www.acics - About Us-Meet Our Commissioners and Staff Directory

Exhibit 20 - www.acics - About Us-Meet Our Commissioners and Staff Directory.docx

**Criteria:** 602.15(a)(2) Competency of Representatives

**Response:**

The ACICS method of assuring education quality and institutional integrity depends greatly on the recruitment and deployment of qualified professionals from the education and employer communities who have the appropriate experience and knowledge of fields relevant to their role as a Council member (Commissioner), intermediate reviewer, Review Board member, and visit evaluation team member.

At ACICS, commissioners are the primary sources of policy, standards, requirements and accreditation decisions. In order to carry out those responsibilities effectively ACICS requires that commissioners be "persons interested in career education; have knowledge or experience useful to the accreditation process; and are willing to contribute opinion advice and expertise." Commissioners are also expected to be "currently or recently engaged in a significant manner in post-secondary institutional or programmatic administration (Exhibit 1: Accreditation Criteria, Appendix A, ps. 90 and 93)."

Regarding the composition of the Council, ACICS requires the commissioners to be either elected by their peers or appointed by the Council. The bylaws of the organization specify and define participation by public representatives as well as representatives of member institutions (Ibid., Article III, p. 92). Among other considerations, at least three of the commissioners "shall be public representatives," defined as someone "not employed or formally employed" by an ACICS institution, or serving as a board member on an ACICS institution, or related to someone employed by an ACICS institution (Ibid., Article I, Section 7, p. 90). Also, at least two of the members shall be "academic representatives," defined as someone currently or recently directly engaged in teaching or research (Ibid., Article III, p. 92).

ACICS requires all new commissioners, public, academic and administrative, to participate and complete a training module that orients them to the standards, practices and procedures of the Council. The objectives of the training include an overview of accreditation, ACICS' role in the accreditation triad, the agency's mission and values, and the responsibilities of Council members. The training also guides new commissioners regarding effective development of standards by which institutions are measured (Exhibit 23: Council, Commissioner and Board of Director Training Manual).

In order to afford due process protections to member institutions, ACICS establishes and maintains a qualified and professional Review Board for hearing appeals of Council decisions. ACICS requires Review Board members to be individuals who "have had experience in accreditation" and "shall not have been a commissioner within one year prior to appointment (Exhibit 1; Accreditation Criteria, Appendix A, Article VII, p. 98)." The bylaws require the Review Board to include a mix of academic, administrative and public members. Review Board members receive training that is specifically tailored to their duties as an appeals panel.

Also integral to the application of accreditation standards through the evaluation process is the recruitment and deployment of trained qualified on-site evaluators. These individuals do not serve in a decision making role or policy making role at ACICS. However, their insights and knowledge are valuable resources to the Council in developing policies and deciding accreditation outcomes.

The qualification of evaluators is specified as "educators, executives and practitioners in business, administrative and technical fields (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-401, p. 8)." They are also expected to have five years of documented experience and/or education in a specialty area or expertise (Exhibit 24: www.acics.org >Evaluators >Becoming an Evaluator Webpage).

Applicants interested in serving as evaluators must submit the requisite documents to evidence minimum qualifications, including evidence that they hold licensure in the relevant field. Applicants are vetted for evidence of experience or academic preparation in the field (Exhibit 25: Sample Evaluator Resumes, Public, Academic, Administrative; Exhibit 26: Resumes of Licensed Evaluators). New evaluators must complete at least two-hours of training (Exhibit 27: Evaluator Training Webinar Presentation) and demonstrate familiarization with instructional materials (Exhibit 28: Evaluator Training Packet).

Upon completion of the training, the new evaluator must pass a final exam (Exhibit 29: New Evaluator Assessment Results). Evaluators who are assigned to on-site visits are briefed on new procedural and policy changes that affect their review (Exhibit 30: Pre-Visit Meeting Outline-Criteria and Procedural Changes).

ACICS has written policies to describe the process employed to ensure that the representatives on evaluation teams are appropriately credentialed and qualified to serve (Exhibit 22: Accreditation Evaluation Training Manual 2015, p. 11).

Additionally, ACICS' scope of recognition includes the evaluation of distance education and evaluators who are vetted to serve in this role must demonstrate, as outlined in the Evaluator Policies and Procedures as well as the web site, experience in the management, instruction and curriculum development of distance education programs, as well as having completed training in that mode of delivery (Exhibit 31: Distance Education Evaluators). Knowledge of self-paced instruction and familiarity with various platforms are preferred.

Every ACICS evaluation team is led by a chair selected and trained to assure that the visit is "conducted fairly and thoroughly" (Exhibit 1, Accreditation Criteria, Title II, Chapter 1, Section 2-1-401, p. 8).

ACICS applies the qualification requirements for team chairs through the application process (Exhibit 32: Team Chair Application). Team chairs are trained through a formal process (Exhibit 33: Chair Training 2013 Binder; Exhibit 34: Team Chair Professional Development 2014 Binder) and are mentored by veteran chairs. In addition, feedback from the mentor and ACICS staff informs the chair's performance (Exhibit 35: New Chair Training Evaluation Form).

ACICS relies on seasoned evaluators with years of experience reviewing ACICS institutions as an

additional resource for the intermediate evaluation of team reports and school responses. Those individuals include chairs of teams and intermediate reviewers whose recommendations are considered by the Council when making accreditation decisions.

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 22 - Accreditation Evaluation Training Manual 2015 | Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf |
| Exhibit 23 - Council, Commissioner and Board of Director Training Manual | Exhibit 23 - Council, Commissioner and Board of Director Training Manual.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage | Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage.pdf |
| Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative | Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative.pdf |
| Exhibit 26 - Resumes of Licensed Evaluators | Exhibit 26 - Resumes of Licensed Evaluators.pdf |
| Exhibit 27 - Evaluator Training Webinar Presentation | Exhibit 27 - Evaluator Training Webinar Presentation.pdf |
| Exhibit 28 - Evaluator Training Packet | Exhibit 28 - Evaluator Training Packet.pdf |
| Exhibit 29 - New Evaluator Assessment Results | Exhibit 29 - New Evaluator Assessment Results.pdf |
| Exhibit 30 - Pre-Visit Meeting Outline-Criteria and Procedural Changes | Exhibit 30 - Pre-Visit Meeting Outline-Criteria and Procedural Changes.pdf |
| Exhibit 31 - Distance Education Evaluators | Exhibit 31 - Distance Education Evaluators.pdf |
| Exhibit 32 - Team Chair Application | Exhibit 32 - Team Chair Application.pdf |
| Exhibit 33 - Chair Training 2013 Binder | Exhibit 33 - Chair Training 2013 Binder.pdf |
| Exhibit 34 - Team Chair Professional Development 2014 Binder | Exhibit 34 - Team Chair Professional Development 2014 Binder.pdf |
| Exhibit 35 - New Chair Training Evaluation Form | Exhibit 35 - New Chair Training Evaluation Form.pdf |

**Criteria:** 602.15(a)(3) Academic/Administrator Representatives

**Response:**

ACICS values the contributions to the quality assurance program provided by educators, practitioners and administrators who work in the occupational, professional and technical fields offered as education programs at member institutions. The Council formalizes its recognition of those contributions through written policies and procedural protocols that require participation by those categories of individuals in the evaluation, policy making and decision making activities of the agency.

A team of evaluators is appointed to review on-site the sufficiency of an institution's compliance with ACICS standards as part of an initial grant, renewal grant or extensive substantive change evaluation. Evaluators are selected from "educators, executives and practitioners (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-401, p. 8)." In addition, the Council specifies that the evaluation teams must "consist of individuals serving as academic, administrative, public or member representatives (Ibid. Section 2-1-402, p.8)."

In order to serve as an evaluator on an ACICS on-site review team, an individual must register and be vetted through a formal process. The online registration (Exhibit 24: www.acics.org-Evaluators-Becoming an Evaluator Webpage, Step 4) and the Evaluation Visit Procedures and Guidelines (Exhibit 36: Visit Evaluation Procedures and Guideline, p.2), requires evaluators to specify their role as academic or administrative (Exhibit 37: Evaluator Database Record). This information is used to ensure that every on-site review team is composed of the requisite representatives. Resumes of the team members for one evaluation visit, as well as the cover page of the team report, demonstrate the agency's interpretation of its definitions (Exhibit 38: MJI Evaluation Visit Materials - Roles, Reports, Resumes).

ACICS' requirement for academic, administrative, and public representatives on the Council, which is the agency's primary decision and policy-making body, are included in the bylaws of the agency (Exhibit 1: Accreditation Criteria, Appendix A, Article I, p. 90). The Council consists of "the elected and appointed commissioners," including "representatives of the public who are interested in career education; have knowledge or experience useful to accreditation." Public members must not be employed or formerly employed by a member institution, or have affiliations that would otherwise undermine their public status (Ibid., Section 7, p. 90). Council composition requirements further specify that it "comprise 15 commissioners," and "must maintain a minimum of three public representatives, six member representatives, two academic representatives and two administrative representatives. "Academic" is someone currently or recently directly engaged in teaching or research at the post-secondary level. "Administrative" is someone engaged in institutional- or program-level administration (Ibid., Article III, Section 1, p. 92)."

Since 2013, five members of the Council have fulfilled the academic category, and six members have fulfilled the public category (Exhibit 10: Commissioner Roster and Resumes).

ACICS considers the Review Board for Appeals a decision-making body. The Review Board, sitting as a review panel, has the authority to affirm, modify or reverse an accrediting decision of the Council. A Review Board panel must include at least one public, one academic and one administrative representative (Exhibit 1: Accreditation Criteria, Appendix A, Article VII, p. 98). Since 2013, eight members of the Review Board have fulfilled the academic category, and four members have fulfilled the public category (Exhibit 11: ACICS Review Board Roster since 2013 and sample resumes).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 10 - Commissioner Roster and Sample Resumes | Exhibit 10 - Commissioner Roster and Sample Resumes.pdf |
| Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes | Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes.pdf |
| Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage | Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage.pdf |
| Exhibit 36 - Visit Evaluation Procedures and Guidelines | Exhibit 36 - Visit Evaluation Procedures and Guidelines.pdf |
| Exhibit 37 - Evaluator Database Record | Exhibit 37 - Evaluator Database Record.pdf |
| Exhibit 38 - MJI Evaluation Visit Materials - Roles Reports Resumes | Exhibit 38 - MJI Evaluation Visit Materials - Roles Reports Resumes.pdf |

**Criteria:** 602.15(a)(5) Public Representatives

**Response:**

ACICS values the participation and contribution of knowledgeable, professional members of the post-secondary education community who are not directly or indirectly affiliated with an ACICS college, school or service provider. The Council has written requirements for participation by members of the public in the evaluation, policy making and decision making aspects of its accreditation enterprise.

ACICS defines "Public Representative" as persons who are interested in career education; have knowledge or experience useful to the accreditation process; are willing to contribute opinion, advice, and expertise to the endeavors of ACICS and the Council; and are not (1) employed or formerly employed by an institution or program that either is accredited by the agency or has applied for accreditation or (2) associated as members of the governing board, owners, shareholders, consultants or in some other similar capacity with an institution or program that either is accredited by the agency or has applied for accreditation; or (3) a member of any related, associated, or affiliated trade association or membership organization; or (4) a spouse, parent, child or sibling of an individual identified in paragraph (1), (2) or (3) of this definition (Exhibit 1, Accreditation Criteria, Appendix A, Article I, Section 7, p. 90).

Public members are expected to be included on all full evaluation team visits that are conducted by ACICS as part of the quality review of institutions seeking initial grants, renewal grants or extensive substantive change approvals. Public members on evaluation teams have access to all of the information relevant to the review that is provided to other team members, including the institution's self-study and update report (Ibid., Title II, Chapter 1, Section 2-1-402, p. 8).

The required inclusion of public members on ACICS evaluation teams is specified in the agency's written procedures (Exhibit 22: Accreditation Evaluation Training Manual 2015, Team Composition, p.11). Coordinators apply this procedure, and access a database of evaluators who have been vetted as public members, in composing a team for a site visit (Exhibit 9: ACICS Roster of Evaluators). Public evaluators are selected based on their experience, education, practitioner status and other factors manifest in their resumes (Exhibit 25: Sample Evaluator Resumes, Public, Academic, Administrative).

The policy regarding public participation in the 15-member Council, which is the only policy making and the primary decision making body of ACICS, requires that "at least three commissioners shall be public representatives (Exhibit I: Appendix A, Article III, Section 1-2, p. 92-93)." A standing committee of the Council is responsible for "the selection of candidates for election as commissioners and appointed as commissioners" for recommendation to the Council, including public commissioners (Ibid., Article V, Section 1(a), p. 95). Since 2013, six public representatives have been appointed to serve on the Council. Public members of the Council are vetted based on their experience, education and other factors as reflected in their resumes (Exhibit 10: Commissioner Roster and Sample Resumes).

ACICS policy for public participation in the Review Board of Appeals requires that "at least one public, one academic, and one administrative representative" constitute a Review Board panel. The panels have the authority to "affirm, remand, amend or overturn" an action of the Council (Exhibit I: Accreditation Criteria, Appendix A, Article VII, Section 1, p. 98). ACICS bylaws specify that Review Board members "shall be appointed by the Council," as well as their term of service and their absence from the Council for at least the prior year. The policy delegates to the President of ACICS the convening of a Review Board panel (Ibid.). A roster of eligible panelists is available for composing a given panel. Public members of the Review Board are vetted based on their experience, education and other factors as reflected in their resumes (Exhibit 11: ACICS Review Board Roster since 2013 and sample resumes).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 22 - Accreditation Evaluation Training Manual 2015 | Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 9 - ACICS Roster of Evaluators | Exhibit 9 - ACICS Roster of Evaluators.xlsx |
| Exhibit 10 - Commissioner Roster and Sample Resumes | Exhibit 10 - Commissioner Roster and Sample Resumes.pdf |
| Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes | Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes.pdf |
| Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative | Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative.pdf |

**Criteria:** 602.15(a)(6) Conflict of Interest

**Response:**

ACICS values the independence of its evaluators, policy makers, decision makers and professional staff from any undue conflicts of interest. That emphasis on integrity is explicitly discussed in the section of the Council's policy document regarding the selection and actions of members of the Review Board of Appeals (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-602, p. 32), as well as the section dealing with visit team composition. In the first case, Review Board panelists are scrutinized for their compliance with the agency's conflict of interest policies; and in the case of evaluators, the institution may request replacement of a team member for apparent conflict of interest reasons (Ibid., Title II, Chapter 1, Section 2-1-400, p. 8).

ACICS' policy defines conflict of interest as a commissioner "having any interest in an institution appearing before the Council" or a commissioner who "feels it would not be proper to participate" in a decision making activity directed towards a specific institution. The conflict of interest policy is applied in the assigning of commissioners to hearing panels that are empaneled to decide the denial of a grant of accreditation (Exhibit 23: Council, Commissioner and Board of Director Training Manual, Standards of Ethical Responsibility, p. 20). The same definition applies to Review Board members who are empaneled to decide appeals of Council Decisions (Exhibit 40: Policies and Procedures Manual, Chapter 51, Review Board, p. 215).

All members of the Council, who also constitute the ACICS Board of Directors, and the Review Board of Appeals must review and sign an ethics disclosure as part of their training and orientation to their duties (Exhibit 41: Signed Commissioner Disclosures). Also during Council meetings, commissioners are required to indicate those accreditation files or institutions for which a conflict of interest may arise (Exhibit 109: Signed Abstention list for Council Meetings).

The ethical expectations of evaluators are expressed at the beginning of the process for vetting, training and selecting members of on-site review teams. Evaluators are informed that the credibility of ACICS accreditation is "based upon the singular integrity of all those individuals charged with the adoption of policies, procedures, and standards and with the evaluation and measurement of institutional performance." ACICS' policy requires evaluators to "avoid impropriety and the appearance of impropriety," to perform his or her duties "impartially and diligently," and to "refrain from any business activity inappropriate to accreditation responsibilities, including the offering of any materials or information pertinent to the institution's operation or services." The policy further requires evaluators to refrain from the review of "any institution with which he or she has been, is currently, or presently intends to be directly or indirectly involved (Exhibit 36: Visit Evaluation Procedures and Guidelines, p. 4)." Before an evaluator is assigned to a site review visit, he or she must sign and return for the file the Canons of Ethical Responsibility attestation (Exhibit 42: Sample Signed Canons of Ethical Behavior).

ACICS staff and agency representatives are also required to guard against conflicts of interest, real or perceived. The agency's controls against conflicts of interest are memorialized in written

materials that are provided to all staff and representatives as part of their orientation process (Exhibit 39: Staff Handbook 1-12-15 Excerpt - Conflict of Interest, p. 25, 31-33).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 109 - Signed Abstention List for Council meetings | Exhibit 109 - Signed Abstention List for Council meetings.pdf |
| Exhibit 23 - Council, Commissioner and Board of Director Training Manual | Exhibit 23 - Council, Commissioner and Board of Director Training Manual.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 36 - Visit Evaluation Procedures and Guidelines | Exhibit 36 - Visit Evaluation Procedures and Guidelines.pdf |
| Exhibit 39 - Staff Handbook 1-12-15 Excerpt - Conflict of Interest | Exhibit 39 - Staff Handbook 1-12-15 Excerpt - Conflict of Interest.pdf |
| Exhibit 40 - Policies and Procedures Manual, Chapter 51, Review Board | Exhibit 40 - Policies and Procedures Manual, Chapter 51, Review Board.pdf |
| Exhibit 41 - Signed Commissioner Disclosures | Exhibit 41 - Signed Commissioner Disclosures.pdf |
| Exhibit 42 - Sample Signed Receipt of Canons of Ethical Behavior | Exhibit 42 - Sample Signed Receipt of Canons of Ethical Behavior.pdf |

**Criteria:** 602.16(a)(1)(i) Student Achievement

**Response:**

ACICS defines education quality in terms of student achievement, among other factors (Exhibit 43: Institutional Effectiveness - A Guide to Implementation, page 6). The agency gives discretion to the institution or program to set its own thresholds for some of those factors, "consistent with mission," and encourages the institution to demonstrate "the degree to which it meets its own predetermined educational outcomes (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-110, p. 37)." Council prescribes which outcome data must be reported by the institution every year (Ibid., 3-1-111, pgs. 38-39), the minimum thresholds for acceptable performance, and the sanctions applied when institutions or programs fail to perform at standard for student retention, placement, and licensure pass rate.

In addition to prescribed standards for certain indicators of student achievement, ACICS requires institutions to establish their own benchmarks for graduate satisfaction, employer satisfaction, and student learning outcomes such as cumulative grade point average, portfolio review and other measures of "skill and competency attainment." The development and application of plans to impact student achievement are mandatory and accomplished through the Campus Effectiveness Planning (CEP)(Ibid.).

Council routinely reviews student achievement data submitted through the annual Campus Accountability Report (CAR), which is required as a condition of maintaining ACICS accreditation. Each institution every year must submit reliable, accurate data regarding the enrollment levels in each program, retention rates, placement rates and licensure exam pass rates when applicable. Programs and institutions whose performance fall below the Council's published standards (Exhibit 86: ACICS Student Achievement Rates and Definition of Placement - ACICS Webpage) are notified and required to remedy the deficiency in a timely manner, including documentation of a plan to improve performance that is subject to Council review (Ibid., Title II, Chapter 1, Section 2-1-809, p. 12).

When the annual CAR data is submitted, the institution is notified that the information has been captured and that the preliminary performance rates have been calculated (Exhibit 44: 2014 CAR Reports - ITT). After the data has been reviewed by Council, the institution is notified if the data indicates substandard performance (Exhibit 45: ITT Student Achievement Outcomes Letter).

The integrity of self-reported student achievement data is reviewed for accuracy during on-site evaluation visits. The team also reviews the CEP to ensure that institutions document a proper analysis of their retention and placement activities and identify appropriate goals and remedies for substandard performance (Exhibit 46: PIP Revision to CFI CEP). If the team finds deficiencies in the improvement plan or the CEP, it establishes a finding in the team report. If an institution is unable to rectify the deficiency, the institution faces deferral, a finding of non-compliance, and ultimately a directive to show-cause (Exhibit 47: Salter School-Tewksbury Renewal, p. 5).

For institutions whose mission includes programs at the doctoral level, the Council imposes additional requirements for student achievement. ACICS prescribes that "professional doc¬toral degrees are designed to make students experts in their fields and in the workplace. As such, the outcomes …involve using knowledge and techniques to purposefully address prob¬lems and opportunities in their workplace."

ACICS requires that doctoral degree course work "heightens the level of professional expertise in the area or field of study and an understanding of appropriate research methods." Research is intended "to apply technologies, knowledge, or concepts in a new way to a workplace problem." ACICS also requires "evidence that the coursework enables graduates to function/perform in the area or field of study." These elements must be evident in the programs' strategic plan, along with measures that define student success (Exhibit 1: Title III, Chapter 7, Section 3-7-100, p. 71). For institutions offering doctoral level programs under ACICS review since 2011, a substantial percentage of graduates derived employment benefit from the education. The student achievement of students reflects the unique characteristics of the population including citizenship status and professional experience (Exhibit 3: Profile of Doctoral Students and Graduates, 2011-2015).

ACICS standards have been compared to commonly accepted standards for doctoral programs of other recognized accrediting agencies and with degree requirements of regionally and nationally accredited institutions not accredited by ACICS. The analysis included admissions standards, curricular requirements, faculty qualifications, and instructional resource requirements of Middle States Association of Colleges and Schools, Western Association of Schools and Colleges, and the Distance Education Accrediting Council (Exhibit 5: Accrediting Agency Doctoral Standards Crosswalk).

Regional agencies are quite broad in stating their requirements compared to DEAC and ACICS. For example, regarding faculty credentials, one regional accreditor requires "faculty with credentials appropriate to the graduate curricula." Another regional accreditor calls for "at least 30 semester hours or equivalent at the post-baccalaureate graduate, or professional level."

The comparable ACICS standard requires: "All doctoral degree courses are to be taught by faculty possessing doctoral or terminal professional degrees from accredited institutions. These individuals also must demonstrate expertise in the field of study taught and possess applicable professional experience for participating in doctoral degree program. Faculty shall be assigned in terms of their major and minor areas of academic preparation, related professional experience, and appropriate required professional certification to practice in the field ... (Exhibit 1: Accreditation Criteria, Title III, Chapter 7, Section 3-7-502, p. 73-74)."

While regional accrediting agencies offer institutions wide freedom to establish standards that may take into consideration the nature of the discipline and the objectives of the program, ACICS requires 90 semester hours beyond a baccalaureate degree for a doctoral level credential. ACICS's requirements on institutional and program-level outcomes (retention rate, placement rate, graduate and employer satisfaction and student learning outcomes) are specific and must be reported annually.

When an institution seeks approval to add a program at the doctoral level, ACICS requires it to

demonstrate how the program compares with similar programs offered by other accredited institutions. The evidence also must include mission statement, an inventory of community resources and a comprehensive program description (Exhibit 48: Stratford University Doctoral Program Narrative). The comparison is reviewed by Council in reaching an accrediting decision, including the program's quality and comparability of specific program requirements, credit requirements, and other factors. The quality of the doctoral program is also evaluated through a quality assurance monitoring visit, which produces a team report, a school response, Council deliberations and an action letter (Exhibit 49: Globe University-Minneapolis RV Doctoral Program Team Report and ACICS

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |
| Exhibit 47 - Salter School-Tewksbury Renewal, p. 5 | Exhibit 47 - Salter School-Tewksbury Renewal, p. 5.doc |
| Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted | Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted.pdf |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015 | Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015.docx |
| Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk | Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk.xlsx |
| Exhibit 43 - Institutional Effectiveness - A Guide to Implementation page 10 | Exhibit 43 - Institutional Effectiveness - A Guide to Implementation page 10.pdf |
| Exhibit 44 - ITT 2014 CAR Report | Exhibit 44 - ITT 2014 CAR Report.pdf |
| Exhibit 45 - ITT Student Achievement Outcomes Letter | Exhibit 45 - ITT Student Achievement Outcomes Letter.pdf |
| Exhibit 46 - PIP Revision to CFI CEP | Exhibit 46 - PIP Revision to CFI CEP.pdf |
| Exhibit 48 - Stratford University Doctoral Program Narrative | Exhibit 48 - Stratford University Doctoral Program Narrative.pdf |

**Criteria:** 602.16(a)(1)(ii) Curricula

**Response:**

The quality of the curricula offered at the program and institutional levels is established by ACICS through multiple sections of its standards document, organized by credential level. In addition, curriculum quality requires active involvement of faculty through the governance of the institution (Exhibit 1: Accreditation Criteria, Title III, Chapter I, Section 3-1-501(c), p. 46). The quality of curriculum required for programs leading to certification or licensure are further defined as that which affords "students the opportunity to obtain the minimum skills and competencies to become certified, licensed or registered … (Ibid., Section 3-1-502 and Section 3-1-503, p. 46)".

In developing programs, ACICS requires institutions to pay particular attention to the quality of the curriculum in terms of "sequence of subjects leading to an occupational objective, an academic credential, or both." In addition, ACICS standards require objectives for each curriculum to be stated and published (Ibid., Section 3-1-513 (a), p. 48), and that the evaluation and revisions to curriculum relate to "community surveys" and other means for determining educational or employer needs (Ibid., Section 3-1-514, p. 48). ACICS also expects that curriculum at each credential level "quantitatively and qualitatively approximate the standards at other institutions offering" comparable credential programs (Ibid., Chapter 3, Section 3-3-203, p. 55).

In addition to standards of quality that apply generally to all curriculum and courses offered at ACICS institutions, the agency applies standards to curriculum at all credential levels; for courses and programs delivered through distance education (Ibid., Appendix H, Section II (Curriculum and Instructional Delivery), pgs. 119-120); and for direct assessment competency-based education (Ibid., Section I, (Curriculum Development and Direct Assessment Measures), pgs. 117-118).

ACICS standards address specific aspects of curriculum quality, including course sequencing (prerequisites), general education, courses in the major, objectives for each course and the support provided by the curriculum to the mission of the institution. Well-defined learning objectives and an appropriate sequence of course prerequisites are both required (Ibid., Title III, Chapter 1, Section 3-1-532(b), p. 50, and Section 3-1-513(b), p. 48) and must be described in the Catalog (Ibid., Appendix C, item 10(a), p. 103 and item 11(e), p. 104) and the Syllabus (Ibid., Glossary, p. 86). Standards for program objectives, the relationship of these objectives to the mission of the institution, the nature and content of courses in the major, and of general education requirements are prescribed in the "Educational Activities" sections for each credential level, including occupational and academic associate's degrees (Ibid., Title III, Chapter 3, Section 3-3-200, p. 55 and Chapter 4, Section 3-4-200, p. 59); Bachelor's (Ibid., Chapter 5, Section 3-5-200, p. 63); Master's (Ibid., Chapter 6, Section 3-6-400, p. 67) and Doctoral levels (Ibid., Chapter 7, Section 3-7-400, p. 72).

Standards for curricular quality are applied by ACICS in a number of ways: upon the review of new programs; as part of the renewal of accreditation process; in the review of complaints and adverse information; and during the review of annual program effectiveness data and reports. The curricula quality is evaluated initially when an institution seeks approval for a new program (Exhibit 48:

Stratford University Doctoral Program Narrative). Information regarding general education requirements , and the mix of instructional settings (lab, lecture, externship) is reviewed and verified during the initial application process and during subsequent onsite evaluation visits (Exhibit 51: Academic Credit Analysis).

The application of the curriculum-specific standards to initial applicants and institutions seeking renewal of accreditation is accomplished through the required self-evaluation (Exhibit 52: Self Study Narrative Template, Section 5, ps. 11-13) and the report generated by the site visit team (Exhibit 7: Team Report Template, Sections. 9.01-9.59, ps. 70-89). Changes to curriculum that are material to its quality must be reported to ACICS and approved either as a substantive change or as a non-substantive change (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, Section 2-2-121, p. 17). When a program at an institution falls short of standards regarding stated objectives, relevance to major field of study, general education component or other factors, the institution receives written feedback and is required to demonstrate that the finding has been remedied (Exhibit 53: Exhibit MSB Curriculum Finding, Team Report, Questions, 9.39 and 9.40, p. 4 - School Response, p. 6 - Council Deferral letter, p. 7 - School Response to Deferral Letter, p. 9-11).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 51 - Academic Credit Analysis | Exhibit 51 - Academic Credit Analysis.pdf |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1 | Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 48 - Stratford University Doctoral Program Narrative | Exhibit 48 - Stratford University Doctoral Program Narrative.pdf |
| Exhibit 50 - New Program Application Template | Exhibit 50 - New Program Application Template.pdf |

**Criteria:** 602.16(a)(1)(iii) Faculty

**Response:**

Requirements for faculty as an element of institutional quality at ACICS institutions reflect the unique mission and purpose of their programs, which emphasize professional, technical and occupational fields designed to lead to employment. Faculty engaged in delivering outcomes that fulfill that mission are expected to reflect appropriate educational backgrounds, professional experience, and participation in curriculum development and professional development activities.

General requirements for all institutions regarding faculty include their participation in the self-evaluation process (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-204, p. 7) and the onsite review by the accreditation team (Ibid., Section 2-1-205, p. 7). In addition, all institutions are expected to demonstrate they have "appropriate faculty" to implement the mission (Ibid., Title III, Chapter 1, Section 3-1-102, p. 37), be organized in a manner that promotes "understanding, cooperation, and responsibility" among faculty and staff (Ibid., Section 3-1-200, p. 39), and that faculty grasp their obligations, the standards by which their work will be evaluated, and the documentation of that evaluation (Ibid., Section 3-1-202(b), p. 40).

Regarding qualifications of faculty to teach assigned subjects and demonstrate knowledge in specific fields of study sufficient to provide effective instruction, ACICS requires that faculty "be academically and experientially appropriate to the subject matter they teach"; "competent to teach the subject matter being offered"; and have "reasonable latitude in their choice of teaching methods (Ibid., 3-1-541, p. 50)."

In addition to general standards applied to all institutions, the agency standards address faculty teaching load, preparation, subject preparation, assignments, stability and student-teacher ratio for each credential level awarded. Faculty standards specific to non-degree programs are included in Title III, Chapter 2, Section 3-2-100 p. 53. Comparable faculty standards specific to occupational associate's degree programs of study are prescribed in Title III, Chapter 3, Section 3-3-300, p. 56. Faculty standards specific to academic associate's degree programs of study are prescribed in Title III, Chapter 4, Section 3-4-300, p. 60. Faculty standards specific to bachelor's degree programs of study are prescribed in Title III, Chapter 5, Section 3-5-300 p. 64. Faculty standards specific to master's degree programs of study are prescribed in Title III, Chapter 6, Section 3-6-500, p. 68. Faculty standards specific to doctoral degree programs of study are prescribed in Title III, Chapter 7, Section 3-7-500, p. 73 (Exhibit 1: Accreditation Criteria).

Every main and branch campus must submit a self-evaluation, in order to renew accreditation, which includes a faculty staff summary sheet. The self-evaluation must include an explanation of the faculty involvement and contribution to the implementation of the institution's mission; how the institution ensures faculty clearly understand their duties and responsibilities; an explanation of how faculty are monitored and evaluated; and a description of how the administration provides for academic freedom of faculty (Exhibit 52: Self-Study Narrative Template, ps. 14-17). During an evaluation visit, the evaluation team reviews required documentation of faculty

qualifications and experience. The team also interviews staff, students and faculty to evaluate the institution's compliance with the faculty information contained in the self-evaluation. The findings of the team are memorialized in the team report template. Section 9 of the report focuses on compliance with faculty standards for each program offered by the institution as evaluated by subject specialists. Report questions in section 9 correspond to specific standards regarding faculty credentials, training, evaluation and development. (Exhibit 7: Team Report Template, ps. 72, 79-83).

Institutions are also required to establish and maintain documented evidence of faculty development plans and achievements, including in-service and professional growth activities. This information must be updated annually (Exhibit 1: Accreditation Criteria, Section 3-1-543, p. 5).

When an institution's faculty fails to meet minimum standards for experience, educational background, qualifications aligned with program of instruction, and other factors, ACICS directs the institution to remedy the finding in a timely manner and provide written evidence (Exhibit 54: California Miramar University Doctoral Program Team Report Citation, Question R.26 p 6; School Response, p. 9; and Council Approval Letter, p. 43).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 54 - California Miramar University Doctoral Program Team Report, School Response and Council Approval Letter 1_Redacted | Exhibit 54 - California Miramar University Doctoral Program Team Report, School Response and Council Approval Letter 1_Redacted.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.16(a)(1)(iv) Facilities/Equipment/Supplies

**Response:**

Certain tangible assets that support an institution in providing programs designed to educate students in professional, technical or occupational fields according to ACICS requirements must meet ACICS standards and expectations. The Council prescribes the requirements for facilities, equipment, supplies and other instruction materials in the context of career education that leads to employment.
Specifically, ACICS requires institutions to provide an environment "that is conducive to good instruction and learning" and "supports the educational programs offered by the institution." ACICS evaluates the sufficiency of the educational environment "against the demands made upon it by the curricula, faculty, and students (Exhibit 1, Accreditation Criteria, Section 3-1-600, Educational Facilities, pg. 51)."

Regarding the quality of support for the program of instruction, Council expects "facilities, instructional equipment, resources, support for modes of instructional delivery, and personnel" to be appropriate to the program (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-531, p. 50)." Regarding the capacity to support the program of instruction, ACICS requires "that the quantity and type of instructional material and equipment is proportionate to the size of the institution and the nature of the program (Ibid.)."

The Accreditation Criteria (Ibid., Section 3-1-600, p. 51) has specific requirements in subsections regarding plant and equipment and also requires that the plant shall meet general tests of safety, usefulness, cleanliness, maintenance, health, lighting, and compliance with local or state laws and code requirements. On-site evaluation teams verify that the institution presents satisfactory current fire and safety permits issued by the local government.

Regarding instructional resources, the Council prescribes requirement for instructional resources, audiovisual teaching equipment and instructional materials, including library resources. A general standard prescribes budget allocations and expenditures for instructional resources, equipment and materials (Ibid., Title III, Chapter 2, Section 3-2-200, p. 54).

The required level and quality of facilities, supplies, materials and equipment are prescribed in greater detail within the separate sections dedicated to each credential level (Ibid., Chapter 3, Section 3-3-402, p. 57; Chapter 4, Section 3-4-402, p. 61; Chapter 5, Section 3-5-402, p. 65; Chapter 6, Section 3-6-702, p. 69; Chapter 7, Section 3-7-702, p. 75). In addition, qualifications of library staff are prescribed under separate sections for each credential level. For example, institutions offering doctoral degree programs require a librarian to be professionally trained and with special qualifications "to aid students in research and is competent to use and to aid in the use of the library technologies and resources (Ibid., Section 3-7-701, p. 75)."

ACICS tests the institution's compliance with these requirements through specific sections of the self-evaluation report (Exhibit 52: Self-Study Narrative Template, Sections 6 and 8) during the

comprehensive review process (Exhibit 7: Team Report Template, Sections 6 and 8) and in reviewing complaints and adverse information in between comprehensive reviews.

Failure to demonstrate compliance with ACICS standards regarding support of the instructional program through sufficient tangible assets results in a finding that must be addressed by the program or institution in a timely manner (Exhibit 55: ITT Facilities, Team report and School Response).

Institutions offering distance education programs are required to provide an accessible and reliable learning management system and adequate technical support. All support services must be equivalent in quality and scope to those provided to students enrolled in ground-based programs. The Campus Effectiveness Plan must include the institution's plans for allocation of adequate resources to serve current and future numbers of distance education students to assure compliance with student achievement standards and student learning outcomes (Exhibit 1: Accreditation Criteria, Appendix H, Section II, ps. 119-121; Exhibit 7: Team Report Template, Section 10, Items H.25, H.28, H.29, H.31, and H.07).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 55 - ITT Facilities, Team report and School Response | Exhibit 55 - ITT Facilities, Team report and School Response.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.16(a)(1)(v) Fiscal/Administrative Capacity

**Response:**

The financial vitality and administrative capabilities of institutions offering programs that lead to professional, technical or occupational employment are subject to scrutiny and evaluation by ACICS before acceptance for initial accreditation based on audited financial information, every year based on formal financial reports and audited updates, and more frequently as appropriate when indications of financial or administrative weakness are discovered.

ACICS makes it clear that financial stability and administrative capability, particularly related to operational ethics, are integral to the evaluation of "the institution's overall educational quality … self-evaluated and judged by peers (Exhibit 1: Accreditation Criteria, Title I, Chapter 1, Introduction, p. 1)."

A number of factors are reviewed by the Council in evaluating an institution's financial and administrative capacity. Those factors include the size and scope of the operation, the continuity of service and the adequacy of resources to support instruction. A primary factor of evaluation is the sufficiency of resources "to accomplish its mission (Ibid, Title III, Chapter 1, Section, 3-1-203, p. 40)."

The application of those requirements for financial and administrative capacity occurs at various stages in the process of accreditation review. A current audited financial statement is required by the institution during the initial application process (Ibid., Title II, Chapter 1, Section 2-1-803, p. 11). These statements are reviewed by a qualified financial analyst and the institution must provide evidence of financial stability before completing the initial grant process. Institutions that cannot meet this threshold are not allowed to continue with the accreditation review (Exhibit 56: Sample Initial Applicants with Poor Financials Redacted).

In addition, every accredited institution must submit an Annual Financial Report (AFR) (Exhibit 57: AFR Template), including audited financial statements. The content and purpose of the AFR and audited financial statement are prescribed by the Council (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-802 and 2-1-803, p. 11). The Council prescribes in detail the dimensions of the annual financial report, guidelines for developing the report, timeframes for submittal, and financial penalties for non-compliance (Exhibit 58: www.acics.org -accreditation - annual financial report) (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-502, p. 31).

The AFR requires the institution to upload balance sheet and income statement information. ACICS' technology platform captures the data and uses it to calculate financial ratios that are disclosed to the institution. If the institution, based on the financial ratios, is exhibiting financial stress, it is afforded the opportunity to write an explanatory narrative (Exhibit 57: AFR Template, pgs. 9-11).

The annual financial reports and audited statements are reviewed by Council using a systematic rubric (Exhibit 59: FRC Scoring Rubric). Based on the numeric values derived from the scoring

rubric and other considerations, Council may require the institution to submit a quarterly financial report, a financial improvement plan, or both (Exhibit 60: QFR and FIP Template). In the event the financial analysis demonstrates substantial lack of financial stability, Council issues an order to show-cause (Exhibit 61: Bristol University Team Report, School Response, Council Show-Cause Letter, ps. 539-540). Institutions subject to financial review monitoring are not eligible for a maximum accreditation grant length (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-701, p. 10) and are required to receive permission from the Council prior to initiating a new branch campus (Ibid., Chapter 2, Section 2-2-104(a), p. 14).

When the Council discovers indications of financial or administrative weakness, such as adverse information received from other agencies including the Department of Education, Council may order quarterly financial reports, a financial improvement plan and a plan for the orderly closure of the institution that provides for the continuation and completion of the studies of all students currently enrolled (Ibid., Section 2-2-303, p. 19).

ACICS' standards regarding administrative capacity require that the institution must be led by individuals who are qualified, well-trained, and responsible for implementing the institution's stated mission (Ibid., Title III, Chapter 1, Section 3-1-300 and 3-1-301, p. 40). In addition, the standards require an emphasis on the efficiency and effectiveness of the administration, and that the administrative staff members are aware of their duties and responsibilities, and are evaluated based on these duties (Ibid., Section 3-1-202(a) and 3-1-202(b), p. 40).

Finally, integral to the evaluation of an institution for an initial or renewal grant is the review of its administrative capacity. That review begins with the self-evaluation (Exhibit 52: Self Study Narrative, Sections 2 and 3, ps. 4-7). During the comprehensive evaluation visit, the team reviews the self-study; interviews staff, faculty, and students; observes campus operations; and reviews documentation provided by the institution. The team's findings regarding administrative capacity of the institution is captured in specific sections of the report (Exhibit 7: Team Report Templates, Sections 2-3, ps. 8-14). When the Council determines that the institution is deficient in administrative capacity, based on a review of the team report and the school response, it will require the institution to come into compliance in a timely manner (Exhibit 61: Bristol University, Team Report p. 10, School Response p. 177, Council Action Letter, item 5, p. 526).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 56 - Sample Initial Applicants with Poor Financials_Redacted | Exhibit 56 - Sample Initial Applicants with Poor Financials_Redacted.pdf |
| Exhibit 57 - AFR Template | Exhibit 57 - AFR Template.pdf |
| Exhibit 58 - www.acics.org -accreditation - annual financial report | Exhibit 58 - www.acics.org -accreditation - annual financial report.docx |
| Exhibit 59 - FRC Scoring Rubric | Exhibit 59 - FRC Scoring Rubric.pdf |
| Exhibit 60 - QFR and FIP Template | Exhibit 60 - QFR and FIP Template.pdf |

| | |
|---|---|
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 46 - PIP Revision to CFI CEP | Exhibit 46 - PIP Revision to CFI CEP.pdf |

**Criteria:** 602.16(a)(1)(vi) Student Support Services

**Response:**

Students who enroll in programs designed to prepare them for employment in professional, technical and occupational fields have unique needs and expectations. ACICS expects that support services provided by member institutions directly address the unique economic circumstances and demographics of their students: compared to students participating in more traditional higher education programs, students attending ACICS colleges and schools are more likely to lack family financial support, have children at home, work fulltime, and have a household income that places them at or below the federal poverty level (Exhibit 62: APSCU Students profile).

Regardless of any unique demographics or economic characteristics, continuous awareness of the education experience of all students is a priority for the Council, reflected in its value statement at www.acics.org>about us: "ACICS is committed to the importance of a quality educational experience for all students."

The Council expects that student support services reflect "the highest ethical standard" and "conform to all applicable laws and regulations." The program of student support services provided by each institution must be consistent with its stated mission, including services provided to students attending branch campuses, learning sites, and enrolled in distance education classes and programs (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-400, p. 42).

At minimum, ACICS institutions are required to have one experienced person on staff to counsel students on personal or academic problems and job placement opportunities. Institutions are expected to have orientation activities to assist new students in adapting to the institution. In addition, ACICS expects the institution to have a system of educational, occupational, and personal advising, an emphasis on student success through retention and program completion, and documented employment assistance. Retention and completion are emphasized in these standards in terms of the students' "academic and socioeconomic characteristics." ACICS requires institutions to document the counseling they provide students regarding student loans (Ibid., Section 3-1-441, pgs. 45 - 46).

Another area of emphasis for ACICS standards regarding student services is the administration of financial aid. The Council acknowledges that participation in state and federal student financial aid programs requires "serious responsibility," and expects all institutions participating in federal or state student financial aid programs to be knowledgeable of and in compliance with applicable laws and regulations. ACICS requires institutions to have at least one professionally qualified administrative staff person and an appropriate set of financial controls (Ibid., Section 3-1-434, p. 44).

ACICS considers access to an effective grievance process integral to quality in student services. Institutions must establish, publish and implement policies and procedures for considering complaints received from students (Ibid., Section 3-1-202(d), p. 40). The grievance procedures must include publication of information regarding contacting ACICS.

Because careful recordkeeping is crucial to the effective operation of student support services, ACICS requires that all such records be available at each institutional site during evaluation visits. Council standards for recordkeeping include the requirement that all basic records and reports pertaining to students shall be safely protected from theft, fire, water damage, or other possible loss (Ibid., Section 3-1-303(a)(f)(g), p. 41).

The opportunities for ACICS to evaluate the quality and sufficiency of student services include review of the self-evaluation narrative (Exhibit 52: Self Study Narrative, Questions 4.7-4.21, ps. 9-10), observations, interviews and documents reviewed during site visits (Exhibit 7: Team Report Template, Questions 4.01-4.02, p.15) and the review of retention and placement outcomes derived from the annual Campus Accountability Report (CAR).

In addition, during on-site evaluation visits, students are requested to complete an online survey instrument that indicates their level of satisfaction with a variety of factors, including several that directly impact the quality of student services (Exhibit 63: Sample Student Survey).

Based on information derived from on-site visits, the review of adverse information or complaints, and annual CAR, if Council determines that the institution is not providing sufficient or appropriate student support services, it will require the institution to demonstrate compliance with this standard in a reasonable timeframe (Exhibit 61: Bristol University Team Report Question 4.61, p.23, School Response p. 316, Council Deferral Letter, Item 15, p. 527).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 62 - APSCU Student Profile | Exhibit 62 - APSCU Student Profile.pdf |
| Exhibit 63 - Sample Student Survey | Exhibit 63 - Sample Student Survey.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.16(a)(1)(vii) Recruiting & Other Practices

**Response:**

ACICS expects that integrity and ethical practices be applied to all aspects of the institutions' operations including the admission of students. Further, it requires that individuals assigned to recruitment and admissions duties will be selected "with the utmost care," and that they be trained adequately, supervised appropriately and evaluated effectively (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-202, pgs. 39-40). This standard applies to all institutions offering programs at all credential levels at all locations. In addition, ACICS has established and applies expectations regarding the integrity and accuracy of information shared with the public and prospective students regarding the effectiveness of the institution's programs.

ACICS has developed and applied accreditation standards that govern advertising and publications, catalogs, academic calendars, recruitment and admissions, and the enrollment and grading of students.

Regarding publications and advertising, ACICS standards stress "truth in advertising." In addition, publications must be professional and information must be accurate, factual and current (Ibid., Section 3-1-700, p. 51). The specific standards for the institutional catalog require among other elements disclosure of admission requirements, including the basis for admissions and requirements for certification, licensure or registration in the professional field (Ibid., Appendix C, pgs. 103-105).

ACICS prescribes that institutional marketing materials, including advertising, must be factual, and must present material "in a manner that avoids leaving any false, misleading, or exaggerated impressions with respect to the institution, its personnel, its courses and services, or the occupational opportunities for its graduates." In addition, the Council prescribes detailed requirements regarding all advertisements, endorsements, sales promotions, monetary incentives, and references to financial aid (Ibid., Title III, Chapter 1, Section 3-1-703, pgs. 51-52, and Appendix C, p. 106).

ACICS requires that institutions disclose in their catalog specific requirements for certification, licensing, or registration in the program's career field, where applicable (Ibid., Appendix C, Catalog 10(e), p. 104). For programs where state certification, licensing, or registration is mandatory, the curriculum "must contain the necessary course work to afford students the opportunity to obtain the minimum skills and competencies in order to become certified, licensed, or registered in that career field (Ibid., Title III, Chapter 1, Section 3-1-502, p. 46)."

ACICS has specific expectations regarding the disclosure and manner by which an institution recruits and admits students. The standards require that students admitted have achieved at a minimum graduation from high school or an equivalent. The standards also require that the institution's admission policy conforms to the institutional mission, is publicly stated, and is administered as written (Ibid., Section 3-1-411, p. 42). ACICS also requires that recruitment activities are "ethical and compatible" with the educational objectives of the institution, and that any individual engaged in the admissions or recruitment process "is communicating current and accurate

information regarding courses and programs, services, tuition, terms, and operating policies (Ibid., Section 3-1-412, pgs. 42-43)."

For all institutions, programs and campuses, ACICS requires all institutions to develop and publish in the catalog a policy that measures whether students are progressing satisfactorily in their program. Included is the requirement that the institution must monitor whether a student meets the minimum qualitative and quantitative components of the standards of satisfactory academic progress (Ibid., Appendix D, pgs. 108-110).

The opportunities for ACICS to test the fidelity of an institution's performance to these standards of integrity include the review of the self-evaluation document (Exhibit 52: Self-Study Narrative Template, Sections 4, ps. 8-9, Section 7, p. 19), observations, interviews, file reviews and anonymous student surveys (Exhibit 63: Sample Student Survey) conducted during a site visit, and recurring evaluations of online representations made by the institution; these online reviews occur between comprehensive evaluations.

The student surveys ask specific questions about the admissions and recruiting process. The evaluation team uses the results of the surveys to determine if there are any concerns with the institution's practices regarding admissions and recruitment, as well as issues regarding advertising and publications, catalogs, academic calendars, and grading of students. Based on findings of the evaluation team as memorialized in its report and the institutions response, if the Council determines that the institution is not conducting its recruitment and admissions of students according to standards, it is subject to deferrals or other sanctions (Exhibit 64: MJI Team Report, Questions 7.10 and 7.17, ps. 22-23; School Response ps. 1498 and 1514; Council Deferral Letter, Items 7 and 8, p. 1750).

In addition, and supplemental to the comprehensive review conducted during a reaccreditation visit, ACICS monitors whether institutions are providing accurate information regarding their student achievement performance as required by Council (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-704, p. 52). Guidance regarding appropriate and ethical disclosures has been provided to all institutions (Exhibit 65: ACICS Best Practices - Institutional Student Achievement Disclosure Information). The best practices are used as a point of reference in reviewing the online publication of student achievement performance (Exhibit 66: ACICS Disclosure Verification Program Instructions and Spreadsheet 2015).
Finally, if and when ACICS receives information from an oversight partner agency regarding the disclosures of an institution, ACICS requires a satisfactory response from the institution (Exhibit 67: BPC Adverse Report, December 2015).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 63 - Sample Student Survey | Exhibit 63 - Sample Student Survey.pdf |

| | |
|---|---|
| Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers | Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers.pdf |
| Exhibit 65 - ACICS Best Practices - Institutional Student Achievement Disclosure Information | Exhibit 65 - ACICS Best Practices - Institutional Student Achievement Disclosure Information.pdf |
| Exhibit 66 - ACICS Disclosure Verification Program Instructions and Spreadsheet 2015 2 | Exhibit 66 - ACICS Disclosure Verification Program Instructions and Spreadsheet 2015 2.pdf |
| Exhibit 67 - BPC Adverse Report, December 2015 | Exhibit 67 - BPC Adverse Report, December 2015.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.16(a)(1)(viii) Program Length

**Response:**

ACICS acknowledges the close relationship between program quality and the length and content of programs as those factors apply to post-secondary education intended to result in employment. The relationship is defined and emphasized through Council standards that apply in general to all programs, and that are prescribed in detail for specific credentials and types of programs. Of primary concern to ACICS are program attributes in relationship to "institutional mission, program objectives and content, types and locations of instructional delivery, knowledge and skills necessary for students to reach competence, and additional requirements that may be placed upon a graduate for employability, including, if applicable, certification or licensure (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-807, p.11)."

Also of concern is that program content and length have demonstrable comparability to similar programs offered at other accredited colleges and schools. ACICS standards for course and program measurement are spelled out in Council policy documents (Ibid., Title III, Chapter 1, Section 3-1-516(a), pgs. 48-49). Using the standard "Carnegie" definition of a credit hour and commonly accepted practice for relating the clock hours of lecture to laboratory to practicum, the agency standard requires that one quarter credit hour equals, at a minimum, 10 classroom hours of lecture (plus out-of-class student work), 20 hours of laboratory and 30 hours of practicum. One semester credit hour equals, at a minimum, 15 classroom hours of lecture (plus out-of-class student work), 30 hours of laboratory and 45 hours of practicum.

ACICS develops and revises the standards periodically by collecting and analyzing data about program length in contact hours, and other factors, from each institution every year. The Council compares that data to its benchmarks. The information is published and made available to the public through www.acics.org (Exhibit 17: 2014 Summary of Key Operating Statistics (KOS), pg. 15). An institution with a program length of more than one standard deviation above or below the mean for similar programs must provide a written explanation to the Council that addresses the basis for the variance. Explanations that fail to demonstrate acceptable justification for the variance are subject to "on-site evaluation, a compliance warning, or the withholding of inclusion of the program from the institution's current grant of accreditation (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-807, p.11)."

When the Council encounters a program whose length is abnormally long or brief, it notifies the institution and requires explanation for the variance (Exhibit 68: Sanford Brown Program Review, ps. 1, 4-5).

The relationship between education quality and program length and content is further prescribed by ACICS's standards that address indicators and expectations at each credential level. For example, ACICS requires that academic associates' degree programs, a credential level that served about 18 percent of students enrolled in 2014 (Exhibit 17: 2014 Key Operating Statistics, pg. 5) must contain a minimum of 60 semester hours, 90 quarter hours, or their equivalent normally earned over a period

of four semesters, six quarters, or the equivalent.

The standards also specify the content proportions, concentration area and general education. For example, ACICS requires that an academic associate's degree contain "a minimum of 30 semester hours, 45 quarter hours, or their equivalent in courses within the areas of concentration; and a minimum of 15 semester hours, 22.5 quarter hours, or their equivalent in general education courses (Exhibit 1: Accreditation Criteria, Title III, Chapter 4, Section 3-4-202, p. 59)."

To further define and prescribe quality of program design, ACICS specifies that courses within the area of concentration cannot be applied toward fulfillment of general education requirements; courses that fulfill the concentration versus general education requirements must be described in the institutional catalog, and the institution must provide an explanation of its course numbering system.

ACICS further requires the institution to provide general education offerings that emphasize "principles and theory … not practical applications associated with a particular occupation or profession. General education courses give balance to the total program and must be appropriate for the program and the needs of the students (Ibid.)." The Council's expectations for general education courses, including humanities, mathematics and the sciences, and social sciences, are defined as "areas of learning which are deemed to be the common experience of all "educated" persons (Ibid., Glossary, pgs. 81-82)."

The length and content requirements for awarding a bachelor's degrees, master's degrees and doctorate degrees are specified in the sections for each credential (Ibid., Title III, Chapter 5, Section 3-5-202, p. 63; Chapter 6, Section 3-6-403, p. 67; Chapter 7, Section 3-7-403, p. 72). Credit awarded for courses or programs delivered through nontraditional means (e.g., distance education or independent study) frequently use alternate but equivalent methods of credit calculation. The rationale used must be submitted to the Council for pre-approval of the credit calculation, and the institution must demonstrate the clock or credit hours awarded are appropriate for the degrees and credentials offered, for example by demonstrating that students completing these programs or courses have acquired equivalent levels of knowledge, skills, or competencies to those acquired in traditional formulas (Ibid., Chapter 1, Section 3-1-516(b), p. 49).

For non-traditional education activities that involve a mix of in-person and on-line delivery modalities, ACICS requires the institution to clearly delineate the types of online activities that will augment the in-person activities when it first proposes the new program for inclusion under the grant of accreditation, including "a detailed description of the on-line educational activities: faculty-student interaction, student-student interaction, assignments, testing and evaluation (Exhibit 69: MRC - DE Approval Letter, p. 2, and Application, p. 5).

Specific elements of the self-evaluation documentation and the team report enable the on-site evaluators to review and compare the effective implementation of the program with that of the approved program design (Exhibit 52: Self Study Narrative Template, Section 5, p. 11; Exhibit 7: Team Report Template, Section 5, Question 5.19, p. 39). When the Council encounters programs that fail to meet these requirements, the institution is notified in writing and compelled to make timely adjustments to program length, content or methods of measuring credit hours. (Exhibit 53: MSB Curriculum Finding, Team Report, Questions 9.39 and 9.40, p. 4, School Response, p. 6,

Council Deferral Letter, p. 9, School Response to Deferral Letter, p. 11).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1 | Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1.pdf |
| Exhibit 68 - Sanford Brown Program Review Redacted | Exhibit 68 - Sanford Brown Program Review Redacted.pdf |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 1 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 1.pdf |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 2 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 2.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 17 - 2014 Summary of Key Operating Statistics | Exhibit 17 - 2014 Summary of Key Operating Statistics.pdf |

**Criteria:** 602.16(a)(1)(ix) Student Complaints

**Response:**

The timely and effective resolution of complaints from students enrolled at ACICS colleges and schools is given strong emphasis by the Council through its structure, policies and procedures. This emphasis is in part derived from the Council's public emphasis on conducting accreditation in a manner that values "the importance of a quality educational experience for all students (Exhibit 12: www.acics.org-About Us-Mission Statement, Value)."

Structurally, the Council dedicates the resources and deliberations of one standing committee to the review of student complaints and other adverse information. The committee meets three times a year to review and consider complaints from students regarding member institutions in order to "ensure integrity and ethical relations, and to foster cooperation among institutions on behalf of students (Exhibit 1: Accreditation Criteria, Appendix A, Article V, Section 1(b), p. 95)." The in-depth review of institutional complaints and adverse information by the committee may result in recommendations to the full Council to order an on-site review supplemental to the recurring reaccreditation review; it may also produce changes to the Council's policies in response to deficiencies derived from students or adverse information (Exhibit 71: Excerpt of BPC Report, MJI, December 2012; MJI Renewal Grant Evaluation and Special Visit Letter; Exhibit 1: Accreditation Criteria, Appendix J, p. 126).

The incidence and severity of complaints from students are given weight by Council in its review and decision-making regarding a number of aspects of the operations of member institutions. They are considered during the review and approval of realignment of campuses (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, Section 2-2-202, p. 18). Also, complaints are considered by the Council to augment information discovered through the comprehensive accreditation evaluation of institutions, and as such are subject to certain actions if the complaint is not resolved to the satisfaction of the Council (Ibid., Chapter 3, Section 2-3-700, p. 34).

Students with complaints against member institutions have access to an on-line submittal portal that provides an expedient and comprehensive method of establishing the basis of their concern. The website offers substantive and procedural guidance to students regarding the timely and effective resolution of their issues (Exhibit 72: www.acics.org - Home - About Us - Complaint Procedures).

After reviewing an analysis of the complaint, including the institution's effort to resolve the matter and applicable standards, the Council decides if the complaint merits conditioning of the grant of accreditation, requires more information from the institution, or dismissal based on the information provided (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-700 (a)(b)(c), p. 34).

ACICS standards prescribe that the primary responsibility for complaint resolution lies with the institution, and that the institution must have and apply a complaint policy that complies with Council standards (Ibid., Title III, Chapter 1, Section 3-1-202(d) on p. 40). A fundamental element of the review of the complaint by ACICS is a determination of whether or not the student had

utilized the institution's complaint process and resources (Ibid.). The student (complainant) receives follow up communication; when the Council discovers evidence of non-compliance with specific ACICS standards, it can require a special visit which produces a report. The campus is provided an opportunity to respond to the report (Exhibit 73: Laurus College Complaint Case 1).

Complaints and adverse information are shared in advance with members of the comprehensive on-site evaluation team; they are informed about the severity and persistence of complaints against the institution. The information helps shape the focus of the evaluation visit as appropriate (Exhibit 61: Bristol University Team Report, School Response, Council Show-Cause Letter).

If an on-site team finds the institution's student grievance policy or practices out of compliance with Council standards, it will document the finding and require the institution to respond (Exhibit 7: Team Report Template, Questions 2.06 and 2.07, p. 9).

Copies of correspondence between ACICS and the institution regarding complaints are maintained on file. The information is taken into consideration as part of the review of an institution's request for renewal of accreditation or other substantive changes. The Council is made aware of open complaints or adverse information in a methodical way, and is provided access to the institution's files, which include in-depth information about the nature and resolution of past complaints (Exhibit 74: 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 71 - Excerpt of BPC Report, MJI, December 2012; MJI Renewal Grant Evaluation and Special Visit Letter | Exhibit 71 - Excerpt of BPC Report, MJI, December 2012; MJI Renewal Grant Evaluation and Special Visit Letter.pdf |
| Exhibit 72 - www.acics.org - Home - About Us - Complaint Procedures | Exhibit 72 - www.acics.org - Home - About Us - Complaint Procedures.docx |
| Exhibit 73 - Laurus College Complaint Case 1 | Exhibit 73 - Laurus College Complaint Case 1.pdf |
| Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet | Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet.docx |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 12 - www.acics.org-About Us-Mission Statement, Value | Exhibit 12 - www.acics.org-About Us-Mission Statement, Value.JPG |

**Criteria:** 602.16(a)(1)(x) Title IV Responsibilities

**Response:**

A substantial proportion of member institutions participate in federal student aid programs under Title IV of the Higher Education Act. ACICS develops and applies standards regarding compliance with Title IV regulations during its accreditation evaluations. The requirements are integrated throughout ACICS standards. They are included in sections that pertain to fraud and abuse (Exhibit 1: Accreditation Criteria, Appendix G, pgs. 114-115), the rate at which students default of education loans (Ibid., Title II, Chapter 1, Section 2-1-810, p. 12), admissions and recruitment (Ibid., Title III, Chapter 1, Section 3-1-410, p.42), course and program measurement (Ibid., Section 3-1-516(b), p. 48), policies that ensure satisfactory academic progress (Ibid., Appendix D, pgs. 108 - 110), appropriate structure of ESL (English as Second Language) programs (Ibid., Appendix F, pgs. 112-113), non-traditional programs (including those delivered on-line, and direct assessment/competency based programs) (Ibid., Title II, Chapter 2, Section 2-2-111, p. 16 and Appendix H, p. 116); contracts and agreements with other accredited institutions (Ibid., Section 2-2-504, p. 24), and complaints and adverse information (Ibid., Chapter 3, Section 2-3-700, p. 34).

In addition, ACICS provides prescriptive guidance to member institutions regarding the scope of its recognition and the accreditation of doctoral degrees, and the current exclusion of those programs for Title IV participation: "The current scope of recognition … as approved by the U.S. Department of Education … includes diploma programs and degree programs through the Master's degree. Therefore, accreditation of a doctoral program by ACICS does not make the program eligible for purposes of participation in federal student aid programs (Ibid., Title III, Chapter 7, Introduction, p. 71)". A doctoral level program approved by ACICS receives written notification of the disclosure requirements regarding ineligibility of its students to participate in Title IV programs (Exhibit 75: Globe Doctoral ACICS letter, p. 2).

ACICS requirements for compliance with the Department's Title IV regulations regarding "fraud or abuse" prescribe that the agency will notify the Department of any institution it believes "fails to comply." Specifically, institutions are reviewed regarding "systemic noncompliance" with respect to the Department's definition of credit hour or significant noncompliance regarding conformity with commonly accepted practice in the assignment of credit hours to one or more programs at the institution (Exhibit 1: Accreditation Criteria, Appendix G, Item 4, ps. 114-115). The institution is provided the opportunity to demonstrate its compliance.

Regarding the institutions' Cohort Default Rates, a standing committee of the Council reviews the information provided by the Department each year and applies that information in evaluating financial stability. Institutions with rates of more than 30 percent for even a single year are subject to additional monitoring and reporting (Exhibit 80: FRC Dec 2015 Minutes, Item E. p. 8). Council requires those institutions to develop and submit a default rate improvement plan which must include counseling of students concerning loan repayment obligations (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-441(d) p. 45), occupational advising, retention and program completion activities, and employment assistance (Exhibit 77: Daymar College (10142) ACICS

CDR DRIP letter; Exhibit 78: Daymar College DCG Default Plan FY12).

Since the Department established new regulations regarding 3-year Cohort Default Rates, ACICS has conducted recurring outreach to member institutions regarding compliance with CDR requirements. The outreach effort encouraged institutions to address and improve default rates (Exhibit 79: Letter from Dr. Gray, ACICS, Regarding ED Illustrative trial three-year CDR data). The average rate of CDR among ACICS institutions was 19.3 percent in 2010; it has declined to 16.3 percent in 2012.

An institution's default rate is included in Council considerations of its request for a renewal grant. The CDRs for the past three years are summarized and shared with the institution's primary file reviewer during the Council meeting (Exhibit 74: 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet, p. 1).

The Council also reviews adverse information received from the Department derived from financial or compliance audits, programs reviews, or other information. The Council may require additional information, conduct a special visit, issue a compliance warning or a show-cause directive (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-700, p. 34). The institution is directed to respond directly to the issues that led to adverse action by the Department's Federal Student Aid division and identify its actions to resolve the issues and come into compliance with ACICS standards for financial sustainability (Exhibit 81: ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS).

In addition, ACICS serves as an important resource to Title IV Program Participation teams who request information about the accreditation status of member institutions on a regular basis. Those requests are fulfilled promptly and effectively (Exhibit 116: Table of PPT Information Requests, 2013-2015).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet | Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet.docx |
| Exhibit 75 - Globe Doctoral ACICS letter | Exhibit 75 - Globe Doctoral ACICS letter.pdf |
| Exhibit 77 - Daymar College (10142) ACICS CDR DRIP letter | Exhibit 77 - Daymar College (10142) ACICS CDR DRIP letter.pdf |
| Exhibit 78 - Daymar College DCG Default Plan FY12 | Exhibit 78 - Daymar College DCG Default Plan FY12.docx |
| Exhibit 79 - Letter from Dr. Gray, ACICS, Regarding ED Illustrative trial three-year CDR data | Exhibit 79 - Letter from Dr. Gray, ACICS, Regarding ED Illustrative trial three-year CDR data.pdf |
| Exhibit 80 - FRC Dec 2015 Minutes | Exhibit 80 - FRC Dec 2015 Minutes.pdf |
| Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS | Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS.pdf |

| | |
|---|---|
| Exhibit 116 - Table of PPT Information Requests, 2013-2015 | Exhibit 116 - Table of PPT Information Requests, 2013-2015.xlsx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.16(a)(2) Preaccreditation Standards

**Response:**

ACICS does not offer pre-accreditation to any institution or program. The Council prescribes the steps for receiving initial accreditation as including preliminary review, application, resource visit, and self-evaluation. (Exhibit 1: Accreditation Criteria, Section 2-1-200, p. 6)

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.16(b)(c) Distance/Correspondence Education

**Response:**

ACICS currently has within its scope the accreditation of distance education programs and institutions. The Council is not seeking a change in this status.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(a) Mission & Objectives

**Response:**

Five sections of the agency's standards articulate ACICS's clear expectations of an institution concerning its performance and effectiveness compared to mission, achievement of defined objectives, and conformity of programs to commonly accepted standards. The categories of standards applied in the context of educational objectives include the organization of the institution (Exhibit 1: Accreditation Criteria, Section 3-1-200, p. 39), the financial stability of the institution (Ibid., Section 3 1 203, p. 40), the manner in which the institution recruits and admits students (Ibid., Section 3 1 412, p. 43), the sufficiency of instructional resources and materials (Ibid., Section 3-2-200, p. 54), and policies ensuring satisfactory academic progress of students (Ibid., Appendix D, p. 108).

Additionally, changes to an institution's mission are considered substantive; the new mission must be reviewed and approved by the Council in conjunction with the institution's request for expansion of scope (Ibid., Section 2-2-101(a), p. 13).

ACICS expects that all institutions have a clearly specified mission that is supported by career objectives, programs that support said mission and conform to commonly accepted standards. To be eligible for accreditation by ACICS the institution's mission must be "to offer educational programs that help students develop skills and competencies to enhance their careers (Ibid., Section 1-2-100(c), p. 2)." In addition, the Council clearly directs all institutions to develop and disclose explicit elements of its mission, purpose and objectives, including "substantial" devotion to career related education. The objectives for the institution must demonstrate reasonableness for "the program of instruction, mode of delivery and facilities," regardless of single-purpose or multi-purpose mission (Ibid., Section 3-1-100, p. 37).

ACICS' effective evaluation of quality in terms of mission and purpose requires a thoughtful review of the institution's effectiveness plan, which must describe how it continuously improves its programs and processes, the outcomes to which it aspires, and the types of data it will use to measure those outcomes (Ibid., Section 3-1-111, p. 38). In addition to financial stability and compliance with state and federal laws, ACICS institutions are expected to demonstrate effectiveness in terms of student achievement outcomes which include retention, placement, graduate and employer satisfaction, and indications of student learning, including licensure pass rates where applicable. The goals for placement and retention must be published by each campus and subject to review by ACICS.

The Council has a number of opportunities to evaluate the integration of the institutional mission with all components of operations. The impact of the mission on institutional quality is evaluated for an institution's initial grant or during reevaluation of accreditation. The institution's plans for effective implementation and inclusion of new activity (expansion of scope, new locations, etc.) is also evaluated in the context of published mission and purpose.

At the beginning of the accreditation process, the institution's self-evaluation narrative requires disclosure and explanation of its mission and educational activities (Exhibit 52: Self Study Narrative Template, ps. 2-3 and 11). The review of the Campus Effectiveness Plan (CEP), which is based on the institution's mission, is assigned to the chair of the review team, who is a veteran evaluator with substantial experience in conducting accreditation on-site reviews. The evaluation focuses on the campus's overall effectiveness at achieving its mission and the degree to which it meets its own predetermined outcomes. In addition, the evaluation of overall educational activities requires that program offerings are consistent with the mission and that the faculty is adequate to ensure, through outcomes, that the institution is achieving its mission (Exhibit 7: Team Report Template, question 5.14, p. 38-39, and question 5.31, p. 44).

Likewise, the evaluation of a new program application requires that the institution's objectives at each credential level to be in congruence with the institutional mission. For example, institutions offering academic associate's degrees are required to have program objectives that reflect the application of an institution's mission: "An institution applying for the inclusion of an academic associate's degree program shall demonstrate that its programs, courses, and services are appropriate to its mission and to its specific goals and objectives (Exhibit 1: Accreditation Criteria, Section 3-4-201, pg. 59)." The application of this requirement is accomplished through the documentation required from an institution seeking approval of a new program, or one at a higher credential level, or a program that outside of its current scope of accreditation (Exhibit 50: New Program Application Template, p. 3)."

The Council also requires that program design, including degree requirements, conform to commonly accepted standards, at each degree level, and that the curriculum for the program quantitatively and qualitatively approximate the standards in effect at other collegiate institutions with programs at that level (Exhibit 1: Accreditation Criteria, Sections 3-3-203, p. 55; 3-4-203, p. 99, and 3-5-203, p. 63). Instructional procedures, texts, and materials must be appropriate to the purposes, curriculum, and standards of collegiate institutions. Through the team report and the school response, the Council is able to evaluate how an institution is achieving its stated objectives and whether its educational requirements comply with commonly accepted standards (Exhibit 7: Team Report Template, Section 9, question 9.35, p. 83; question 9.40, p. 85; question 9.46, p. 86; and question 9.53, p.88).

When an institution fails to demonstrate how its effectiveness planning or implementation fulfills its published mission, purpose or goals, Council requires a response to the finding and evidence of appropriate adjustments to its operations (Exhibit 61: Bristol University Team Report, School Response, Council Show-Cause Letter, question 1.09, p. 7, question H.07, p. 56, School Response p. 167, Council Action Letter, item 2, p. 525).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |

| | |
|---|---|
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 50 - New Program Application Template | Exhibit 50 - New Program Application Template.pdf |

**Criteria:** 602.17(b) Self-Study

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(c) On-Site Review

**Response:**

One of the primary ways in which ACICS collects empirical data regarding the quality and integrity of institutions and programs is the deployment of on-site review teams which visit every campus at least once during the accreditation cycle. The average ACICS accreditation grant length is 3-4 years; the maximum is six years (Exhibit 1: Accreditation Criteria, Section 2-1-701, p. 10). In addition to on-site visits that compare the content of self-evaluations with evidence encountered in person during an initial or renewal cycle, the Council may order a team visit if "it has received adverse information or when general operations of the institution may be called into question (Ibid., Section Appendix B, p. 101)," or to monitor the quality of a substantive change (Ibid., Section 2-2-102, p. 13), including the establishment of new campuses (Ibid, Section 2-2-110 (a), p. 15), the reassignment or consolidation of campuses (Ibid., Section 2-2-202, p. 18), or a change in location (Ibid., Section 2-2-602, p. 26).

All of these considerations apply to the evaluation of doctoral level programs by ACICS, even though those evaluations have occurred outside of its formal recognition. ACICS has reviewed the quality and integrity of several institutions offering the Doctor of Computer Engineering degree or the Doctor of Business Administration degree. Only institutions that have offered other graduate-level programs and demonstrated a basis for community and employer support were allowed to launch doctoral programs. Since 2005, the review of those programs has involved quality monitoring visits to at least eight institutions in three states serving more than 80 graduates (Exhibit 3: Profile of Doctoral Students and Graduates, 2011-2015). The quality monitoring visits were conducted by subject specialists who hold doctoral credentials and extensive practical experience (Exhibit 54: California Miramar University Doctoral Program Team Report, p. 3, School Response and Council Approval Letter 1).

When an ACICS institution initiates accreditation review of a professional doctoral program, it must demonstrate during the application review that it is eligible, under ACICS standards, to initiate the substantive change; that its mission and objectives align with offering a program at the professional doctoral level; that is has approval from the state licensing authority; that it has successfully engaged in offering graduate-level programs; that it has financial stability and administrative capability to support the program; that a need for the program exists; that the program's admissions policy complies with ACICS standards; that the curricular content is comparable to those of other accredited institutions; that the institution has established professional work settings for conducting applied and practical research; that the qualifications of the designated program director and program faculty are appropriate and sufficient; and that the instructional facilities and instructional resources (including library resources) are sufficient to offer doctoral-level programs (Exhibit 48: Stratford University Doctoral Program Narrative) (Exhibit 82: Stratford University - Council Approval to Expand the Institutions Scope of Accreditation Letter ).

In order to accurately disclose to students and the general public the status of the doctoral program accreditation, institutions offering doctoral programs are required to publish a standard statement

which is included in the doctoral program approval letters (Ibid.).

The size, composition and responsibilities of all on-site review teams, including those who review doctoral-level programs, are prescribed in the Council's published policy document. Among other considerations a team visit occurs after the institution has "submitted a satisfactory self-study," and the team is composed of "educators, executives and practitioners," (Exhibit 1: Accreditation Criteria, Section 2-1-400, 2-1-401, p. 8). In addition, on-site review team composition is based on "type and size of the institution, programs offered, mode of educational delivery," and other factors (Ibid., Section 2-1-402, p. 8).

The Council also prescribes team functions and procedures. The scope of the visit depends on program offerings, and the team is required to verify information in the self-study and to report on its observations of the institution's performance relative to its mission (Ibid., Section 2-1-501, 2-1-502, p. 9). Among the required procedures the team is expected to consult with faculty, administrators, students and the chief on-site administrator. It is expected to document its observations and interviews in writing, contribute to a comprehensive team report that is conveyed to ACICS and the institution (Ibid., Section 2-1-503, p. 9).

ACICS provides extensive resources to train and orient members of its on-site evaluation teams regarding Council standards, the interpretation of those standards, the accreditation process, and the significant contribution that effective team reports make to Council deliberations (Exhibit 28: Evaluator Training Packet, ps. 2, 3, 5, 8, 34, 36). The breadth and depth of a typical team report applied to an institution offering doctoral-level programs provides written findings to the institution (Exhibit 54: California Miramar University Doctoral Program Team Report, p. 8, School Response and Council Approval Letter 1).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 82 - Stratford University - Council Approval to Expand the Institutions Scope of Accreditation Letter | Exhibit 82 - Stratford University - Council Approval to Expand the Institutions Scope of Accreditation Letter.pdf |
| Exhibit 54 - California Miramar University Doctoral Program Team Report, School Response and Council Approval Letter 1_Redacted | Exhibit 54 - California Miramar University Doctoral Program Team Report, School Response and Council Approval Letter 1_Redacted.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015 | Exhibit 3 - Profile of Doctoral Students and Graduates, 2011-2015.docx |
| Exhibit 28 - Evaluator Training Packet | Exhibit 28 - Evaluator Training Packet.pdf |
| Exhibit 48 - Stratford University Doctoral Program Narrative | Exhibit 48 - Stratford University Doctoral Program Narrative.pdf |

**Criteria:** 602.17(d) Response to Site Review

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(e) Agency Analysis of Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(f) Report on Compliance & Student Achievement

**Response:**

Integral to the Council's effective evaluation of institutional quality and integrity is the evidence and data encountered during on-site visits through observations, interviews and reviews of documentation. ACICS places great emphasis on the completeness and rigor of the written reports generated by the on-site visit teams. The Council expects the report to cover "each area reviewed…and other information pertinent to an accurate evaluation." The substance of that report must include any findings of material non-compliance with standards. It may also include "recommendations for institutional improvement (Exhibit 1: Accreditation Criteria, Section 2-1-503, p.9)." The team report is shared with the institution's "chief onsite administrator" who is invited to respond to any findings in writing (Ibid., Section 2-1-601, p. 9).

ACICS utilizes a team report format whose structure parallels the structure of its standards document, and reflects the structure of the self-study report. Sequentially the template reports on the institution's planning and performance relative to its published mission and purpose; general education standards applicable to all institutions; and standards for each program and credential level. The on-site evaluation team uses the information in the self-study as a point of reference in completing the team report and assessing the program's and institution's compliance with standards. Every item of inquiry is cross-referenced in the team report to the corresponding section of the ACICS standards (Exhibit 7: Team Report Template).

A completed team report as defined by ACICS answers in writing all applicable questions, summarizes the findings in terms of specific criteria, and identifies which findings require an institutional response. When the institution receives the team report, it is afforded the opportunity to respond to the team's findings by a certain date (Exhibit 83: Everest Woodbridge Team Report, ps. 1, 38). The team report and the institutional response are packaged together for review by Council (Exhibit 64: MJI Team Report, School Response, p. 42, Council Action Letter).

The Council reviews the team report and the institutional response to determine whether the institution has resolved the findings. For institutions or programs with unresolved findings, Council deliberations focus on how profoundly the institution is non-compliant; the institution's ability to come into compliance in a timely manner not to exceed established maximums; and the type of additional documentation necessary to make an informed decision (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Introduction, p. 27). The Council's action letter identifies the specific standard at issue and specifies the documentation necessary in order for the institution to resolve the finding (Exhibit 64: MJI Team Report, School Response, Council Action Letter page numbers, p. 1750).

As an element of its review of institutional effectiveness, ACICS evaluates indicators of student achievement through the comprehensive on-site visit as well as through accountability reports submitted by each institution, for each program, every year. At minimum, ACICS requires every program and institution to plan for, operate and collect data regarding retention performance and placement performance. In the category of "student learning outcomes," Council also requires that

data regarding program level licensure/certification pass rates be collected, reported and evaluated each year for programs where licensure is required to gain employment (Exhibit 1: Accreditation Criteria, Section 3-1-111, p. 38). These are the primary elements of student achievement established by the Council (Ibid., Section 3-1-111, p. 38).

The review of student achievement performance through the comprehensive site visit begins with institutional self-evaluation as reflected in the Campus Effectiveness Plan (CEP). On an annual basis, the institution is expected to integrate student achievement rates (as reported to ACICS in the Campus Accountability Report (CAR)) with its effectiveness plan for the campus and each program, and to revise and update the CEP accordingly (Exhibit 84: Sample Campus Effectiveness Plan, p. 23).

The institution is required to revise the CEP with an improvement plan for any program below benchmark in retention, placement, or licensure pass rates. During the comprehensive on-site visit, the evaluation team reviews the CEP to determine if the campus has developed and is implementing revisions to its operations that appropriately address its deficiencies in student achievement (Exhibit 85: ITT Tech-Philadelphia, Team Report, Question 1.10, p. 6, CEP Citation, School Response, p. 37, and Council Action Deferral Letter, p. 93).

In addition to the review of student achievement as part of the on-site visit and team report, Council evaluates student achievement data on an annual basis through the CAR. The Council expects institutions to be in compliance with published student achievement measures. When Council determines student achievement is below standard, it "will require the institution to add an Improvement Plan within its CEP... and issue a compliance warning and require the institution to demonstrate compliance (Exhibit 1: Accreditation Criteria, Section 2-1-809, p. 12)." Numerical standards for student achievement are disclosed publicly (Exhibit 86: ACICS Student Achievement Rates and Definition of Placement - ACICS Webpage).

The Council's review of CAR data is a formal, structured annual activity that determines, based on current benchmarks, whether the campus or program is performing according to ACICS standards. Based on the review, ACICS notifies the institution of the actions it must take to remedy the deficiencies (Exhibit 86: Due Process for Student Achievement Standards Table; Exhibit 94: CAR template for student achievement below standards and letters). When a campus or program does not come into compliance within Council's time frame, the campus or program is provided a letter of withdrawal that details the area of noncompliance and provides appeal procedures (Exhibit 94: CAR template for student achievement below standards, CAR Withdrawal Letter Template, p. 7).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 83 - Everest Woodbridge Team Report | Exhibit 83 - Everest Woodbridge Team Report.pdf |
| Exhibit 84 - Sample Campus Effectiveness Plan | Exhibit 84 - Sample Campus Effectiveness Plan.pdf |

| | |
|---|---|
| Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral | Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral.pdf |
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |
| Exhibit 94 - CAR template for student achievement below standards and letters | Exhibit 94 - CAR template for student achievement below standards and letters.pdf |
| Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers | Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.17(g) Student Verification

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.18(a) Standards Respect Mission, Ensure Quality & Are Clearly Written

**Response:**

ACICS expresses its accreditation requirements for all institutions and programs in several sections of its published and internet-accessible standards document, which forms a comprehensive structure for the consistent application of Council expectations (Exhibit 1: Accreditation Criteria; www.acics.org>about us>publications). General standards apply to all institutions and programs "whatever methodology and mode of educational delivery is used." The Council prescribes that, while encouraging innovation and flexibility, "extreme deviation" from the standards is not permitted (Exhibit 1: Accreditation Criteria, Title III, Introduction, Chapter 1, p. 37). In addition, the Council expresses additional requirements at each credential level in six distinct sections of its standards (Ibid., Chapters 2-7, ps. 53-76).

The Council's standards are respectful of the mission of the institution while they are also consistently applied and enforced to ensure that the education and training offered by ACICS-accredited institutions are of sufficient quality to achieve the institution's stated objective(s) for the duration of the accreditation period granted, including those offered through distance education and at the doctoral degree level. Among other considerations, the Council expects the institutional objectives to be "devoted substantially to career oriented education," including institutions whose mission is single purpose or multi-purpose (Ibid., Section 3-1-100, p. 37).

The mission of the institution provides the foundation for the accreditation review. The mission is reviewed initially when an institution first seeks accreditation from ACICS and throughout the rest of the process including during the comprehensive on-site evaluation. During the review, ACICS checks to see that the institution has established a mission in writing and disclosed it publicly. It also checks to see that the faculty, financial resources, physical plant, administration, management, and education activities are committed to the successful implementation of the mission (Ibid., Section 3-1-102, p. 37).

The evaluation of each institution on the basis of its stated mission is prescribed by the Council through its standards for institutional effectiveness planning and operational adjustments, consistent with its mission and focused on continuous improvement (Ibid., Section 3-1-110, p. 37).

ACICS ensures that the Council's expectations are applied consistently throughout the accreditation process through a variety of structural mechanisms. These include formal training offered to accreditation staff and on-site evaluators, "an independent group composed to evaluate the campus's adherence to ACICS criteria." Team members are instructed and trained to provide an explanation of each area of noncompliance in the site evaluation report including a reference to the section of the standards. Cross-referencing findings in the team report to Council standards "enables everyone who reviews the report (institution, commissioners, staff) to locate information easily (Exhibit 22: Accreditation Evaluation Training Manual 2015, ps. 19, 32)."

The Council's written standards are provided to all institutions seeking initial or renewal grants of

accreditation during their participation in a mandatory accreditation workshop. The content of those standards, and considerations for how they are applied by an on-site review team and the Council, are given substantial profile during the workshop (Exhibit 89: Renewal Accreditation Workshop PowerPoint, ps. 3, 8, 9).

When the Council's standards are updated, the document is revised, published and made available through www.acics.org>about us>publications. The revised document includes an appendix that shows revisions as a helpful resource to institutions and interested parties (Exhibit 1: Accreditation Criteria, Criteria Revisions, p. 139).

The consistent application of clear standards by the Council includes a structured process for making any substantive changes to its standards. That process includes disclosure to all stakeholders of proposed changes; explanation of those changes through an interactive medium; and solicitation of stakeholders' reactions to the proposed changes for consideration by the Council in adopting the final version (Exhibit 90: September 2014- Memorandum to the Field, ps. 18, 26; Exhibit 91: AWARE Webinar- October_ 2015, ps. 10-22).

The review of quality and integrity of institutions offering distance education activities, which is included under ACICS' current scope of recognition, follows the same structural and procedural protocols as those applying to traditional programs and institutions. Among other considerations, the Council expects consistency and clarity in the application of distance education standards by ACICS.

Structurally, ACICS standards regarding distance education and other non-traditional methods are captured in a single comprehensive section (Exhibit 1: Accreditation Criteria, Appendix H, p. 116). ACICS expects those institutions offering distance education to provide quality support services that are comparable to those offered in a residential format. An institution seeking to include distance education in its grant of accreditation must apply and receive approval from the Council prior to its initiation (Exhibit 69: MRC - DE Approval Letter, p. 1 and Institution Application, p. 3). That approval is based on a review of the alignment of the distance education delivery mode with the institutional mission and objectives stated in the Campus Effectiveness Plan (CEP) (Exhibit 69, Question 2, p. 6).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 89 - Renewal Accreditation Workshop PowerPoint | Exhibit 89 - Renewal Accreditation Workshop PowerPoint.pptx |
| Exhibit 91 - AWARE Webinar- October_ 2015 | Exhibit 91 - AWARE Webinar- October_ 2015.pptx |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 1 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 1.pdf |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 2 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 2.pdf |

| | |
|---|---|
| Exhibit 22 - Accreditation Evaluation Training Manual 2015 | Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 90 - September 2014- Memorandum to the Field | Exhibit 90 - September 2014- Memorandum to the Field.pdf |

**Criteria:** 602.18(b) Consistent Application of Standards

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.18(c) Decisions Based on Published Standards

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.18(d) Reasonable Assurance of Accurate Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.18(e) Report Clearly Identifies Deficiencies

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.19(a) Reevaluation

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.19(b) Monitoring

**Response:**

The Council's expectations of institutional compliance with standards of quality and integrity are continuous -- before, during and after the comprehensive accreditation review. ACICS has developed and applies a number of monitoring and evaluation activities in between recurring accreditation cycles that enable the Council to identify institutional- and program-level problems and weaknesses. Those activities monitor financial, student achievement, student indebtedness, substantive changes, excessive growth, adverse information and complaints, and other reliable sources of information regarding institutional performance. ACICS' specific standards provide consistency in application across all institutions and programs.

Council expectations regarding institutional and program level compliance with standards on an ongoing basis are articulated in several sections of the ACICS standards document. The Council advises an institution that it "inherently agrees to keep ACICS fully informed of activities," to provide annual reports on financial and student achievement indicators, and to report changes to ACICS (Exhibit 1: Accreditation Criteria, Sections, 2-1-800, 2-1-801, 2-1-802, ps. 10-11).

Regarding financial conditions, annual audited statements, the Annual Financial Report (AFR), and other reliable sources of information are used by the Council to assess whether "an institution's financial condition may be weak or deteriorating." When that assessment indicates abnormal financial risk the Council may require the submittal of a financial improvement plan and quarterly financial reports, issue a compliance warning, require a special or unannounced visit, a show-cause directive or take other negative action (Ibid., Section 2-1-808, p. 11). Institutions that fall short of financial stability requirements are notified in writing by the Council of the deficiencies, the degree of substandard performance, the required remedies, and timeframes (Exhibit 92: Daymar College (10306) QFR) (Exhibit 81: ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS)

Regarding student achievement, the Campus Accountability Report (CAR) and other reliable sources of information are used by the Council to assess whether an institution's placement, retention or licensure pass rate performance is below standards. When that assessment indicates substandard performance, the Council may require the development of a program-level or campus-level improvement plan as an addendum to its Campus Effectiveness Plan (CEP), issue a compliance warning, a show-cause directive or take other negative action (Exhibit 1: Accreditation Criteria, Section 2-1-809, p. 12). The improvement plan is reviewed by Council for its sufficiency and effectiveness, and must be included in the CEP for review during the next comprehensive on-site visit (Exhibit 93: CEP with Example of a Program Improvement Plan).

In addition, when the substandard student achievement performance merits a compliance warning, a program must "come into compliance … prior to the expiration of the established timeframe or be taught out … or otherwise conditioned (Exhibit 1: Accreditation Criteria, Section 2-2-502, p. 23)." Institutions or programs that fall short of minimum student achievement performance benchmarks

are notified in writing by the Council of the deficiencies, the degree of substandard performance, the required remedies, and timeframes. (Exhibit 94: CAR template for student achievement below standards and letters; Exhibit 6: Everest University - ACICS Show-Cause letter).

The frequency and scope of ACICS reviews of institutions and programs between accreditation cycles is driven by a number of factors, including substantive changes, financial and student achievement performance below standard, complaints and adverse information, and other reasons (Exhibit 117: Special Visits Summary Table).

ACICS has a direct stake in monitoring the ongoing degree and nature of student indebtedness derived from member institutions. Institutions whose graduates or completers incur a heavy debt load as they enter the workforce are disadvantaged in their economic prospects; in addition, high student indebtedness undermines the reputation of quality derived from accreditation. The Council monitors Cohort Default Rates (CDR) and applies that information in evaluating financial stability. Institutions with rates higher than federal standards are subject to additional monitoring and reporting (Exhibit 1: Accreditation Criteria, Section 2-1-810, p.12).

Another key element of the Council's interim monitoring and review of institutional quality and integrity is the tracking and analysis of complaints and adverse information. (Ibid., Section 2-3-700, p. 34). ACICS investigates and takes action on legitimate complaints and adverse information about an institution from any reliable source, including federal or state agencies, other accrediting entities, the news media, students, faculty or other third parties.

During each meeting (three times a year), the Council reviews an analysis of complaints and adverse information, and considers which cases may require additional information or action. The Council's evaluation considers the nature and extensiveness of the issue(s), the frequency of the alleged deficiencies, and other factors. This ongoing monitoring includes prescriptive correspondence to the institution at least three times a year, and written responses from the institution (Exhibit 81: ACICS Adverse letter to ITT, School Response 2015). The substance of those exchanges of information are shared with the Council at each meeting (Exhibit 95: ITT Adverse letter, January 2016) (Exhibit 67: BPC Adverse Report, December 2015, Extracts: ITT; Exhibit 96: CCi Excerpt BPC Adverse Report - April 2015).

One of the actions taken by Council regarding an institution that is exhibiting extreme risk based on adverse financial or other information is to require the timely submittal of a plan for the continuation and completion of students enrolled. When a closing institution fails to provide for students in an appropriate manner, members of its executive team and governance body are subject to debarment (Exhibit 1: Accreditation Criteria, Section 2-3-900, p. 35). The name, date and institutional affiliation of the debarred individual is disclosed publicly (Exhibit 97: www.acics.org>council actions>accreditation conditioned>action to debar).

ACICS may initiate a special on-site visit to review the legitimacy of the issues. Information derived from the special visit, along with the institution's response, is reviewed by the Council as part of its ongoing monitoring process (Exhibit 98: ACICS Response to Special Visit Report - MJI, Aug, 2013; Exhibit 73: Laurus College Complaint case 1).

**Exhibit(s) Linked to this Criterion**

| Exhibit Title | File Name |
|---|---|
| Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS | Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS.pdf |
| Exhibit 92 - Daymar college (10306) QFR | Exhibit 92 - Daymar college (10306) QFR.pdf |
| Exhibit 93 - CEP with Example of a Program Improvement Plan | Exhibit 93 - CEP with Example of a Program Improvement Plan.pdf |
| Exhibit 95 - ITT Adverse Letter January 2016 | Exhibit 95 - ITT Adverse Letter January 2016.pdf |
| Exhibit 96 - CCi Excerpt BPC Adverse Report - April 2015 | Exhibit 96 - CCi Excerpt BPC Adverse Report - April 2015.docx |
| Exhibit 98 - ACICS Response to Special Visit Report - MJI, Aug, 2013 | Exhibit 98 - ACICS Response to Special Visit Report - MJI, Aug, 2013.docx |
| Exhibit 94 - CAR template for student achievement below standards and letters | Exhibit 94 - CAR template for student achievement below standards and letters.pdf |
| Exhibit 97 - www.acics.org - council actions -accreditation conditioned -action to debar | Exhibit 97 - www.acics.org - council actions -accreditation conditioned -action to debar.docx |
| Exhibit 117 - Special visits summary table | Exhibit 117 - Special visits summary table.docx |
| Exhibit 67 - BPC Adverse Report, December 2015 | Exhibit 67 - BPC Adverse Report, December 2015.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 6 - Everest University - ACICS Show-Cause Letter | Exhibit 6 - Everest University - ACICS Show-Cause Letter.pdf |

**Criteria:** 602.19(c) Annual Headcount

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.19(d) Significant Growth

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.19(e) Distance/Correspondence Headcount Increase

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.20(a) Enforcement Timelines

**Response:**

The Council's authority to take decisive and timely action against institutions or programs that are falling short of requirements for quality and integrity is derived from multiple sections of the Criteria, which member institutions encounter throughout the standards, specifically those that apply to denials, withdrawals, suspensions and revocations. Those are defined by ACICS as accreditation denied (Exhibit 1: 2-3-300, p. 29); withdrawal (Ibid., 2-3-400, p. 30); suspension (Ibid., 2-3-402, p. 30); revocation (Ibid., 2-3-401, p. 30). ACICS distinguishes denial actions from withdrawal actions in terms of "withholding" accreditation versus removing accreditation before expiration of the current grant.

When Council receives information or determines through routine reviews or investigations that an institution is not meeting one or more of standards, it escalates the formality and rigor of its review. Council emphasizes the degree to which the institution is below standards, evidence that the institution can remedy deficiencies, and prescribed maximum timeframes for resolving issues. ACICS institutions are informed that "if Council determines an institution is not in compliance…it will take prompt adverse action…or require the institution to bring itself into compliance…within a time frame specified (Ibid., Title II, Chapter 3, Introduction, p. 27)."

Evidence regarding the degree of deficiency and the institution's capacity to remedy the issue is derived from periodic, comprehensive on-site visits; special visits; complaints and adverse information; and required annual reports regarding financial and student achievement performance. Council also reviews the response from the institution: "When the Council has considered all the information… it will make a judgment as to an institution's compliance…based on the extent of an institution's compliance…referred to as a Council action (Ibid.)."

The process for resolving issues of substandard performance affords the institution a reasonable opportunity to explain, modify or mitigate the issue. Before Council denies, withdraws, suspends or revokes accreditation, the institution is able to respond to a deferral, compliance warning, or show-cause directive (Ibid., 2-3-200 through 2-3-403, p. 28-31). A visual depiction of the hierarchy of Council actions is included (Exhibit 99: Council Action Process Chart).

One source of adverse information is on-site evaluation visit. Through observations, interviews and file reviews, the evidence is reflected in the team report, cross-referenced to specific standards, and provided to Council along with the institution's response. After review, Council may take no action, defer action pending receipt of additional information, issue a compliance warning, a show-cause directive or take immediate adverse action (Ibid.).
In every case, Council conveys the findings in writing and indicates the information it requires for a deferral (Exhibit 85: ITT Tech-Philadelphia, p. 93-94); a compliance warning (Exhibit 94: CAR templates, p. 4); or a directive to show cause, including the institution's response. If unsatisfied, Council takes adverse action (Exhibit 61: Bristol University, p. 530).

Another source of information regarding deficiencies is the annual institutional reports required by Council as a condition for maintaining accreditation (Exhibit 1: 2-1-801, p. 10 and 2-1-802, p. 11). The required annual reports provide information regarding student achievement performance (Exhibit 86: ACICS Student Achievement Webpage) and financial stability (Exhibit 1: 2-1-808, p. 11).

If performance regarding student achievement is below standard, Council will consider the degree to which the campus or program is out of compliance and the likelihood that it will achieve compliance in the established time frame. For the first year below student achievement standards, the campus is required to complete an improvement plan for review by Council (Exhibit 94: CAR templates). If the campus or program performs below standard for a second consecutive year, the Council issues a compliance warning (Ibid, p. 4). Programs or campuses that perform below student achievement standards for a third consecutive year are subject to immediate adverse action, including suspension of accreditation, (Ibid., p. 7) or program termination (Exhibit 6: Everest University - ACICS Show-Cause letter).

If financial stability is below standard, Council will review the degree to which the campus is financially at risk and the likelihood that it may achieve financial stability in the established time frame. Council applies a scoring rubric to financial information to determine if an institution's resources are sufficient to sustain the delivery of quality education: "When…an institution's financial condition may be weak or deteriorating," Council will require quarterly updates and an improvement plan (Exhibit 60: QFR and FIP Template). In addition, an institution subject to heightened financial monitoring is restricted in the initiation of branch campuses and learning sites. If the institution fails to meet ACICS standards for financial stability, it may be issued a directive to show cause (Exhibit 1: 2-1-808, p. 11; Exhibit 103: Pittsburgh Career Institute (70534) Financial Show Cause). If the institution fails to demonstrate an ability to meet Council requirements within established timeframe, the accreditation may be withdrawn through suspension (Exhibit 1: 2-3-402(a) p. 30).

In addition to information derived from periodic accreditation reviews and annual reports, the Council also receives and reviews information from third-parties. Though generally unsolicited, it is given substantial weight by Council in deciding accreditation status. The information may pertain to "low completion rates, low placement rates, high default rates, tuition refunds, negative audits or program reviews, and governmental agency investigations (Ibid., 2-3-700, p. 34)."

ACICS evaluates complaints and adverse information to determine the degree to which the issue is related to standards. This determination is integral to the Council's authority to require a response or additional information, or to take subsequent conditioning or adverse actions. Assuming the information is related to a standard, ACICS will collect additional information through correspondence, special visits or a combination thereof (Exhibit 73: Laurus College Complaint Case 1, ps. 3-6). If that additional information takes the form of a written team report, the institution is afforded an opportunity to provide a written response (Ibid., p. 13). The Council may close the complaint, take additional action including a compliance warning, or issue a directive to show cause.

Recently, Council's review of information about member institutions' performance below standards derived from accreditation reviews, annual reports, and complaints and adverse information has

resulted in a substantial number of denials and withdrawals of accreditation, as well as debarment actions and show cause directives (Exhibit 104: ACICS Council Actions 2011 - 2015).

## Exhibit(s) Linked to this Criterion

| Exhibit Title | File Name |
| --- | --- |
| Exhibit 73 - Laurus College Complaint Case 1 | Exhibit 73 - Laurus College Complaint Case 1.pdf |
| Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral | Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral.pdf |
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |
| Exhibit 94 - CAR template for student achievement below standards and letters | Exhibit 94 - CAR template for student achievement below standards and letters.pdf |
| Exhibit 99 - Council Action Process Chart | Exhibit 99 - Council Action Process Chart.pdf |
| Exhibit 103 - Pittsburgh Career Institute (70534) Financial Show Cause | Exhibit 103 - Pittsburgh Career Institute (70534) Financial Show Cause.pdf |
| Exhibit 104 - ACICS Council Actions 2011 - 2015 | Exhibit 104 - ACICS Council Actions 2011 - 2015.xlsx |
| Exhibit 60 - QFR and FIP Template | Exhibit 60 - QFR and FIP Template.pdf |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 6 - Everest University - ACICS Show-Cause Letter | Exhibit 6 - Everest University - ACICS Show-Cause Letter.pdf |

**Criteria:** 602.20(b) Enforcement Action

**Response:**

ACICS' written standards prescribe a number of circumstances, including adverse or negative information about an institution's or program's quality and integrity, when Council must take prompt or immediate adverse action, including the denial or withdrawal of accreditation. Those circumstances include a determination that the institution or program "is not in compliance" with Council standards (Exhibit 1: Accreditation Criteria, Chapter 3, Introduction, p. 27); an institution notifies the Council that it has closed or ceased operations (Ibid., Section 2-3-401(a)); the institution does not challenge its suspension of accreditation (Ibid., Section 2-3-401(b)); the institution fails to file annual reports of its financial stability or its student achievement performance (Ibid., Section 2-3-401(c)); or the institution fails to remit mandatory fees and expenses (Ibid., Section 2-3-401(d)). In addition, Council standards prescribe that the grant of accreditation can be immediately suspended "when, in the judgement of ACICS an institution no longer complies with the criteria." Immediate suspension could be triggered by the direct evaluation of an institution, a branch campus or any of its programs; lack of conformity of required periodic reports; lack of cooperation in arranging for a site evaluation; and substantial deviation from a Council directive, among other factors (Ibid., Section 2-3-402(a-f), p. 30).

Finally, a change of ownership automatically results in discontinuation of an institution's grant of accreditation. The grant may be reinstated "only upon application to and approval by the Council (Ibid., Section 2-2-403(a), p. 22)." ACICS does not consider discontinuation of accreditation due to change of ownership to be a withdrawal action or a negative action.

The Council has the discretion to take immediate adverse action after it has reviewed pertinent information collected from its own sources and the response from the institution. It also has the discretion to defer immediate adverse action in order to provide an institution the opportunity to remedy issues and deficiencies. This discretion applies to institutions whose performance may be only marginally below standard or have demonstrated a capacity to operate in compliance in a reasonable timeframe (Ibid., Title II, Chapter 3, Introduction, p. 27). Institutions with programs out of compliance with student achievement standards are expected to remedy their performance or discontinue the program within one year (Exhibit 86: ACICS Student Achievement Rates and Definition of Placement - ACICS Webpage, p. 3).

In extraordinary circumstances that the Council has not encountered in the last five years, it may grant a limited extension of the established timeframe for good cause: "Time frames may be extended at the sole discretion of the Council for good cause, including evidence that there has been significant improvement in the deficient area(s) and the applicable time frame does not provide sufficient time to demonstrate full compliance, e.g., significant improvement in completion or placement rates (Exhibit 1: Accreditation Criteria, Introduction to Title II, Chapter 3, p. 27)."

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |

| | |
|---|---|
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.21(a)(b) Systematic Review of Standards

**Response:**

The effectiveness of ACICS' standards and program of quality assurance substantially relies upon a systematic and recurring process of revision, application, scrutiny and evaluation. The Council's commitment to that process is formalized as an "ongoing and comprehensive review" of it standards, policies and procedures in order to "ascertain their appropriateness and effectiveness (Exhibit 1: Accreditation Criteria, Section 1-1-200(b), p.1)."

A key element of that review is recommendations and information collected from a variety of stakeholders, including "member institutions or other interested parties… and appropriate governmental agencies (Ibid.)." Changes to standards, policies or procedures may be initiated by the Council, member institutions or other interested parties. In every case, those proposed changes will be disclosed publicly and feedback will be solicited by ACICS before the changes are adopted and implemented.

A primary mechanism for the Council to solicit and collect feedback regarding the sufficiency of its standards and program of accreditation is the annual accreditation survey, which is conveyed to member institutions, evaluators, commissioners, staff, administrators, faculty, students, employers and state regulatory agencies. Each year the survey seeks specific recommendations regarding approximately one-fifth of the sections of the Council's standards. In the interval of five years, every section of the standards is submitted to stakeholders through this mechanism and reviewed by Council (Exhibit 105: 2013 Systematic Review of the Accreditation Criteria Survey Responses).

Responses to the survey are reviewed by the Council each year (Exhibit 106: February 2015 Policy Meeting Agenda). Based on the survey and other information that is relevant to the Council's standards and ACICS' effectiveness, the Council initiates changes for disclosure to the public. Any changes to policy or procedure approved by the Council receive profile in the Memorandum to the Field, which includes a solicitation for feedback from stakeholders (Exhibit 107: September 2015 Memorandum to the Field). The feedback is reviewed and considered by the Council (Exhibit 111: Comments from the Field and Committee Actions) before the changes are adopted as final (Exhibit 90: September 2014 Memorandum to the Field).

In addition to the outreach mechanisms of ACICS provided through the annual systematic accreditation survey and the response form attached to every Memo to the Field, the Council has initiated an advisory committee as another method to collect feedback on its policies and procedures. The committee is comprised of key external stakeholders with equal representation from students, faculty, graduates and employers (Exhibit 107: September 2015 Memorandum to the Field, Item H., p. 19).

## Exhibit(s) Linked to this Criterion

| Exhibit Title | File Name |
|---|---|

| | |
|---|---|
| Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses | Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses.xls |
| Exhibit 106 - February 2015 Policy Meeting Agenda | Exhibit 106 - February 2015 Policy Meeting Agenda.pdf |
| Exhibit 107 - September 2015 Memorandum to the Field | Exhibit 107 - September 2015 Memorandum to the Field.pdf |
| Exhibit 111 - Comments from the Field and Committee Actions | Exhibit 111 - Comments from the Field and Committee Actions.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 90 - September 2014- Memorandum to the Field | Exhibit 90 - September 2014- Memorandum to the Field.pdf |

**Criteria:** 602.21(c) Revision of Standards

**Response:**

Integral to the formation of accreditation policy and procedures by ACICS is perspective gained from the systematic and recurring solicitation of primary and secondary stakeholders. Primary stakeholders, those who educate and employ graduates of ACICS institutions, and the Council's oversight partners in the state and federal communities; secondary stakeholders are derived from the broader accreditation, academic, workforce development and policy communities, as well as the general public. In addition, the Council initiates thoughtful consideration of the underlying dynamics of its quality assurance enterprise through academic research and commentary (Exhibit 108: Quality, Accountability and Action White Paper).

The impetus for Council to conduct ongoing and comprehensive review of its accreditation standards, policies and procedures to ensure that they are appropriate and effective is part of its published standards (Exhibit 1, Accreditation Criteria, Section 1-1-200, p. 1).

The Council's prescriptive and extensive process for soliciting stakeholder participation in the critique and revision of policy includes a formal annual survey, triennial outreach through the Council's field memos (Exhibit 105: 2013 Systematic Review of the Accreditation Criteria Survey Responses; Exhibit 107: September 2015 Memorandum to the Field, p. 21), and recurring conversations with oversight partners through meetings, participation in conferences (Exhibit 18: ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST) and other legislative and regulatory forums (Exhibit 110: Testimony of Albert Gray HELP, ACICS letter to Sen. Alexander and Murray, Response from Sen. Murray).

The solicitation of perspectives on Council policy and the integration of that feedback into policy formation typically occur within a 12-month cycle: Council initiates policy proposals during the first quarter of the year, shares the proposals publically during the second quarter, collects feedback in the third quarter and adopts final revisions in December. An example of this process is the revision to the ACICS requirements for "Community Involvement," doctoral level faculty qualifications and admissions and recruitment practices that were finalized in December 2015 and which becomes effective in 2016 (Exhibit 111: Comments from the Field and Committee Actions).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses | Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses.xls |
| Exhibit 107 - September 2015 Memorandum to the Field | Exhibit 107 - September 2015 Memorandum to the Field.pdf |
| Exhibit 108 - Quality, Accountability and Action White Paper | Exhibit 108 - Quality, Accountability and Action White Paper.pdf |

| | |
|---|---|
| Exhibit 110 - Testimony of Albert Gray HELP, ACICS letter to Sen Alexander and Murray, Response from Sen Murray | Exhibit 110 - Testimony of Albert Gray HELP, ACICS letter to Sen Alexander and Murray, Response from Sen Murray.pdf |
| Exhibit 111 - Comments from the Field and Committee Actions | Exhibit 111 - Comments from the Field and Committee Actions.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST | Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST.pdf |

**Criteria:** 602.22(a)(1) Approval of Substantive Changes

**Response:**

The Council prescribes specific requirements for substantive changes made at the institutional or program level. The depth and breadth of those requirements are explained in the General Procedures and the Council Actions sections of the standards document (Exhibit 1: Accreditation Criteria, Section 2-2-100, p. 13 and Section 2-3-300, p. 29). By definition, institutions must seek and receive formal approval by the Council before they initiate operations based on a change in mission, ownership, certain new programs, additional campuses or a change in location of an existing campus, among other changes (Ibid., Section 2-2-101, p. 13).

The extent of review applied by ACICS to substantive changes is a function of the breadth and depth of the changes. Member institutions are clearly informed that the Council will require "… a comprehensive on-site evaluation if substantive changes are sufficiently extensive that the institu-tion's capacity to maintain compliance with accreditation standards requires an immediate assessment." The Council defines "extensive change" as those which in aggregate constitute an institution that is "no longer the same since last evaluated (Ibid., Section 2-2-102, p. 13)."

Council also requires on-site quality monitoring evaluations for the following substantive changes: new programs significantly different than others being offered or at a higher credential level; a delivery method currently not used by the institution; and a new branch campus or a new learning site that offers 50 percent or more of an academic program. Council also requires onsite evaluation following the reinstatement of accreditation based on change in ownership or control. The on-site evaluations are to ensure the institution remains compliant with ACICS standards.

ACICS describes the assessment, approval, and monitoring procedures associated with each action in the unique application required for each type of change (Exhibit 112: Application Templates). Institutions are provided guidance on the process of approval in the General Procedures section of the standards (Exhibit 1: Accreditation Criteria, Sections 2-2-103 through 2-2-111, ps. 14-16).

As ACICS applies the Council's requirements for review of substantive changes to new programs, for example, the institution must submit information comparing the proposed program content with that of programs approved and serving students. That information is provided to ACICS as part of the academic credit analysis (Exhibit 51: Academic Credit Analysis). The Council evaluates the proposed program against four tests to determine if the program is out-of-scope. The tests are the number of courses in the proposed program, the programs' relationship to the Classification of Instructional Program (CIP) code established by the U.S. Department of Education, licensure or certification requirements, and externship requirements (Exhibit 113: November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter).

When an institution requests a new program at a higher credential level, significantly different than any program currently offered, or through a different delivery method, the institution is required to explain the impact on the academic, financial, and facilities resources of the institution (Exhibit 114:

Plan to Expand Institution Scope of Accreditation Template). Council reviews the materials in reaching a decision to include the change under the grant of accreditation (Exhibit 113: November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter).

All substantive change requests are reviewed by full Council or the Executive Committee of the Council which has the authority to act "on behalf of the Council between Council meetings (Exhibit 1: Accreditation Criteria, Appendix A, pg. 96)." The Executive Committee has access to the application and supporting documents that augment the institution's request. It also has access to a report which tracks any previously approved substantive change for that institution, so that the Council may consider whether cumulative substantive changes merit a comprehensive on-site evaluation in advance of the expiration of the current grant.

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 112 - Application Templates | Exhibit 112 - Application Templates.pdf |
| Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter | Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter.pdf |
| Exhibit 114 - Plan to Expand Institution Scope of Accreditation Template | Exhibit 114 - Plan to Expand Institution Scope of Accreditation Template.doc |
| Exhibit 51 - Academic Credit Analysis | Exhibit 51 - Academic Credit Analysis.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(2)(i-vii) Types of Substantive Change

**Response:**

Council requires each accredited institution to maintain standards of quality and integrity, including the initiation of the review by ACICS of all substantive changes, as well as other activities at the institution (Exhibit 1: Title II, Chapter 2, Introduction, p. 13). Council requires "approval by ACICS before substantive changes are implemented, and institutions should notify ACICS of other significant changes." The Council expects to be notified immediately of substantive changes at an institution, including changes in its mission or objectives, management, ownership, control, educational programs (including the same program offered at a higher credential), mode of educational delivery, name, geographical location, and state or local authority to operate "Accreditation Criteria," (Ibid, 2-2-101, p. 13).

The Council requires an on-site quality assurance monitoring visit following approval to expand an institution's scope of accreditation for the following reasons: new programs of study significantly different than others being offered or at a higher credential level; different delivery method for a program such as distance education or direct-assessment competency-based; initiation of a new branch campus, an acquisition of a branch campus or initiation of a new learning site that offers 50% or more of an academic program; and reinstatement of accreditation following a change in ownership or control. The on-site evaluation visits are conducted to ensure the institution remains compliant with the agency standards.

All substantive change requests are presented to the Council, when in session, or the Executive Committee, when Council is not in session (Ibid, Appendix A, p. 96). Substantive change actions are presented to the Council or Executive Committee in advance of their meetings. The material includes a brief institutional history, a list of the campuses' active and approved programs of study, and the substantive change request. If the substantive change is for a program of study determined to be out-of-scope, additional information is provided to the Council or Executive Committee. (Exhibit 113: Nov 2015 Executive Committee Meeting Minutes). The Council or Executive Committee has access to the complete application of the institution's request for a substantive action and a Substantive Change Actions Report which informs the Council of any previously approved substantive change for that institution. This process allows the Council to take action on the proposed substantive change and to track the cumulative substantive changes approved for the institution since its last grant of accreditation.

The substantive change application has extensive requirements for back-up documentation depending on the type of change requested (Exhibit 112: Application Templates).

Another change which requires Council approval is modification of more than 25% of a program's content. When an institution makes a modification to a program that is deemed substantial, it must apply for and receive approval for a new program. (Exhibit 1: Accreditation Criteria 2-2-101(g), p. 13).

Upon approval, a non-main location is included within the scope of the institution's grant of accreditation. All new branch campuses are required to undergo a quality assurance monitoring visit within six months of the initiation of classes at the location. This visit is conducted by an ACICS staff member who completes a "Branch Campus Verification Report" (Exhibit 119: QAM-NB formerly Branch Verification Report Jan 2016) or a "Learning Site Verification Report" (Exhibit 118: QAM-Learning Site Verification Report Template Jan 2016). The purpose of the on-site visit is to verify the information reported in the Branch Campus Application or the Learning Site Application and to review the establishment of the location. All learning sites which offer at least 50% of an educational program must seek prior approval from Council and undergo a visit within six months of the date proposed for initiating services to students.

Formal collaboration with another accredited institution is a substantive change that requires Council approval (Exhibit 1: Section 2-2-505, p. 24). Contracts with Unaccredited Institutions or Entities are substantive changes that are also subject to Council review and approval. Council restricts delivery of no more than 25% of a program of study (Ibid, Section 2-2-506, p. 25). The institution must provide a copy of the contract and other required information for ACICS' review and approval.

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 112 - Application Templates | Exhibit 112 - Application Templates.pdf |
| Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter | Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter.pdf |
| Exhibit 118 - QAM-Learning Site Verification Report Template Jan 2016 | Exhibit 118 - QAM-Learning Site Verification Report Template Jan 2016.doc |
| Exhibit 119 - QAM-NB formerly Branch Verification Report Jan 2016 | Exhibit 119 - QAM-NB formerly Branch Verification Report Jan 2016.doc |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(2)(viii) Approving Additional Locations

**Response:**

ACICS does not exempt member institutions from adhering to current requirements for prior approval before advertising, recruiting, or enrolling students at an additional location, a new branch, or a new learning site that offers 50% or more of a program of study. The agency requires and conducts evaluation visits according to policy to all additional locations (Exhibit 1: Accreditation Criteria, Section 2-2-104, p. 14; Section 2-2-110, p. 15). The Department's provisions under 602.22 (a) (2) (viii) (A), (B), (C), (D), and (E) do not apply to ACICS.

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(2)(ix-x) Other Locations Needing Approval

**Response:**

As a condition of maintaining accreditation, ACICS institutions are required to keep the Council fully informed of activities at their campuses, including the acquisition of an institution by another entity (Exhibit 1: Accreditation Criteria, Section 2-2-101(h)(i), p. 13). New acquisitions of an educational entity must be fully disclosed. An institution will be considered to be in violation of Council standards if it operates any other institution by acquisition or by new start-ups without first securing ACICS approval. Any new main campus or a new fully-operating branch will be subject to evaluation as a new branch campus or as an initial applicant (Ibid., Section 2-2-104, p. 14).

The conditions under which an institution may enter into a teach-out agreement with another accredited institution, and receive Council approval, are explicit (Ibid., Section 2-2-303, p. 19). If an institution opens a new permanent location to conduct a teach-out for students of another institution that has ceased operation or plans to cease operations, the ACICS institution is subject to the new branch application process. The terms of the Council's approval are communicated in writing to the institution conducting the teach-out (Exhibit 120: Teach-out branch approval letter).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 120 - Teach-out branch approval letter | Exhibit 120 - Teach-out branch approval letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(3) When New Evaluation Required

**Response:**

ACICS standards fully disclose the substantive changes that require Council review and approval prior to implementation. Institutions are required to notify the Council in advance of the changes or any other "significant changes," as indicated in the general procedures that apply to all institutions (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, p.13). In addition to evaluating the quality of individual changes in programs, governance, facilities, or mission, among other changes, the Council considers the cumulative and holistic effect of substantive changes on the accreditation standing of the institution. The requirement of a comprehensive on-site evaluation applies not only to the initiation of a new grant of accreditation, but also to extensive substantive changes. Council's standards call for an "immediate assessment" when the effect of the cumulative changes makes the institution different from that which was evaluated during the previous comprehensive on-site evaluation (Ibid., Section 2-2-102, p. 13).

ACICS has established quality control mechanisms for monitoring an institution's multiple substantive change requests. The elements of that mechanism include the substantive change application, a report which records each substantive change approved by the Council, and a protocol to share the report with Council every time it is considering a subsequent substantive change request from that institution (Exhibit 113: November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter, ps. 19-26).

The information reviewed by Council when it considers a new substantive change request includes key institutional information such as when the institution was last accredited, current financial and student achievement reporting status, the most current placement and retention rate, its 3-year cohort default rates, and a list of the institutions active approved programs of study.

Based on the review of the request, Council may approve, or defer a decision pending receipt of additional information, or deny. As a component of its deliberation, Council reviews changes that have occurred since the last comprehensive on-site evaluation to determine if a "new institution has evolved." In that case, Council may defer or deny the action, place the institution on monitoring status, require a written response, or require a comprehensive on-site evaluation (Exhibit 113: November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter, p. 25).

In order for an ACICS institution to include a professional doctoral-level program in its grant of accreditation, the Council reviews the substantive change application and the following factors: the institution's eligibility to initiate this substantive change; the alignment of the doctoral program with the institution's mission and objectives; approval by the state licensing authority; the history of the institutions graduate-level program performance; its financial status and capability; and a substantive demonstration of the need for the program in the community.

ACICS will also require and review a clear description of the admissions policy; demonstration of

comparability of the curricular requirements with other accredited institutions; availability of professional work settings for conducting applied and practical research; qualifications of designated program director; qualifications of potential faculty; and demonstration of expansion of instructional facilities and instructional resources (including library resources) to offer doctoral-level programs (Exhibit 48: Stratford University Doctoral Program Narrative; Exhibit 82: Stratford University - Council Approval to Expand the Institutions Scope of Accreditation Letter).

ACICS deploys subject specialists who hold doctoral credentials and extensive practical experience to perform the on-site evaluation of the proposed doctoral-level program (Exhibit 19: Doctoral Programs Evaluators & Resumes).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 82 - Stratford University - Council Approval to Expand the Institutions Scope of Accreditation Letter | Exhibit 82 - Stratford University - Council Approval to Expand the Institutions Scope of Accreditation Letter.pdf |
| Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter | Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 19 - Doctoral Programs Evaluators & Resumes_Redacted | Exhibit 19 - Doctoral Programs Evaluators & Resumes_Redacted.pdf |
| Exhibit 48 - Stratford University Doctoral Program Narrative | Exhibit 48 - Stratford University Doctoral Program Narrative.pdf |

**Criteria:** 602.22(b) Substantive Change Procedures

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(c) Fiscal and Administrative Capacity Determination

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(c)(1) Approval of Additional Locations

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(c)(2) Approval Procedures for 3+ Locations

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(c)(3) Approval Procedures for Rapid Growth

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(d) Purpose of Visits

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(a) Public Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(b) Opportunity for 3rd-party Comments

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(c) Complaint Procedures

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(d) Public Disclosure of Accreditation Status

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(e) Public Correction of Inaccurate Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(f) Proviso for additional procedures

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(a) Branch Campus

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(b) Change in Ownership

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(1) Teach-out Plan Triggers

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(2) Treatment of Students

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(3) Notifying Other Agencies

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(4) Requiring Teach-out Agreements

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(5) Approving Teach-out Agreements

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(d) Closed Institution

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(e) Transfer of Credit Policies

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(f)(2) Credit Hour Review

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(f)(3) Actions of Deficiences

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(f)(4) Credit Hour Notifications

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(a-e) Basic Due Process Requirements

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(f) Specific Appeals Requirements

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(g) Basis for Appeal Outcome Provided

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(h) New Financial Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(a) Notifications: Positive Decisions

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(b) Notifications: Negative Decisions

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(c) Notice to Public w/in 24 hours

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(d) Brief Summary w/in 60 Days

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(e) Notifications: Voluntary Withdrawal

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.27(a)(1-5) Other Information to be Provided

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.27(a)(6-7),(b) Fraud and Abuse

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(a) Regard for the Legal Authorization of an Institution

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(b) Regard for Negative Actions by Other Accreditors

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(c) Explanation of Over-riding Decision

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(d) Requirement to Initiate Review

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(e) Information-Sharing with Other Accrediting/Approval Bodies

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

## Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** Requested Scope of Recognition

**Response:**

"For the accreditation of private postsecondary institutions offering certificates or diplomas, and postsecondary institutions offering associate's, bachelor's, master's or professional doctoral degrees in programs designed to educate students for professional, technical, or occupational careers, including those that offer those programs via distance education."

# EXHIBIT 2

To Declaration of Allyson B. Baker

**COMMENTS OF ACCREDITING COUNCIL FOR INDEPENDENT COLLEGES AND SCHOOLS TO SENIOR DEPARTMENT OF EDUCATION OFFICIAL FOLLOWING NACIQI RECOMMENDATION**

Pursuant to 34 C.F.R. §602.35(b), the Accrediting Council for Independent Colleges and Schools (ACICS or the Agency), respectfully submits these comments to the Senior Department Official (SDO) with the United States Department of Education (Department or ED).  These comments are in response to the recommendation made by the National Advisory Committee on Institutional Quality and Integrity (NACIQI) at its meeting regarding ACICS's Petition for Continued Recognition (Petition) held on June 23, 2016 as part of the NACIQI Meeting that commenced on June 22, 2016 (NACIQI Meeting).[1]  These comments supplement all the materials that ACICS has provided to the Department and all of the communications between the Agency and the Department to date.  Moreover, ACICS respectfully requests the opportunity to meet in person with the SDO to discuss these comments.

---

[1] ACICS is filing these comments at this time out of an abundance of caution.  The Agency respectfully submits that pursuant to 34 C.F.R. §602.35, which provides for an agency comment "within ten days following the Advisory Committee meeting," that its comments are not due until the conclusion of the NACIQI Meeting that commenced on June 22, 2016. This NACIQI Meeting, which was originally scheduled to conclude on June 24, 2016, has not yet concluded; rather, there is a "telephonic extension of this meeting," on dates not yet announced.  (Transcript of NACIQI Meeting, June 24, 2016 at 126:16-20).  The regulations provide for submission of a comment ten days from conclusion of the NACIQI Meeting, which has not yet occurred in this instance.  On July 1, 2016, counsel for ACICS sought confirmation from the Department that the NACIQI Meeting had not concluded within the meaning of the regulations and was informed that notwithstanding the record created by the transcript of NACIQI Meeting proceedings on June 24, 2016, the Meeting had concluded within the meaning of the regulations.  ACICS disagrees with this conclusion and respectfully reserves the right to supplement these comments, if necessary, within 10 days from the conclusion of the telephonically-extended NACIQI Meeting that commenced on June 22, 2016, in accordance with 34 C.F.R. §602.35.

1

ACICS submits that the SDO should grant the Agency twelve months to demonstrate and achieve compliance with the criteria for recognition.[2]  In the alternative, ACICS respectfully requests that the SDO return the Petition to the Staff for re-consideration of the Report recommendations and/or return the Petition to NACIQI for reconsideration during the December 2016 NACIQI Meeting.  (*See* Proposed SDO Recommendation, Exhibit A).

ACICS can demonstrate compliance with all accrediting agency criteria, and provide evidence of effective application of those criteria, by April 2017, well within the 12 month period during which time the SDO is permitted to allow ACICS to come into compliance.  *See* 34 C.F.R. §602.36(e)(3)(i).  In fact, in advance of the NACIQI Panel Hearing, ACICS had already provided to the Staff and NACIQI evidence of effective application of these criteria.  The SDO should decide to continue ACICS's recognition status in full or provide a twelve month period for ACICS to demonstrate effective application of each criteria.

Furthermore, as discussed below, the findings and recommendation of the Staff Report and the NACIQI recommendation are the result of procedural irregularities, unfair processes, and are an abuse of discretion and, thus, arbitrary and capricious.  First, the Staff Report and NACIQI make recommendations that are not supported by record.  Second, the Staff Report and NACIQI make recommendations that do not consider relevant factors, as put forth in the relevant regulations.  Third, the Staff Report and NACIQI hold ACICS to regulatory standards that were not previously announced and about which ACICS did not receive adequate prior notice.  Fourth, the Staff Report and NACIQI recommendations are unlawful as a result of procedural irregularities.  Fifth, the Staff Report and NACIQI recommendations violate the most elementary

---

[2] Although ACICS leads with a request that it be given twelve months to demonstrate compliance, the Agency also makes a request that the SDO grant ACICS unqualified recognition.  (*See* Exhibit A.)

2

principles of equal protection of the law, because they have treated ACICS differently than similarly-situated agencies.  Finally, neither the Staff Report nor the NACIQI Meeting was the result of impartial processes, as required by the regulations.  Rather, the outcome of the proceedings was prejudiced by application of political pressures both upon and within the Department, the net result of which is that ACICS faces severe sanctions for failure to act like an Inspector General with plenary investigative authority over schools – a standard that greatly exceeds the responsibilities imposed on an accrediting agency by the Department's regulations.

## BACKGROUND

On January 8, 2016, ACICS submitted a Petition for Continued Recognition to the Department, pursuant to 34 C.F.R. § 602.31(a)(2).  On March 3, the Department sent the Agency a Supplemental Request for additional information.  This Supplemental Request was explained, via email to ACICS as being "a set of question[s]" that the Office of the Under Secretary "want[s] to ask ACICS during the recognition process," further noting that "we have tied these questions to the recognition process" and that ACICS will have 30 days to respond.  (March 3, 2016 email from H. Bounds to A. Gray, Exh. D).  On March 10, ACICS sought an extension of time to respond to the Supplemental Request, because the request required that the Agency supplement or replace more than 30 narrative responses, and more than 100 exhibits to the Petition already submitted.  This effort also required that ACICS provide the Department with more than 80 additional documents.  In a March 15 email, ACICS received an extension of time to respond to Section II of the March 3 Supplemental Request, but not Section I.  (*See* March 15, 2016 email from H. Bounds to A. Gray).  On April 1, ACICS submitted its responses to Section I of the Department's March 3 Supplemental Request which concern "Overall Questions."  On May 4, the Department provided ACICS with a draft staff analysis in response to the Petition.

3

Then, on May 16, ACICS submitted its responses to Section II of the Department's March 3 Supplemental Request concerning "Questions related to specific standards in Jan. 2016 submission."[3]  The Department required that ACICS submit any response to the draft analyst report on June 3.  In a June 3 letter, the Agency reiterated its request for additional time to respond to that draft staff analysis, and in a response sent the same day, the Department denied that request for an extension of time and also denied ACICS's request that NACIQI defer consideration of the Petition until its December 2016 Meeting. (*See* June 3, 2016 letter from H. Bounds to T. Bieda, Exh. D).

On June 15, the Department issued its Staff Report to the SDO on Recognition Compliance Issues prepared in response to the Petition; this Report included a Staff recommendation to deny the Agency's petition for renewal of recognition and to withdraw the Agency's recognition. The basis for that decision was the Staff's conclusion that "the agency could not remedy its compliance issues."  On June 23, 2016, NACIQI voted 10-3 to recommend withdrawal of ACICS's recognition, without giving the Agency twelve months to demonstrate compliance.  (NACIQI Transcript, June 23, 2016 (hereinafter "NACIQI Tr.") at 280:1-6; 293:21-22).

As established by the record, ACICS can demonstrate or has achieved compliance with each criteria for recognition and can effectively apply the criteria within 12 months. The SDO should continue the agency's recognition as permitted by 34 C.F.R. §602.36(e)(3)(i) with regular compliance reports required pursuant to 34 C.F.R. §§602.32; 602.34.  Any other action by the

---

[3] Mr. Bounds's March 15 email granting ACICS an extension of time for responding to Section II of the March 3 Supplemental Request noted that "given that information received as late as May 16, 2016 would not allow Department staff the time to fully review and analyze it in time for the June NACIQI Meeting, ACICS should be prepared to return at the fall NACIQI meeting for further discussion as warranted."  (*See* March 15, 2016 email from H. Bounds to A. Gray, Exh. D).

SDO would be an abuse of discretion, arbitrary and capricious, unfair, and contrary to the federal recognition regulations governing accrediting agencies.


## I.     ACICS HAS THE CAPACITY TO COMPLY WITH EACH OF THE REGULATORY CRITERIA ADDRESSED IN THE STAFF REPORT

ACICS has provided the Department with abundant evidence that it will come into compliance with all necessary criteria within twelve months, if not sooner.  In numerous instances, it is already in compliance with the criteria.

In order to assist the SDO in a review of the evidence in the record, Exhibit B to these Comments is an Executive Summary and Detailed Background of ACICS's Resolution of the 21 Residual Findings of the Department's Staff Report (Executive Summary).  The Executive Summary provides a high level overview of the evidence in the record and is also a more comprehensive review of the status of the responses to each of the 21 findings in the Staff Report.  This Executive Summary, of course, is not a comprehensive recitation or summary of all materials previously provided by ACICS in support of its Petition or otherwise provided to the Department.  The Executive Summary underscores that the Staff Report and NACIQI recommendations are not supported by the facts in the record.  Indeed, this Executive Summary provides some of the evidence that ACICS was prepared to offer during the NACIQI Meeting.  During the Meeting, the Agency stated that it was prepared to "go down each one of the 21 items [identified in the Staff Report] that we have looked at and [to] tell you what we are going to do for each of those [21 items] and if allowed the opportunity we will take the time to go through those" items.  (NACIQI Tr. 239:1-4).  But ACICS was not allowed that opportunity to explain in

detail how it intends to and how it already has responded to each of the 21 findings identified in the Staff Report.

The attached Executive Summary conclusively establishes that within 12 months, ACICS will be able to demonstrate its compliance with each criterion in Subpart B of 34 C.F.R. Part 602, as well as effective application of each of those criteria.  Specifically, the Executive Summary categorizes the 21 findings in the Staff Report findings as follows:

- o Category A Findings (5 of 21 Findings): for which *only the provision of additional documentation or the effective date of a new policy or standard was cited as a lack of demonstrable compliance*, meaning that upon the effective date compliance is achieved.  The revised standards became effective July 1, 2016, and they are currently applicable to all ACICS campuses and programs.

- o Category B Findings (6 of 21 Findings): for which a *demonstration of effective implementation is the primary barrier to demonstrating compliance*. Enhanced processes or procedures have been applied to campuses and programs during the Spring 2016 accreditation cycle (April – May – June) and have produced reports, responses from institutions and other analytic considerations that will be reviewed by the Council at its August 1, 2016 meeting for the purpose of making accrediting decisions. The outcomes of the Council decisions are and will continue to be shared with the Department and the public through www.acics.org.

- o Category C Findings (10 of 21 Findings): for which *ACICS is acting pursuant to an achievable timeline to establish new policies and procedures and demonstrate effective implementation to demonstrate compliance*. ACICS has revised its standards and other policies for consideration and adoption by the Council at its August 1, 2016 Council meeting, with evidence of implementation to be established no later than April 2017, if not sooner.

  - ▪ Taking into full consideration  the requirements and procedures inherent in the accreditation calendar and institutional review process that are largely outside of the control of ACICS, full implementation of standard and policy revisions to campuses and programs required for this category of findings will be demonstrated after the Fall 2016 accreditation cycle (September – October – November 2016).

- In addition, revised standards and requirements previously established by ACICS regarding student achievement and applied through the review of the annual Campus Accountability Report (CAR) commence with the submittal of the 2016 CAR data, due to ACICS November 1, 2016. The data will be subject to integrity testing and computational analysis using ACICS's revised standards and requirements and will be presented for Council review at the December 2016 Council meeting (December 5, 2016).

- Based on that review, campuses and programs that have not been able to demonstrate compliance with student achievement standards within the established Council timeframe will be subject to adverse actions and notifications, and ACICS will be able to demonstrate implementation of those new standards and requirements to the Department no later than March 2017.

Thus, more than half (11) of the 21 findings identified in the Staff Report were remedied on July 1, 2016, the effective date of new policies and standards (Category A Findings), or will be remedied by the review of evidence collected and subject to Council review in August 2016 (Category B findings). The remaining findings (Category C Findings) require additional revisions to established policies or procedures and a reasonable interval for implementation during the established and routine ACICS accreditation cycles of Fall 2016 and Winter 2017 (January – February – March 2017).  As described by the supporting evidence already submitted to the Department and also described in part in the Executive Summary, ACICS will be able to demonstrate implementation of these new standards and requirements no later than April 2017, well within the 12-month period.

## II.   THE STAFF REPORT AND NACIQI RECOMMENDATIONS ARE NOT SUPPORTED BY FACTS IN THE RECORD AND DO NOT STEM FROM A CONSIDERATION OF RELEVANT FACTORS

### A.   The Facts In The Record Do Not Support The Staff's Recommendation Or NACIQI's Recommendation

As noted above, ACICS has repeatedly presented evidence of its compliance efforts to date and of its capacity to achieve compliance with criteria within twelve months.  The Staff Report findings are not supported by substantial evidence, nor do the Department's conclusions derive from a "reasoned path from the facts." *Am. Federation of Gov't Employees, Local 2924 v. Fed. Labor Relations Authority*, 470 F.3d 375, 380 (D.C. Cir. 2006).  Indeed, the Regulations specifically require that the Department Staff "take[] into account all available relevant information concerning the compliance of the agency with those criteria and in the agency's effectiveness in applying the criteria." 34 C.F.R. § 602.32(b).  The Report does not reflect reasoned consideration of "all available information."

In many instances, the Staff Report findings are merely conclusory, and without any evidentiary support.  This observation was echoed by several NACIQI Panel members.  Anne Neal, from the American Council of Trustees and Alumni, for example, noted that she "continue[d] to be concerned that the staff reviews apply standards with different degrees of severity depending upon the entity with which they are dealing" and that she "was surprised that the presentation [of the Staff Report] was more conclusory than it was explanatory.  To the point that there are even places where there is editorial comment . . . or even assumptions that are presented."  (NACIQI Tr. 28:5-11).

For example, the Staff Report finding regarding 34 C.F.R. § 602.15(a)(1), which requires that ACICS have the "administrative and fiscal capability to carry out its accreditation activities in light of its requested scope of recognition," is based on speculation and in direct contravention of facts explicitly referenced in the Report.  Specifically with respect to this criteria, the Report states that "no complaints have been received at the Department indicating that there have been staffing problems," and further explains that "when Department staff visited the agency's offices

8

in April 2016 several staff members were interviewed and the administrative processes were observed to be functioning efficiently." (Rep. at 6.) The Regulation is clear, and these and other facts cited in the Report establish that ACICS meets this criterion; the Agency has demonstrated that it "has adequate administrative staff and financial resources to carry out its accrediting responsibilities." (*Id*.) Notwithstanding these cites, the Report concludes, without any basis or explanation, that "the recent departure of the executive director, with no permanent replacement, seems to indicate that the agency has staffing concerns." (*Id*.) The Report further makes the unsupported and broad assertion that Staff is "concerned that [ACICS's] lack of effective monitoring approaches for its institutions reflects inadequate staffing." There is, however, no evidence to support this finding.

Another example relates to the criteria for "fiscal capability," where the Report also makes a speculative conclusion that ignores the facts of ACICS's independently-audited financial statements and forecasting. (Rep. at 6.)

In another such example concerning the Report finding that addresses 34 C.F.R.§ 602.27(a)(6)-(7), which establishes that an agency must notify the Department if has "reason to believe" that any of the institutions that it accredits are violating Title IV by engaging in fraud and abuse, the Staff again ignores the facts in the record. Here, ACICS has responded by stating that it "attests that the application of those review questions [concerning the improper use of Title IV funds] has not produced any findings of Title IV fraud or abuse during the past five years." (NACIQI Packet at 129). The Staff's findings discount this attestation, which specifically responds to the accrediting criterion at issue. Instead, the Staff concludes that ACICS is noncompliant because ACICS has not provided documentation that it "consistently notified the Department regarding suspected Title-IV-related fraud and abuse, or to attest that it

had not found any occasion to do so," further noting that "there have been instances of fraud and abuse discovered at several ACICS-accredited institutions within the last few years." (*Id.*) The fact that ACICS unearthed no fraud, which is – by nature – difficult, if not impossible, to detect, does not support a finding of noncompliance. Here, too, there is no substantial evidence that supports the Staff Report conclusion.

Finally, NACIQI's recommendation is not supported by the facts in the record. To this end, during the Meeting, numerous commenters repeatedly referenced ACICS's ongoing efforts to continue to improve upon policies and procedures. For example, Chuck Mula, from the Department stated that "the agency has provided revised standards that are in compliance with our requirements for those standards." (NACIQI Tr. 48:14-16). Mr. Porcelli further noted that "our role is not to punish [ACICS] for their past sins but what are they going to do going forward and yes they have what really looks like good operation to go forward." (*Id*. 57:7-9). Mr. Porcelli further echoed these sentiments and dispelled the rhetoric that ACICS is "an evil agency," as he acknowledged that its personnel and Council members have worked hard to arrive at the right conclusions. (NACIQI Tr. 24:5-9). The NACIQI Meeting included numerous other comments and statements from the Department and Panel members that underscore how the recommendations to revoke recognition "run counter to" the facts in the record. *Cablevision Sys. Corp. v. F.C.C.*, 597 F.3d 1306, 1310 (D.C. Cir. 2010) (citations omitted).

### B.     The Staff Report Does Not Consider The Relevant Factors

The Staff Report is not the result of reasoned consideration and misapplies the relevant regulations that must guide the decision as to whether an accrediting agency should be recognized. In numerous instances throughout the Report, the Staff applies the wrong criteria to ACICS and then makes unsupported findings. For example, 34 C.F.R. § 602.16(a)(1)(i) requires

that an agency "address the quality of the institution or program" by looking to "[s]uccess with respect to student achievement in relation to the institution's mission, . . . including, as appropriate, consideration of course completion, State licensing examination, and job placement rates."  The Staff Report ignores the clear evidence that ACICS complies with this criterion, including the Agency's use of algorithms designed to further verify job placement data that is furnished by the schools it accredits.  (Rep. at 11-12).  Indeed, during the NACIQI Meeting, Mr. Porcelli also explained that ACICS had "started using an algorithm to catch fraudulent representations from the schools and [that] . . . falsified placements just dropped dramatically." (NACIQI Tr. 57:8-9; 16-20). The Report considers factors not relevant to this specific criterion and makes an unsupported conclusion of noncompliance as to ACICS's assessment of placement rates.  And in apparent reference to this unsupported conclusion, the Staff Report notes that "many investigations and lawsuits were brought against ACICS-accredited institutions for falsified placement rates in the last five years, resulting in many judgments/high dollar settlements." (Rep. at 12).  Specifically, here, the Staff Report references two settlements, two consent decrees and one default judgment, all of which, of course, involve non-adjudicated findings of facts.  Nevertheless, the Report concludes that "[i]n response ACICS should explain what actions it took with respect to each pending or settled State or federal lawsuit initiated for the benefit of students against ACICS-accredited institutions in the last five years."  (*Id.*).  Again, the Report misapplies the guidance to arrive at an unsupported conclusion.

Moreover, lawsuits and investigations are not dispositive of liability.  And ACICS is not an Inspector General or a special prosecutor deputized to investigate allegations of fraud. Indeed, there are no accrediting criteria that contemplate such a role for any agency. There are also no criteria that require that an agency establish its compliance by noting how it has

responded to the mere bringing of a lawsuit or the pursuit of a confidential investigation about

which an agency might only learn through media reports.[4]  In fact when ACICS has tried to take

actions against schools, stemming from allegations of unlawful conduct, it has encountered

challenges that are inherent to the role of accrediting agencies.  During the NACIQI Meeting,

Anthony Bieda, ACICS's Executive-in-Charge, spoke at length about these limitations,

explaining that "until those investigations produce not only a finding of wrong-doing but actually

evidence of a wrong-doing or a fraud or abuse that we can get access to[,] we are pretty limited

and were pretty limited in being able to use those allegations as a basis to take formal adverse

action."  (NACIQI Tr. 81:10-13).  Mr. Porcelli further elaborated on how these shifting standards

and limitations have significantly and unfairly disadvantaged ACICS:

> The Agency was a very successful partner with the U.S. Department of Education
> for many, many years and even as late as 2011, the last review you know the
> issues that were brought up were ones that could be corrected but what seems to
> have happened and again I can't prove it but it seems that . . . when the Agency
> tried to – their standards were actually very good but it is the implementation
> because when you get right down to the nitty gritty of applying them there are
> places where the school's [sic] lawyers would fight back and because of some
> really minor item in the ACICS or at any accrediting agency's regulations they
> would overturn a finding.

(NACIQI Tr. 23: 13-22).  In other words, if ACICS took adverse actions against the schools it

accredits, those actions could be – and often have been – litigated and overturned by courts.

The Staff Report also fails to consider the relevant factors when it addresses ACICS's

compliance with Regulation 34 C.F.R. § 602.16(a)(1)(vii), which concerns the "[r]ecruiting and

admissions practices, academic calendars, catalogs, publications, grading and advertising," of a

school.  The Staff Report notes that:

---

[4] Law enforcement investigations are confidential.  And there is no mechanism in place whereby
law enforcement officials notify ACICS of investigations.  ACICS often learned about
investigations of those schools that it accredits through media reports or securities filings if the
school was part of a publicly-held multi-campus system.

> The materials viewed by Department Staff showed that the agency's visiting team evaluates the self-study and reviews evidence including the transfer of credit policy, recruitment materials and advertisements, copies of catalogs and handbooks, the academic calendar and class schedules, and student records including grades.  As a result, the petition narrative notes that ACICS has applied a substantial number of sanctions to large multi-campus systems based on deficiencies in these categories.

(Rep. at 15).  Nevertheless, the Staff Report concludes that because "a significant number of State attorneys general and others have obtained sizeable recoveries against ACICS-accredited institutions based on misrepresentations to prospective students and abusive recruiting," the Agency is "not effective in ensuring academic quality."  (*Id.*).  Here, too, the Staff does not consider the relevant factors delineated by the regulation.  In fact, the Report cites facts that demonstrate compliance with the regulations if these criteria were actually applied.  The Report instead holds ACICS to a standard that functionally requires that the Agency perform a quasi-prosecutorial function.  Throughout the Report, the Staff applies a standard that considers factors that are not relevant, which, in turn, results in findings that are arbitrary and capricious.

## III.   THE DEPARTMENT CHANGED THE ACCREDITING STANDARDS, WITHOUT PROVIDING ACICS WITH ADEQUATE NOTICE, AND THE STAFF AND NACIQI RECOMMENDATIONS ARE UNPRECEDENTED

### A.   The Department And NACIQI Only Recently Revised Their Approach To Key Recognition Criteria On Which ACICS Has Been Evaluated

In the middle of ACICS's recognition cycle, the Department and NACIQI substantially changed their guidelines and standards for evaluating accrediting agencies.  This deprived ACICS of fair notice.  In fact, these changes, which have been implemented since ACICS filed its Petition on January 8, are well-documented.

A January 20, 2016 memorandum from Lynn Mahaffie, who had been delegated the Duties of Assistant Secretary for Postsecondary Education, to incoming Acting Secretary John

King, describes in great detail the recent actions that the Department has taken regarding

oversight of accreditors:

> Given the importance of [advancing quality outcomes for students and protecting
> students and taxpayers], we recommend that the Department continue to work
> over the next 120 days **to identify opportunities to increase the rigor of the
> Department's processes to determine whether an agency is "effective"** and
> whether it evaluates its institutions for educational objectives consistent with the
> institutions' degrees, maintains degree standards that are commonly accepted, and
> assures that the institutions are successful in achieving these objectives.  Already
> we are pursuing differentiated, risk-based Department reviews of accreditation
> agencies; additional uses and comparisons of student outcome data and accreditor
> sanctions in reviews of agencies; and ways to assess or strengthen the
> effectiveness of accreditor standards and criteria related to student outcomes.
> Mechanisms for increased communication, information sharing, and collaboration
> among federal agencies are also being developed by an interagency task force
> addressing practices that inhibit student opportunity, put taxpayer funds at risk,
> and threaten consumers, issues that are especially concerning in the for-profit
> sector.

(Jan. 20, 2016 Memorandum from L. Mahaffie at 3-4 (emphasis added)).  In a March 29, 2016

blog entitled "Strengthening Accreditation to Protect Students," Undersecretary Mitchell

elaborated on how the Department intended to increase the rigor of its fact-finding process with

accreditors coming up for review in June 2016:

> The Department is committed to strengthening its monitoring and review of
> agencies that have accredited such institutions. Specifically, we are increasing the
> rigor of our fact-finding process with the accreditors coming up for review this
> summer, as well as in other review and recognition processes going forward. This
> process includes requiring responses to questions about how the accreditor's
> standards, policies, and practices allowed such poor and problematic performance
> to develop and continue; the specific actions an accreditor took and when; and
> how the accreditor plans to changes its practices to prevent those same situations
> from arising with similar institutions. This information will inform the
> Department's decisions regarding recognition for accrediting agencies.

http://blog.ed.gov/2016/03/strengthening-accreditation-to-protect-students/

Also in March, NACIQI announced its plan adopted at its December 2015 meeting "to

pilot a more systematic approach to considering student achievement and other outcome and

performance metrics in the hearings for agencies that come before it for consideration of their petition for recognition renewal at its June 2016 meeting."  NACIQI announced that there would be four foci of this pilot: "general performance and outcomes of the institutions the agency accredits, decision activities of and data gathered by the agency, standards and practices with regard to student achievement, and agency activities in improving program/institutional quality." Typically, a pilot proposal is an experimental program that is used to determine the feasibility of applying a concept more extensively, after further analysis and review.  Here, NACIQI's new "pilot" program was used against ACICS, not only without notice prior to it submitting its Petition, but also without the benefit of the customary feedback that is used to determine whether new standards are appropriate for widespread application. (*See* http://www2.ed.gov/about/bdscomm/list/naciqi-dir/2016-spring/pilot-project-march-2016.pdf).

On April 22, 2016, Under Secretary Ted Mitchell sent a letter to all accrediting agencies recognized by the Department calling on them to devote greater resources (and in a more flexible manner) to their review of colleges and universities, particularly for-profit colleges. The letter provides detailed new guidance on how accreditors should examine schools, with an emphasis on using quantitative measures such as retention, graduation and student loan default rates to judge quality. The Staff Report for ACICS, applying these heightened review standards, was issued on June 15, 2016, less than two months after this letter was sent.  The Department and NACIQI have clearly changed the standards in the middle of ACICS's accrediting cycle.  And although the lack of notice provided to ACICS about these changing standards has resulted in an unfair process, the Agency has and is working to come into compliance with all accrediting criteria, as noted above and detailed in Exhibit B.

### B.   Denying ACICS Twelve Months To Demonstrate Compliance With The New Criteria Under The Circumstances Would Be Unfair And Unprecedented

NACIQI has made an unprecedented recommendation:  that the SDO deny ACICS's petition for renewal of recognition, and withdraw its recognition, without providing ACICS with an opportunity to resolve outstanding issues. The unprecedented nature of this recommendation reflects a lack of process, especially since Department Staff, in reaching their findings, included numerous new interpretations of existing standards of which ACICS was found to be in full compliance only three years ago.  As noted below, NACIQI's treatment of ACICS is unprecedented and also unfair.

Attached to this comment is Exhibit C, which is a chart summarizing the 70 re-recognition renewal petitions that have been before NACIQI since December 2010 in which the agency was found to have one or more violations of the federal standards. Of those 70 petitions, 22 agencies presented between 7 and 15 violations; six agencies presented between 14 and 21 violations; and 15 agencies had 22 or more violations, with four presenting more than 40 violations. In all but one of these matters[5] ED staff and NACIQI recommended that the institution be given more time to bring the outstanding violations into compliance.

As Exhibit C also demonstrates, eleven of the agencies where Department staff had found more than 21 violations of the federal standards were Title IV gatekeepers, recognized for Title

---

[5] In June 2012, the Puerto Rico State Agency (subsequently renamed the Puerto Rico State Agency for the Approval of Public Postsecondary Vocational, Technical Institutions and Programs (PRHRDC)) was denied re-recognition in the face of 33 violations of standards. However, the Secretary, on appeal, rejected NACIQI's recommendation and granted PRHRDC recognition. At a subsequent NACIQI meeting two years later in June 2014, the panel reviewed a compliance report required by the Secretary and found that PRHRDC still did not meet all of the criteria, but rather than again recommending that it be denied recognition, NACIQI gave PRHRDC six additional months to come into compliance with the areas that had been noncompliant since 2012. The Secretary agreed with this recommendation.

IV purposes. For all of these Title IV gatekeepers, NACIQI recommended that they be given 12 months to come into compliance.

And, as noted above, Exhibit B demonstrates that ACICS has already achieved, or can achieve compliance with each criteria for recognition and effectively apply the criterion within 12 months.

> **C.** **Similarly Situated Agencies Have Not Been Held To The Same Standards That Are Now Being Imposed On ACICS**

ACICS is being held to a higher standard than other accrediting agencies – a standard more fitting for an Inspector General or special prosecutor. That higher standard reflects an expectation that is also markedly different from the manner in which Department Staff applied the federal recognition standards to ACICS during its last renewal when it was found to be in full compliance with the standards.

The fact of this new and higher standard is nowhere more apparent than in the numerous references to law enforcement investigations and settlements throughout the proceedings regarding ACICS's Petition.  These references are intended to suggest that ACICS failed to – but should have – taken the same actions that an Inspector General or special prosecutor might take when investigating allegedly wrongful or fraudulent conduct.  Indeed, the Staff Report, as well as comments during the NACIQI meeting, leave the impression that ACICS's failure to discover fraudulent activities and other wrongful conduct at schools subject to such investigations and lawsuits is *ipso facto* conclusive evidence of "weak monitoring," a "failure to document enforcement" and that ACICS's data verification and other compliance efforts were "ineffective." (*See e.g*., Rep. at 12, 16, 22; NACIQI Tr. 149:8-18). Not only has this new higher standard been imposed upon ACICS without notice, it is clear from the record that this standard is being applied only to ACICS.

17

The Staff Report and NACIQI Meeting never mentioned that many of the higher education holding companies cited as examples in the Report as "problem" companies also owned and operated schools that were accredited by other agencies, including the following:

| Company | Owned Schools Also Accredited By |
|---|---|
| Career Education Corporation | The Higher Learning Commission (HLC) and Middle States Commission on Higher Education (MSCHE) (schools subject to the New York Attorney General settlement) |
| Corinthian Colleges | Accrediting Bureau of Health Education Schools (ABHES), Accrediting Commission of Career Schools and Colleges (ACCSC), HLC, and WASC Senior College and University Commission (WSCUC) (corporate-wide fraud alleged) |
| Education Management Corp. | American Bar Association (ABA), ACCSC, HLC, MSCHE, New England Association of Colleges and Schools (NEASC), Northwest Commission on Colleges and Universities (NWCCU), Southern Association of Colleges and Schools (SACS), and WSCUC (corporate-wide recruiting and misrepresentation alleged) |
| ITT | NEASC (Daniel Webster College) (corporate-wide fraud alleged) |
| Lincoln Tech | ACCSC, NEASC |

During the NACIQI Meeting that commenced on June 22, many of the agencies listed above, as well as several other programmatic accrediting agencies, were up for renewal and oversaw the same "problem schools" as ACICS. However, these agencies were not questioned or challenged – either by the Staff or during the NACIQI Meeting – about any failure to prevent alleged fraudulent or improper conduct or to institute investigations.

In particular, the Staff Report and the NACIQI Meeting specifically focused on the events surrounding Corinthian Colleges, and criticized ACICS for continuing to accredit

18

Corinthian's schools until Corinthian ceased operations and declared bankruptcy. These criticisms ignore the actual facts, however.  On July 3, 2014, eight months before Corinthian closed its schools and filed for bankruptcy, the Department announced that it had entered into an unprecedented, and sweeping operating agreement with Corinthian that provided students enrolled at Corinthian's schools with an opportunity to complete their education and also protects taxpayers' investment while Corinthian worked to either sell or close its schools. *See* http://www.ed.gov/news/press-releases/us-department-education-accepts-operating-plan-corinthian-colleges-inc.  This agreement was put in place after the Department imposed a delay in Title IV funding in June 2014 that threatened to put Corinthian out of business.  The Department's agreement required that Corinthian put in place an independent monitor, former United States Attorney Patrick Fitzgerald, who had full access to Corinthian's books and records. It also provided for weekly audits of Corinthian's Title IV fund draws by an independent Title IV auditor and the regular submission to the Department of 13-week cash flow projections. The operating agreement was part of a comprehensive effort by the Department to oversee the wind down of Corinthian's schools as well as an investigation, working with the California Attorney General's Office, into allegations of false placement data and other marketing misrepresentations.

http://www.streetinsider.com/Guidance/Corinthian+Colleges+(COCO),+U.S.+Education+Dept.+Enter+Operating+Agreement/9640773.html.

During the time period that this agreement with Corinthian Colleges was in effect, the Department was in charge of all Corinthian-related matters and investigations.  The Department convened and conducted weekly teleconferences to provide status reports and updates to state licensing and accrediting agencies regarding the status of Corinthian's operations, as well as the

enforcement activities that were taking place against Corinthian and its institutions.  ACICS was an active and regular participant in these teleconferences, providing information as requested regarding the accreditation status of Corinthian's Everest Colleges holding ACICS grants of accreditation.  At no point during the time period that the Department was overseeing the wind-down of Corinthian did the Department ever indicate that ACICS's oversight of Corinthian had not been in accordance with Department expectations or regulations.

ACICS is not a government law enforcement agency, but, it, nevertheless, did commence investigations of the schools involved in the alleged fraudulent conduct.  ACICS also was not the only accreditor of Corinthian's schools or of schools that are owned by other holding companies of multi-campus locations referenced in the Staff Report and at the NACIQI Meeting.  It is arbitrary and capricious to hold ACICS to an unprecedented standard, not contemplated by the Department's regulations.  It would be profoundly unfair and a denial of equal protection to single out ACICS, given all of the other agencies that also accredited Corinthian schools.

## IV. PROCESS IRREGULARITIES AND THE POLITICAL ENVIRONMENT HAVE MADE IT DIFFICULT, IF NOT IMPOSSIBLE, FOR ACICS TO RECEIVE A FAIR REVIEW THAT SATISFIES DUE PROCESS

### A. Numerous Procedural Irregularities Marred The Petition Process

The drafting of the Staff Report and the conduct of the NACIQI Meeting were marred by numerous process irregularities that made it impossible for ACICS's Petition to get fair consideration.  To this end, Mr. Porcelli noted during the NACIQI Meeting that although he has written "hundreds" of staff reports during his 30-year career, this Report drafting process was different.   (NACIQI Tr. 61:5-10).  In particular, he explained that he "could not personally handle all of the material by myself," and that "in the past a staff person would be able to do that." (NACIQI Tr. 61:11-18).  He also acknowledged that he "received advice from outside" the

Department's Accreditation Group, but then stated that he did not "want to comment on that" advice, thus demonstrating his discomfort with the propriety of the advice that he had received, as that step was a deviation from usual protocol.  (NACIQI Tr. at 42:17-19).

Moreover, on March 3, -- nearly two months after ACICS had submitted its Petition -- the Accreditation Group of the Department sent ACICS an onerous Supplemental Response for additional information, created by the Office of the Under Secretary of Education and purportedly "tied . . . to relevant recognition criteria."  (March 3, 2016 email from H. Bounds to Al Gray, Exh. D).  Notwithstanding the onerous nature of the Supplemental Request and its stated connection to the recognition criteria, the Department Accreditation Group gave ACICS until May 16, only a partial extension of time for responding; the remainder of the response was due on April 1.  In granting this partial extension, Mr. Bounds noted that the May 16 submission date "would not allow Department staff the time to fully review and analyze" this information "in time for the June NACIQI meeting," and that "ACICS should be prepared to return at the fall NACIQI meeting for further discussion and possible action as warranted."  (March 15, 2016 email from H. Bounds to A. Gray, Exh. D).  Nevertheless, the Department denied ACICS's June 3 request that NACIQI defer consideration of the Petition until its December 2016 meeting.  (June 3, 2016 letter from H. Bounds to T. Bieda).  In other words, the Accreditation Group served ACICS with a substantial Supplemental Request drafted by the Office of the Under Secretary and apparently tied to recognition criteria and then gave ACICS inadequate time to respond to that Supplemental Request and also gave NACIQI inadequate time to consider this additional information.  And, then, in an about-face, the Accreditation Group informed ACICS that the May 16 response to the Supplemental Request would not be considered in the

deliberations about ACICS's Petition.  (May 18, 2016 email from H. Bounds to T. Bieda, Exh. D).

As further proof that this process was both irregular and involved unprecedented involvement from offices in the Department outside of the Accreditation Group, on June 22, Under Secretary Ted Mitchell issued a formal statement at the opening of the NACIQI Meeting. He made an apparent reference to ACICS and noted that "the truth is that some agencies need to up their game, and occasionally, agencies demonstrate such wide and deep failure that they simply cannot be entrusted with making the determinations we, you, and the public count on." (June 22, 2016 T. Mitchell Statement).  Whatever the intent underlying Mr. Mitchell's statement, it had the effect of undermining the self-regulatory principle on which the review of accrediting agencies is based.  Mr. Mitchell's statement clearly informed NACIQI Panel members of the outcome that the Department wished the NACIQI Meeting to reach.  It is hard to imagine a clearer step by the Department to put its thumb on the scale in advance of any final decision, or a more obvious denial of due process.

The NACIQI Meeting also involved process that was irregular and unprecedented.  And as part of a tacit recognition of this, Frank Wu, one of ACICS's Primary NACIQI Readers, warned Panel members and third party commenters alike that he "would not feel quite right saying or thinking . . . we need to make an example of" ACICS.  (NACIQI Tr. 166:15-16). Nevertheless, during the NACIQI Meeting, there were numerous instances when ACICS was implicitly held accountable for conduct concerning schools it never accredited and for broader concerns with the accreditation community at large.  For example, one Panel Member incorrectly suggested that ACICS had accredited Trump University; it did not.  (NACIQI Tr. at 113:12-15; 114:13-14).  Another Panel Member stated falsely that ACICS had accredited Heald College, a

part of the Corinthian Colleges system; the Agency never accredited Heald.  (NACIQI Tr. at

128:11-22).  WASC was the agency that had accredited Heald, and WASC's former president,

Ralph Wolff, is the other NACIQI Primary Reader; he also made the motion to revoke

recognition that NACIQI ultimately adopted.  (NACIQI Tr. at 2:3-4; 279:20-280:6).

In addition, the Meeting included comments from numerous third party commenters,

many of whom offered testimony that had little or no connection to the specific accrediting

criteria at issue, exemplifying the truly unfair nature of the NACIQI Meeting proceedings.  For

example, one such commenter, an Assistant Attorney General from Maryland, addressed the

Meeting.  He explained that "when a state files a case or a lawsuit against a school . . . vast

amounts of resources have been expended in investigation, collection of complaints, analysis of

documents and interviewing witnesses," and that "[t]o even initiate an investigation beyond just

bringing a complaint is not something that states take lightly."  He continued by noting that even

if the subject of a settlement neither admits nor denies liability, "there is still a problem" that

accrediting agencies should know to address. (NACIQI Tr. 149:8-18).  This commenter, who had

the floor longer than most third-party commenters, was allowed to mention facts and standards

wholly irrelevant to the question of whether ACICS had met accrediting criteria.  He commented

as a representative of law enforcement, and his comments sought to impose on ACICS the same

law enforcement obligations that the Maryland Attorney General (and all other State Attorneys

General) have as a matter of law.  But accrediting agencies are neither Inspectors General nor

special prosecutors.

Furthermore, this third-party commenter, like other NACIQI Panel members and third-

party commenters, also mentioned the fact of consumer complaints relating to schools. Mention

of these complaints in the absence of any effort to substantiate the complaints, let alone identify

23

how those complaints concern conduct arising from a failure of ACICS's accrediting process,

provides no actual evidence that could reasonably inform consideration of ACICS's Petition.

Instead, mention of these complaints unfairly tainted the NACIQI Meeting and reflects the larger

process irregularities that marred the entire Report and NACIQI processes here.

It was not surprising in light of all of these irregularities, then, that in the final comment

before the NACIQI Chair called a vote on the pending motion to deny ACICS's petition, Simon

Boehme, a student Panel Member couched the NACIQI vote in terms of sending a message to,

and a referendum about, the higher education accreditation community through ACICS:

> ***And I have always been a big proponent and pushing this Committee to take a bold
> step and to send a message to the accreditation community*** that enough is enough and so
> I hope that Anne is wrong that this process was you know filled with integrity and the
> Department head and senior official will you know, as Madame Chair pointed out, they
> will look through all of these materials and I bet you they will because this is a huge
> decision but ultimately I do have to -- I will support the Motion and I think it is time as a
> Committee we take these steps necessary to start putting accreditation to make it more
> responsive for students and consumers.

(NACIQI Tr. 293:10-17) (emphasis added).

## B.      The Petition Process Is Unfairly Politicized

The Staff's and NACIQI's consideration of ACICS's Petition has been unfairly

politicized, which has precluded the Agency's Petition from receiving fair consideration.  For

example, a few days before the NACIQI Meeting commenced, Senator Elizabeth Warren (D-

MA), issued a report condemning ACICS and exhorting the NACIQI Panel and Department to

deny ACICS recognition.  Specifically, this report announced that "[i]f NACIQI members and

the Department of Education officials want to restore public confidence in their own review

process, they must demonstrate that they understand the devastating consequences of ACICS's

long record of failure."  (*Rubber Stamps:  ACICS and Troubled Oversight of College*

24

*Accreditors*, prepared by Staff of Sen. Elizabeth Warren, at 2). The report spends 17 pages singling out ACICS, for example, stating that "[e]ven in the crowded field of accrediting failures, ACICS deserves special opprobrium." (*Id*. at 4). This report, which was followed by a press conference, received extensive media coverage, making it increasingly difficult for ACICS to receive a fair consideration at the NACIQI Meeting, especially as the Panel members are appointed by Congress. Indeed, Media outlets also have focused intensely on the Agency's Petition.

In addition, in May, more than a dozen State Attorneys General signed a letter to the Department encouraging denial of the Agency's Petition, and, as noted above, a representative of those State Attorneys General offered extensive third-party comments at the NACIQI Meeting. (*See infra* at 23). The politicized nature of ACICS's Petition and the political pressure on the Department to "send a message" first became clear to ACICS itself in April 2016, during its Council meeting. At that meeting, Mr. Porcelli addressed the Council, and emphasized how political pressure was dictating treatment of ACICS's Petition; he told the Council: I don't think you understand what trouble you are in. (*See also*, NACIQI Tr. 244:17-245:15).

The unfairly politicized nature of ACICS's Petition process, the Staff Report, and the NACIQI Meeting was acknowledged by several NACIQI Panel Members. Toward the beginning of the proceeding, Ms. Neal reiterated the need for "due process to apply," and her concern that when she read the Staff Report she was "not sure" that ACICS "is being given a fair shake." (NACIQI Tr. 28:22-29:4). And another Panel Member, Arthur Rothkopf, President Emeritus of Lafayette College, explained his process concerns surrounding the involvement of Department offices other than the Accreditation Group and how that could functionally give the Department "two bites at the apple" and render the process irregular. (*Id*. 50:20-51:4).

25

Indeed, the highly politicized and irregular nature of the Petition process was aptly described by Judith Eaton, who is the President, Council for Higher Education Accreditation (CHEA).  Ms. Eaton explained that "[f]or NACIQI and the Department, the role of politics – in contrast to policy, standards and regulations – cannot be ignored in the determination of the fate of ACICS.  Accreditation was invented in part to buffer higher education against undue political influence.  NACIQI itself was created to provide public, apolitical scrutiny of accrediting organizations as gatekeepers.  Just as accreditation has been federalized, the ACICS decision makes clear the extent to which both NACIQI – and accreditation – have been politicized." (June 24, 2016 Statement from J. Eaton, CHEA President).

## CONCLUSION

For all of the foregoing reasons, as well as in light of all of the materials previously provided to the Department, ACICS respectfully submits that the SDO should continue the Agency's recognition as permitted by 34 C.F.R. 602.36(e)(3)(i) with regular compliance reports required pursuant to 34 C.F.R. 602.32; 602.34. Any other action by the SDO would be an abuse of discretion and contrary to the federal recognition regulations governing accrediting agencies.

Respectfully submitted,

/s/ Allyson B. Baker
Allyson B. Baker
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone:  (202) 344-4000
Facsimile:  (202) 344-8300
Email:  abbaker@venable.com

Kenneth J. Ingram
Whiteford Taylor Preston, LLP
1800 M Street, NW
Suite 450N
Washington, DC 20036
Phone: 202.659.6790
Fax: 202.327.6140

***Counsel, Accrediting Council for Independent
Colleges and Schools***

# EXHIBIT 2a

To Declaration of Allyson B. Baker

EXHIBIT B

# EXHIBIT B

# Executive Summary and Detailed Background of ACICS Resolution of 21 Residual Findings of the Department's Staff Report
### July 5, 2016

## EXECUTIVE SUMMARY

- On January 8, 2016, the Accrediting Commission for Independent Colleges and Schools ("ACICS" or "Agency") submitted a Petition for Continued Recognition ("Petition") to the U.S.  Department of Education ("ED"), pursuant to 34 C.F.R. § 602.31(a)(2).

- The ED Staff Report to the Senior Department Official ("SDO") on Recognition Compliance Issues that was prepared in response to the Petition included a Staff recommendation to deny the Agency's Petition and to withdraw the Agency's recognition. The basis for that recommendation is the Staff's conclusion that "the agency could not remedy its compliance issues."

- On June 23, 2016, the National Advisory Committee on Institutional Quality and Integrity (NACIQI) voted 10-3 to recommend to the SDO withdrawal of the Agency's recognition.

- This Executive Summary and Detailed Background responds to the NACIQI recommendation, as permitted by 34 C.F.R. § 602.35(b), by providing information regarding areas where the NACIQI recommendation, and the Staff Report that underlies that recommendation, are not supported by the record and by demonstrating that the NACIQI recommendation is incomplete based on the record.  This Executive Summary and Detailed Background is not meant to summarize every factual or documentary submission by ACICS to ED or NACIQI included in the record related to the Petition to date, but to focus on key evidence related to the residual 21 remaining problems identified in the Staff Report.

- As demonstrated by the full record, ACICS has capacity to achieve compliance with each criterion for recognition and to produce evidence of effective application of the criteria within 12 months. Therefore, the SDO should grant ACICS unqualified recognition.  In the alternative, the SDO should grant ACICS twelve months to demonstrate and achieve compliance with the criteria for recognition as permitted by 34 C.F.R. § 602.36(e)(3)(i) with regular compliance reports required pursuant to 34 C.F.R. §§ 602.32; 602.34. Also, the SDO should return the Petition to the ED Staff for re-consideration of the Staff Report recommendations and/or return the Petition to NACIQI for reconsideration during the December 2016 NACIQI Meeting

1

- Any other action by the SDO would be an abuse of discretion, arbitrary and capricious, and contrary to the federal recognition regulations governing accrediting agencies.

- As demonstrated below, with regard to the remaining twenty-one (21) criteria identified in the Staff Report, ACICS is either already in compliance with the cited criterion or has and is making changes and enhancements to ACICS standards, policies, and procedural protocols to further demonstrate compliance with the criteria. Some of those changes require formal adoption by the Council and, in some cases, collection and transmission of evidence of implementation through the direct application of the reforms to member campuses and programs. Within 12 months, ACICS will be able to demonstrate its compliance with each criterion in Subpart B of 34 C.F.R. Part 602, as well as effective application of each of those criteria.

- Specifically, more than half (11) of the 21 problems identified in the Staff Report were remedied by the July 1, 2016 effective date of new policies and standards (see Category A Findings below) or will be remedied by the review of evidence collected and subject to Council review in August 2016 (see Category B findings below).  The remaining 10 findings (Category C Findings below) require additional revisions to established policies or procedures and a reasonable interval for implementation during the established and routine ACICS accreditation cycles of Fall 2016 and Winter 2017 (January – February – March 2017), and its annual institutional report cycle, circumstances presenting themselves due to the accrediting agency calendar and need for review of institutional compliance with such policies.

- To support a clearer understanding of the inventory of progress ACICS has compiled toward addressing each of the 21 remaining issues in the Staff Report, we have categorized the findings as follows:

  o **Category A Findings (5 of 21 Findings)**: For which only the provision of additional documentation or the effective date of a new policy or standard was cited by ED Staff as a lack of demonstrable compliance. As demonstrated in the Detailed Background, ACICS is currently in compliance with each of these 5 criteria, with any additional documentation submissions to occur at the August 1, 2016 Council meeting.

  o **Category B Findings (6 of 21 Findings)**: For which demonstration of effective implementation is the primary barrier to demonstrating compliance. Enhanced processes or procedures have been applied to campuses and programs during the Spring 2016 accreditation cycle (April – May – June) and have produced reports, responses from institutions and other analytic considerations that will be reviewed

by the Council at its Augusts 2016 meeting for the purpose of making accrediting decisions. The outcomes of the Council decisions are and will continue to be shared with the Department and the public through www.acics.org.

o **Category C Findings (10 of 21 Findings)**: For which ACICS is acting pursuant to a timeline to establish new policies and procedures and demonstrate effective implementation to demonstrate compliance. ACICS has revised its standards and other policies for consideration and adoption by the Council at its August 1, 2016 Council meeting, with evidence of implementation to be established no later than the end of the first institutional review cycle of 2017, or by April 2017.

- Full implementation of standard and policy revisions required for this category of findings will require at least the Fall 2016 accreditation cycle (September – October – November 2016) for implementation and application to campuses and programs, a step which must take place in order to demonstrate implementation.
- In addition, revised standards and requirements previously established by ACICS regarding student achievement and applied through the review of the annual Campus Accountability Report (CAR) commence with the submittal of the 2016 CAR data, due to ACICS November 1, 2016. The data is subject to integrity testing and computational analysis before it is presented for Council review at the December 2016 Council meeting (December 5, 2016).
- Based on that review, campuses and programs that have not been able to demonstrate compliance with student achievement standards within the established Council timeframe will be subject to adverse actions and notifications, and ACICS will be able to demonstrate implementation of those new standards and requirements to the Department no later than April 2017.

- With regard to Category C Findings, although ACICS has the flexibility to shorten accreditation review cycles to expedite approval of additional policy changes so as to accelerate evidence of effective enforcement of those changes for ED, the dissemination of information regarding new policies or standards, and the subsequent adoption of those requirements by ACICS accredited institutions, requires adequate lead time in order to be effective. Also, in fairness to the institutions that will be subject to the enforcement of the new standards, a reasonable period of notice for implementation must be provided.

- As demonstrated, ACICS can demonstrate compliance with all accrediting agency criteria, and provide evidence of effective application of those criteria, by April 2017,

well within the 12-month period the SDO is permitted to allow ACICS to come into compliance.

**Detailed Background**
**ACICS Resolution of 21 Residual Findings of the Department's Staff Report**
**July 5, 2016**

I.      TIMELINE FOR ACCELERATING REFORMS AND SUPPLEMENTS FOR ACICS
PROGRAM OF QUALITY ASSURANCE AND INTEGRITY REVIEW

A number of issues arising from the ACICS quality review of accredited private post-secondary
institutions, domestically and internationally, during the period of 2012 – 2016, prompted the
organization's leadership to consider and initiate a series of reforms to its standards, policies,
procedural protocols and interactions with member institutions. The reforms were developed,
tested and implemented in an orderly and thoughtful manner through the recurring Council
cycle: a reform was proposed and reviewed by Council; comments were solicited from external
stakeholders; those comments were integrated into a revised policy directive; and the policy
change was formally adopted with an effective date that provides a reasonable opportunity for an
institution to integrate new requirements and expectations into the planning and operations of its
education enterprise.

The re-recognition process provided, beginning in 2015, additional feedback from ED through a
series of meetings, correspondence, emails and other communications, which included
information and perspective from ED that indicated a need for ACICS to accelerate reform
development and implementation. ACICS responded by developing and establishing a series of
"fast track" policy proposals, some of which were first presented to Council in February 2016,
tested with external stakeholders in March 2016, and approved by Council in April 2016.

In April 2016, the Council identified several more policy reforms it deemed necessary and
immediate to addressing residual issues raised by the Department regarding the effectiveness of
its program of quality assurance. It responded by compressing the typical cycle of development,
vetting, adoption, and approval. Responses from the field were integrated into the policies
adopted by the Council on May 12, 2016, which became effective through published standards
and written communiqués on July 1, 2016.

The development, review, testing and implementation of new standards and evaluative protocols
are by design and nature an iterative process requiring multiple cycles and critiques. The
effectiveness of the revised policies and procedures depends on close attention by the Agency to
the evidence derived from implementation. ACICS expects that a revised practice or protocol
may need to be revisited and enhanced before its effectiveness is of sufficient value to the
Agency's program of accreditation. On that basis, ACICS has anticipated that the process for
initiating and testing reforms to standards and procedures that are responsive to issues and
perspectives raised by the Department will extend into 2017. At minimum, ACICS requires at
least two full accreditation cycles (four months each in duration) to fully implement, critique and
revise higher standards in a manner that complements and enhances the performance of member

colleges and schools.

Those cycles and anticipated reform implementation steps are detailed below:

**Accreditation Cycle Zero (April through August 2016)**

Reflecting a sense of urgency and a commitment to begin a multi-year series of reforms immediately, ACICS developed and adopted the following policy revisions and procedural enhancements during the Spring 2016 accreditation review cycle:

1.  Data Integrity Standard (Policy)
2.  Recruitment and Admissions Monitoring (Policy)
3.  Greater ethical standards/requirements of Council Members (Bylaws)
4.  Suspension of accepting applications for initial grants of accreditation (Policy)
5.  Dedicated data integrity reviewer on all site visit teams (Procedural)
6.  Pre-visit surveys of students, faculty, staff (Procedural)
7.  Expanded narration in team reports (Procedural)
8.  Enhanced training for IRC, Council members (Procedural)
9.  Enhanced ethical standard attestations for IRC members (Procedural)
10. Establishment of At-Risk Institution Group to escalate review of schools demonstrating quality/integrity issues; adoption of a broader basis for interim reviews of campuses and programs (Procedural)
11. Expand use of PVP data sampling and testing program to augment CAR data testing performed on site by data integrity reviewer (Procedural)
12. Complete outreach initiative to all state licensing boards and establish recurring protocol for sharing information regarding licensure and certification exam pass rates, other student achievement metrics
13. Integration of evidence derived from items 1, 2, 5, 6, 7, 9, 10, 11, 12 into the Council's deliberations and decision-making, August 1 through 5, 2016
14. Council review of remands by Review Board of Appeals of adverse decisions

**Accreditation Cycle 1 (August through December 2016):**

1.  All deployed evaluators are subject to re-screening of credentials, new training regime, renewed ethics attestations, and performance review requirements before being assigned to any site visit (Procedural)
2.  Announcement regarding new student achievement data submission regime for the 2016 CAR (due Nov. 1, 2016) with written guidance expressing enhanced expectations of data accuracy and reliability; inventory of data integrity tests to which student achievement data will be subject; definition of Council's degree of tolerance for unreliable data; and disclosure of consequences for self-reported

data whose integrity cannot withstand independent testing for accuracy and reliability (Policy)

3. Apply enhanced data integrity testing algorithms to 2016 CAR data and report results to Council.

4. Accelerated enforcement by Council of sanctions for student achievement deficiencies (Policy)

5. Revisions to the pre-visit survey instrument and the narrative requirements for team reports based on assessment by Council and executive team (Procedural)

6. Enhancements to collecting and analyzing CAR-based data integrity by dedicated data integrity reviewers (Procedural)

7. Enhancements to the collection and analysis of placement data through the random sampling tests performed by the Placement Verification Program (PVP) based on assessment by the Council and executive team (Procedural)

8. Enhancements to the protocol for evaluating institutional recruitment and admissions practices and documented adherence to written policies (Procedural)

9. Initiate round of special visits to programs/institutions demonstrating high risk factors derived from complaints, adverse information, student achievement data, financial stability data or other reliable sources.

10. Review of effectiveness of policy and procedural reforms by Council and ACICS executive team.

**Accreditation Cycle 2 (January through April 2017):**

1. Test integrity of 2016 CAR student achievement data by dedicated data integrity reviewers on-site, and through enhanced PVP sampling protocol remotely.

2. Announce adverse actions against campuses, institutions with student achievement performance below standard that have not come into compliance within required timeframe.

3. Accumulate, review and adjust, as necessary, teach-out plans and agreements for programs and institutions subject to adverse actions for sub-standard student achievement performance.

4. Enforce and announce sanctions against institutions whose 2016 program/campus level CAR data fails to pass integrity tests.

5. Modify and enhance training modules for all coordinators and evaluators assigned to on-site teams based on changes to policies and procedures derived from the previous accreditation cycle, IRC deliberations and Council considerations.

6. Based on review of effectiveness of policy and procedural reforms by Council and ACICS executive team, make further revisions and enhancements to site-visit process, including integration or risk-based factors, documentation protocols, pre-visit surveys and data integrity testing.

7.    Develop further revisions to ACICS standards that respond to issues derived from Accreditation Cycles 1, 2; share with all stakeholders; adopt and implement for Spring 2017 accreditation cycle.

II.    DETAILED BACKGROUND ON STATUS OF CATEGORY A (5 of 21), CATEGORY B (6 of 21) and CATEGORY C (10 of 21) FINDINGS

**Category A Findings (5 of 21 Findings)**: **For which only the provision of additional documentation or the effective date of a new policy or standard was cited by ED Staff as a lack of demonstrable compliance. As demonstrated in the Detailed Background, ACICS is currently in compliance with each of these 5 criteria, with any additional documentation submissions to occur at the August 1, 2016 Council meeting.**

**Category A - Finding 1 – Staff and Financial Resources**

Accrediting agency regulation: 34 C.F.R. § 602.15(a)(1) Administrative and fiscal responsibilities. ACICS must have the administrative and fiscal capability to carry out its accreditation activities in light of its requested scope of recognition. ACICS meets this requirement if it demonstrates that the agency has adequate administrative staff and financial resources to carry out its accrediting responsibilities.

Staff Report Finding: The Staff Report contains numerous positive statements about ACICS staff and finances.  Nonetheless, the Report concludes that ACICS has not demonstrated that ACICS reserves and planning can weather highly-probable long-term decreases in budgeted revenue. The agency needs to submit its FY 2015-2016 audit and FY 2016-2017 budget in October 2016. The Report also indicated that ACICS needs to provide specifics as to how ACICS plans to operate efficiently and effectively in light of reduced revenue.

ACICS Response:  ACICS has a reserve investment document from an independent third party attesting to adequate financial reserves which is being supplemented by a statement as to how ACICS can gain access to that liquidity if needed and which will be completed by the August 1, 2016 Council meeting.  In addition, the Fiscal Year 2017 budget adopted by ACICS balances expenditures with anticipated revenues, reflecting contraction of business activity and other anticipated contingencies including litigation. This budget will be adopted by the Council at the August 1, 2016 meeting.  ACICS objects to the Staff Report asserting that stronger effectiveness in the accreditation review of institutions poses a threat to the financial viability of the Agency. There is no factual basis for that assertion in the record.

Conclusion: ACICS can demonstrate its continuing compliance by the submission of additional documentation by August 1, 2016.

**Category A – Finding 2 – Designation of Public and Non-Public Representatives**

Accrediting agency regulation: 34 C.F.R. § 602.15(a)(5) **-** Representatives of the public on all decision-making bodies.

Staff Report Finding:  The Agency needs to provide documentation that members of each appeal body have signed the generalized form designed for both public and non-public members of the main decision-making body, or a form more specific to their specialized role. The Agency needs to document that it has been consistently verifying that persons currently classified as public members on any decision-making body fully meet the Secretary's definition.

ACICS Response:  ACICS has revised the attestation to more clearly delineate the public and academic roles. See attached Exhibit 262.1. This revised form will be signed by the four members of the ACICS Review Board that convenes on July 29, 2016.

Conclusion: ACICS is in compliance with this criterion and will have evidence of effective application by July 29, 2016.

**Category A – Finding 3 – Conflicts of Interest**

Accrediting agency regulation: 34 C.F.R. § 602.15(a)(6) - Clear and effective controls against conflicts of interest, or the appearance of conflicts of interest, by the agency's -(i) Board members; (ii) Commissioners; (iii) Evaluation team members; (iv) Consultants;(v) Administrative staff; and (vi) Other agency representatives.

Staff Report Finding: "It is not clear if every member of the Intermediate Review Committee (IRC) signs any kind of attestation connected with conflicts of interest. Although technically not a decision making body, IRC members make an initial review of each institution's materials and site team report in order to present a recommendation to the ACICS decision-makers for their consideration. As a result, IRC members provide a critical service that could be affected by an undisclosed conflict of interest. The agency needs to provide documentation that all members of an IRC have consistently signed an attestation regarding conflict of interest issues, and, if not, why not. … it is unclear what, if anything, ACICS had been doing all along to ensure its IRC members were free of conflicts of interest."

ACICS Response: ED Staff misunderstands that every IRC member is drawn from the ranks of evaluators who have been previously required to endorse conflict of interest statements before serving as ACICS volunteers in any capacity, including as an evaluator or as a member of the IRC.  ACICS has already submitted for the record Exhibit 263 which are examples of signed conflict of interest statements from evaluators who have served as IRC members between 2012 - 2016 and whose documentation is derived from their service as evaluators.

Conclusion: ACICS has been in compliance with this criterion and has already submitted documentation for the record demonstrating that individuals who served on the IRC were aware of the ACICS conflict of interest policy and signed conflict of interest statements that applied to their roles at ACICS in any capacity, including on the IRC.

**Category A – Finding 4 – Comprehensive Evaluation Upon Substantive Change**

Accrediting agency regulation: 34 C.F.R. §602.22(a)(3) - The Agency's substantive change policy must define when the changes made or proposed by an institution are or would be

sufficiently extensive to require the agency to conduct a new comprehensive evaluation of that institution.

Staff Report Finding**:** The Agency needs to develop a written policy that would enable it to consistently determine whether a new comprehensive evaluation is required.

ACICS Response: ACICS continues to meet this criterion as evidenced in its current standards in Criteria Section 2-2-102 (Effect of Extensive Substantive Changes).  ACICS has a policy that utilizes a matrix to evaluate extensive substantive changes and which is presented to the Council for consideration prior to approval of any substantive change.  The Agency's evidence of implementation of this standard can be found in Exhibit 113, Executive Committee Minutes of substantive change (November 20, 2015). As a recent example of ACICS implementation of this standard, a visit was conducted by ACICS to an institution as a result of a request for a substantive change related to offering programs at a higher credential level.  As a result of prior substantive change requests for this institution, including establishing new programs and facilitating teach-out of closed schools, ACICS initiated a comprehensive review and site visit. See Exhibit 113, p. 5, 19-24, and 25.

Conclusion: Documents in the record and current ACICS policies and procedures demonstrate current compliance and effective implementation of this criterion.

**Category A – Finding 5 –Teach Out Plans**

Accrediting agency regulation: 34 C.F.R. § 602.24(c )(1) - Teach-out plans and agreements

Staff Report Finding: The Agency needs to revise its teach out plan policies to include the requirements of this section of the criteria.

ACICS Response: ACICS currently has language in its procedural documents related to teach out plans and agreements, including specific evidence that ACICS requires teach-out plans in each of these circumstances: (1) limitation or termination of Title IV; (2) ACICS withdrawal of accreditation of an institution; (3) institutional closure; and (4) when a state licensing agency plans to or has revoked institutional authorization.  See Exhibits 267. Nonetheless, to address Staff concerns, ACICS is scheduled to revise its Accreditation Criteria to consolidate all references to teach out policies which are currently spread across various sections of the Accreditation Criteria. This revision to existing policy is being accomplished through: (1) development by ACICS staff of a policy outline for presentation to Council at the August 1, 2016 meeting for discussion, revision and adoption.

Conclusion: Documents in the record and current ACICS policies and procedures demonstrate current compliance and effective implementation of this criterion.

**Category B Findings (6 of 21 Findings): For which demonstration of effective implementation is the primary barrier to demonstrating compliance. Enhanced processes or procedures have been applied to campuses and programs during the Spring 2016 accreditation cycle (April – May – June) and have produced reports, responses from**

**institutions and other analytic considerations that will be reviewed by the Council at its Augusts 2016 meeting for the purpose of making accrediting decisions. The outcomes of the Council decisions are and will continue to be shared with the Department and the public through www.acics.org.**

### Category B – Finding 1 – Fiscal and Administrative Capacity – At Risk Institutions

Accrediting agency regulation: 34 C.F.R. § 602.16 (a)(1)(v) - Fiscal and administrative capacity as appropriate to the specified scale of operations.

Staff Report Finding:  The Agency needs to fully implement its plans to more consistently review and identify at-risk institutions. In addition, the agency needs to develop and implement its strengthened expectations for visiting teams to more consistently uncover institutional fiscal and administrative problems while on-site … The agency's fiscal and administrative standards have failed to identify institutions that were unable to run their programs efficiently, as evidenced by their poor retention and placement rates, and by their poor stewardship of Title IV funds. As well, the agency's ability to consistently judge the competence and/or ethical practices of the institutional administrators is also called into question.

ACICS Response: The Comment submitted by ACICS to SDO dated July 5, 2016, articulates ACICS concerns about the change in ED's interpretation of this criterion to ACICS as compared to application of the criterion to ACICS in the past and with respect to other accrediting agencies.

To respond to the concerns cited by ED, ACICS has established an At-Risk Institution Group (ARIG), unprecedented among accrediting agencies, which has already initiated nine special site visits based on investigations of complaints received including from comments solicited by ACICS prior to every full team visit during the Spring 2016 accreditation cycle, as well as media reports, publicly available information about state actions, and enrollment growth issues. These visits have resulted in an average of ten compliance findings per campus, and this evidence and school responses to same will be reviewed at the August 1, 2016 Council meeting.  ACICS received nearly 3,000 comments from faculty, administrators, and students from the ACICS calls for comment issued prior to ACICS site visits. ACICS is continuing this survey of campus students, faculty and staff prior to each on-site review. In addition, ACICS has instituted expanded requirements for narrative content for site visit team reports. The Council will review at its August 1, 2016 meeting the first set of team reports with expanded narrative content that will be used to make accrediting decisions.

ACICS values and honors the interagency oversight partnerships in which it participates, and continues to expand its outreach to other government entities in establishing a more effective network for sharing information about at-risk institutions, including recent outreach to ICE/SEVIS; state nursing boards; and the Title IV/FSA multi-campus teams.

Conclusion: ACICS has taken steps as described above to enhance its ability to identify at risk institutions. Evidence of the effectiveness of these procedures will be available at the August 1,

2016 meeting and at that point ACICS will have fully demonstrated compliance with this criterion.

## Category B – Finding 2 - Misrepresentation

Accrediting agency regulation: 34 C.F.R. § 602.16 (a)(1)(vii) - Recruiting and admissions practices, academic calendars, catalogs, publications, grading, and advertising.

Staff Report Finding: ACICS needs to fully implement its new and strengthened initiatives regarding misrepresentations to prospective students and abusive recruiting. In addition, the agency needs to regularly verify that each institution's recruitment process is complying with the new ACICS requirements.  It is apparent that the agency's process for implementing its standards in this area is not sufficiently effective. Over the last five years, a significant number of State attorneys general and others have obtained sizeable recoveries against ACICS-accredited institutions based on misrepresentations to prospective students and abusive recruiting … Therefore, it is apparent that the agency's standards in this area, and its implementation of them, are not effective in ensuring academic quality. As a result, a comprehensive and workable plan for remedying this deficiency in the agency's accreditation process is required, as well as any changes it has made already to ensure compliance with this new section. The agency's track record related to verifying self-reported information has been problematic. As a result, ACICS should be regularly verifying each institution's recruitment processes, a verification that may include the use of secret shoppers. In any event, the agency's new and strengthened initiatives have not produced the evidence to find ACICS in compliance with the requirements of this section."

ACICS Response:  The Comment submitted by ACICS to SDO dated July 5, 2016, articulates ACICS concerns about the change in ED's interpretation of this criterion to ACICS as compared to application of the criterion to ACICS in the past and with respect to other accrediting agencies.

Nonetheless, as acknowledged by ED, ACICS initiated reforms including new standards that apply to recruiting practices (Exhibits 125 and 206) requiring institutions to monitor recruitment practices consistently and is now requiring institutions to publish campus level and program level student achievement rates while establishing At-Risk Institutions Group (ARIG) monitoring and other steps (Exhibit 222). Outreach to students during the Spring 2016 site visit cycle produced approximately 3,000 comments from students regarding issues at ACICS institutions including statements regarding course scheduling, transferability of credit, explanation of tuition and fees, and appropriateness of resources.  The pattern of deficiencies related to the new admissions and recruitment standard (Exhibit 180, Accreditation Criteria, Section 3-1-412 (a), Recruitment, p. 43), effective July 1, 2016, will be reviewed by at its August 1, 2016 meeting.  That meeting will allow the Council to review a pattern of findings based on the new standard and to determine what tools, including secret shopping, can be used to enhance compliance. Institutions found to be out of compliance with the new standard after its effective date of July 1, 2016 will be subject to adverse action or required to come into compliance within the maximum timeframe.  Institutions found to have violated the new standard before its

effective date of July 1 can have accreditation decisions deferred for further evaluation including the use of secret shoppers as a tool to test compliance.

Conclusion: ACICS has a new policy in place addressing this criterion as of July 1, 2016. The August 1, 2016 Council meeting will review site visit findings under the new policy and take any appropriate deferral or enforcement action. ACICS will be in compliance with this criterion through evidence of effective implementation of same by August 2016.

**Category B – Finding 3 – Student Complaints**

Accrediting agency regulation - 34 C.F.R. § 602.16(a)(1)(ix) - Record of student complaints received by, or available to, the agency.

Staff Report Finding - The agency needs to continue implementing its strengthened process for obtaining and evaluating the record of student complaints for each institution. In addition, the agency needs to compile evidence that its strengthened process is effective in practice … a comprehensive and workable plan for remedying the deficiency in the agency's accreditation process is required, as well as any changes it has made already to ensure compliance with this section … It is too early for the evidence of the [new ACICS] process' effectiveness to be compiled.

ACICS Response:  It is the position of ACICS that it is and has been in compliance with this criterion. For example, Page 4 of the Staff Report indicates that since the last accreditation review of ACICS by ED, only three student complaints have been submitted to ED and ACICS was found to have appropriately acted on each such complaint.  As noted by the Staff Report, ACICS also processes anonymous complaints, not common among accreditors.

In an effort to address the concerns raised by ED, however, ACICS has taken new steps to demonstrate continued and strengthened compliance in this area.  As acknowledged in the Staff Report, ACICS has initiated a number of enhanced reviews of student complaints including the establishment of an online complaint system to solicit, receive and review complaints from students, faculty, staff and others prior to a site visit.  See Exhibit 268 (Call for Comment Survey).  This online complaint process has enabled ACICS to encounter evidence that in most cases corroborates information received from complaints or other sources of adverse information. This information is also used by the ACICS At Risk Institutions Group (ARIG) review as a trigger for additional monitoring action including special or unannounced visits; seven of which have already been initiated based on a ARIG review.  The authority to require a special visit does not require Council approval; it resides within the executive leadership of the organization. See ACICS Standard 2-3-800. The results of the special visits derived from the reviews by the ARIG will be reviewed at the August 1, 2016 Council meeting, including at least two site visits based on student complaints and the institutional response to same, with decisions on enforcement action to be taken at that meeting. By August 2016, ACICS will have evidence of effective implementation of its new complaint resolution and action procedures described in the record.  Further, at the ACICS August 2016 meeting, ACICS will also consider a new policy to establish a permanent complaint hotline that ACICS accredited schools will be required to provide to all staff and students.

Conclusion:  At the August 1, 2016 Council meeting the Council will take action based on information gathered and reviewed under its new enhanced policies and will, at that time, have evidence of effective implementation of its new student complaint procedures.

**Category B – Finding 4 – Achievement of Stated Objectives**

Accrediting agency regulation: 34 C.F.R. § 602.17(a) - Application of standards in reaching an accrediting decision - The agency must have effective mechanisms for evaluating an institution's or program's compliance with the agency's standards before reaching a decision to accredit or pre-accredit the institution or program. The agency meets this requirement if the agency demonstrates that it-
(a) Evaluates whether an institution or program-
(l) Maintains clearly specified educational objectives that are consistent with its mission and appropriate in light of the degrees or certificates awarded;
(2) Is successful in achieving its stated objectives; and
(3) Maintains degree and certificate requirements that at least conform to commonly accepted standards.

Staff Report Finding**:** The Agency must clarify its policies and procedures relative to its new data integrity standards and new team reviewer. The Agency must also demonstrate that it has applied these standards (for example, in a site visit report) … Based on widespread placement rate falsification (see Finding related to criteria 34 C.F.R. 602.16(a)(1)(ii)), the agency is not in compliance with this section … the agency needs to demonstrate what it will do to consistently ensure the reliability of its decisions as to whether the institution is successful with regard to placement. Exhibit 206 does not provide enough details related to reported changes in data integrity standards and addition of a new data integrity reviewer on the site team for the Department staff to understand the impact of these changes on the agency's overall review of the institutions relative to their missions and objectives.  For example, if the information is found to be inaccurate on the institutions Campus Accountability Report (CAR), it is stated that the agency will require additional intensive verification of the CAR. However, the intensive verification process is not explained.  Additionally, the new data integrity standard is effective August 1, 2016. It remains unclear how the agency has held institutions accountable for ensuring integrity in their data submissions before adopting this standard, or afterward. A new data integrity reviewer has been added as part of the onsite visit team and is said to be effective for the Spring 2016 cycle, but that more guidance will be issued in Fall 2016. However, there was not a site visit report (or exhibit) that included information about the new reviewer demonstrating application of this standard. The narrative states that the reviewer has been trained for this role and the agency has included documentation of communication and training for this role in Exhibit 203. Without additional information to clarify the new standards and documents demonstrating the application of these processes, the agency has not documented that it has consistent application of standards in the reliability of its decisions relative to its institutions for mission and objectives.

ACICS Response:  The new Data Integrity Standard was effective July 1, 2016.  Data Integrity Reviewers (DIRs) were included on every evaluation team during the Spring 2016 cycle. This

additional capacity enabled ACICS to test the integrity of 84% of all reported placements. In addition, the reviewers examined 100% of the documentation supporting those reported as "not available for placement." In addition, DIRs discovered 23 findings related to campuses inability to verify the data, the absence of sufficient information to support classifications, or because of inaccuracy in the Campus Accountability Report.  These findings will be reviewed by the Council at its August 1, 2016 meeting.  ACICS is developing a scoring rubric or similar empirical evaluative tool that measures the deviations in tested data from reported data; establishes tolerances for such deviations; assigns weights for degree of deviation, persistence of deviations and sources of deviations; and then integrates the application of the scoring rubric into Council review and decision-making deliberations.

Conclusion: As of August 1, 2016, ACICS will have evidence of effective application of its new data integrity standards.

**Category B – Finding 5 – Reasonable Basis for Accuracy of Information**

Accrediting agency regulation: 34 C.F.R. § 602.18 (d) – The agency must consistently apply and enforce standards that respect the stated mission of the institution, including religious mission, and that ensure that the education or training offered by an institution or program, including any offered through distance education or correspondence education, is of sufficient quality to achieve its stated objective for the duration of any accreditation or pre-accreditation period granted by the agency. The agency meets this requirement if the agency – (d) has a reasonable basis for determining that the information the agency relies on for making accrediting decisions are accurate.

Staff Report Finding - The Agency must clarify how the agency holds institutions accountable for ensuring integrity in their data submissions and explain their verification processes. The Agency must provide documentation demonstrating that they have applied their standards (such as an onsite visit report) … the Agency has institution a "Placement Verification Program" to randomly call employers to see if the information provided by selection institutions was reasonably accurate. Although that program has a valid purpose, it is apparent that the Agency had an inadequate process and providing insufficient resources to accomplish its purpose. The same concerns are true for the verification of institutional retention rates. Therefore, based on the widespread placement rate falsification discussed in the criteria for 34 C.F.R. § 602.16(a)(1)(i), the Agency is not in compliance with this section. The Agency does not appear to have a reasonable basis for determining the information it relies on for making accrediting decisions is accurate. As a result, the Agency needs to address what it will do to ensure that its decisions are consistently based on reliable information.

ACICS Response:  ACICS had and will continue to have procedures in place to demonstrate a reasonable basis for determining that the information the agency relies on for making accrediting decisions is accurate. Historically, ACICS has relied upon on-site random sampling of placement outcome back-up documentation as its standard protocol and practice.  That process was enhanced beginning in Spring 2016 with addition of dedicated Data Integrity Reviewer (DIR) to review every placement outcome reported by the campus for the previous year, including all available back-up documentation, not just random samples.  Further, ACICS added a data

integrity algorithm to its IT platform two years ago.  ACICS added the Placement Verification Program (PVP) that establishes random monthly placement data testing in January 2016.  In addition, ACICS has in the past, based on Council discretion and for good cause, required institutions to submit their data to independent third- party verification at their expense.

As demonstrated in the record, ACICS has issued a Memo to the Field putting institutions on notice that all data reported to ACICS for any purposes is expected to reflect accurate and verifiable information about institutional performance and is subject to review by ACICS and established a new data integrity standard in Standard 3-1-203. This enhanced policy is in effect as of July 1, 2016.

The Data Integrity Reviewer's (DIR) role was included on every evaluation team (37) in Spring 2016. As a result of this enhanced focus on the integrity of placement data reported and disclosed, on average, 84% of all reported placements have been attempted and 100% documentation review conducted for those reported as not available for placement. In addition, based on information received from third parties, extensive inconsistencies in the placement reported and unverified, the Council has directed campuses to conduct an independent third party review of all reported data for multiple years. Further, the DIR identified 23 findings based on campus inability to verify the data, the absence of sufficient information to support classifications, or because of inaccuracy in the Campus Accountability Report prepared. These findings will be reviewed by the Council at its August 1. 2016 meeting with action on accreditation status of affected institutions at that time.

As stated in the Staff Report, ACICS monitors data integrity through a proprietary information technology system that tests document submissions to identify missing or inaccurate fields of information.  This electronic algorithm will be enhanced by December 2016 to identify outlier data fields, and to assist in identifying at risk institutions for considering by the At Risk Institution Group. Data is also verified during on-site reviews by the DIR and other ACICS staff, and by monthly data sampling. Independent third party audits are utilized where a pattern of concerns are revealed

Conclusion:  As of August 1, 2016, ACICS will have evidence of the effective application of is enhanced data integrity and related placement verification policies.

**Category B – Finding 6 – Out of Cycle Review**

Accrediting agency regulation: 34 C.F.R. § 602.21 Review of standards.
(a) The agency must maintain a systematic program of review that demonstrates that its standards are adequate to evaluate the quality of the education or training provided by the institutions and programs it accredits and relevant to the educational or training needs of students.
(b) The agency determines the specific procedures it follows in evaluating its standards, but the agency must ensure that its program of review --
(1) Is comprehensive;
(2) Occurs at regular, yet reasonable, intervals or on an ongoing basis;
(3) Examines each of the agency's standards and the standards as a whole; and

(4) Involves all of the agency's relevant constituencies in the review and affords them a meaningful opportunity to provide input into the review.

Staff Report Finding: The Agency must provide additional documentation to demonstrate that it has a systematic recurring process to identify issues occurring at problematic institutions outside of its normal standards review process as noted in the draft analysis. The Agency must also provide a completed Campus Effectiveness Plan (CEP) and evidence of a standards revision as a result of its review of a CEP … The Agency does not have an effective mechanism for reviewing standards out of the scheduled cycle that have allowed significant issues at problematic institutions to go unchecked. Although the Agency may claim that its procedures already allow for that special focus to take place at any time, its implementation has been demonstrably inadequate. Therefore, the Agency needs to revise its standards review program to encourage a special focus on any deficiencies in its standards that are identified during each decision-making meeting. In addition, the Agency needs to provide documentation that it is expeditiously and consistently implementing that specialized standards review, as needed.

ACICS Response:  ACICS provided a completed CEP, Exhibit 93, which was overlooked by ED Staff and that provides evidence of the effective application of the new standard to a CEP. Outside of the normal review process, ACICS employs a systematic review of institutional data (enrollment, retention, placement, financials) on an annual basis. These data are reviewed by the Institutional Effectiveness Committee (IEC) and Financial Review Committee (FRC) standing committees which take actions on the information reported by institutions.

Further, the At Risk Institutions Group (ARIG) has been established to closely monitor critical activities that occur outside the normal process – including complaints, adverse information, growth, financial monitoring. For example, and as have been previously noted, ARIG review has resulted in seven special visits have been initiated as a result of this more focused, all-encompassing review.

Conclusion: ACICS meets this criterion based on evidence submitted in the record and will have evidence of enhancements to its focused review process evaluated by the Council at the August 1, 2016 meeting with accrediting decisions made at that time.

**Category C Findings (10 of 21 Findings)**: For which ACICS is acting pursuant to a timeline to establish new policies and procedures and demonstrate effective implementation to demonstrate compliance. ACICS has revised its standards and other policies for consideration and adoption by the Council at its August 1, 2016 Council meeting, with evidence of implementation to be established no later than the end of the first institutional review cycle of 2017, or by April 2017.

- Full implementation of standard and policy revisions required for this category of findings will require at least the Fall 2016 accreditation cycle (September – October – November 2016) for implementation and application to campuses and programs, a step which must take place in order to demonstrate implementation.
- In addition, revised standards and requirements previously established by ACICS regarding student achievement and applied through the review of the annual Campus

Accountability Report (CAR) commence with the submittal of the 2016 CAR data, due to ACICS November 1, 2016. The data is subject to integrity testing and computational analysis before it is presented for Council review at the December 2016 Council meeting (December 5, 2016).

- Based on that review, campuses and programs that have not been able to demonstrate compliance with student achievement standards within the established Council timeframe will be subject to adverse actions and notifications, and ACICS will be able to demonstrate implementation of those new standards and requirements to the Department no later than April 2017.

**Category C – Finding 1 – Acceptance by Others**

Accrediting Agency Regulation: 34 C.F.R. § 602.13 Acceptance of the agency by others - The agency must demonstrate that its standards, policies, procedures, and decisions to grant or deny accreditation are widely accepted in the United States by --
(a) Educators and educational institutions; and
(b) Licensing bodies, practitioners, and employers in the professional or vocational fields for which the educational institutions or programs within the agency's jurisdiction prepare their students.

Staff Report Finding: The Agency still needs to address how well graduates of its institutions succeed on those licensing exams that are required for employment, especially by using data specific to each licensing exam.  In addition, the Agency still needs to provide documentation of continued positive relationships with state licensing-related entities and nurse accrediting agencies, especially by providing current documents … The Agency needs to delineate the programs that its accredited institutions offer where a licensing examination for that field exists, and then the Agency needs to address how well graduates of its institutions succeed on those licensing exams that are required for employment, as well as on those licensing exams that are optional for employment … The Agency needs to provide documentation of continued positive relationships with state licensing-related entities and nurse accrediting agencies … the demonstration of employer support is based on data self-reported by institutions … this is of concern because little, if any, of that data appears to have been verified by the Agency, and because any verification by the Agency appears to have taken place during the site team evaluations that only occur approximately every five years, after much of the data is already too old to be of use … the Agency needs to provide reliable documentation of its acceptance by employers … in light of the negative third party comments submitted by the attorneys general of 13 states, the ACICS claim that it remains in good standing with all state approving agencies is difficult to accept.

ACICS Response: ACICS has successfully completed formal recognition reviews by the Accrediting Commission for Education in Nursing (ACEN), Texas Higher Education Coordinating Board, the Council for Higher Education Accreditation (CHEA) and the American Registry of Radiologic Technologists (ARRT) during the past eight years.  In addition, on the basis of its recognition by CHEA and the Department, ACICS is recognized by the American Association of Colleges of Nursing.  Of the five recognition sources, only CHEA requires

18

periodic renewal of recognition. Therefore, ACICS has not been required to nor has sought renewal reviews by the other four entities, and therefore does not have affirmative documentation of its continuing acceptance by those authorities to submit to ED Staff. However, ACICS status with each of those entities has not changed.

Further, in order to provide the information requested by ED regarding graduate performance on licensing exams required or relevant to programs offered by ACICS institutions in every state in which that institution operates, ACICS is developing a systematic matrix to identify and track in greater detail the performance of more than 640 professional programs offered in more than 40 states for which licensure or certification is required for placement in employment.

The elements of the performance tracking will include: (1) the pass rate of the most recent cohort and trend lines for the past three cohorts; (2) the placement performance by cohort for each program; (3) current approval status of the program by the state licensing board (i.e., conditional approval; probation; approval withdrawn). The matrix will inform the design of reviews of the programs by ACICS site review teams, contribute to the risk-based analysis of ACICS schools, and inform the Council's accreditation decisions. ACICS expects to have this matrix in place by the beginning of the Fall 2016 site visit cycle, September 1, 2016.

In the meantime, ACICS will continue to reach out to establish more robust relationships with state licensing bodies, programmatic accrediting agencies, and employers to obtain additional updated statements of acceptance of ACICS accreditation, as well as to establish stronger working relationships to share information related to graduate and institutional performance. ACICS expects outreach to licensing entities to be complete by July 31, 2016, with a report to Council at the August 1, 2016 meeting, and with additional outreach to proceed as ACICS works to expand the matrix of applicable state and accreditor licensing entities applicable to all programs offered by ACICS schools. For that purpose, ACICS has established a State and Accreditor Working Group which is composed of entities with which ACICS already has established relationships and which will be built out with additional state and accrediting agency contacts to facilitate better communication. The membership of the State and Accreditor Working Group will be developed and added to as ACICS builds out its matrix of relevant licensing entities.

ACICS has taken enforcement action related to licensing exam performance based on 2015 data. For example, based on 2015 licensure exam data, ACICS issued 40 Compliance Warnings for licensure rates below ACICS standards, issued 81 accreditation action deferrals based on licensure rates below ACICS standards, and found that 512 programs offered by ACICS accredited schools had exam passage rates above ACICS standards.

Over the last three (3) years, ACICS has moved toward the ability to provide license exam passage rate information at the program specific level to obtain data usable to make accrediting decisions but the process as described requires until the December 2016 Council meeting to complete this process fully, with evidence of enforcement of these new requirements available by April 2017. In the meantime, ACICS has submitted evidence of action taken utilizing 2015 CAR data on institution level licensure passage rates. See Exhibit 195: Student Achievement Letters, at p. 1, 3, 6, and 8

ED's *Guidelines for the Preparing/Reviewing Petitions and Compliance Reports* (2012), available at http://www2.ed.gov/admins/finaid/accred/agency-guidelines.pdf, states that "wide acceptance does not necessarily mean unanimous acceptance by all of the agency's constituents/communities of interest." Further, "wide acceptance by licensing bodies" is generally reviewed by ED Staff to "see if the agency discussed and demonstrated, as appropriate, aspects such as --

- Graduation from an institution and/or program accredited by the agency as a requirement to sit for an exam and/or to obtain a license or certification, employment, etc.
- Accreditation as acceptance by state approval authorities for institutional/program licensure to operate, reciprocity, etc.
- Support from state approval, licensure, and/or certification offices.

It is unreasonable to request state approval authorities to generate "letters of support" for any accreditor outside of the formal process of granting recognition unless the authority has accomplished a formal recognition review recently, as the state approval agency head would have no basis to offer a written endorsement. Requiring ACICS to obtain letters of support/acceptance from every state approval authority is unprecedented and, as noted in the ACICS Comment to SDO dated July 5, 2016, a change in ED's interpretation of the accreditation criteria for which ACICS was not given sufficient notice.

With additional time, ACICS is committed to surveying its State and Accreditor Working Group to seek additional affirmations in response to ED's findings including by asking the members of the Working Group: "Do you have reservations about the sufficiency of ACICS accreditation reviews to colleges and schools operating in your state? If so, what is the basis for those concerns?" This type of survey will give ACICS and ED concrete information rather than use a lack of recent support documents from states as a basis for denial of accreditation.

Conclusion: ACICS is taking concrete measurable steps toward implementing a program level licensing exam passage rate student achievement measure in the CAR, with evidence of application of that policy to be in place by April 2017 at the latest. ACICS will also have additional written evidence of licensing entity support for review at the August 1, 2016 Council meeting. ACICS is also engaging in relationship building and coordination with licensing entities through the establishment of a State and Accreditor Working Group. As a result, ACICS has established that it can further substantiate compliance with this criterion within 12 months.

**Category C – Finding 2 – Adequacy of Volunteer Training**

Accrediting Agency Regulation: 34 C.F.R. § 602.15(a)(2) - Administrative and fiscal responsibilities. - The agency must have the administrative and fiscal capability to carry out its accreditation activities in light of its requested scope of recognition. The agency meets this requirement if the agency demonstrates that— (a)(2) - Competent and knowledgeable individuals, qualified by education and experience in their own right and trained by the agency on their responsibilities, as appropriate for their roles, regarding the agency's standards, policies and procedures, to conduct its on-site evaluations, apply or establish its policies, and make its

accrediting and pre-accrediting decisions, including, if applicable to the agency's scope, their responsibilities regarding distance education and correspondence education …

Staff Report Finding: The agency needs to document how its revised training program for all volunteers provides more focus on consistently recognizing problems and questionable practices at institutions, particularly concerning student achievement. In addition, the agency needs to document that each volunteer has undergone the improved training process before being permitted to fulfill the tasks assigned to them.  Furthermore, the agency needs to document the membership and activities of its new Ethics Review Board … including how it will prevent the ethical issues faced by ACICS over the past few years.  It needs to document the integrity and sufficiency of its data verification regime, both in design and implementation … the Department staff is aware that some previous members of the Council were connected to institutions that were themselves the subject of serious concern to the agency for various reasons.  The agency was also aware of the appearance of inappropriate self-interest and a lack of competency presented by those previous situations … the Department staff is concerned because of the Council's failures in discovering and acting upon questionable and fraudulent behavior at a significant number of larger institutions accredited by ACICS …

ACICS Response:

ACICS is developing an expanded/enhanced training program for evaluators, Council members, Institutional Review Committee (IRC) members and accreditation coordinators that includes modules on how to analyze and apply the ACICS data integrity standards to student achievement data and an enhanced focus on Title IV compliance, student achievement performance, admissions/recruitment activities, and the integration of at-risk institutions metrics into the campus review process.  The Council will review a training course and fraud detection template at the August 1, 2016 meeting for adoption by ACICS that would train Commissioners, evaluators and staff.  Once the training module is complete, ACICS will hold a webinar for evaluators with training for staff in the same time period.  Information evaluated by ACICS at the August 1, 2016 meeting from team reports involving data integrity reviewers will be utilized to adjust the template and include high risk areas for evaluation. ACICS is prepared to document Commissioner, evaluator and staff training by the August 1, 2016 meeting. In addition, ACICS is prepared to document training of evaluators before their deployment in the Fall 2016 travel cycle, September-November 2016. Team reports on the results of that training will be reviewed by ACICS at the December 2016 meeting during which accreditation decisions will be made.

With regard to the new data integrity policy, at the August 1, 2016 Council meeting the Council will review the results of data Integrity Reviewers on 37 site visit teams, who made a total of 3,482 attempted contacts to verify placements and successfully contacted over 2,250 graduates (which is a 64% contact rate). Of the 2,250 graduates, ACICS confirmed 2,196 confirmed placements, resulting in a confirmation rate of 97%. See Exhibit 269 (On-site placement verification by Dedicated Integrity Reviewer). The Teams found 23 findings of questionable data integrity practices relative to placement which are incorporated into the respective team reports.

At the August 2016 Council meeting, ACICS will determine how to use data derived from team reports to apply the new data integrity standard and how to determine if the available information constitutes a breach of the data integrity standard, including determining the appropriate

statistical tolerance for variance from reported placement rates for student achievement data that cannot be confirmed. ACICS will obtain an expert to advise on statistically acceptable variance. After these decisions are made, ACICS will be in a position to apply the information obtained from the new data verification policy to accreditation decisions. At the August 1, 2016 Council meeting, the data integrity policy will be discussed including how the dedicated data integrity reviewers, combined with the ACICS submission algorithm, Placement Verification Program and the third-party independent verification protocols will be used together to increase Council confidence in self-reported data used to make accreditation decisions.  With respect to the algorithm utilized by ACICS to review CAR reports for omissions and errors, ACICS is building out a stronger risk identification mechanism to that algorithm by November 2016 to assist in identifying anomalies in reported student achievement data to assist in risk-level review.

With regard to the new Ethics Review Board, ACICS has identified candidates that would fulfill the requirements of the bylaws establishing the Ethics review board which became effective July 1, 2016. The composition of the Board will be released by July 31, 2016.

Conclusion: Within 12 months, ACICS will be able to demonstrate robust training of all ACICS evaluators, Commission, committee members and staff regarding their responsibilities including the identification of questionable or fraudulent activity and student achievement data. The Ethics Review Board will be operational by July 31, 2016. The first set of information from the DIRs as part of the Team Reports will be available to the Commission at the August 2016 meeting, with decisions on application of that information to accrediting decisions at that meeting and evidence of application of that new policy to institutions by the December 2016 meeting.

## Category C – Finding 3 – Academic and Administrative Personnel

Accrediting Agency Regulation: 34 C.F.R. § 602.15 (a)(3),(4) - Administrative and fiscal responsibilities.-  The agency must have the administrative and fiscal capability to carry out its accreditation activities in light of its requested scope of recognition. The agency meets this requirement if the agency demonstrates that— (a)(3) The agency has academic and administrative personnel on its evaluation, policy, and decision-making bodies, if the agency accredits institutions; (a)(4) Educators and practitioners on its evaluation, policy, and decision-making bodies, if the agency accredits programs or single-purpose institutions that prepare students for a specific profession;

Staff Report Finding: The agency needs to clarify and document its entire process for the recruitment, selection, and verification of the qualifications and experience possessed by those selected to serve on the agency's evaluation teams and decision-making bodies.

ACICS Response:

The Staff Report contains many positive statements about ACICS compliance with these criteria. In response to the identified residual concerns, ACICS has prepared a revised Attestation Form to more clearly indicate roles, qualifications and experience of those selected to serve on the agency's evaluation teams and decision-making bodies which will be utilized for all evaluators, the Commission and IRC. The prototype was developed for the Review Board, and the same format and content of attestations will be applied to evaluators, IRC members, and Council

22

members, see Exhibit 262. In addition, ACICS is developing a new on site team composition procedure that requires the review of the attestation and the CV on file to ensure academic or administrative qualifications.

Conclusion: ACICS has enhanced its procedures for obtaining and verifying information related to the roles, qualifications and experience of those selected to serve on the agency's evaluation teams and decision-making bodies which will be utilized for all evaluators, the Commission and IRC.  These procedures have been revised and ACICS will have evidence documenting effective application of these new procedures by the August 1, 2016 Council meeting.

## Category C – Finding 5 – Title IV Compliance

Accrediting Agency Regulation: 34 C.F.R. §602.16 (a)(1)(x) Accreditation and preaccreditation standards. The agency must demonstrate that it has standards for accreditation, and preaccreditation, if offered, that are sufficiently rigorous to ensure that the agency is a reliable authority regarding the quality of the education or training provided by the institutions or programs it accredits. The agency meets this requirement if- (1) The agency's accreditation standards effectively address the quality of the institution or program in the following areas: (x) Record of compliance with the institution's program responsibilities under Title IV of the Act, based on the most recent student loan default rate data provided by the Secretary, the results of financial or compliance audits, program reviews, and any other information that the Secretary may provide to the agency.

Staff Report Finding: The Department cannot see how the agency could apply these revisions in such a way as to document effectiveness in monitoring in the time it would be given to respond in a compliance report, particularly in view of its weak record in monitoring and failure to document enforcement, and prior lack of cooperation with the Department.

ACICS Response:  As stated in the Comment by ACICS to the SDO, ACICS is concerned that ED's expectations with regard to ACICS fraud detection go beyond what has ever been required of ACICS or any accreditor in the past, and that ACICS has not been provided adequate time to adjust to these new requirements.  Nonetheless, ACICS has made significant strides in enhancing evaluator and staff training and expectations with regard to ACICS operations under this criterion.  In addition to the policy changes already documented in the record and referred to in the Staff Report, ACICS has established and conveyed to all accreditation coordinators, managers, evaluators and team chairs a written protocol in the Office of the Executive to methodically and routinely notify the Department of any suspected fraud or abuse derived from the on-site evaluation of campuses or other sources of information (Exhibit 270: Executive Directive Regarding Fraud and Abuse).  The protocol makes systematic the identification and communication of issues regarding the appropriate administration of federal student aid.  This protocol fulfills the requirements articulated in the ACICS standards.  See Exhibit 180, Accreditation Criteria, Appendix G, p. 114. As stated in Appendix G, the Council will inform ED of all instances of suspected fraud or abuse. The institution will

In the situation of MJI, ACICS had received no complaints from students regarding the quality of education or the administration of student financial aid prior to the initiation of an adverse inquiry by ACICS in December 2012; the basis for that inquiry was adverse media information

regarding the heavy reliance of MJI on the enrollment of students participating in study abroad activities.  MJI was subject to a Title IV program review in 2013, while the ACICS adverse inquiry was underway.  To the best of the agency's knowledge, the FSA division of ED had no findings from that program review.  ACICS has withdrawn MJI's grant of accreditation effective July 2016. This action has been acknowledged by ACICS, see Exhibit 266, MJI Acknowledgment letter of Withdrawal, July 1, 2016, and constitutes the culmination of a sustained oversight partnership between the agency and the Department's Title IV division. However, the MJI situation is unacceptable and ACICS policies and procedures have been changed to require an affirmative obligation of all ACICS personnel, including Commissioners and evaluators, to report any suspected fraud to the Office of the Executive as a first step in fulfilling the ACICS reporting obligation to the Department.  Before the beginning of the Fall 2016 travel cycle (September 1, 2016) ACICS will establish a tip line for fraud and abuse that institutions will be required to make available to all students and staff, which will supplement the calls for comment to students and staff that precede all ACICS site visits.

Conclusion: ACICS has put in place strengthened policies and procedures for detecting Title IV fraud and abuse and will be able to demonstrate by April 2017 the effectiveness of those enhanced protocols.

**Category C – Finding 6 – Sufficiency of Team Visit Process (Past Placement Rate Issue)**

Accrediting Agency Regulation: 34 C.F.R. § 602.17(c) ‐ Conducts at least one on-site review of the institution or program during which it obtains sufficient information to determine if the institution or program complies with the agency's standards.

Staff Report Finding: The agency needs to provide evidence that its regular on-site visit process currently and consistently obtains sufficient information to determine if the institution complies with ACICS standards … Based on the widespread placement rate falsification discussed in Section 602.16(a)(1)(i), and prevalent actions by state and federal authorities for recruiting abuse and misrepresentation discussed in Section 602.16(a)(1)(vii), the agency is not in compliance with this section. ACICS is apparently not obtaining sufficient information to determine if the institution complies with the agency's standards. Therefore, the agency needs to explain what changes it has made and will make to ensure it consistently obtains sufficient information during an on-site evaluation to make a reliable compliance determination.

ACICS Response:  As stated in the Comment by ACICS to the SDO dated July 5, 2016, ACICS is concerned that ED's application of this criterion to ACICS has been influenced by placement rate errors at institutions that have been the subject of state attorney general or other investigations or state or federal lawsuits, and that ACICS has not been provided sufficient time to adjust its operations to meet ED's changed and heightened standards under this criterion.

Nonetheless, ACICS has made significant strides in enhancing on-site visit protocols to obtain better information about problems with school operations. As referenced by the Staff Report, a "Call for Comment" initiative has been implemented during the current on-site review cycle that resulted in 4,000 comments received – 3,000 from students. Exhibit 268 (Sample Call for Comment Survey). The themes of responses – course scheduling, knowledge of transferability of credit, tuition and fees not fully explained, and appropriateness of resources, assists in focusing

on-site visit reviews.  ACICS integrates consideration of complaints and adverse information into the pre-visit planning meetings.   Since January 2016, findings from the Placement Verification Program (PVP) have been available to inform the accreditation cycle, including the review of institutions during site visits.

As referenced in the Staff Report, a dedicated Data Integrity Reviewer has been added to each full team visit, starting with the Spring 2016 visit cycle, with the explicit responsibility to perform enhanced verification of the institution's Campus Accountability Report (CAR) data during site visits. Team Reports containing more elaborate narration regarding the sources of findings encountered on-site by the program evaluator, as well as information obtained by the DIRs, will inform deliberations and actions of the Council beginning with the August 2016 meeting.

As previously discussed, ACICS is also performing a more comprehensive screening and training of all evaluators, including with respect to fraud detection, and is soliciting additional information on a regular basis from school staff and students to determine areas of concern, such as through both call to comment and hotline, and utilizing the information from the At Risk Institutions Group to target areas for review during the site visits.

Conclusion: ACICS has or will put in place strengthened on site visit procedures and institutional monitoring to be able to demonstrate no later than  April 2017 that it has the required policies and procedures and has evidence demonstrating the effectiveness of those new policies and procedures.


**Category C – Finding 7 – Institutional Review Processes**

Accrediting Agency Regulation: 34 C.F.R. § 602.19(b) Monitoring and reevaluation of accredited institutions and programs**.**  (b) The agency must demonstrate it has, and effectively applies, a set of monitoring and evaluation approaches that enables the agency to identify problems with an institution's or program's continued compliance with agency standards and that takes into account institutional or program strengths and stability. These approaches must include periodic reports, and collection and analysis of key data and indicators, identified by the agency, including, but not limited to, fiscal information and measures of student achievement, consistent with the provisions of § 602.l6(f). This provision does not require institutions or programs to provide annual reports on each specific accreditation criterion.

Staff Report Finding**:** The agency does not meet the requirements of this section of the criteria. The agency must demonstrate that it could apply revision in such a way as to document effectiveness in monitoring in the time it would be given to respond in a compliance report, particularly in view of its weak record in monitoring and failure to document enforcement. Also, the agency must demonstrate that it provided the appropriate information and documentation of the use of all monitoring mechanisms included in the agency's narrative as requested in the staff draft analysis.

ACICS Response:  The ACICS Financial Review Committee (FRC) has issued multiple show-cause directives in recent years reflecting sensitivity to factors of risk derived from institutional financial reports and inquiries.  ACICS has utilized an escalating scale of actions against

institutions with demonstrated financial weakness, including: Quarterly Financial Reports (QFR), Financial Improvement Plans (FIP), show cause directives, and ultimately withdrawal of accreditation. The QFRs are reviewed at each ACICS meeting to evaluate a school's progress in addressing its financial challenges or to see if they are deteriorating.  If ACICS finds evidence of a school having serious problems, it can and does conduct special visits to the school to review if the school is able to deliver student services in the relevant areas.  See Exhibit 271 (Notification of Financial Special Visit, p. 3).   As long as the school has a plan, and the quality of the education is not affected, the Council continues to monitor the school's financial situation.  The schools ultimately either address their financial concern or they close.  They are required to provide teach out plans in the event needed.

During 2012-2016, the FRC has taken the following actions: QFR (76); Continued QFR (185); FIP (79); Continued FIP (228); and Financial Show-Cause (35). ACICS acknowledges that self-reported student achievement data were not verified in the past to the extent now required by ACICS.  ACICS has implemented a Data Integrity Reviewer on each institution visit whose sole purpose is to verify student achievement (Campus Accountability Report) data.  The effectiveness of the DIR program is under review following the Spring 2016 cycle, and opportunities to enhance the program will be applied to the Fall 2016 site visit cycle.  ACICS is confident that measurable results will be provided to NACIQI within 6-12 months.

ACICS provides here additional information or documentation to describe its process for reviewing the financial information it collects and the manner by which it identifies abnormal risk. The Financial Review Committee (FRC), applies a series of financial ratios to the information provided by institutions, including a scoring rubric. See Exhibit 59.   ACICS uses a template for Annual Financial Reports (AFR). See Exhibit 57.   In the ACICS response to the staff draft report, ACICS previously provided documentation of the financial and or student achievement monitoring of two Sanford Brown campuses in Table C of its response to questions from ED (Exhibit 121) and the Arlington VA and Silver Spring MD Everest College campuses. See Exhibits 215a and 215b.  With regard to the process and action taken for Corinthian campuses in California after notification to ACICS of the state attorney action in 2011 as well as CEC after notice of the NY AG action, Corinthian was subject to heightened monitoring by ACICS through the Business Practices Committee protocol for adverse information and was required to provide to the Council at least three times a year updates regarding the substance and procedural status of the state attorney general investigation. See Exhibit 256: BPC Minutes, December 2014, p. 10-12.   ACICS issued a show-cause directive to Career Education Corporation after the New York attorney general investigation produced evidence of false reports regarding student achievement performance. See Exhibit 194 - 1. CEC Show-Cause third-party placement verification - 2 Sample team report - data integrity finding.

Conclusion: The agency's revised Accreditation Criteria and enhanced procedures include stronger monitoring and evaluation approaches for identifying problems with an institution's or program's continued compliance with ACICS standards. ACICS can demonstrate no later than April 2017 the effective application of those new procedures to monitor institutions.

**Category C – Finding 8 – Enforcement**

Accrediting Agency Regulation: 34 C.F.R. §602.20 (a)(1)(2)(i)(ii)(iii) Enforcement of standards. (a) If the agency's review of an institution or program under any standard indicates that the institution or program is not in compliance with that standard, the agency must-

(l) Immediately initiate adverse action against the institution or program; or

(2) Require the institution or program to take appropriate action to bring itself into compliance with the agency's standards within a time period that must not exceed:

(i) Twelve months, if the program, or the longest program offered by the institution, is less than one year in length;

(ii) Eighteen months, if the program, or the longest program offered by the institution, is at least one year, but less than two years, in length;

(iii) Two years, if the program, or the longest program offered by the institution, is at least two years in length.

Staff Report Finding**:** The agency's response to the documentation requests regarding enforcement of timelines was insufficient. In addition, the agency's proposed language revisions are insufficient and have not been finalized and implemented, and the agency has been ineffective in past efforts to bring itself into compliance. As a result, the agency cannot be found in compliance with the requirements of this section.

ACICS Response:  The changes ACICS has made to its policies and procedures comply with this accreditation criterion. ACICS has taken immediate action against institutions for standards violations including 93 show-cause directives and 2789 heightened monitoring actions within the last five years.  As a result of the new ACICS compliance warning process, 26 campuses and 725 programs are in jeopardy of losing accreditation following submission of the 2016 Campus Accountability Report (CAR). Those programs and campuses are required to demonstrate compliance with ACICS standards through their submission of 2016 CAR Reports, due November 1, 2016. Council will review the student achievement performance at the December 2016 meeting and take adverse actions against those programs and campuses that have not fully remedied their student achievement performance.  ACICS will develop and adopt revised student achievement standards that clarify how information from any regular or interim visit, or from other sources of information, can be a basis for immediate adverse action or affording institutions no more than the maximum interval to get back into compliance. Those revised standards will be reviewed and adopted by Council by December 2016.

Information specific to Westwood and ITT documentation requests were provided to ED in the May 2016 response to Part II of ED's supplemental request for information. See Exhibits 157, 160. The Staff Report does not acknowledge that submission and the Staff Report author may not have been aware of that supplemental submission.

Conclusion: The agency is developing revisions to its Accreditation Criteria and standard procedures to include a revised set of monitoring and evaluation approaches for identifying problems with an institution's or program's continued compliance with ACICS standards. ACICS can demonstrate no later than April 2017 the effective application of those new procedures to monitor institutions.

**Category C – Finding 9 – Maximum Time Frame for Compliance**

Accrediting Agency Regulation**:** 34 C.F.R. § 602.20 (b) - If the institution or program does not bring itself into compliance within the specified time period, the agency must take immediate adverse action unless the agency, for good cause, extends the period for achieving compliance.

Staff Report Finding**:** The agency's proposed policy language regarding good cause extensions does not include a maximum time period, as requested. In addition, the agency did not provide the requested documentation demonstrating ACICS took immediate adverse action when an institution did not bring itself into compliance within the specified time period. As a result, the agency cannot be found in compliance with the requirements of this section.

ACICS Response: New language will be presented to Council on August 1, 2016 and adopted at that time that will more clearly define the time frame on any extensions to the required maximum timeframe granted for good cause, including more specificity with regard to the conditions upon which a good cause extension would be granted. ACICS will apply risk factors in deciding if and when an extension for good cause will be grated, and for what duration.

ACICS has not taken immediate adverse action against a school after the exhaustion of the maximum time frame. ACICS has not encountered an opportunity to grant an extension for good cause in the current recognition cycle. Recent history indicates that programs or campuses that struggle to meet standards have themselves voluntarily withdrawn the programs and/or closed the campus before exhausting the maximum time frames for compliance.

After monitoring issues related to ITT derived from state attorney general investigations and other governmental inquiries for more than two years, the Council ordered ITT to develop and submit a comprehensive teach-out plan for review and approval by ACICS. When the institution resisted that requirement, the Council issued a show-cause directive. Likewise, after years of monitoring the Westwood issues with state attorneys general through recurring reports and deliberations before the Council's Business Practices Committee, the institution announced it had ceased taking new enrollments, provided teach-out plans to ACICS and is winding down operations.

Conclusion: The Agency is taking action at its August 1, 2016 meeting to provide more specificity with regard to maximum time frames for institutional response. ACICS can demonstrate no later than April 2017 the effective application of this revised language, but has not in the past exceeded its published time frames for taking adverse actions and considers itself to have been in compliance with criterion at all times.

## Category C – Finding 10 – Title IV Compliance

Accrediting Agency Regulation: 34 C.F.R. § 602.27(a)(1)(6-7) Other information the agency must provide the Department. (a)(6) The name of any institution or program it accredits that the agency has reason to believe is failing to meet its Title IV, HEA program responsibilities or is engaged in fraud or abuse, along with the agency's reasons for concern about the institution or program; and (a)(7) If the Secretary requests, information that may bear upon an accredited or preaccredited institution's compliance with Title IV, HEA program responsibilities, including the eligibility of the institution or program to participate in Title IV, HEA programs. (b) If an agency

has a policy regarding notification to an institution or program of contact with the Department...
it must provide for a case by case review of the circumstances surrounding the contact, and the
need for the confidentiality of that contact. Upon a specific request by the Department, the
agency must consider that contact confidential.

Staff Report Finding**:**  The agency's Accreditation Criteria provided fail to comply with the
requirements of this section and as a response for this item are not effective until July 1, 2016.
The agency has not complied with this section in practice and has provided no basis for
concluding it will do so in the future. It is unclear to Department staff how the agency has held
its institutions accountable for fraud and abuse prior to this or how it will follow the effective
date (July 1, 2016) of the new standards. Department staff is concerned because there have been
instances of fraud and abuse discovered at several ACICS-accredited institutions within the last
few years, including misrepresentations to students and falsification of placement rates.
Therefore, the agency needs to provide documentation that it consistently notified the
Department regarding suspected Title IV-related fraud and abuse during the last five years, or to
attest that it had not found any occupation to do so.

ACICS Response: As stated in the Comment by ACICS to the SDO of July 5, 2016, ACICS is
concerned that ED's expectations with regard to ACICS fraud detection go beyond what has ever
been required of ACICS or any accreditor in the past, and that ACICS has not been provided
adequate time to adjust to these new requirements.  Further, we believe that ACICS standards in
Appendix G incorporate the requirements of this criterion. Nonetheless, ACICS will revise that
language to match the regulatory language specifically.

Historically, ACICS has informally contacted ED to share information on institutions it believes
has engaged in fraud and abuse. These determinations have been made based on team's review
of refund processes, review of satisfactory academic progress (SAP) monitoring, and
inappropriate completion of contact hours (credits). ACICS is committed to better
communication with ED in regard to potential fraud and abuse. However, we respectfully
disagree with the Staff's assertion that we had made a determination of abuse but failed to
communicate that with the Department. For example, in the case of Computer Systems Institute
(CSI), the events of falsification took place in 2012. ACICS first reviewed and accredited the
institution in 2014. ACICS was first notified about the issues in 2016. ACICS issued a show-
cause directive against the institution and withdrew its accreditation. The action has been
appealed and is pending review by the ACICS Board of Review (pending and subjected to
remand by the Council).

ACICS is training all Commissioners, evaluators and staff on fraud detection issues, as well as
instituting heightened evaluation procedures. The At Risk Institution Group has also been
established to evaluate at least monthly new information about accredited institutions that may
be a basis for action. ACICS is also establishing a hotline for ACICS accredited school students
and staff to supplement its call for comment procedures before each site visit.

Conclusion: The agency's current Appendix G language meets this criterion, and ACICS is
working to further strengthen that language, along with numerous other initiatives put in place by
ACICS to obtain better information about compliance with ACICS standards, including
information relevant to potential fraud or abuse. ACICS has not and is not out of compliance

with this criterion, but will have additional evidence of actions taken to discern and report concerns to ED based on its new risk detection procedures and DIR findings no later than March 2017.

# EXHIBIT 2b

## To Declaration of Allyson B. Baker

**EXHIBIT C**

EXHIBIT 1 SUMMARY CHART

| # of Issues | NACIQI MTG. | Agency | Title IV | 602.13 | 602.15(a)(1) | 602.15(a)(2) | 602.15(a)(3) | 602.15(a)(5) | 602.15(a)(6) | 602.16(a)(1)(i) | 602.16(a)(1)(iv) | 602.16(a)(1)(vi) | 602.16(a)(1)(ix) | 602.16(a)(1)(x) | 602.17(a) | 602.17(c) | 602.18(d) | 602.19(b) | 602.20(a) | 602.20(b) | 602.21(a)(b) | 602.22(a)(3) | 602.24(c)(1) | 602.27(a)(6-7),(b) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 6/23/2016 | Accrediting Commission Of Career Schools and Colleges | Y | | | | | X | | | | | | | | | | | | | | | | |
| 5 | 6/23/2016 | American Bar Association | Y | | X | X | X | | | | | | | | | | | | | | | | | |
| 18 | 6/23/2016 | American Osteopathic Association | Y | X | | | X | | | X | X | X | X | | | | | X | X | | | | |
| 2 | 6/23/2016 | American Psychological Association | Y | | | | | | | | | | | | | | | | X | X | | | | |
| 1 | 6/23/2016 | Transnational Association Of Christian Colleges and Schools | Y | | | X | | | | | | | | | | | | | | | | | | |
| 3 | 12/16/2015 | American Board of Funeral Service Education | Y | | | | | | X | | | | | | | | | | | | | | | |
| 3 | 12/16/2015 | Midwifery Education Accreditation Council | Y | | | | | | | | | | | | | | | X | X | X | | | | |
| 3 | 12/16/2015 | Montessori Accreditation Council For Teacher Education | Y | | | | | | | | | | | | | | | X | | X | | | | |
| 12 | 12/16/2015 | New York State Board Of Regents (Nursing Education) | Y | | | | | | | | | | | | | | | | | | | | | |
| 12 | 12/16/2015 | Oklahoma Department of Career & Technology Education | N | | | | | | | | | | | | | | | | | | | | | |
| 7 | 12/16/2015 | WASC Accrediting Commission For Community and Junior Colleges | Y | | | | | | | | | | | | | X | | | X | | | | | |
| 2 | 6/25/2015 | Accreditation Commission for Education in Nursing | Y | | | | | | | | | | | | | | | | | | | | | |
| 4 | 12/31/2014 | American Veterinary Medical Association | N | X | | | | | | X | | | | | | | | | | | X | | |
| 2 | 12/18/2014 | Accreditation Commission for Education in Nursing | Y | | | | | | | | | | | | | | | | | | | | | |
| 25 | 6/18/2014 | National Association Of Schools Of Dance | Y | | | | | | | X | X | | X | | | | | X | | | | X | |
| 27 | 6/18/2014 | National Association Of Schools Of Music | Y | | | | | | | X | X | | X | | | | | X | X | | | X | |
| 8 | 6/18/2014 | Puerto Rico State Agency for the Approval of Public Postsecondary Vocational, Technical Institutions and Programs | N | | | | | | | | | | | | | | | | | | | | | |
| 22 | 6/18/2014 | National Association Of Schools Of Theatre | Y | | | | | | | X | | | X | | | | | X | | | | X | |
| 12 | 12/22/2013 | Council on Accreditation of Nurse Anesthesia Educational Programs | Y | | | | | | | | | | | | | | | | | | X | | |
| 12 | 12/22/2013 | Northwest Commission on Colleges and Universities | Y | | | | X | X | | | | | X | | | | | X | | X | | | |
| 15 | 12/22/2013 | WASC Accrediting Commission for Community and Junior Colleges | Y | X | | | X | | | X | | | | X | | | | X | X | | X | | |
| 7 | 6/6/2013 | Accreditation Council on Optometric Education | N | | | | | | | X | | | X | | | | | X | X | | X | | |
| 4 | 6/6/2013 | Association of Advanced Rabbinical and Talmudic Schools | Y | | | | | | | | | | | | | | | | X | X | | | |
| 9 | 6/6/2013 | Commission on Accreditation of Healthcare Management Education | N | | | | | X | | | | | | | | | | X | X | X | | | |
| 8 | 6/6/2013 | National Association Of Schools Of Art and Design | Y | | | | X | | | | | | X | | | | | X | X | | | | |
| 4 | 6/6/2013 | New England Association Of Schools and Colleges, Commission on Institutions of Higher Education | Y | | | | | | | | | | | | | | | | X | X | | | |
| 11 | 6/6/2013 | North Central Association of Colleges and Schools, The Higher Learning Commission | Y | | | | | | | X | X | X | X | X | | | | | | | | | |
| 2 | 6/6/2013 | Maryland Board Of Nursing | N | | | | | | | | | | | | | | | | | | | | | |
| 23 | 12/11/2012 | Accreditation Council for Education in Nutrition and Dietetics | N | | | | X | X | | | | | X | | | | | X | | | X | | X | X |
| 14 | 12/11/2012 | American Veterinary Medical Association | N | X | | | X | X | | X | | | | | | | | | X | X | X | | X | X |
| 7 | 12/11/2012 | American Physical Therapy Association | N | | | | | X | | | | | | | | | | | X | X | | | |
| 4 | 12/11/2012 | Liaison Committee On Medical Education | N | | | | | | | | | | | | | | | | | X | | | |
| 4 | 12/11/2012 | Middle States Commission on Higher Education | Y | | X | | | | | | | | | | | | | | | | X | | |
| 42 | 12/11/2012 | New York State Board Of Regents | Y | | X | X | X | X | | | | | X | | | | | X | | X | | | X |
| 29 | 12/11/2012 | WASC Accrediting Commission For Senior Colleges and Universities | Y | | | X | X | X | X | | X | | X | | | | | X | X | | X | | |
| 1 | 12/11/2012 | Montessori Accreditation Council For Teacher Education | Y | | | | | | | | | | | | | | | | | | | | | |
| 3 | 12/11/2012 | Missouri Board of Nursing | N | | | | | | | | | | | | | | | | | | | | | |
| 10 | 6/25/2012 | Accreditation Commission for Midwifery Education | N | | | X | | X | | | | | X | X | | | | X | X | X | | | |
| 9 | 6/25/2012 | Accreditation Council for Pharmacy Education | N | | | X | | | | | | | X | | | | | | | | | | |
| 3 | 6/25/2012 | American Dental Association | Y | | | | | X | | | | | X | | | | | | | | | | |
| 19 | 6/25/2012 | Association for Biblical Higher Education | Y | | | X | | | | | | | X | | | X | | | X | X | X | | |
| 17 | 6/25/2012 | Association for Clinical Pastoral Education, Inc | N | | X | X | | X | | | | | X | | | | | | X | | X | | |
| 6 | 6/25/2012 | Distance Education Accrediting Commission | N | | | | | | | | | | | | | | | | | | | | | |
| 47 | 6/25/2012 | Middle States Association of Colleges and Schools | N | | X | | | | | X | X | | | | | | | X | X | | | X | X | X |
| 4 | 6/25/2012 | National League for Nursing Accrediting Commission | N | | | X | | | | | | | | | | | | | | | | X | |
| 33 | 6/25/2012 | Puerto Rico State Agency | N | | | | | | X | | | | | | | | | | | | | | |
| 19 | 12/14/2011 | Commission on Accreditation for Marriage and Family Therapy Education | N | | | X | | X | | | | | X | | | | | X | X | X | | | |
| 13 | 12/14/2011 | Council on Podiatric Medical Education | Y | | | X | X | | X | | | | | | | | | X | X | | X | X | |
| 44 | 12/14/2011 | Council on Chiropractic Education | Y | X | | X | X | X | | | X | | | | | | | X | X | X | X | X | X |
| 9 | 12/14/2011 | Commission on English Language Accreditation | N | | | | X | | | | | | | | | | | X | | | X | | |
| 10 | 12/14/2011 | Joint Review Committee on Education in Radiologic Technology | N | | | | | X | | | | | | | | | | | | | X | X | |
| 34 | 12/14/2011 | Commission on Accreditation and School Improvement | N | X | | X | X | X | X | | | | X | | X | | | X | X | | X | X | X | X |
| 11 | 12/14/2011 | New York State Board Of Regents (Public Postsecondary Vocational Ed) | N | | | X | X | X | | | | | X | | | | | X | X | X | X | | X |
| 10 | 12/14/2011 | Oklahoma Department of Career & Technology Education | N | | | | | | | | | | | | | | | | | | | | | |
| 6 | 12/14/2011 | Pennsylvania State Board for Vocational Education, Bureau of Career and Technical Education | N | | | | | | | | | | | | | | | | | | | | | |
| 4 | 12/14/2011 | Maryland Board of Nursing | N | | | | | | | | | | | | | | | | | | | | | |
| 13 | 6/8/2011 | Accrediting Bureau Of Health Education Schools | Y | | | | | X | | | | | | | | | | X | | | X | | |
| 26 | 6/8/2011 | Accreditation Commission for Acupuncture and Oriental Medicine | Y | | | | | X | | | | | X | | | | | X | X | X | | | |
| 12 | 6/8/2011 | Accrediting Council for Independent Colleges and Schools | Y | | | | X | | | | | | X | | | | | X | X | X | | | |
| 24 | 6/8/2011 | American Bar Association | Y | | | | | | | X | | | | | | | | X | | | | | |
| 7 | 6/8/2011 | American Psychological Association | Y | | X | | | X | | | | | X | X | | | | X | | | | | |
| 44 | 6/8/2011 | Commission on Accrediting of the Association of Theological Schools | Y | | | X | X | | X | | | | X | | | | | X | X | X | X | | |
| 26 | 6/8/2011 | Council On Occupational Education | Y | | | | | | | X | | | | | | | | | X | | X | | |
| 22 | 6/8/2011 | Transnational Association Of Christian Colleges and Schools | Y | X | X | X | X | | | X | | | | | | | | X | | | X | X | |
| 12 | 12/1/2010 | Council on Accreditation | Y | | | | | X | | | | | X | | | | | | | X | | X | |
| 7 | 12/1/2010 | Council on Academic Accreditation in Audiology and Speech-Language Pathology | N | | | | | | | | | | | | | | | | | | | | | |
| 13 | 12/1/2010 | Commission on Massage Therapy Accreditation | Y | | | | X | | | | | | | | | | | X | | X | | X | |
| 5 | 12/1/2010 | Midwifery Education Accreditation Council | Y | | | X | | | | | | | | | | | | | | X | | | |
| 2 | 12/1/2010 | Montessori Accreditation Council For Teacher Education | Y | | | | | | | | | | | | | | | | | | | | | |
| 3 | 12/1/2010 | National Accrediting Commission of Career Arts and Sciences | Y | | | | | | | | | | | | | | | X | X | X | | | |

# EXHIBIT 2c

To Declaration of Allsyon B. Baker

EXHIBIT D

# EXHIBIT D



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE OF POSTSECONDARY EDUCATION

June 3, 2016

Mr. Anthony Bieda
Executive in Charge
Accrediting Council for Independent Colleges and Schools
750 First Street, NE | Suite 980 | Washington, DC 20002

Dear Mr. Bieda,

I have received your letter of today requesting that we grant a deferral of ACICS's submission of its response to the draft staff analysis of ACICS provided to ACICS on May 4, 2016. As you know, the submission is due today. ACICS has had the 30 days for response provided under 34 CFR 602.32(f)(3). Presumably you are also requesting a deferral of ACICS's appearance before the National Advisory Committee on Institutional Quality and Integrity, currently scheduled for June 23.

As I mentioned when you raised this issue yesterday, I cannot grant this request. The draft analysis includes numerous findings of non-compliance. In such a situation, per Section 496(l)(1) of the Higher Education Act, the Department is faced with the alternative of either (1) after notice and an opportunity for a hearing, limiting, suspending or terminating the agency's recognition, or (2) requiring the agency to take appropriate action within a time frame not exceeding 12 months and, if the agency then fails to bring itself into compliance, after notice and an opportunity for a hearing, limiting, suspending or terminating recognition. Deferral would violate these requirements, and I have no authority to grant one. Absent a response, I also have no basis for concluding your agency is in compliance.

I understand that ACICS has faced a formidable challenge in applying for renewal of recognition, but it is required by law to establish it meets the Criteria for Recognition in order to be renewed. As you know, ACICS will not be compelled to respond at the June, 2016 meeting to any analysis by the staff of its May 16, 2016 submission. The delayed submission of this material, and the additional deferral of consideration of it, was an accommodation provided to ACICS, and does not postpone the need for ACICS to establish its compliance for purposes of renewal.

I look forward to receiving ACICS's response today and proceeding with the scheduled review by NACIQI.

Herman Bounds Jr. Ed.S
Director, Accreditation Group

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

| | |
|---|---|
| **From:** | Bounds, Herman |
| **To:** | Anthony Bieda |
| **Cc:** | Quentin Dean |
| **Subject:** | RE: Part II Response - ACICS |
| **Date:** | Wednesday, May 18, 2016 11:20:28 AM |

Great, Thanks Tony.

Herman Bounds Jr., Ed.S
Director
Accreditation Group
Office of Post Secondary Education
US Department of Education
400 Maryland Ave
Washington DC  20202
Herman.Bounds@ed.gov<mailto:Herman.Bounds@ed.gov>
202-453-7615

**From:** Anthony Bieda [mailto:ABieda@acics.org]
**Sent:** Wednesday, May 18, 2016 11:18 AM
**To:** Bounds, Herman
**Cc:** Quentin Dean
**Subject:** Re: Part II Response - ACICS

Most helpful. We will proceed to submit on a thumbdrive. Thanks Herman.

Sent from my iPad

On May 18, 2016, at 11:14 AM, Bounds, Herman <Herman.Bounds@ed.gov> wrote:

> Tony I do not include the supplemental information in the petition at all! That
> information will be reviewed separately (that info could be submitted to us on a flash
> drive).  We do not want to  mix the responses. We will review the supplemental
> information that was due on May 16 separately outside of the recognition process . If
> we need to talk we can set up a call today!
>
> Herman Bounds Jr., Ed.S
> Director
> Accreditation Group
> Office of Post Secondary Education
> US Department of Education
> 400 Maryland Ave
> Washington DC  20202
> Herman.Bounds@ed.gov<mailto:Herman.Bounds@ed.gov>
> 202-453-7615

**From:** Anthony Bieda [mailto:ABieda@acics.org]
**Sent:** Wednesday, May 18, 2016 9:50 AM

**To:** Porcelli, Steve
**Cc:** Duke, Karen; Bounds, Herman; Lefor, Valerie; n@ACICS.onmicrosoft.com
**Subject:** Re: Part II Response - ACICS

Thanks Steve. We will go online by noon today and hit submit. Regards, Tony Bieda

Sent from my iPhone

On May 18, 2016, at 9:42 AM, Porcelli, Steve <Steve.Porcelli@ed.gov> wrote:

> Under the new agency response section for 602.13, I found new Exhibit 124: The narrative responding to the Department's supplemental information request (Part 2 that was due May 16).  I also found new Exhibits 125-177 that you provided as documentation for the Part 2 narrative.
>
> I believe that you will be able to provide your response to the original staff analysis for 602.13 (that is due no later than June 3, 2016) within the new response section for 602.13.  Since we have not done this type of multi-layered data submission before, everyone will need to remember that there could be unforeseen complications.
>
> Unless you hear otherwise from Karen Duke within the next two hours, please hit the submit button.  Thanks.

---

**From:** Anthony Bieda [mailto:ABieda@acics.org]
**Sent:** Monday, May 16, 2016 11:19 PM
**To:** Porcelli, Steve
**Subject:** Part II Response - ACICS

Dear Steve:
All of the narrative and volumes of requested exhibits have been uploaded to the system under 602.13.
We have not pushed "submit," pending your instructions. I want to be sure that you can see the submittal on the system, and that we will have the opportunity to submit more information to the 602.13 window as aprt of our response to your recommendations due June 3.
Regards,

Anthony S. Bieda
Executive in Charge
Accrediting Council for Independent Colleges and Schools
750 First Street, NE | Suite 980 | Washington, DC 20002
www.acics.org | 202.336.6781 - p | 202.842.2593 - f
Follow us on Twitter - http://twitter.com/acicsaccredits
Like us on Facebook - http://facebook.com/acicsaccredits
<image001.png>

Confidentiality Notice:
This communication is only intended for the persons or entities to which it is addressed or copied and may contain information that is confidential and/or privileged in some way. Distribution or copying

of this communication or the information contained herein is not expressly authorized. ACICS reserves the right to disclose this communication as required by law without the consent of the persons or entities to which this communication is addressed.

| From: | Bounds, Herman |
|---|---|
| To: | Albert C. Gray |
| Cc: | Porcelli, Steve; Anthony Bieda |
| Subject: | RE: OUS questions- request for extension |
| Date: | Thursday, March 17, 2016 1:07:34 PM |

Thanks Al. Let Steve or me know if you have any problems resubmitting your petition in the system by April 1st with the questions in section I incorporate.  Contact me or Steve anytime you have additional questions. Herman

Herman Bounds Jr., Ed.S
Director
Accreditation Group
Office of Post Secondary Education
US Department of Education
400 Maryland Ave
Washington DC  20202
Herman.Bounds@ed.gov<mailto:Herman.Bounds@ed.gov>
202-453-7615

**From:** Albert C. Gray [mailto:agray@acics.org]
**Sent:** Thursday, March 17, 2016 11:18 AM
**To:** Bounds, Herman
**Cc:** Porcelli, Steve; Anthony Bieda
**Subject:** RE: OUS questions- request for extension

Dear Herman,

Thank for your response to our request for an extension, and for allowing ACICS an additional 45 days to provide narrative and documents in response to Section II of the OUS questions. We certainly appreciate your understanding in this situation.  We will proceed to provide the Section I responses by April 1 as you have directed.  Please be assured that ACICS understands the importance of these questions as they relate to the Department's monitoring and review of ACICS' effectiveness as a recognized accrediting agency.

As you indicate, ACICS will look forward to further communications form the Accreditation Group in the normal process as we proceed toward the June NACIQI meeting. We have always  wanted to be fully cooperative with, and responsive to , the Accreditation Group during the recognition process and we will continue to work with you in that way.

I don't think a telephone call will be necessary at this point, but we remain available at any time should you and Steve want to have a call or meet in person.

Best regards,

*Albert C. Gray*
President & CEO

**Accrediting Council for Independent Colleges and Schools**
750 First Street, NE | Suite 980 | Washington, DC 20002
www.acics.org | 202.336.6778 - p | 202.464.5621 – f | 202.306-4864 - c
Follow us on Twitter - http://twitter.com/acicsaccredits
Like us on Facebook - http://facebook.com/acicsaccredits

---

**From:** Bounds, Herman [mailto:Herman.Bounds@ed.gov]
**Sent:** Tuesday, March 15, 2016 7:34 PM
**To:** Albert C. Gray
**Cc:** Anthony Bieda; Porcelli, Steve
**Subject:** RE: OUS questions- request for extension

Dear Dr. Gray,

We received your email of March 10, 2016, requesting an extension of time to submit information requested by the Department on March 3, 2016.

Given the significance of the issues facing institutions accredited by ACICS over the past several years, the information we requested is important to the Department's responsibility to monitor and review ACICS's effectiveness as a recognized accrediting agency.  We would also expect that ACICS would already have compiled much, if not all, of this information as part of its own monitoring and analysis of these issues and actions to be taken.

As such, responses to questions in "Section I. Overall Questions," along with supporting documentation for those questions, remain due to the Department no later than the original deadline of Friday, April 1, 2016.

We are willing to provide an extension of time for responses to questions in "Section II. Questions related to specific standards in Jan. 2016 submission," along with supporting documentation for those questions:  this material will be due no later than Monday, May 16, 2016 (the 45-day extension you have requested).

At this time, we are proceeding with our analysis for the June NACIQI meeting, which will be based on information we have at the time we develop our recommendation.   Accordingly, ACICS should expect the usual steps, including further questions from the Accreditation Group, in the normal process and on the typical timeline for a June discussion.  Furthermore, given that information received as late as May 16, 2016, would not allow Department staff the time to fully review and analyze it in time for the June NACIQI meeting, ACICS should be prepared to return at the fall NACIQI meeting for further discussion and possible action as warranted.  Thank you for your cooperation with our request.

Steve and I will be happy to schedule a phone call to discuss further as you requested.

Herman Bounds Jr., Ed.S
Director
Accreditation Group
Office of Post-Secondary Education
US Department of Education
400 Maryland Ave
Washington DC  20202
Herman.Bounds@ed.gov<mailto:Herman.Bounds@ed.gov>
202-453-7615

---

**From:** Albert C. Gray [mailto:agray@acics.org]
**Sent:** Thursday, March 10, 2016 1:30 PM
**To:** Bounds, Herman
**Cc:** Anthony Bieda; Porcelli, Steve
**Subject:** OUS questions- request for extension

Dear Herman:

ACICS has reviewed and analyzed the substantial request for additional information that would supplement or replace more than 30 narrative sections and more than 100 exhibits in our petition that was submitted by ACICS in early January. Based on that inventory, we estimate ACICS will have to retrieve or develop, package and produce for upload to the Department's recognition application system more than 80 additional documents, not including the production of internal emails that fit the description provided in the Department's information request.  ACICS is currently less than 25 days away from its April Council meeting, and staff is fully occupied preparing the volumes of documents and analytics necessary to support and inform  effective, decisive , Council deliberations. In light of these circumstances and the timing issue, ACICS would appreciate your consideration  in requesting an extension to the Office of the Undersecretary for the fulfillment of their unprecedented information request: an additional 45 days beyond the April 1 requested deadline will be necessary.

Please let me know when we can discuss this timing issue on the telephone and we will schedule the call.  Thank you for your kind consideration.

Regards,

Al


*Albert C. Gray*
President & CEO
**Accrediting Council for Independent Colleges and Schools**
750 First Street, NE | Suite 980 | Washington, DC 20002
www.acics.org | 202.336.6778 - p | 202.464.5621 – f | 202.306-4864 - c
Follow us on Twitter - http://twitter.com/acicsaccredits
Like us on Facebook - http://facebook.com/acicsaccredits

**From:** Albert C. Gray
**To:** Anthony Bieda
**Subject:** FW: Additional questions for petition
**Date:** Thursday, March 03, 2016 5:35:32 PM
**Attachments:** Questions for ACICS 2016-03-02.docx

---

**From:** Bounds, Herman [mailto:Herman.Bounds@ed.gov]
**Sent:** Thursday, March 03, 2016 1:36 PM
**To:** Albert C. Gray
**Cc:** Porcelli, Steve
**Subject:** Additional questions for petition

Al,

I wanted to inform you that the Office of the Under Secretary (OUS) has developed a set of question they want to ask ACICS during the recognition process. We have tied the questions to relevant recognition criteria. I will explain later today on the call.  Karen Duke will return your petition today between 1 and 2 so you can respond to these questions, in your petition. . I have informed OUS that we will allow you up to 30 days to respond. Also, it might be easier to just upload a folder with your responses and the addition documentation in one section of your petition, of course, that is your decision.

Herman

Herman Bounds Jr., Ed.S
Director
Accreditation Group
Office of Post Secondary Education
US Department of Education
1990 K Street NW
Washington DC  20006
Herman.Bounds@ed.gov<mailto:Herman.Bounds@ed.gov>
202-219-7011

**U.S. Department of Education Questions for ACICS**
**March 2, 2016**

Given the Department's responsibility to conduct a thorough analysis of ACICS in preparation for the review of its recognition in June, the Department is providing these additional questions for response from ACICS.  **Responses are due to the Department no later than <u>Friday, April 1, 2016</u>.**  Specific instructions on how to submit answers and documents will follow.  If ACICS has already submitted a specific document with its petition that helps answer a question below, it should reference that document specifically in its response.

## I. Overall Questions

Over the past few years, ACICS-accredited institutions have been the subject of major investigations and lawsuits from multiple federal agencies and state attorneys general.  For example:

- Corinthian schools:  fraudulent job-placement figures,  problems that led to challenges to financial stability and ultimately closure, with major problems with teach out
- CEC: fraudulent job placement figures
- ITT:  misleading and unfair recruiting practices, title IV compliance
- Michigan Jewish Institute:  enrollment and title IV eligibility issues
- Westwood: fraudulent job placement figures, misleading and unfair recruiting practices related to wages and transferability of credits, closure in 2016
- Lincoln Tech: fraudulent job placement figures, misleading and unfair recruiting practices
- Globe: misleading and unfair recruiting practices related to job opportunities and transferability of credits
- Le Cordon Bleu: fraudulent job placement figures, misleading and unfair recruiting practices

This record suggests more than isolated or disparate issues, but a consistent pattern of significant and illegal actions on the part of ACICS-accredited institutions.  As required in section 496 of the HEA, the Secretary must consider not just the existence but the effectiveness of each accrediting agency's standards, policies and practices:  whether the agency has applied <u>effectively</u> the requirements of the statute, and whether it is a reliable authority on the quality of education offered.  Please provide narrative with supporting Documents for each of the following questions.

1) Accrediting standards such as 602.16(a)(1)(i), 602.16(a)(1)(iii), 602.16(a)(1)(vii), 601.16(a)(1)(x), 602.17(f), and 602.24(c)(1) exist in order to prevent the specific kinds of

1

issues listed above, or at a minimum  to identify and have the accreditor act on those kind of issues.  Sections 602.19 and 602.20 require accrediting agencies to monitor and enforce standards to ensure institutional compliance with those standards.  How did your standards, policies, and practices allow these situations to occur and continue over time?  How were those schools meeting ACICS standards for accreditation despite their practices?

2) Sections 602.19 and 602.20 require accrediting agencies to monitor and enforce standards to ensure institutional compliance with those standards. At what point did you learn about the investigations (state attorneys general, FTC, CFPB, ED, etc.)?  What actions were you undertaking with these institutions, and when – e.g., probation, warning, increased monitoring, intervention, etc.?

3) Section 602.27(a) (6-7) and (b) require an agency to inform the Department of Education with the identity of any institution or program it accredits that it believe is failing to meet its Title IV, HEA program responsibilities or is engaged in fraud or abuse, along with the agency's reasons for concern about the institution or program.  What information were you sharing with the Department, and when, about these situations as they developed?

4) How have you changed your standards, policies, and practices as a result of these situations, and how will the changes prevent these situations from occurring again?

**II. Questions related to specific standards in Jan. 2016 submission**

Please provide further information, and Documentation as appropriate, on the following questions related to your January 2016 submission to the Department.

a. 602.13 acceptance of the agency by others – How has the number of major investigations into and actions against so many of ACICS's schools (CEC, Corinthian, ITT, MJI, Westwood, Lincoln Tech) by multiple federal agencies and states, plus the Congressional inquiry, affected ACICS's public acceptance and credibility?  What actions have you taken in response?

b. 602.15(a)(1) staffing/financial resources – Are you confident in the number and expertise of your staff and institutional review teams, and in the level of your financial resources?  Any changes you have made or plan to make?

c. 602.15(a)(2) competency of representatives -- Are you confident in the process and criteria you use to choose members of your review teams, and the expertise of your

representatives?  Confident in your conflict of interest policies and practices?  Any changes you have made or plan to make?

d.  602.16(a)(1)(i) student achievement –   Given what's happened with Corinthian, CEC, ITT, MJI, Westwood, and Lincoln Tech related to inaccurate student achievement data, what were the shortcomings in your process of verifying those data and how are you changing the process to prevent this from happening in the future? How did these issues occur despite ACICS's 2012-2013 move to require independent verification and auditing of student achievement data? Do you define retention as completion of the current academic year, rather than return for a subsequent term, even if a program may typically require over 12 months to complete. Is this different from other agencies' methods of calculating retention for programs over 12 months in length? If so, why do you measure retention this way?

e.  602.16(a)(1)(vii) recruiting and 602.26 notification of accrediting decisions – Provide Documentation  about each instance of an issue with recruiting practices or advertising for Corinthian schools, ITT, MJI, Westwood, Lincoln Tech, and Globe, and Documentation indicating whether or when you notified the Department. For each of these instances, please provide all emails among, and Documents sent or received by, any of ACICS directors, officers, staff members, consultants (including all members of college review teams), and third parties which concern those schools, for the following time periods:
    - Corinthian Schools: from January 1, 2014, to the present.
    - ITT:  From November 1, 2013, to the present
    - Westwood: from November 1, 2011, to the present
    - Lincoln Tech: from July 1, 2014 to the present
    - Globe: from July 1, 2014 to the present
    - Le Cordon Bleu: February 1, 2013 to the present

    And: are you changing your policies and practices in any way given these issues?

f.  602.16(a)(1)(x) Title IV responsibilities and 602.19(b) monitoring – Provide Documentation, including all communications and analyses, of when you had reason to believe and when you notified the Department of each instance that a Corinthian school, ITT, CEC, and MJI, had violated its Title IV responsibilities or engaged in fraud or abuse.

3

g.  602.17(f) compliance and student achievement – Provide all Documentation of institutions that you continue to believe  have issues with verifiable achievement data since the last time you amended either your policies or processes for the submission of such data.  When did you last amend those policies or processes, and what Documentation do you have of changed policies or processes?

h.  602.19 monitoring -- For each of the instances listed in Section I, please provide all emails among, and Documents sent or received by, any of ACICS directors, officers, staff members, consultants (including all members of college review teams), and third parties which concern those schools, for the following time periods:
   - Corinthian Schools: from January 1, 2014, to the present.
   - CEC:  from February 1, 2013, to the present
   - ITT:  From November 1, 2013, to the present
   - MJI: from October 1, 2012, to the present
   - Westwood: from November 1, 2011, to the present
   - Lincoln Tech: from July 1, 2014 to the present
   - Globe: from July 1, 2014 to the present
   - Le Cordon Bleu: February 1, 2013 to the present

i.  602.20(a) and (b) enforcement timelines and actions – With respect to when you have identified problems in general since January 1, 2013, please provide the total number of institutions or programs you have reviewed off cycle; as well as the number of instances in which you have taken adverse action and the nature of those actions; the number in which you have placed the institution or program on probation or equivalent status; and the number in which you have taken other corrective actions and the nature of those actions.

What is the mean time you actually allowed (including all extensions) for a school to come into compliance under each of 602.20(a)(2)(i), (ii), and (iii)?  For each such school, provide the time allowed and break out this data for probation and show cause.

j.  602.21(a)(b) systemic review of standards and 602.21(c) revision of standards – Has any review or change been prompted by the multiple issues and investigations over the past few years?  If so, what?  If not, why not?

k.  602.24(c)(1), (c)(4), (c)(5) teach out plan triggers, requirements, application – Provide all Documentation regarding teach out policies and processes in general or the application of such policies and processes to any institution in the last three years. Provide all

Documentation on specific teach out plans adopted to date for ITT, MJI, or any other schools for whom you are contemplating adverse action.

l.  602.27(1)(6-7),(b) fraud and abuse and 602.21 review of standards – Given what's happened with problem schools, are there any changes to policies and procedures you've made or plan to make?  For each of the instances listed in Section I, please provide all emails among, and Documents sent or received by, any of ACICS directors, officers, staff members, consultants (including all members of college review teams), and third parties which concern those schools, for the periods specified in item h above.

m. 602.28(e) information sharing with other accrediting/approval bodies and and 602.19(b) monitoring -- Given what's happened with problem schools, are there any changes to policies and procedures you've made or plan to make?

What materials do you request from the institution and what additional materials do you systematically gather prior to your review?  Provide all pre-review materials for each Corinthian, CEC, and ITT campus that you had gathered.

Per sections 602.14 and 602.15, provide all instances in which you have changed your reviewers or provided your reviewers with information to focus their review based upon this information.

Per 602.17 and 602.18, how do you verify information provided by a school?

# EXHIBIT 3

To Declaration of Allyson B. Baker

| Step 1 - Contact Information |
|---|

**Identifier:**     ACICS
**Name:**     Accrediting Council for Independent Colleges and Schools
**Meeting Date:**     06/2016

### Address

750 First Street, NE, Suite 980
Washington, DC   20002-4223

### Accrediting Agency Administrator

Title:     President and CEO
Name:     Dr. Albert C Gray
Phone Number:     202-336-6778
Fax Number:     202-842-2593
Email:     agray@acics.org

### Point of Contact (POC) for the Content of the Submission

Name:     Mr. Anthony S Bieda
Phone Number:     202.336.6781
Email:     abieda@acics.org

| Step 2 |
|---|

**Type of Submission:** Renewal Petition

**This is your agency's current scope of recognition granted by the Secretary of Education:**

The accreditation of private postsecondary institutions offering certificates or diplomas, and postsecondary institutions offering associate, bachelor's, or master's degrees in programs designed to educate students for professional, technical, or occupational careers, including those that offer those programs via distance education.

**Criteria:** 602.10 Link to Federal programs

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.11 Geographic scope of accrediting activities.

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.12(b) Expansion of Scope

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

| Exhibit Title | File Name |
| --- | --- |
| Exhibit 8 - Lincoln University Renewal Report, Response, Deferral Letter, Deferral Response, Approval Letter | Exhibit 8 - Lincoln University Renewal Report, Response, Deferral Letter, Deferral Response, Approval Letter.pdf |
| Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted | Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 2 - Professional Doctorate Degrees Reference Document | Exhibit 2 - Professional Doctorate Degrees Reference Document.docx |
| Exhibit 4 - Table of ACICS Accredited doctorate programs | Exhibit 4 - Table of ACICS Accredited doctorate programs.pdf |
| Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk | Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk.xlsx |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.13 Acceptance of the agency by others.

**Response:**

The broad acceptance of ACICS accreditation by the education community, licensure authorities, employers and others is a priority of the organization. The acceptability of ACICS accreditation standards is articulated in several sections of the published standards, including for purposes of participation in federal student aid programs (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, Section 2-2-501, p. 22); the ratios of students to teachers in instructional settings (Ibid, Title III, Chapter 2, Section 3-2-106, p. 54); teaching assignments of faculty (Ibid, Title III, Chapter 3, Section 3-3-302 (b), p. 56); admissions requirements; and the assignment of credit hours (Ibid, Appendix G, pgs. 114-115).

To fortify the acceptance by the education community, educators and practitioners from a wide array of fields reflected in all categories of programs offered by ACICS institutions are recruited and enlisted to lead and conduct on-site evaluations (Exhibit 9: ACICS Roster of Evaluators); and to serve as members of the Council, Board of Directors and Review Board for Appeals (Exhibit 10: Commissioner Roster and Resumes; Exhibit 11: ACICS Review Board Roster since 2013 and Sample Resumes).

Members of the Council, including public members and those with primarily academic qualifications, have the authority and responsibility to review program and institutional alignment with standards of quality (Exhibit 1: Accreditation Criteria, Appendix A, Article III, Section 2, items (b)(c)(d)(g)(i), pgs. 92- 93). They also have the responsibility to participate in the development, adoption and implementation of standards and practices that best fulfill ACICS' mission of assuring the quality of education designed to "advance educational excellence" at independent, non-public colleges and schools and the "value of a quality educational experience for all students" (Exhibit 12: www.acics.org-About Us-Mission Statement, Value) (Exhibit 1: Accreditation Criteria, Appendix A, Article III, Section 2, items (a)(e)(f), p. 92).

ACICS's program of accreditation, including policies and criteria, is recognized and acknowledged throughout the United States and internationally by state approval authorities, programmatic accrediting agencies, regionally-accredited institutions and foreign ministries of education as a reliable authority on quality and integrity. Since 2011, ACICS has voluntarily subjected its accreditation authority to the independent review and approval of the Council for Higher Education Accreditation (Exhibit 13: CHEA ACICS recognition granted Sep. 2012); the American Registry of Radiologic Technologists (Exhibit 14: ACICS Recognition by ARRT, January 27, 2015); and more than 13 foreign ministries of education (Exhibit 15: International Ministries of Higher Education, Notification of Accreditation, December 2015). When establishing the eligibility of any college or school for accreditation by ACICS, the institution must demonstrate that is has the authority to operate as such by the local government and operate according to applicable laws and regulations (Exhibit 1: Accreditation Criteria, Title I, Chapter 2,

Section 1-2-100 (b) and (f), pgs. 2-3).

The acceptance of ACICS accreditation by members of the education community is further demonstrated by the transferability of course credits earned at ACICS colleges and schools to other institutions. More than half (55 percent) of ACICS institutions have established articulation agreements with institutions accredited by regional and national accrediting agencies, and nearly half (48 percent) have "at least one agreement with a regionally accredited institution. (Exhibit 16: Transfer Policy and Student Experience Survey Report, Pg. 4).

The acceptance of ACICS by employers is demonstrated by the placement performance for graduates reported on the annual Campus Accountability Report. The average percentage of students placed in their field or related field of study for all ACICS institutions was 66% in 2012, 72% in 2013 and 74% in 2014, based on self-reported data that is subject to episodic verification during full team visits (Exhibit 17: 2014 Summary of Key Operating Statistics, pg. 11).

Finally, ACICS executive staff members are regularly invited to give presentations, sit on panels, and participate in meetings and conferences where accreditation standards, practices and issues are discussed (Exhibit 18: ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| Exhibit Title | File Name |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 9 - ACICS Roster of Evaluators | Exhibit 9 - ACICS Roster of Evaluators.xlsx |
| Exhibit 10 - Commissioner Roster and Sample Resumes | Exhibit 10 - Commissioner Roster and Sample Resumes.pdf |
| Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes | Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes.pdf |
| Exhibit 12 - www.acics.org-About Us-Mission Statement, Value | Exhibit 12 - www.acics.org-About Us-Mission Statement, Value.JPG |
| Exhibit 13 - CHEA ACICS recognition granted Sep. 2012 | Exhibit 13 - CHEA ACICS recognition granted Sep. 2012.pdf |
| Exhibit 14 - ACICS Recognition by ARRT, January 2015, and ACICS Continued Recognition for 5 years, Aug 2015 | Exhibit 14 - ACICS Recognition by ARRT, January 2015, and ACICS Continued Recognition for 5 years, Aug 2015.pdf |
| Exhibit 15 - International Ministries of Higher Education, Notification of Accreditation, December 2015 | Exhibit 15 - International Ministries of Higher Education, Notification of Accreditation, December 2015.docx |

| Exhibit 16 - Transfer Policy and Student Experience Survey Report | Exhibit 16 - Transfer Policy and Student Experience Survey Report.pdf |
| Exhibit 17 - 2014 Summary of Key Operating Statistics | Exhibit 17 - 2014 Summary of Key Operating Statistics.pdf |
| Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST | Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST.pdf |

**Criteria:** 602.14(a) Category of Agency

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.14(b) Separate and Independent

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.14(c) Joint Use of Personnel

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.14(d)(e) Separate & Independent Waiver

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.15(a)(1) Staffing/Financial Resources

**Response:**

ACICS recognizes that the development and application of quality standards to post-secondary education institutions is a resource-intensive enterprise, that requires sufficient levels of funding, staffing, facilities, materials, supplies and expertise. The Board of Directors has primary responsibility for ensuring that the accreditation program is adequately funded, staffed and led by professionals with appropriate experience and knowledge to support the Council's development and application of accreditation standards. This responsibility extends to the assurance of quality at institutions offering doctorate level programs.

Seven members of the Council and three senior administrators at ACICS hold doctoral-level degrees from accredited institutions; most of the accreditation staff holds graduate degrees (Exhibit 20: www.acics>About Us-Meet Our Commissioners and Staff Directory).

ACICS' capacity to review institutions and programs includes financial resources and infrastructure. The primary sources of revenue for the agency are sustaining fees derived from member institutions, program and activity fees, and investments. (Exhibit 21: ACICS Budget 2015-2016). When an increased need in technological or employee resources is identified, senior management responds quickly and decisively to meet this new need. Financial data comes from an integrated financial system, which facilitates the effective management of the Council's financial transactions through timely and accurate communication of this financial data.

The Council's 2015-2016 operating budget is included in Exhibit 21. ACICS is financially stable and through careful budgeting and administration is able to cover costs with the above identified revenue resources, and by accessing its reserves for strategic investments in information technology.

During the past three years, ACICS has invested in excess of $2 million for information technology infrastructure development and upgrades. Its capacity is also derived from a

long history of accrediting programs related to business administration and computer science.

Employees are well trained in their areas of responsibility and have sufficient resources available to them to perform with a high standard of professionalism. Specifically, all employees who are responsible for the development and application of ACICS standards are required to successfully complete formal training, observe evaluation site visits, and pass three month and six month performance reviews (Exhibit 22: Accreditation Evaluation Training Manual 2015_Redacted; Exhibit 20: www.acics>About Us-Meet Our Commissioners and Staff Directory).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 21 - ACICS Budget 2015-2016 | Exhibit 21 - ACICS Budget 2015-2016.docx |
| Exhibit 22 - Accreditation Evaluation Training Manual 2015 | Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf |
| Exhibit 20 - www.acics - About Us-Meet Our Commissioners and Staff Directory | Exhibit 20 - www.acics - About Us-Meet Our Commissioners and Staff Directory.docx |

**Criteria:** 602.15(a)(2) Competency of Representatives

**Response:**

The ACICS method of assuring education quality and institutional integrity depends greatly on the recruitment and deployment of qualified professionals from the education and employer communities who have the appropriate experience and knowledge of fields relevant to their role as a Council member (Commissioner), intermediate reviewer, Review Board member, and visit evaluation team member.

At ACICS, commissioners are the primary sources of policy, standards, requirements and accreditation decisions. In order to carry out those responsibilities effectively ACICS requires that commissioners be "persons interested in career education; have knowledge or experience useful to the accreditation process; and are willing to contribute opinion advice and expertise." Commissioners are also expected to be "currently or recently engaged in a significant manner in post-secondary institutional or programmatic administration (Exhibit 1: Accreditation Criteria, Appendix A, ps. 90 and 93)."

Regarding the composition of the Council, ACICS requires the commissioners to be either elected by their peers or appointed by the Council. The bylaws of the organization specify and define participation by public representatives as well as representatives of member institutions (Ibid., Article III, p. 92). Among other considerations, at least three of the commissioners "shall be public representatives," defined as someone "not employed or formally employed" by an ACICS institution, or serving as a board member on an ACICS institution, or related to someone employed by an ACICS institution (Ibid., Article I, Section

7, p. 90). Also, at least two of the members shall be "academic representatives," defined as someone currently or recently directly engaged in teaching or research (Ibid., Article III, p. 92).

ACICS requires all new commissioners, public, academic and administrative, to participate and complete a training module that orients them to the standards, practices and procedures of the Council. The objectives of the training include an overview of accreditation, ACICS' role in the accreditation triad, the agency's mission and values, and the responsibilities of Council members. The training also guides new commissioners regarding effective development of standards by which institutions are measured (Exhibit 23: Council, Commissioner and Board of Director Training Manual).

In order to afford due process protections to member institutions, ACICS establishes and maintains a qualified and professional Review Board for hearing appeals of Council decisions. ACICS requires Review Board members to be individuals who "have had experience in accreditation" and "shall not have been a commissioner within one year prior to appointment (Exhibit 1; Accreditation Criteria, Appendix A, Article VII, p. 98)." The bylaws require the Review Board to include a mix of academic, administrative and public members. Review Board members receive training that is specifically tailored to their duties as an appeals panel.

Also integral to the application of accreditation standards through the evaluation process is the recruitment and deployment of trained qualified on-site evaluators. These individuals do not serve in a decision making role or policy making role at ACICS. However, their insights and knowledge are valuable resources to the Council in developing policies and deciding accreditation outcomes.

The qualification of evaluators is specified as "educators, executives and practitioners in business, administrative and technical fields (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-401, p. 8)." They are also expected to have five years of documented experience and/or education in a specialty area or expertise (Exhibit 24: www.acics.org >Evaluators >Becoming an Evaluator Webpage).

Applicants interested in serving as evaluators must submit the requisite documents to evidence minimum qualifications, including evidence that they hold licensure in the relevant field. Applicants are vetted for evidence of experience or academic preparation in the field (Exhibit 25: Sample Evaluator Resumes, Public, Academic, Administrative; Exhibit 26: Resumes of Licensed Evaluators). New evaluators must complete at least two-hours of training (Exhibit 27: Evaluator Training Webinar Presentation) and demonstrate familiarization with instructional materials (Exhibit 28: Evaluator Training Packet).

Upon completion of the training, the new evaluator must pass a final exam (Exhibit 29:

New Evaluator Assessment Results). Evaluators who are assigned to on-site visits are briefed on new procedural and policy changes that affect their review (Exhibit 30: Pre-Visit Meeting Outline-Criteria and Procedural Changes).

ACICS has written policies to describe the process employed to ensure that the representatives on evaluation teams are appropriately credentialed and qualified to serve (Exhibit 22: Accreditation Evaluation Training Manual 2015, p. 11).

Additionally, ACICS' scope of recognition includes the evaluation of distance education and evaluators who are vetted to serve in this role must demonstrate, as outlined in the Evaluator Policies and Procedures as well as the web site, experience in the management, instruction and curriculum development of distance education programs, as well as having completed training in that mode of delivery (Exhibit 31: Distance Education Evaluators). Knowledge of self-paced instruction and familiarity with various platforms are preferred.

Every ACICS evaluation team is led by a chair selected and trained to assure that the visit is "conducted fairly and thoroughly" (Exhibit 1, Accreditation Criteria, Title II, Chapter 1, Section 2-1-401, p. 8).

ACICS applies the qualification requirements for team chairs through the application process (Exhibit 32: Team Chair Application). Team chairs are trained through a formal process (Exhibit 33: Chair Training 2013 Binder; Exhibit 34: Team Chair Professional Development 2014 Binder) and are mentored by veteran chairs. In addition, feedback from the mentor and ACICS staff informs the chair's performance (Exhibit 35: New Chair Training Evaluation Form).

ACICS relies on seasoned evaluators with years of experience reviewing ACICS institutions as an additional resource for the intermediate evaluation of team reports and school responses. Those individuals include chairs of teams and intermediate reviewers whose recommendations are considered by the Council when making accreditation decisions.

### Exhibit(s) Linked to this Criterion

| Exhibit Title | File Name |
| --- | --- |
| Exhibit 22 - Accreditation Evaluation Training Manual 2015 | Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf |
| Exhibit 23 - Council, Commissioner and Board of Director Training Manual | Exhibit 23 - Council, Commissioner and Board of Director Training Manual.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage | Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage.pdf |

| | |
|---|---|
| Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative | Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative.pdf |
| Exhibit 26 - Resumes of Licensed Evaluators | Exhibit 26 - Resumes of Licensed Evaluators.pdf |
| Exhibit 27 - Evaluator Training Webinar Presentation | Exhibit 27 - Evaluator Training Webinar Presentation.pdf |
| Exhibit 28 - Evaluator Training Packet | Exhibit 28 - Evaluator Training Packet.pdf |
| Exhibit 29 - New Evaluator Assessment Results | Exhibit 29 - New Evaluator Assessment Results.pdf |
| Exhibit 30 - Pre-Visit Meeting Outline-Criteria and Procedural Changes | Exhibit 30 - Pre-Visit Meeting Outline-Criteria and Procedural Changes.pdf |
| Exhibit 31 - Distance Education Evaluators | Exhibit 31 - Distance Education Evaluators.pdf |
| Exhibit 32 - Team Chair Application | Exhibit 32 - Team Chair Application.pdf |
| Exhibit 33 - Chair Training 2013 Binder | Exhibit 33 - Chair Training 2013 Binder.pdf |
| Exhibit 34 - Team Chair Professional Development 2014 Binder | Exhibit 34 - Team Chair Professional Development 2014 Binder.pdf |
| Exhibit 35 - New Chair Training Evaluation Form | Exhibit 35 - New Chair Training Evaluation Form.pdf |

**Criteria:** 602.15(a)(3) Academic/Administrator Representatives

**Response:**

ACICS values the contributions to the quality assurance program provided by educators, practitioners and administrators who work in the occupational, professional and technical fields offered as education programs at member institutions. The Council formalizes its recognition of those contributions through written policies and procedural protocols that require participation by those categories of individuals in the evaluation, policy making and decision making activities of the agency.

A team of evaluators is appointed to review on-site the sufficiency of an institution's compliance with ACICS standards as part of an initial grant, renewal grant or extensive substantive change evaluation. Evaluators are selected from "educators, executives and practitioners (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-401, p. 8)." In addition, the Council specifies that the evaluation teams must "consist of individuals serving as academic, administrative, public or member representatives (Ibid. Section 2-1-402, p.8)."

In order to serve as an evaluator on an ACICS on-site review team, an individual must register and be vetted through a formal process. The online registration (Exhibit 24: www.acics.org-Evaluators- Becoming an Evaluator Webpage, Step 4) and the Evaluation

Visit Procedures and Guidelines (Exhibit 36: Visit Evaluation Procedures and Guideline, p.2), requires evaluators to specify their role as academic or administrative (Exhibit 37: Evaluator Database Record). This information is used to ensure that every on-site review team is composed of the requisite representatives. Resumes of the team members for one evaluation visit, as well as the cover page of the team report, demonstrate the agency's interpretation of its definitions (Exhibit 38: MJI Evaluation Visit Materials - Roles, Reports, Resumes).

ACICS' requirement for academic, administrative, and public representatives on the Council, which is the agency's primary decision and policy-making body, are included in the bylaws of the agency (Exhibit 1: Accreditation Criteria, Appendix A, Article I, p. 90). The Council consists of "the elected and appointed commissioners," including "representatives of the public who are interested in career education; have knowledge or experience useful to accreditation." Public members must not be employed or formerly employed by a member institution, or have affiliations that would otherwise undermine their public status (Ibid., Section 7, p. 90). Council composition requirements further specify that it "comprise 15 commissioners," and "must maintain a minimum of three public representatives, six member representatives, two academic representatives and two administrative representatives. "Academic" is someone currently or recently directly engaged in teaching or research at the post-secondary level. "Administrative" is someone engaged in institutional- or program-level administration (Ibid., Article III, Section 1, p. 92)."

Since 2013, five members of the Council have fulfilled the academic category, and six members have fulfilled the public category (Exhibit 10: Commissioner Roster and Resumes).

ACICS considers the Review Board for Appeals a decision-making body. The Review Board, sitting as a review panel, has the authority to affirm, modify or reverse an accrediting decision of the Council. A Review Board panel must include at least one public, one academic and one administrative representative (Exhibit 1: Accreditation Criteria, Appendix A, Article VII, p. 98). Since 2013, eight members of the Review Board have fulfilled the academic category, and four members have fulfilled the public category (Exhibit 11: ACICS Review Board Roster since 2013 and sample resumes).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 10 - Commissioner Roster and Sample Resumes | Exhibit 10 - Commissioner Roster and Sample Resumes.pdf |
| Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes | Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes.pdf |

| | |
|---|---|
| Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage | Exhibit 24 - www.acics.org-Evaluators-Becoming an Evaluator Webpage.pdf |
| Exhibit 36 - Visit Evaluation Procedures and Guidelines | Exhibit 36 - Visit Evaluation Procedures and Guidelines.pdf |
| Exhibit 37 - Evaluator Database Record | Exhibit 37 - Evaluator Database Record.pdf |
| Exhibit 38 - MJI Evaluation Visit Materials - Roles Reports Resumes | Exhibit 38 - MJI Evaluation Visit Materials - Roles Reports Resumes.pdf |

**Criteria:** 602.15(a)(5) Public Representatives

**Response:**

ACICS values the participation and contribution of knowledgeable, professional members of the post-secondary education community who are not directly or indirectly affiliated with an ACICS college, school or service provider. The Council has written requirements for participation by members of the public in the evaluation, policy making and decision making aspects of its accreditation enterprise.

ACICS defines "Public Representative" as persons who are interested in career education; have knowledge or experience useful to the accreditation process; are willing to contribute opinion, advice, and expertise to the endeavors of ACICS and the Council; and are not (1) employed or formerly employed by an institution or program that either is accredited by the agency or has applied for accreditation or (2) associated as members of the governing board, owners, shareholders, consultants or in some other similar capacity with an institution or program that either is accredited by the agency or has applied for accreditation; or (3) a member of any related, associated, or affiliated trade association or membership organization; or (4) a spouse, parent, child or sibling of an individual identified in paragraph (1), (2) or (3) of this definition (Exhibit 1, Accreditation Criteria, Appendix A, Article I, Section 7, p. 90).

Public members are expected to be included on all full evaluation team visits that are conducted by ACICS as part of the quality review of institutions seeking initial grants, renewal grants or extensive substantive change approvals. Public members on evaluation teams have access to all of the information relevant to the review that is provided to other team members, including the institution's self-study and update report (Ibid., Title II, Chapter 1, Section 2-1-402, p. 8).

The required inclusion of public members on ACICS evaluation teams is specified in the agency's written procedures (Exhibit 22: Accreditation Evaluation Training Manual 2015, Team Composition, p.11). Coordinators apply this procedure, and access a database of evaluators who have been vetted as public members, in composing a team for a site visit (Exhibit 9: ACICS Roster of Evaluators). Public evaluators are selected based on their experience, education, practitioner status and other factors manifest in their resumes

(Exhibit 25: Sample Evaluator Resumes, Public, Academic, Administrative).

The policy regarding public participation in the 15-member Council, which is the only policy making and the primary decision making body of ACICS, requires that "at least three commissioners shall be public representatives (Exhibit I: Appendix A, Article III, Section 1-2, p. 92-93)." A standing committee of the Council is responsible for "the selection of candidates for election as commissioners and appointed as commissioners" for recommendation to the Council, including public commissioners (Ibid., Article V, Section 1(a), p. 95). Since 2013, six public representatives have been appointed to serve on the Council. Public members of the Council are vetted based on their experience, education and other factors as reflected in their resumes (Exhibit 10: Commissioner Roster and Sample Resumes).

ACICS policy for public participation in the Review Board of Appeals requires that "at least one public, one academic, and one administrative representative" constitute a Review Board panel. The panels have the authority to "affirm, remand, amend or overturn" an action of the Council (Exhibit I: Accreditation Criteria, Appendix A, Article VII, Section 1, p. 98). ACICS bylaws specify that Review Board members "shall be appointed by the Council," as well as their term of service and their absence from the Council for at least the prior year. The policy delegates to the President of ACICS the convening of a Review Board panel (Ibid.). A roster of eligible panelists is available for composing a given panel. Public members of the Review Board are vetted based on their experience, education and other factors as reflected in their resumes (Exhibit 11: ACICS Review Board Roster since 2013 and sample resumes).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 22 - Accreditation Evaluation Training Manual 2015 | Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 9 - ACICS Roster of Evaluators | Exhibit 9 - ACICS Roster of Evaluators.xlsx |
| Exhibit 10 - Commissioner Roster and Sample Resumes | Exhibit 10 - Commissioner Roster and Sample Resumes.pdf |
| Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes | Exhibit 11 - ACICS Review Board Roster since 2013 and sample resumes.pdf |
| Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative | Exhibit 25 - Sample Evaluator Resumes, Public, Academic, Administrative.pdf |

**Criteria:** 602.15(a)(6) Conflict of Interest

**Response:**

ACICS values the independence of its evaluators, policy makers, decision makers and professional staff from any undue conflicts of interest. That emphasis on integrity is explicitly discussed in the section of the Council's policy document regarding the selection and actions of members of the Review Board of Appeals (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-602, p. 32), as well as the section dealing with visit team composition. In the first case, Review Board panelists are scrutinized for their compliance with the agency's conflict of interest policies; and in the case of evaluators, the institution may request replacement of a team member for apparent conflict of interest reasons (Ibid., Title II, Chapter 1, Section 2-1-400, p. 8).

ACICS' policy defines conflict of interest as a commissioner "having any interest in an institution appearing before the Council" or a commissioner who "feels it would not be proper to participate" in a decision making activity directed towards a specific institution. The conflict of interest policy is applied in the assigning of commissioners to hearing panels that are empaneled to decide the denial of a grant of accreditation (Exhibit 23: Council, Commissioner and Board of Director Training Manual, Standards of Ethical Responsibility, p. 20). The same definition applies to Review Board members who are empaneled to decide appeals of Council Decisions (Exhibit 40: Policies and Procedures Manual, Chapter 51, Review Board, p. 215).

All members of the Council, who also constitute the ACICS Board of Directors, and the Review Board of Appeals must review and sign an ethics disclosure as part of their training and orientation to their duties (Exhibit 41: Signed Commissioner Disclosures). Also during Council meetings, commissioners are required to indicate those accreditation files or institutions for which a conflict of interest may arise (Exhibit 109: Signed Abstention list for Council Meetings).

The ethical expectations of evaluators are expressed at the beginning of the process for vetting, training and selecting members of on-site review teams. Evaluators are informed that the credibility of ACICS accreditation is "based upon the singular integrity of all those individuals charged with the adoption of policies, procedures, and standards and with the evaluation and measurement of institutional performance." ACICS' policy requires evaluators to "avoid impropriety and the appearance of impropriety," to perform his or her duties "impartially and diligently," and to "refrain from any business activity inappropriate to accreditation responsibilities, including the offering of any materials or information pertinent to the institution's operation or services." The policy further requires evaluators to refrain from the review of "any institution with which he or she has been, is currently, or presently intends to be directly or indirectly involved (Exhibit 36: Visit Evaluation Procedures and Guidelines, p. 4)." Before an evaluator is assigned to a site review visit, he or she must sign and return for the file the Canons of Ethical Responsibility attestation (Exhibit 42: Sample Signed Canons of Ethical Behavior).

ACICS staff and agency representatives are also required to guard against conflicts of interest, real or perceived. The agency's controls against conflicts of interest are memorialized in written materials that are provided to all staff and representatives as part of their orientation process (Exhibit 39: Staff Handbook 1-12-15 Excerpt - Conflict of Interest, p. 25, 31-33).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 109 - Signed Abstention List for Council meetings | Exhibit 109 - Signed Abstention List for Council meetings.pdf |
| Exhibit 23 - Council, Commissioner and Board of Director Training Manual | Exhibit 23 - Council, Commissioner and Board of Director Training Manual.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 36 - Visit Evaluation Procedures and Guidelines | Exhibit 36 - Visit Evaluation Procedures and Guidelines.pdf |
| Exhibit 39 - Staff Handbook 1-12-15 Excerpt - Conflict of Interest | Exhibit 39 - Staff Handbook 1-12-15 Excerpt - Conflict of Interest.pdf |
| Exhibit 40 - Policies and Procedures Manual, Chapter 51, Review Board | Exhibit 40 - Policies and Procedures Manual, Chapter 51, Review Board.pdf |
| Exhibit 41 - Signed Commissioner Disclosures | Exhibit 41 - Signed Commissioner Disclosures.pdf |
| Exhibit 42 - Sample Signed Receipt of Canons of Ethical Behavior | Exhibit 42 - Sample Signed Receipt of Canons of Ethical Behavior.pdf |

**Criteria:** 602.15(b) Recordkeeping

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

| Exhibit(s) Linked to this Criterion |
|---|
| No Exhibits uploaded for this Criterion |

**Criteria:** 602.16(a)(1)(i) Student Achievement

**Response:**

ACICS defines education quality in terms of student achievement, among other factors (Exhibit 43: Institutional Effectiveness - A Guide to Implementation, page 6). The agency gives discretion to the institution or program to set its own thresholds for some of those

factors, "consistent with mission," and encourages the institution to demonstrate "the degree to which it meets its own predetermined educational outcomes (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-110, p. 37)." Council prescribes which outcome data must be reported by the institution each year (Ibid., 3-1-111, pgs. 38-39), the minimum thresholds for acceptable performance, and the sanctions applied when institutions or programs fail to perform at standard for student retention, placement, and licensure pass rate.

In addition to prescribed standards for certain indicators of student achievement, ACICS requires institutions to establish their own benchmarks for graduate satisfaction, employer satisfaction, and student learning outcomes such as cumulative grade point average, portfolio review and other measures of "skill and competency attainment." The development and application of plans to impact student achievement are mandatory and accomplished through the Campus Effectiveness Planning (CEP)(Ibid.).

Council each year reviews student achievement data submitted through the annual Campus Accountability Report (CAR), which is required as a condition of maintaining accreditation. Each institution each year must submit reliable, accurate data regarding the enrollment levels in each program, retention data, placement data and licensure exam data when applicable. Programs and institutions whose performance fall below the Council's published standards (Exhibit 86: ACICS Student Achievement Rates and Definition of Placement - ACICS Webpage) are notified and required to remedy the deficiency in a timely manner, including documentation of a plan to improve performance that is subject to Council review (Ibid., Title II, Chapter 1, Section 2-1-809, p. 12).

When the data is submitted, the institution is notified if the information fails certain integrity tests. The data is used by the ACICS information technology platform to calculate preliminary performance rates for each program and campus (Exhibit 44: 2014 CAR Reports - ITT). After the data has been reviewed by Council, the institution is notified if the data indicates substandard performance (Exhibit 45: ITT Student Achievement Outcomes Letter).

The integrity of self-reported student achievement data is reviewed for accuracy during on-site evaluation visits. The team also reviews the CEP to ensure that institutions document a proper analysis of their retention and placement activities and identify appropriate goals and remedies for substandard performance (Exhibit 46: PIP Revision to CFI CEP). If the team finds deficiencies in the improvement plan or the CEP, it establishes a finding in the team report. If an institution is unable to rectify the deficiency, the institution faces deferral, a finding of non-compliance, and ultimately a directive to show-cause (Exhibit 47: Salter School-Tewksbury Renewal, p. 5).

Due to deficiencies in student achievement, the Council has applied heightened monitoring requirements to nearly 600 programs and campuses operated by large

multi-campus systems in the past few years. These sanctions include written improvement plans that are subject to review by on-site evaluators and the Council; deferral actions and compliance warnings (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16, Table G). In addition, the Council has strengthened the reliability and integrity of data derived from the annual accountability reports (Ibid, Table H) and applied sanctions to institutions whose data fall short of integrity standards (Ibid, Table J).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 47 - Salter School-Tewksbury Renewal, p. 5 | Exhibit 47 - Salter School-Tewksbury Renewal, p. 5.doc |
| Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted | Exhibit 49 - Globe University-Minneapolis RV Doctoral Program Team Report and ACICS Letter_Redacted.pdf |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk | Exhibit 5 - Accrediting Agency Doctoral Standards Crosswalk.xlsx |
| Exhibit 43 - Institutional Effectiveness - A Guide to Implementation page 10 | Exhibit 43 - Institutional Effectiveness - A Guide to Implementation page 10.pdf |
| Exhibit 44 - ITT 2014 CAR Report | Exhibit 44 - ITT 2014 CAR Report.pdf |
| Exhibit 45 - ITT Student Achievement Outcomes Letter | Exhibit 45 - ITT Student Achievement Outcomes Letter.pdf |
| Exhibit 46 - PIP Revision to CFI CEP | Exhibit 46 - PIP Revision to CFI CEP.pdf |

**Criteria:** 602.16(a)(1)(ii) Curricula

**Response:**

The quality of the curricula offered at the program and institutional levels is established by ACICS through multiple sections of its standards document, organized by credential level. In addition, curriculum quality requires active involvement of faculty through the governance of the institution (Exhibit 1: Accreditation Criteria, Title III, Chapter I, Section 3-1-501(c), p. 46). The quality of curriculum required for programs leading to certification or licensure are further defined as that which affords "students the opportunity to obtain

the minimum skills and competencies to become certified, licensed or registered … (Ibid., Section 3-1-502 and Section 3-1-503, p. 46)".

In developing programs, ACICS requires institutions to pay particular attention to the quality of the curriculum in terms of "sequence of subjects leading to an occupational objective, an academic credential, or both." In addition, ACICS standards require objectives for each curriculum to be stated and published (Ibid., Section 3-1-513 (a), p. 48), and that the evaluation and revisions to curriculum relate to "community surveys" and other means for determining educational or employer needs (Ibid., Section 3-1-514, p. 48). ACICS also expects that curriculum at each credential level "quantitatively and qualitatively approximate the standards at other institutions offering" comparable credential programs (Ibid., Chapter 3, Section 3-3-203, p. 55).

In addition to standards of quality that apply generally to all curriculum and courses offered at ACICS institutions, the agency applies standards to curriculum at all credential levels; for courses and programs delivered through distance education (Ibid., Appendix H, Section II (Curriculum and Instructional Delivery), pgs. 119-120); and for direct assessment competency-based education (Ibid., Section I, (Curriculum Development and Direct Assessment Measures), pgs. 117-118).

ACICS standards address specific aspects of curriculum quality, including course sequencing (prerequisites), general education, courses in the major, objectives for each course and the support provided by the curriculum to the mission of the institution. Well-defined learning objectives and an appropriate sequence of course prerequisites are both required (Ibid., Title III, Chapter 1, Section 3-1-532(b), p. 50, and Section 3-1-513(b), p. 48) and must be described in the Catalog (Ibid., Appendix C, item 10(a), p. 103 and item 11(e), p. 104) and the Syllabus (Ibid., Glossary, p. 86). Standards for program objectives, the relationship of these objectives to the mission of the institution, the nature and content of courses in the major, and of general education requirements are prescribed in the "Educational Activities" sections for each credential level, including occupational and academic associate's degrees (Ibid., Title III, Chapter 3, Section 3-3-200, p. 55 and Chapter 4, Section 3-4-200, p. 59); Bachelor's (Ibid., Chapter 5, Section 3-5-200, p. 63); Master's (Ibid., Chapter 6, Section 3-6-400, p. 67).

Standards for curricular quality are applied by ACICS in a number of ways: upon the review of new programs; as part of the renewal of accreditation process; in the review of complaints and adverse information; and during the review of annual program effectiveness data and reports. The curricula quality is evaluated initially when an institution seeks approval for a new program. Information regarding general education requirements , and the mix of instructional settings (lab, lecture, externship) is reviewed and verified during the initial application process and during subsequent onsite evaluation visits (Exhibit 51: Academic Credit Analysis).

The application of the curriculum-specific standards to initial applicants and institutions seeking renewal of accreditation is accomplished through the required self-evaluation (Exhibit 52: Self Study Narrative Template, Section 5, ps. 11-13) and the report generated by the site visit team (Exhibit 7: Team Report Template, Sections. 9.01-9.59, ps. 70-89). Changes to curriculum that are material to its quality must be reported to ACICS and approved either as a substantive change or as a non-substantive change (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, Section 2-2-121, p. 17). When a program at an institution falls short of standards regarding stated objectives, relevance to major field of study, general education component or other factors, the institution receives written feedback and is required to demonstrate that the finding has been remedied (Exhibit 53: Exhibit MSB Curriculum Finding, Team Report, Questions, 9.39 and 9.40, p. 4 - School Response, p. 6 - Council Deferral letter, p. 7 - School Response to Deferral Letter, p. 9-11).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 51 - Academic Credit Analysis | Exhibit 51 - Academic Credit Analysis.pdf |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1 | Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 50 - New Program Application Template | Exhibit 50 - New Program Application Template.pdf |

**Criteria:** 602.16(a)(1)(iii) Faculty

**Response:**

Requirements for faculty as an element of institutional quality at ACICS institutions reflect the unique mission and purpose of their programs, which emphasize professional, technical and occupational fields designed to lead to employment. Faculty engaged in delivering outcomes that fulfill that mission are expected to reflect appropriate educational backgrounds, professional experience, and participation in curriculum development and professional development activities.

General requirements for all institutions regarding faculty include their participation in the self-evaluation process (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-204, p. 7) and the onsite review by the accreditation team (Ibid., Section 2-1-205, p. 7). In addition, all institutions are expected to demonstrate they have "appropriate faculty" to implement the mission (Ibid., Title III, Chapter 1, Section 3-1-102, p. 37), be organized

in a manner that promotes "understanding, cooperation, and responsibility" among faculty and staff (Ibid., Section 3-1-200, p. 39), and that faculty grasp their obligations, the standards by which their work will be evaluated, and the documentation of that evaluation (Ibid., Section 3-1-202(b), p. 40).

Regarding qualifications of faculty to teach assigned subjects and demonstrate knowledge in specific fields of study sufficient to provide effective instruction, ACICS requires that faculty "be academically and experientially appropriate to the subject matter they teach"; "competent to teach the subject matter being offered"; and have "reasonable latitude in their choice of teaching methods (Ibid., 3-1-541, p. 50)."

In addition to general standards applied to all institutions, the agency standards address faculty teaching load, preparation, subject preparation, assignments, stability and student-teacher ratio for each credential level awarded. Faculty standards specific to non-degree programs are included in Title III, Chapter 2, Section 3-2-100 p. 53. Comparable faculty standards specific to occupational associate's degree programs of study are prescribed in Title III, Chapter 3, Section 3-3-300, p. 56. Faculty standards specific to academic associate's degree programs of study are prescribed in Title III, Chapter 4, Section 3-4-300, p. 60. Faculty standards specific to bachelor's degree programs of study are prescribed in Title III, Chapter 5, Section 3-5-300 p. 64. Faculty standards specific to master's degree programs of study are prescribed in Title III, Chapter 6, Section 3-6-500, p. 68 (Exhibit 1: Accreditation Criteria).

Every main and branch campus must submit a self-evaluation, in order to renew accreditation, which includes a faculty staff summary sheet. The self-evaluation must include an explanation of the faculty involvement and contribution to the implementation of the institution's mission; how the institution ensures faculty clearly understand their duties and responsibilities; an explanation of how faculty are monitored and evaluated; and a description of how the administration provides for academic freedom of faculty (Exhibit 52: Self-Study Narrative Template, ps. 14-17).
During an evaluation visit, the evaluation team reviews required documentation of faculty qualifications and experience. The team also interviews staff, students and faculty to evaluate the institution's compliance with the faculty information contained in the self-evaluation. The findings of the team are memorialized in the team report template. Section 9 of the report focuses on compliance with faculty standards for each program offered by the institution as evaluated by subject specialists. Report questions in section 9 correspond to specific standards regarding faculty credentials, training, evaluation and development. (Exhibit 7: Team Report Template, ps. 72, 79-83).

Institutions are also required to establish and maintain documented evidence of faculty development plans and achievements, including in-service and professional growth activities. This information must be updated annually (Exhibit 1: Accreditation Criteria, Section 3-1-543, p. 5).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.16(a)(1)(iv) Facilities/Equipment/Supplies

**Response:**

Certain tangible assets that support an institution in providing programs designed to educate students in professional, technical or occupational fields according to ACICS requirements must meet ACICS standards and expectations. The Council prescribes the requirements for facilities, equipment, supplies and other instruction materials in the context of career education that leads to employment.
Specifically, ACICS requires institutions to provide an environment "that is conducive to good instruction and learning" and "supports the educational programs offered by the institution." ACICS evaluates the sufficiency of the educational environment "against the demands made upon it by the curricula, faculty, and students (Exhibit 1, Accreditation Criteria, Section 3-1-600, Educational Facilities, pg. 51)."

Regarding the quality of support for the program of instruction, Council expects "facilities, instructional equipment, resources, support for modes of instructional delivery, and personnel" to be appropriate to the program (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-531, p. 50)." Regarding the capacity to support the program of instruction, ACICS requires "that the quantity and type of instructional material and equipment is proportionate to the size of the institution and the nature of the program (Ibid.)."

The Accreditation Criteria (Ibid., Section 3-1-600, p. 51) has specific requirements in subsections regarding plant and equipment and also requires that the plant shall meet general tests of safety, usefulness, cleanliness, maintenance, health, lighting, and compliance with local or state laws and code requirements. On-site evaluation teams verify that the institution presents satisfactory current fire and safety permits issued by the local government.

Regarding instructional resources, the Council prescribes requirement for instructional resources, audiovisual teaching equipment and instructional materials, including library resources. A general standard prescribes budget allocations and expenditures for instructional resources, equipment and materials (Ibid., Title III, Chapter 2, Section 3-2-200, p. 54).

The required level and quality of facilities, supplies, materials and equipment are

prescribed in greater detail within the separate sections dedicated to each credential level (Ibid., Chapter 3, Section 3-3-402, p. 57; Chapter 4, Section 3-4-402, p. 61; Chapter 5, Section 3-5-402, p. 65; Chapter 6, Section 3-6-702, p. 69; Chapter 7, Section 3-7-702, p. 75). In addition, qualifications of library staff are prescribed under separate sections for each credential level.

ACICS tests the institution's compliance with these requirements through specific sections of the self-evaluation report (Exhibit 52: Self-Study Narrative Template, Sections 6 and 8) during the comprehensive review process (Exhibit 7: Team Report Template, Sections 6 and 8) and in reviewing complaints and adverse information in between comprehensive reviews.

Failure to demonstrate compliance with ACICS standards regarding support of the instructional program through sufficient tangible assets results in a finding that must be addressed by the program or institution in a timely manner (Exhibit 55: ITT Facilities, Team report and School Response).

Institutions offering distance education programs are required to provide an accessible and reliable learning management system and adequate technical support. All support services must be equivalent in quality and scope to those provided to students enrolled in ground-based programs. The Campus Effectiveness Plan must include the institution's plans for allocation of adequate resources to serve current and future numbers of distance education students to assure compliance with student achievement standards and student learning outcomes (Exhibit 1: Accreditation Criteria, Appendix H, Section II, ps. 119-121; Exhibit 7: Team Report Template, Section 10, Items H.25, H.28, H.29, H.31, and H.07).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| Exhibit Title | File Name |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 55 - ITT Facilities, Team report and School Response | Exhibit 55 - ITT Facilities, Team report and School Response.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.16(a)(1)(v) Fiscal/Administrative Capacity

**Response:**

The financial vitality and administrative capabilities of institutions offering programs that lead to professional, technical or occupational employment are subject to scrutiny and evaluation by ACICS before acceptance for initial accreditation based on audited financial information, every year based on formal financial reports and audited updates, and more

frequently as appropriate when indications of financial or administrative weakness are discovered.

ACICS makes it clear that financial stability and administrative capability, particularly related to operational ethics, are integral to the evaluation of "the institution's overall educational quality … self-evaluated and judged by peers (Exhibit 1: Accreditation Criteria, Title I, Chapter 1, Introduction, p. 1)."

A number of factors are reviewed by the Council in evaluating an institution's financial and administrative capacity. Those factors include the size and scope of the operation, the continuity of service and the adequacy of resources to support instruction. A primary factor of evaluation is the sufficiency of resources "to accomplish its mission (Ibid, Title III, Chapter 1, Section, 3-1-203, p. 40)."

The application of those requirements for financial and administrative capacity occurs at various stages in the process of accreditation review. A current audited financial statement is required by the institution during the initial application process (Ibid., Title II, Chapter 1, Section 2-1-803, p. 11). These statements are reviewed by a qualified financial analyst and the institution must provide evidence of financial stability before completing the initial grant process. Institutions that cannot meet this threshold are not allowed to continue with the accreditation review (Exhibit 56: Sample Initial Applicants with Poor Financials Redacted).

In addition, every accredited institution must submit an Annual Financial Report (AFR) (Exhibit 57: AFR Template), including audited financial statements. The content and purpose of the AFR and audited financial statement are prescribed by the Council (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-802 and 2-1-803, p. 11). The Council prescribes in detail the dimensions of the annual financial report, guidelines for developing the report, timeframes for submittal, and financial penalties for non-compliance (Exhibit 58: www.acics.org -accreditation - annual financial report) (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-502, p. 31).

The AFR requires the institution to upload balance sheet and income statement information. ACICS' technology platform captures the data and uses it to calculate financial ratios that are disclosed to the institution. If the institution, based on the financial ratios, is exhibiting financial stress, it is afforded the opportunity to write an explanatory narrative (Exhibit 57: AFR Template, pgs. 9-11).

The annual financial reports and audited statements are reviewed by Council using a systematic rubric (Exhibit 59: FRC Scoring Rubric). Based on the numeric values derived from the scoring rubric and other considerations, Council may require the institution to submit a quarterly financial report, a financial improvement plan, or both (Exhibit 60: QFR and FIP Template). In the event the financial analysis demonstrates substantial lack of

financial stability, Council issues an order to show-cause (Exhibit 61: Bristol University Team Report, School Response, Council Show-Cause Letter, ps. 539-540). Institutions subject to financial review monitoring are not eligible for a maximum accreditation grant length (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-701, p. 10) and are required to receive permission from the Council prior to initiating a new branch campus (Ibid., Chapter 2, Section 2-2-104(a), p. 14).

When the Council discovers indications of financial or administrative weakness, such as adverse information received from other agencies including the Department of Education, Council may order quarterly financial reports, a financial improvement plan and a plan for the orderly closure of the institution that provides for the continuation and completion of the studies of all students currently enrolled (Ibid., Section 2-2-303, p. 19). For certain large multi-campus systems, ACICS has imposed heightened monitoring requirements on more than 170 campuses in recent years based on deficiencies in financial stability and sustainability (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Table C).

ACICS' standards regarding administrative capacity require that the institution must be led by individuals who are qualified, well-trained, and responsible for implementing the institution's stated mission (Ibid., Title III, Chapter 1, Section 3-1-300 and 3-1-301, p. 40). In addition, the standards require an emphasis on the efficiency and effectiveness of the administration, and that the administrative staff members are aware of their duties and responsibilities, and are evaluated based on these duties (Ibid., Section 3-1-202(a) and 3-1-202(b), p. 40).

Integral to the evaluation of an institution for an initial or renewal grant is the review of its administrative capacity. That review begins with the self-evaluation (Exhibit 52: Self Study Narrative, Sections 2 and 3, ps. 4-7). During the comprehensive evaluation visit, the team reviews the self-study; interviews staff, faculty, and students; observes campus operations; and reviews documentation provided by the institution. The team's findings regarding administrative capacity of the institution is captured in specific sections of the report (Exhibit 7: Team Report Templates, Sections 2-3, ps. 8-14). When the Council determines that the institution is deficient in administrative capacity, based on a review of the team report and the school response, it will require the institution to come into compliance in a timely manner (Exhibit 61: Bristol University, Team Report p. 10, School Response p. 177, Council Action Letter, item 5, p. 526).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |

| | |
|---|---|
| Exhibit 56 - Sample Initial Applicants with Poor Financials_Redacted | Exhibit 56 - Sample Initial Applicants with Poor Financials_Redacted.pdf |
| Exhibit 57 - AFR Template | Exhibit 57 - AFR Template.pdf |
| Exhibit 58 - www.acics.org -accreditation - annual financial report | Exhibit 58 - www.acics.org -accreditation - annual financial report.docx |
| Exhibit 59 - FRC Scoring Rubric | Exhibit 59 - FRC Scoring Rubric.pdf |
| Exhibit 60 - QFR and FIP Template | Exhibit 60 - QFR and FIP Template.pdf |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 46 - PIP Revision to CFI CEP | Exhibit 46 - PIP Revision to CFI CEP.pdf |

**Criteria:** 602.16(a)(1)(vi) Student Support Services

**Response:**

Students who enroll in programs designed to prepare them for employment in professional, technical and occupational fields have unique needs and expectations. ACICS expects that support services provided by member institutions directly address the unique economic circumstances and demographics of their students: compared to students participating in more traditional higher education programs, students attending ACICS colleges and schools are more likely to lack family financial support, have children at home, work fulltime, and have a household income that places them at or below the federal poverty level (Exhibit 62: APSCU Students profile).

Regardless of any unique demographics or economic characteristics, continuous awareness of the education experience of all students is a priority for the Council, reflected in its value statement at www.acics.org>about us: "ACICS is committed to the importance of a quality educational experience for all students."

The Council expects that student support services reflect "the highest ethical standard" and "conform to all applicable laws and regulations." The program of student support services provided by each institution must be consistent with its stated mission, including services provided to students attending branch campuses, learning sites, and enrolled in distance education classes and programs (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-400, p. 42).

At minimum, ACICS institutions are required to have one experienced person on staff to counsel students on personal or academic problems and job placement opportunities. Institutions are expected to have orientation activities to assist new students in adapting to

the institution. In addition, ACICS expects the institution to have a system of educational, occupational, and personal advising, an emphasis on student success through retention and program completion, and documented employment assistance. Retention and completion are emphasized in these standards in terms of the students' "academic and socioeconomic characteristics." ACICS requires institutions to document the counseling they provide students regarding student loans (Ibid., Section 3-1-441, pgs. 45 - 46).

Another area of emphasis for ACICS standards regarding student services is the administration of financial aid. The Council acknowledges that participation in state and federal student financial aid programs requires "serious responsibility," and expects all institutions participating in federal or state student financial aid programs to be knowledgeable of and in compliance with applicable laws and regulations. ACICS requires institutions to have at least one professionally qualified administrative staff person and an appropriate set of financial controls (Ibid., Section 3-1-434, p. 44).

ACICS considers access to an effective grievance process integral to quality in student services. Institutions must establish, publish and implement policies and procedures for considering complaints received from students (Ibid., Section 3-1-202(d), p. 40). The grievance procedures must include publication of information regarding contacting ACICS.

Because careful recordkeeping is crucial to the effective operation of student support services, ACICS requires that all such records be available at each institutional site during evaluation visits. Council standards for recordkeeping include the requirement that all basic records and reports pertaining to students shall be safely protected from theft, fire, water damage, or other possible loss (Ibid., Section 3-1-303(a)(f)(g), p. 41).

The opportunities for ACICS to evaluate the quality and sufficiency of student services include review of the self-evaluation narrative (Exhibit 52: Self Study Narrative, Questions 4.7-4.21, ps. 9-10), observations, interviews and documents reviewed during site visits (Exhibit 7: Team Report Template, Questions 4.01-4.02, p.15) and the review of retention and placement outcomes derived from the annual Campus Accountability Report (CAR).

In addition, during on-site evaluation visits, students are requested to complete an online survey instrument that indicates their level of satisfaction with a variety of factors, including several that directly impact the quality of student services (Exhibit 63: Sample Student Survey).

Based on information derived from on-site visits, the review of adverse information or complaints, and annual CAR, if Council determines that the institution is not providing sufficient or appropriate student support services, it will require the institution to demonstrate compliance with this standard in a reasonable timeframe (Exhibit 61: Bristol University Team Report Question 4.61, p.23, School Response p. 316, Council Deferral

Letter, Item 15, p. 527).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 62 - APSCU Student Profile | Exhibit 62 - APSCU Student Profile.pdf |
| Exhibit 63 - Sample Student Survey | Exhibit 63 - Sample Student Survey.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.16(a)(1)(vii) Recruiting & Other Practices

**Response:**

ACICS expects that integrity and ethical practices be applied to all aspects of the institutions' operations including the admission of students. Further, it requires that individuals assigned to recruitment and admissions duties will be selected "with the utmost care," and that they be trained adequately, supervised appropriately and evaluated effectively (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-202, pgs. 39-40). This standard applies to all institutions offering programs at all credential levels at all locations. In addition, ACICS has established and applies expectations regarding the integrity and accuracy of information shared with the public and prospective students regarding the effectiveness of the institution's programs.

ACICS has developed and applied accreditation standards that govern advertising and publications, catalogs, academic calendars, recruitment and admissions, and the enrollment and grading of students.

Regarding publications and advertising, ACICS standards stress "truth in advertising." In addition, publications must be professional and information must be accurate, factual and current (Ibid., Section 3-1-700, p. 51). The specific standards for the institutional catalog require among other elements disclosure of admission requirements, including the basis for admissions and requirements for certification, licensure or registration in the professional field (Ibid., Appendix C, pgs. 103-105).

ACICS prescribes that institutional marketing materials, including advertising, must be factual, and must present material "in a manner that avoids leaving any false, misleading, or exaggerated impressions with respect to the institution, its personnel, its courses and services, or the occupational opportunities for its graduates." In addition, the Council

prescribes detailed requirements regarding all advertisements, endorsements, sales promotions, monetary incentives, and references to financial aid (Ibid., Title III, Chapter 1, Section 3-1-703, pgs. 51-52, and Appendix C, p. 106).

ACICS requires that institutions disclose in their catalog specific requirements for certification, licensing, or registration in the program's career field, where applicable (Ibid., Appendix C, Catalog 10(e), p. 104). For programs where state certification, licensing, or registration is mandatory, the curriculum "must contain the necessary course work to afford students the opportunity to obtain the minimum skills and competencies in order to become certified, licensed, or registered in that career field (Ibid., Title III, Chapter 1, Section 3-1-502, p. 46)."

ACICS has specific expectations regarding the disclosure and manner by which an institution recruits and admits students. The standards require that students admitted have achieved at a minimum graduation from high school or an equivalent. The standards also require that the institution's admission policy conforms to the institutional mission, is publicly stated, and is administered as written (Ibid., Section 3-1-411, p. 42). ACICS also requires that recruitment activities are "ethical and compatible" with the educational objectives of the institution, and that any individual engaged in the admissions or recruitment process "is communicating current and accurate information regarding courses and programs, services, tuition, terms, and operating policies (Ibid., Section 3-1-412, pgs. 42-43)."

For all institutions, programs and campuses, ACICS requires all institutions to develop and publish in the catalog a policy that measures whether students are progressing satisfactorily in their program. Included is the requirement that the institution must monitor whether a student meets the minimum qualitative and quantitative components of the standards of satisfactory academic progress (Ibid., Appendix D, pgs. 108-110).

The opportunities for ACICS to test the fidelity of an institution's performance to these standards of integrity include the review of the self-evaluation document (Exhibit 52: Self-Study Narrative Template, Sections 4, ps. 8-9, Section 7, p. 19), observations, interviews, file reviews and anonymous student surveys (Exhibit 63: Sample Student Survey) conducted during a site visit, and recurring evaluations of online representations made by the institution; these online reviews occur between comprehensive evaluations.

The student surveys ask specific questions about the admissions and recruiting process. The evaluation team uses the results of the surveys to determine if there are any concerns with the institution's practices regarding admissions and recruitment, as well as issues regarding advertising and publications, catalogs, academic calendars, and grading of students. Based on findings of the evaluation team as memorialized in its report and the institutions response, if the Council determines that the institution is not conducting its recruitment and admissions of students according to standards, it is subject to deferrals or

other sanctions (Exhibit 64: MJI Team Report, Questions 7.10 and 7.17, ps. 22-23; School Response ps. 1498 and 1514; Council Deferral Letter, Items 7 and 8, p. 1750).

In addition, and supplemental to the comprehensive review conducted during a reaccreditation visit, ACICS monitors whether institutions are providing accurate information regarding their student achievement performance as required by Council (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-704, p. 52). Guidance regarding appropriate and ethical disclosures has been provided to all institutions (Exhibit 65: ACICS Best Practices - Institutional Student Achievement Disclosure Information). The best practices are used as a point of reference in reviewing the online publication of student achievement performance (Exhibit 66: ACICS Disclosure Verification Program Instructions and Spreadsheet 2015).
Finally, if and when ACICS receives information from an oversight partner agency regarding the disclosures of an institution, ACICS requires a satisfactory response from the institution (Exhibit 67: BPC Adverse Report, December 2015).

As applied to large multi-campus systems, ACICS has ordered more than 230 deferrals and other sanctions based on deficiencies in these categories. (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16, Table F). Admissions practices, based on direct surveys of students, is generally viewed as satisfactory (Ibid, Table L, Questions A.03, A.04, A.05 and A.09).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| Exhibit Title | File Name |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 63 - Sample Student Survey | Exhibit 63 - Sample Student Survey.pdf |
| Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers | Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers.pdf |
| Exhibit 65 - ACICS Best Practices - Institutional Student Achievement Disclosure Information | Exhibit 65 - ACICS Best Practices - Institutional Student Achievement Disclosure Information.pdf |
| Exhibit 66 - ACICS Disclosure Verification Program Instructions and Spreadsheet 2015 2 | Exhibit 66 - ACICS Disclosure Verification Program Instructions and Spreadsheet 2015 2.pdf |
| Exhibit 67 - BPC Adverse Report, December 2015 | Exhibit 67 - BPC Adverse Report, December 2015.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.16(a)(1)(viii) Program Length

**Response:**

ACICS acknowledges the close relationship between program quality and the length and content of programs as those factors apply to post-secondary education intended to result in employment. The relationship is defined and emphasized through Council standards that apply in general to all programs, and that are prescribed in detail for specific credentials and types of programs. Of primary concern to ACICS are program attributes in relationship to "institutional mission, program objectives and content, types and locations of instructional delivery, knowledge and skills necessary for students to reach competence, and additional requirements that may be placed upon a graduate for employability, including, if applicable, certification or licensure (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-807, p.11)."

Also of concern is that program content and length have demonstrable comparability to similar programs offered at other accredited colleges and schools. ACICS standards for course and program measurement are spelled out in Council policy documents (Ibid., Title III, Chapter 1, Section 3-1-516(a), pgs. 48-49). Using the standard "Carnegie" definition of a credit hour and commonly accepted practice for relating the clock hours of lecture to laboratory to practicum, the agency standard requires that one quarter credit hour equals, at a minimum, 10 classroom hours of lecture (plus out-of-class student work), 20 hours of laboratory and 30 hours of practicum. One semester credit hour equals, at a minimum, 15 classroom hours of lecture (plus out-of-class student work), 30 hours of laboratory and 45 hours of practicum.

ACICS develops and revises the standards periodically by collecting and analyzing data about program length in contact hours, and other factors, from each institution every year. The Council compares that data to its benchmarks. The information is published and made available to the public through www.acics.org (Exhibit 17: 2014 Summary of Key Operating Statistics (KOS), pg. 15). An institution with a program length of more than one standard deviation above or below the mean for similar programs must provide a written explanation to the Council that addresses the basis for the variance. Explanations that fail to demonstrate acceptable justification for the variance are subject to "on-site evaluation, a compliance warning, or the withholding of inclusion of the program from the institution's current grant of accreditation (Exhibit 1: Accreditation Criteria, Title II, Chapter 1, Section 2-1-807, p.11)."

When the Council encounters a program whose length is abnormally long or brief, it notifies the institution and requires explanation for the variance (Exhibit 68: Sanford Brown Program Review, ps. 1, 4-5).

The relationship between education quality and program length and content is further

prescribed by ACICS's standards that address indicators and expectations at each credential level. For example, ACICS requires that academic associates' degree programs, a credential level that served about 18 percent of students enrolled in 2014 (Exhibit 17: 2014 Key Operating Statistics, pg. 5) must contain a minimum of 60 semester hours, 90 quarter hours, or their equivalent normally earned over a period of four semesters, six quarters, or the equivalent.

The standards also specify the content proportions, concentration area and general education. For example, ACICS requires that an academic associate's degree contain "a minimum of 30 semester hours, 45 quarter hours, or their equivalent in courses within the areas of concentration; and a minimum of 15 semester hours, 22.5 quarter hours, or their equivalent in general education courses (Exhibit 1: Accreditation Criteria, Title III, Chapter 4, Section 3-4-202, p. 59)."

To further define and prescribe quality of program design, ACICS specifies that courses within the area of concentration cannot be applied toward fulfillment of general education requirements; courses that fulfill the concentration versus general education requirements must be described in the institutional catalog, and the institution must provide an explanation of its course numbering system.

ACICS further requires the institution to provide general education offerings that emphasize "principles and theory … not practical applications associated with a particular occupation or profession. General education courses give balance to the total program and must be appropriate for the program and the needs of the students (Ibid.)." The Council's expectations for general education courses, including humanities, mathematics and the sciences, and social sciences, are defined as "areas of learning which are deemed to be the common experience of all "educated" persons (Ibid., Glossary, pgs. 81-82)."

The length and content requirements for awarding a bachelor's degrees, master's degrees and doctorate degrees are specified in the sections for each credential (Ibid., Title III, Chapter 5, Section 3-5-202, p. 63; Chapter 6, Section 3-6-403, p. 67; Chapter 7, Section 3-7-403, p. 72).
Credit awarded for courses or programs delivered through nontraditional means (e.g., distance education or independent study) frequently use alternate but equivalent methods of credit calculation. The rationale used must be submitted to the Council for pre-approval of the credit calculation, and the institution must demonstrate the clock or credit hours awarded are appropriate for the degrees and credentials offered, for example by demonstrating that students completing these programs or courses have acquired equivalent levels of knowledge, skills, or competencies to those acquired in traditional formulas (Ibid., Chapter 1, Section 3-1-516(b), p. 49).

For non-traditional education activities that involve a mix of in-person and on-line delivery

modalities, ACICS requires the institution to clearly delineate the types of online activities that will augment the in-person activities when it first proposes the new program for inclusion under the grant of accreditation, including "a detailed description of the on-line educational activities: faculty-student interaction, student-student interaction, assignments, testing and evaluation (Exhibit 69: MRC - DE Approval Letter, p. 2, and Application, p. 5).

Specific elements of the self-evaluation documentation and the team report enable the on-site evaluators to review and compare the effective implementation of the program with that of the approved program design (Exhibit 52: Self Study Narrative Template, Section 5, p. 11; Exhibit 7: Team Report Template, Section 5, Question 5.19, p. 39). When the Council encounters programs that fail to meet these requirements, the institution is notified in writing and compelled to make timely adjustments to program length, content or methods of measuring credit hours. (Exhibit 53: MSB Curriculum Finding, Team Report, Questions 9.39 and 9.40, p. 4, School Response, p. 6, Council Deferral Letter, p. 9, School Response to Deferral Letter, p. 11).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| Exhibit Title | File Name |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1 | Exhibit 53 - MSB Curriculum Finding, Team Report, Q. School Response, Council Deferral Letter, School Response 1.pdf |
| Exhibit 68 - Sanford Brown Program Review Redacted | Exhibit 68 - Sanford Brown Program Review Redacted.pdf |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 1 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 1.pdf |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 2 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 2.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 17 - 2014 Summary of Key Operating Statistics | Exhibit 17 - 2014 Summary of Key Operating Statistics.pdf |

**Criteria:** 602.16(a)(1)(ix) Student Complaints

**Response:**

The timely and effective resolution of complaints from students enrolled at ACICS colleges and schools is given strong emphasis by the Council through its structure, policies and procedures. This emphasis is in part derived from the Council's public emphasis on conducting accreditation in a manner that values "the importance of a quality educational

experience for all students (Exhibit 12: www.acics.org-About Us-Mission Statement, Value)."

Structurally, the Council dedicates the resources and deliberations of one standing committee to the review of student complaints and other adverse information. The committee meets three times a year to review and consider complaints from students regarding member institutions in order to "ensure integrity and ethical relations, and to foster cooperation among institutions on behalf of students (Exhibit 1: Accreditation Criteria, Appendix A, Article V, Section 1(b), p. 95)." The in-depth review of institutional complaints and adverse information by the committee may result in recommendations to the full Council to order an on-site review supplemental to the recurring reaccreditation review; it may also produce changes to the Council's policies in response to deficiencies derived from students or adverse information (Exhibit 71: Excerpt of BPC Report, MJI, December 2012; MJI Renewal Grant Evaluation and Special Visit Letter; Exhibit 1: Accreditation Criteria, Appendix J, p. 126).

The incidence and severity of complaints from students are given weight by Council in its review and decision-making regarding a number of aspects of the operations of member institutions. They are considered during the review and approval of realignment of campuses (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, Section 2-2-202, p. 18). Also, complaints are considered by the Council to augment information discovered through the comprehensive accreditation evaluation of institutions, and as such are subject to certain actions if the complaint is not resolved to the satisfaction of the Council (Ibid., Chapter 3, Section 2-3-700, p. 34).

Students with complaints against member institutions have access to an on-line submittal portal that provides an expedient and comprehensive method of establishing the basis of their concern. The website offers substantive and procedural guidance to students regarding the timely and effective resolution of their issues (Exhibit 72: www.acics.org - Home - About Us - Complaint Procedures).

After reviewing an analysis of the complaint, including the institution's effort to resolve the matter and applicable standards, the Council decides if the complaint merits conditioning of the grant of accreditation, requires more information from the institution, or dismissal based on the information provided (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-700 (a)(b)(c), p. 34).

ACICS standards prescribe that the primary responsibility for complaint resolution lies with the institution, and that the institution must have and apply a complaint policy that complies with Council standards (Ibid., Title III, Chapter 1, Section 3-1-202(d) on p. 40). A fundamental element of the review of the complaint by ACICS is a determination of whether or not the student had utilized the institution's complaint process and resources (Ibid.). The student (complainant) receives follow up communication; when the Council

discovers evidence of non-compliance with specific ACICS standards, it can require a special visit which produces a report. The campus is provided an opportunity to respond to the report (Exhibit 73: Laurus College Complaint Case 1).

Complaints and adverse information are shared in advance with members of the comprehensive on-site evaluation team; they are informed about the severity and persistence of complaints against the institution. The information helps shape the focus of the evaluation visit as appropriate (Exhibit 61: Bristol University Team Report, School Response, Council Show-Cause Letter).

If an on-site team finds the institution's student grievance policy or practices out of compliance with Council standards, it will document the finding and require the institution to respond (Exhibit 7: Team Report Template, Questions 2.06 and 2.07, p. 9).

Copies of correspondence between ACICS and the institution regarding complaints are maintained on file. The information is taken into consideration as part of the review of an institution's request for renewal of accreditation or other substantive changes. The Council is made aware of open complaints or adverse information in a methodical way, and is provided access to the institution's files, which include in-depth information about the nature and resolution of past complaints (Exhibit 74: 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet).

The Council has reviewed the pattern of student complaints derived from certain large multi-campuses systems and applied heightened monitoring requirements, including addition site visits, in order to protect student interests (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Table B). Financial aid complaints from those institutions are the most frequently received and resolved through the Council's adverse and complaints resolution program.

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 71 - Excerpt of BPC Report, MJI, December 2012; MJI Renewal Grant Evaluation and Special Visit Letter | Exhibit 71 - Excerpt of BPC Report, MJI, December 2012; MJI Renewal Grant Evaluation and Special Visit Letter.pdf |
| Exhibit 72 - www.acics.org - Home - About Us - Complaint Procedures | Exhibit 72 - www.acics.org - Home - About Us - Complaint Procedures.docx |
| Exhibit 73 - Laurus College Complaint Case 1 | Exhibit 73 - Laurus College Complaint Case 1.pdf |
| Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet | Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet.docx |

| | |
|---|---|
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 12 - www.acics.org-About Us-Mission Statement, Value | Exhibit 12 - www.acics.org-About Us-Mission Statement, Value.JPG |

**Criteria:** 602.16(a)(1)(x) Title IV Responsibilities

**Response:**

A substantial proportion of member institutions participate in federal student aid programs under Title IV of the Higher Education Act. ACICS develops and applies standards regarding compliance with Title IV regulations during its accreditation evaluations. The requirements are integrated throughout ACICS standards. They are included in sections that pertain to fraud and abuse (Exhibit 1: Accreditation Criteria, Appendix G, pgs. 114-115), the rate at which students default of education loans (Ibid., Title II, Chapter 1, Section 2-1-810, p. 12), admissions and recruitment (Ibid., Title III, Chapter 1, Section 3-1-410, p.42), course and program measurement (Ibid., Section 3-1-516(b), p. 48), policies that ensure satisfactory academic progress (Ibid., Appendix D, pgs. 108 - 110), appropriate structure of ESL (English as Second Language) programs (Ibid., Appendix F, pgs. 112-113), non-traditional programs (including those delivered on-line, and direct assessment/competency based programs) (Ibid., Title II, Chapter 2, Section 2-2-111, p. 16 and Appendix H, p. 116); contracts and agreements with other accredited institutions (Ibid., Section 2-2-504, p. 24), and complaints and adverse information (Ibid., Chapter 3, Section 2-3-700, p. 34).

ACICS requirements for compliance with the Department's Title IV regulations regarding "fraud or abuse" prescribe that the agency will notify the Department of any institution it believes "fails to comply." Specifically, institutions are reviewed regarding "systemic noncompliance" with respect to the Department's definition of credit hour or significant noncompliance regarding conformity with commonly accepted practice in the assignment of credit hours to one or more programs at the institution (Exhibit 1: Accreditation Criteria, Appendix G, Item 4, ps. 114-115). The institution is provided the opportunity to demonstrate its compliance.

Regarding the institutions' Cohort Default Rates, a standing committee of the Council reviews the information provided by the Department each year and applies that information in evaluating financial stability. Institutions with rates of more than 30 percent

for even a single year are subject to additional monitoring and reporting (Exhibit 80: FRC Dec 2015 Minutes, Item E. p. 8). Council requires those institutions to develop and submit a default rate improvement plan which must include counseling of students concerning loan repayment obligations (Exhibit 1: Accreditation Criteria, Title III, Chapter 1, Section 3-1-441(d) p. 45), occupational advising, retention and program completion activities, and employment assistance (Exhibit 77: Daymar College (10142) ACICS CDR DRIP letter; Exhibit 78: Daymar College DCG Default Plan FY12).

Since the Department established new regulations regarding 3-year Cohort Default Rates, ACICS has conducted recurring outreach to member institutions regarding compliance with CDR requirements. The outreach effort encouraged institutions to address and improve default rates (Exhibit 79: Letter from Dr. Gray, ACICS, Regarding ED Illustrative trial three-year CDR data). The average rate of CDR among ACICS institutions was 19.3 percent in 2010; it has declined to 16.3 percent in 2012.

An institution's default rate is included in Council considerations of its request for a renewal grant. The CDRs for the past three years are summarized and shared with the institution's primary file reviewer during the Council meeting (Exhibit 74: 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet, p. 1).

The Council also reviews adverse information received from the Department derived from financial or compliance audits, programs reviews, or other information. The Council may require additional information, conduct a special visit, issue a compliance warning or a show-cause directive (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Section 2-3-700, p. 34). The institution is directed to respond directly to the issues that led to adverse action by the Department's Federal Student Aid division and identify its actions to resolve the issues and come into compliance with ACICS standards for financial sustainability (Exhibit 81: ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS).

In addition, ACICS serves as an important resource to Title IV Program Participation teams who request information about the accreditation status of member institutions on a regular basis. Those requests are fulfilled promptly and effectively (Exhibit 116: Table of PPT Information Requests, 2013-2015).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| Exhibit Title | File Name |
| Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet | Exhibit 74 - 15728 August 2015 Orange Sheet - Bristol File Review Work Sheet.docx |
| Exhibit 77 - Daymar College (10142) ACICS CDR DRIP letter | Exhibit 77 - Daymar College (10142) ACICS CDR DRIP letter.pdf |
| Exhibit 78 - Daymar College DCG Default Plan FY12 | Exhibit 78 - Daymar College DCG Default Plan FY12.docx |

| | |
|---|---|
| Exhibit 79 - Letter from Dr. Gray, ACICS, Regarding ED Illustrative trial three-year CDR data | Exhibit 79 - Letter from Dr. Gray, ACICS, Regarding ED Illustrative trial three-year CDR data.pdf |
| Exhibit 80 - FRC Dec 2015 Minutes | Exhibit 80 - FRC Dec 2015 Minutes.pdf |
| Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS | Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS.pdf |
| Exhibit 116 - Table of PPT Information Requests, 2013-2015 | Exhibit 116 - Table of PPT Information Requests, 2013-2015.xlsx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.16(a)(2) Preaccreditation Standards

**Response:**

ACICS does not offer pre-accreditation to any institution or program. The Council prescribes the steps for receiving initial accreditation as including preliminary review, application, resource visit, and self-evaluation. (Exhibit 1: Accreditation Criteria, Section 2-1-200, p. 6)

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.16(b)(c) Distance/Correspondence Education

**Response:**

ACICS currently has within its scope the accreditation of distance education programs and institutions. The Council is not seeking a change in this status.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(a) Mission & Objectives

**Response:**

Five sections of the agency's standards articulate ACICS's clear expectations of an institution concerning its performance and effectiveness compared to mission, achievement of defined objectives, and conformity of programs to commonly accepted standards. The categories of standards applied in the context of educational objectives include the organization of the institution (Exhibit 1: Accreditation Criteria, Section 3-1-200, p. 39), the financial stability of the institution (Ibid., Section 3 1 203, p. 40), the manner in which the institution recruits and admits students (Ibid., Section 3 1 412, p. 43), the sufficiency of instructional resources and materials (Ibid., Section 3-2-200, p. 54), and

policies ensuring satisfactory academic progress of students (Ibid., Appendix D, p. 108).

Additionally, changes to an institution's mission are considered substantive; the new mission must be reviewed and approved by the Council in conjunction with the institution's request for expansion of scope (Ibid., Section 2-2-101(a), p. 13).

ACICS expects that all institutions have a clearly specified mission that is supported by career objectives, programs that support said mission and conform to commonly accepted standards. To be eligible for accreditation by ACICS the institution's mission must be "to offer educational programs that help students develop skills and competencies to enhance their careers (Ibid., Section 1-2-100(c), p. 2)." In addition, the Council clearly directs all institutions to develop and disclose explicit elements of its mission, purpose and objectives, including "substantial" devotion to career related education. The objectives for the institution must demonstrate reasonableness for "the program of instruction, mode of delivery and facilities," regardless of single-purpose or multi-purpose mission (Ibid., Section 3-1-100, p. 37).

ACICS' effective evaluation of quality in terms of mission and purpose requires a thoughtful review of the institution's effectiveness plan, which must describe how it continuously improves its programs and processes, the outcomes to which it aspires, and the types of data it will use to measure those outcomes (Ibid., Section 3-1-111, p. 38). In addition to financial stability and compliance with state and federal laws, ACICS institutions are expected to demonstrate effectiveness in terms of student achievement outcomes which include retention, placement, graduate and employer satisfaction, and indications of student learning, including licensure pass rates where applicable. The goals for placement and retention must be published by each campus and subject to review by ACICS.

Council has a number of opportunities to evaluate the integration of the institutional mission with operations. The impact of the mission on institutional quality is evaluated for an institution's initial grant or during reevaluation of accreditation. The institution's plans for effective implementation and inclusion of new activity (expansion of scope, new locations, etc.) is also evaluated in the context of published mission and purpose.

At the beginning of the accreditation process, the institution's self-evaluation narrative requires disclosure and explanation of its mission and educational activities (Exhibit 52: Self Study Narrative Template, ps. 2-3 and 11). The review of the Campus Effectiveness Plan (CEP), which is based on the institution's mission, is assigned to the chair of the review team, who is a veteran evaluator with substantial experience in conducting accreditation on-site reviews. The evaluation focuses on the campus's overall effectiveness at achieving its mission and the degree to which it meets its own predetermined outcomes. In addition, the evaluation of overall educational activities requires that program offerings are consistent with the mission and that the faculty is

adequate to ensure, through outcomes, that the institution is achieving its mission (Exhibit 7: Team Report Template, question 5.14, p. 38-39, and question 5.31, p. 44).

Likewise, the evaluation of a new program application requires that the institution's objectives at each credential level to be in congruence with the institutional mission. For example, institutions offering academic associate's degrees are required to have program objectives that reflect the application of an institution's mission: "An institution applying for the inclusion of an academic associate's degree program shall demonstrate that its programs, courses, and services are appropriate to its mission and to its specific goals and objectives (Exhibit 1: Accreditation Criteria, Section 3-4-201, pg. 59)." The application of this requirement is accomplished through the documentation required from an institution seeking approval of a new program, or one at a higher credential level, or a program that outside of its current scope of accreditation (Exhibit 50: New Program Application Template, p. 3)."

Council also requires that program design, including degree requirements, conform to commonly accepted standards, at each degree level, and that the curriculum for the program quantitatively and qualitatively approximate the standards in effect at other collegiate institutions with programs at that level (Exhibit 1: Accreditation Criteria, Sections 3-3-203, p. 55; 3-4-203, p. 99, and 3-5-203, p. 63). Instructional procedures, texts, and materials must be appropriate to the purposes, curriculum, and standards of collegiate institutions. Through the team report and the school response, the Council is able to evaluate how an institution is achieving its stated objectives and whether its educational requirements comply with commonly accepted standards (Exhibit 7: Team Report Template, Section 9, question 9.35, p. 83; question 9.40, p. 85; question 9.46, p. 86; and question 9.53, p.88).

When an institution fails to demonstrate how its effectiveness planning or implementation fulfills its published mission, purpose or goals, Council requires a response to the finding and evidence of appropriate adjustments to its operations (Exhibit 61: Bristol University Team Report, School Response, Council Show-Cause Letter, question 1.09, p. 7, question H.07, p. 56, School Response p. 167, Council Action Letter, item 2, p. 525).

For certain multi-campus systems, Council has placed great emphasis on programs and campuses demonstrating sufficient student achievement performance. When retention, placement or licensure rates fall below standard, ACICS imposes a series of interventions and requirements to promote improvement and compliance (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Table G)

### Exhibit(s) Linked to this Criterion

| Exhibit Title | File Name |
|---|---|
|  |  |

| | |
|---|---|
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 52 - Self Study Narrative Template | Exhibit 52 - Self Study Narrative Template.doc |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |
| Exhibit 50 - New Program Application Template | Exhibit 50 - New Program Application Template.pdf |

**Criteria:** 602.17(b) Self-Study

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(c) On-Site Review

**Response:**

One of the primary ways in which ACICS collects empirical data regarding the quality and integrity of institutions and programs is the deployment of on-site review teams which visit every campus at least once during the accreditation cycle. The average ACICS accreditation grant length is 3-4 years; the maximum is six years (Exhibit 1: Accreditation Criteria, Section 2-1-701, p. 10). In addition to on-site visits that compare the content of self-evaluations with evidence encountered in person during an initial or renewal cycle, the Council may order a team visit if "it has received adverse information or when general operations of the institution may be called into question (Ibid., Section Appendix B, p. 101)," or to monitor the quality of a substantive change (Ibid., Section 2-2-102, p. 13), including the establishment of new campuses (Ibid, Section 2-2-110 (a), p. 15), the reassignment or consolidation of campuses (Ibid., Section 2-2-202, p. 18), or a change in location (Ibid., Section 2-2-602, p. 26).

The size, composition and responsibilities of all on-site review teams are prescribed in the Council's published policy document. Among other considerations a team visit occurs

after the institution has "submitted a satisfactory self-study," and the team is composed of "educators, executives and practitioners," (Exhibit 1: Accreditation Criteria, Section 2-1-400, 2-1-401, p. 8). In addition, on-site review team composition is based on "type and size of the institution, programs offered, mode of educational delivery," and other factors (Ibid., Section 2-1-402, p. 8).

The Council also prescribes team functions and procedures. The scope of the visit depends on program offerings, and the team is required to verify information in the self-study and to report on its observations of the institution's performance relative to its mission (Ibid., Section 2-1-501, 2-1-502, p. 9). Among the required procedures the team is expected to consult with faculty, administrators, students and the chief on-site administrator. It is expected to document its observations and interviews in writing, contribute to a comprehensive team report that is conveyed to ACICS and the institution (Ibid., Section 2-1-503, p. 9).

ACICS provides extensive resources to train and orient members of its on-site evaluation teams regarding Council standards, the interpretation of those standards, the accreditation process, and the significant contribution that effective team reports make to Council deliberations (Exhibit 28: Evaluator Training Packet, ps. 2, 3, 5, 8, 34, 36).

Multi-campus systems subject to on-site reviews produced an array of findings that were reviewed and considered by Council, including deficiencies regarding program administration/planning/development/evaluation, which was the most common finding (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Table F)

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 28 - Evaluator Training Packet | Exhibit 28 - Evaluator Training Packet.pdf |

**Criteria:** 602.17(d) Response to Site Review

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(e) Agency Analysis of Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.17(f) Report on Compliance & Student Achievement

**Response:**

Integral to the Council's effective evaluation of institutional quality and integrity is the evidence and data encountered during on-site visits through observations, interviews and reviews of documentation. ACICS places great emphasis on the completeness and rigor of the written reports generated by the on-site visit teams. The Council expects the report to cover "each area reviewed…and other information pertinent to an accurate evaluation." The substance of that report must include any findings of material non-compliance with standards. It may also include "recommendations for institutional improvement (Exhibit 1: Accreditation Criteria, Section 2-1-503, p.9)." The team report is shared with the institution's "chief onsite administrator" who is invited to respond to any findings in writing (Ibid., Section 2-1-601, p. 9).

ACICS utilizes a team report format whose structure parallels the structure of its standards document, and reflects the structure of the self-study report. Sequentially the template reports on the institution's planning and performance relative to its published mission and purpose; general education standards applicable to all institutions; and standards for each program and credential level. The on-site evaluation team uses the information in the self-study as a point of reference in completing the team report and assessing the program's and institution's compliance with standards. Every item of inquiry is cross-referenced in the team report to the corresponding section of the ACICS standards (Exhibit 7: Team Report Template).

A completed team report as defined by ACICS answers in writing all applicable questions, summarizes the findings in terms of specific criteria, and identifies which findings require an institutional response. When the institution receives the team report, it is afforded the opportunity to respond to the team's findings by a certain date (Exhibit 83: Everest Woodbridge Team Report, ps. 1, 38). The team report and the institutional response are packaged together for review by Council (Exhibit 64: MJI Team Report, School Response,

p. 42, Council Action Letter).

The Council reviews the team report and the institutional response to determine whether the institution has resolved the findings. For institutions or programs with unresolved findings, Council deliberations focus on how profoundly the institution is non-compliant; the institution's ability to come into compliance in a timely manner not to exceed established maximums; and the type of additional documentation necessary to make an informed decision (Exhibit 1: Accreditation Criteria, Title II, Chapter 3, Introduction, p. 27). The Council's action letter identifies the specific standard at issue and specifies the documentation necessary in order for the institution to resolve the finding (Exhibit 64: MJI Team Report, School Response, Council Action Letter p. 1750).

As an element of its review of institutional effectiveness, ACICS evaluates indicators of student achievement through the comprehensive on-site visit as well as through accountability reports submitted by each institution, for each program, every year. At minimum, ACICS requires every program and institution to plan for, operate and collect data regarding retention performance and placement performance. In the category of "student learning outcomes," Council also requires that data regarding program level licensure/certification pass rates be collected, reported and evaluated each year for programs where licensure is required to gain employment (Exhibit 1: Accreditation Criteria, Section 3-1-111, p. 38). These are the primary elements of student achievement established by the Council (Ibid., Section 3-1-111, p. 38).

The review of student achievement performance through the comprehensive site visit begins with institutional self-evaluation as reflected in the Campus Effectiveness Plan (CEP). On an annual basis, the institution is expected to integrate student achievement rates (as reported to ACICS in the Campus Accountability Report (CAR)) with its effectiveness plan for the campus and each program, and to revise and update the CEP accordingly (Exhibit 84: Sample Campus Effectiveness Plan, p. 23).

The institution is required to revise the CEP with an improvement plan for any program below benchmark in retention, placement, or licensure pass rates. During the comprehensive on-site visit, the evaluation team reviews the CEP to determine if the campus has developed and is implementing revisions to its operations that appropriately address its deficiencies in student achievement (Exhibit 85: ITT Tech-Philadelphia, Team Report, Question 1.10, p. 6, CEP Citation, School Response, p. 37, and Council Action Deferral Letter, p. 93).

In addition to the review of student achievement as part of the on-site visit and team report, Council evaluates student achievement data on an annual basis through the CAR. The Council expects institutions to be in compliance with published student achievement measures. When Council determines student achievement is below standard, it "will require the institution to add an Improvement Plan within its CEP... and issue a

compliance warning and require the institution to demonstrate compliance (Exhibit 1: Accreditation Criteria, Section 2-1-809, p. 12)." Numerical standards for student achievement are disclosed publicly (Exhibit 86: ACICS Student Achievement Rates and Definition of Placement - ACICS Webpage).

The Council's review of CAR data is a formal, structured annual activity that determines, based on current benchmarks, whether the campus or program is performing according to ACICS standards. Based on the review, ACICS notifies the institution of the actions it must take to remedy the deficiencies (Exhibit 86: Due Process for Student Achievement Standards Table; Exhibit 94: CAR template for student achievement below standards and letters). When a campus or program does not come into compliance within Council's time frame, the campus or program is provided a letter of withdrawal that details the area of noncompliance and provides appeal procedures (Exhibit 94: CAR template for student achievement below standards, CAR Withdrawal Letter Template, p. 7).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 83 - Everest Woodbridge Team Report | Exhibit 83 - Everest Woodbridge Team Report.pdf |
| Exhibit 84 - Sample Campus Effectiveness Plan | Exhibit 84 - Sample Campus Effectiveness Plan.pdf |
| Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral | Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral.pdf |
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |
| Exhibit 94 - CAR template for student achievement below standards and letters | Exhibit 94 - CAR template for student achievement below standards and letters.pdf |
| Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers | Exhibit 64 - MJI Team Report, School Response, Council Action Letter page numbers.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.17(g) Student Verification

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.18(a) Standards Respect Mission, Ensure Quality & Are Clearly Written

**Response:**

ACICS expresses its accreditation requirements for all institutions and programs in several sections of its published and internet-accessible standards document, which forms a comprehensive structure for the consistent application of Council expectations (Exhibit 1: Accreditation Criteria; www.acics.org>about us>publications). General standards apply to all institutions and programs "whatever methodology and mode of educational delivery is used." The Council prescribes that, while encouraging innovation and flexibility, "extreme deviation" from the standards is not permitted (Exhibit 1: Accreditation Criteria, Title III, Introduction, Chapter 1, p. 37). In addition, the Council expresses additional requirements at each credential level in six distinct sections of its standards (Ibid., Chapters 2-7, ps. 53-76).

The Council's standards are respectful of the mission of the institution while they are also consistently applied and enforced to ensure that the education and training offered by ACICS-accredited institutions are of sufficient quality to achieve the institution's stated objective(s) for the duration of the accreditation period granted, including those offered through distance education. Among other considerations, the Council expects the institutional objectives to be "devoted substantially to career oriented education," including institutions whose mission is single purpose or multi-purpose (Ibid., Section 3-1-100, p. 37).

The mission of the institution provides the foundation for the accreditation review. The mission is reviewed initially when an institution first seeks accreditation from ACICS and throughout the rest of the process including during the comprehensive on-site evaluation. During the review,
ACICS checks to see that the institution has established a mission in writing and disclosed it publicly. It also checks to see that the faculty, financial resources, physical plant, administration, management, and education activities are committed to the successful implementation of the mission (Ibid., Section 3-1-102, p. 37).

The evaluation of each institution on the basis of its stated mission is prescribed by the Council through its standards for institutional effectiveness planning and operational adjustments, consistent with its mission and focused on continuous improvement (Ibid., Section 3-1-110, p. 37).

ACICS ensures that the Council's expectations are applied consistently throughout the accreditation process through a variety of structural mechanisms. These include formal

training offered to accreditation staff and on-site evaluators, "an independent group composed to evaluate the campus's adherence to ACICS criteria." Team members are instructed and trained to provide an explanation of each area of noncompliance in the site evaluation report including a reference to the section of the standards. Cross-referencing findings in the team report to Council standards "enables everyone who reviews the report (institution, commissioners, staff) to locate information easily (Exhibit 22: Accreditation Evaluation Training Manual 2015, ps. 19, 32)."

The Council's written standards are provided to all institutions seeking initial or renewal grants of accreditation during their participation in a mandatory accreditation workshop. The content of those standards, and considerations for how they are applied by an on-site review team and the Council, are given substantial profile during the workshop (Exhibit 89: Renewal Accreditation Workshop PowerPoint, ps. 3, 8, 9).

When the Council's standards are updated, the document is revised, published and made available through www.acics.org>about us>publications. The revised document includes an appendix that shows revisions as a helpful resource to institutions and interested parties (Exhibit 1: Accreditation Criteria, Criteria Revisions, p. 139).

The consistent application of clear standards by the Council includes a structured process for making any substantive changes to its standards. That process includes disclosure to all stakeholders of proposed changes; explanation of those changes through an interactive medium; and solicitation of stakeholders' reactions to the proposed changes for consideration by the Council in adopting the final version (Exhibit 90: September 2014-Memorandum to the Field, ps. 18, 26; Exhibit 91: AWARE Webinar- October_ 2015, ps. 10-22).

The review of quality and integrity of institutions offering distance education activities, which is included under ACICS' current scope of recognition, follows the same structural and procedural protocols as those applying to traditional programs and institutions. Among other considerations, the Council expects consistency and clarity in the application of distance education standards by ACICS.

Structurally, ACICS standards regarding distance education and other non-traditional methods are captured in a single comprehensive section (Exhibit 1: Accreditation Criteria, Appendix H, p. 116). ACICS expects those institutions offering distance education to provide quality support services that are comparable to those offered in a residential format. An institution seeking to include distance education in its grant of accreditation must apply and receive approval from the Council prior to its initiation (Exhibit 69: MRC - DE Approval Letter, p. 1 and Institution Application, p. 3). That approval is based on a review of the alignment of the distance education delivery mode with the institutional mission and objectives stated in the Campus Effectiveness Plan (CEP) (Exhibit 69, Question 2, p. 6).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 89 - Renewal Accreditation Workshop PowerPoint | Exhibit 89 - Renewal Accreditation Workshop PowerPoint.pptx |
| Exhibit 91 - AWARE Webinar- October_ 2015 | Exhibit 91 - AWARE Webinar- October_ 2015.pptx |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 1 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 1.pdf |
| Exhibit 69 - MRC - DE Approval Letter and Application - Part 2 | Exhibit 69 - MRC - DE Approval Letter and Application - Part 2.pdf |
| Exhibit 22 - Accreditation Evaluation Training Manual 2015 | Exhibit 22 - Accreditation Evaluation Training Manual 2015.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 90 - September 2014- Memorandum to the Field | Exhibit 90 - September 2014- Memorandum to the Field.pdf |

**Criteria:** 602.18(b) Consistent Application of Standards

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

| Exhibit(s) Linked to this Criterion |
|---|
| No Exhibits uploaded for this Criterion |

**Criteria:** 602.18(c) Decisions Based on Published Standards

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

| Exhibit(s) Linked to this Criterion |
|---|
| No Exhibits uploaded for this Criterion |

**Criteria:** 602.18(d) Reasonable Assurance of Accurate Information

**Response:**

ACICS standards express and imply that of paramount concern is the trust relationship between the Council and member institutions:
"31202. The integrity of an institution is manifested by the professional competence, experience, personal
responsibility, and ethical practices demonstrated by all individuals comprising the ownership, control, or management.
An institution must assume full responsibility for the actions, statements, and conduct of its representatives and
must, therefore, select each of them with the utmost care, provide them with adequate training, and arrange for
constant and proper supervision and evaluation of their work. (Exhibit 1: ps. 39, 40)." The expectation of integrity and reliability of information derived from the accreditation process is also emphasized in program planning (Ibid, Section 3-1-512, p. 47) and in defining the role of the Business Practices Committee of the Council (Ibid, Article V, Section 1 (b), p. 95).

Council has clarified and enhanced how those expectations apply to information and data provided by the institutions that are used to make accreditation decisions. The most salient data integrity reforms include revisions and enhancements to the team report template (Exhibit 7: Team Report Template, Questions 5.12 and 5.13, ps. 37, 38; Questions 9.18 and 9.19 ps. 75, 76), the requirements for third party verification, the ACICS Placement Verification Program (PVP) and the information-technology based data integrity algorithm applied during the submittal of self-reported student achievement data. (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Table H). These efforts to enhance the reliability of information used in reaching accrediting decisions has produced direct feedback and in some cases sanctions against certain multi-campus systems (Ibid, Table J).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 7 - Team Report Template | Exhibit 7 - Team Report Template.pdf |

**Criteria:** 602.18(e) Report Clearly Identifies Deficiencies

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.19(a) Reevaluation

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.19(b) Monitoring

**Response:**

Council's expectations of institutional compliance with standards are continuous -- before, during and after the comprehensive accreditation review. ACICS has developed and applies a number of monitoring and evaluation activities between recurring accreditation cycles that enable the Council to identify institution and program-level weaknesses. Those activities monitor financial, student achievement, student indebtedness, substantive changes, excessive growth, adverse information and complaints, and other reliable sources of information regarding institutional performance. (Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Tables A, B and C). ACICS' specific standards provide consistency in application across all institutions and programs.

Council expectations regarding institutional and program level compliance with standards on an ongoing basis are articulated in several sections of the ACICS standards document. The Council advises an institution that it "inherently agrees to keep ACICS fully informed of activities," to provide annual reports on financial and student achievement indicators, and to report changes to ACICS (Exhibit 1: Accreditation Criteria, Sections, 2-1-800, 2-1-801, 2-1-802, ps. 10-11).

Regarding financial conditions, annual audited statements, the Annual Financial Report

(AFR), and other reliable sources of information are used by the Council to assess whether "an institution's financial condition may be weak or deteriorating." When that assessment indicates abnormal financial risk the Council may require the submittal of a financial improvement plan and quarterly financial reports, issue a compliance warning, require a special or unannounced visit, a show-cause directive or take other negative action (Ibid., Section 2-1-808, p. 11). Institutions that fall short of financial stability requirements are notified in writing by the Council of the deficiencies, the degree of substandard performance, the required remedies, and timeframes (Exhibit 92: Daymar College (10306) QFR) (Exhibit 81: ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS)

Regarding student achievement, the Campus Accountability Report (CAR) and other reliable sources of information are used by the Council to assess whether an institution's placement, retention or licensure pass rate performance is below standards. When that assessment indicates substandard performance, the Council may require the development of a program-level or campus-level improvement plan as an addendum to its Campus Effectiveness Plan (CEP), issue a compliance warning, a show-cause directive or take other negative action (Exhibit 1: Accreditation Criteria, Section 2-1-809, p. 12). The improvement plan is reviewed by Council for its sufficiency and effectiveness, and must be included in the CEP for review during the next comprehensive on-site visit (Exhibit 93: CEP with Example of a Program Improvement Plan).

In addition, when the substandard student achievement performance merits a compliance warning, a program must "come into compliance … prior to the expiration of the established timeframe or be taught out … or otherwise conditioned (Exhibit 1: Accreditation Criteria, Section 2-2-502, p. 23)." Institutions or programs that fall short of minimum student achievement performance benchmarks are notified in writing by the Council of the deficiencies, the degree of substandard performance, the required remedies, and timeframes. (Exhibit 94: CAR template for student achievement below standards and letters; Exhibit 6: Everest University - ACICS Show-Cause letter).

The frequency and scope of ACICS reviews of institutions and programs between accreditation cycles is driven by a number of factors, including substantive changes, financial and student achievement performance below standard, complaints and adverse information, and other reasons (Exhibit 117: Special Visits Summary Table).

ACICS has a direct stake in monitoring the ongoing degree and nature of student indebtedness derived from member institutions. Institutions whose graduates or completers incur a heavy debt load as they enter the workforce are disadvantaged in their economic prospects; in addition, high student indebtedness undermines the reputation of quality derived from accreditation. The Council monitors Cohort Default Rates (CDR) and applies that information in evaluating financial stability. Institutions with rates higher than federal standards are subject to additional monitoring and reporting (Exhibit 1:

Accreditation Criteria, Section 2-1-810, p.12).

Another key element of the Council's interim monitoring and review of institutional quality and integrity is the tracking and analysis of complaints and adverse information. (Ibid., Section 2-3-700, p. 34). ACICS investigates and takes action on legitimate complaints and adverse information about an institution from any reliable source, including federal or state agencies, other accrediting entities, the news media, students, faculty or other third parties.

During each meeting (three times a year), the Council reviews an analysis of complaints and adverse information, and considers which cases may require additional information or action. The Council's evaluation considers the nature and extensiveness of the issue(s), the frequency of the alleged deficiencies, and other factors. This ongoing monitoring includes prescriptive correspondence to the institution at least three times a year, and written responses from the institution (Exhibit 81: ACICS Adverse letter to ITT, School Response 2015). The substance of those exchanges of information are shared with the Council at each meeting (Exhibit 95: ITT Adverse letter, January 2016) (Exhibit 67: BPC Adverse Report, December 2015, Extracts: ITT; Exhibit 96: CCi Excerpt BPC Adverse Report - April 2015).

One of the actions taken by Council regarding an institution that is exhibiting extreme risk based on adverse financial or other information is to require the timely submittal of a plan for the continuation and completion of students enrolled. When a closing institution fails to provide for students in an appropriate manner, members of its executive team and governance body are subject to debarment (Exhibit 1: Accreditation Criteria, Section 2-3-900, p. 35). The name, date and institutional affiliation of the debarred individual is disclosed publicly (Exhibit 97: www.acics.org>council actions>accreditation conditioned>action to debar).

ACICS may initiate a special on-site visit to review the legitimacy of the issues. Information derived from the special visit, along with the institution's response, is reviewed by the Council as part of its ongoing monitoring process (Exhibit 98: ACICS Response to Special Visit Report - MJI, Aug, 2013; Exhibit 73: Laurus College Complaint case 1).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| Exhibit Title | File Name |
| Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS | Exhibit 81 - ACICS Adverse letter to ITT, School Response 2015, Summary of ITT Financial Periodic Report to ACICS.pdf |
| Exhibit 92 - Daymar college (10306) QFR | Exhibit 92 - Daymar college (10306) QFR.pdf |
| Exhibit 93 - CEP with Example of a Program Improvement Plan | Exhibit 93 - CEP with Example of a Program Improvement Plan.pdf |

| | |
|---|---|
| Exhibit 95 - ITT Adverse Letter January 2016 | Exhibit 95 - ITT Adverse Letter January 2016.pdf |
| Exhibit 96 - CCi Excerpt BPC Adverse Report - April 2015 | Exhibit 96 - CCi Excerpt BPC Adverse Report - April 2015.docx |
| Exhibit 98 - ACICS Response to Special Visit Report - MJI, Aug, 2013 | Exhibit 98 - ACICS Response to Special Visit Report - MJI, Aug, 2013.docx |
| Exhibit 94 - CAR template for student achievement below standards and letters | Exhibit 94 - CAR template for student achievement below standards and letters.pdf |
| Exhibit 97 - www.acics.org - council actions -accreditation conditioned -action to debar | Exhibit 97 - www.acics.org - council actions -accreditation conditioned -action to debar.docx |
| Exhibit 117 - Special visits summary table | Exhibit 117 - Special visits summary table.docx |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 67 - BPC Adverse Report, December 2015 | Exhibit 67 - BPC Adverse Report, December 2015.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 6 - Everest University - ACICS Show-Cause Letter | Exhibit 6 - Everest University - ACICS Show-Cause Letter.pdf |

**Criteria:** 602.19(c) Annual Headcount

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.19(d) Significant Growth

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

---

**Criteria:** 602.19(e) Distance/Correspondence Headcount Increase

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

---

**Criteria:** 602.20(a) Enforcement Timelines

**Response:**

The Council's authority to take decisive and timely action against institutions or programs that are falling short of requirements for quality and integrity is derived from multiple sections of the Criteria, which member institutions encounter throughout the standards, specifically those that apply to denials, withdrawals, suspensions and revocations. Those are defined by ACICS as accreditation denied (Exhibit 1: 2-3-300, p. 29); withdrawal (Ibid., 2-3-400, p. 30); suspension (Ibid., 2-3-402, p. 30); revocation (Ibid., 2-3-401, p. 30). ACICS distinguishes denial actions from withdrawal actions in terms of "withholding" accreditation versus removing accreditation before expiration of the current grant.

When Council receives information or determines through routine reviews or investigations that an institution is not meeting one or more of standards, it escalates the formality and rigor of its review. Council emphasizes the degree to which the institution is below standards, evidence that the institution can remedy deficiencies, and prescribed maximum timeframes for resolving issues. ACICS institutions are informed that "if Council determines an institution is not in compliance…it will take prompt adverse action…or require the institution to bring itself into compliance…within a time frame specified (Ibid., Title II, Chapter 3, Introduction, p. 27)."

Evidence regarding the degree of deficiency and the institution's capacity to remedy the issue is derived from periodic, comprehensive on-site visits; special visits; complaints and adverse information; and required annual reports regarding financial and student achievement performance. Council also reviews the response from the institution: "When the Council has considered all the information… it will make a judgment as to an institution's compliance…based on the extent of an institution's compliance…referred to as a Council action (Ibid.)."

The process for resolving issues of substandard performance affords the institution a

reasonable opportunity to explain, modify or mitigate the issue. Before Council denies, withdraws, suspends or revokes accreditation, the institution is able to respond to a deferral, compliance warning, or show-cause directive (Ibid., 2-3-200 through 2-3-403, p. 28-31). A visual depiction of the hierarchy of Council actions is included (Exhibit 99: Council Action Process Chart).

One source of adverse information is on-site evaluation visit. Through observations, interviews and file reviews, the evidence is reflected in the team report, cross-referenced to specific standards, and provided to Council along with the institution's response. After review, Council may take no action, defer action pending receipt of additional information, issue a compliance warning, a show-cause directive or take immediate adverse action (Ibid.).
In every case, Council conveys the findings in writing and indicates the information it requires for a deferral (Exhibit 85: ITT Tech-Philadelphia, p. 93-94); a compliance warning (Exhibit 94: CAR templates, p. 4); or a directive to show cause, including the institution's response. If unsatisfied, Council takes adverse action (Exhibit 61: Bristol University, p. 530).

Another source of information regarding deficiencies is the annual institutional reports required by Council as a condition for maintaining accreditation (Exhibit 1: 2-1-801, p. 10 and 2-1-802, p. 11). The required annual reports provide information regarding student achievement performance (Exhibit 86: ACICS Student Achievement Webpage) and financial stability (Exhibit 1: 2-1-808, p. 11).

If performance regarding student achievement is below standard, Council will consider the degree to which the campus or program is out of compliance and the likelihood that it will achieve compliance in the established time frame. For the first year below student achievement standards, the campus is required to complete an improvement plan for review by Council (Exhibit 94: CAR templates). If the campus or program performs below standard for a second consecutive year, the Council issues a compliance warning (Ibid, p. 4). Programs or campuses that perform below student achievement standards for a third consecutive year are subject to immediate adverse action, including suspension of accreditation, (Ibid., p. 7) or program termination (Exhibit 6: Everest University - ACICS Show-Cause letter).

If financial stability is below standard, Council will review the degree to which the campus is financially at risk and the likelihood that it may achieve financial stability in the established time frame. Council applies a scoring rubric to financial information to determine if an institution's resources are sufficient to sustain the delivery of quality education: "When…an institution's financial condition may be weak or deteriorating," Council will require quarterly updates and an improvement plan (Exhibit 60: QFR and FIP Template). In addition, an institution subject to heightened financial monitoring is restricted in the initiation of branch campuses and learning sites. If the institution fails to meet

ACICS standards for financial stability, it may be issued a directive to show cause (Exhibit 1: 2-1-808, p. 11; Exhibit 103: Pittsburgh Career Institute (70534) Financial Show Cause). If the institution fails to demonstrate an ability to meet Council requirements within established timeframe, the accreditation may be withdrawn through suspension (Exhibit 1: 2-3-402(a) p. 30).

In addition to information derived from periodic accreditation reviews and annual reports, the Council also receives and reviews information from third-parties. Though generally unsolicited, it is given substantial weight by Council in deciding accreditation status. The information may pertain to "low completion rates, low placement rates, high default rates, tuition refunds, negative audits or program reviews, and governmental agency investigations (Ibid., 2-3-700, p. 34)."

ACICS evaluates complaints and adverse information to determine the degree to which the issue is related to standards. This determination is integral to Council's authority to require a response or additional information, or to take subsequent conditioning or adverse actions. Information related to a standard requires the collection of additional information through correspondence, special visits or a combination (Exhibit 73: Laurus College Complaint Case 1, ps. 3-6). If the additional information takes the form of a written team report, the institution is afforded an opportunity to provide a written response (Ibid., p. 13). Council may close the complaint, take additional action including a compliance warning, or issue a directive to show cause.

Council's review of information about member institutions' performance below standards derived from accreditation reviews, annual reports, and complaints and adverse information has resulted in a substantial number of denials and withdrawals of accreditation, as well as debarment actions and show cause directives (Exhibit 104: ACICS Council Actions 2011 - 2015). Intervals for resolving deficiencies at certain multi-campus systems are typically less than one year (Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Table E).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 73 - Laurus College Complaint Case 1 | Exhibit 73 - Laurus College Complaint Case 1.pdf |
| Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral | Exhibit 85 - ITT Tech-Philadelphia, Team Report, CEP Citation, School Response and Council Action Letter Deferral.pdf |
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |

| | |
|---|---|
| Exhibit 94 - CAR template for student achievement below standards and letters | Exhibit 94 - CAR template for student achievement below standards and letters.pdf |
| Exhibit 99 - Council Action Process Chart | Exhibit 99 - Council Action Process Chart.pdf |
| Exhibit 103 - Pittsburgh Career Institute (70534) Financial Show Cause | Exhibit 103 - Pittsburgh Career Institute (70534) Financial Show Cause.pdf |
| Exhibit 104 - ACICS Council Actions 2011 - 2015 | Exhibit 104 - ACICS Council Actions 2011 - 2015.xlsx |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 60 - QFR and FIP Template | Exhibit 60 - QFR and FIP Template.pdf |
| Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter | Exhibit 61 - Bristol University Team Report, School Response, Council Show-Cause Letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 6 - Everest University - ACICS Show-Cause Letter | Exhibit 6 - Everest University - ACICS Show-Cause Letter.pdf |

**Criteria:** 602.20(b) Enforcement Action

**Response:**

ACICS' written standards prescribe a number of circumstances, including adverse or negative information about an institution's or program's quality and integrity, when Council must take prompt or immediate adverse action, including the denial or withdrawal of accreditation. Those circumstances include a determination that the institution or program "is not in compliance" with Council standards (Exhibit 1: Accreditation Criteria, Chapter 3, Introduction, p. 27); an institution notifies the Council that it has closed or ceased operations (Ibid., Section 2-3-401(a)); the institution does not challenge its suspension of accreditation (Ibid., Section 2-3-401(b)); the institution fails to file annual reports of its financial stability or its student achievement performance (Ibid., Section 2-3-401(c)); or the institution fails to remit mandatory fees and expenses (Ibid., Section 2-3-401(d)). In addition, Council standards prescribe that the grant of accreditation can be immediately suspended "when, in the judgement of ACICS an institution no longer complies with the criteria." Immediate suspension could be triggered by the direct evaluation of an institution, a branch campus or any of its programs; lack of conformity of required periodic reports; lack of cooperation in arranging for a site evaluation; and substantial deviation from a Council directive, among other factors (Ibid., Section 2-3-402(a-f), p. 30).

Finally, a change of ownership automatically results in discontinuation of an institution's grant of accreditation. The grant may be reinstated "only upon application to and approval by the Council (Ibid., Section 2-2-403(a), p. 22)." ACICS does not consider discontinuation

of accreditation due to change of ownership to be a withdrawal action or a negative action.

The Council has the discretion to take immediate adverse action after it has reviewed pertinent information collected from its own sources and the response from the institution. It also has the discretion to defer immediate adverse action in order to provide an institution the opportunity to remedy issues and deficiencies. This discretion applies to institutions whose performance may be only marginally below standard or have demonstrated a capacity to operate in compliance in a reasonable timeframe (Ibid., Title II, Chapter 3, Introduction, p. 27). Institutions with programs out of compliance with student achievement standards are expected to remedy their performance or discontinue the program within one year (Exhibit 86: ACICS Student Achievement Rates and Definition of Placement - ACICS Webpage, p. 3).

In extraordinary circumstances that the Council has not encountered in the last five years, it may grant a limited extension of the established timeframe for good cause: "Time frames may be extended at the sole discretion of the Council for good cause, including evidence that there has been significant improvement in the deficient area(s) and the applicable time frame does not provide sufficient time to demonstrate full compliance, e.g., significant improvement in completion or placement rates (Exhibit 1: Accreditation Criteria, Introduction to Title II, Chapter 3, p. 27)."

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement | Exhibit 86 - ACICS Student Achievement Rates and Definition of Placement.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.21(a)(b) Systematic Review of Standards

**Response:**

The effectiveness of ACICS' standards and program of quality assurance substantially relies upon a systematic and recurring process of revision, application, scrutiny and evaluation. The Council's commitment to that process is formalized as an "ongoing and comprehensive review" of it standards, policies and procedures in order to "ascertain their appropriateness and effectiveness (Exhibit 1: Accreditation Criteria, Section 1-1-200(b), p.1)."

A key element of that review is recommendations and information collected from a variety of stakeholders, including "member institutions or other interested parties… and appropriate governmental agencies (Ibid.)." Changes to standards, policies or procedures may be initiated by the Council, member institutions or other interested parties. In every case, those proposed changes will be disclosed publicly and feedback will be solicited by

ACICS before the changes are adopted and implemented.

A primary mechanism for the Council to solicit and collect feedback regarding the sufficiency of its standards and program of accreditation is the annual accreditation survey, which is conveyed to member institutions, evaluators, commissioners, staff, administrators, faculty, students, employers and state regulatory agencies. Each year the survey seeks specific recommendations regarding approximately one-fifth of the sections of the Council's standards. In the interval of five years, every section of the standards is submitted to stakeholders through this mechanism and reviewed by Council (Exhibit 105: 2013 Systematic Review of the Accreditation Criteria Survey Responses).

Responses to the survey are reviewed by the Council each year (Exhibit 106: February 2015 Policy Meeting Agenda). Based on the survey and other information that is relevant to the Council's standards and ACICS' effectiveness, the Council initiates changes for disclosure to the public. Any changes to policy or procedure approved by the Council receive profile in the Memorandum to the Field, which includes a solicitation for feedback from stakeholders (Exhibit 107: September 2015 Memorandum to the Field). The feedback is reviewed and considered by the Council (Exhibit 111: Comments from the Field and Committee Actions) before the changes are adopted as final (Exhibit 90: September 2014 Memorandum to the Field).

In addition to the outreach mechanisms of ACICS provided through the annual survey and the response form attached to each Memo to the Field, the Council has initiated an advisory committee as another method to collect feedback on its policies and procedures. The committee is comprised of key external stakeholders with equal representation from students, faculty, graduates and employers (Exhibit 107: September 2015 Memorandum to the Field, Item H., p. 19).

Other relevant constituencies who have shaped the focus and direction of the Council's revisions to policy and standards include the Office of the Undersecretary (Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Correspondence Dated March 2, 2016, Appendix).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| Exhibit Title | File Name |
| Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses | Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses.xls |
| Exhibit 106 - February 2015 Policy Meeting Agenda | Exhibit 106 - February 2015 Policy Meeting Agenda.pdf |
| Exhibit 107 - September 2015 Memorandum to the Field | Exhibit 107 - September 2015 Memorandum to the Field.pdf |

| | |
|---|---|
| Exhibit 111 - Comments from the Field and Committee Actions | Exhibit 111 - Comments from the Field and Committee Actions.pdf |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 90 - September 2014- Memorandum to the Field | Exhibit 90 - September 2014- Memorandum to the Field.pdf |

**Criteria:** 602.21(c) Revision of Standards

**Response:**

Integral to the formation of accreditation policy and procedures by ACICS is perspective gained from the systematic and recurring solicitation of primary and secondary stakeholders. Primary stakeholders are students, those who educate and employ graduates of ACICS institutions, and the Council's oversight partners in the state and federal communities; secondary stakeholders are derived from the broader accreditation, academic, workforce development and policy communities, as well as the general public. In addition, the Council initiates thoughtful consideration of the underlying dynamics of its quality assurance enterprise through academic research and commentary (Exhibit 108: Quality, Accountability and Action White Paper).

The impetus for Council to conduct ongoing and comprehensive review of its accreditation standards, policies and procedures to ensure that they are appropriate and effective is part of its published standards (Exhibit 1, Accreditation Criteria, Section 1-1-200, p. 1).

The Council's prescriptive and extensive process for soliciting stakeholder participation in the critique and revision of policy includes a formal annual survey, triennial outreach through the Council's field memos (Exhibit 105: 2013 Systematic Review of the Accreditation Criteria Survey Responses; Exhibit 107: September 2015 Memorandum to the Field, p. 21), and recurring conversations with oversight partners through meetings, participation in conferences (Exhibit 18: ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST) and other legislative and regulatory forums (Exhibit 110: Testimony of Albert Gray HELP, ACICS letter to Sen. Alexander and Murray, Response from Sen. Murray).

The solicitation of perspectives on Council policy and the integration of that feedback into policy formation typically occur within a 12-month cycle: Council initiates policy proposals during the first quarter of the year, shares the proposals publically during the second quarter, collects feedback in the third quarter and adopts final revisions in December. An example of this process is the revision to the ACICS requirements for "Community Involvement," doctoral level faculty qualifications and admissions and recruitment

practices that were finalized in December 2015 and which becomes effective in 2016 (Exhibit 111: Comments from the Field and Committee Actions).

Focused scrutiny on admissions, recruitment, advertising and marketing practices of certain large multi-campus systems has informed numerous modifications and enhancements to Council standards, practices and outreach activities. Those enhancements are intended to clarify the Council's expectations regarding integrity and accountability, and give ACICS more authority to discern and adjust performance that degrades the education experience of students (Exhibit 121: ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16: Table M).

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses | Exhibit 105 - 2013 Systematic Review of the Accreditation Criteria Survey Responses.xls |
| Exhibit 107 - September 2015 Memorandum to the Field | Exhibit 107 - September 2015 Memorandum to the Field.pdf |
| Exhibit 108 - Quality, Accountability and Action White Paper | Exhibit 108 - Quality, Accountability and Action White Paper.pdf |
| Exhibit 110 - Testimony of Albert Gray HELP, ACICS letter to Sen Alexander and Murray, Response from Sen Murray | Exhibit 110 - Testimony of Albert Gray HELP, ACICS letter to Sen Alexander and Murray, Response from Sen Murray.pdf |
| Exhibit 111 - Comments from the Field and Committee Actions | Exhibit 111 - Comments from the Field and Committee Actions.pdf |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |
| Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST | Exhibit 18 - ACICS presentations to THECB, NASASPS, Capital Roundtable, CCST.pdf |

**Criteria:** 602.22(a)(1) Approval of Substantive Changes

**Response:**

The Council prescribes specific requirements for substantive changes made at the institutional or program level. The depth and breadth of those requirements are explained in the General Procedures and the Council Actions sections of the standards document (Exhibit 1: Accreditation Criteria, Section 2-2-100, p. 13 and Section 2-3-300, p. 29). By definition, institutions must seek and receive formal approval by the Council before they

initiate operations based on a change in mission, ownership, certain new programs, additional campuses or a change in location of an existing campus, among other changes (Ibid., Section 2-2-101, p. 13).

The extent of review applied by ACICS to substantive changes is a function of the breadth and depth of the changes. Member institutions are clearly informed that the Council will require "… a comprehensive on-site evaluation if substantive changes are sufficiently extensive that the institu-tion's capacity to maintain compliance with accreditation standards requires an immediate assessment." The Council defines "extensive change" as those which in aggregate constitute an institution that is "no longer the same since last evaluated (Ibid., Section 2-2-102, p. 13)."

Council also requires on-site quality monitoring evaluations for the following substantive changes: new programs significantly different than others being offered or at a higher credential level; a delivery method currently not used by the institution; and a new branch campus or a new learning site that offers 50 percent or more of an academic program. Council also requires onsite evaluation following the reinstatement of accreditation based on change in ownership or control. The on-site evaluations are to ensure the institution remains compliant with ACICS standards.

ACICS describes the assessment, approval, and monitoring procedures associated with each action in the unique application required for each type of change (Exhibit 112: Application Templates). Institutions are provided guidance on the process of approval in the General Procedures section of the standards (Exhibit 1: Accreditation Criteria, Sections 2-2-103 through 2-2-111, ps. 14-16).

As ACICS applies the Council's requirements for review of substantive changes to new programs, for example, the institution must submit information comparing the proposed program content with that of programs approved and serving students. That information is provided to ACICS as part of the academic credit analysis (Exhibit 51: Academic Credit Analysis). The Council evaluates the proposed program against four tests to determine if the program is out-of-scope. The tests are the number of courses in the proposed program, the programs' relationship to the Classification of Instructional Program (CIP) code established by the U.S. Department of Education, licensure or certification requirements, and externship requirements (Exhibit 113: November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter).

When an institution requests a new program at a higher credential level, significantly different than any program currently offered, or through a different delivery method, the institution is required to explain the impact on the academic, financial, and facilities resources of the institution (Exhibit 114: Plan to Expand Institution Scope of Accreditation Template). Council reviews the materials in reaching a decision to include the change under the grant of accreditation (Exhibit 113: November 2015 Executive Committee

Meeting Minutes with Exhibits and Council approval letter).

All substantive change requests are reviewed by full Council or the Executive Committee of the Council which has the authority to act "on behalf of the Council between Council meetings (Exhibit 1: Accreditation Criteria, Appendix A, pg. 96)." The Executive Committee has access to the application and supporting documents that augment the institution's request. It also has access to a report which tracks any previously approved substantive change for that institution, so that the Council may consider whether cumulative substantive changes merit a comprehensive on-site evaluation in advance of the expiration of the current grant.

| Exhibit(s) Linked to this Criterion | |
|---|---|
| Exhibit Title | File Name |
| Exhibit 112 - Application Templates | Exhibit 112 - Application Templates.pdf |
| Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter | Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter.pdf |
| Exhibit 114 - Plan to Expand Institution Scope of Accreditation Template | Exhibit 114 - Plan to Expand Institution Scope of Accreditation Template.doc |
| Exhibit 51 - Academic Credit Analysis | Exhibit 51 - Academic Credit Analysis.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(2)(i-vii) Types of Substantive Change

**Response:**

Council requires each accredited institution to maintain standards of quality and integrity, including the initiation of the review by ACICS of all substantive changes, as well as other activities at the institution (Exhibit 1: Title II, Chapter 2, Introduction, p. 13). Council requires "approval by ACICS before substantive changes are implemented, and institutions should notify ACICS of other significant changes." The Council expects to be notified immediately of substantive changes at an institution, including changes in its mission or objectives, management, ownership, control, educational programs (including the same program offered at a higher credential), mode of educational delivery, name, geographical location, and state or local authority to operate "Accreditation Criteria," (Ibid, 2-2-101, p. 13).

The Council requires an on-site quality assurance monitoring visit following approval to expand an institution's scope of accreditation for the following reasons: new programs of study significantly different than others being offered or at a higher credential level; different delivery method for a program such as distance education or direct-assessment competency-based; initiation of a new branch campus, an acquisition of a branch campus or initiation of a new learning site that offers 50% or more of an academic program; and

reinstatement of accreditation following a change in ownership or control. The on-site evaluation visits are conducted to ensure the institution remains compliant with the agency standards.

All substantive change requests are presented to the Council, when in session, or the Executive Committee, when Council is not in session (Ibid, Appendix A, p. 96). Substantive change actions are presented to the Council or Executive Committee in advance of their meetings. The material includes a brief institutional history, a list of the campuses' active and approved programs of study, and the substantive change request. If the substantive change is for a program of study determined to be out-of-scope, additional information is provided to the Council or Executive Committee. (Exhibit 113: Nov 2015 Executive Committee Meeting Minutes). The Council or Executive Committee has access to the complete application of the institution's request for a substantive action and a Substantive Change Actions Report which informs the Council of any previously approved substantive change for that institution. This process allows the Council to take action on the proposed substantive change and to track the cumulative substantive changes approved for the institution since its last grant of accreditation.

The substantive change application has extensive requirements for back-up documentation depending on the type of change requested (Exhibit 112: Application Templates).

Another change which requires Council approval is modification of more than 25% of a program's content. When an institution makes a modification to a program that is deemed substantial, it must apply for and receive approval for a new program. (Exhibit 1: Accreditation Criteria 2-2-101(g), p. 13).

Upon approval, a non-main location is included within the scope of the institution's grant of accreditation. All new branch campuses are required to undergo a quality assurance monitoring visit within six months of the initiation of classes at the location. This visit is conducted by an ACICS staff member who completes a "Branch Campus Verification Report" (Exhibit 119: QAM-NB formerly Branch Verification Report Jan 2016) or a "Learning Site Verification Report" (Exhibit 118: QAM-Learning Site Verification Report Template Jan 2016). The purpose of the on-site visit is to verify the information reported in the Branch Campus Application or the Learning Site Application and to review the establishment of the location. All learning sites which offer at least 50% of an educational program must seek prior approval from Council and undergo a visit within six months of the date proposed for initiating services to students.

Formal collaboration with another accredited institution is a substantive change that requires Council approval (Exhibit 1: Section 2-2-505, p. 24). Contracts with Unaccredited Institutions or Entities are substantive changes that are also subject to Council review and approval. Council restricts delivery of no more than 25% of a program of study (Ibid,

Section 2-2-506, p. 25). The institution must provide a copy of the contract and other required information for ACICS' review and approval.

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 112 - Application Templates | Exhibit 112 - Application Templates.pdf |
| Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter | Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter.pdf |
| Exhibit 118 - QAM-Learning Site Verification Report Template Jan 2016 | Exhibit 118 - QAM-Learning Site Verification Report Template Jan 2016.doc |
| Exhibit 119 - QAM-NB formerly Branch Verification Report Jan 2016 | Exhibit 119 - QAM-NB formerly Branch Verification Report Jan 2016.doc |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(2)(viii) Approving Additional Locations

**Response:**

ACICS does not exempt member institutions from adhering to current requirements for prior approval before advertising, recruiting, or enrolling students at an additional location, a new branch, or a new learning site that offers 50% or more of a program of study. The agency requires and conducts evaluation visits according to policy to all additional locations (Exhibit 1: Accreditation Criteria, Section 2-2-104, p. 14; Section 2-2-110, p. 15). The Department's provisions under 602.22 (a) (2) (viii) (A), (B), (C), (D), and (E) do not apply to ACICS.

| Exhibit(s) Linked to this Criterion | |
| --- | --- |
| **Exhibit Title** | **File Name** |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(2)(ix-x) Other Locations Needing Approval

**Response:**

As a condition of maintaining accreditation, ACICS institutions are required to keep the Council fully informed of activities at their campuses, including the acquisition of an institution by another entity (Exhibit 1: Accreditation Criteria, Section 2-2-101(h)(i), p. 13). New acquisitions of an educational entity must be fully disclosed. An institution will be considered to be in violation of Council standards if it operates any other institution by acquisition or by new start-ups without first securing ACICS approval. Any new main campus or a new fully-operating branch will be subject to evaluation as a new branch campus or as an initial applicant (Ibid., Section 2-2-104, p. 14).

The conditions under which an institution may enter into a teach-out agreement with another accredited institution, and receive Council approval, are explicit (Ibid., Section 2-2-303, p. 19). If an institution opens a new permanent location to conduct a teach-out for students of another institution that has ceased operation or plans to cease operations, the ACICS institution is subject to the new branch application process. The terms of the Council's approval are communicated in writing to the institution conducting the teach-out (Exhibit 120: Teach-out branch approval letter).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 120 - Teach-out branch approval letter | Exhibit 120 - Teach-out branch approval letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(a)(3) When New Evaluation Required

**Response:**

ACICS standards fully disclose the substantive changes that require Council review and approval prior to implementation. Institutions are required to notify the Council in advance of the changes or any other "significant changes," as indicated in the general procedures that apply to all institutions (Exhibit 1: Accreditation Criteria, Title II, Chapter 2, p.13). In addition to evaluating the quality of individual changes in programs, governance, facilities, or mission, among other changes, the Council considers the cumulative and holistic effect of substantive changes on the accreditation standing of the institution. The requirement of a comprehensive on-site evaluation applies not only to the initiation of a new grant of accreditation, but also to extensive substantive changes. Council's standards call for an "immediate assessment" when the effect of the cumulative changes makes the institution different from that which was evaluated during the previous comprehensive on-site evaluation (Ibid., Section 2-2-102, p. 13).

ACICS has established quality control mechanisms for monitoring an institution's multiple substantive change requests. The elements of that mechanism include the substantive change application, a report which records each substantive change approved by the Council, and a protocol to share the report with Council every time it is considering a subsequent substantive change request from that institution (Exhibit 113: November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter, ps. 19-26).

The information reviewed by Council when it considers a new substantive change request includes key institutional information such as when the institution was last accredited, current financial and student achievement reporting status, the most current placement and retention rate, its 3-year cohort default rates, and a list of the institutions active approved programs of study.

Based on the review of the request, Council may approve, or defer a decision pending receipt of additional information, or deny. As a component of its deliberation, Council reviews changes that have occurred since the last comprehensive on-site evaluation to determine if a "new institution has evolved." In that case, Council may defer or deny the action, place the institution on monitoring status, require a written response, or require a comprehensive on-site evaluation (Exhibit 113: November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter, p. 25).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter | Exhibit 113 - November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.22(b) Substantive Change Procedures

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

| Exhibit(s) Linked to this Criterion |
|---|
| No Exhibits uploaded for this Criterion |

**Criteria:** 602.22(c) Fiscal and Administrative Capacity Determination

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

| Exhibit(s) Linked to this Criterion |
|---|
| No Exhibits uploaded for this Criterion |

**Criteria:** 602.22(c)(1) Approval of Additional Locations

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(c)(2) Approval Procedures for 3+ Locations

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(c)(3) Approval Procedures for Rapid Growth

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.22(d) Purpose of Visits

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(a) Public Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(b) Opportunity for 3rd-party Comments

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(c) Complaint Procedures

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(d) Public Disclosure of Accreditation Status

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.23(e) Public Correction of Inaccurate Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

---

**Criteria:** 602.23(f) Proviso for additional procedures

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

---

**Criteria:** 602.24(a) Branch Campus

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

---

**Criteria:** 602.24(b) Change in Ownership

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

---

**Criteria:** 602.24(c)(1) Teach-out Plan Triggers

**Response:**

The orderly and appropriate cessation of educational activities by an institution, regardless of the reason for cessation, is high priority for ACICS. The Council expresses its authority and expectations for approved teach-outs in numerous sections of its standards (Exhibit 1: Sections 2-1-700, p. 10; 2-2-101, p. 13;2-2-303, p. 19; 2-2-230, p. 28.) In addition, Council has fortified its policies regarding penalties applied to individuals responsible for closing an institution without following the requirements of an approved teach-out plan or providing refunds to students (Ibid, Section 2-3-900, p. 35).

The incidence of ACICS institutions closing precipitously has prompted the Council to take debarment actions against at least 10 owners and operators of five different institutions (Exhibit 122: www.acics.org>Council Actions>Accreditation Conditioned>Action to Debar). In addition, the Council has issued a notice of intent to debar against former executives of Corinthian Colleges for the cessation of operations at four Everest Institute campuses in California coincidental with the corporation's bankruptcy filing.

Derived from adverse information provided by the federal government, state agencies and other sources, ACICS has also required the submission of teach-out plans for Michigan Jewish Institute, ITT Tech Institutes and other institutions who may be at risk of ceasing operations (Exhibit 123: Adverse letters to ITT and MJI).

| Exhibit(s) Linked to this Criterion | |
|---|---|
| **Exhibit Title** | **File Name** |
| Exhibit 123 - Adverse letters to ITT and MJI | Exhibit 123 - Adverse letters to ITT and MJI.pdf |
| Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16 | Exhibit 121 - ACICS Response to U.S. Department of Education's Supplemental Request for Information 03 03 16.docx |
| Exhibit 122 - www.acics.org-Council Actions-Accreditation Conditioned-Action to Debar | Exhibit 122 - www.acics.org-Council Actions-Accreditation Conditioned-Action to Debar.pdf |
| Exhibit 1 - Accreditation Criteria | Exhibit 1 - Accreditation Criteria.pdf |

**Criteria:** 602.24(c)(2) Treatment of Students

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

| Exhibit(s) Linked to this Criterion |
|---|

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(3) Notifying Other Agencies
**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion
No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(4) Requiring Teach-out Agreements
**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion
No Exhibits uploaded for this Criterion

**Criteria:** 602.24(c)(5) Approving Teach-out Agreements
**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion
No Exhibits uploaded for this Criterion

**Criteria:** 602.24(d) Closed Institution
**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(e) Transfer of Credit Policies

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(f)(2) Credit Hour Review

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(f)(3) Actions of Deficiences

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.24(f)(4) Credit Hour Notifications

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(a-e) Basic Due Process Requirements

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(f) Specific Appeals Requirements

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(g) Basis for Appeal Outcome Provided

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.25(h) New Financial Information

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(a) Notifications: Positive Decisions

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(b) Notifications: Negative Decisions

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(c) Notice to Public w/in 24 hours

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(d) Brief Summary w/in 60 Days

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.26(e) Notifications: Voluntary Withdrawal

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.27(a)(1-5) Other Information to be Provided

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.27(a)(6-7),(b) Fraud and Abuse

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(a) Regard for the Legal Authorization of an Institution

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

### Exhibit(s) Linked to this Criterion

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(b) Regard for Negative Actions by Other Accreditors

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(c) Explanation of Over-riding Decision

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(d) Requirement to Initiate Review

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** 602.28(e) Information-Sharing with Other Accrediting/Approval Bodies

**Response:**

There have been no changes to our agency's policies and/or practices since our last NACIQI review (of a petition and/or compliance report) that could bring our agency into noncompliance with any of the requirements of this section of the Secretary's Criteria for Recognition.

**Exhibit(s) Linked to this Criterion**

No Exhibits uploaded for this Criterion

**Criteria:** Requested Scope of Recognition

**Response:**

There have been no changes to our agency's policies and/or practices since our last
NACIQI review (of a petition and/or compliance report) that could bring our agency into
noncompliance with any of the requirements of this section of the Secretary's Criteria for
Recognition.

# EXHIBIT 4

To Declaration of Allyson B. Baker

**Response to U.S. Department of Education's Supplemental Request for Information Regarding ACICS' Petition for Re-recognition**

**Part II Responses, May 16, 2016**

**Introduction**

The Accreditation Group of the Office of Post-Secondary Education of the U.S. Department of Education (ED) requested ACICS to submit responses to Section II "Questions related to specific standards in Jan. 2016 submission" by May 16, 2016. Additional documentation, as appropriate, related to specific institutions listed by the Department and other general questions are presented in this submission of responses to the second set of questions. Responses to the first set of questions were submitted on April 1, 2016.

As required by the ED, a large portion of this response relates directly to the following institutions and associated compliance issues:

- Corinthian schools:  job-placement performance, financial stability, campus closures and teach out provisions
- CEC: job placement performance
- ITT:  recruiting practices, title IV compliance
- Michigan Jewish Institute:  enrollment and title IV eligibility
- Westwood: job placement performance, recruiting practices related to wages, transferability of credits, closure of campuses.
- Lincoln Tech: job placement performance, recruiting practices
- Globe University: recruiting practices related to job opportunities and transferability of credit
- Le Cordon Bleu: job placement performance, recruiting practices

These issues were also addressed in the Council's Part I response submitted on April 1, 2016.

The Council's response to ED's request for comments regarding the multistate attorneys general investigations, dated April 8, 2016, further addresses specific institutional issues (Exhibit 127: Response to the Secretary of Education Letter dated May 16, 2016 from Mr. Anthony Bieda). In addition, ACICS has attached a comprehensive research report responding to the findings of the ED's Performance Data by Accreditor (November 2015) which ranks performance of accrediting agencies based on metrics applied to student and institutional outcomes. (Exhibit 140: Improving the Department's Performance Data by Accreditor Dataset.)

Support for the institutions accredited by ACICS, and the quality assurance role played by the agency, is recognized by a variety of external stakeholders, including students, graduates, and

employers (Exhibit 150: Letters of Support; Exhibit 151: ITT Employers, Exhibit 152: ITT Students).

a. *602.13 acceptance of the agency by others – How has the number of major investigations into and actions against so many of ACICS's schools (CEC, Corinthian, ITT, MJI, Westwood, Lincoln Tech) by multiple federal agencies and states, plus the Congressional inquiry, affected ACICS's public acceptance and credibility?  What actions have you taken in response?*

ACICS acknowledges that there have been substantial inquiries into the operations of member institutions over the last several years.  Among other considerations, those inquiries have increased the frequency and intensity with which ACICS interacts and exchanges information with other oversight partners, including state governments, federal agencies, and Congress.  The primary impact of these inquiries has been to expand and strengthen relationships between ACICS and a variety of external stakeholders. Regarding ACICS' public acceptance and credibility, the demand for accreditation and quality review by the agency has remained substantially unchanged during this interval.

Despite scrutiny applied to ACICS institutions, the agency continues to serve as a reliable resource for quality assurance for state licensing authorities, other accrediting agencies, international ministries of education, evaluators, employers, and educational institutions. (Exhibit 13: CHEA ACICS recognition granted Sep. 2012; Exhibit 14: ACICS Recognition by ARRT, January 27, 2015; Exhibit 15: International Ministries of Higher Education, Notification of Accreditation, December 2015).

ACICS receives inquiries from as many as 20 institutions a month that seek initial accreditation with by submitting an Eligibility Self-Assessment Checklist. More than 115 institutional representatives from many regions within the United States and abroad participated in the ACICS Initial Accreditation Workshops during 2015. Inasmuch as ACICS applies rigorous standards in screening initial applicants, only a fraction of the institutions who apply are granted initial accreditation. In a typical year, more institutions are granted initial accreditation than those who withdraw or lose their accreditation (Table A):

**Table A:**

| Year | Number of voluntary withdrawals | Number of Initials |
|------|--------------------------------|--------------------|
| 2015 | 14 | 30 |
| 2014 | 14 | 19 |
| 2013 | 18 | 21 |

| 2012 | 12 | 19 |
|------|----|----|
| **Total** | **58** | **89** |

These numbers reflect the continuing interest on the part of institutions in the U.S. and abroad in gaining an ACICS accreditation.

ACICS has voluntarily sought and received independent review of its effectiveness by a variety of accreditation authorities. (Table B). The process of seeking independent review strengthens and contributes value to the substantial investment of time, funds and energy made by thousands of students each year.

**Table B:**
Inventory of Accountability Reviews of ACICS, 2006 through 2016

| HOW: | WHEN: | OUTCOME: |
|------|-------|----------|
| Self-evaluation reviewed by CHEA | 2007 | Recognition continued through December 2011. |
| Self-study reviewed by NLNAC Board | 2008 | Recognition: ACICS schools eligible for NLNAC specialized accreditation. |
| Self-evaluation reviewed by THECB Board | 2009 | Recognition: ACICS colleges retain eligibility to offer degree programs in Texas |
| Self-evaluation; observation of Council; observation of school review; ED staff report, NACIQI review | 2011 | Compliance report required on 13 issues; recognition extended pending receipt of report. |
| Self-evaluation; observation of Council; review by CHEA Committee on Recognition (COR) | 2011 | Compliance report on one issue; recognition extended one year. |
| Compliance report and CHEA Board review | 2012 | Recognition granted through 2016. |
| ED Compliance report | 2013 | Recognition granted through December 2016 |
| Self-evaluation and review by ARRT Board | 2015 | Recognition: graduates of ACICS schools w/RT programs eligible for certification, licensure |

| HOW: | WHEN: | OUTCOME: |
|---|---|---|
| Self-evaluation reviewed by CHEA COR | 2015 | Eligibility affirmed; process for recognition commences |
| Self-evaluation; observation of Council; observation of school review; ED staff report, NACIQI review | 2016 | Pending. |
| Self-evaluation; observation of Council; review by CHEA Committee on Recognition (COR) | 2016 | Deferral; report due Fall 2016 |

ACICS has strengthened its standards and applied stronger requirements on member institutions over the last five years.  This is reflected in the number of institutions who have received a negative Council action and the increased number of institutions that are under heightened monitoring by the agency (Table C:)

**Table C:**

| Action | Totals | 2015 (Jan-Nov) | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|---|
| Show Cause Directive/Probation | 106 | 11 | 8 | 3 | 11 | 73 |
| Action to Withdraw | 4 | 0 | 0 | 1 | 3 | 0 |
| Denials | 10 | 0 | 3 | 1 | 2 | 4 |
| Revocations | 41 | 10 | 20 | 11 | 0 | 0 |
| Debarments | 6 | 0 | 4 | 2 | 0 | 0 |
| Institution Closings | 126 | 37 | 40 | 27 | 19 | 3 |
| Voluntary Withdrawals | 54 | 15 | 14 | 18 | 5 | 2 |
| Campuses placed on heightened monitoring for student achievement* | 553 | 120 | 113 | 120 | 182 | 138 |
| Campuses placed on heightened monitoring for financial stability reasons | 254 | 91 | 79 | 34 | 25 | 25 |

*Includes institutions with placement and retention rates below Council Standards*

As indicated in the agency's response to Part I of the Department's inquiry, ACICS has monitored all of the adverse cases listed in the Department's letter, and corresponded with each institution (Exhibit 121: Table A; Exhibits 153-160: Adverse letters, responses). The following institutions continue to be under heightened monitoring by the Council with the institutions under a show-cause directive: ITT Technical Institute, Michigan Jewish Institute, Everest Institutions (currently structured under Zenith Education Group).

ACICS has actively responded to requests for information from Congress, and has actively met with representatives of Congressional offices to keep policy makers fully informed of the developments regarding accreditation of ACICS member institutions, and to keep an active dialogue about improvements that can be made to ensure that students derive value from their education.

ACICS requires institutions to comply with federal, state and local laws; it reviews potential violations of law by member institutions routinely.  ACICS cooperates fully in the discovery phase of multiple inquiries and investigations of accredited institutions made by state and federal authorities. Between Sep. 2011 and February 2016 ACICS responded to 28 requests for information from state Attorneys General, spent over 800 hours to collect and provide nearly 500,000 pages of supportive information. In addition, during the same time period, the agency responded to 12 investigative demands for information from federal agencies, including the Federal Trade Commission, the Department of Education, Department of Justice, Securities and Exchange Commission, and the Department of Homeland Security. To fulfill these requests, the agency spent over 450 hours collecting and providing federal agencies with over 440,000 pages of information (Exhibit 138: Inventory of Subpoena Requests, 2010 -2016).

In order to fully assess and verify aggregate institutional performance data by accreditor dataset, ACICS sought the services of expert researchers and observers of higher education trends. This resulted in two white papers by Dr. Bob Cohen and Dr. Nam D. Pham co-researcher Mary Donovan. A synopsis of the white paper is presented by Dr. Thomas H. Wickenden (Exhibit 140: Improving the U.S. Department's Performance Data by Accreditor Dataset: A Synopsis of Two ACICS White Papers). These papers conclude that there are significant shortcomings when the Department presents for comparison aggregate data to assess quality of education. The data presented for accreditors is misleading due to limitations in the underlying data and methodological assumptions.

***b. 602.15(a)(1) staffing/financial resources – Are you confident in the number and expertise of your staff and institutional review teams, and in the level of your financial resources?  Any changes you have made or plan to make?***

## Staffing and Financial Resources

ACICS is confident that the number and expertise of the regular staff and institutional evaluators are more than adequate for the number of institutions reviewed, and that the financial resources allocated to support the accreditation activity are adequate.

The ACICS Board has responsibility for ensuring that the accreditation activity is adequately funded, staffed and led by professionals with appropriate experience and expertise to consistently and effectively apply the Council's accreditation standards. ACICS staff consists of 39 individuals and more than 1,900 trained, qualified on-site volunteer evaluators. Approximately 50 percent of the staff is dedicated to the recurring review of institutions through site visits and document reviews. Accreditation coordinators must have at least a bachelor's degree; 68 percent of the accreditation coordinators hold graduate degrees, including doctoral degrees. They are all vetted and trained so that they are able to understand and interpret Council standards, to coordinate effectively on-site evaluation teams, and to communicate effectively in writing and verbally.

The allocation of resources to meet the demand for accreditation services is accomplished through the annual budgeting process. For the current fiscal year (2016),  the accreditation workload of (475 visit projects, 665 program reviews, 870 annual accountability report reviews) is funded by an operating budget of more than $11 million and supported by a reserve fund in excess of $13 million.

The need for additional staff is considered in the budget development process. Revenues that support operations are derived from application fees, sustaining fees, and visit-related fees paid by the institutions. The number of institutions undergoing on-site evaluations each year varies depending upon the expiration of grant length, the number of quality monitoring visits and the number of special or unannounced visits. ACICS is confident of the sufficiency of staffing capacity to handle on-site evaluations as indicated in the Table D below:

**Table D:**

| Sufficiency of Capacity | | |
|---|---|---|
| *Number of visits by staff per cycle from 2013-2016* | | |
| **Year - Cycle** | **Number of Visit Projects** | **Number of Staff** |
| 2013   Winter | 197 | 14 |
|           Spring | 183 | 14 |
|           Fall | 177 | 14 |
| 2014   Winter | 136 | 13 |
|           Spring | 151 | 14 |
|           Fall | 150 | 13 |
| 2015   Winter | 135 | 13 |
|           Spring | 139 | 13 |
|           Fall | 170 | 14 |
| 2016   Winter | 135 | 12 |

Council is confident of the expertise and capabilities of on-site evaluators. It trusts the value of well-established procedures for the review and assessment of individual performance and activities performed. ACICS removes from the active roster evaluators who are assessed to be incompetent or have demonstrated inappropriate behavior. Procedures include identifying "areas of need" for recruitment of new evaluators. New evaluator recruitment, enhancement of evaluator training, and expanded evaluator performance protocol are ongoing and summarized in Tables E, F and G:

| Table E: Inventory of Evaluator Recruitment / Changes in Pool | |
|---|---|
| *To accommodate the changes and additions to the programs offered by current members and initial applicants, the following areas of expertise have been added over the last four years.* | |
| Nuclear Engineering | Agroeconomics |
| Wind Turbine Technician | Divinity/Bible Studies |
| Anesthesia Assistant | Gerontology Assistant |
| Solar/Wind/Renewable Energy Tech | Pet Grooming |
| Environmental Technology | Food Science |
| Oriental Medicine | Nuclear Engineering |
| Machine Tool Technology/Machinist | Applied Linguistics |
| Animal and Equine Science | International Law |
| Biotechnology | Midwifery |
| Agro-Industrial Engineering And Agribusiness | Geological, Cartographic, Estimative And Building Sciences |
| Modern Languages | Law |
| Organizational Leadership | Pedagogy |
| Political Sciences | Psychology |
| Defense and Security | National Security |
| Fire Science | MRI |
| Colon Therapy | Human Services |
| (Nurse) Midwifery | (Nurse) Anesthesia |
| Nanomedicine | Medical Physics |

## Table F: Inventory of Evaluator Training Enhancements

1. *Evaluator Training Materials*
   a. *A packet of information is provided at time of training which includes a presentation, best practices, policies and procedures manual, reimbursement guidelines, etc.*
   b. *Resources listed on web page (http://www.acics.org/evaluators/content.sapx?id=2292)*
   c. *Focused assessment/training of all evaluators; assessment for student relations evaluator (development of manual); development of distance education training; Chair Focus Group; SR Focus Group*
   d. *Team Chair Professional Development (July 2014)*
2. *Frequency of training and total trained*

| Frequency of Training | Total Trained |
|---|---|
| March 2016 | 6 |
| September 2015 | 18 |
| September 2015 | 26 |
| July 2015 | 9 |
| March 2015 | 10 |
| January 2015 | 13 |
| December 2014 | 23 |
| November 2014 | 23 |
| September 2014 | 16 |
| July 2014 | 17 |
| May 2014 | 38 |
| April 2014 | 61 |
| February 2014 | 57 |
| January 2014 | 7 |
| September 2013 (Everest Hosted) | 13 |
| March 2013 (Daymar Hosted) | 13 |
| March 2013 | 30 |
| April 2013 | 27 |
| **TOTAL** | **407** |

## Table G: Review of Criteria for Evaluator Performance

*Approximately two-four weeks at the conclusion of each travel cycle, staff members are required to complete Evaluator Evaluations (Excel Spreadsheet) and Chair Evaluations (Survey Monkey).*

*The Evaluator Evaluations use the following scale for assessment, with comments recommended across any scoring but required for any evaluation below 3 (average).*

*1= Unacceptable       2 = Needs Improvement        3 = Average       4 = Above Average        5 = Exceptional*

*N/A*

| Areas of Evaluation | Expectation |
|---|---|
| Preparedness & Timeliness | Respected visit schedule; reviewed relevant pre-visit materials; discussed areas of non-compliance when discovered; completed report by the end of the visit. |
| Organizational Skills | Was aware of responsibilities as a team member; prioritized duties; reviewed questions; shared concerns; allotted enough time to deal with concerns. |
| Interaction with Team | Was easy to work with, independent, not disruptive; discussed areas of non-compliance and concerns with team members; offered assistance to others. |
| Interaction with Institution | Was pleasant and considerate to faculty, staff, and students; performed required duties in a professional manner; dressed appropriately for business in accordance with ACICS standards. |
| Writing Skills | Used complete sentences and appropriate format; made minimal grammatical errors; answered questions completely; elaborated on citations. |
| Knowledge of Criteria | Recognized areas of noncompliance; requested citation numbers and correct verbiage; documented why areas were out of compliance. |
| Ethics | Adhered to Canons of Ethical Responsibility |
| Expertise | Demonstrated knowledge of subject matter, including curricula, program objectives, instructional tools and equipment. |
| Adherence to Travel & Reimbursement. Policies | Responsive to requests from staff; abided by travel policy; demonstrated respect for all individuals involved in the visit process |

Summary of Review:

Evaluations across multiple cycles are reviewed to determine if there is a pattern of less than acceptable performance/behavior or if any negative (less than 3 on the scale) feedback can be kept under observation.  This review is conducted by a team of travel staff members who serve on rotation to include at least one new coordinator and one seasoned coordinator to provide perspective.

The evaluations are discussed, with emphasis placed on those with less than average assessments overall as well as in each individual area. During completion of the evaluations, comments are encouraged generally, and required in the cases of negative scoring. Evaluators who did not show up or cancelled are

| Table G: Review of Criteria for Evaluator Performance | |
|---|---|
| *Approximately two-four weeks at the conclusion of each travel cycle, staff members are required to complete Evaluator Evaluations (Excel Spreadsheet) and Chair Evaluations (Survey Monkey).*<br><br>*The Evaluator Evaluations use the following scale for assessment, with comments recommended across any scoring but required for any evaluation below 3 (average).*<br><br>*1= Unacceptable       2 = Needs Improvement       3 = Average       4 = Above Average       5 = Exceptional*<br><br>*N/A* | |
| Areas of Evaluation | Expectation |
| also reviewed and the reason for the cancellation considered (emergency versus a pattern of not showing up).<br><br>Following the review, decisions on actions are made, with the area of Ethics violation taken to the leadership. The travel team is briefed on any negative actions either via email or during the regularly scheduled travel meetings and the report saved on the ACICS shared drive for future reference. | |

Summary of Outcomes:

As a result of evaluation reviews, the following actions have been taken:
- Evaluator is placed on monitoring status – still active but performance in subsequent cycles monitored for improvement
- Evaluator has been notified that they need to complete additional training
- Evaluator has been provided with an edited version of their report so they can see the changes that had to be made
- Evaluator has been placed on limited travel
- Evaluator has been made inactive

In all instances, the individual is contacted via telephone and/or email to let them know of the action and provide an opportunity for response.

*c. 602.15(a)(2) competency of representatives -- Are you confident in the process and criteria you use to choose members of your review teams, and the expertise of your representatives?  Confident in your conflict of interest policies and practices?  Any changes you have made or plan to make?*

## Competency of Representatives and Conflict of Interest Policies

ACICS is confident in the process and criteria used to choose members of its evaluation teams, as well as in the expertise of its public and institutional representatives. ACICS is also confident that its policies and practices methodically preclude participation in onsite evaluations, policy formation and decision making by individuals who have a conflict of interest. However, as an agency that believes in continuous enhancements and strengthening of processes, areas for change have been identified and appropriate action taken to ensure that the competency of all representatives are without question.

The onsite evaluation teams who conduct the reviews of institutional processes, programs, and procedures are chosen based on criteria that are applied through the system (Exhibit 25: Sample Evaluator Resumes, Public, Academic, Administrative; Exhibit 26: Resumes of Licensed Evaluators; Exhibit 22: Accreditation Evaluation Training Manual 2015, p. 11). Recognizing that expectations have changed, ACICS has been reviewing the expert pools in different areas and making changes that are consistent with those new expectations. Feedback from institutions and staff members on the performance of evaluators is routinely sought and may result in deactivating evaluators deemed to be deficient in their performance and/or requiring them to undergo additional training. In 2015 all Student Relations evaluators were required to undergo specialized training in order to strengthen their contributions to the review process. Several of the evaluators were removed from the pool of Student Relations specialists because of deficient performance.

ACICS has practiced zero-tolerance in the application of the conflict of interest policy to the on-site evaluation teams.  In addition to the signed attestation of the evaluator at the time of application, conflict of interest issues are also discussed in the required Evaluator Training presentation. ACICS staff representatives disclose the campus under review when forming a team in order for them to share if there is a conflict of interest with that institution. Once the campus receives the team memorandum, which includes the team composition information, the institution has an opportunity to notify of any potential conflict with team members, which may include prior employment, consulting engagements, etc. ACICS will consider the information in composing the team in a manner that avoids conflicts of interest and other ethical issues.

The conflict of interest policy applied to the Council has been enhanced recently. The Council has established a Board of Ethics to act upon perceived or actual conflicts of interest involving any commissioner. Another enhancement to the Bylaws mandates that a commissioner will

resign if they are employed by an institution deemed to be under serious scrutiny by ACICS (Exhibit 125: Memorandum to the Field, April 2016, p. 8).

The Board's nominating committee carefully reviews every candidate who expresses interest in serving on the Council and disqualifies any candidate who might have conflicts of interest. During 2012-2016 time period, 159 candidates where reviewed by the nominating committee; 26 were removed from consideration due to perceived conflicts of interest, including if they worked for a school with an open adverse inquiry, or affiliated with an institution under negative action, or are charged with criminal activity.  In addition, the Council removed three Commissioners from the Council due to conflicts of interests that appeared during their tenure (Exhibit 141: Commissioner Applicants 2012-2016).

*d.  602.16(a)(1)(i) student achievement –   Given what's happened with Corinthian, CEC, ITT, MJI, Westwood, and Lincoln Tech related to inaccurate student achievement data, what were the shortcomings in your process of verifying those data and how are you changing the process to prevent this from happening in the future? How did these issues occur despite ACICS's 2012-2013 move to require independent verification and auditing of student achievement data? Do you define retention as completion of the current academic year, rather than return for a subsequent term, even if a program may typically require over 12 months to complete. Is this different from other agencies' methods of calculating retention for programs over 12 months in length? If so, why do you measure retention this way?*

## Student Achievement and Verification of Data

ACICS is aware of deficiencies in the integrity of self-reported data by member institutions particularly related to placement outcomes. That awareness was heightened in 2011 when one major multi-campus system disclosed irregularities in the reporting of placement data to ACICS. At that time, and because of the issues, Council issued a show-cause directive and required the multi-campus system, at its own expense, to submit for Council review independent verification of all of the previous year's placement data.

In addition to the Council requiring independent verification of placement data on a case-by-case basis, ACICS has fortified its system of testing data integrity in the following ways: 1. Placement verification program which tests a minimum of 20 percent of member institutions each year for intensive scrutiny of their placement data; 2. A dedicated student achievement data evaluator assigned to that task on every site visit; 3. A data integrity test that is applied when the campus data is uploaded into the ACICS IT platform annually.

The dedicated student achievement evaluator (Exhibit 125: Memorandum to the Field, April 2016) conducts up to 100% verification of all graduates reported as placed and of all graduates who were classified as not available for placement.  Calls are made to graduates and/or employers. Any campus receiving a finding of inaccurate student achievement placement data will be required to submit its CAR data for intensive verification.

Based on these enhancements to ACICS' data testing protocols, the Council has substantially greater confidence today that student achievement data that it receives each year is a reasonable representation of actual performance.

When data reported on the CAR is found to be incorrect, the campus is required to pay a fee and resubmit a revised CAR. The Council reviews that finding during the file review process and verifies that the correction has been made.

To ensure that institutions are fully aware of its expectations, the Council added a Data Integrity standard to its criteria which makes explicit the requirement for truthfulness, reliability, and accuracy of data collected and submitted to ACICS. The standard also expresses Council's discretion to independently review performance data for verification at any time and for any reason.

For several decades, ACICS has required the institutions to track and report retention rates as part of its Campus Effectiveness Plan. This concept is closely tied to the 'Satisfactory Academic Progress' policy required by ED of all accreditors.

ACICS defines retention as completion of a Campus Accountability Report (CAR) year, July 1st-June 30th. The method of calculating retention at the program-level is the same regardless of program length. Other accrediting agencies such as The Accrediting Bureau of Health Education Schools and the Accrediting Commission of Career Schools and Colleges utilize retention as a measurement of student achievement and apply different methodologies of calculating program retention. However, they are both comparable to ACICS' calculation, as neither agency calculates retention differently for programs over 12 months in length.

The Council is currently developing criteria for the reporting and verification of completion or graduation rates. The annual Campus Accountability Report (CAR) calls for the institutions to report the percentage of students completing the credentials within 100 percent of the program length and the percentage of completing the credentials within 150 percent of the program length. These are self-reported figures.

e.  **602.16(a)(1)(vii) recruiting and 602.26 notification of accrediting decisions – Provide Documentation  about each instance of an issue with recruiting practices or advertising for Corinthian schools, ITT, MJI, Westwood, Lincoln Tech, and Globe, and Documentation indicating whether or when you notified the Department. For each of these instances, please provide all emails among, and Documents sent or received by, any of ACICS directors, officers, staff members, consultants (including all members of college review teams), and third parties which concern those schools, for the following time periods:**

- *Corinthian Schools: from January 1, 2014, to the present.*
- *ITT:  From November 1, 2013, to the present*
- *Westwood: from November 1, 2011, to the present*
- *Lincoln Tech: from July 1, 2014 to the present*
- *Globe: from July 1, 2014 to the present*
- *Le Cordon Bleu: February 1, 2013 to the present*

**And: are you changing your policies and practices in any way given these issues?**

The Council has analyzed in-depth the incidence of deficiencies regarding recruitment, admissions, advertising and marketing derived from team reports, complaints, adverse and other sources. ACICS adopted a more prescriptive standard for recruitment and admissions which is effective July 1, 2016. The revised standard requires institutions to ensure that any person or entity engaged in recruitment activities is communicating current and accurate information, among other items of student achievement disclosures. The institution also will be required to present for review during on-site visits written documentation that demonstrates that it is systematically monitoring the recruiting and admissions activities.

ACICS is developing visit templates to be utilized by on-site evaluation teams to test for compliance with this requirement that will be applied during the Fall 2016 review cycle.

Pertinent e-mails (Exhibits 165 – 177) and team reports, institutional responses and Council actions for the institutions specified are appended (Exhibits 147-148: Team Reports, Institutional Responses and Council Actions for Institutions.)

f.  **602.16(a)(1)(x) Title IV responsibilities and 602.19(b) monitoring – Provide Documentation, including all communications and analyses, of when you had reason to believe and when you notified the Department of each instance that a Corinthian school, ITT, CEC, and MJI, had violated its Title IV responsibilities or engaged in fraud or abuse.**

ACICS takes seriously its responsibility as an oversight partner with the Department's FSA division. ACICS has formally established procedures and protocols to test for compliance with the expectations of the Department of Education in connection with federal student aid regulations.

The on-site evaluation review of Title IV-related items includes a review of the last audit by the Program Participation Team to determine if they had any questions or concerns with the institution's practices with the administration of federal financial aid.

In addition, the standard team report template has as many as 84 questions that are directly or indirectly related to Title IV compliance.  While a majority of these compliance questions are addressed by the Student Relations evaluator, who has some expertise in the administration of student financial aid, other questions (such as academic credit analysis, distance education regulations, and verification of retention and placement data) are addressed by program specialists, distance education specialists, or the educational activities specialists.

Additionally, the appropriate application of standards of satisfactory academic progress through the qualitative and quantitative measurements is also reviewed to ensure that students' progress is accurately tracked and, if necessary, financial aid funds are not being inappropriately disbursed. Further, ACICS reviews the qualifications and expertise of financial aid administrators to ensure that they are capable of applying the Department's regulations. The institution's conversion of contact hours to credit is evaluated through its class schedules, time cards for externship hours, and interviews with students.

The agency did not find any systemic issues signifying apparent fraud that warranted a notification to the Department in the timeframe specified.

**g.** ***602.17(f) compliance and student achievement – Provide all Documentation of institutions that you continue to believe  have issues with verifiable achievement data since the last time you amended either your policies or processes for the submission of such data.  When did you last amend those policies or processes, and what Documentation do you have of changed policies or processes?***

Please refer to Table G (Exhibit 121: Part 1 response) for an analysis of application of heightened monitoring based on student achievement data. Copies of Compliance Warning letters issued to institutions are provided (Exhibit 148: Copies of Compliance Warning Letters Based on 2014 CAR Data).

Additional changes have since been made to the *Accreditation Criteria* to ensure that institutions are clear on the expectations. Section 3-1-704 Performance Information disclosure standard was recently revised (Exhibit 125: Memorandum to the Field, April 2016, p. 4). The revision was primarily to clarify that the current expectation and interpretation of that the information must be at the campus-level (and not at the institutional-level for multi-campus institutions) and include, at a minimum retention, placement, and licensure where applicable.  Based on further discussion, the Council is stipulating that this information must also be at the campus and program levels as reported to ACICS in the most recent Campus Accountability Report. This information will be verified onsite and/or using any of the data integrity tests available to ACICS. The new policy was voted by the Council in May 2016 and will be effective July 1, 2016.

h. *602.19 monitoring -- For each of the instances listed in Section I, please provide all emails among, and Documents sent or received by, any of ACICS directors, officers, staff members, consultants (including all members of college review teams), and third parties which concern those schools, for the following time periods:*

- *Corinthian Schools: from January 1, 2014, to the present.*
- *CEC:  from February 1, 2013, to the present*
- *ITT:  From November 1, 2013, to the present*
- *MJI: from October 1, 2012, to the present*
- *Westwood: from November 1, 2011, to the present*
- *Lincoln Tech: from July 1, 2014 to the present*
- *Globe: from July 1, 2014 to the present*
- *Le Cordon Bleu: February 1, 2013 to the present*

Pertinent e-mails are provided with this submission (Exhibits 165 – 177: E-mails Sent or Received by ACICS Representatives). Please note that Commissioners and team members correspond with schools only through ACICS staff.

*i.* *602.20(a) and (b) enforcement timelines and actions – With respect to when you have identified problems in general since January 1, 2013, please provide the total number of institutions or programs you have reviewed off cycle; as well as the number of instances in which you have taken adverse action and the nature of those actions; the number in which you have placed the institution or program on probation or equivalent status; and the number in which you have taken other corrective actions and the nature of those actions.*

*What is the mean time you actually allowed (including all extensions) for a school to come into compliance under each of 602.20(a)(2)(i), (ii), and (iii)?  For each such school, provide the time allowed and break out this data for probation and show cause.*

Reviews of institutions off regular cycle are directed by the Council as a result of complaints, adverse information, potential financial instability, student achievement issues or apparent non-compliance with specific standards. Examples are as follows:

Lebanon College – April 2013 (Financial as well as academic reasons)

California International Business University – March 2013 (Financial as well as academic reasons)

New York Institute of English and Business – March 2013 (Financial)

Mattia College – June 2015 – FACT review focused on institutional operations, student relations, and overall educational activities

Brown Mackie College Phoenix and Tucson – October 2015 – review of nursing program as a result of adverse action taken by the AZ Board of Nursing

*Unannounced Visits:*

Herguan University – November 2014 (Complaints and adverse information)

Laurus College – February 2014 and 2016d (Complaints and adverse information)

The Council has strengthened its process for conducting interim on-site evaluation visits between renewal of accreditation periods. Any time ACICS conducts an on-site visit, the evaluation team will review an institution's overall effectiveness in key areas such as administrative capability, effectiveness planning, admissions and recruitment practices, recordkeeping, faculty qualifications, etc. Interim on-site evaluations will be included as part of the quality assurance monitoring process of the Council.

Table E in the Part I response to Supplemental Request for Information (EXHIBIT 121: ACICS Response to U. S. Department of Education Supplemental Request for Information 03 03 16)

presents an analysis of intervals required to resolve accreditation findings. This summary is representative of all institutions.

The time allotted for institutions to come into compliance is based on the length of the longest program, as stipulated by the regulation and stated in the Accreditation Criteria, Title II, Chapter 3, Introduction (Exhibit 1: *Accreditation Criteria,* p. 27.) Even for 'good cause,' the Council has not allowed any institution to remain accredited beyond the expiration of the maximum time frame. In extreme findings of non-compliance, the Council may revoke an institution's accreditation even when the institution's maximum time frame has not expired. The institution is granted appropriate due process rights.

ACICS recently denied accreditation of an institution. Upon appeal, however, the Court restrained ACICS from suspending or withdrawing the institution's accreditation due, in part, to ACICS not providing the institution with the maximum time to come into compliance. The institution had numerous significant findings which warranted revocation following a deferral and a special visit, with opportunities given to the school for responses.

***j.   602.21(a)(b) systemic review of standards and 602.21(c) revision of standards – Has any review or change been prompted by the multiple issues and investigations over the past few years?  If so, what?  If not, why not?***

**Systematic Review and Revision of Policies:**

Over the past three years, as part of the routine systematic review of standards, ACICS has implemented revisions to several policies and procedures that are designed to strengthen the quality assurance and quality monitoring processes. These include: (1) enhanced training and development of ACICS accreditation coordinators and on-site evaluation team chairs, student relations specialists, and other evaluators; (2) aggressive monitoring of institutions that have been subject to ACICS' investigation of complaints and adverse information; (3) monitoring of institutions that show signs of stress that may impact on their financial stability; and (4) introduction and implementation of additional policies and procedures that affect student outcomes (such as placement rates, retention and student persistence rates, licensure pass rates, student satisfaction, graduate satisfaction, and employer satisfaction).

In August 2014 the Council defined Student Learning Outcomes and included 'direct' as well as 'indirect' assessments of learning especially as they apply to Competency-based Education. In December 2014 the Council published extensive standards for Competency-based Programs. In December 2014 the Council published and included in the Accreditation Criteria a new appendix on Principles and Guidelines for Program Enhancement Education or Study Abroad Activities. These are examples of standards that were either revised or newly introduced as a result of systematic reviews of Council policies and standards.

 In addition, the agency has strengthened its procedures for monitoring institutional disclosures of student achievement information, verification of graduate placement data submitted by institutions, timely notification of Council actions to the Department and other agencies, and pre-emptively requiring teach-out plans from institutions that show evidence of financial instability or that show evidence of significant non-compliance of Council standards.

The Council has also taken action on the following items that will go into effect in July 1, 2016 with prior notification to member institutions, with input from the public: clear definition of 'Academic Quality'; data integrity standard; recruitment activities review; institutional performance disclosures; and revised definition of 'placement'.

***k.   602.24(c)(1), (c)(4), (c)(5) teach out plan triggers, requirements, application – Provide all Documentation regarding teach out policies and processes in general or the application of such policies and processes to any institution in the last three years.***

***Provide all Documentation on specific teach out plans adopted to date for ITT, MJI, or any other schools for whom you are contemplating adverse action.***

## Institutional Closures and Teach-Outs

When an institution voluntarily or involuntarily closes, it is required to comply with the agency's teach-out policies and procedures (ACICS Petition to the Department, January 7, 2016: Response to Section 602.24(c)(1) Teach-out Plan Triggers, p. 69). All email correspondence in connection with teach-outs is included in the ACICS email submission.  Evidence of teach-out plans submitted as part of a response to adverse information is included in Exhibits 153-160: Adverse Correspondence.

If an institution closes without processing an acceptable teach-out plan, such as was the case with CCi's schools in California and New York, the agency has applied its policy regarding debarment actions against the chief administrator or other decision-makers (Exhibit 126: Debarment Correspondence and Council Actions).

Table K of the Part I response (Exhibit 121: ACICS Response to U.S. Department of Education Supplemental Request for Information) presents a summary of campus closings and withdrawals, including approved teach-out/closure plans for institutions under consideration. Documents pertaining to teach-out plans and approval letters for selected institutions are also attached (Exhibit 145: Teach-out Plans and Approval Letters).

l. ***602.27(1)(6-7),(b) fraud and abuse and 602.21 review of standards – Given what's happened with problem schools, are there any changes to policies and procedures you've made or plan to make?  For each of the instances listed in Section I, please provide all emails among, and Documents sent or received by, any of ACICS directors, officers, staff members, consultants (including all members of college review teams), and third parties which concern those schools, for the periods specified in item h above***.

Through its systematic process of policy and procedure reviews, which relies on contribution and assessment of all stakeholders and interested parties, ACICS has been making and will continue to make changes that demonstrate its commitment to quality and the integrity of its membership.

In order to address fraudulent job-placement disclosures, ACICS has adopted a new Data Integrity Standard which will be effective July 1, 2016. This standard requires that all data reported to ACICS is expected to reflect an accurate and verifiable portrayal of institutional performance and is subject to review by ACICS. The technology system is designed to calculate and test the integrity of certain student achievement data.

In order to strengthen the data verification function, ACICS added a dedicated Data Integrity Reviewer to each on-site evaluation team.

To strengthen the recruitment activities review, on-site evaluation teams will not only interview recruitment and admissions personnel but also assess that the institution has a written documentation to show that it systematically monitors its recruitment and admissions activities. The team will also continue to have access to student surveys which include specific questions on recruitment and admissions practices of the institution that the students were exposed to.

The institutional performance disclosure requirements have been clarified and strengthened. The data must match those reported to ACICS in the most recent Campus Accountability Report and must be reliable.

Pertinent e-mails are submitted with this response.

> ***m. 602.28(e) information sharing with other accrediting/approval bodies and 602.19(b) monitoring -- Given what's happened with problem schools, are there any changes to policies and procedures you've made or plan to make?***

*What materials do you request from the institution and what additional materials do you systematically gather prior to your review?  Provide all pre-review materials for each Corinthian, CEC, and ITT campus that you had gathered.*

*Per sections 602.14 and 602.15, provide all instances in which you have changed your reviewers or provided your reviewers with information to focus their review based upon this information.*

*Per 602.17 and 602.18, how do you verify information provided by a school?*

The agency has appropriate policies and procedures for sharing information with the Department, state licensing agencies, other accrediting agencies and the public. All Council actions are communicated to these stakeholders within 30 days following each Council session. Such notifications are also sent to all states where the institutions are located (not just to the states which have required notifications) and also to Title IV regional offices.

When two major systems of institutions were under scrutiny from the Department of Education and Title IV regional offices, ACICS participated in conference calls on a weekly basis and provided information called for by the various regulators and state licensing agencies. The agency also works closely with such states as California, Texas and Florida in providing specific information regarding various substantive change approvals, including initial and renewal grants of accreditation.

ACICS' policies and procedures call for verification of an institution's compliance with approved program offerings, credit hour analysis, out-of-class educational activity, standards of satisfactory academic progress, enrollment agreements, institutional disclosures, institutional publications, etc.

The following materials are required from the institutions prior to a review:

- An application for renewal of accreditation or substantive change
- Institutional self-study
- School catalog
- Copy of the Campus Effectiveness Plan
- State authorization
- Academic credit analysis
- Syllabi for new programs
- Campus Accountability Report
- Annual Financial Report

On-site evaluation teams will have access to the following documents at least two weeks prior to a visit:

- An update on self-study
- Faculty and staff rosters, including qualifications
- List of approved programs
- Syllabi (on-site and electronic access in some cases)
- Access to distance education courses (where applicable)
- Academic Credit Analysis

Self-studies and required attachments are presented for specific institutions (Exhibits 146 (a) and 146 (b): Self-Studies and Pre-visit Materials.)

# EXHIBIT 5

## To Declaration of Allyson B. Baker

**U.S. Department of Education**

**Staff Report
to the
Senior Department Official
on
Recognition Compliance Issues**

| RECOMMENDATION PAGE |
| --- |

1.  **Agency:**  Accrediting Council for Independent Colleges and Schools (1956/2013)
    <span style="font-size:smaller">(The dates provided are the date of initial listing as a recognized agency and the date of the agency's last grant of recognition.)</span>

2.  **Action Item:**  Petition for Continued Recognition

3.  **Current Scope of Recognition:**  The accreditation of private postsecondary institutions offering certificates or diplomas, and postsecondary institutions offering associate, bachelor's, or master's degrees in programs designed to educate students for professional, technical, or occupational careers, including those that offer those programs via distance education.

4.  **Requested Scope of Recognition:**  Same as above.

5.  **Date of Advisory Committee Meeting:**  June, 2016

6.  **Staff Recommendation:**  Deny the agency's petition for renewal of recognition, and withdraw the agency's recognition".

    The staff recommendation represents one step in the overall process of reviewing an agency's recognition. NACIQI will make its own independent recommendation, and both staff and NACIQI recommendations will be provided for the Senior Department Official for the actual decision. The staff recommendation is to withdraw recognition, which would mean the agency could not remedy its compliance issues. However, in order to provide guidance to NACIQI or the SDO – and ultimately the agency itself – about what the agency would need to do if the SDO were to decide to let it seek to come into compliance, this staff report describes the actions the agency would need to take to correct the issues cited.

7.  **Issues or Problems:**  It does not appear that the agency meets the following sections of the Secretary's Criteria for Recognition. These issues are summarized below and discussed in detail under the Summary of Findings section.

    -- The agency still needs to address how well graduates of its institutions succeed on those licensing exams that are required for employment, especially by using data specific to each licensing exam. In addition, the agency still needs to provide documentation of continued positive relationships with state licensing-related entities and nurse accrediting agencies, especially by providing current documents. [§602.13]

    -- The agency's response did not demonstrate that ACICS reserves and planning can weather highly-probable long-term decreases in budgeted revenue. The agency needs to submit its FY 2015-2016 audit when it becomes available in October 2016. In addition, the agency needs to submit its FY 2016-2017 budget at that time as well.

    [§602.15(a)(1)]

    -- The agency needs to document how its revised training program for all volunteers provides more focus on consistently recognizing problems and questionable practices at institutions, particularly concerning student achievement. In addition, the agency needs to document that each volunteer has undergone the improved training process before being permitted to fulfill the tasks assigned to them. Furthermore, the agency needs to document the membership and activities of its new Ethics Review Board. It needs to document the integrity and sufficiency of its data verification regime, both in design and implementation. [§602.15(a)(2)]

    -- The agency needs to clarify and document its entire process for the recruitment, selection, and verification of the qualifications and experience possessed by those selected to serve on the agency's evaluation teams and decision-making bodies. [§602.15(a)(3)]

    -- The agency needs to ensure that the conflict of interest attestation forms required of appeal board members are clearly understood, and consistently interpreted, by those required to sign them. [§602.15(a)(5)]

1

-- The agency still needs to provide clear documentation of its consistent past practices to ensure that members of the Intermediate Review Committee (IRC) were free from conflicts of interest. [§602.15(a)(6)]

-- The agency must effectively demonstrate that it has resolved issues of widespread placement rate falsification. The agency must explain its delay in implementing verification it promised to begin performing in 2011. The agency must specifically explain what actions it took with respect to each pending or settled State or federal lawsuit initiated for the benefit of students against ACICS-accredited institutions in the last 5 years to demonstrate that its actions were appropriate and effective. The agency must also demonstrate that it took follow up action on evidence it had that placement rate data submitted by institutions was unreliable. The agency must also provide current documentation policies/practices to address the non-compliant issues. [§602.16(a)(1)(i)]

-- The agency needs to fully implement its plans to more consistently review and identify at-risk institutions. In addition, the agency needs to develop and implement its strengthened expectations for visiting teams to more consistently uncover institutional fiscal and administrative problems while on-site. [§602.16(a)(1)(v)]

-- The agency needs to fully implement its new and strengthened initiatives regarding misrepresentations to prospective students and abusive recruiting. In addition, the agency needs to regularly verify that each institution's recruitment process is complying with the new ACICS requirements. [§602.16(a)(1)(vii)]

-- The agency needs to continue implementing its strengthened process for obtaining and evaluating the record of student complaints for each institution. In addition, the agency needs to compile evidence that its strengthened process is effective in practice. [§602.16(a)(1)(ix)]

-- The agency does not meet the requirements of this section of the criteria. The Department cannot see how the agency could apply these revisions in such a way as to document effectiveness in monitoring in the time it would be given to respond in a compliance report, particularly in view of its weak record in monitoring and failure to document enforcement, and prior lack of cooperation with the Department. [§602.16(a)(1)(x)]

-- The agency does not meet the requirements of this section. The agency must clarify its policies and procedures relative to its new data integrity standards and new team reviewer. The agency must also demonstrate that it has applied these standards. (For example, in a site visit report) [§602.17(a)]

-- The agency needs to provide evidence that its regular on-site visit process currently and consistently obtains sufficient information to determine if the institution complies with ACICS standards. [§602.17(c)]

-- The agency must have a reasonable basis for determining that the information it relies on for making accrediting decisions is accurate. The agency must clarify how the agency holds institutions accountable for ensuring integrity in their data submissions and explain their verification processes. The agency must provide documentation demonstrating that they have applied their standards (such as an onsite visit report). [§602.18(d)]

-- The agency does not meet the requirements of this section of the criteria. The agency must demonstrate that it could apply revision in such a way as to document effectiveness in monitoring in the time it would be given to respond in a compliance report, particularly in view of its weak record in monitoring and failure to document enforcement. Also, the agency must demonstrate that it provided the appropriate information and documentation of the use of all monitoring mechanisms included in the agency's narrative as requested in the staff draft analysis.

[§602.19(b)]

-- The agency's response to the documentation requests regarding enforcement of timelines was insufficient. In addition, the agency's proposed language revisions are insufficient and have not been finalized and implemented, and the agency has been ineffective in past efforts to bring itself into compliance. As a result, the agency cannot be found in compliance with the requirements of this section. [§602.20(a)]

-- The agency's proposed policy language regarding good cause extensions does not include a maximum time period, as requested. In addition, the agency did not provide the requested documentation demonstrating ACICS took immediate adverse action when an institution did not bring itself into compliance within the specified time period. As a result, the agency cannot be found in compliance with the requirements of this section. [§602.20(b)]

-- The agency must provide additional documentation to demonstrate that it has a systematic reoccurring process to identify issues occurring at problematic institutions outside of its normal standards review process as noted in the draft analysis. The agency must also provide a completed CEP and evidence of a standards revision as a result of its review of a CEP. [§602.21(a)(b)]

-- The agency continues to be out of compliance with this criterion. The agency needs to develop a written policy that would enable it to consistently determine whether a new comprehensive evaluation is required. [§602.22(a)(3)]

-- The agency does not meet the requirements of this section. The agency needs to revise its teach out plan policies to include the requirements of this section of the criteria. [§602.24(c)(1)]

-- The agency does not meet the criteria in this section. The agency's Accreditation Criteria provided fail to comply with the requirements of this section and as a response for this item are not effective until July 1, 2016. The agency has not complied with this section in practice and has provided no basis for concluding it will do so in the future. It is unclear to Department staff how the agency has held its institutions accountable for fraud and abuse prior to this or how it will following the effective date (July 1, 2016) of the new standards. [§602.27(a)(6-7),(b)]

| EXECUTIVE SUMMARY |
|---|

## PART I: GENERAL INFORMATION ABOUT THE AGENCY

The Accrediting Council for Independent Colleges and Schools (ACICS) is a national institutional accreditor that was founded in 1912. The agency currently accredits approximately 900 campuses (245 main and 674 additional locations) in 47 states and Puerto Rico. The agency's recognition enables its institutions to establish eligibility to receive Federal student assistance funding under Title IV of the Higher Education Act of 1965, as amended (Title IV). The agency serves as the Title IV gatekeeper for the vast majority of the institutions it accredits. Consequently, the agency must meet the Secretary's separate and independent requirements.

### Recognition History

The Secretary of Education first recognized ACICS in 1956 under the agency's former name, the Accrediting Commission for Business Schools. Since that time, the Secretary periodically reviewed the agency and granted it continued recognition. In 1985, ACICS requested an expansion of scope to include the accreditation of master's degree programs. That request was subsequently granted by the Secretary. In 2006, ACICS requested an expansion of scope to accredit institutions that offer programs via distance education. That request was also subsequently granted by the Secretary.

The last full review of ACICS took place at the June 2011 meeting of the National Advisory Committee on Institutional Quality and Integrity (NACIQI). After that review the Department continued the current recognition of the agency, and required a compliance report in 12 months on the issues identified in the staff report. As a result of the agency's review at the June 2013 NACIQI meeting, the compliance report was accepted and the agency's recognition was renewed for the remaining period of three years.

In conjunction with the current review, Department staff reviewed the agency's narrative and supporting documentation and conducted an observation of the agency's decision meeting held in Washington, DC in April 2016. Since the agency's last review, the Department had received three written complaints from students. After reviewing those complaints, it was found that ACICS had not violated its own written policies or the requirements of the Secretary's Criteria for Recognition.

In connection with the agency's current petition for continued recognition, however, the Department received approximately 40 written third-party comments. Since those comments have raised serious concerns regarding the accrediting activities of ACICS, they have been used to identify several of the issues listed in the "Issues or Problem" section of this analysis.

**PART II: <u>SUMMARY OF FINDINGS</u>**

<u>§602.13 Acceptance of the agency by others.</u>
**The agency must demonstrate that its standards, policies, procedures, and decisions to grant or deny accreditation are widely accepted in the United States by--**
**(a) Educators and educational institutions; and**
**(b) Licensing bodies, practitioners, and employers in the professional or vocational fields for which the educational institutions or programs within the agency's jurisdiction prepare their students.**

Traditionally, ACICS has been able to demonstrate its support among educators and practitioners by its varied site visitor list of several hundred experienced educators and practitioners. In addition, the agency has been able to demonstrate its acceptance by educational institutions by the extensive list of ACICS-accredited institutions. Furthermore, the agency has demonstrated its acceptance outside of its own universe through its recognition over the last few years by the Council for Higher Education Accreditation (CHEA). (Department staff noted that CHEA deferred its decision to renew ACICS' recognition in April 2016 and asked the agency to return for review in November 2016.)

When it comes to licensing agencies, ACICS appears to have obtained the acceptance of only one entity, the American Registry of Radiologic Technologists. However, ACICS accredits institutions that offer programs in other areas that either require licensure for employment, or at least expect licensure of those graduates who want to advance to higher-paying positions in their chosen fields.

Therefore, the agency needs to delineate the programs that its accredited institutions offer where a licensing examination for that field exists. Then the agency needs to address how well graduates of its institutions succeed on those licensing exams that are required for employment, as well as on those licensing examinations that are optional for employment.

Also, during its last review for recognition five years ago, ACICS reported that its accredited nurse education programs (within ACICS institutions) had received special consideration from accrediting agencies for nurse education. At that time, ACICS also reported that Texas had recognized ACICS for degree-granting authority and that ACICS accreditation was used by state agencies as an element of their licensure requirements in California, Florida and Utah. However, that evidence of acceptance was not highlighted in the current petition for recognition.

Therefore, the agency needs to provide documentation of continued positive relationships with state licensing-related entities and nurse accrediting agencies.

Furthermore, the current petition narrative notes the agency's acceptance by employers is demonstrated by the placement performance for graduates reported by its institutions on their annual Campus Accountability Reports (CAR). The average percentage of students placed in their field or related field of study for all ACICS institutions was 66 percent in 2012, 72 percent in 2013, and 74 percent in 2014. In addition, the agency previously reported that the percentage in 2009 was even higher at 75 percent.

Department staff is particularly concerned because the demonstration of employer support is based on data that is self-reported by the institutions themselves. This is of concern because little, if any, of that data appears to have been verified by the agency, and because any verification by the agency appears to have taken place during the site team evaluations that only occur approximately every five years, after much of the data is already too old to be of use.

In addition, Department staff is concerned about the accuracy of job placement rates because, as shown in Section 602.16(a)(1)(i), there is documentation of a widespread problem with ACICS- accredited institutions providing unverifiable or false data in their annual reports to ACICS. For example, the data from the Corinthian schools included fraudulent job-placement figures that led to financial challenges and ultimately closure, with major disruption for the multitudes of affected students. Furthermore, the job placement figures from CEC, Westwood, Le Cordon Bleu, and Lincoln Tech, among others, were deemed fraudulent as well. The agency needs to provide reliable documentation of its acceptance by employers.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needed to delineate the programs that its accredited institutions offer where a licensing examination for that field exists. As well, the agency needed to address how well graduates of its institutions succeed on those licensing exams that are required for employment. In addition, the agency needed to provide documentation of continued positive relationships with state licensing-related entities and nurse accrediting agencies.

In response, ACICS does provide current documentation of its recognition by the American Registry of Radiologic Technologists (ARRT). However, although the agency again notes that it has been recognized by the Council for Higher Education Accreditation (CHEA). Department staff again notes that currently CHEA has deferred its decision to renew ACICS' recognition and asked the agency to return for review in November 2016. In addition, the agency states that it "retains good standing with all state approval agencies, including formal recognition by the Texas Higher Education Coordinating Board," But the letter from the Texas Higher Education Coordinating Board is not current (dated 2008), and without current documentation it is difficult to accept the claim that ACICS retains good standing

with "all" state approval agencies, especially in light of the negative third-party comments submitted by the attorneys general of 13 states.

In addition, the documentation the agency submitted from the National League for Nursing Accrediting Commission (NLNAC) is from 2008, before that agency underwent massive reform and evolved into the Accreditation Commission for Education in Nursing (ACEN). As well, the documentation from the Commission on Collegiate Nursing Education (CCNE) is a generic template from 2008 and only includes ACICS in a list of existing national accrediting agencies. Regarding other specialized programmatic accreditors (some of which are not recognized by the Department), the fact that ACICS expects its institutions to seek their accreditation in certain cases is not evidence of ACICS's acceptance by those specialized accreditors in return.

The agency reports the following programs that require graduates to attain licensure or certification to work: nursing, medical assistant, occupational therapy, massage therapy, cosmetology, veterinary science, radiologic technologists, and surgical technician. The agency states that it requires programs to meet state board requirements and ensures that they do so during the agency's initial and renewal accreditation processes. The agency notes that it requires programs to achieve a minimum of 60% licensure/certification and to comply with that respective state's standard. ACICS notes the average reported placement rate for these programs was 73.72%. These and other statements in the agency's narrative depend on and assert the reliability of student achievement data collected by the agency. They accordingly are addressed in 602.16(a)(1)(i), and as stated there, the agency has failed to establish that the data it collects can be relied upon.

In summary, the agency still needs to address how well graduates of its institutions succeed on those licensing exams that are required for employment, especially by using data specific to each licensing exam. In addition, the agency still needs to provide documentation of continued positive relationships with state licensing-related entities and nurse accrediting agencies, especially by providing current documents.

## §602.15 Administrative and fiscal responsibilities

**The agency must have the administrative and fiscal capability to carry out its accreditation activities in light of its requested scope of recognition. The agency meets this requirement if the agency demonstrates that--**

**(a) The agency has--**

**(1) Adequate administrative staff and financial resources to carry out its accrediting responsibilities;**

Although no complaints have been received at the Department indicating that there have been staffing problems, the recent departure of the executive director, with no permanent replacement, seems to indicate that the agency has staffing concerns. In the recognition process, agency staff members have been accessible and have been able to provide requests for information. In addition, when Department staff visited the agency's offices in April 2016 several staff members were interviewed and the administrative processes were observed to be functioning efficiently. However, Department staff is concerned that the lack of effective monitoring approaches for its institutions reflects inadequate staffing and financial resources.

Regarding finances, the agency's budget for the current fiscal year indicates that ACICS has managed to maintain revenues adequate to conduct the accrediting activities expected of a recognized accrediting agency. The primary sources of revenue are the dues and fees paid by accredited institutions. The remainder comes from educational activities and investment income. Each institution pays for the costs of its own on-site evaluation.

However, the fiscal year 2016 budget indicates that the agency plans to reduce its expenditures by over one million dollars and yet it still projects a deficit of almost 200,000 dollars, primarily due to the "contraction of the private independent career college sector."

As the agency also indicated in its budget, ACICS has been "scaling operations to match resource levels." Department staff is concerned that significant reductions in personnel and/or accrediting operations could result in a diminishment of the agency's efficiency when it comes to strictly enforcing its standards and maintaining the heightened monitoring of its institutions that is needed.

When Department staff observed the agency's April 2016 decision-making meeting, ACICS expressed goals of strengthening its standards and improving its enforcement of them. If it does so, the agency can expect a contraction in its membership with the resulting decrease in revenues. In addition, a stricter regimen will likely result in an increase in both time and money expended by the agency. There is likely to be an increase in appeals from the adversely-affected institutions, as well as an increase in costly litigation that can follow an unsuccessful appeal. Once the institutions become accustomed to strict enforcement of increasingly clearer agency standards, their performance may improve and the number of appeals and subsequent litigation may diminish, although membership may be reduced.

Therefore, the agency needs to provide specifics as to how ACICS plans to operate efficiently and effectively in light of reduced revenue. In addition, the agency needs to submit its audited financial statement for fiscal year 2014-15 now, and its audited financial statement for fiscal year 2015-16 as soon as that audit becomes available.

**Analyst Remarks to Response:**

The draft staff analysis found that the agency needs to provide specific details as to how ACICS plans to operate efficiently and effectively in light of reduced revenue. In addition, the agency needs to submit its audited financial statement for fiscal year 2014-15 now, and its audited financial statement for fiscal year 2015-16 as soon as that audit becomes available.

In response, the agency documented that the mechanisms are in place to effectively manage any increased litigation by adversely-affected institutions resulting from a stricter enforcement of ACICS requirements. In particular, ACICS has insurance for protracted legal disputes and can recover the cost of litigation from the institutions involved.

As requested, ACICS provided its audited financial statements for the period ending June 30, 2015 and that report confirmed that the agency was maintaining sufficient resources to continue operating as it had been. That report was provided to the agency in October 2015 by the firm of Councilor, Buchanan & Mitchell, P.C. (Exhibits 201 and 202).

Department staff also requested that the current year's audit be provided when available since the agency was predicting significant reductions due to the contraction of private career colleges, a trend that is expected to continue. Since that audit is not expected to be available until October 2016, there is still concern that a greater-than-expected contraction could adversely affect the agency's already questionable effectiveness when it comes to monitoring and enforcement issues.

Department staff agrees that the documentation included in the agency's response to the draft analysis demonstrates that ACICS had the financial reserves capable of handling "unanticipated, short-term ebbs in budgeted revenue." Department staff also notes, however, that the agency's circumstances have changed dramatically since October 2015. At that time, the audit included the optimistic statement that "Management believes it is highly probable that ACICS will continue to be recognized as an accrediting body for an indefinite period."

At this time, however, evidence is needed that the agency's reserves and planning can weather highly-probable long-term decreases in budgeted revenue. The documentation provided by ACICS was unable to demonstrate compliance with the requirements of this section at this time.

As a result, the agency still needs to submit its FY 2015-2016 audit when it becomes available in October 2016, and at the same time, the agency needs to submit its FY 2016-2017 budget.

> **(2) Competent and knowledgeable individuals, qualified by education and experience in their own right and trained by the agency on their responsibilities, as appropriate for their roles, regarding the agency's standards, policies, and procedures, to conduct its on-site evaluations, apply or establish its policies, and make its accrediting and preaccrediting decisions, including, if applicable to the agency's scope, their responsibilities regarding distance education and correspondence education;**

Policy and Decision-Making:

The ACICS Council, which is currently comprised of 14 members, is both the policy-making and decision-making body. The agency provided sample resumes for a few commissioners as evidence of their extensive qualifications and experience. In addition, the agency provides all commissioners with training that describes the Council responsibilities and operations, and includes distance education, as well as regular updating during Commission meetings.

Furthermore, the agency uses an Intermediate Review Committee (IRC), comprised of trained individuals, to take make an initial review of each institution's materials and site team report in order to present a recommendation to the ACICS Council for their consideration. Typically, the IRC meets the week prior to the Council meeting in order to prepare their recommendations.

The agency also maintains a separate Review Board pool from which to select individuals at any given time to hear appeals. As also applies to the Council and IRC, the members of the Review Board must be free of conflicts of interest as defined in the agency's canons of ethical responsibilities and be trained before undertaking their duties.

Department staff observed a Council meeting and found the individual members to be thorough in their examination of the materials. However, concerns regarding Council operations are noted at the end of this section.

In addition, Department staff is aware that some previous members of the decision-making body were connected to institutions that were themselves the subject of serious concern to the agency for various reasons. The agency was also aware of the appearance of inappropriate self- interest and a lack of competency presented by those previous situations. During its April 2016 decision-meeting, ACICS drafted a proposal to create an ethics review board for the purpose of identifying any decision-makers who should resign or be removed from their positions. That draft proposal was sent to the agency's constituents for comments before adoption by the agency. The agency needs to provide information and documentation on how this ethics review board will specifically prevent the ethical issues faced by ACICS over the past several years.

On-Site Evaluators:

ACICS does provide for the qualification of its site evaluators by requiring that they receive training, including the evaluation of distance education, and their performance is regularly reviewed. As well, ACICS makes training available on the web and the agency uses a tracking system to ensure that the required persons begin and complete their training.

Furthermore, site evaluators must document their competencies in the area they will evaluate and adhere to the agency's canons of ethical responsibility. Evaluators include college faculty, state department of education officials, practitioners, administrators and deans. The agency has developed a large database of site team evaluators that includes those from ACICS accredited institutions and those who have no current connection to an ACICS institution. Sample site visit reports examined by Department staff indicated that the agency's standards were examined by the volunteers while on-site.

Department staff is concerned because of the Council's failures (discussed in other sections) in discovering and acting upon questionable and fraudulent behavior at a significant number of larger institutions accredited by ACICS.

As well, Department staff is concerned because the materials available to the decision-makers are informed by the volunteer evaluators who conduct the site visits for the agency. The on-site evaluators are the eyes and ears of the Council, and their ability to consistently detect questionable and fraudulent behavior at visited institutions needs to be greatly improved.

Therefore, the agency needs to substantially improve its training program for all volunteers, including the on-site evaluators, the IRC members, the decision-makers, and those hearing appeals. The training needs to provide more focus on consistently recognizing problems and questionable and fraudulent practices at institutions, particularly concerning student achievement. In addition, the agency needs to ensure that each volunteer has undergone the improved training process before being permitted to fulfill the tasks assigned to them. Furthermore, the agency needs to report if the draft proposal to create an ethics review board was adopted and implemented as written, or revised in some manner, to ensure decision makers are competent and free of self-interest.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needs to substantially improve its training program for all volunteers, including the on-site evaluators, the Intermediate Review Committee members, the decision-makers, and those hearing appeals. The training needs to provide more focus on consistently recognizing problems and questionable practices at institutions, particularly concerning student achievement. In addition, the agency needs to ensure that each volunteer has undergone the improved training process before being permitted to fulfill the tasks assigned to them. Furthermore, the agency needs to report if the draft proposal to create an ethics review board was adopted and implemented as written, or revised in some manner.

In response, the agency noted that it began revising its training in May 2016 that is now being provided to all of its volunteers. The content of that training is still in flux and will need to be documented more thoroughly by the agency. And of course, it is too early to determine the effectiveness of that training and the eventual outcomes that may result. As well, those results will need to be documented fully by the agency.

The response focused on the addition of a dedicated data integrity reviewer to each site visit. That person will be specially trained to contact and verify the placement outcomes of all graduates reported as placed in the prior reporting period. However, the documentation does not describe the data integrity reviewer's qualifications, nor the process ACICS used or resources it called upon in coming up with its verification scheme. The description of the scheme is sketchy and the some of the parameters articulated are vague. There are two other unresolved issues regarding the data integrity reviewer.

First, it must be remembered that the prior reporting that is being validated on-site by the data integrity reviewer may be several months old by the time of the site visit, depending on when that information had been reported originally. Therefore, a focus on more recent placements will also be needed. As well, it must be remembered that institutions are normally visited only once during their period of accreditation, typically when a renewal of accreditation is due. Therefore, the institutions that are not scheduled for another site visit for several years will still need special attention from ACICS to verify their reported placements.

Related to data integrity, the agency noted its development of a training manual for the student relations specialist. That person is responsible for "the evaluation of the ethical practices in recruitment/admissions, the assessment of satisfactory academic progress for accurate monitoring and evaluation, the determination of the appropriateness of refunds, and the results of federal audits (U.S. Department of Education Financial Student Aid and Veterans' Affairs)." Again, it is too early to evaluate the effectiveness of the training, which is only now being conducted.

Regarding the Ethics Review Board (ERB), the agency did decide on its establishment to consist of one commissioner affiliated with an ACICS institution and two independent public member commissioners. (Currently, there are five public members on the commission.) The materials indicate that the ERB can review real or perceived conflicts of interest, and that it has the power to direct a commissioner to resign. A commissioner must automatically resign if he or she "is employed by an institution that is deemed to be under sustained and serious scrutiny with regard to ACICS standards and requirements." Whether or not the ERB will exercise its power diligently, effectively and consistently also remains to be seen.

The agency had been requested to show that it had substantially improved its training, and that the revised training was being required of all volunteers going forward. In addition, the agency was required to note if it had established

its Ethics Review Board as envisioned. ACICS has begun the lengthy process to establish an effective training program, implement it for all volunteers, and to progress with its Ethics Review Board. At this time, only the beginning stages of these processes can be documented. Little documentation is available regarding consistent implementation, and no documentation is available regarding effectiveness and actual results.

Therefore, ACICS needs to document how its revised training program for all volunteers provides more focus on consistently recognizing problems and questionable practices at institutions, particularly concerning student achievement. In addition, the agency needs to document that each volunteer has undergone the improved training process before being permitted to fulfill the tasks assigned to them. Furthermore, the agency needs to document the membership and activities of its new Ethics Review Board.

**(3) Academic and administrative personnel on its evaluation, policy, and decision-making bodies, if the agency accredits institutions;**

As an institutional accreditor ACICS is required to have both academic personnel, and administrative personnel, on all site evaluation teams, and on all policy and decision-making bodies. The agency's written policies confirm that is the agency's intent in assigning the proper persons to teams and committees. However, other than a cryptic list for one site visit, there is insufficient evidence that the agency consistently assigns the proper persons as expected.

In addition, it appears that evaluators classify themselves to certain categories without verification by the agency as to the accuracy of their claim. Furthermore, it appears that the information in the agency's database may be quite old and showing that the evaluators may not have had updated training for several years or more.

Therefore, the agency needs to provide evidence that it has maintained adequate representation of both academic personnel, and administrative personnel, on its site teams and decision-making bodies, and that it continues to do so. In addition, the agency needs to document how it has verified that those selected for evaluation and/or decision-making positions actually possess the necessary qualifications to fulfill those roles effectively.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needs to provide evidence that it has maintained adequate representation of both academic personnel, and administrative personnel, on its site teams and decision-making bodies. In addition, the agency needs to document how it has verified that those selected for evaluation and/or decision-making positions actually possessed the necessary qualifications to fulfill those roles effectively.

In response, ACICS noted that it requires every full onsite evaluation team to be composed of at least one academic and one administrative evaluator. Department staff notes that although this interpretation of the regulation is minimalist, it nonetheless meets the requirement. In actual practice, the documentation shows that the agency typically has sufficient inclusion of the required designations represented. And as previously noted, the agency's policy and decision-making body includes adequate representation of the required persons.

ACICS reported that evaluators initially self-identify their preferred roles and academic or administrative designation. Then that self-identification vetted and verified by ACICS before the person is assigned to a team. In addition, the agency reported that it reviewed "all current resumes of active evaluators, including the currency of their professional experience, and the relevance of documented experience to the evaluation roles they are assigned." The agency reported that as a result, of 1138 active evaluators, 405 meet the "academic" designation and 666 meet the "administrative" designation.

The agency also reported that it conducts resume reviews, requests for attestations of qualifications, and evidence of licensure/certification/registration in those fields relevant to their evaluator assignments. However, requesting an "attestation" of qualifications is quite different from reviewing "documented experience." It is not clear the extent to which ACICS relies on attestations versus actual documented experience in assigning its evaluators to specific tasks. The results of the review and purging of the agency's evaluator pool, while certainly laudable, does raise questions as to the qualifications of those who served as evaluators up to that point. The inconsistent and unreliable process that resulted from the unknown percentage of unqualified or poorly vetted evaluators obviously cannot be repeated.

**(5) Representatives of the public on all decision-making bodies; and**

The agency requires at least three public members on the decision-making body (there are currently six on that body) and at least one public member on any appeal panel. Although not a Department requirement, the agency also requires public member participation on each site evaluation team. The agency's definition of a public member covers the conditions contained in the Secretary's definition.

In addition, ACICS provided documentation that it verifies that a member of the decision-making body fulfills the conditions for being designated as a public member (or a non-public member) by requiring a signed affidavit that enumerates the necessary conditions for both types of members. However, it is not clear if members of any appeal

body sign the form designed for the main decision-making body, or a form more specific to their specialized role.

Therefore, the agency needs to provide documentation that members of each appeal body have signed the generalized form designed for both public and non-public members of the main decision-making body, or a form more specific to their specialized role. In addition, the agency needs to document that it has been consistently verifying that persons currently classified as public members on any decision-making body fully meet the Secretary's definition.

**Analyst Remarks to Response:**

The draft staff analysis found that the agency needs to provide documentation that members of any appeal body sign the generalized form designed for both public and non-public members of the main decision-making body, or a form more specific to their specialized role. In addition, the agency needs to document that it has been consistently verifying that persons currently classified as public members on any decision-making body fully meet the Secretary's definition.

In response, the agency provided documentation that the members of an appeal board do sign a specialized attestation form designed for their circumstances. However, there appears to be some confusion by the members of those appeal boards as to whether or not they are attesting to being a "member" (affiliated with an ACICS school) or a public member, or they are being designated as an academic or an administrator. Some persons check only one box, while others respond to two different categories (cf. Exhibit 210).

Department staff understands that when it comes to the full decision-making commission, if a commissioner could qualify to be both an academic and a public member that the person can only serve as a public member. However, that distinction is not clear on the form for persons who hear appeals. The sample materials actually signed by appeals board members indicate there is no apparent consistency. As a result, the effectiveness of the attestation materials being used by the agency is called into question.

The agency provided materials showing that it uses cross-referenced materials to verify that persons currently classified as public members on the full commission meet the Secretary's definition of a public member. However, as noted above, the materials used to verify the status of appeal board members appear to be inconsistently interpreted by those required to sign them, thereby raising questions regarding their effectiveness. As a result, the agency cannot be found in compliance with the requirements of this section.

---

    **(6) Clear and effective controls against conflicts of interest, or the appearance of conflicts of interest, by the agency's--**

        (i) Board members;

        (ii) Commissioners;

        (iii) Evaluation team members;

        (iv) Consultants;

        (v) Administrative staff; and

        (vi) Other agency representatives; and

---

ACICS requires all decision-makers, staff and site visitors to disclose any conflicts of interest before assignments are made to review reports, to participate in site visits and to take action on any institutions. In addition, reminders of the agency's controls against conflicts of interest are part of the training provided to those involved in various aspects of the agency's operations.

The agency expects decision-makers, including appeal panel members, to sign an attestation that they are aware of the ethical expectations. And for site visitors, who are identified as volunteer "independent contractors," the agency expects those persons to sign attestations of their awareness of the agency's policies in these matters. Department staff observed an ACICS decision-making meeting and noted that various commissioners were identified and left the room when consideration of an institution where a conflict, or potential conflict, could be involved.

There is one issue, however, that concerns Department staff. It is not clear if every member of the Intermediate Review Committee (IRC) signs any kind of attestation connected with conflicts of interest. Although technically not a decision-making body, IRC members make an initial review of each institution's materials and site team report in order to present a recommendation to the ACICS decision-makers for their consideration. As a result, IRC members provide a critical service that could be affected by an undisclosed conflict of interest.

The agency needs to provide documentation that all members of an IRC have consistently signed an attestation regarding conflict of interest issues, and if not, to explain why not.

**Analyst Remarks to Response:**

The draft staff analysis found that the agency needs to provide documentation that all members of an Intermediate Review Committee (IRC) have consistently signed an attestation regarding conflict of interest issues, and if not, to explain why not.

In response, the agency stated that "Individuals who have been assigned to serve on the Intermediate Review Committee have signed the IRC Conflict of Interest Attestation." In addition, the agency provided documentation that four persons signed the form on May 31, 2016 in preparation for an IRC meeting that had not yet taken place when the agency's response was submitted to the Department.

The draft staff analysis had requested documentation that members of the IRC have been consistently required to sign a conflict of interest attestation before they served on an IRC. Department staff finds the documentation (Exhibit 212 – Sample July 2016 IRC attestations) provided by ACICS as a wholly inadequate response. The original request was to document what the practice of ACICS had been to date. A handful of forms that appeared to be a record of what the new agency practice will be (from this point forward) is not responsive.

Therefore, at this point it is unclear what, if anything, ACICS had been doing all along to ensure that its IRC members were free of conflicts of interest. Based on the evidence provided, ACICS must be found in noncompliance with the requirements of this section.

## §602.16 Accreditation and preaccreditation standards

**(a) The agency must demonstrate that it has standards for accreditation, and preaccreditation, if offered, that are sufficiently rigorous to ensure that the agency is a reliable authority regarding the quality of the education or training provided by the institutions or programs it accredits. The agency meets this requirement if -**

**(1) The agency's accreditation standards effectively address the quality of the institution or program in the following areas:**

**(i) Success with respect to student achievement in relation to the institution's mission, which may include different standards for different institutions or programs, as established by the institution, including, as appropriate, consideration of course completion, State licensing examination, and job placement rates.**

Section 3-1-110 of the agency's Accreditation Criteria states that ACICS reviews information on the degree to which the institution meets its own predetermined educational outcomes. Section 3-1-111 states that each institution must have a Campus Effectiveness Plan (CEP) that includes at a minimum the following elements: student retention rates; student placement rates; level of graduate & employer satisfaction; student learning outcomes; & graduation rates. Each institution must identify & describe in the CEP how the data were collected, the rationale for using each type of data, a summary & analysis of the data, & an explanation of how the data have been used to improve educational processes. ACICS provides its ACICS Student Achievement Webpage, which indicates that ACICS has set standards at 60% for both retention & placement. ACICS also states that an institution is required to submit licensing exam rates in its annual Campus Accountability Report (CAR). According to ACICS, student achievement information is reviewed both during the on-site visit& in the CAR. ACICS included documentation of a site team report, CAR, & template self-study. In response to supplemental questions from the Department, ACICS explains the steps it has taken to improve the effectiveness of the agency's operations & outcomes of 7 multi-campus systems, & explains increased attention & action for placement on heightened monitoring for those institutions. ACICS also included a table of the enhancements made to ensure the integrity of self-reported student achievement data.

However, the agency's Accreditation Criteria are unclear on the agency's review of the educational outcomes the institution sets, and on how institutions are informed of the outcomes requirements ACICS has set for retention & placement. ACICS has not described how it determined that the rates it set are sufficiently rigorous to qualify the agency as reliable. While it appears the ACICS Student Achievement Webpage was created in furtherance of the agency's 2013 compliance report regarding program-level student achievement data, the relationship between the prescriptive ACICS Student Achievement Webpage & the agency's Accreditation Criteria, is unclear, so staff cannot determine what, if any, consequence the Webpage has. The site team report & CAR demonstrate that outcome rates are collected, but it is unclear how this information is reviewed & verified, or what & how recommendations are made to the institution. The site team report also does not demonstrate that the team made a judgment about the appropriateness of the measures chosen nor the rigor of the goals established by the institution. The template self-study asks relevant questions, but as it is a template, ACICS has not demonstrated its implementation or effectiveness. ACICS must submit complete self-studies & site team reports the Arlington, VA and Silver Spring, MD campuses of Everest College to verify how the outcomes data submitted by institutions are reviewed & verified, & how this data is used. Although the table in the agency's response to supplemental questions from the Department describes what outcomes data is self-reported & what data is subject to verification either on-site, via third-party or by ACICS verification, no documentation was provided as how ACICS determines which data to verify or that it has actually implemented these verification processes. In its response, ACICS must submit such documentation.

In the agency's 2013 compliance report, ACICS stated that programs that require a license to become employed would need to demonstrate at least a 60% first attempt pass rate on the licensure exams, & to be in compliance with all State or national requirements. But the CEP provided in the petition does not include a reporting requirement for

licensing exam rates. ACICS did not provide any documentation regarding its decision not to require reporting on these rates, nor did it provide any documentation as to how, if, or when the licensing exam rate data in the CAR is reviewed by ACICS. Also, licensing exam rate information is not included in the Accreditation Criteria thresholds, so it is unclear if this outcome is being reviewed. If ACICS decided not to include licensure exam rates & compliance with State/national requirements as student achievement measures, ACICS must clearly explain its rationale for this. Such rates are commonly used by the greater accreditation community to measure student success for vocational programs.

ACICS previously reported it was expanding efforts to verify placement data. In the agency's 2013 compliance report, staff noted, "Previously, the agency had been doing spot checks of self-reported placement data during scheduled site visits. However, ACICS is now moving to regular independent verification by pre-approved third party auditors. Initially, 20% of campuses will be randomly selected to have their rates independently verified each year, while all institutions coming up for renewed accreditation will be independently audited for the accuracy of their submitted student achievement data." However, ACICS has not documented implementation of such changes. Documentation indicates that ACICS did not follow through on these commitments & only recently began experimenting with verification. Even more concerning is substantial evidence the agency's accrediting process is ineffective on student achievement. At least 3 times, oversight agencies acted against ACICS-accredited institutions for falsified or low placement rates where ACICS had irrefutable evidence of the same, often from the agency's own reviews. ACICS left the institution's accreditation in place or re-accredited it anyway. Also, many investigations & lawsuits were brought against ACICS-accredited institutions for falsified placement data in the last 5 years, resulting in many judgments/high-dollar settlements. This included a $2.5M settlement of the NY Attorney General's (AG) action against CEC; a consent decree worth $4.5M in the CO AG action against Alta/Westwood; a consent decree for $3.75M against Salter College in a MA AG action; settlements against Kaplan Career Inst. ($1.375M) & LTI ($1.1M) in actions by the MA AG; & a default judgment against Corinthian for $1.1B in a CA AG action. Many other cases are pendin

ACICS' materials do not reflect real movement to address the pervasive noncompliance with its student achievement standards. While ACICS recently issued a show cause letter to the ITT multi-campus chain, citing unresolved investigations from 20 different AGs regarding, e.g., placement, & other rates, that it took this many State investigations to result in action by ACICS concerning compliance with its student achievement standards, in a time frame coincident with the agency's submission of its application for renewal of recognition, shows the agency's application of those standards is ineffective. An April 19, 2016 ACICS "Memorandum to the Field" proposing changes to agency policies does not go beyond stating that ACICS has discretion to independently review data . In response, ACICS should explain what actions it took with respect to each pending or settled State or federal lawsuit initiated for the benefit of students against ACICS-accredited institutions in the last 5 years.

**Analyst Remarks to Response:**
The agency explains that its student achievement measures were based on a review of other accreditors' measures, outreach to stakeholders, and feedback from member institutions. In response to the draft, the agency provides documentation concerning how they utilize licensure rates. (Section 2-1-809 ). The licensure rate information is reviewed annually through the Campus Accountability Report (CAR). If the CAR reflects performance that does not meet the Council's student achievement standard for licensure at 60% the institution will be placed on an Improvement Plan as part of its Campus Effectiveness Plan (CEP). The CEP focuses on 6 data elements. While licensure is included, it is not one of the 6 elements specifically mentioned for 'institutional effectiveness' in the accreditation manual, so it is unclear whether licensure has ramifications for accreditation status; and there is no explanation of how licensure rates are calculated. If ACICS has a benchmark for licensure and a program is not meeting that benchmark, the agency should take the appropriate enforcement action. The agency has provided documentation of enforcement of licensure rates in Ex. 195, but the exhibit also demonstrates the agency is not enforcing appropriate timelines under §602.20. (More in that section). However, it is unclear whether the licensure rate standards have been actually been approved by the Council. Ex. 214 demonstrates that student achievement standards, including licensure, were discussed by the Council, but the minutes indicate that the Council recommended Table B, which does not include licensure rate standards/benchmarks. Council standards and agency benchmarks (including licensure rates) are posted on the agency's webpage.

Ex. 217 verifies that the Institutional Effectiveness Committee (IEC) voted in Dec. to remove graduation (grad) rates as a benchmark. This is a change from the draft; it is not clear why the change is only being reported now. This appears to be a significant retreat in terms of accountability of the agency's institutions, since level of graduate satisfaction, even if somehow effectively defined and implemented, does not reflect satisfaction among students who do not graduate, and since grad rates are commonly included in the recognition process by recognized accrediting agencies. While the updated Accreditation Manual removes grad rates, there was no documentation of the updated CAR, nor the demonstration of the application of this change at institutions. It is also unclear how this change will be communicated to all institutions to ensure they're collecting information about the 'level of graduate satisfaction.' Also unclear is the role of the IEC as it relates to the Council. While it appears as if the IEC includes Council members, there is no documentation explaining the IEC's role or training. The IEC is not recognized as a decision maker for this agency, so the IEC should not make agency policy.

The agency states it conducts verification annually by selecting 20% of institutions for review of placement data. Selecting a sample of institutions for verification is not uncommon among accrediting agencies. The agency has included Ex.193 to document this verification. However, it is unclear how this process actually occurs, if backup information is collected from the institution to verify these placements, or by whom and with what qualifications. This regime apparently was put in place only earlier this year. The agency asserts, regarding §602.13, that the regime involves "independent third-party verification of all placement data, at the institution's expense, when deemed necessary by the Council," but does not describe the qualifications of the 3rd parties, does not explain when the Council might deem this necessary, and provides no documentation it has occurred.

Ex. 206 does not provide the details related to reported changes in data integrity standards and the addition of a new data integrity reviewer for the site team. If information is found to be inaccurate, the agency will require additional intensive verification of the CAR. However, this intensive process is not explained. The new data integrity standard is effective 08/01/2016. It remains unclear how the agency has held institutions accountable for ensuring integrity in their data submissions before adopting this standard, or afterward. The addition of the new reviewer is said to be effective for the spring 16 cycle, but that more guidance will be issued in fall 16, but neither Ex. 215a nor 215b document this change. The narrative states the reviewer has been trained for this role. Documentation for this training was included in section 34 CFR 602.17(a), Ex.203.

In its narrative regarding §602.13, the agency contends that the average reported placement rate for ACICS-accredited programs where graduates require licensure is 73.72%; that the agency's data integrity algorithm resulted in incidences of data integrity problems dropping from 3,000 in 2011 to 150 in 2015; and that ACICS's placement verification program resulted in review of 1,137 placements for 85 ACICS-accredited campuses in 2016, with a verification rate of 90%. ACICS further asserts that there is "no available evidence to date to confirm fraudulent behavior by member institutions" and that placement rate litigation settlements have not admitted liability. ACICS' assertions ignore the findings made by the Dept. and the California Attorney General confirming widespread placement rate fraud at institutions nationwide accredited by ACICS well into 2015. https://studentaid.ed.gov/sa/sites/default/files/ev-wy-findings.pdf. Such findings of misconduct, subsequently upheld in a California court http://oag.ca.gov/news/press-releases/attorney-general-kamala-d-harris-obtains-11-billion-judgment-against-predatory, were such as to compel the Dept. to agree to discharge millions of dollars of federal student loans. In addition, it is not plausible to dismiss multiple settlements, that impose very substantial obligations, monetary and otherwise, and that result from claims filed in the public interest by state attorneys general, as if they were materially lacking in substantiation. Overall, in the context of the documentation of widespread placement rate fraud, ACICS's statements regarding licensure pass rates achieved and the effectiveness of its algorithm cannot be credited. While it is unclear whether the 85 campuses ACICS verified reflected entire institutions, or only portions of institutions, in either case this reflects testing, on average, of only 13 students per campus.

The agency has provided documentation as to how the site visit team reviews the CEP, in the form of the site visit reports and the self-study. (Ex. 215a & 215b). This information along with Ex. 43, 44, 46, 52 and 195 demonstrate how the agency reviews its institutions. However, Ex.215a is outside of this review period. The agency also failed to document multiple reviews of different institutions demonstrating implementation of the student achievement standards.

---

**(a)(1)(v) Fiscal and administrative capacity as appropriate to the specified scale of operations.**

---

The agency's expectations regarding fiscal and administrative capacity are based primarily in the agency standards on "Organization" and "Administration." Regarding fiscal matters, the agency requires an institution to have adequate revenues and assets to meet its responsibilities, to ensure continuity of service, and to accomplish its mission that reflects a balanced application of resources to operations. In addition, the amount of expenses and debt must not burden the educational objectives of the institution and the financial profile of the institution must support the intent of its objectives.

Furthermore, the agency requires all institutions to submit an Annual Financial Report (AFR) that includes financial statements accompanied by audited financial reports prepared and certified by an independent certified public accountant. If financial triggers warrant extra scrutiny, the institution may be monitored by a special financial committee and the agency's written policies allow ACICS to request additional financial reports when necessary.

The agency's expectations regarding general administrative capacity include the following aspects of administrative competence. In summary, each institution is expected to have a chief executive officer and a qualified on-site administrator at the main campus and at all branches. Institutional managers are responsible for implementation of the institutional mission as determined by the governing body, and management is expected to continuously evaluate the programs of study, the student activity program, guidance services, financial aid services, instructional procedures and resources. In addition, institutions are expected to maintain records for future planning, for the students for informational purposes, and for evaluations visits. Those administrative records are to cover financial aid activities, admissions, curricula, accreditation and licensure, guidance, instructional resources, supplies and equipment, school plant, faculty and staff, student activities and student personnel. Student records maintained include test scores, initial and periodic academic and career advising, admission rates, completion rates of those enrolled, and general placement rates or specific career placement rates, as appropriate, among other things.

The materials viewed by Department staff showed that the agency's visiting team evaluates evidence of the institution's fiscal and administrative capacity while on-site. The evidence includes the organizational chart, budgets and audits, as well as staff duties, to see if the overall fiscal and administrative capacity of the institution is adequate to accomplish the stated goals and objectives.

However, it is apparent that the actions of the on-site team, together with the materials required by the agency, are insufficient to consistently determine the fiscal and administrative capacity of problematic institutions. The agency's fiscal and administrative standards have failed to identify institutions that were unable to run their programs efficiently, as evidenced by their poor retention and placement rates, and by their poor stewardship of Title IV funds. As well, the agency's ability to consistently judge the competence and/or ethical practices of the institutional administrators is also

called into question.

The agency needs to demonstrate that its standards for evaluating the fiscal and administrative capacity of each institution are sufficiently effective. In addition, the agency needs to provide a comprehensive and workable plan for remedying this deficiency in the agency's accreditation process, as well as any changes it has made already to ensure compliance with this section.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needs to demonstrate that its standards for evaluating the fiscal and administrative capacity of each institution are sufficiently effective. In addition, the agency needs to provide a comprehensive and workable plan for remedying this deficiency in the agency's accreditation process, as well as any changes it has made already to ensure compliance with this section.

The agency was cited because its on-site teams, following agency materials, were unable to consistently identify institutions that were unable to run their programs efficiently, as evidenced by their poor retention and placement rates, and by their poor stewardship of Title IV funds. As well, the agency's ability to consistently judge the competence and/or ethical practices of the institutional administrators was also called into question.

In response, ACICS summarized its previous requirements and practices and also provided some documentation that it followed up on complaints, but those materials were not responsive to the main concerns. The agency, however, did acknowledge its need to improve methods for discerning financial weakness. As well, the agency acknowledged that it needed to move more quickly and forcefully to take action when an institution did not meet the fiscal and administrative requirements. As a result, the agency established an "At-Risk Institution" committee to review all actions facing an institution, as well as information that calls into question its general operations.

The "at-risk" review will include 1) financial stability; 2) student achievement performance; 3) adverse information; 4) complaints; 5) enrollment growth monitoring; 6) excessive substantive changes monitoring; 7) information derived from Title IV compliance audits, inquiries and information exchanges; and 8) findings derived from the most recent comprehensive site visit or quality assurance monitoring visit. If heightened risk is discerned, the agency may conduct an unannounced or short-notice visit, a status change to heightened-monitoring, and a demand for a written response to specific issues.

The agency also noted it plans to strengthen the recurring reviews regarding the financial and/or administrative capacity of institutions. As part of that process, the ACICS Financial Review Committee enhanced its financial ratios, and the agency plans to test the "Altman Z-Score" calculation during its August 2016 meeting. That calculation analyzes "five distinctive financial ratios used for determining the odds of bankruptcy among companies."

The agency discussed the paper reviews that it plans to start using, but did not discuss any plans to enhance the focus of its visitors while actually on site as part of the evaluation team. Although most of the agency's plans are commendable and should improve the agency's ability to uncover difficulties more expeditiously, at this time the plans have not been fully implemented or produced significant and tangible results.

**(a)(1)(vii) Recruiting and admissions practices, academic calendars, catalogs, publications, grading, and advertising.**

The agency's expectations regarding these various areas are primarily contained in a number of standards and explanatory materials. The standards areas include "Admissions and Recruitment," "Standards of Satisfactory Progress," "Tuition and Fees," and "Publications." The explanatory materials include "Appendix C: Institutional Publications Requirements" and "Appendix D: Standards of Satisfactory Progress."

In summary, the agency's expectations are that an institution has the ultimate responsibility for the activities of its employees, vendors, contractors, or agents in the referral, recruiting, evaluation, and admissions processes. At a minimum, the institution's recruitment policies must be ethical and the admissions policy must state that students admitted to programs leading to a certificate, diploma, or degree must have graduated from a high school or its equivalent, or demonstrate an ability to benefit from the training offered. Also, the school must have a statement regarding transfer of credit.

The institution is expected to ensure that any person or entity engaged in admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and programs, services, tuition, terms and operating policies. As well, recruitment and enrollment personnel may not be designated as counselors or advisors and may not make final decisions regarding financial aid eligibility, packaging, awarding and disbursement. An institution participating in Federal student financial aid must designate a person to administer student aid and the person who determines the amount of student awards cannot be responsible for disbursing those awards.

The guidelines for institutional publications expect that all accredited and applicant institutions publish an acceptable catalog that includes a listing of the full-time faculty members (showing the degrees held, institutions that awarded the degrees and area of teaching specialization); an academic calendar; names and titles of the administrators of the institution; a statement of the programs offered; and if currently accredited, a statement accurately denoting this fact.

The agency expects that an institution's policies conform to its mission and demonstrate compatibility with its

objectives. In addition, the institution is expected to fully explain the grading system used on the transcript, that it be consistent with the institutional catalog, and that the institution maintains a permanent academic record of the student's progress.

The materials viewed by Department staff showed that the agency's visiting team evaluates the self-study and reviews evidence including the transfer of credit policy, recruitment materials and advertisements, copies of catalogs and handbooks, the academic calendar and class schedules, and student records including grades. As a result, the petition narrative notes that ACICS has applied a substantial number of sanctions to large multi-campus systems based on deficiencies in these categories.

Nonetheless, it is apparent that the agency's process for implementing its standards in this area is not sufficiently effective. Over the last five years, a significant number of State attorneys general and others have obtained sizeable recoveries against ACICS-accredited institutions based on misrepresentations to prospective students and abusive recruiting. For example, the Illinois Attorney General brought action against Alta/Westwood for misrepresentation, achieving agreement by the institution to forgive $15 million in institutional loans. The U.S. Department of Justice recovered $95.5 million in a settlement of 4 qui tam lawsuits against EDMC Management Corporation. ["Qui tam" has part of the penalty going to the one bringing the action and the rest to a public body.] Daymar College entered into a consent decree for payment of $12.4 million in an action brought by the Kentucky Attorney General. The North Carolina Attorney General withdrew the license for the dental assistant program at Kaplan College's Charlotte, North Carolina campus, based on misrepresentations. A student won $2 million in punitive damages against Vatterott College for violations of this nature.

Therefore, it is apparent that the agency's standards in this area, and its implementation of them, are not effective in ensuring academic quality. As a result, a comprehensive and workable plan for remedying this deficiency in the agency's accreditation process is required, as well as any changes it has made already to ensure compliance with this section.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency must demonstrate that its process for implementing its standards is sufficiently effective regarding misrepresentations to prospective students and abusive recruiting. In addition, the agency needs to provide a comprehensive and workable plan for remedying this deficiency in the agency's accreditation process, as well as any changes it has made already to ensure compliance with this section.

In response, the agency first provided clarifications regarding some of the specific problems cited by the Department relevant to abusive recruiting and misrepresentations. In summary, one of the institutions was not accredited by ACICS; another institution's problems were resolved before it became ACICS accredited. However, although ACICS argues that the four EDMC qui tam lawsuits "originated" at institutions that were not accredited by ACICS, the case litigated pertained to all EDMC campuses; and the settlement, which included claims being investigated by 40 state attorneys general, was corporate-wide. So ACICS is not accurate in suggesting that the litigation and settlement did not pertain to ACICS-accredited schools.

Nonetheless, the agency did acknowledge that some ACICS-accredited institutions have been accused of misrepresentation and abusive recruiting, and initiated the following reforms. Those recent reforms include new standards that apply to recruiting practices (cf. Exhibits 125 and 206). Basically, the agency is requiring each institution to document that it is consistently monitoring its own recruitment practices. That involves ensuring that anyone involved in "admissions or recruitment activities on its behalf is communicating current and accurate information regarding courses and programs, student achievement disclosures services, tuition, terms, and operating policies."

In addition, the agency is requiring each institution to publish campus-level and program-level student achievement rates. Furthermore, the agency is strengthening its monitoring of at-risk institutions, increasing call for comment opportunities, and investigating all complaints, even those submitted anonymously (Exhibit 222).

Department staff agrees that it is important to clarify the institution's culpability for its own recruitment activities. However, the agency's track record related to verifying self-reported information has been problematic. As a result, ACICS should be regularly verifying each institution's recruitment processes, a verification that may include the use of "secret shoppers." In any event, the agency's new and strengthened initiatives have not yet produced the evidence to find ACICS in compliance with the requirements of this section.

**(a)(1)(ix) Record of student complaints received by, or available to, the agency.**

The agency's expectations regarding the record of student complaints are found under "Complaints and Adverse Information" in Section 2-3-700, and "Integrity" in Section 3-1-202(d). The first set of expectations primarily covers the processes used by ACICS, while the section under "Integrity" sets forth the minimal grievance-related requirements that each institution must maintain.

ACICS requires each institution to establish, publish and implement appropriate grievance policies and procedures for considering complaints received from students, employees and other interest parties. The institution must make its grievance procedures for students accessible by publishing the procedure in the institutional catalog or student

handbook, and must also include the ACICS name and address. Regarding the agency's obligations, ACICS written policy is to maintain a record of the complaints it receives. The policy also details the mechanism used to effectively process complaints in a consistent manner.

Regarding recent activities, the petition narrative notes that ACICS has reviewed the pattern of student complaints involving some large multi-campus systems and has applied heightened monitoring requirements, including additional site visits, in order to protect student interests. The narrative also notes the most frequently received and resolved complaints from those institutions processed through the agency's complaints resolution program involve financial aid issues.

Nonetheless, it is apparent that the agency's process for implementing its standards in this area is not sufficiently effective. The large number of third-party comments that the Department recently received regarding ACICS clearly indicate that what ACICS has been doing since its last review by the Department is insufficient. The evidence indicates that three aspects involving complaints needs to be revamped and greatly improved.

First, ACICS in its own complaint processing has not been able to adequately obtain, evaluate and resolve student complaints efficiently. As well, the agency's process and requirements for schools to inform ACICS regarding complaints and their resolution, as well as those for learning of systemic complaints independently of the institution, have not been sufficient. Furthermore, although the materials viewed by Department staff showed that the agency's visiting teams review the written student complaints record, the teams are not sufficiently using that information to successfully evaluate each institution's compliance with ACICS standards.

Therefore, it is apparent that the agency's standards in this area, and its implementation of them, are not effective in ensuring academic quality. As a result, a comprehensive and workable plan for remedying this deficiency in the agency's accreditation process is required, as well as any changes it has made already to ensure compliance with this section.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needs to demonstrate that its standards for obtaining and evaluating the record of student complaints for each institution are sufficiently effective. In addition, the agency needs to provide a comprehensive and workable plan for remedying this deficiency in the agency's accreditation process, as well as any changes it has made already to ensure compliance with this section.

In response, the agency noted its online complaints system that is used to solicit, receive and review complaints from students, faculty, staff and others. The agency then examines the complaints for patterns in order to identify systemic problems that will require further investigation. As a result, the agency recently conducted special visits to two schools. The schools are being given the opportunity to respond to the findings of the on-site evaluators. After that is completed, the schools are being brought before the ACICS commissioners for their decision. The agency noted that this approach allows for a "rapid action process" for the resolution of issues and enforcement, as appropriate.

In addition to the special process just described, the agency uses the pattern of complaints prior to regular site visits so that the evaluators can make focused inquiries in a timely manner. As noted previously, the agency also processes anonymous complaints, a practice that is not common among accrediting bodies. Furthermore, the agency provided substantial documentation to show that it is implementing its stronger focus on student complaints. It is too early for the evidence of the process' effectiveness to be compiled.

---

**(a)(1)(x) Record of compliance with the institution's program responsibilities under Title IV of the Act, based on the most recent student loan default rate data provided by the Secretary, the results of financial or compliance audits, program reviews, and any other information that the Secretary may provide to the agency; and**

---

ACICS's primary standards relative to Title IV requirements are found in Section 3-1-430. Standards cover institutionally-financed grants & loans; tuition & charges; the refund policy; the administration of student financial aid; & the policy on cash discounts. Also, the following other sections relate: "Complaints and Adverse Information" (Section 2-3-700); "Student Loan Cohort Default Rates (CDR) Review" (Section 2-1-810); "Counseling and Guidance" (Section 3-1-441); and "Guidelines on Disclosure &Notification" (Appendix G). The student services standards require that institutions counsel students on repayment and document this. ACICS requires an institution to publish in its catalog an equitable refund policy. An institution that participates in Title IV programs is expected to be knowledgeable of, and in compliance with, applicable laws and regulations. Each institution must address its default rate annually and in its self-study. The agency is expected to monitor each institution's student loan CDR. If the institution's most recent CDR triggers a review, or its default rate improvement plan failed to minimize student loan defaults adequately, the agency will require additional action.

ACICS policy indicates that the agency uses information provided by the Secretary to determine whether to investigate an institution. In addition, any time ACICS receives information or has substantive evidence that an institution is in jeopardy of having its eligibility status with another entity or its accreditation status with another agency restricted, ACICS can take further action.

However, the agency's Title IV standards and process for implementing them is ineffective, as was demonstrated

when the Department investigated Title IV fraud by an ACICS-accredited institution, Michigan Jewish Institute (MJI). The Department notified ACICS in late 2012 of concerns about MJI as to (i) whether MJI's programs were designed to educate students for professional, technical or occupational careers as required by the agency's published policies and by the agency's scope of recognition, and (ii) whether the institution's contractual arrangements with foreign institutions met ACICS's and Department requirements.

In response, ACICS instituted a special review of MJI. ACICS notified MJI of its determination that "a vast majority of the institution's students" were enrolled in a program of religious studies outside ACICS's scope of recognition, and required those programs to be taught out (April 17, 2013 ACICS letter). ACICS also required MJI to provide it with copies of any contracts with institutions abroad. Under the agency's published policies, MJI should have provided these contracts to ACICS before initiating them. In the April 2013 letters, ACICS advised MJI of numerous findings of noncompliance and solicited additional information (ACICS letters dated August 19, 2013 and December 30, 2013). In April 2014, ACICS renewed the institution's accreditation "with admonishment," including in the letter additional demands for 13 contracts MJI still had not provided (New Grant Approval Letter with Admonishment).

Notwithstanding, ACICS wrote to the Department in July 2014, to respond to "questions that we have been advised that the Department of Education representative . . . raised during a recent program review regarding ACICS's approval of certain education abroad activities of MJI" (ACICS letter of July 23, 2014). In the letter, ACICS said nothing about its numerous findings regarding MJI, about the fact that MJI had not provided prior notice of its international contracts to ACICS, violating published policies, nor about the fact that the religious studies program was outside the agency's accreditation and recognition. Instead, the letter recited that MJI had been subject to "comprehensive on-site reviews, in which MJI's international partnership agreements were specifically examined to determine their compliance," and that "MJI's international partnership agreements and education abroad activities have been previously been, and . . . remain approved in compliance with applicable Accreditation Criteria." The letter concealed the agency's own concerns about MJI, which were directly pertinent to Title IV fraud the Department ultimately uncovered, and, in failing to disclose ACICS' own finding regarding the religious studies programs, withheld proof of MJI's liability to the Department for repayment of millions. The Department's own investigation of MJI later revealed what ACICS knew or should have known: that the institution operated primarily by recruiting and awarding Pell Grants to individuals who sought the funds to finance ineligible religious studies at ineligible foreign institutions rather than using them to support any significant engagement in the programs MJI purported to offer (cf. MJI Letters, dated February 25, 2016 and April 15, 2016).

The agency's conduct with respect to the MJI and the Department indicates that the agency does not effectively apply its standards and policies regarding compliance with Title IV. Therefore, the agency must explain what changes it has made and will make that ensure it is consistently effective with respect to Title IV compliance.

**Analyst Remarks to Response:**
In response to the Department Staff draft analysis, ACICS has documented its policy revisions and process to explain changes it has made to improve its effectiveness with respect to Title IV compliance (Exhibit 180, Accreditation Criteria, July 1, 2016, Appendix J, p. 126). The agency's revised policies and procedures concern encountering and sharing information with the Department in advance of a scheduled program review, and increased outreach to the multi-campus team of the Federal Student Aid Program Compliance division. ACICS has added the review of annual FSA compliance audits to the materials it brings before the Council for consideration in evaluating an institution's financial stability. ACICS has also implemented a process by which institutions placed on heightened cash monitoring status by the Department are required to submit letters of credit and must also provide financial improvement plans to the Council for review and approval. If institutions are placed on HCM2 status by the Department they are required to submit a teach-out plan that provides for the orderly cessation of operations in the event of financial catastrophe or a decision by the owners to close the institution.

ACICS' new policy of notifying the Department of any institution is found non-compliant with an ACICS standard related to Title IV, including credit hours calculations, Satisfactory Academic Progress, refunds return of Title IV resources, tuition and fees, scholarships, cohort default rates or financial stability is demonstrated in the agency's Exhibit 249: EDMC, Zenith Education Group, ITT, Delta Career Education Show Cause letters 2016. However, the criteria required the agency to have been doing this all along. In addition, requirements for sharing information with the Department are not narrowly limited to Title-IV specific issues, as ACICS's policies would suggest; instead, they apply whenever a recognized agency has reason to believe an accredited institution has been engaged in fraud or abuse. Contrary to ACICS's narrative, and as demonstrated in part by the Michigan Jewish site review report ACICS has submitted with its petition, the evidence of abuse on the part of that institution was clear notwithstanding the institution's use of study abroad and ought to have been disclosed to the Department, even more so since the Department expressly asked the agency about the school in performing a program review.

While the agency has provided its revised multi-faceted approach to monitoring which will target and apply increased monitoring/reporting of specific schools that are not meeting agency standards/expectations, the Department is concerned regarding whether the agency will be able to demonstrate and provide documentation that it collects information in the appropriate time lines and follows up on a variety of reporting areas including for example, financial, student achievement, retention, and job placement data along with the institution's Title IV responsibilities.

**§602.17 Application of standards in reaching an accrediting decision.**

**The agency must have effective mechanisms for evaluating an institution's or program's compliance with the agency's standards before reaching a decision to accredit or preaccredit the institution or program. The agency meets this requirement if the agency demonstrates that it--**

    **(a) Evaluates whether an institution or program--**

        **(1) Maintains clearly specified educational objectives that are consistent with its mission and appropriate in light of the degrees or certificates awarded;**

        **(2) Is successful in achieving its stated objectives; and**

        **(3) Maintains degree and certificate requirements that at least conform to commonly accepted standards;**

ACICS' standards expect each institution's objectives to be devoted substantially to career-related education. As well, there are to be reasonable programs of instruction with a mode of delivery and facilities that help students develop skills and competencies to enhance their careers (cf. Section 3-1-100: Mission: Purpose and Objectives, and Section 1-2-100: Minimum Eligibility Requirements).

The stated process is for the agency to send a visiting team to review the data collected on the elements of student retention, student placement, graduate satisfaction, employer satisfaction, and student learning outcomes. The focus is to be on each program credential offered in order to see whether the institution has achieved its missions and objectives. The final step is for the agency's decision-makers to assess the success, or failure, of an institution in achieving its stated objectives.

However, based on the widespread placement rate falsification discussed in Section 602.16(a)(1)(i), the agency is not in compliance with this section. The agency accredits institutions that provide vocational programs. Placement in the field of training is the ultimate objective of these programs. Without reliable information on which to determine whether students are placed, the agency is unable to make a reliable determination as to whether the institutions are successful in achieving this objective. Therefore, the agency needs to demonstrate what it will do to consistently ensure the reliability of its decisions as to whether an institution is successful with regard to placement.

**Analyst Remarks to Response:**
In response to the draft analysis, the agency has further explained their processes for a systematic review of its institutions relative to mission and objectives. The agency included documentation (Exhibit 229) that demonstrates how they have placed institutions in a probationary status based on their review of student outcomes data.

However, Exhibit 206 does not provide enough details related to reported changes in data integrity standards and the addition of a new data integrity reviewer on the site team for Department staff to understand the impact of these changes on the agency's overall review of the institutions relative to mission and objectives. For example, if information is found to be inaccurate on the institutions Campus Accountability Report (CAR), it is stated that the agency will require additional intensive verification of the CAR. However, the intensive verification process is not explained.

Additionally, the new data integrity standard is effective 08/01/2016. It remains unclear how the agency has held institutions accountable for ensuring integrity in their data submissions before adopting this standard, or afterward. A new data integrity reviewer has been added as part of the onsite visit team and is said to be effective for the spring 2016 cycle, but that more guidance will be issued in fall 2016. However, there was not a site visit report (or exhibit) that included information about the new reviewer demonstrating application of this new standard. The narrative states the reviewer has been trained for this role and the agency has included documentation of communication and training for this role in Exhibit 203.

Without additional information to clarify the new standards and documents demonstrating the application of these processes, the agency has not demonstrated that it has consistent application of standards in the reliability of its decisions relative to its institutions for mission and objectives.

**(c) Conducts at least one on-site review of the institution or program during which it obtains sufficient information to determine if the institution or program complies with the agency's standards;**

The agency conducts on-site reviews of approximately three days duration for institutions seeking either initial or renewed accreditation. The intent of the on-site evaluation is to verify information contained in the self-study and to review institutional compliance with ACICS standards, policies and procedures.

The agency provides guidance to the team regarding the conduct of the on-site evaluation and on how to prepare the written team report while on-site. Guidance includes questions that should be asked during interviews with the institution's director, students, admission director and representatives, the financial aid director and officers, placement director and faculty.

In order to help ensure that sufficient information is obtained by the team, a checklist is provided to the institution of materials and documents that must be assembled before the site visit. While on-site, team members review those materials, including student records, and student achievement outcome data on retention and placement rates provided by the institution in its annual report to ACICS. In addition, the team reviews faculty and administrative staff records and publications; classrooms and instructional resources; and equipment and educational facilities. Subject matter specialists evaluate and review each program's area of study.

At the conclusion of the visit the team conducts an exit interview to report its overall draft findings. The team chair prepares the final evaluation report after editing the draft before submitting it to the agency.

However, based on the widespread placement rate falsification discussed in Section 602.16(a)(1)(i), and prevalent actions by state and federal authorities for recruiting abuse and misrepresentation discussed in Section 602.16(a)(1)(vii), the agency is not in compliance with this section. ACICS is apparently not obtaining sufficient information to determine if the institution complies with the agency's standards. Therefore, the agency needs to explain what changes it has made and will make to ensure it consistently obtains sufficient information during an on-site evaluation to make a reliable compliance determination.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needs to explain what changes it has made and will make to ensure it consistently obtains sufficient information during a site visit to make a reliable compliance determination.

In response, the agency referred to a number of actions that it has taken that are related to the on-site process. Those actions include gathering information from a variety of external sources in a "call for comment" prior to the institution's visit. Critical information found at any time will put the institution into the "at-risk" category, which heightens the level of investigation both during and outside of the regularly-scheduled on-site process. As well, the agency has expanded its verification of the institutional materials submitted to ACICS, materials also used by the on-site team.

The strongest improvement that ACICS has made to the regular on-site process is the additional inclusion of a "data integrity reviewer" on each site visit. That person's primary role is to test and review the institution's self-reported data while on-site and following up immediately on any questionable data. The agency also reported that is strengthening the template outline used by on-site teams, especially emphasizing explanatory statements, so that the report is more useful to both the institution and the agency's decision-makers.

In summary, the agency discussed a number of actions that it has taken that are related to, but mostly outside of, the actual on-site process. This criterion requires the agency to conduct at least one on-site review during which it obtains sufficient information to determine if the institution complies with the agency's standards. Although the agency is making strides at improving its overall processes, there was insufficient evidence that its regular on-site visit process currently and consistently meets the requirements of this section.

---

### §602.18 Ensuring consistency in decision-making

**The agency must consistently apply and enforce standards  that respect the stated mission of the institution, including religious mission, and that ensure that the education or training offered by an institution or program, including any offered through distance education or correspondence education, is of sufficient quality to achieve its stated objective for the duration of any accreditation or preaccreditation period granted by the agency. The agency meets this requirement if the agency--**

> **(d) Has a reasonable basis for determining that the information the agency relies on for making accrediting decisions is accurate; and**

---

Up until recently, ACICS relied on traditional methods to obtain reasonably accurate information. It began with the training of its on-site evaluators before they began their work, with occasional updating of that training to meet new challenges. While on-site, the evaluators followed a written process for obtaining the needed information, and for verifying its accuracy, through cross-checking existing records and interviewing numerous parties in different situations.

The agency also instructed its evaluators to present their initial findings to the institution while on-site, where the first opportunity was given for the institution to ensure that the team had accurate information. Then, after the draft evaluation report was shared with the institution, another opportunity occurred to ensure that the information was accurate before it went to the ACICS decision-makers.

More recently, the agency instituted a "Placement Verification Program" to randomly call employers to see if the information provided by selected institutions was reasonably accurate. Although that program had a valid purpose, it is apparent that the agency had an inadequate process and provided insufficient resources to accomplish its purpose. The same concerns are true for the verification of institutional retention rates.

Therefore, based on the widespread placement rate falsification discussed in Section 602.16(a)(1)(i), the agency is not in compliance with this section. The agency does not appear to have a reasonable basis for determining that the

information it relies on for making accrediting decisions is accurate. As a result, the agency needs to address what it will do to ensure that its decisions are consistently based on reliable information.

**Analyst Remarks to Response:**

In response to the draft analysis, the agency provided additional explanation for clarifying the processes and the use of information it relies on for making accrediting decisions is accurate. The agency states in its narrative that they are not able to conduct verification on every item in the institutional information and the agency relies on the standard that states that "All data reported to ACICS for any purpose is expected to reflect an accurate and verifiable portrayal of institutional performance and is subject to review for integrity, accuracy, and completeness." (Memo to the Field, pg. 4) Department staff concern is that this is a new standard that is not in effect until July 1, 2016. It remains unclear how the agency has held institutions accountable for ensuring integrity in their data submissions before adopting this standard, or afterward. It has been noted in other section that verification of information has been problematic for the agency.

The agency explains that student achievement data are reviewed at three points in time-upon submission by algorithms, by the data integrity reviewer during site visits, and by monthly sampling. If any of these reviews reveal concerns, the data is subject to an independent audit. However, while stated in the agency's documents that the data integrity reviewers has been added to the site visit team in Spring 2016, Department staff has been unable to confirm the involvement of this individual on a site visit report. Exhibit 203 was included that demonstrates documentation of training for the data integrity reviewer. Additionally with regards to the independent third-party verification of all placement data, (at the institution's expense, when deemed necessary by the Council) the agency does not describe the qualifications of the 3rd parties, does not explain when the Council might deem this necessary, and provides no documentation it has occurred.

The agency has included documentation of a disclosure verification presentation from their 2016 annual conference. While it documents training, it is not clear who attended the session, if the information was made available to those unable to make the conference, or how the information in this training session is communicated to all institutions. It appears that the requirement of the disclosure for verification and comparison of the institutions website against the Campus Accountability Report (CAR) by the institution is a result of a CHEA requirement. While the agency states that they will be systematically verifying the information in these locations for accuracy, they have not provided documentation demonstrating this review.

**§602.19 Monitoring and reevaluation of accredited institutions and programs.**

> **(b) The agency must demonstrate it has, and effectively applies, a set of monitoring and evaluation approaches that enables the agency to identify problems with an institution's or program's continued compliance with agency standards and that takes into account institutional or program strengths and stability. These approaches must include periodic reports, and collection and analysis of key data and indicators, identified by the agency, including, but not limited to, fiscal information and measures of student achievement, consistent with the provisions of §602.16(f). This provision does not require institutions or programs to provide annual reports on each specific accreditation criterion.**

The agency stated it has multiple monitoring approaches that include the Annual Financial Report (AFR), Campus Accountability Report (CAR), substantive change requests, complaints and other external information, Cohort Default Rate (CDR) reviews, and special on-site evaluations to any institution deemed to need additional oversight.

With regard to fiscal information, all institutions must submit an AFR, which includes the annual audited financial statement. ACICS states that an institution that is deemed to have "abnormal financial risk" may be required to submit a financial improvement plan and quarterly financial reports; may be issued a compliance warning, show cause or other negative action; or may be required to host a special or unannounced visit. ACICS states that if an institution does not meet the agency's financial stability requirements, the institution would be notified in writing of the deficiencies, the degree of substandard performance, the required remedies, and timeframes to return to compliance. However, ACICS did not provide any information or documentation to describe its process for reviewing the financial information it collects or the manner by which it identifies "abnormal financial risk" or what its financial stability requirements are. ACICS also did not provide a template or completed example of an AFR.

ACICS provided 2 examples of actions it has taken as a result of financial review. One example was in response to the review of an AFR, which required a quarterly financial report, but no further action (such as review of the quarterly financial report or any other action by ACICS) was provided. The other example was in response to action taken by the Department's Office of Federal Student Aid with regards to financial monitoring - not the agency's review - and also did not include any further action by ACICS.

With regard to student achievement, all institutions must submit a CAR, which includes retention, placement, and licensure pass rates, as applicable. ACICS states that an institution that is deemed to have "substandard performance" may be required to develop a program-level or campus-level improvement plan as an addendum to its Campus Effectiveness Plan (CEP); and/or may be issued a compliance warning, a show-cause directive or other negative action. Although ACICS provided template response letters, it did not provide any information or documentation to describe its process for reviewing the student achievement information it collects or the manner by which it identifies "substandard performance." In its response to supplemental questions posed by the Department,

ACICS states it "has fortified its requirements for the integrity of student achievement data, subjecting the data to a multi-step integrity check upon submittal, enhanced templates for review by evaluators during site visits, 3rd party verification in certain circumstances, and verification through an in-house outreach process," but provided no documentation of the additional processes stated. ACICS provided a completed example of a CAR in Section 602.16(a)(

ACICS provided 2 examples of actions it has taken as a result of the review of student achievement. One example was an institution's CEP, but no agency action letter regarding the CEP nor further action (such as review of the CEP or any other action by ACICS) was provided. The other example was an agency action letter that noted "a weak and deteriorating level of student achievement," placed the institution on show cause, required an improvement plan and teach-out plan, but also did not include any further action by ACICS.

Within its narrative and Accreditation Criteria, Section 2-1-810, ACICS states that an "improvement plan is reviewed by Council for its sufficiency and effectiveness, and must be included in the CEP for review during the next comprehensive on-site visit" and if "the Council determines the institution is out of compliance with the Council's requirement for student achievement, the Council will issue a compliance warning and require the institution to demonstrate compliance with the next year's CAR." The review of improvement actions required by ACICS a year or more in the future does not align with the requirements of Section 602.20. Therefore, the agency's current financial and student achievement monitoring and evaluation approaches have not demonstrated that ACICS is able to identify financial issues or problems with an institution's student achievement measures, based on the agency's recent history and limited action with multiple institutions that have had publicly-reported, financial and student achievement issues. In response, ACICS must include documentation of the financial &/or student achievement monitoring of 2 Sanford Brown campuses in Table C of its response to questions from the Department, & the Arlington, VA & Silver Spring, MD Everest College campuses.

Beyond the review of fiscal information and measures of student achievement, ACICS states it monitors institutions via substantive change requests, complaints and other external information, Cohort Default Rate (CDR) reviews, and special on-site evaluations to any institution deemed to need additional oversight. Although ACICS stated that it monitors its institutions using these approaches, it provided exceptionally limited information and documentation on its review process for such approaches.

For example, the agency's standard on CDR reviews states ACICS "will monitor an institution's student loan cohort default rates" and an institution "may be subject to additional reports or actions based upon these rates" with no indication on how the review will be conducted or benchmarks for action. ACICS provided committee meeting minutes for the review of "adverse cases", which included a timeline and current status for each institution. However, most of the cases were status reports based on the actions of others (i.e. State agencies, State Attorneys General, the Department, etc.) and were not action items by ACICS.

In its response to supplemental questions from the Department, ACICS included a table of the "heightened monitoring" imposed on seven institutions and/or multi-campus groups. Although the table includes when ACICS was first notified of issues by State agencies, State Attorneys General, the Department, etc., no documentation was provided as to what the agency did in response to the receipt of that information. In its response, ACICS must submit documentation of the process and action taken for the Corinthian Colleges campuses located in CA after notification of the State Attorney General action in 2011, and must submit documentation of the process and action taken for the Career Education Corporation campuses in NY after notification of the State Attorney General action in 2011.

In addition, the large number of substantial settlements agreed to by ACICS-accredited institutions in qui tam actions and actions by State attorneys general indicate that ACICS is not effective in its monitoring. Its monitoring regime appears insufficient to deter widespread misconduct regarding placement, recruiting and admissions. The actions discussed in Section 602.16(a)(1)(i) also indicate that the agency does not act on the information obtained through its monitoring. The agency must demonstrate how it was effective in its monitoring and provide a comprehensive plan for addressing this pervasive problem.

**Analyst Remarks to Response:**
In response to the Department Staff Draft analysis, ACICS via its narrative and supporting exhibits provided information and documentation to describe its process for reviewing data and information it has collected and the manner in which it has identified deficiencies with regards to fiscal information and measures of student achievement. (Exhibit 127: Response to Secretary of Education Letter May 16, 2016 from A. Bieda). The agency states, that the Council monitors and evaluates institutional performance regarding financial stability, student achievement, excessive growth, substantive changes, and adverse information and complaints through its standing committees. The agency's narrative details the process used by the committees involved in the monitoring and evaluation process. With regard to monitoring fiscal information, every accredited institution must submit an Annual Financial Report (AFR) (Exhibit 57: AFR Template), including audited financial statements. The content and purpose of the AFR and audited financial statement are prescribed by the Council (Exhibit 180: Accreditation Criteria, Title II, Chapter 1, Section 2-1-802 and 2-1-803, p. 12)). The agency also provided documentation via its exhibits that are meant to demonstrate that it has collected the information its process require – the QFR, FIP or both. (Exhibit 252: Everest QFR Letter; Exhibit 253: Everest Institute QFR Letter; Exhibit 254: Everest Institute CQFR Letter). In requiring the institution to submit a QFR or FIP, the institution is notified in writing by the Council of the deficiencies, the degree of substandard performance, the required remedies, and timeframes. The agency provided a rubric to show how it arrives at these judgments. However, its documentation does not show any consequence of the filing of such reports, other than one instance of requiring a second report.

With regard to student achievement, the agency does not explain its failure to uncover or report Corinthian's

widespread placement rate misrepresentations, other than to imply it does not credit any evidence of noncompliance or misconduct not included in a final judgment of a court of law. As discussed above in response to 602.16(a)(1)(i), Corinthian's widespread misconduct in this area has been confirmed by a California court and through the Department's own investigations, resulting in appointment of a special master (Exhibit uploaded by Department staff) and proceedings for discharge of thousands of student loans. The agency also provides only the most general response to the Department's requests for documentation regarding Sanford Brown and CEC schools. Letters regarding deficient student achievement data (Exhibit 240) do not feature public sanctions and emphasize deferrals, mitigating circumstances, waivers, and rounding errors. Minutes intended to establish effective monitoring (Exhibit 250) reflect approvals of institutional requests, with one non-substantive denial and minimal deferrals
.
While the agency's revised Accreditation Criteria (Exhibit 180, effective July 2016) documents a revised set of monitoring and evaluation approaches for identifying problems with an institution's or program's continued compliance with agency standards and with this section of the criteria, those criteria have not yet been applied.

The Department cannot see how the agency could apply these revisions in such a way as to document effectiveness in monitoring in the time it would be given to respond in a compliance report, particularly in view of its weak record in monitoring and failure to document enforcement. Also, Department staff was not able to verify that ACICS provided the appropriate information and documentation of the use of all monitoring mechanisms included in the agency's narrative as requested in the staff draft analysis.


**§602.20 Enforcement of standards**

> **(a) If the agency's review of an institution or program under any standard indicates that the institution or program is not in compliance with that standard, the agency must--**

> > **(1) Immediately initiate adverse action against the institution or program; or**

> > **(2) Require the institution or program to take appropriate action to bring itself into compliance with the agency's standards within a time period that must not exceed--**

> > > (i) Twelve months, if the program, or the longest program offered by the institution, is less than one year in length;

> > > (ii) Eighteen months, if the program, or the longest program offered by the institution, is at least one year, but less than two years, in length; or

> > > (iii) Two years, if the program, or the longest program offered by the institution, is at least two years in length.


The agency has a policy that meets the requirements of this section, included in Title 2, Chapter 3 of the agency's Accreditation Criteria. What is not clear is that ACICS is enforcing the policy, which seems inconsistent with or at least not referenced in other pertinent agency materials. In addition, many of the issues noted here were noted in the agency's 2011 petition for recognition & 2013 compliance report to the Department.
Although the agency's policy states that it would take "prompt adverse action" or provide a time period to return to compliance, ACICS states that an institution would be able to "respond to a deferral, compliance warning, or show-cause directive" before the Council "denies, withdraws, suspends or revokes accreditation," which does not meet the requirements of this section. In addition, the agency provided its "Council Action Process Chart" which does not have an option for an immediate adverse action, as defined by the Department in Section 602.3.
The agency's narrative & section 2-3-700 of its Accreditation Criteria, ACICS states that it reviews information submitted by third-parties, to include from "federal or state agencies or other accrediting agencies, or through public media sources." Although ACICS provided limited documentation concerning its review of a complaint & its monitoring & investigation of "adverse" information, ACICS did not provide any documentation on the use of information received from federal or state agencies or other accrediting agencies, or through public media sources to initiate agency enforcement action. In its response, ACICS must submit such documentation regarding enforcement action taken in response to the State Attorneys General investigations in public media sources related to Corinthian Colleges, ITT Educational Institutes, and Westwood Colleges, & notifications received from the Department's Office of Federal Student Aid concerning Corinthian Colleges.
Section 2-3-101 of its Accreditation Criteria, ACICS states that it can include an "admonition" with a grant of accreditation action. An admonition is used when the "Council may judge an institution to be generally in compliance with the criteria, but it also may wish to call the institution's attention to one or more deficiencies that are not serious enough to preclude a grant of accreditation but that nonetheless must be corrected." The agency's statement strongly suggests that any admonition would pertain to an institution that is out of compliance with one or more standards. Under 602.20, ACICS does not have the option of granting accreditation while an institution is out-of-compliance with the agency's standards.
Section 602.19(b), the annual reporting process described by ACICS - both in the narrative & in the agency's policies and procedures - is not comprehensive to enable ACICS to identify problems with an institution's continued compliance with agency standards. This is supported by the agency's narrative in this section, which states that ACICS will take action based on an annual report that indicates substandard performance with respect to student

achievement or financial stability, but does not provide specific documentation as to what the agency considers substandard performance in those areas. The agency included its ACICS Student Achievement Webpage, but it is unclear that this information is provided in the agency's standards or anywhere else besides the Webpage, & whether it is therefore enforceable and enforced by ACICS.

Section 602.16(a)(1)(i) is not clear that the agency's review of student achievement meets the enforcement timelines as required by this section. An action letter the agency has provided that it sent to an institution that was not meeting the agency's student achievement standards is concerning. The letter explains that the institution must submit an improvement plan & is placed in the "year 1 category" for not achieving the required student achievement rates. While the letter is linked to the due process information included on the ACICS Student Achievement Webpage, it is not clear in the letter that "year 1" means deferral. In addition, while it is permissible to defer decision when an agency needs additional information to determine compliance, that cannot be done when an institution is clearly out-of-compliance with not only the agency's benchmarks, but its standards, as reflected in this example. Under the requirements of this section, any program of less than one year should face adverse action at the end of "year 1," absent an extension for good cause. Without additional information regarding the length of the institution's longest program, Dept staff cannot tell if ACICS met the requirements for enforcement timelines of this section with respect to this example, since the letter clearly states that the institution is not meeting the required standard. The lack of clarity is supported by the agency's narrative in this section, which states "For the first year below student achievement standards, the campus is required to complete an improvement plan for review by Council. If the campus or program performs below standard for a second consecutive year, the Council issues a compliance warning. Programs or campuses that perform below student achievement standards for a third consecutive year are subject to immediate adverse action, including suspension of accreditation, or program termination." This section requires an agency to take immediate adverse action, or give an institution a specific timeframe for coming into compliance. The agency's narrative, & its ACICS Student Achievement Webpage, clearly indicate that ACICS provides a time period longer than regulations allow to return to compliance for an institution that is not meeting the agency's student achievement stan Based on the narrative throughout the petition, ACICS appears to be confused with the application of the regulation with regards to its review of student achievement. Although the agency's student achievement standards have a clear bright-line for retention & placement rates, the agency appears to only determine an institution out-of-compliance after given time to improve. Specifically, the agency's narrative states "Institutions with programs out of compliance with student achievement standards are expected to remedy their performance or discontinue the program within one year." However, the information included in the ACICS Student Achievement Webpage clearly states "If a program reports three consecutive years of below-standard retention, placement, or licensure pass rates, it will be required to cease enrollment and terminate the program of study." The agency's interpretation of this regulation in regards to its review of student achievement is incorrect & must be revised to reflect enforcement as soon as the institution or program's rates are reported below the agency's published standard.

ACICS provided examples of council action letters on deferral, show cause, & an unannounced site visit. However, as the examples provided did not include the full cycle of the review (i.e. first determination that the institution was out of compliance to final action), notification of the specific time period to return to compliance, nor any examples of adverse actions, the agency has not demonstrated that it initiates immediate adverse action or enforces the required time period for an institution found to be out-of-compliance.

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needs to revise its enforcement action policies to meet the requirements of this section. The agency must also provide the specific documentation requested regarding the agency's use of information received from federal or state agencies or other accrediting agencies, or through public media sources to initiate agency enforcement action. Furthermore, the agency must provide complete documentation to demonstrate that it has initiated immediate adverse action or enforced the required time period for an institution found to be out-of-compliance with any standard.

In response, the agency noted that it has begun the process to revise its pertinent criteria so that the related problems noted in the draft analysis will be remedied. As noted in the draft analysis, the agency did publish a chart that contained the necessary timeframes for coming into compliance that coincides with the Department's required timelines. The agency's proposed revisions should help clarify somewhat earlier language that tended to confuse and hamper a consistent application of the agency's standards, particularly with regard to the maximum enforcement timeframes.

However, ambiguities and inconsistencies remain, such as the timeframes for enforcing student achievement standards, as well as the significance of agency "admonitions" and their consistency with this criterion. In addition, the revisions do not address the action of "accreditation deferred," and include exceptions to enforcement for "significant progress." These exceptions appear to enable multiple extensions based on unquantified improvement, negating the effectiveness of the standard. All of this precludes a determination that the revised policies would comply even if other policies were conformed with them.

The student achievement website information has a heading for "withdrawal or suspension of a program," but the only enforcement options it discusses are probation or other unspecified conditions on accreditation. Similarly, under the heading "Immediate Adverse Action," the website lists only probation or other conditions on accreditation. Probation is not an "adverse action" within the meaning of the Criteria. The website also indicates that probation/"conditions" may be imposed for deficient rates of student achievement only "absent any other evidence" and only if the rates are "significantly below" the standard and the institution's capacity to improve is "limited." Taken together, these website policies do not appear to provide ACICS with a basis for taking adverse action as defined in the Criteria based on noncompliance with the agency's student achievement benchmarks.

The proposed revisions are to be considered by the ACICS decision-makers at their August 2016 meeting. Those

proposed revisions should reduce confusion somewhat. However, further revisions are likely before final approval, and they will need to be circulated to the agency's constituents before final adoption and implementation.

With the various scenarios envisioned in the ACICS proposal (cf. Exhibit 121) Department staff believes that it is still not entirely clear when each enforcement timeframe actually begins, or in other words, when "the clock starts ticking." The agency has many interlocking policies, including the repeated granting of deferrals, which tend to delay and/or muddle the enforcement calculations. As well, the letters that the affected institution will actually receive regarding the beginning and length of the enforcement period will need to be clear and precise, which has not been demonstrated.

As well, ACICS was asked to provide specific documentation regarding the agency's use of information received from federal or state agencies or other accrediting agencies, or through public media sources to initiate agency enforcement action. In response, the agency provided a summary (Exhibit 244) that highlighted the increased monitoring that ACICS initiated as a result information received from outside sources. However, initiating heightened monitoring, and initiating an enforcement action, are two entirely different responses to a critical situation.

In addition, ACICS was asked to provide complete documentation to demonstrate that it initiated immediate adverse action or enforced the required time period for an institution found to be out-of-compliance with any standard. However, ACICS did not provide the requested documentation. It did not provide documentation requested with regard to ITT, Westwood, and agency response to state and federal investigations, nor did it provide any of the other documentation requested in the draft. The agency was cited on this criterion in 2011 and 2013, and the fact that it remains out of compliance undercuts confidence in the its documentation of initiatives to revise its policies.

Since the agency's response to the documentation requests was insufficient and since the proposed language revisions do not remedy the deficiencies and inconsistencies and have not been finalized and implemented, and in view of the agency's ineffectiveness in addressing this Criterion in the past, ACICS was unable to demonstrate compliance with the requirements of this section.

**(b) If the institution or program does not bring itself into compliance within the specified period, the agency must take immediate adverse action unless the agency, for good cause, extends the period for achieving compliance.**

The agency provided a written policy that meets the requirements of this section, in which the agency can take immediate adverse action if an institution does not bring itself into compliance within the specified time period. However, the agency did not provide any documentation to demonstrate that it has ever taken such action, as required by the regulations and the agency's policies. As discussed in Section 602.20(a), the agency's written policies regarding student achievement on their face violate this requirement since they establish a timeframe for coming into compliance that may exceed the time periods provided in Section 602.20(a).

The agency also has a written policy that includes parameters under which a good cause extension could be granted. However, the policy does not include a maximum length of any good cause extension. (The agency stated that no institutions have been granted a good cause extension in the previous five years, and therefore the agency could not provide documentation of its granting of good cause extensions to demonstrate compliance with this section.)

Until the agency satisfactorily addresses these matters, a finding of compliance cannot be made

**Analyst Remarks to Response:**
The draft staff analysis found that the agency needed to provide documentation to demonstrate that it had taken immediate adverse action if an institution did not bring itself into compliance within the specified time period. In addition, the agency needed to revise its policy on good cause extensions to include a maximum time period.

In response, the agency noted that it has adopted a revised policy (effective July 2016) that allows a good cause extension at the discretion of the Council, provided there is evidence that the area of deficiency is improving significantly, and that the standard maximum timeframe does not afford the institution sufficient time to demonstrate full compliance. The agency has incorporated a variant of that language into its template letter that is only used in situations when student outcomes fall below the ACICS expectations. In those circumstances, the institution is informed that "The Council has the discretion, in rare circumstances, to consider an extension of the compliance interval for good cause. However, the institution/program will be required to 1)demonstrate "significant improvement" in the student achievement metric since the previous report, and 2) how the additional time will enable it to meet the requirement. Without those two elements manifest, a good cause extension will not be considered by the Council or available to the institution or program."

It should be noted that the draft staff analysis expressly noted that ACICS needed to revise its policy on good cause extensions to include a maximum time period. The revised policy does not include a maximum time period. Furthermore, the revised policy may actually undermine the ability of ACICS to remove accreditation from an institution since the policy applies when "the standard maximum timeframe does not afford the institution sufficient time to demonstrate full compliance."

In addition, the draft staff analysis asked the agency to provide documentation to demonstrate that it had taken immediate adverse action if an institution did not bring itself into compliance within the specified time period.

However, ACICS did not provide the requested documentation.

In summary, the agency's proposed policy language regarding good cause extensions (to take effect in July 2016) does not include a maximum time period, as requested. As well, the agency's response did not provide the requested documentation to demonstrate ACICS took immediate adverse action when an institution did not bring itself into compliance within the specified time period. As a result, ACICS was unable to demonstrate compliance with the requirements of this section at this time.

---

**§602.21 Review of standards.**

   **(a) The agency must maintain a systematic program of review that demonstrates that its standards are adequate to evaluate the quality of the education or training provided by the institutions and programs it accredits and relevant to the educational or training needs of students.**
   **(b) The agency determines the specific procedures it follows in evaluating its standards, but the agency must ensure that its program of review--**

   **(1) Is comprehensive;**

   **(2) Occurs at regular, yet reasonable, intervals or on an ongoing basis;**

   **(3) Examines each of the agency's standards and the standards as a whole; and**

   **(4) Involves all of the agency's relevant constituencies in the review and affords them a meaningful opportunity to provide input into the review.**

---

The agency maintains an integrated approach to ensure that its program of review is regular and comprehensive. The review is conducted annually and focuses on different parts (approximately one-fifth) of the accreditation criteria. As a result, over the five-year period all of the standards have been reviewed with opportunities for comment made available to the agency's constituencies.

Each annual survey asks the agency's constituencies, including member institutions, evaluators, commissioners and staff, state regulatory agencies and students to focus on the selected standards with regard to their relevancy and adequacy. That is, the relevancy of the standard to the educational/training needs of students, and the adequacy of the standard to evaluate the quality of education/training provided by the institution. The results of the annual survey are considered during the agency's policy meetings where issues can result in proposed revisions of standards and a request for further comments from the constituents.

In addition, to obtain further comments on its standards and practices, ACICS conducts regional meetings, employer surveys, and webinars for its constituents. A recent webinar was conducted on April 28, 2016 regarding the agency's new approaches to verifying placement information. The webinar reported that ACICS is adding an additional on-site team member specifically for the purpose of review the placement data reported by the institution.

However, the agency's current system for comprehensively reviewing its standards has an apparent flaw. The agency is focused on the section of the standards scheduled for review each year. Yet the agency does not have an effective mechanism for reviewing standards out of the scheduled cycle that have allowed significant issues at problematic institutions to go unchecked. Although the agency may claim that its procedures already allow for that special focus to take place at any time, its implementation has been demonstrably inadequate.

Therefore, the agency needs to revise its standards review program to encourage a special focus on any deficiencies in its standards that are identified during each decision-making meeting. In addition, the agency needs to provide documentation that it is expeditiously and consistently implementing that specialized standards review, as needed.

**Analyst Remarks to Response:**
The draft staff analysis found the agency out of compliance with this criterion. Department staff noted that the agency did not have a systematic process to review its standards outside of the scheduled review cycle to address issues at problematic institutions, and make changes as appropriate. The agency discusses in its response, the methods and practices it employs which would inform its decision regarding standards revisions or updates. As an example, the agency references that it tracks all accreditation findings contained in team reports and identifies those most frequently cited. The information is used to evaluate which standards are worthy of revision to strengthen student protections or to clarify the Council's intent. However, in previous criteria it has been noted that verification of the information reviewed by the onsite visit team and used by the agency's decision making body has been problematic and unreliable.

The agency also discusses new requirements/policies to help it determine whether standards changes should be accomplished outside of its current standards review process. The agency references its Campus Effective Plan (CEP). However, the agency has not provided a completed CEP for review nor has it provided evidence of how this plan was helpful in determining whether a standards change is/was necessary.

The CEP was a major discussion in the meeting of the Institutional effectiveness Committee (IEC); however, It was

noted in 602.16(a)(1) there is no documentation explaining the IEC's role or training. The IEC is not recognized as a decision maker for this agency, so the IEC should not make agency policy. Therefore the role of this committee to establish or approve policy regarding the CEP is unclear.

The agency informs Department staff that it has adopted tougher standards regarding the review of recruitment and admissions practices, because of fraud and misrepresentation by institutions. However, these policy changes appear to have been made long after indications of fraud and misrepresentation were publicly known at institutions cited in the draft analysis.

## §602.22 Substantive change.

**(3) The agency's substantive change policy must define when the changes made or proposed by an institution are or would be sufficiently extensive to require the agency to conduct a new comprehensive evaluation of that institution.**

This criterion requires ACICS to define when substantive changes and/or proposed substantive changes are, or would be, sufficiently extensive to require the agency to conduct a new comprehensive evaluation.

ACICS written policy is to "conduct a comprehensive on-site evaluation of the institution if substantive changes that have been made or are proposed are sufficiently extensive that the institution's capacity to maintain compliance with accreditation standards requires an immediate assessment." To determine whether the proposed or adopted changes are sufficiently extensive, the agency notes when the types and/or number of changes are so substantial that the nature and scope of the accredited institution will no longer be the same since last evaluated and in its place a new institution has evolved ("Effect of Extensive Substantive Changes" 2-2-102).

The petition narrative indicates that in order to monitor the proposed/adopted substantive changes at each institution, ACICS documents each institution's substantive change request, and each substantive change approved by the decision-makers. Then, the agency's practice is to give the list to the decision-makers every time it considers a subsequent substantive change request from that institution. However, Department staff could find no written policy supporting that practice to help ensure its consistent implementation.

The agency also provided its "November 2015 Executive Committee Meeting Minutes with Exhibits and Council approval letter" (Exhibit 113). However, when Department staff examined that exhibit, there was no clear list of previously-proposed or approved substantive changes for the decision-makers to rely upon in their deliberations. Furthermore, there was no indication in the materials that consistent decisions are being made to require, or not require, a new institutional evaluation.

Therefore, the agency needs to provide a written policy that clearly describes the mechanism by which ACICS documents and monitors the proposed and adopted substantive changes at each institution. In addition, the agency needs to provide documentation that its decision-makers are given a clear list of previously-proposed or approved substantive changes that could trigger a new institutional evaluation. Furthermore, the agency needs to provide documentation that its decision-makers are making consistent decisions regarding whether or not to require a new institutional evaluation.

**Analyst Remarks to Response:**
In the draft staff analysis the agency was found out of compliance. The agency needed to provide a written policy that clearly describes the mechanism by which ACICS documents and monitors the proposed and adopted substantive changes at each institution. In addition, the agency needs to provide documentation that its decision-makers are given a clear list of previously-proposed or approved substantive changes that could trigger a new institutional evaluation. In addition the agency must provide documentation that its decision-makers are making consistent decisions regarding whether or not to require a new institutional evaluation.

After review of the agency's response it is clear that the agency has not adequately addressed all of the issues identified by Department staff in the draft analysis. It is still not clear based on the provided documentation whether on a consistent bases decision makers are given a clear list of previously-proposed or approved substantive changes that would trigger a new comprehensive evaluation. It is also unclear as to whether decision-makers are making consistent decisions regarding whether or not to require a new institutional evaluation. It is apparent that the agency does not have a written policy that identifies the specific reasons/types of substantive changes that would require a new comprehensive evaluation or a written process to determine whether a new comprehensive evaluation is required on a consistent basis.

In addition, the agency states in its narrative "that to ensure that the aggregation of substantive changes trigger a new comprehensive review if a written threshold is breached, each substantive change is awarded points in a rubric and weighted depending on the accumulated impact on the institution's nature and character". However, the agency did not provide the rationale or associated policy for this points system and rubric. The agency also did not discuss what this written threshold is or how it was established.

The agency has not provided the information or documentation to demonstrate compliance with this criterion.

**§602.24 Additional procedures certain institutional accreditors must have.**

**(c) Teach-out plans and agreements.**

**(1) The agency must require an institution it accredits or preaccredits to submit a teach-out plan to the agency for approval upon the occurrence of any of the following events:**

**(i) The Secretary notifies the agency that the Secretary has initiated an emergency action against an institution, in accordance with section 487(c)(1)(G) of the HEA, or an action to limit, suspend, or terminate an institution participating in any title IV, HEA program, in accordance with section 487(c)(1)(F) of the HEA, and that a teach-out plan is required.**

**(ii) The agency acts to withdraw, terminate, or suspend the accreditation or preaccreditation of the institution.**

**(iii) The institution notifies the agency that it intends to cease operations entirely or close a location that provides one hundred percent of at least one program.**

**(iv) A State licensing or authorizing agency notifies the agency that an institution's license or legal authorization to provide an educational program has been or will be revoked.**

The current petition notes that the incidence of ACICS institutions closing precipitously has prompted debarment actions against at least 10 owners and operators of five different institutions. In addition, the agency has issued a notice of intent to debar against former executives of Corinthian Colleges for the cessation of operations at four Everest Institute campuses in California coincidental with the corporation's bankruptcy filing. Furthermore, based on adverse information provided by the federal government, state agencies and other sources, ACICS has also required the submission of teach-out plans for Michigan Jewish Institute, ITT Tech Institutes and other institutions who may be at risk of ceasing operations. As well, the agency provided documentation of these recent actions related to teach-outs.

In the past, the agency provided documentation that its written policies explicitly corresponded with the requirements of this section of the criteria regarding teach-out plans and agreements. Although the current petition narrative has referred to some written policies (particularly "Teach-Out" 2-2-303), they do not explicitly refer to these requirements.

Therefore, the agency needs to document that it has written policies that correspond to the requirements of this section on teach-out plans and agreements, to include the agency's risk assessment framework and list of institutions considered 'at risk' by the agency. In addition, the agency needs to provide documentation that it is consistently implementing those policies in practice, and has a comprehensive process for reviewing the plans.

**Analyst Remarks to Response:**

In response to the Department staff draft analysis, ACICS provided in (Exhibit 180) Accreditation Criteria effective July 1, 2016 demonstrating written policies documenting its requirements regarding teach-out plans and agreements. While the agency has, in practice required its teach out plans to include the requirements of this section, its revised teach out policies do not included the terminology used in 602.24(C)(1). It should also be noted, that the requirements for teach-out plans and agreements that were in the agency's Accreditation Criteria approved January 2016 do not include the language of this section. The agency needs to revise its teach out plan policies to include all the requirements in this section of the criteria.

**§602.27 Other information an agency must provide the Department.**

**(a)(6) The name of any institution or program it accredits that the agency has reason to believe is failing to meet its Title IV, HEA program responsibilities or is engaged in fraud or abuse, along with the agency's reasons for concern about the institution or program; and**
**(a)(7)If the Secretary requests, information that may bear upon an accredited or preaccredited institution's compliance with its Title IV, HEA program responsibilities, including the eligibility of the institution or program to participate in Title IV, HEA programs.(b) If an agency has a policy regarding notification to an institution or program of contact with the Department in accordance with paragraph (a)(6) or (a)(7) of this section, it must provide for a case by case review of the circumstances surrounding the contact, and the need for the confidentiality of that contact. Upon a specific request by the Department, the agency must consider that contact confidential.**

The agency has attested that there have been no changes to its policies and/or practices in this area. However, Department staff is concerned because there have been instances of fraud and abuse discovered at several ACICS-accredited institutions within the last few years, including misrepresentations to students and falsification of placement rates.

Therefore, the agency needs to provide documentation that it consistently notified the Department regarding suspected Title IV-related fraud and abuse during the last five years, or to attest that it had not found any occasion to do so.

**Analyst Remarks to Response:**
In response to the draft analysis, the agency has provided a copy of their Accreditation Criteria that will be effective on July 1, 2016 and attested that there have not been any findings of Title IV fraud or abuse during this recognition period. However, the Accreditation Criteria cited simply reference selected Title IV requirements, and for the most part do not concern 602.27 or compliance with it. The only portion relevant to 602.27 the agency cites is a "guideline" found in paragraph (4) of Appendix G, which contains a commitment to disclosure to the Department that is significantly weaker than that required by 602.27(a)(6), and which ignores the requirements of 602.27(a)(7) and (b) entirely. The Accreditation Criteria also do not become effective until July 1, so there could not be documentation of implementation of the Criteria even if they were compliant, which as discussed they are not. In addition, the agency has not demonstrated that it complies with 602.27 in practice, and there is ample evidence it does not. For example, the agency has not explained why it did not share with the Department the information it had about the abuse practiced by, for example, Michigan Jewish Institute and CSI, discussed under 602.16(a)(1)(i) and (x), nor can its claims of a lack of any abuse to report be squared with the documented abuse regarding placement rates discussed under 602.16(a)(1)(i).


# PART III: <u>THIRD PARTY COMMENTS</u>

## Staff Analysis of 3rd Party Written Comments

Approximately 40 written third-party comments were received regarding this agency. The comments reflected negative views regarding the agency. Most of the comments are on behalf of individuals, but there were 4 comments on behalf of organizations or State entities. Most of the commenters did not tie their areas of alleged noncompliance to specific sections of the Secretary's Criteria for Recognition.

The vast majority of comments submitted to the Department were associated with a group called the Debt Collective. In these 33 comments submitted by students, the overwhelming information provided is that the institution in which they attended misrepresented various aspects of the program to the students. In a number of cases, students expressed discontent with the quality of the instruction they received in terms of both faculty qualifications and curriculum, with the large costs associated with the program, and in regards to the processes used and information provided as they were recruited and/or admitted to the program.

As these comments appear to be complaints about specific institutions, the Department does not typically commence a review of an agency based on individual complaints unless and until a complainant exhausts the agency's published complaint procedures. It is not clear that all of the issues raised in the comments would indicate noncompliance with the Secretary's Criteria for Recognition by the agency. However, there are areas within this analysis where the commenters' concerns are parallel to those of the Department. The Department has noted in this analysis that it has questions related to the agency's review of student achievement and recruiting and admissions practices in Section 602.16(a)(1).

A group of Veterans' Organizations raised concerns regarding the default rates of the institutions that are accredited by ACICS, about the student outcome and recruiting standards of ACICS being weaker than other accrediting agencies, and the recruitment practices at various institutions accredited by ACICS that involve misrepresentations about cost and job availability. The Department has noted in this analysis that it has questions related to the agency's review of student achievement and recruiting and admissions practices, in Section 602.16(a)(1), and the agency's monitoring of institutions in Section 602.19(b).

A group of consumer organizations raised concerns regarding the poor track record of student achievement by ACICS institutions, that the agency relied too much upon institutional administrators in its work and lacked sufficient representation from other constituencies, that a large number ACICS-accredited institutions are under investigation, and that ACICS fails to acknowledge any necessary improvement, but rather it actively defends the success of its current work. The Department has noted in this analysis that it has questions related to the agency's review of student achievement in Section 602.16(a)(1)(i), the agency's wide acceptance in Section 602.13, the agency's monitoring of institutions in Section 602.19(b), and the agency's enforcement actions in Section 602.20.

A group of state attorney generals raised concerns that ACICS has failed to take action when improper job placement statistics are reported by an institution, that ACICS has an inadequate job placement verification processes, that ACICS demonstrates a lack of transparency and cooperation with investigations into student outcomes, that more action was needed as a result of the Corinthian Colleges investigations, and that ACICS failed repeatedly to take action in response to public enforcement actions by state and federal law enforcement. The Department has noted in this analysis that it has questions related to the agency's review of student achievement in Section 602.16(a)(1)(i), the agency's wide acceptance in Section 602.13, the agency's monitoring of institutions in Section 602.19(b), and the

agency's enforcement actions in Section 602.20.

A memo from the Center for American Progress (CAP) raises similar questions from other commenters about ACICS's standards for student placement rates, default rates, student outcomes, and recruitment standards. The request for additional information of the agency is reflected in the agency's review of student achievement and recruiting and admissions practices, in Section 602.16(a)(1), and the agency's monitoring of institutions in Section 602.19(b). CAP also raises concerns about the number of the lawsuits brought against ACICS. This information cited and in need of additional information is included in this analysis in the student achievement in Section 602.16(a)(1)(i), the agency's wide acceptance in Section 602.13, the agency's monitoring of institutions in Section 602.19(b), and the agency's enforcement actions in Section 602.20. Note: Due to space limitations, not every single lawsuit was able to be named individually in those sections.

### Agency Response to 3rd Party Comments

ACICS requested members of the community, including students, graduates, employers, the work-force development community and policy makers to express their opinions regarding the agency's value to them personally and to their organizations.

### Staff Analysis of Agency Reponse to 3rd Party Comments

In response to the third party comments, ACICS asked for their stakeholders (including students, graduates, employers, the workforce development community and policymakers) to provide background regarding the value of attending/working with an ACICS accredited institution. The agency subdivided the responses into three exhibits: letters of support (Exhibit 150), employer letters (Exhibit 150-2), and letters from students (Exhibit 150-3). The letters of support include 54 testimonies from multiple parties on the experiences they have had in/related to programs that are accredited by ACICS at 15 colleges, with 34 of the 54 comments pertaining to a single institution. A number of these letters contain identical language, suggesting that they may have been part of a letter campaign. The employer letters capture 84 signatures of individuals attesting to the quality of education that a 16th institution, ITT Technical, has provided and the benefit the employers have received as a result of their relationship with that institution. However, ACICS put ITT on show cause on April 20, 2016, with a letter demonstrating that ACICS itself had serious concerns about "the institutions' administrative capacity, organizational integrity, financial viability, and ability to serve students in a manner that complies w/ ACICS standards." The final exhibit includes 64 letters from ITT Technical students who attended that institution and had positive experiences.

While the information provided demonstrates support by these individuals for ACICS-accredited institutions, it does not address the concerns that the draft staff report raised. The agency did not provide a narrative response to address the specific concerns relevant to the Secretary's Criteria including those previously mentioned about student outcomes and the falsification of that information (including verification of placement data), misleading recruitment and advertising practices, questions regarding Title IV responsibilities (including those about default rates), and those concerns related to lacking faculty qualifications and curriculum standards. The agency also did not give a clear indication if the issues that were brought forth through the 3rd party comment process have been considered and/or resolved through the agency's complaint standards and processes. The narrative did not specifically respond to address any of the comments, not those from individuals, nor the comments from the 19 attorneys general, nor the comments from the groups of consumer and veteran's organizations, nor from the Center for American Progress.

While not included in this section of the petition, the agency did provide documentation of their written response to the Attorney General's letter under section 602.19(b).

# EXHIBIT 6

## To Declaration of Allyson B. Baker

1           U.S. Department of Education

2         Office of Postsecondary Education

3

4       NATIONAL ADVISORY COMMITTEE ON

5       INSTITUTIONAL QUALITY AND INTEGRITY

6                   (NACIQI)

7                 June 22, 2016

8             8:30 a.m. - 5:30 p.m.

9

10         Double Tree by Hilton Hotel

11           Washington Ballroom

12       Washington, CD - Crystal City

13          300 Army Navy Drive

14          Arlington, VA  22202

15

16

17

18

19

20

21

22

1                              **Table of Contents**

2      **Consent Agenda: Puerto Rico State Agency for Public Postsecondary Vocation**      **12**

3      **American Psychological Association (APA), Commission on Accreditation**          **15**

4      **NACIQI Primary Readers:     Jill Derby, Ph.D.**

5                                   **Anne D. Neal, J.D.**

6      **Department Staff:           Chuck Mula**

7      **Agency Representatives:     Kathleen J. Bieschke, Ph.D, Chairperson APA**

8                                   **Jacqueline Remondet Wall, Ph.D, Director Office of**

9      **Program Consultation and Accreditation, APA**

10

11     **Accreditation Commission for Acupuncture and Oriental Medicine (ACAOM)   145**

12     **NACIQI Primary Readers:     Arthur Rothkopf, J.D.**

13                                  **Federico Zaragoza, Ph.D.**

14     **Department Staff:           Rachael Shultz, Ed.D.**

15     **Agency Representatives:     Mark S. McKenzie, Ph.D., Executive Director,**

16     **ACAOM**

17                                  **John Paul Liang, Ph.D., Chair, ACAOM**

18                                  **Karl Gauby, Ph.D., Directory of Regulatory Affairs,**

19     **ACAOM**

20

21     **American Bar Association (ABA), Council of the Section of Legal Education**

22

1     **(Table of Contents – Continued)**

2     **And Admissions to the Bar**                                                      **164**

3     **NACIQI Primary Reader:     Roberta L. Derlin, Ph.D.**

4                                          **Arthur E. Keiser, Ph.D.**

5     **Department Staff:        Nicole Harris**

6     **Agency Representatives:   Barry Currier, Managing Director, ABA**

7                                          **Stephanie Giggetts, Accreditation Counsel, ABA**

8                                          **William Adams, Deputy Managing Director, ABA**

9                                          **Rebecca White Berch, Justice of the Supreme Court of**

10    **Arizona and Chair of the Council of the Sectiion of Legal Education and Admissions**

11    **to the Bar**

12

13

14

15

16

17

18

19

20

21

22

23

1                           P R O C E E D I N G S

2                                                          (8:30 a.m.)

3           MS. PHILLIPS:  Good morning I would like to ask you to take your seats.

4    Committee Members I believe you are almost all here.  It is 8:30 and we are going to start

5    on time.  It is my pleasure to welcome you to the June, 2016 meeting of the National

6    Advisory Committee on Institutional Quality and Integrity.

7                  I'm Susan Phillips, Chair of the Committee and it is my pleasure first off

8    this morning to introduce Ted Mitchell, Under Secretary of Education.  Mr. Mitchell as

9    you know has been instrumental in advancing many initiatives around institutional

10   accreditation quality during this term.  I understand his time is very tight to day so we

11   very much appreciate him coming.  He won't be able to stay for long but we welcome his

12   comments to launch our meeting, so Ted with that.

13          MR. MITCHELL:  Thank you Susan and I am happy to be here, happy to

14   see my friends on NACIQI and I will be brief because you have a long agenda this

15   morning and for the rest of the week.  Pardon me -- I don't have to tell any of the

16   members around the table about the importance of accreditation.  Students and families

17   rely on accreditors' stamp of approval to make informed decisions about their education

18   and the federal government depends on accreditors in deciding who can be trusted with

19   access to billions of dollars in taxpayer funded student aid.

20                 For the most part that trust is based on demonstrated commitment and

21   ability.  The majority of agencies with whom we work, work hard every day to evaluate

22   the quality of their institutions and they deserve our thanks.  But the truth is that some

1    agencies need to up their game and occasionally agencies demonstrate such wide and

2    deep failure that they simply cannot be trusted with making the determinations we you

3    and the public count on.

4            The good news is this -- together NACIQI and the Department and to

5    insure that once again accreditation is a mark of quality without fail and without

6    exception across our nation.  Before I continue I want to say a word about the

7    recommendations before you on today's docket.  I know that you will be faced with some

8    tough decisions and I know that you will approach these decisions with your usual care.

9            I won't speak to any of the Department's specific recommendations this

10   morning because I want to let the staff recommendations speak for themselves.  I do want

11   to say with gratitude that the staff has worked incredibly hard over the past several

12   months to do a thorough review of all of the agencies on the docket.

13           I want to thank Herman Bounds and the accreditation group along with

14   Sally Morgan, Jen Hong and all the others who have been involved in this important

15   work.  I want to say forthrightly that I fully support their analyses and the

16   recommendations they have provided to you.

17           I trust that you will give their work full and thoughtful consideration.

18   Ultimately we need to continue to shift the focus of all of our work to outcomes if we are

19   going to insure students receive the quality education that they expect and deserve.  High

20   quality post-secondary education programs should not exist as small ions of excellence.

21   In every state students should find a wealth of options to well prepare them for their

1    future careers and they should feel confident that accreditation is one of the many tools

2    that they can use to evaluate their options.

3             The only way to insure that the system works, to truly give us assurance

4    that institutions are serving students well is to have an accreditation process that allows

5    the flexibility for innovation and the rigor to hold institutions accountable.  And the only

6    way to do that is to focus on outcomes.

7             NACIQI and the Department share these goals.  As evidenced by your

8    2012 and 2015 proposals that have informed our work over the last several years along

9    with a few ideas of our own we have put many of these ideas into our legislative proposal

10   and unfortunately in the fact of Congressional inaction we have put many of them in

11   place through Executive action.

12            Over the last year we clarified that accreditors have the flexibility to focus

13   their highest level of scrutiny on institutions that they determine present high levels of

14   risk to students.  Our guidance encouraged them to use that flexibility to focus their

15   resources on higher risk or more problematic institutions.

16            We ourselves are employing a more risk-based process for the

17   Department's ongoing review of accreditors.  Pardon me -- we've pulled in new data and

18   materials from across the Department to inform the review and the recommendations.

19   We have asked that accreditors reframe the information they submit to us in a format that

20   is simpler and more uniform to help us and the public understand what is going on with

21   the institutions in an accreditor's portfolio.

1       And we have called for greater transparency from accreditors.  We are

2   adding to that transparency ourselves by posting accreditor's standards related to student

3   outcomes along with the performance of the institutions they accredit.  NACIQI has also

4   requested greater information on accreditors' outcomes for its pilot and yesterday as you

5   know we publicly released the next generation of this information.  The Department has

6   created dashboards of key institutional outcomes for each accreditor's portfolio in an easy

7   to digest format.

8       The Department and NACIQI have been traveling this road together.

9   Your pilot effort on outcomes data is a major step forward for the field.  It takes a little

10   work to understand what the data mean, how best to utilized them in the context of these

11   discussions and in the criteria for agency recognition but at the end of the day what's

12   more important than how well student's succeed in accessing and completing their

13   education with the positive long-term outcomes that accrue.

14       It's clear to me how seriously you have taken this charge and we are very,

15   very grateful for the partnership that we have.  We also recognize that there is a need to

16   improve coordination and information sharing across the triad since protecting students is

17   a shared responsibility.  To meet this need we stepped up our communications with

18   accreditors to make agencies more familiar with the resources available to help inform

19   their own reviews and we are actively working with CHEA to explore how to increase

20   and improve information sharing with state agencies in a similar way.

21       When we last gathered I noted that accreditation was much on the nation's

22   mind and the work of the accreditation community has never been more important which

1    means that the work of NACIQI has never been more important.  This was true then it

2    holds true now and will continue to be the case for the foreseeable future.  The growing

3    demand for higher education across the marketplace and the proliferation of providers of

4    education challenge all of us, accreditors, NACIQI and the Department to do everything

5    in our power to strength accreditation and to make it excellent without fail.

6            Never before has a post-secondary degree meant so much and never

7    before has there been such a need for prospective students to be informed investors in

8    their own futures empowered with accurate and timely information about institutions.

9    The landscape demands rigorous and focused attention to student outcomes and our

10   approach to accreditation and our broad attention across the Department to transparency.

11           To be clear the push for accountability isn't just for accreditors it is for all

12   of us including the Department, NACIQI, states and Congress.  Just as we hold

13   institutions accountable we have to hold ourselves accountable.  That's why we continue

14   to sharpen our efforts to create information through tools like the college score card, why

15   we build rules like gainful employment to protect students from programs that do not

16   provide true access to middle class jobs and that is why we have created our new student

17   aid enforcement unit to complement the work done by our program compliance teams in

18   routing out bad actors.

19           We need your partnership in restoring trust to the accreditation process as

20   a true and consistent indicator of quality.  When we see schools provide extremely poor

21   outcomes for students or even commit fraud while maintaining their accreditation it is a

22   black mark on the entire field.

1      The unfortunate reality is that not all institutions have students' best

2      interests at heart nor are they investing their resources in a way that maximizes student's

3      success.  Accreditors need to be the fail-safe in these instances but too often they have

4      been asleep at the switch.  To be clear I am not painting all the accreditors with the same

5      brush.  The majority of agencies are working hard to evaluate the quality of the

6      institutions in their portfolio to celebrate successful schools, to help struggling

7      institutions improve and where necessary to remove accreditation from institutions that

8      systematically fail their students.

9      However we know that some are not and the presence of poor players

10     taints the reputation of all accreditors and raises questions about the value of

11     accreditation as a whole.  That should be as troubling to the entire accreditation

12     community as it is to us at the Department and it is why we have a responsibility to act.

13     We must continue to do all we can to ensure that accreditors are focused

14     on the right things and effectively hold institutions accountable.  If they are not we have

15     to make the hard decisions and take tough actions.  We have to think carefully through all

16     the consequences for institutions and students and at the end of the day we must insure

17     that any accreditor receiving federal recognition is doing its job to protect students.

18     To do anything less is to sanction poor oversight and put even more

19     students at risk.  Our students are counting on us.  This work isn't easy this work is a

20     partnership between all of us.  I am extremely grateful for that partnership and extremely

21     gratified at the commitment of NACIQI as collective and as individual members to work

1    on behalf of the accreditation system and importantly work on behalf of the students

2    across America who depend on us, thank you Susan.

3                MS. PHILLIPS:  Thank you very much Ted we appreciate your time and

4    understand that you are not able to take questions at this point.  We will start with our --

5    we will shuffle a bit our locations and start with our regulator meeting agenda in just

6    about two minutes.

7                (Pause in meeting)

8                MS. PHILLIPS:  Apologies for having some technical difficulties up here

9    we will get them worked out.  In the meantime we will go ahead and get started.  Again

10   it's always very inspiring to hear Under Secretary Mitchell speak.  We are very fortunate

11   to have had some of his time this morning.

12               As we start our meeting today as always I wanted to start with

13   introductions of the Committee Members.  Let's see I think I will start with Jill and we

14   will go around and your name and institution affiliation.

15               MS. DERBY:  Jill Derby, Senior Consultant with the Association of

16   Governing Boards of Colleges and Universities.

17               MS. DERLIN:  Bobbie Derlin, Associate Provost Emeritus, New Mexico

18   State University.

19               MR. ZAROGOZA:  Federico Zargoza, Vice-Chancellor of Economic and

20   Workforce Development for the Alamo Colleges.

21               MR. BROWN:  Hank Brown.

22               MR. WOLFF:  Ralph Wolff, no institutional affiliation.

# EXHIBIT 7

## To Declaration of Allyson B. Baker

1      U.S. DEPARTMENT OF EDUCATION

2      OFFICE OF POSTSECONDARY EDUCATION

3

4      NATIONAL ADVISORY COMMITTEE ON INSTITUTIONAL

5      QUALITY AND INTEGRITY

6      (NACIQI)

7

8      June 23, 2016

9

10      Double Tree by Hilton Hotel

11      Washington Ballroom

12      Washington DC - Crystal City

13      300 Army Navy Drive

14      Arlington, VA  22202

15

16

17

18

19

20

21

22

1   APPEARANCES:

2

3   NACIQI PRIMARY READERS

4   Ralph Wolff, J.D.

5   Frank H. Wu, J.D.

6

7   DEPARTMENT STAFF

8   Steve Porcelli

9

10   AGENCY REPRESENTATIVES

11   Mr. Anthony Steven Bieda, Executive In Charge, ACICS

12   Dr. Lawrence Leak, Chair of ACICS

13   Mr. Ian Harazduk, Senior Manager Policy and Compliance

14

15   THIRD PARTY ORAL COMMENTERS

16   Tara Kabarsh representing Robert Shireman | Senior Fellow, The Century Foundation

17   Christopher J. Madaio, Esq. | Maryland Office of the Attorney General, Consumer Protection

18   Division

19   Ben Miller | Senior Director for Postsecondary Education, Center for American Progress

20   Steve Gunderson| President and CEO, Association of Private Sector Colleges and Universities

21   Aaron Shenck | Executive Director, The Pennsylvania Association of Private School

22   Administrators

23   Doug Seelbach | Mechanical Designer/3d Designer, Six Sigma/The UPS Store

1    Allan G. Hancock CLU ChFC | Chief Executive Officer and Chairman of the Board, The Hancock

2    Group, Inc., and, Advisory Board Member, DuBois Business College

3    Joshua K Renicker | Chief Operating Officer, Energy Access, Inc.

4    Mark Lunghofer | Production Manager, Sensit Technologies LLC.

5        Quirt Marlon Collins

6    Jim Bare | Registered Medical Assistant / Registered Phlebotomy Technician, Johnson City

7    Community Health Clinic

8    James Harsh | Systems Support Technician, ITT Technical Institute/employee/graduate

9    Xavier Ferguson | Recruiting Coordinator, Labor Ready

10   Kevin M. Gratz | Talent Acquisition Specialist, SSM/Dean Clinic

11   Bobbie Casteel Consultant | Perkins Cybersecurity & Advisory Services

12   Matt Mitchell, Recruiter ITT Tech

13   Sara Nolan Collins, Legal Services Director of Veterans Education Success

14   Nicole Hosprung, American Federation of Teachers

15   Mendi Goble | Executive Director, Richmond Chamber of Commerce

16   Carrie Wofford | President, Veterans Education Success

17   Walter Ochinko | Policy Director, Veterans Education Success

18

19

20

21

22

23

1                                              INDEX

2          U.S. DEPARTMENT OF EDUCATION, NACIQI MEETING JUNE 23, 2016 –

3          RENEWAL OF RECOGNITION – ACCREDITING COUNCIL FOR INDEPENDENT

4                              COLLEGES AND SCHOOLS (ACICS)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1    U.S. DEPARTMENT OF EDUCATION, NACIQI MEETING JUNE 23, 2016 –

2    RENEWAL OF RECOGNITION – ACCREDITING COUNCIL FOR INDEPENDENT

3    COLLEGES AND SCHOOLS (ACICS)

4    P R O C E E D I N G S

5    (8:34 a.m.)

6    MS. PHILLIPS:  Good morning and welcome to the second day of the

7    June meeting of the National Advisory Committee on Institutional Quality and Integrity.

8    I'm Susan Phillips the Chair of the Committee welcoming you here today. We are going

9    to start with introductions and procedures.  One quick note to put on the record from

10   yesterday -- there was a recusal on the American Bar Association Frank Wu. We didn't

11   put it on the record and I wanted to make sure that was clear.  He did not participate in

12   the vote in that matter.

13   This morning we wanted to start with introductions of the Committee.  We

14   will start I think on the reverse side with Kathleen if you could introduce yourself and

15   your affiliation.

16   MS. ALIOTO:  Kathleen Sullivan Alioto from Boston, San Francisco and

17   New York.

18   MR. LEBLANC:  Paul LeBlanc, Southern New Hampshire University.

19   MS. NEAL:  Anne Neal the American Council of Trustees and Alumni.

20   MR. O'DONNELL:  Rick O'Donnell with Skills Fund.

21   MR. WU:  Frank Wu of University of California Hastings College of Law.

22   MR. BOEHME:  Simon Boehme.

1          MR. BOUNDS:  Herman Bounds, Department of Education, Director of

2   the Accreditation Group.

3          MS. HONG:  Good morning Jennifer Hong, Executive Director and

4   Designated Federal Official on the Committee.

5          MR. KEISER:  Art Keiser, Chancellor at Keiser University, Fort

6   Lauderdale, Florida.

7          MR. ROTHKOPF:  Arthur Rothkopf, President Emeritus, Lafayette

8   College.

9          MS. MORGAN:  Sally Morgan, Office of General Counsel, Department

10   of Education.

11          MS. MANGOLD:  Donna Mangold, Office of General Counsel.

12          MR. STAPLES:  Cam Staples, New England Association of Schools and

13   Colleges.

14          MR. WOLFF:  Ralph Wolff, former President of WASC, currently just an

15   independent consultant.

16          MR. BROWN:  Hank Brown, President Emeritus of the University of

17   Colorado.

18          MR. ZARAGOZA:  Federico Zaragoza, Vice-Chancellor of Economic and

19   Workforce Development, Alamo Colleges.

20          MS. DERLIN:  Bobbie Derlin, Associate Provost Emeritus, New Mexico

21   State University.

22          MS. DERBY:  Jill Derby, Association of Governing Boards of

1    Universities and Colleges.

2           MS. PHILLIPS:  Thank you all and welcome.  In particular thanks also to

3    the Department staff who have been working to prepare for this meeting -- to just begin

4    our work today I want to repeat a bit of the introduction in case those in the audience

5    were not here yesterday.  We have three different parts of our Agency Review Agenda

6    this meeting.  For the part that we enter this morning we had announced our plans to pilot

7    a more systematic approach to considering a student achievement and other outcome and

8    performance metrics in the hearings of agencies that come before us for consideration of

9    the Petition for Recognition Renewal.

10          The approach that we are piloting at this meeting seeks to bring

11   information about Agency standards and practices about student achievement into greater

12   focus in our deliberations at Agency recognition and into our policy development

13   discussions.  It also draws in more information available like newly available in the score

14   card and underscores the important role that recognized agencies play in insuring

15   improvement among institutions they accredit that are at risk of falling out of compliance

16   with Agency standards.

17          There are four focuses to this pilot 1:  General Performance and outcomes

18   of the institution that you agency accredits; 2:  Decision activities of and data gathered by

19   the Agency; 3:  Standards and practices with regard to student achievement and 4:

20   Agency activities in improving institutional and program quality.

21          Questions about the first three of these will be included in the review

22   process prior to formal action and the last will be included after formal action is complete

1    if it hadn't already been addressed.  So the review procedures that we begin this morning

2    will include as always the Primary Readers introducing the Agency application,

3    Department staff providing a briefing, questions for the Department staff by the Readers

4    or members of the Committee, opportunity for the Agency to respond and questions of

5    the Agency, particularly those pilot questions, third party comments, response to the third

6    party comments and finally this discussion and vote and the final set of project questions.

7    You will see me keeping on track on those issues because today is a day when we have

8    considerable third party comment I will do the introductions for that as we come up of the

9    directions of three minutes and how to use your mic and so forth.

10              So without further ado we are going to start up with our announced agenda

11   for today.  We are a bit behind two agencies will be coming up a little later today instead

12   of yesterday afternoon but we will start this morning with Renewal of Recognition

13   Petition for the Accrediting Council for Independent Colleges and Schools otherwise

14   known as ACICS.

15              The Primary Readers for his are Ralph Wolff and Frank Wu.  Department

16   staff is led by Steve Porcelli and others have participated as well.  So with that let me ask

17   if there are any recusals seeing none the Readers will please introduce the Agency

18   Petition is that going to be Ralph?

19              MR. WOLFF:  I guess that's me.  Good morning.  I would like to give an

20   introduction to ACICS.  It was founded in 1912 so it is over 100 years old.  It was

21   granted initial recognition in 1956.  In 1985 its scope was expanded to beyond associate

22   bachelor's degrees to master's degrees.

1          In 2006 its scope was expanded for distance education.  Its last full review

2    was in 2011 and there were 12 areas of non-compliance renewed for 12 months and the

3    proposed expansion of scope to include doctoral degrees was denied.  In those 12 areas of

4    non-compliance were several of the areas that are before us today.  I will say that as far as

5    I could tell in reading the transcript from 2011 not with the degree of severity that is

6    reflected in the staff report before us today.

7          ACICS is a national institutional accrediting body for schools and colleges

8    offering certificates and diplomas and as I said for associate bachelors and master's

9    degrees.  It has 245 institutions, 674 additional locations, approximately 800,000 students

10   served by its institutions.

11          According to the score card at the undergraduate level 74% are Pell

12   students and 55% of the undergraduate students are under-represented students of color,

13   thank you.

14          MS. PHILLIPS:  Thank you Ralph.  We move now to the briefing from

15   the Department staff, Steve I believe you are going to take the lead on that.

16          MR. PORCELLI:  Yes good morning.  I am Steve Porcelli of the

17   Department's accreditation staff.  The staff recommendation to the senior Department

18   official regarding the Accrediting Council for Independent Colleges and Schools or

19   ACICS is to deny the Agency's Petition for Renewal of Recognition and to withdraw the

20   Agency's recognition.

21          The staff recommendation to withdraw recognition was made because the

22   Agency is not in compliance with the Secretary's criteria for recognition and we believe

1    that the Agency could not satisfactorily demonstrate compliance with all of the cited

2    issues within the 12 month period provided by the regulations to do so.

3            This is particularly the case in view of the Agency's very recent

4    circulation of numerous revisions to its standards and practices that have not been fully

5    approved by its members or implemented and proven effective.  As well the Agency's

6    weak record in monitoring enforcement of its member institutions is a pressing concern.

7    The major areas where ACICS was found to be non-compliant with the criteria at this

8    time are fully described in the staff analysis therefore my presentation will only

9    summarize those findings briefly.

10           Also I would like to stress that my presentation summarizes what ACICS

11   would still need to have to do and to document that it is done and effectively but only if

12   the senior Department official does not adopt the staff recommendation to withdraw the

13   Agency's recognition.

14           Those actions would include to address how well graduates succeed on

15   licensing exams required for employment and to provide current documentation of

16   positive relationships with state licensing related entities and nurse accrediting agencies

17   to demonstrate that the Agency's reserves and planning can weather highly probable,

18   long-term decreases in budgeted revenue.

19           To document how the revised training program for all volunteers provides

20   more focus on consistently recognizing problems and questionable practices at

21   institutions, particularly concerning student achievement and to document that each

22   volunteer has undergone the approved training process before fulfilling their assigned

1    tasks.

2             To document the membership and activities of the Agency's new Ethics

3    Review Board, to document the integrity and sufficiency of the Agency's data

4    verification policies and procedures, to clarify and document the entire process for the

5    recruitment, selection and verification of the qualifications and experience possessed by

6    those selected for evaluation teams and decision-making bodies.

7             To ensure that the conflict of interest attestation forms required of Appeal

8    Board members are clearly understood and consistently interpreted by those Board

9    members, to provide clear documentation of consistent past practices, to ensure that

10   members of the Intermediate Review Committee were free from conflicts of interest, to

11   effectively demonstrate that the Agency has resolved the issue of widespread placement

12   rate falsification and to explain the delay in implementing the verifications that ACICS

13   promised to start in 2011.

14            To demonstrate that the Agency took follow-up action on evidence, that

15   the placement rate data submitted by institutions was unreliable and to provide current

16   documentation of the Agency's policies and practices to address the non-compliant

17   issues.  To specifically explain what actions the Agency took with respect to each state or

18   federal lawsuit initiated for the benefit of students against its institutions within the last

19   five years and to demonstrate that the Agency's actions were appropriate and effective.

20            To fully implement the Agency's plans to more consistently review and

21   identify at-risk institutions and to develop and implement its strengthened expectations

22   for visiting teens to more consistently uncover fiscal and administrative problems while

1    on site.

2            To fully implement the Agency's new and strengthened initiatives

3    regarding misrepresentations to perspective students and abusive recruiting and to

4    regularly verify that each institution's recruitment process is complying with the

5    Agency's new requirements.  To continue implementing the Agency's strengthened

6    process for obtaining and evaluating the record of student complains for each institution

7    and to compile evidence that its strengthened process is effective in practice, to apply the

8    Agency's revised Title 4 compliance policies and to document the Agency's

9    effectiveness in monitoring compliance with them.

10           To clarify the policies and procedures relative to the Agency's new data

11   integrity standards and the new site team reviewer who has been added to focus on data

12   integrity and to demonstrate that the Agency has applied these standards, to provide

13   evidence that the regular on-site visit process currently and consistently obtains sufficient

14   information to determine if the institution complies with the Agency's standards.

15           To demonstrate that the Agency has a reasonable basis for determining

16   that the information used for making accrediting decisions is accurate.  To clarify how

17   the Agency holds institutions accountable for insuring integrity in their data submissions

18   and to explain the ACICS verification processes and to provide documentation

19   demonstrating that the Agency has applied its standards.

20           To apply the Agency's revised monitoring requirements and to document

21   the Agency's effectiveness in enforcing them and to document the use of all of the

22   monitoring mechanisms that the Agency included in its original Petition narrative.  To

1    document that the Agency's enforcement of timelines for coming into compliance with

2    ACICS standards meets all of the Department's requirements to document that the

3    Agency's proposed language revisions regarding the enforcement of timelines are

4    clarified and strengthened and also finalized and implemented.

5              To include a maximum time period in the Agency's policy on good cause

6    extensions and the need to document that the Agency took immediate adverse action

7    when an institution did not bring itself into compliance within the specified period.  To

8    demonstrate that the Agency has a systematic reoccurring process to identify issues

9    occurring at problematic institutions outside of its normal standards review process and to

10   provide an updated campus effectiveness plan and to provide evidence of a standard's

11   revision resulting from the review of one.

12             To develop a written policy that would enable the Agency to consistently

13   determine whether a new comprehensive evaluation is required.  To revise the Agency's

14   policies on teach-out plans to specifically include all the teach-out plan triggers contained

15   in the Department's requirements.

16             And finally to insure that Agency's criteria comply with the Department's

17   fraud and abuse requirements and to document that the Agency complies with those

18   requirements in practice.  As just summarized our review found that the Agency is not in

19   compliance with the Secretary's criteria for recognition and we believe that the Agency

20   could not satisfactorily demonstrate compliance with all of the cited issues within the 12

21   month period provided by the regulations to do so.

22             Therefore as stated earlier, we are recommending that the senior

1    Department official deny the Agency's Petition for Renewal of Recognition and

2    withdraw the Agency's recognition.  The staff recommendation is based on our review of

3    the Agency's Petition, documentation, third party comments and observation of an

4    Agency decision-making meeting.

5            Together with my colleagues Valerie Lefor and Chuck Mula we would

6    like to be happy to answer your questions regarding the Agency's compliance with the

7    criteria for recognition.  Gail McLarnon our Senior Director of Policy Analysis,

8    Development and the Accreditation Groups is here to answer your questions about other

9    matters, thank you.

10           MS. PHILLIPS:  Thank you Steve, questions for staff by the Primary

11   Readers?

12           MR. WOLFF:  Thank you I must say that's an exhaustive list of issues so

13   it seems to me that there are some issues that are more documentary in character than if

14   recognition were continued could be fulfilled.  To me going through the staff analysis the

15   nub of the matter seems to be around 602.16 Rigor of the Standards 602.18 Enforcement

16   of the Monitoring and 20 -- Enforcement of the Standards.

17           And I would -- so I would just like to know the basis how you interacted

18   with the Agency.  Let me read on page 12 a couple of sections from the report which

19   seem to be the basis on which many of the areas of -- or the findings of non-compliance

20   flow.  At least 3 times oversight agencies acted against ACICS accredited institutions for

21   falsified or low-placement rates where ACICS had irrefutable evidence of the same often

22   from the Agency's own teams.

1       ACICS left the institution's accreditation in place and then on page 21 I'll

2   be asking the Agency the same thing -- with regard to student achievement the Agency

3   does not explain its failure to uncover or report Corinthian's wide-spread placement rate

4   misrepresentation nor does other than to apply it does not credit any evidence of non-

5   compliance or misconduct not included in a final judgment of the court of law.

6       As discussed above in 602.16-A1 Roman at I, Corinthian's wide-spread

7   misconduct in this area has been confirmed by a California Court through the

8   Department's own investigations resulting in appointment of a special Master going on.

9   The Agency provides -- also provides only the most general response to the Department's

10  request for documentation regarding Sanford Brown and CE schools, letters regarding

11  deficiency student achievement, Exhibit 240 do not feature public sanctions and

12  emphasize deferrals, mitigating circumstances, waivers and rounding errors.

13      Minutes intended to establish effective monitoring, Exhibit 250 reflect

14  approvals of institutional requests.  This is also reflected in much of the public comments

15  so as I understand this Michigan Jewish Institute and there are a number of specific

16  institutional cases where the Department staff have found that the failure of the Agency

17  to act even in response to either its teams or to court findings has become the basis, or

18  central basis of non-compliance.

19      So I want to see if I have gotten that accurate so that we can focus on what

20  really seem to be the key evidentiary bases for the recommendation of non-compliance.

21      MR. PORCELLI:  Yes you have and I would also defer to Sally Morgan

22  for the details on those matters because we focus on the criteria for recognition and when

1   we say the staff we mean the wider staff including other members of the Department that

2   have helped us with providing legal information and what happened in court cases and

3   that type of thing.

4          MR. WOLFF:  It would be helpful Sally or whoever on the staff -- what

5   was the interaction with the -- I mean there is a public record of what happened between

6   2011 and current time but in terms of the interaction with the staff what kind of requests

7   were made about actions taken with respect to those institutions that ACICS accredits

8   that were the subject of court order or were falsification of records or misrepresentation

9   had been found by either teams or some other bodies.

10          Were requests made, were team reports reviewed, what's the basis on the

11   finding of the non-responsiveness of the Agency?

12          MS. MORGAN:  In these cases the Agency was asked for example with

13   the Michigan Jewish Institution we were doing a program review and we asked you know

14   -- and we have those documents in the record but the Agency was not forthcoming.  They

15   said everything is fine with this school, all of these programs have been accredited all

16   along and their team report reflects things such as students duly enrolled in one of which

17   program was not even within their scope of recognition.

18          They couldn't figure out the transcripts, they couldn't figure out who the

19   staff of the institution was and so they had -- if you look at Exhibit 64 which is their site

20   visit report you will see that they have lots of information that should have rang all kinds

21   of bells regarding this institution and instead when they were asked for help from the

22   program review nothing was forthcoming.

1        The Wisconsin case involved the state licensing agency continually going

2    back to the school finding you know that there could be no reliance on the school's

3    information about placement rates and expectations and again and again the school was

4    found unreliable and the crediting agency was copies on all of these letters and did

5    nothing.

6        MR. WOLFF:  Thank you.  I would say I would have concern if there was

7    a single action that this Committee was going to focus on with respect to one agency.  I

8    think the issue here is whether or not there is a pattern of practice of over time that leads

9    to failure to maintain confidence in the Agency as a reliable authority on institutional

10   quality and especially integrity.

11       And so I want to follow-up with the Agency with respect to these issues

12   and how they have responded.  The second area I would like to just focus on is that you

13   have indicated and the Agency has indicated that they have taken a number of corrective

14   measures and so many of them either have yet to be approved or have yet to be

15   implemented as I understand it but I would like to have the staff's assessment whether if

16   implemented would they be sufficient to address the concerns about what the staff has

17   found the Agency has done or failed to do over the last five years?

18       MR. PORCELLI:  When I went to the April -- observed the April

19   decision-making meeting of the ACICS Council it was after I presented to them the

20   issues that the Department was concerned about they had a special session and came up

21   with a number of actually very good first attempts to correct these issues.

22       The issue is that they have adopted -- you know they have to send them

1    out to their people, they have to flush them out, they have to actually then implement

2    them, some of them won't even be effective until July probably for the fall you know, fall

3    site visit schedule and I would have to you know honestly say because of the good start

4    that the Agency took after the 2013 you know they had their compliance report and they

5    were going to you know do all of these verifications and it started off strong and then

6    kind of it didn't meet what we thought it was going to do that I'm not -- you know I can't

7    say with confidence that these things would be effectively put into place.

8           But they certainly are -- they are all well excellent really points to correct

9    the issues, yes that's an answer but it is the implementation and you can put anything on

10   paper and promise it but it is the implementation that is really how we can judge an

11   Agency.

12          MR. WOLFF:  Thank you Frank I have one more question and then turn it

13   over to you.  In the public comments I am particularly referring to one submitted by Ben

14   Miller there is a recalculation of retention rates the Corinthian -- there is also a group of

15   data sets around their performance -- the ACICS in relationship to other accrediting

16   agencies on a number of criteria.

17          I wonder if that data was reviewed and found to be accurate.  I was in no

18   position to do that in reading it but for example with Corinthian the data were

19   significantly different for completion or retention by a large magnitude of error and the

20   claims that ACICS is substantially below most other -- even other national accrediting

21   agencies.  I just wonder is the Commission -- did the staff review those I mean is that

22   data similar to what data the staff has or in particularly the Corinthian data about the

1    recalculated I think it was graduation rates?

2            MR. PORCELLI:  Again since this has to do with an individual school I

3    would defer to Sally.

4            MS. MORGAN:  The Department in its investigations has confirmed the

5    widespread inaccuracy of placement rates for Corinthian and that includes not only the

6    Held or Heald schools, but also the Everest Schools and the WyoTech schools and we are

7    providing student borrowers with access to borrow to their loans on that basis.

8            MR. WOLFF:  Okay thank you.

9            MR. WU:  Like others in the room I am not unaware that this matter has

10   attracted some attention and so I want to make sure that we are mindful of the relevant

11   statute and regulations and processes so my first question to staff I should preface by

12   saying it's with all due respect to staff and just to insure that for any more cynical

13   observers that we have this clear -- I just want to make sure that this particular agency is

14   being held to the same standards as any other agency recognized by the Department of

15   Education.

16           MR. PORCELLI:  Our review went on the standards -- I mean the

17   Secretary's criteria for recognition.

18           MR. WU:  Great, that's what I would assume would be the case and

19   certainly as we proceed through this that is what we are looking at -- at all the relevant

20   standards and how this agency stacks up and how other agencies would as well.

21           MS. PHILLIPS:  Frank I think we have an additional staff comment,

22   Herman?

1          MR. BOUNDS:  No I just wanted to reiterate what Steve said.  We

2   reviewed this agency based on the criteria.  There is also another agency up for review

3   who accredited some of these same schools and we reviewed all of the abundance of

4   information on both to come up with our recommendations so we again as I said

5   yesterday we try to review consistently based on what's in the criteria and what

6   information we have available.

7          MR. WU:  Thank you and I have every confidence that that is so and I am

8   sure we NACIQI will do that as well.  The same question is a more general question not

9   just for the staff who handled this particulate matter but also Herman and Jennifer and

10  any others who might have background.

11         I'm curious about something -- I wonder are there entities whether they

12  are called accrediting agencies or whether they are some other type of membership

13  organization for higher education institutions that are not recognized by NACIQI but go

14  about their business as for example a scholarly society or body.

15         In law for example there is the American Association of Law Schools

16  which is not an accrediting authority.  I ask that for a reason but let me get the answer and

17  then I will explain why I am asking this very specific question.  Do you know of any non-

18  profit associations that are not Department of Education recognized that in some way

19  have colleges, universities, graduate programs as their members?

20         MS. HONG:  Yes.

21         MR. WU:  There are more than one, there are many out there?

22         MS. HONG:  Yes there's accrediting organizations that are not recognized

1    by the Department.  There are also other membership organizations that are not

2    recognized by the Department.

3           MR. WU:  Great, that's what I thought.  So it is not uncommon for

4    someone to set up a non-profit that wants to perform some sort of function, accrediting or

5    recognizing members or conferring honors.  The reason I note this is because I think

6    some observers have the perception that this body is determined to put a non-profit

7    agency out of business.  That's actually not what we are trying to decide.

8           We are trying to decide what recommendation to make to the Department

9    of Education about whether this entity can perform a gate-keeping function for Title 4

10    purposes, quasi-governmental function that the U.S. has delegated to accrediting

11    authorities.  In other words nobody is out to get anybody there are non-profit associations

12    that are voluntary membership groups that go about their business, that attract members

13    for whatever reasons.

14           Some of them confer a particular honor there is a prestige to belonging

15    and so schools want to belong to those groups.  So I think it is just important to preface

16    that just to understand that all we are doing here is asking should this particular entity be

17    given an extraordinary power of gate-keeping.

18           Let me ask staff just so I am clear, how many institutions does this agency

19    serve a gate-keeping function for?

20           MR. PORCELLI:  The vast majority of their -- it depends on how you

21    want to count them there are like 250 main campuses and then all tolled with the

22    additional locations, other campuses about 800 roughly and the vast majority of them are

1    for Title 4 purposes.

2              MR. WU:  Right and I will save a question for the agency which is I

3    wonder if they were not performing this gate-keeping function would their members still

4    wish to be part of this association and recognized by -- if staff has a view on that I would

5    welcome that.  I am assuming that schools apply for this recognition specifically because

6    of the gate-keeping function that is performed, that is a school that is accredited by this

7    Agency is thereby eligible to receive federal funding for its students.

8              MS. PHILLIPS:  Steve before you respond Herman would like to get a

9    word in.

10             MR. BOUNDS:  After being here so long I should remember to push the

11   button.  So I just wanted to -- to bring up some addition numbers, our numbers are a little

12   different from you know some of the Agency numbers.  I think Sally may help this is

13   kind of based on program participation agreements so either way a lot of institutions I

14   think we have 243 institutions that receive Title 4 and we are talking 336,000 students or

15   so.

16             So I just wanted to -- there are some differences between the numbers and

17   how the Agency counts because they accredit each individual campus at times so just a

18   little difference in the numbers.

19             MS. PHILLIPS:  Steve I think I interrupted you as you were trying to

20   answer Frank's question, excuse me.

21             MR. PORCELLI:  Well most accrediting agencies I mean they started out

22   as you know peer review to help them reach certain quality levels but then once the

1    federal aid became attached to that that has become a major driver so yes I am sure there

2    are a number of schools that are in ACICS for the peer review purposes but the vast

3    majority are there for they link with Title 4.

4            MR. WU:  Thank you I will ask the Agency that same question and there

5    is nothing wrong with that they are members of this entity so they can receive federal

6    funding.  My last question is with respect to either Corinthian as a specific case or more

7    generally my colleague Ralph alluded to a pattern -- would you say that the issue here is

8    that the standards that the Agency has set aren't very good -- that is they are lax, they are

9    easy to meet or that the standards themselves the old ones or the revised ones are

10   stringent and they just haven't been applied or enforced with great care.

11           Is it that the standards are just low and weak standards or that the

12   enforcement has been spotty and subject to apparently some fraud or possibly both?

13           MR. PORCELLI:  It's -- I've thought about this quite a bit, it is really

14   difficult to say because the Agency was a very successful partner with the U.S.

15   Department of Education for many, many years and even as late as 2011, the last review

16   you know the issues that were brought up were ones that could be corrected but what

17   seems to have happened and again I can't prove it but it seems that more deference was

18   given to maybe the chains that were involved in ACICS schools and when the Agency

19   tried to -- their standards are actually very good but it is in the implementation because

20   when you get down to the nitty gritty of applying them there are places where the

21   school's lawyers would fight back and because of some really minor item in the ACICS

22   or at any accrediting agency's regulations they would overturn a finding.

1     And then if the Agency then they would go to an appeal and if they still

2   upheld -- if the ACICS still upheld its adverse action against the school the schools would

3   go to the courts and then we would even have federal judges saying you know the

4   Agency was too tough on their schools.

5     So I don't want anybody to think this is a simple -- that this is just an evil

6   agency that is not the case, it is very complicated.  People try to do their best.  I think

7   what the issue is and this is just a personal observation -- the people that are involved in

8   academic accreditation, non-profit public institutions they know where to look for

9   problems.

10     You know the intersection of sports and academics, they know where all

11   the problems are but when people get into for profit education there is a different set of

12   challenges, not better or worse just different and people that aren't specifically trained in

13   looking for those items they just -- they can be -- they could overlook things or they

14   could not enforce them as stringently and that is just my opinion.

15     MR. WU:  Thank you, you actually raise a very interesting issue that I

16   believe NACIQI should take up at some point.  Could I just make sure that I have heard

17   you correctly?  I heard you say that from time to time this agency did try to get tough on

18   individual institutions, the individual institutions would hire lawyers and become litigious

19   and the agency would then back down for fear of adverse outcome.

20     That is they didn't stick to their guns and maybe that was for a reason

21   because they thought that in later judicial review there would be some problem.  Parties

22   settle cases all the time for all sorts of reasons.  Is that something that has happened here?

1          MR. PORCELLI:  I wouldn't say out of fear it is just that and you go

2    through this also -- you may know that there is an issue but the regulation -- the criteria

3    for recognition don't allow you to -- to push it beyond a certain point and so they may

4    have seen a problem at a school but it was so new and so clever by the bad actors at the

5    school that they were able to use the actual language of the ACISC criteria against the

6    Agency and that's the impression I got from reading the materials.

7          They almost need to -- they were -- this is probably more important for

8    you to realize that they were in a program improvement model for the longest time, this is

9    a 100 year old agency so that is how they all started out and their compliance model

10   wasn't as strong and it was like a perfect storm that these schools were able to say you

11   know we can misuse these criteria against the Agency and then the Agency I guess in

12   some cases they back down but in other cases they found themselves between a rock and

13   a hard place.

14         We want to do this action but our criteria do not specifically address this

15   bizarre situation if that helps.

16         MR. WU:  Yes so I hear you saying that you and the staff are not in any

17   way accusing ACICS of being evil or bad, they are not evil people.  This situation just

18   develops right so we are not judging any particular individual's moral character when we

19   look at whether to recognize -- or whether to recommend an agency have that status to be

20   recognized?

21         MR. PORCELLI:  Correct.

22         MR. WU:  Just a last comment, some time when we take up policy issues -

1    - so I am sympathetic to the agency some time when we take up policy issues perhaps we

2    could look at the rock and the hard place problem which is not unique to this agency.

3    That problem arises when we say to agencies, "You need to enforce your standards."  But

4    then when they try to enforce their standards because they don't enjoy the governmental

5    immunities that the federal government does -- they can get wrapped up in litigation, we

6    have seen examples of that and they may make a judgment call that it is just too hard to

7    be as tough as people want them to be so that is just a thorny policy problem that we

8    ought to take up at some point because nobody else will, but those are all my questions.

9           MR. PORCELLI:  Just to add to that without the state's Attorney's

10   General they with all of their resources could not bring schools to admit guilt and had to

11   settle with them when there obviously were problems at those schools, the schools will

12   deny that but there are obviously problems at that but even like I said the Attorney's

13   General could not bring most of them to a final judgment.

14          MS. PHILLIPS:  Thank you Readers and staff we have a number of

15   Committee members who have indicated questions.  I have so far Rick and Hank and

16   Cam just let me know if you do so Rick go ahead.

17          MR. O'DONNELL:  Thank you I actually want to follow-up on Frank's

18   questions because I heard your comments a little differently.  Is the issue that the Agency

19   would press schools and back down in the face of threats of litigation or I thought I heard

20   you say that in some cases federal judges actually ruled against the Agency in which case

21   they wouldn't necessarily back down they just lost in court so can you help me

22   understand from your perspective how often was there a case where there were threats of

1    potential litigation that caused them to back down and how often did they actually lose in

2    court against an Agency?

3            MR. PORCELLI:  We didn't get into that it was and I am glad you asked

4    for clarification -- the Agency standards are -- seem to be clearly written when it comes

5    to you find a school out of compliance with something the school will find some nit-

6    picky point in the standard where it says well we did this but you can't prove we didn't

7    do that and so when it goes through the appeal process in the ACICS they will overturn

8    their original decision to take an adverse action against a school.

9            In certain cases where they do not overturn -- they upload their adverse

10   action then the schools go to the courts and I know one case in particular the judge said

11   the Agency was being too tough on them.  Now there is another side to this too that the

12   Agency has and again it is just my understanding is that they have not been -- I think they

13   have been complacent with a lot of actions at schools and felt maybe they weren't so bad

14   until it all blew up and then you know the students came forward and said you know this

15   has really been a problem for us -- it's a widespread problem.

16           It's almost like you know a solid building that they weren't paying

17   attention and termites got in and then just after a while you realize the storm came that is

18   blowing this house down so it is both.  That they have been lax in some cases, other cases

19   they have backed off and then in the cases where they have been strong a lot of times the

20   schools will just go to the courts and try to overturn it there.

21           MS. PHILLIPS:  I have Anne?

22           MS. NEAL:  Well good morning everyone.  I would also like to pursue the

1    line of questioning that Frank has raised because I think we all rely on staff and the

2    Department to present issues fairly and objectively to us to give us and to give the public

3    confidence that there is a consistent application of standards when it comes to this

4    regulatory process and others.

5           And yesterday as you all know I raised this concern and I am going to

6    raise it again today because I continue to be concerned that the staff reviews apply

7    standards with different degrees of severity depending upon the entity with which they

8    are dealing and I will say and just looking at the staff report that in many respects I was

9    surprised that the presentation was more conclusory than it was explanatory.

10          To the point that there are even places where there is editorial comment if

11   you will or even assumptions that are presented which I find quite surprising.  You just

12   said and I will read from this document, "It is not plausible to dismiss multiple

13   settlements that impose very substantial obligations, monetary and otherwise and that

14   result from claims filed in the public interest by state Attorney's General as if they were

15   materially lacking in substantiation.

16          Having gone to an ABA accredited law school I learned that settlements if

17   there is no declaration of guilt are not an indication of guilt and yet this is a suggestion

18   that we are to assume because of that that this accrediting body is guilty.  I then looked

19   later on in the staff report at the large number of third party comments that the

20   Department recently received regarding ACICS clearly indicate that what ACICS has

21   been doing since its last review is insufficient and the evidence indicates and it goes on.

22          So what I take away from that is if lots of third parties arrive that that

1    should be an indication that there is a problem with an accrediting body and I find that

2    troublesome whether it is Title 4 or Title 9 I think due process needs to apply and I am

3    not sure when I read these kinds of comments in the staff report that this accrediting body

4    is being given a fair shake.

5            Now you just mentioned issues like athletics and academics as a big area

6    and then you contrasted that with some of the challenges that the for-profits are having.

7    When I think of athletics just to try to look again at equal application of standards we

8    know that the UNC had an on-going scandal but I don't recall that SACS identified it

9    until it was already well in the press.

10           And yet we have not taken any action against SACS.  I look at various

11    data that the Department has supplied and I just simply want to put it into the record

12    because I am trying to get a context for this.  Based on the data that DOE provided next

13    steps for increasing coordination with and clarifying flexibility for accreditors and I am

14    not saying this is good or bad I simply want to put this into the record.

15           ACICS accredits only 6.6% of all institutions that are in the bottom third

16    nationally compared to SACS 23% and HLC nearly 32%.  The number of ACICS

17    institutions with single digit graduation rates -- 13 is less than half of those accredited by

18    Middle States which has 34, HCL 51 or SACS 35 and about as many as those accredited

19    by WASC.

20           So I simply raise this because to Frank's question you responded that yes

21    indeed we are dealing with this entity fairly and equally as we have all others and I yet I

22    continue to be concerned that what is presented to me does not definitively illustrate that.

1          MS. PHILLIPS:  I think there's a Herman response I will put in here.

2          MR. BOUNDS:  So I just wanted to respond to a couple of those

3    questions.  We are going to be looking at all agencies that were involved in the

4    accreditation of some of these institutions that this agency has accredited so we are going

5    to be looking at those agencies as they come up for review.

6          We are also looking at the next set of regional accreditors that are coming

7    up for review based on information that we have and some of the new things that we are

8    doing in the Department to look at a lot of outside information and the data that we are

9    collecting.

10          So again I would say that I think we do review each agency based on the

11    information.  There was a lot of information about this agency that was out there.  We

12    looked at a lot of information thus was the reason for having several other sections of the

13    Department to help out with the reviews.

14          I want to go back to one thing I said yesterday is that when we review

15    complaints and this is a similar situation -- we have to also look at past practices and

16    things that have happened before and I noticed I said that if we are doing a review of an

17    agency and we see incidents that have caused irreparable harm we have to consider that

18    as part of our review.

19          And all that information was put into the review of the Agency.  The other

20    thing I would say I think Frank asked the question about what is it with the Agency is it

21    that their standards are good and they may not have applied them adequately and I think

22    that's probably the issue is that what we have seen in the review is that there just was not

1          the application of those standards on a consistent basis.

2                    There were things that happened and there were actions that weren't taken

3          and so we have to look at that and we have to evaluate that, regardless of and Steve

4          brought up some points you know regardless of what is the on-goings or issues that an

5          agency may have defending what it does but what we have to look at is actions and how

6          the agency reviewed institutions that may have not been performing well.

7                    So all of that information is what we used to conduct our review.  We

8          could not dismiss all the Attorney General's investigations.  We could not dismiss the

9          third party comments so there was a totality of information that we had to use as part of

10        this review.

11                  I don't think if we would have looked at that I think we would be getting

12        questions about why did we not consider this additional information so whether we

13        consider it and there are questions of maybe we are being a little too harsh or we don't

14        consider it in any requests we are not being thorough enough -- we have to take that line,

15        whatever the criteria says and whatever those outside issues, concerns, actions or

16        inactions all of those things play a part in our review as they relate to the criteria for

17        recognition.

18                  MS. PHILLIPS:  Thank you just to let you know I have got Hank, Cam,

19        Frank and Arthur so far.  Did Chuck want to respond?

20                  MR. MULA:  I would like to add something to what Herman said.  I

21        actually reviewed the 602 series 16 standards that is what my position was in this

22        evaluation and I think that we really need to address this.  The standards are looked at in

1    very detail because of the issues that were out there on the Corinthian schools.

2              So we went back in reading those standards to try to determine if the

3    Agency did indeed monitor the Corinthian school because that is what we were looking at

4    because if you look at the standards they are perfectly fine standards but application of

5    the standards to the point that was rigorous enough to begin monitoring these institutions

6    was a complete failure.

7              So we could not find evidence that the agency started soon enough,

8    evaluated it in the timeframes that needed to be evaluated, monitored the institution to

9    where it was in compliance with the monitoring standards so the standard itself was

10   strong and that is why they passed because they had good standards.

11             In responding to our analysis they have revised these standards to make

12   them stronger and they did a very good job of doing that.  But those new standards will

13   not be able to make up for the damage that was done because of a not so rigorous review

14   of their standards that they had.

15             I could not find evidence at all.  I had come to a point and then the

16   evidence would stop.  And I was against the wall, there was no further evidence that I

17   could verify that this application was done the way we expect it to be done.  And we look

18   at all agencies that way especially since the Corinthian issue.  All of the agencies in this

19   period will look at that in that form so the standards are good but I could not find

20   evidence at least in the part of sections I was looking at that showed me that satisfied the

21   Department, not me personally the Department requirements for implementation,

22   rigorous implementation of those standards.

1          So I think that needs to be addressed and like I said the revised editions of

2    the standards that they presented us are very good standards but I don't believe that

3    anybody including this Agency unless it hired 100 more people would be able to

4    implement those standards in a timeframe of a compliance report, thank you.

5          MS. PHILLIPS:  Thank you Chuck, back to speaking order, Hank?

6          MR. BROWN:  Thank you I know monitoring job placement or properly

7    reporting job placement my experiences with public institutions is a challenge.  We had

8    always hoped that Congress would come forward and allow access to social security

9    information to complete that task obviously maintaining confidentiality about the social

10   security account but I am wondering that since the job placement accuracies of the issues

11   here -- how many of our accrediting agencies do a good job of insuring that you have a

12   complete report on the job placements.

13         MR. PORCELLI:  I wouldn't have that number. The only ones that we

14   expect of the vocational institutions is the vocational training so that the regular I guess

15   most of the regionals I don't believe they track the placements that type of thing, they

16   haven't been expected to in the past so there is an uneven-ness there.

17         MR. BROWN:  Well how many of our agencies do a good job of

18   reporting job placement?

19         MR. PORCELLI:  Probably less than half a dozen, Herman you want to?

20         MR. BOUNDS:  Well I think we need to characterize that first so if we

21   look at the national accreditors which that is their business to graduate folks and make

22   sure they have work.  I can speak to the three or four that I was the analyst for before

1    taking this position and went on several site visits.

2              I think their job placement work is fairly good.  The other agency that we

3    are going to look at today I think their job placement verifications are pretty good, they

4    have hired some -- they hired an outside -- they require their institutions to have outside

5    groups come in and verify job placement.

6              So frankly for my opinion I think overall the nationals that I have been

7    associated with as far as being their analyst have pretty good or are pretty active in that

8    role.  They have to be now with the -- you know, with all of the -- you know scrutiny

9    over job placement rates and verification of data.

10             I have sat on many site visits where and some of the agencies here today I

11   don't want to call their names but I have watched them place calls, pick out students at

12   random so I think overall most of them do a fairly, fairly good job at that or either try to

13   do a fairly good job at that.

14             MS. PHILLIPS:  Jen?

15             MS. HONG:  Just to add to that keep in mind that we have accrediting

16   agencies whose institutions that they accredit are making very explicit claims about the

17   short-term occupational programs that they accredit about job placement so that is

18   another thing to keep in mind.

19             MR. BROWN:  I was just wondering about it from a consistency point of

20   view if a majority of the accreditors are not insuring an adequate indication of job

21   placement if we are into a position of demanding something from this accreditor that we

22   don't demand from the public institutions.

1        MR. PORCELLI:  Well that's a bigger issue but our concern is that if the

2    federal money is being -- the majority of it is being spent because the student wants to

3    gain employment somewhere then tracking placement that's really important.  I mean

4    you heard from agencies yesterday they don't even have placement rates so there is an

5    uneven-ness there but when it comes to vocational education, occupational education, the

6    schools know that is what is being expected of them.

7        MR. BROWN:  I'm a strong advocate of accumulating the data.  It just

8    seems to me we need to be vigorous across the board not just in this area.

9        MS. PHILLIPS:  Herman?

10        MR. BOUNDS:  I will let Sally go first.

11        MS. PHILLIPS:  Sally?

12        MS. MORGAN:  I'll just mention that this Agency and the other nationals

13    have placement rates in their standards therefore we expect them to have accurate data

14    and to be able to apply them.  And in addition as Jennifer alluded to even if they are not

15    in the standards in a case of misrepresentation that goes to issues of recruiting and

16    marketing which should also be reached by an Agency's standards even if they don't

17    have a specific standard on placement rates.

18        MS. PHILLIPS:  Alright I have so far Cam, Frank, Arthur and Ralph.

19        MR. STAPLES:  Thank you Susan.  I'm persuaded that you have

20    documented a number of substantial problems for the Agency and I think Ralph went

21    through those pretty well and I think one of the challenges for us of course is that your

22    recommendation is extraordinary and it is extraordinary because although as Frank said it

1    doesn't shut the Agency down it has a dramatic impact on 800 institutions, campuses

2    how you define it.

3             So I understand that that part of it is a judgment call and then you think

4    you have documented the challenges and the violations but there is a judgment call as to

5    whether they can come into compliance within 12 months or not and whether we should

6    give them that opportunity or not and we have had that question many times here with

7    agencies in fact we do it all the time.

8             We extend 12 months all the time and it really is a judgment as to how

9    deep and how profound and how significant the issues are I guess and whether it is not

10   just a matter of their capacity but it is whether you have confidence that they are even

11   capable of implementing the standards as you described.

12            So part of it is timing and part of it is I think confidence in the entity et al

13   that it can do the job that it has committed to do or saying it will do in their Petition.  But

14   part of the concern that I would just like to ask about is that we had an instance yesterday

15   with just one institution where there were a number of students caught in the crossfire

16   and we know that that happens where they are already admitted, they are already in the

17   program accreditation gets revoked of an institution in the midst of that circumstance and

18   they have a profound impact on their program.

19            We are looking at I don't know how many students with 800 campuses,

20   tens of thousands of students I would think at least and I guess I just want to ask I am

21   sure that you have given this a lot of thought, you and the staff in general -- what is the

22   likelihood of the institutions within 18 months I don't know if we have had an experience

1    like this -- being able to maintain their accreditation as they seek alternative accreditors?

2                And I guess from my own understanding of the timelines it could be

3    problematic.  There could be institutions that lose accreditation pending candidacy

4    application review by an alternative creditor even if they found one.  So I think for us to

5    consider this for an extraordinary step we have to have a pretty clear picture of what the

6    likely impact would be.

7                So I guess I would like to have an understanding of how you the staff view

8    that process and what's the likely impact on institutions if this accreditor loses its

9    recognition?

10               MS. PHILLIPS:  Herman?

11               MR. BOUNDS:  So first -- the first part of my answer would be that there

12   are probably five or six other agencies who could pick up some of these schools and

13   depending on their scopes of recognition would have to fit that individual program.  So

14   there are places for these folks to go.

15               We look at the last major accreditor to lose recognition or just a voluntary

16   withdrawal -- that was North Central Association, NCA Cassidy and I think -- I don't

17   remember the numbers but it is maybe you know 60 to 70% of those students found a

18   place to go, there were some that didn't.

19               We have to be -- we kind of have to be -- we have to realize that the 18

20   months it is a critical point, it is not a lot of time.  I can just say that there are agencies

21   that could pick some of these schools up but you are right some of these institutions may

22   not be able to meet that -- may not be able to meet that mark but there are definitely other

1    agencies that could pick up the slack and Sally I don't know if she wants to add.

2            MS. Morgan:  I could add that agencies that are -- schools that are under

3    sanction by the ACICS -- any agency that was going to take them up would have to

4    justify that to us and if the agency -- if the institution had actually been lost accreditation

5    from ACICS they would be ineligible for two years.

6            We did look at this issue of capacity -- we are very concerned about the

7    students but the other alternatives we thought of -- first we thought the agency could not

8    come into compliance we thought it was not -- there was no real probability of that

9    happening and the options that we came up with in our judgment would have caused just

10   lengthened the period of dislocation for the schools and the students.

11           MR. STAPLES:  Just one follow-up have you looked at the timelines for

12   other agencies that might take an institution?  In other words is 18 months even enough

13   time for an institution to apply -- go through the accreditation process and become

14   accredited sufficient to maintain its financial aid accessibility during this whole time?

15           My perception is that it is not and I guess I am just thinking that even a

16   good institution that finds an accreditor may go through a window of time where students

17   don't have access to Title 4 funds that's my concern and I understand we have big issues

18   on the table regarding the agency but I think we need to be very clear about what the

19   impact might be on a number of institutions and their students.

20           MR. BOUNDS:  I'll let Sally correct me if I am wrong but during this 18

21   month process they are still Title 4 eligible during that time.  And I think the schools that

22   don't have any problems that are pretty high performing when they are looked at by other

1    creditors I think they are probably going to be able to make their timeframe.

2         It is going to be those schools that are on the cuff, mediocre, may have

3    some performance issues -- I think those schools will be looked at more closely by the

4    accreditors and that may slow down the pipe.  I will say that for us as Department staff

5    we will, you know we will try to -- of course we can't do anything to change the

6    regulation that is set but we are here to help.

7         We would be here to help an accreditor who had questions about processes

8    and how to get through you know, how to get through you know -- how to make sure that

9    they pick these schools up while still maintaining their compliance and we would be able

10   to try to help in that way in answering any questions they may have.  But you know

11   there's -- you have to as you say you have to be realistic, there are going to be some

12   schools probably that may not make the A team list but I think if they are a very high

13   performing institution as Sally said institutions who are not under any type of adverse

14   action I think those schools will move through that process and be okay.\

15        And then when you look at the schools that are under some type of

16   adverse action or are in trouble I think we would still want that heightened scrutiny of

17   those schools by a new accreditor because those schools frankly are the ones that are

18   problematic.

19        MS. PHILLIPS:  Sally and then --

20        MS. MORGAN:  I would just add that the decision were it to be adopted it

21   will be a while because the senior Department official would have 90 days to decide --

22   make a decision and then the Agency would be able to appeal.  There is no deadline on

1    the Secretary for making a decision.

2            So it is not like the 18 months would start tomorrow.

3            MS. MCLARNON:  Yes sorry I would agree with Sally that this is the

4    first step in a process.  The Department's recommendation would be followed by of

5    course NACIQI's and the Department's SDO than if appealed the Secretary.  I would add

6    to that the decision to recommend termination was not a decision made lightly.

7            Our position is that to not terminate -- not to terminate would in the long-

8    term put students and taxpayers in harm's way and we carefully considered the impact of

9    this decision on institutions as well as the students, especially students.  So the

10   Department stands ready should this play out and come to termination to provide all of

11   the information we possibly can to students to inform them of their options given that

12   their various circumstances, their ability to continue their programs uninterrupted, their

13   ability to transfer to other institutions.

14           If institutions are in danger of closing their eligibility for closed school

15   discharges there are a number of options available to students and we are committed to

16   providing all of that information and all the assistance that we possibly can to students

17   who might be affected by what ultimately would be a termination.

18           MS. PHILLIPS:  Thank you if I could ask you to turn off your other mic,

19   the one that doesn't work thank you.  I have so far Art, Frank, Arthur and Ralph.

20           MR. KEISER:  Steve I liked your analogy about the building that has

21   termites and when the termites first infest -- I had termites once in one of my houses, and

22   it went on for years and I didn't even know it.

1      Yet in this particular case you have an agency that accredited and I would

2 like to look at Corinthian for the moment but it was not the only accreditor that accredited

3 schools from Corinthian is that correct?

4      MR. PORCELLI:  Yes there were several.

5      MR. KEISER:  Did any of the accrediting agencies take an action that you

6 have suggested they should have taken?

7      MR. PORCELLI:  Chuck is more familiar with that.

8      MR. MULA:  As far as we know that the agencies that have been

9 evaluated in this time frame and that's not including what's coming up for the next

10 meeting, yeah accrediting agencies did take the appropriate action in the timeframe

11 required by this criteria.

12      MR. PORCELLI:  At least one of them did anyway.

13      MR. KEISER:  How about since all of the schools were licensed, how

14 many of the state agencies that license these schools withdrew their license provision

15 which would have been you know similar to the removal or taking a negative action?

16      MR. PORCELLI:  I don't have the answer to that.  I don't believe there

17 were any but Sally might have more information on that.

18      MR. KEISER:  How about the VA, the VA goes into our schools annually

19 as does the state, how many VA visits that were done by state-approving agencies

20 identified or were able to see the problems and take action prior to any of the federal

21 government actions?

22      MR. PORCELLI:  I don't have the answer to that.

1          MR. KEISER:  So in the case of I think brought up about the University of

2     North Carolina or the case of Louisville I mean there are a number of different actions --

3     when an accredited -- how does an accredited agency in this case reviews institutions

4     every five years and reviews you now a regional does it ever 10 years, how can they be

5     expected to have the foresight to identify these particular problems?

6          MR. MULA:  Excuse me we have a criteria that requires accrediting

7     agencies to notify this Department and all of the other licensure agencies or bodies that

8     regulate state requirements when they believe that an institution is going to be involved in

9     an adverse action.

10          And the same other agencies are supposed to inform all the other

11     accrediting agencies and there is the uncommon way of doing it by reading the paper or

12     looking at something when something comes up on the news but there are ways in the

13     process where agencies learn about --

14          MR. KEISER:  Well I agree with that but how many of the programmatic

15     accreditors that accredited Corinthian or Western which accredited the Heald schools did

16     they send official notification?

17          MR. MULA:  We know officially the one agency did the agency that was

18     evaluated in this timeframe for this review of this Committee.

19          MR. KEISER:  But was it before the feds took action or was it post-

20     action?

21          MR. MULA:  No it was post-action.

22          MR. KEISER:  Okay let me ask you another question --

1          MS. PHILLIPS:  Herman?

2          MR. BOUNDS:  Yes I just wanted to clarify the other agencies that we are

3    talking about they were proactive in their review of this situation so they took action

4    previously before the Department took action.

5          MR. MULA:  That's correct we do have ACICS did take action before the

6    announcement came out by the Attorney Generals.

7          MR. KEISER:  Okay because the reason I say the regional is because the

8    newspapers again which I read unfortunately much too much, it makes me depressed, the

9    big issues were the three Heald schools in which the placement discrepancies were

10   identified.  Did WASC take action upon that?

11         MR. MULA:  We haven't had any opportunity to evaluate any of the

12   regionals.

13         MR. KEISER:  And again this goes to the concern that Frank had which is

14   the fair application and that is what my concerns are here.   Has ACICS taken actions

15   against institutions that have violated their standards and have they either on the two

16   actions that are recognized by the government are removal of accreditation or probation -

17   - have they done that?

18         MR. MULA:  In their response to our Draft Analysis they did demonstrate

19   evidence that they are taking action but this is -- the action that we are looking at that

20   they document is something that has already been in process so what they are doing is

21   they are applying their new standards and their new processes by picking up from that

22   point.

1          MR. KEISER:  I'm talking about before even forget Corinthians.

2          MR. PORCELLI:  Yes that was the case.  I don't remember the name of

3   the school that is still in the federal courts I believe.

4          MR. KEISER:  But they have taken negative actions on institutions?

5          MR. PORCELLI:  Yes.

6          MR. KEISER:  Because yesterday we dealt with an agency that has had

7   similar kind of concerns with falsification in the placement rates and things like that and

8   yet they took no actions yet that was not cited in the staff report.  Is that inconsistency

9   there?  I don't know it is bothersome to me.

10          MR. PORCELLI:  We haven't -- it was such a deluge of information about

11   ACICS that the information is found throughout the staff analysis and we didn't get a

12   deluge of information about any other accrediting agency to this extent.

13          MR. KEISER:  The ADA have like five articles just on Monday but

14   anyway when you did the visits, because you go to the schools -- you go on a visit, were

15   you able to identify concerns on the visits that you took when you did the evaluation of

16   the school?

17          MR. PORCELLI:  For this go-round I only visited the decision-making

18   meeting.  For the previous go-round I did go to watch the site visitors.

19          MR. KEISER:  Did you find them to be different or having a challenge

20   compared to other agencies?

21          MR. PORCELLI:  They were in a particularly good institution and so I

22   didn't see any you know they were doing what site visit teams do.  They were pretty

1     thorough and just happened to be that was a really good school.  Had it been some

2     underhandedness going on falsification that wasn't even at the time it wasn't on the radar

3     so it could have been happening.

4           MR. KEISER:  So it could have been happening so why is that different

5     than when a team comes in and Corinthian I don't know had 75 institutions I don't know

6     how many were accredited by ACICS but why is that different?  I mean the team goes in

7     and spends three or four days looking at you know the carpets which have already been

8     mopped and cleaned and all the rugs have been pulled and the dust has been taken off,

9     isn't the accreditation process like that and you are holding this agency accountable for

10    looking into something that they weren't even aware of at the time that these things were

11    happening until the federal government brought this to the attention of the public?

12         MR. PORCELLI:  In my opinion I think you are comparing things that

13    really aren't exactly the same like with your ABA they don't even have a placement rate

14    or a requirement for that so compare that to ACICS which does have a placement

15    verification it is like apples and oranges.

16         And in this case too you may have a school you know these things do

17    happen but the deluge that came in on the ACICS schools is just different, it is just a

18    different situation and to compare it to a you know a small potatoes problem doesn't

19    seem fair.

20         MR. KEISER:  So the ABA does not have the requirement does ACICS

21    have a requirement have a placement rate or is that their own decision?

22         MR. PORCELLI:  ACICS has a placement rate -- well regulations expect

1    that yes.

2                    MR. KEISER:  They don't for the ABA?

3                    MR. PORCELLI:  I can't answer that.  I'll let Herman answer that.

4                    MR. KEISER:  They are a vocational school is all I know.

5                    MR. BOUNDS:  So again as I stated earlier you have to categorize your

6    types of institutions.  Occupational institutions we expect to look for those things like

7    placement rates, we look at the licensure exam rates.  Steve is right it is really comparing

8    to different organizations.  Yes it is really like comparing two different organizations --

9    again the ABA stated student achievement measure is their licensure exam pass rate for

10   the bar that is their requirement.

11                   The Department is not allowed to establish the student achievement

12   measure but once the Agency establishes the measure then we expect them to uphold that

13   measure.  When we review a lot of nationals we use a comparison if we see one national

14   has a rate and they have similar institutions we ask those questions in the analysis.  Hey

15   look this agency has a placement rate, you don't.  You vote for accredited occupational

16   institutions to explain to us why you think it is appropriate for you not to have that.

17                   MR. KEISER:  Isn't the ABA a national accrediting agency by definition?

18                   MR. BOUNDS:  ABA is actually what we would call a programmatic

19   agency that accredits free-standing institutions so it is really an academic agency, they do

20   have a -- they do teach a program that requires licensure and we think their licensure

21   exam pass rate establishes what they measure, what their students obtain after graduation.

22                   I can let Sally chime in.

1          MS. MORGAN:  Yeah I will just add as several folks have said we were

2   deluged with information about ACICS.  On the ABA we were not.  We did not look into

3   those particular allegations because we largely didn't know they were there and nobody

4   put it before us.

5          With the ACICS we were deluged and it wasn't a case of all of a sudden in

6   2016 ACICS was knocked for a loop when Corinthian went belly up -- instead there had

7   been a steady stream of lawsuits on placement rates that these schools were losing and

8   ACISC defended the school including in front of Congress.

9          In addition in 2011 they told us understanding that there was a problem in

10  this verification area they said, "We are going to start verifying our placement rate

11  information."  And then along comes Renewal Petition and all of a sudden they tell us,

12  "Well in January, 2016 we started verifying."

13         So there was a what -- four or five year gap there between what they

14  promised us they would do and what they did.

15         MR. KEISER:  My final question is I have been doing this with you guys

16  a long time and the first time I have ever heard of an agency going ahead and being

17  proactive to change their regs or change their standards and then the staff commenting

18  that these are not in place already even though they were ex-post review.

19         So that's a little different in process and procedure isn't it than we have

20  normally done?

21         MR. PORCELLI:  I think it isn't in this sense at least since probably the

22  last 7 years or so since the 2009 amendments when the staff comes before you and we

1    recommend a compliance report 99% of the time a NACIQI member will ask alright are

2    you confident that the agency will be able to accomplish this in 12 months and that's the

3    answer that honestly I would be hopeful that they could but I have no confidence that

4    they could do this in 12 months.

5            So that's where as you mentioned earlier -- somebody mentioned earlier

6    this is a judgment and the judgment is there are so many things and they are so deep

7    rooted and if there were more time that would be great but there isn't.  We are held to the

8    12 month rule and according to the 12 month rule our hands as staff -- the

9    recommendation has to be that because they are not in compliance now.  NACIQI has

10   different parameters they operate under.

11           But as far as we can recommend we have to recommend the withdrawal

12   recognition.

13           MR. KEISER:  Thank you Steve and Chuck and staff.

14           MR. MULA:  I would just like to make another comment on Steve's -- the

15   agency has provided revised standards that are in compliance with our requirements for

16   those standards.  All of those 602.16 series standards and their monitoring standards are

17   now in compliance as if they were to be adapted and I am not sure that they are all -- that

18   the Commission have met and have done that.

19           But the revised drafts are all in compliance.  However the requirements --

20   the criteria requires the Department to determine if that can be done in a reasonable

21   amount of time which is evidence of implementation and that is the key to this decision.

22           MS. PHILLIPS:  I have Herman and then we are going to move to Frank.

1          MR. BOUNDS:  So the last thing I just wanted to bring up if these

2    standards revisions or changes could have been done sooner we would have had more

3    time to evaluate that.  If the standards revision where it appears to be reactive instead of a

4    proactive approach that's what causes us not to know or not to be confident that these

5    things could be done in the 12 month period -- they were adopted post some of these

6    issues.

7          If you in the course of reviews or in the course of judgments you

8    determined that hey maybe something we are doing is not quite right and try to adopt

9    changes at that time then we may have had more time to review, to assess and say yes

10   they are on the right track.  We just don't have that we just don't have that now.

11         MS. PHILLIPS:  Thank you moving on to Frank.

12         MR. WU:  I think this has been said by staff but I just wanted to confirm

13   the evaluation here is not of the Agency standards in the abstract but as they are actually

14   applied so if an agency came before us and they had the impeccable standards but in the

15   application just didn't really apply them or applied them in a spotty manner or a relaxed

16   manner or erratically or poorly they would still fail.

17         MR. PORCELLI:  Yes and we would also point out that even though

18   when I read the list of items that were issues when I say document -- it's really

19   documenting effecting implementation.  It is not just providing us with a policy thank

20   you.

21         MS. PHILLIPS:  Okay Arthur?

22         MR. ROTHKOPF:  I would like to raise a process question here.  In my

1    several years on NACIQI the process has basically been that the staff comes to us and I

2    mean the accreditation staff comes to us with its analysis.  We go through it, challenge it,

3    agree with it, make a recommendation and then the Department if you will, the Secretary

4    then has an opportunity to agree or disagree.

5            But our analysis is based on what is brought to us by the accreditation

6    staff.  I have to ask the question and then move from there -- is the recommendation -- is

7    the report we received simply that of the accreditation staff or does it reflect the input of

8    the Secretary and the Secretary's office?

9            I know there is someone, I'm not sure I have your name but you are in the

10   policy office and I guess what I'm concerned about is the Department getting two bites of

11   the apple here.  I'm assuming that and I would like to ask the staff, the accreditation staff

12   would you have made this recommendation absent advice from the others in the

13   Department including the Secretary's office, the policy office, et cetera or was this your

14   recommendation without any input from elsewhere?

15           And I am concerned that if indeed there is advice coming from elsewhere

16   in the Department and indeed may have participated in the writing and I am interested in

17   that, then I wonder if we have a very hard situation here.  We have the Secretary's office

18   and maybe the ultimate decision-making participating in recommending to us.  We are an

19   advisory committee with all the rights and privileges that advisory committees have.

20           We make a recommendation but then it goes back to people who have

21   already pre-decided this, is already an indication that I found implicit in what the Under

22   Secretary said yesterday and what was said here that you have it already to make sure that

1    everyone gets their right place.

2            But isn't this giving as I have said before the Department other than the

3    accreditation staff whom we work with intimately two bites at the apple and is this the

4    right process?

5            MS. MCLARNON:  Sally would you like to begin?

6            MS. MORGAN:  Yes I will just start by saying we have two possible

7    decision-makers here.  We have the senior Department official and we also have in the

8    event of an appeal the Secretary.  Both of them have been completely walled off from the

9    discussion of this Agency and from the preparation of the staff report.

10           MS. MCLARNON:  And I absolutely agree with Sally that is absolutely

11   the case.  This recommendation came from the accreditation staff.  The accreditation staff

12   are career employees they report to me.  I am the current staff as well my name is Gail

13   McClarnon by the way for the record.  We do reside in the Office of Post-secondary

14   Education and that office does report to the Under Secretary's Office.

15           We work together with the Under Secretary's Office, the Office of Federal

16   Student Aid, the Office of our General Counsel on the Department's accreditor and

17   accrediting issues generally.  We do get information from other offices within the

18   Department.  The Office of Federal Student Aid, the Office of General Counsel that

19   inform our analysis of agencies that come up for recognition that by no means that we are

20   going to sources within the Department that are walled off as Sally points out, that would

21   take -- be involved in this decision going forward that is absolutely not the case.

22           So I would like to reassure you that while we do work together on

1    accreditation issues and that other offices within the Department provide us with

2    information to inform our decision it is the accreditation staff who come forward with the

3    recommendation.

4         MR. ROTHKOPF:  Thank you I appreciate that.  Steve and Chuck it was

5    your judgment having read the file without advice from outside the accrediting group that

6    this Agency should no longer be recognized?

7         MR. PORCELLI:  I wouldn't say there was not advice from outside

8    however I would say that I have maintained the innocent until proven guilty stance that

9    we have used you know so that an agency they submit their materials and we look at

10   those materials and it is not until we have gone through all of those materials that we

11   determine whether they meet the criteria or not, regardless of what anybody else says.

12        And we can attest -- I can attest, my integrity is intact that I kept the

13   innocent until proven guilty and the materials just show that they don't meet the criteria

14   at this point and it is our judgment that they will have -- that I don't have confidence that

15   they could meet them in the 12 month period.

16        And that's all we are tasked to do and that's all that I can tell you.

17        MR. ROTHKOPF:  Just to follow-up you said you received some advice

18   from outside.  That was outside the accrediting group?

19        MR. PORCELLI:  I don't want to comment on that thank you.

20        MS. MCLARNON:  I'll comment on it.  The Department is working to

21   bring more rigor to the accreditation process I think this Committee is aware of that and I

22   think that I just mentioned that we bring other offices into our deliberations around

1   accrediting decisions.

2           The Office of Federal Student Aid, the General Counsel in particular,

3   Sally is invaluable to us, I think that is who we are referring to when we say to you we

4   bring other information into the process.  We have third party commenters as well so it is

5   a misnomer to think that we are influenced by the newspaper articles that we read.

6           We have information that we bring to the process, that's the information

7   that we consider so Sally may want to piggy-back on what I am saying but if you are

8   questioning our integrity I think your questions are misplaced.

9           MR. ROTHKOPF:  I'm not in any way questioning anyone's integrity I

10  am just trying to find out what went into the decision which is I think we as a body that

11  has to make the recommendation are entitled to -- I mean I have heard that the accrediting

12  group was walled off and now I am not sure where the wall was.  So I rest.

13          MS. PHILLIPS:  Herman I do have a line after Herman.

14          MR. BOUNDS:  So I just wanted to bring up a couple of things.  I think I

15  stated before we had consultation with other offices within the Department and that's no

16  secret and I don't think there's anything wrong with that considering the substantial-ness

17  of this information.  So I want to bring up two points.

18          So during this review we reviewed two agencies who were associated with

19  Corinthian.  You would see from the recommendations they are significantly different.

20  So the point that I want to bring up is no matter who we consulted with and I just have to

21  say this -- I'm a 20 year military person and you know I don't -- I don't sway for most

22  folks or anybody so I just want to make very clear that although we had help, we had

1    discussions with other groups, the first thing I said when we started reviewing both of

2    these agencies was that I could support any recommendation or any advice we got from

3    anybody if the evidence supported it.

4         And that's exactly darn what we did.  If not both of these

5    recommendations would have been similar because there was similar you know -- there

6    was some similar accreditation of institutions between both of these -- both of the

7    accreditors who are up this time for review.  I will also say that we have and we are

8    working to develop questions for the reasonable creditors who are coming up for review

9    who also accredited these schools.

10        So I just want to be perfectly clear that I don't sway for most folks and as

11   Director of the group I want to be very clear that we make this call based on the

12   documentation that we had and the actions of the Agency.

13        And I will add other than the help that we got from OGC which was very

14   helpful because our staff are educators, we are not lawyers and we had to consult with

15   them for some of those legal issues.  I am going to tell you that we would have come to

16   this decision regardless of the influence or help that we got from other folks because we

17   review as I stated yesterday and as I stated today -- we review based on the criteria.

18        You either meet the criteria or you don't.  You either demonstrate

19   application or you don't.  And the last thing I want to say is that this was a unique case.

20   And we had to consider past practice and we had to consider past practice based on what

21   was promised to be done in the future.  And we had to consider the abundance of

22   information that we have got from other entities.

1       And I don't think we have ever and I haven't been in the Department long

2   but I have been an education a long time and I can tell you that this is one incident where

3   we have had a ton -- maybe a ton of information that we had to consider.  And we

4   considered that same ton of information for ACCSC who is coming up later.  All I can

5   tell you is that those recommendations were totally different so if folks think that we got

6   pressured into doing something that we didn't you should look at those

7   recommendations.

8       They are supported by evidence and documentation and that's all I really

9   need to say.

10      MS. PHILLIPS:  Thank you Herman.  Just to let you know the hands that I

11  have seen are Ralph, Simon, Rick, Frank and Paul so Ralph you are up next.

12      MR. WOLFF:  Thank you what I think this conversation leads to I think

13  the greater importance of our coming to our own independent judgment and to me that

14  rests on several criteria.  1:  Do we find with the staff recommendation analysis and

15  particularly after hearing from the Agency there are in fact areas of non-compliance of

16  such a substantial nature as reflected in the staff report and recommendation.

17      Secondly to me whether or not the Agency has taken -- acknowledged was

18  there a problem -- I think the issue is not only whether there was non-compliance but was

19  there in fact a problem that the Agency should have acknowledged and did it address it

20  effectively.

21      And thirdly do we have confidence in the steps that are being taken and all

22  of those to me need to be reviewed in terms of whether revocation or recognition is

1   warranted.  When I read the -- and I will say that this is not unlike accrediting decisions

2   of which I have been involved with hundreds and hundreds and thousands actually.

3              And one other point that I would say is we tend to focus on the placement

4   statistics as a sine qua non as the one thing all agencies and I have looked at the ACICS

5   standards have institutional integrity standards which are as relevant to the ABA as it

6   seems to me.

7              If an organization misrepresents key data it is an institutional integrity

8   issue whether or not they have a placement or issue or a standard of benchmark and I

9   think one of the issues that we are dealing with, with many of the institutions that

10  underlie the concerns of the staff report are institutional integrity issues, not just around

11  fraud and misrepresentation, not just around the issue of the exact placement statistics.

12             Some of the criteria that I see should have ACICS have found these areas

13  of fraud and misrepresentation at Corinthian or other places and so I am asking for your

14  sense on several of these levels.  What I read from the staff report is it should have

15  because it is criteria for verifying the focus on placement data were not adequate at the

16  time.

17             Now there is a separate matter they have now revised that with a site team

18  member and the like but I believe the staff finding would be that the process at the time

19  notwithstanding its standards but the visa process or the verification process was not

20  adequate would that be a fair statement?

21             MR. PORCELLI:  Yes and to add to that in the 2011 findings and in the

22  2013 compliance report we were presented with the information of how they were going

1    to really beef up the placement verifications and get some outside sources to do that and

2    then the outside sources which we didn't find out until later the outside sources because

3    too costly so they hired somebody within ACICS to do the placements from inside and

4    the person in charge of that no question about her integrity whatever and she did the best

5    she could with the staff she had but it just didn't seem to be enough.  It wasn't as

6    complete as we had been promised in the 2013 report.

7            And I guess you could look back in hindsight you know our role is not to

8    punish them for their past sins but what are they going to do going forward and yes they

9    have really what looks like good operation to go forward but can they show that it has

10   been affectively implemented within 12 months, that's where the problem comes in.

11           MR. WOLFF:  I'll treat that as a separate issue the 12 month issue.  But as

12   I understand they are now adding a person to every team to do verification in addition to

13   what they have previously been doing.  So what I am hearing you say is that apart from

14   the issue of implementation you feel that that will get closer to the issue of a substantive

15   process to verify placement rates.

16           MR. PORCELLI:  And also they were using -- they started using an

17   algorithm to catch fraudulent representations from the schools and once -- whether it was

18   the algorithm or the fact that the schools knew they were using the algorithm the number

19   of falsified placements just dropped dramatically or was triggering just a dramatic drop in

20   that.

21           So what they have started to do is starting to show some results.

22           MR.WOLFF:  Thank you the second category for me would be when there

1   was a finding and let's just say by teams did they take appropriate action and I would say

2   at least in the case of one instance where the team that Sally referred to either there was

3   concern that even when an the staff report suggests there was more than one institution,

4   that were teams, lets separate court cases or the like -- teams, where their own teams

5   found misstated if not misrepresented placement rates or other issues of fraud or integrity

6   and the institution integrity there was a failure to act consistently is that a fair statement?

7   MR. PORCELLI:  I can't speak to the specifics of those cases only

8   because like I said we have so much information.  The only thing that I would point out

9   that I did notice when I was at the decision-making meeting and I guess it is obvious to

10  anybody who does placement verifications that the rules for verifying placement are very

11  complicated.

12  So is it a placement if they have worked for 6 months, 12 months that type

13  of thing -- they are very complicated and I think in some cases not many but in some

14  cases there was an unintentional just the person in charge of that just wasn't doing it

15  correctly and not on purpose.

16  Whereas other cases the chain in particularly the chain schools they were

17  intentionally misrepresenting the information so it is -- I'm not sure if that answers your

18  question.  But things are not as simple as they look.

19  MR. WOLFF:  Never are.  It does seem at least with respect to the

20  Michigan Jewish Institute that there was more than just placement statistics and the like

21  but I think this is an issue to engage with the Agency on.  But was there a failure to act

22  and was there an acknowledgement of the problem.

1         To go on to the next category it seems to me where there were court

2   orders, specific findings, settlements and the like whether that should have led to further

3   action on the part of the Agency and as one who has had to work with this there is both

4   the announcement or there are multiple stages -- there is the announcement of an

5   investigation where there are a lot of subpoenas and the like and you are not even sure

6   what is being sought other than some broad category.

7         Then there may be actual findings and a settlement and it is not clear what

8   is disclosed when there are settlements where there is no admission of guilt and what

9   record is actually created so one of the questions that I have is what actual information

10  was available to the Agency pre, post and during these kinds of investigations but I would

11  say the staff report finds that the Agency following at least not-necessarily during but

12  following conclusion where there were settlements for court decisions failed to

13  acknowledge the problems represented by those and failed to act accordingly, is that a

14  fair statement?

15        MR. PORCELLI:  I think that would be a fair statement yes.

16        MR. WOLFF:  And then the question that I have is there any action that I

17  know that there has been a revision of the standards, there's the Ethics Committee and

18  things like that but has the Agency taken any action as to how it would respond in the

19  future to court decisions, settlements or the like?

20        MR. PORCELLI:  No and I probably shouldn't have just said there was

21  accurate statement without asking Sally, did you have any comment to make on that?

22        MS. MORGAN:  No I agreed with his statement.

1        MR. WOLFF:  Well there are a lot of questions that I would like to ask but

2    then it does seem to me that much of the concern is around should there have been action

3    taken because these were large scale findings that affected a lot of students around

4    serious issues of fraud findings of fraud misrepresentation but where are we now?

5        What happened then, what should the Agency have done so I appreciate

6    the work the staff has done but I still think we need to dig deeper in terms of finding out

7    what corrective action has been taken.

8        One final question it would appear to me from the staff report and I would

9    like to see if there is a correction of this by the Agency but it appears to me from the staff

10   report that the Agency did not acknowledge that there was a problem in the way which it

11   handled not only Corinthian but all of the other cases that you cite is that a fair statement?

12       MR. PORCELLI:  That was the most baffling part because you know you

13   could see an Agency just as a method of operating they must have lawsuits in this or that

14   or the other thing and they just take that as a course you know this is going to happen but

15   when so many come in and we have all those Attorney's General bringing those cases

16   you would have thought that that would have really awakened them up at that point.

17       And I guess it is just part of the legal system that they don't want to admit

18   guilt on anything but at least their actions I thought should have spurred them to more

19   action and it didn't.

20       MR. WOLFF:  Thank you I'm done.

21       MS. PHILLIPS:  Thank you.  I have here the following four people signed

22   up.  Because we will have an opportunity to come back to the staff again later I am going

1    to take these four individuals and then call a brief break and then we will come back and

2    resume.

3              So my speaking list right now is Simon, Rick, Frank and Paul.

4              MR. BOEHME:  Thank you Madame Chair and thank you staff for all of

5    your hard work.  Steve how many -- how long have you been working for the

6    Department?

7              MR. PORCELLI:  Almost 30 years.

8              MR. BOEHME:  30 years so how many of these staff reports have you

9    done?

10              MR. PORCELLI:  Hundreds.

11              MR. BOEHME:  Hundreds.  And just taking a step back looking at the

12    bigger picture does this -- how does this staff report how is it similar to the hundreds that

13    you have done, how does it stand apart and obviously this could be a two hour lecture,

14    but briefly how does this and the process from the beginning of reviewing the hundreds

15    of materials how does it stand out to you.

16              MR. PORCELLI:  The only way in particular is just the fact that I could

17    not personally handle all of the material by myself which in the past a staff person would

18    be able to do that.  That's why I have Valerie, Chuck helped, Herman, Sally I mean really

19    it could not have been done without their help.  It was just so much information and just

20    you for being on the Committee in the past we never really looked so much at individual

21    schools we just looked at the accrediting agency and how it complied with the standards.

22              And now the schools are being more of a reflection of an agency's

1    problems so that we have to incorporate that into our review and so in this case the

2    schools became a prominent part of the analysis.

3            MR. BOEHME:  And in the analysis that you did at ACICS because you

4    led their review in 2011 correct?

5            MR. PORCELLI:  Correct.

6            MR. BOEHME:  And from that time give the Committee a feeling of how

7    much their standards have changed and I believe they came back in 2013 and there was

8    some -- they had to come into compliance with a few issues.  In terms of when Mr. Gray

9    then President of ACICS was there radical changes that you noticed within the standards

10   when you went to observe them?

11           Did you start to observe radical culture changes, a different tone that

12   ACICS took than when you were working with them in 2011?

13           MR. PORCELLI:  Not to throw anybody under the bus but it was very

14   difficult to get Mr. Gray to understand the impact of the changes that were needed and so

15   I am hopeful I mean it is a little late but they are seeking a new head to lead them, that the

16   new person will understand accreditation and understand the depth of the issues that need

17   to be addressed.

18           But at the time it was very difficult to get through.

19           MR. BOEHME:  But comparing from your 2011 review and to now tell

20   me about the -- have there been substantial changes?

21           MR. PORCELLI:  Well there really was with that -- they did take like I

22   mentioned before they did start this verification and it looked like it was going to soar

1    and then it kind of got I guess they thought at the time it was probably too expensive but

2    they probably should have stuck with the outside third party people and really beefed that

3    up and it seemed to like have reached a low plateau and then leveled off so that's again

4    that's part of the issue as to we can have all of these issues where they promise they are

5    going to do things, we need to see them implemented.

6           MR. BOEHME:  Did they heed the -- because I have the list and I know

7    we are running short on time and we want to get a break, recommendations that you had

8    for them in 2011 would you say that they took your recommendations, your advice in

9    2011 and you can say in front of us today that yeah they have done some of them, or yeah

10    they have done none of them or what's your read on that?

11           MR. PORCELLI:  Truthfully I was very impressed other than the

12    slackening off on the offer to do the third party verifications.  What was most impressive

13    was the placement student achievement standards were actually lower and weaker and

14    when we cited them on that they actually did beef them up and it is noted in the

15    compliance report a number of schools just proactively said we know we are not going to

16    get this.

17           This program is not going to meet placement and retention standards and

18    so we are just going to drop it now.  Teach the students out -- move them into other

19    things so it had a dramatic effect I mean they really did -- that's the best other than the

20    verification they really took the third party verification, they really took the issue

21    seriously, they really beefed them up in ways that we didn't think they would and they

22    really went forward it with and then -- but it was probably a little late because it was right

1    after the compliance report that the damn broke and of course that was all -- the pressure

2    was building up before that so you have to keep that in mind that when Corinthian broke

3    and everything that was stuff that had been in the works for years.

4           So anyhow I am not sure if that answers your question.

5           MR. BOEHME:  Thank you.

6           MS. PHILLIPS:  I have Rick, Frank, Paul and break okay I have got

7    Frank, Paul and break, nothing like Paul's pressure.

8           MR. WU:  I'm sorry Paul is after me, okay great.  So I am glad to know

9    that staff have applied an innocent until proven guilty standard.  I just note though that's

10   not the standard, that's too high.  This is not a criminal case we are not talking about

11   putting people in prison we are talking about should NACIQI recommend to the

12   Department recognition of an accrediting authority.

13          And I say that to praise staff.  It is great that you have been so scrupulous,

14   so ethical, so differential and really looked at the facts but given the media coverage of

15   this I just hope that we remember and stay focused on what we are here to do.  This is

16   about recognition of an entity to perform a quasi-governmental function as a title for

17   gate-keeper this is not a criminal trial, we are not subject to the standards of a federal

18   jury.

19          Related to that there is nothing wrong with being influenced by third party

20   comments -- we want third party comments, we solicit them, we invite them, we review

21   them, we are supposed to take them seriously.  It would actually be a problem if it were

22   the other way around and we just said, "Oh well third party comments we just throw

1    them in the trash we don't look at them at all."  That would be a problem.

2              I think it is good that we take them seriously and that we look at all of

3    them so as far as I am concerned I think that is fine, both of staff and of this body.  That's

4    why the process is set up with open meetings so that we can have public input and be

5    appropriately influenced by that, that's not bad, that is what facts of bodies are all about,

6    about the sunshine and so on.

7              With respect to that I don't think there is anything wrong with reading the

8    newspaper.  We were picked to be part of this group of 18 people because each of us has

9    some background.  If we were wholly ignorant of higher education accreditation that

10   would strike me as highly problematic -- each one of us has had some experience,

11   whether it is with an accreditor, whether it is a site visit team or an institution of higher

12   education as administrators or faculty member all of that is find.

13             So I just point this out because I worry that given the attention that has

14   been paid here there will be speculation that is unwarranted in particular about the

15   integrity of the staff and so I wanted to say and I will close on this that there is no reason,

16   there is nothing here that suggests that anyone should be questioning any individual staff

17   member or the staff as a whole as to whether they followed the rules and did what they

18   were supposed to do.

19             Everything suggests that they did.  They were in fact extra-scrupulous here

20   and I hope that people don't make a mountain out of a mole hill when there isn't even a

21   mole hill here it is just another case that has come before us that does involve a different

22   recommendation but it is not the first time that an accrediting authority will cease to be

1    recognized by the federal government.

2            It has happened before it can happen again and part of the message that I

3    hope that other accreditors get is as we are even handed this is going to mean that these

4    same standards as part of the pilot that we have rolled out will be applied to everyone and

5    that is a change and a good one.

6            MS. PHILLIPS:  Thank you Frank, Paul?

7            MR. LEBLANC:  I just about 20 minutes of comments to make before the

8    break.  One the important information -- I think that comment was not the work of the

9    accreditation team was walled off from others it was that the senior Department official

10   and the Secretary were walled off from the work.

11           I actually take heart and am comforted by the fact that you would have the

12   input of other aspects or parts of the Department given the seriousness of the

13   recommendation.  And I think of the question should ACICS have had foresight, how

14   could they have foresight?

15           I mean it is hard for me to imagine what more they would need to see and

16   hear aside from multiple lawsuits, AG's and others weighing in on them and their

17   schools.  Certainly ACICS had the foresight to put Corinthian on heightened employment

18   monitoring back in 2014.  It is hard for me to understand how they could not have seen

19   what was happening in their accredited schools.

20           I am a bit of a student of disasters mostly in trying to avoid them and

21   because I am a bit of an aviator -- people who study these things will tell you that

22   disasters are usually not one thing but a confluence of things happening in an unhappy

1    aggregation.

2              When I read the report which I read more than once and marked up

3    extensively, it feels like this is a wide-spread failure of both systems, policies, certainly

4    execution and culture and that all of those things came together in what feels like a

5    disaster to me.

6              I mean you are going to hear from the Agency and has to be persuaded

7    otherwise and then I go to the question we are really being asked which is can they in the

8    next 12 months turn this around and track record in my mind is still the best predictor of

9    future performance and I just don't see the evidence that given the widespread systemic

10   failures of this agency that the can turn this around.

11             Bringing in new leadership which is usually critical to change in culture --

12   I mean someone is going to take my experience six months or more just to really

13   understand what is needed and built the team that is required to move forward.  I think

14   comparing this to AVA for example which we have discussed yesterday, there are many

15   of us myself included who voted against continuation, a lot less egregious evidence of

16   what we have before us today.

17             I don't know how it can go otherwise at this point but again it would be

18   good to hear from the Commentators and the Agency itself.

19             MS. PHILLIPS:  Thank you with that I want to call a 15 minute break

20   bringing us back online at about four minutes until 11 and at that time we will ask the

21   agency to bring -- come forward and make its remarks.

22             MS. PHILLIPS:  Moving forward at this time representatives from ACICS

1      could please join us at the front table, thank you.

2              If I could invite the Committee members to resume their seats -- if I could

3      invite the Committee members to resume their seats, alright I see a quorum in the room

4      so we will resume our proceedings.  We have invited the representatives of the agency to

5      join us at the front table.

6              Good morning welcome -- we would like to have an opportunity for you

7      to make whatever remarks you would care to make, it will be followed by questions from

8      the Primary Readers and also by the Committee member staff.  After that concludes we

9      will move to third party comments you will have an opportunity to respond to those as

10     well.  So with that I invite you to introduce yourselves and to make whatever remarks

11     you care to make.

12             MR. LEAK:  Good morning Madame Chair and members of the Advisory

13     Committee.  My name is Lawrence Leak, Chair of the Board of Directors at ACICS.  At

14     the table with me here is Anthony Bieda, our Executive in Charge and Ian Harazduk a

15     staff member at ACICS.

16             Again good morning to everyone here I am Chair of the Board of ACICS

17     and Chair of its accrediting Council.  I have been a member of the Council since 2012

18     and Board Chair since January of this year.  I have served as a public member of this

19     organization because I believe in the fundamental and valuable role ACICS provides to

20     the institutions it accredits and the students served by these institutions.

21             Prior to and coincidental with my service as a volunteer to ACICS I have

22     served on the Board of Trustees at St. Mary's College of Maryland, I'm retired from a

1    long career in education administration in 2008 serving more than 4 years in the senior

2    administration of academic programs at the University of Maryland, University College.

3              I provide the context of my background to underscore my independence

4    and arm's length relationship with the institutions accredited by ACICS.  My

5    participation in the governance, policy-making and decision-making activities of the

6    Council is strictly as a service to higher education and the public purpose of access,

7    accountability and student success.

8              These considerations underscore every encounter I have with my

9    colleagues on the Council, with member institutions, students, evaluators and the

10    professional staff at ACICS.  Please be assured I share that spirit of public service with

11    all the members of the Council many of whom joined me here today.

12              My comments this morning are offered in that spirit.  Service to the public

13    good, service to the best interests of students and the acknowledgement of the expectation

14    of the character that are manifested across the higher education community -- expectation

15    of effectiveness, transparency and evaluation of quality through means that are

16    progressively driven by evidence and empirical data.

17              Accreditation has changed substantially in the few years that I have been a

18    volunteer for ACICS and many more changes are anticipated and indeed welcomed.  The

19    variety of stakeholders and interests that are participating in the public discourse will not

20    only help strengthen and involve the art of the science of accreditation as we know it.

21              The Council has paid close attention to the expectations that it enhance the

22    effectiveness of its review of institutions, programs and accountability.  Those

1  expectations are taken seriously by the Council and it has initiated a series of reforms and

2  initiatives to fortify its program of accreditation.

3       My respectful request to the Department and to this Advisory Committee

4  today is to provide ACICS sufficient time to allow these initiatives and reforms to bear

5  evidence of effectiveness.  It is the combination of additional time to implement and

6  enforce stronger requirements and the breadth and the depth of those reforms that form

7  the essence of our remarks to the Advisory Committee today.

8       Please allow me to enumerate those initiatives briefly.  First -- the Council

9  appointed new executive leadership in April in order to establish a new direction for the

10  Agency focused on effectiveness and accountability.  Second -- the Council developed

11  and adopted a series of reforms designed to strengthen the review of the following quality

12  dimensions:  Admission and recruitment of students; integrity of data reported by

13  campuses to ACICS regarding student achievement; disclose of institutional and program

14  level performance data to students and to the public and greater flexibility in the

15  imposition of probation actions.

16       In addition the Council has adopted new by-laws to strengthen the review

17  and resolution of perceived conflicts of interest by Council members.  It established a

18  new, independent Ethics Review Board and expanded the rationale for dismissing an

19  individual from the governing body.

20       Two of the three members of the Review Board are designated and must

21  be public members with no current or prior affiliation to ACICS or any of its accredited

22  institutions.

1      Third ACICS ordered the suspension of accepting new applications for

2  initial grants of accreditation effective June 3, 2016.  This action was to insure that the

3  Agency focuses all of its resources and expertise on the thorough and rigorous review of

4  institutions currently awarded grants of accreditation by ACICS before the Agency takes

5  on additional institutions.

6      Fourth the Agency ordered all current evaluators to participate in a

7  comprehensive renewal initiative before they are assigned to the next round of on-site

8  evaluation visits.  The Evaluator Renewal Initiative includes re-signing their credentials

9  for currency and relevance of their professional experienced, updating training to approve

10  their knowledge and evaluative skills regarding new areas of emphasis for team visits,

11  fresh attestations of their knowledge and commitment to ethical standards and an

12  agreement for their performance to be evaluated more frequently using an enhanced

13  performance appraisal template beginning in the Fall 2016 visiting cycle.

14      The Agency also informed institutions serving visa enrollment students

15  that they would be subject to additional evaluation of their compliance with requirements

16  of the Student Exchange and Visitor Program of the federal government.  That enhanced

17  review has begun with direct outreach to officials at immigration and custom

18  enforcement and with officials at other accrediting agencies so that ACICS may better

19  understand the risk factors involved and identifying institutions exhibiting those risk

20  factors.

21      More recently and significantly ACICS has established a blue ribbon panel

22  also known as the Special Advisory Committee to the Board that has the authority to

1   methodically assess every aspect of the agency from top to bottom.  The independent

2   members of the panel will review and make recommendations regarding governance

3   including the composition of the Council, policy including strength -- the strength and

4   clarify of all ACICS standards.

5   　　　　　　Operations including the reoccurring methods and systems by which

6   ACICS applies standards to campuses and programs; human resources including the

7   qualification, training and performance of Council members, evaluators, administrative

8   leadership, accreditation coordinators and others and technical resources including the

9   design and effectiveness of the information technology platform that supports all aspects

10  of the Agency's data collection and data analytics.

11  　　　　　　The panel was established through an executive committee proclamation

12  earlier this month and has been composed so far of four individuals with strong and deep

13  knowledge of post-secondary education and accreditation.

14  　　　　　　These individuals whom are independent of the Council, their assessment

15  and recommendations will become the basis for further fortification and renewal of

16  ACICS.  In summary, the initiatives and reforms undertaken by the Board of ACICS are

17  substantive and immediate.

18  　　　　　　They will have great relevance to the issues identified in the Department's

19  report.  However, these initiatives and reforms are in the early stages of implementation

20  and require more time to bear evidence of their effectiveness.  It is in that context as

21  Chair of ACICS that I respectfully request the Committee afford the Agency the

22  consideration of the additional time of one year to demonstrate compliance.

1          My sincere request is that you carefully consider the merits of the case that

2    ACICS has made for the recommendation of deferral decision and a requirement of a

3    compliance report.  With that Madame Chair I would like to turn to Mr. Tony Bieda to

4    conclude our opening statement.

5          MS. PHILLIPS:  Absolutely.

6          MR. BIEDA:  Thank you Dr. Leak.  Can everybody hear me okay?

7    Madame Chair, members of the Committee my name is Anthony Bieda.  I have been

8    serving since April as the executive in charge of ACICS responsible for day to day

9    operations of the Agency, liaison relationships with the Department and state approval

10   authorities throughout the U.S. and internationally as well as the Agency's relationships

11   with member institutions and the nearly 800,000 students served by our accredited

12   colleges and schools.

13         My background includes 15 years in telecommunications administration

14   followed by 8 years in county government and 13 years in various assignments related to

15   higher education administration policy and accountability.  I served as Assistant County

16   Administrator in Lane County, Oregon before coming to ACICS in that regard I had

17   authority over 1200 employees and an annual budget in excess of 400 million dollars.

18         I also served as primary legislative liaison for the Arizona Board of

19   Regents and in that capacity I was instrumental in developing and publishing an

20   accountability report card for the pubic university system which of course is University

21   of Arizona, Arizona State and Northern Arizona University.

22         That was shared -- that report card was shared with the public and of

1    course the legislature.  Some of the metrics we identified and memorialized in that report

2    card included graduation rates, drop-out rates, persistence rates, research grants and the

3    enrollment profile of in-state students.

4            I helped the universities and their Board of Regents develop strategies for

5    responding to and improving their scores on these metrics.  My presence here today is to

6    affirm and describe the capacity of ACICS to address the serious issues and findings of

7    the Department.  I am here today to answer your questions no matter how difficult those

8    questions may be.

9            Further I am here to assure you about ACICS's ability to remedy the

10   outstanding citations within the next 12 months.  ACICS was formed in 1912 by a group

11   of private business college owners in the upper Midwest of the U.S.  It has provided

12   quality assurance to some of those institutions faithfully and effectively throughout the

13   past 103 years.

14           ACICS was first recognized by the federal government as a reliable

15   authority on institutional quality and integrity in 1956 and has been continuously

16   recognized in that regard for the past 60 years.  Three years ago ACISC received re-

17   recognition by the Department after providing a compliance report.  In addition -- and

18   that was with my involvement -- in addition I led the Agency's effort for the recognition

19   of ACICS by the Council for Higher Education Accreditation or CHEA by the Texas

20   Higher Ed Coordinating Board, the National League of Nursing Accreditation now

21   known as ACN and ARRT within the preceding 7 years.

22           ACICS colleges and schools include more than 800 campuses again

1    serving nearly 800,000 students, 47 states, 10 international locations.  More than 40%

2    of those students are pursuing credentials at the diploma, certificate or Associate's

3    Degree levels.

4           A typical ACICS campus enrolls about 500 students.  The programs with

5    the highest levels of enrollment include business administration, the allied health

6    professions and information technology.  While many ACICS colleges and schools serve

7    students in large metropolitan areas, a majority of the campuses are located in secondary

8    and tertiary markets.

9           In many cases this means the schools are the only post-secondary

10    institution within a reasonable driving distance.  A substantial percentage of the students

11    enrolled at ACICS institutions are working adults.  The majority of them are women very

12    few of them are first-time, full-time students.  These are schools that offer working adults

13    the opportunity to make their lives better.

14           We know, based on the Department's data, that 40% of the undergraduates

15    are PELL recipients, 55% are undergraduates of color.  Consistent with the practices of

16    recognized accreditors ACICS performs its review of the accreditation worthiness of

17    member institutions through a series of activities and procedures that deploy teams of

18    evaluators and staff coordinators to each campus every three to five years.

19           In addition the campuses are subject to interim reviews by ACICS staff

20    and evaluators for a variety of reasons including quality assurance monitoring of

21    substantive changes with the receipt of adverse information from reliable third parties and

22    for other reasons.

1          In addition ACICS collects and reviews from every institution each year

2     student achievement data and institutional financial information.  In short ACICS

3     campuses and programs expect and receive ongoing in-person and remote monitoring of

4     their effectiveness before, during and after each accreditation cycle.

5          Since our last recognition ACICS understands that the expectations and

6     requirements for re-recognition have changed substantially.  The Under Secretary's April

7     2016 letter to federally recognized accrediting agencies laid out the Department's new

8     expectations regarding application of standards and institutional review processes

9     especially with respect to standards related to student achievement and institutions or

10    programs exhibiting higher risk.

11         ACICS takes seriously the concerns about the need for greater

12    accountability and transparency in higher education.  These issues have been raised by

13    external stakeholders as well as the accreditation community.  ACICS has listened to

14    those concerns, participated in those discussions and has and will continue to take

15    decisive actions to inform the organizations -- to improve the organization's effectiveness

16    and fortify trust and confidence in the accreditation process.

17         Briefly I just want to give you a sense of what I have been up to since

18    April with the support of Council.  As Dr. Leak mentioned we have initiated a series of

19    decisive and immediate reforms that are in effect now and will bear fruit this Council

20    cycle.  They include:  temporarily suspending the acceptance of applications for initial

21    grants of accreditation, implementing a number of policy changes that will strengthen the

22    review of member institutions and fortify the principles of transparency and ethical

1   conduct including the new data integrity standard, a review of the institution's written

2   plans for recruiting and admitting students, strengthening the enforcement activities by

3   removing of administrative barriers that have inhibited ACICS from applying more

4   timely and direct sanctions to underperforming schools and programs.

5           And the requirement that each campus provide reliable student

6   achievement data to the public and be placed in a prominent place on its website that it be

7   reliable, accurate and up to date.

8           ACICS also has established and employed an at-risk institution group with

9   the explicit purpose of applying greater review of programs for campuses identified as

10  having quality or integrity issues.  That work group executed at least 7 special visits to at

11  risk campuses in the last two months encountering immediate evidence that will be

12  reviewed by the Council in August along with the institution's responses in order to make

13  an informed decision about their accreditation worthiness.

14          On June 3rd, ACICS also announced a new evaluator development and

15  deployment initiative which Dr. Leak has outlined and that beginning with the fall 2016

16  travel cycle includes re-screening of the currency and relevancy of credentials, additional

17  training requirements, sign attestations about avoidance of conflict of interest and

18  recurring performance evaluations through an enhanced appraisal process.  Quality in

19  evaluator deployment should also be a matter of continuous improvement.

20          We appreciate the critical role ACICS plays in reviewing the quality of

21  education provided to the students at our institutions and we take great pride in the cadre

22  of pure evaluators that ACICS sends to accomplish the peer review of education quality

1    and effectiveness.

2            We believe our evaluators are uniquely positioned to make the qualitative

3    assessments that they are asked to make because they are professional educators.  We

4    know the Department appreciates the role of peer evaluators and the role they play in

5    assuring quality education ACICS's primary mission.

6            Simultaneous with these initiatives, ACICS made procedural

7    enhancements to the site visit review process and implemented those enhancements

8    immediately.  Those enhancements included a data integrity reviewer as you heard for

9    every site visit, a pre-visit survey of students, faculty and staff to identify risk factors and

10   quality issues and then finally requiring expanded narration in the team reports in order to

11   enhance the quality and richness of information available to the Council for its review

12   and decision-making.

13           Members of the community, Dr. Leak and I would like to be in front of

14   you today with the recommendation for renewal of recognition and no finding of non-

15   compliance as was the case in 2013.  We are not asking for that.  We fully appreciate the

16   seriousness of the staff recommendation.  In this regard ACICS recognizes the

17   Department's interpretation, application and required documentation of compliance with

18   such rules having changed significantly since 2013.

19           In fact the sheer volume of documentation requested by the Department in

20   its final recommendations requires more time for ACICS to respond.  ACICS previously

21   requested an extension to respond to the Department's draft report in order to make or

22   document all of the changes in policy and standards required by the Department's new

1    interpretations of the regulations, apply them in a systematic and recurring matter to

2    member institutions and then collect and provide evidence.

3              We renew that request to keep the record open until we can provide that

4    additional information.  We want to thank Mr. Porcelli for his candor and his concerns

5    throughout this process and would also thank Mr. Bounds for his guidance.

6              For better or worse we have become the subject of intense political and

7    public scrutiny and we believe many of the public comments directed to ACICS are not

8    well founded for reasons we have articulated throughout the process.  We invite and

9    remain open however to candid conversations with any and all parties.

10             However the real issue today we believe is the issue of whether we can

11   come into compliance within one year or sooner.  We have studied the staff report with

12   great care and with many of our Commissioners who are here today and we sincerely

13   believe we can solve and address the legitimate issues that the Department has flagged.

14             We do not say this lightly and we take the Department's concerns very

15   seriously.  As you can tell from Dr. Leak's comments we have already made much

16   progress although it will take additional time to demonstrate the effectiveness of our

17   actions.  We welcome your continued input as we move forward.  We are committed to

18   continued progress on the initiatives under way and ACICS will employ whatever

19   resources necessary to address and resolve these concerns.  We only ask we be given the

20   opportunity come back before you fully compliant within one year or less, thank you.

21             MS. PHILLIPS:  Thank you, questions for the agency by the Primary

22   Readers, Ralph?

1          MR. WOLFF:  Thank you both for your presentations.  Let me also say as

2     Susan mentioned at the outset there are these pilot questions.  Rather than focusing on

3     them I'm just going to incorporate them and some of them I believe you have already

4     answered but I just want to acknowledge that they are there but I think the issues are far

5     more serious so thank you.

6          I would like to kind of divide a few questions on to the past and then really

7     follow-up on the future.  But as I have talked about in questioning Mr. Porcelli there are

8     real concerns around the way in which ACICS has responded to those categories that I

9     mentioned particularly where your own teams found evidence of fraud or

10     misrepresentation and there appear to be a failure to act and instances in which court

11     decisions, legal settlements or the like and again failure to act.

12          And as some of the commentators or at least one of the commentators

13     talked about institutions or campuses being placed on the honor roll even after serious

14     findings have been made against these institutions -- so I wonder if you could respond to

15     the how is this situation accurate as to support trade in the staff report and how the

16     Agency represents what is at least addressed or identified as a failure to act under where

17     there were serious findings of fraud and misrepresentation.

18          MR. BIEDA:  Thank you I will respond to this the best I can and I will ask

19     my colleague Ian Harazduk who is a senior accreditation manager to also join in to flush

20     out the response.  First I would like to say that to the degree we failed, ACICS failed to

21     provide documentation that we took decisive action on the basis of those investigations or

22     allegations.

1   It was primarily because we don't believe that documentation existed.  In

2 other words we did not deliberately withhold any documentation to the degree there were

3 team visits and there are reports derived from those visits or there are other kinds of

4 monitoring activities that produced an analysis that went to the Council.

5   To the best of my knowledge every bit of that evidence was sought, was

6 packaged and was provided to the analyst in that spirit.  On the other topic of was our

7 pattern, was ACICS's pattern of response or depth of response to the concerns raised by

8 for example, state Attorney's General sufficient or appropriate given what we now know?

9   I think the answer is that we would have done things differently.  It is also

10 true that until those investigations produce not only a finding of wrong-doing but actually

11 evidence of a wrong-doing or a fraud or abuse that we can get access to we are pretty

12 limited and were pretty limited in being able to use any of those allegations as a basis to

13 take formal adverse action.

14   What we were doing all along however and I think is clear in the evidence

15 we provided is that from the beginning we learned about the first Attorney General

16 investigation even though we knew it would be months or years before there was a final

17 resolution of that investigation, we opened up our own formal adverse monitoring action

18 with the school requiring them to document to us at least three times a year where they

19 stood in that process, what additional information was being provided through the

20 discovery process and to share that with us so that we could review that and our Council

21 could review that in determining the ongoing ability of that institution for accreditation.

22   In all of those cases either the final outcome of the investigation was a

1    settlement where there was articulated in writing no finding of wrong-doing but other

2    factors or other elements that both the Attorney General and the institution agree to as

3    part of the settlement or in some cases those investigations are still pending.

4         Not all of them are resolved but again looking back what that

5    circumstance has enabled us to do is to revisit how we at ACICS view the oversight

6    partners that are relevant to our effective review of these institutions.

7         I think prior to the emergence of these allegations we were pretty much

8    focused on effective relationships with state approval authorities, state certification

9    authorities, Department of Education accreditation group and also Title 4 folks.  Now we

10   have been forced and I think for good reasons, for healthier reasons to expand that

11   universe of oversight partners that we need to pay attention to more closely and on a

12   more regular basis.

13        Before I close my comments I also want to point out to you that over the

14   course of the last three or four years as those state Attorney Generals investigations were

15   ramping up we received numerous and voluminous requests for information about the

16   accreditation status of those institutions, their team reports, their school responses, the

17   Council deliberations and action letters.  I believe in every case we fulfilled those

18   information requests according to a negotiated timeframe.

19        They were very voluminous, they were very numerous.  I also believe in

20   every case with the possible exception of one that I think was mentioned maybe either in

21   the analyst report or some other extraneous piece of information -- in every other case

22   those document productions did not produce a single follow-up inquiry from the

1    Attorney's General in any way.

2            There was no follow-up request for additional information.  There was no

3    follow-up request to discuss what the information meant or doesn't mean there was no

4    discussion about whether or not ACICS was applying its standards, particularly as it

5    relates to some of the fraud and abuse issues in a manner that comports with state

6    consumer protection law.  Those discussions simply did not take place.

7            MR. WOLFF:  Thank you. Others may wish to pursue but I appreciate that

8    hindsight gives you greater clarity and that you are really trying to respond.  Let me if I

9    can have that document -- a lot of the attention has been on the misrepresentation of

10   placement rates where you do have a formal standard and a verification process.

11           I would just like to ask your response in the Department's score card data

12   which I think you have a copy of as well as in one of the public comments and I am just

13   trying to pull up from I think it was from Ben Miller where it tries to look at the

14   relationship with respect not just to placement but default rates, graduation rates, and

15   things of that sort.

16           And the Department's score card here or data here there are a number of

17   institutions whose default rate is well over 10%, 20% or higher.  Graduation rate is in the

18   30% and in at least the data analysis that Ben Miller put across all institutions ACICS,

19   ranks either at the bottom or close -- second to the bottom in its performance in

20   relationship to overall institutions effectiveness if you will.

21           Could you talk about how you address not only the placement issue which

22   I know you have added now a whole new set of criteria but the larger issue of completion

1   and this whole issue of do students get through the program and then are they capable of

2   paying off their loans.

3          MR. BIEDA:  Yes I would be glad to.  First of all let's talk about

4   verification of placement data or verification really of any student achievement data that

5   we request and receive.  It's important to recognize I believe and I know many of you

6   that are members of this panel have forgotten more about how accreditation works than I

7   will ever know but the reason -- the primary reason we collect that data is to inform

8   Council decisions regarding the accreditation worthiness of our institutions.

9          And so the validity of that data, the depth of that data its applicability to

10  those decisions is our primary consideration and to the degree that that self-reported data

11  lacks integrity or lacks an ability to be verified it also undermines the effectiveness of the

12  Council's review of these institutions.

13         So the expectation is that all information self-reported and if you think

14  about the broader definition of self-reported data you think about what is provided in a

15  self-study in an application for renewal grant of accreditation.  Most of that is self-

16  reported as well and that is verified routinely through a series of encounters by the

17  accreditation team and the institutional representatives.

18         The data that comes from an annual campus accountability report is

19  uploaded through a system into our IT platform.  Our IT platform for the last two years

20  has been fortified and enhanced so that it performs as Mr. Porcelli mentioned a series of

21  data integrity protocols through an algorithm and determines if in there are anomalies in

22  what has been uploaded that would then cause the system to reject that report and send it

1    back to the school and make them fix it in some cases at their expense.

2         So that is our first defense that we have added in the recent past to

3    strengthen that.  Secondly is as the staff noted starting with this current accreditation

4    cycle we added a dedicated data integrity reviewer to enforce and apply the expectations

5    of our new data integrity standards so that we are not in a situation where members of the

6    evaluation team are too compromised with other tasks to be able to do due diligence and

7    make the calls to employers and students and look at the back-up documentation

8    thoroughly and professionally.

9         The third aspect that was mentioned in the analyst report is that we did

10   beta test in 2014 and '15 a placement verification program, an additional enhancement

11   which we had committed to back in our compliance report in 2013 but because of some

12   of the testing results we needed to make sure we got it right before we put it in place in

13   January of this year.

14        Since that time it has been used effectively to random sample placement

15   data from a variety of our schools and test that accuracy through outgoing emails and in

16   some cases through phone calls and that has augmented our ability to test the integrity of

17   that data.

18        Finally this Council has always had and we have even employed this tactic

19   very recently as well as back in 2011 the ability to require the schools to submit their

20   student achievement data, including placement to independent third party verification.

21   So it is really a portfolio of four tools that can be employed based on the risk factors

22   associated with that data to make sure that the data that we are reviewing for making

1    accreditation decisions is as accurate and reliable as possible.

2              I will stop there and get to the second part of your question.

3              MR. WOLFF:   Thank you that's very thorough.  Can you just help me

4    understand when you say student achievement data I understand that includes certainly

5    all of this attention you are giving to placement data.  Would it also include retention,

6    graduation, loan default rates, average loan amounts, what are you also including in

7    student achievement that goes through this third party verification and your algorithm?

8              MR. BIEDA:  So the other student achievement data that we require

9    collect and test includes retention.  We do not currently have a graduation rate but we are

10   working to add that to the portfolio and probably the last but most important is student

11   achievement as it relates to licensure and certification pass rates.

12             I emphasize that because as I gave you the profile of our member

13   institutions and you -- I think you heard me say that Allied Health is one of those

14   programs or family of programs that has enlarged enrollment.  We find that more and

15   more of our institutions are having success in offering those programs and more and more

16   of those programs that at one point may have been a 12 month or an 18 month program

17   there are now requirements that they become in order for certification that they have at

18   least an Associate Degree because we encountered that in the past two years very

19   robustly with ARRT the Radiologic and Technology Registry Association.

20             So those trends in the work place -- the work force development

21   community in many cases are driving our need to continually monitor and assess the

22   student achievement effectiveness of our student institutions, particularly those that are

1   offering programs for which licensure and certification is required in order for the student

2   to seek and be employed in that state.

3          That's how that particular student achievement metric ties back to the

4   requirement for placement.

5          MR. WOLFF:  Thank you both of those areas graduation and licensure

6   seem to be or at least are responsive to some of the findings of the staff report.  I have

7   two more questions one simple -- who are the four people on the Advisory Committee,

8   could you give us a description of who they are, their backgrounds?

9          MR. BIEDA:  Yes so I think probably two of them are in the audience

10  today but I am not going to ask them to stand.  Alise Scanlon former Executive Director

11  of the ACCSCT; Roger Williams -- Mr. Roger Williams former leader of ACCET, A-c-c-

12  e-t; Dr. Paul Bot who is an education PhD at University of California Long Beach I

13  believe and also former Commissioner for one of the other accrediting bodies and then

14  last but not least Dr. Jim Johnson who is a demographer at the University of North

15  Carolina at Chapel Hill.

16         Those are the four folks that we have recruited so far and we are open to

17  adding some additional people to do the deep and persistent review of every aspect of our

18  operations so that when we are done with this process we are a stronger more effective

19  organization.

20         MR. WOLFF:  Thank you its California and it would be California State

21  University Long Beach, U.C. wouldn't claim Long Beach as one of its campuses.  My

22  final question for you and I will turn it over to Frank and others, you mentioned revision

1    to the team -- site team reports -- the reports are not public and I am a fierce advocate of

2    making team reports and actions public and would encourage that.

3          But apart from that fact I understand they are not, but having seen some of

4    your reports they seem to be less evaluative than check-offs of a lot of boxes that teams

5    need to verify with scant recommendations at the end and some descriptive information.

6    And they represented at least a concern to me about the evaluative side demonstrating at

7    least is evidence of deep evaluation and the thoroughness of recommendations for both

8    findings of non-compliance and improvement.

9          So my personal review and comment on it, but if you could explain how

10   you see those reports -- how you are modifying the team reports.

11         MR. BIEDA:  So the two immediate changes that we made to the team

12   report for this cycle is number one to expand the section of the team report dealing with

13   data integrity.  If you have a dedicated person that is going to spend two to three days on

14   site just reviewing data integrity, back-up information, calculations, spread sheets et

15   cetera there also needs to be a stronger set of questions and a larger set of evaluative

16   topics for that person to review and to memorialize either through the check boxes or

17   through the narrative provided down below.

18         The second change that we have made this cycle is to require that at the

19   end of each of those check box sections the team reviewer spends some time adding

20   narrative to describe a variety of things including what specific evidence did they review

21   in answering the questions up above.  Were there any anomalies in the evidence they

22   encountered or any other concerns that should be brought forth in memorializing the full

1    team report.

2              That's the just the beginning.  I know we don't like to talk about

3    prospectively but I believe a much deeper dive into the depth and the breadth of our team

4    reports is still necessary.  We simple did what we could with this cycle reflecting the fact

5    that there is need for more robust structure and content for those team reports.

6              MR. LEAK:  I might also add that what we have done now is send out a

7    survey to the staff, faculty and students of the school that we are going to visit so that

8    they have an opportunity to identify comments -- provide comments that identify

9    concerns about any aspect of the school that we want our visiting team to know before

10   they arrive so that they have more than just the self-study report document but they also

11   have anonymous comments that they can follow-up on while they are on site to uncover

12   anything that people may be uncomfortable to say in a group setting.

13             MR. WOLFF:  That's currently being implemented?

14             MR. LEAK:  Yes.

15             MR. WOLFF:  That's being done and can I just ask as you respond is that

16   to all faculty student staff or do you use a sampling methodology?

17             MR. HARAZDUK:  Right now it is the responsibility of the

18   administration at the school to send out that information.  We expect it to be to all

19   faculties, staff and students.  We have numbers whereby we have gotten 4,000 comments

20   back at the 30 or 40 visits that we have done so far.  A large majority -- 3,000 of those

21   comments are from students and we have taken and had examples of where we have used

22   those comments -- the narrative comments that we have gotten back specifically from

1    students and had accreditation findings based on those.

2              In one instance it was particular to administrative capability and we had a

3    great concern on the visit of that and there is now a finding memorializing the team report

4    with that information.  I would like to answer your question too about the reports as well

5    and the scant information that you mentioned was in that.

6              We evolved from a narrative process a few years before I had started so

7    about 10 years ago we had a process whereby we had an entirely narrative process.  But

8    that was obviously time-consuming and being on -- I've been on hundreds of

9    accreditation visits now and it was difficult to get everything written up and completed

10   while we were on site.

11             So the move was to go to a checklist not only to make sure we see

12   everything because we obviously have hundreds of standards that have been mentioned

13   that we need to look at so we felt the checklist approach would make sure that we get you

14   know a view of all of those.

15             And I can tell you as I said of the hundreds of visits I have gone into there

16   is a lot of review, interview and observation that goes into checking that answer yes.

17   Though it may not be you know memorialized on the report and that's something as Tony

18   said that maybe a better job especially with your recommendation to have reports be

19   more public that is something that we can do and certainly enhance and are and have

20   plans to enhance those reports having more information so that is certainly something

21   that we take into account.

22             MR.WOLFF:  Thank you my final comment is just to say that I want to

1    acknowledge I went to your website and you have acknowledged the staff

2    recommendation, made that public and the suspension is I think very thoughtful and

3    helpful and just focusing on where you are now and how to move forward, thank you.

4            MS. PHILLIPS:  Frank?

5            MR. WU:  Good morning thanks for joining us.  Let me start with just a

6    hypothetical question.  I am just curious if you were not recognized by the federal

7    government for a gate-keeper role do you think you would have a continuing function in

8    the world?

9            MR. BIEDA:  Mr. Wu I appreciate that question and thought about a

10   response to that deeply as you had brought it up earlier with the representatives from the

11   Department.  So I would first just to not waste your time say we can't engage in

12   speculation as you would imagine my answer would be.

13           But I think the rest of the answer has to be that there are many institutions

14   that we currently accredit particularly international ones or those that serve a high degree

15   of international students who are not Title 4 participants, number one.

16           Number two there are many other institutions who also rely upon our

17   accreditation in order to gain access to certification and licensure eligibility --

18   programmatic eligibility so now that may go away because some of those programmatic

19   accreditors require that the institutional source of accreditation is recognized but they also

20   view that as a gate or a hurdle they get over so they can get access ultimately to

21   certification or professional participation.

22           And then thirdly there are institutions that in any event view accreditation

1    from a U.S. based accreditor to be something of high value and whether or not we are

2    recognized by the federal government may or may not be material to them.

3          MR. WU:  Thanks that's a very thoughtful answer.  Thinking through all

4    of this I think highlights for all of us the gate-keeping function and how crucial it is and

5    the tremendous amount of federal funds that flow through this whole process ultimately

6    we hope for the benefit of students.

7          Let me turn to the past and then to the future.  My sense is and I am very

8    roughly paraphrasing here but my sense of your opening statement is your strategy and I

9    think it is a good one is to say mistakes were made we are going to be better.  I see some

10   nod okay so and I do want to focus on the future but before I get there just a question or a

11   set of questions about the past because the past is prologue.

12         These are actual questions this is not a rhetorical question.  I am just

13   curious how would you describe because there has been regime change for you, how

14   would you describe the past?  Were the mistakes that were made a result of not having

15   standards or having low standards or were they a result of spotty, erratic or lax

16   enforcement of decent standards or another possibility were you systematically duped by

17   bad actors out there in higher education?

18         How would you describe the past and I would like to offer also not in a

19   rhetorical sense there has been scathing third party commentary and media commentary.

20   I actually would invite you to speak to that.  You have been very thoughtful and you have

21   a forum here an opportunity -- it is not a court of law, it is not a criminal trial but if there

22   is something that you want us to know if so and so said something about you that you

1   mentioned some of the things are unfounded but if you want to point us to something

2   concrete and explain how it is deeply unfounded.

3            I would actually be interested in hearing if you have an example

4   somebody said "X" and you can show us that it is "Y" not "X" at all that would change

5   my perception.

6            MR. BIEDA:  Mr. Wu there's a lot of content in that but let me just start

7   with one residual question from Ralph Wolff dealing with the Ben Miller report and his

8   interpretation of the college scorecard data as applied to accreditors.  So number one and

9   I don't think this will surprise anybody but I think it is important to get it on the record --

10  number one in the development of the college score card data or the iteration of that

11  instrument that came out in November of 2015 there was not to my knowledge any prior

12  contact with ACICS.

13           I can't speak for the rest of the accreditation community with ACICS

14  about how that data derived from performance of individual institutions was going to be

15  aggregated and then rolled up by accreditor and therefore what that would indicate in

16  terms of a rankings or a rating system nor was there an opportunity for us to weigh in and

17  say we have some underlying -- notwithstanding the methodology we have some

18  underlying issues with the quality and accuracy of the underlying data.

19           So those discussions never happened, we were not afforded that

20  opportunity we simply had to live with the conclusions or the portrayal of the agency by

21  that data after released on November 5th, 2015.  I believe since it has been revised at least

22  once maybe twice.

1          Back in January of this year because of our concern about the way that

2   was portraying us but even more so we were concerned about the degree to which it had

3   validity relative to the performance institutions.  We, at our expense, hired a data

4   analytics firm to do the deep dive into the underlying data to critique the reliability of the

5   data sources and also to give us some perspective on the methodology itself.

6          That information was published in May, provided to the Department and it

7   does in fact -- and I think it mimics or repeats a lot of the criticisms from other

8   accreditors of the limitations of that data as well as the short-comings of the methodology

9   used.

10          So to the degree that we have common ground with the Department in

11   seeking more numeric and quantitative ways to evaluate and assess institutional

12   performance we would like to continue to work together and develop that capacity.

13   That's why in Dr. Leak's remarks when he is talking about ACICS aspiring to be more

14   quantitative and more evidence based.

15          There is great interest in doing that, it helps all of us be more effective to

16   the degree that what has already been published requires us to step back and figure out

17   how to apply that to our institutions given the data limitations.  That is work yet to be

18   done.

19          I also want to point out that as far as I know among all of the other third

20   party commenters and again we respect their right to give commentary and invite their

21   participation in this discussion but to my knowledge not one of them with the exception

22   of Mr. Miller on one occasion -- not one of them have ever come to ACICS and said we

1   have questions or issues about your performance or that of your institutions.

2          We would like to sit down and talk to you about these patterns of concern

3   that we have discerned and figure out and at least ask you how is your accreditation

4   methodology affecting these either in a positive way or a negative way.  Those

5   discussions have not happened.

6          So we are kind of at a loss at this point to really understand exactly where

7   the -- what the basis for the concerns are let along have a greater understanding of how

8   we might remedy those concerns which are legitimate concerns through changing our

9   methods and our procedures.

10          MR. WU:  So to follow-up about the past and I would invite you to

11   consider this actually a friendly question and an opening.  How did these things happen

12   that have happened that have caused distress for many people?  If you could just identify

13   what is the cause of this pattern and you could for example say you were duped by one

14   bad actor who is really bad.  That's a plausible story.

15          MR. BIEDA:  Well first I would stipulate because it was a friendly

16   question that not all of our institutions are perfect or are as effective as they need to be

17   and on any given day depending on the effectiveness of our review we ascertain and

18   discover that there are deficiencies and put pressure on them to remedy them.

19          What were the more systemic or patterns that we discerned from the

20   controversy and the criticism that is currently facing both the sector and ACICS colleges

21   and schools -- I think three things.  Number one as I reiterated in my testimony the

22   expectations of the Department as it is reflected in the interpretation and application of

1    the recognition guidelines have changed and I believe have changed substantially.

2           Number two the external dynamics of the marketplace -- what the

3    workforce development community wants and expects, what students expect in terms of

4    the educational experience and how those two come together in an effective educational

5    enterprise.  That has changed as well.

6           The third thing that I really want to point out and emphasize because this

7    is an area that has great fertility for future research and more importantly for our own

8    continuous improvement and that is what is an effective art and science for accrediting

9    large multi-campus institutions?

10          It's one thing to accredit an institution that is a main and a couple of

11   branches.  It is another thing to accredit an institution that may have one or two mains

12   and 120 branch campuses and you know at that point that the institution is operating that

13   way because its business model calls for scale for economies of scale.

14          So certain redundancies that otherwise may be manifested at the

15   administrative level or even at the academic development level at each local campus have

16   in fact been rolled up to a main campus or even at a corporate level.  To the degree that

17   our current methods of discernment can figure out the patterns of deficiency based on the

18   review of a single branch campus they have been effective to the degree that they need to

19   be improved so that we ask the question -- if we see this particular deficiency at one or

20   more branch campuses how do we do a better job of figuring out what is in fact the cause

21   of that deficiency at a main campus or the corporate level?  We need to get better in that

22   regard.

1            MR. HARAZDUK:  I think I can say to your question as well, that I think

2    it was a number of things. I think we can and have done now stronger enforcements, we

3    have shown the process and have explained it with an adverse institution group where

4    these issues come up.

5            We are now you know reviewing them we are going and doing further

6    investigations, we are asking for written comments or we are doing effect visits or we are

7    doing unannounced visits where we are showing up and we are seeing what the school is

8    doing.  We already have implementation of that, we have done 7 specific visits and a

9    number of those are unannounced.

10           A number have been related to student complaints and other issues with

11    data integrity so I think -- you know I think further enforcement we are doing that we

12    have also enhanced our processes as have been said with the data integrity review where

13    we are now doing 100% attempt of these contacts to make sure that any time we are on

14    site we are verifying all of these placements and I don't want to speak for the college and

15    what information they gave but it is certainly possible you know that the information they

16    were giving us was not correct and that is why we are dedicated to enhancing this process

17    and verifying the information that we get.

18           MR. LEAK:  The only thing that I would add is that the Board and the

19    Commissioners on the Council are not tone deaf to the -- you know the voluminous

20    outcry of these third party commenters and so we have directed really a serious look at

21    how we do things and we are making changes so that we can be the accreditor that you

22    expect us to be.

1       And we are in the process of making those changes but I want you to see

2  that we have not been tone deaf and that we are serious about real change.

3       MR. WU:  Thanks, you actually have an interesting, potentially persuasive

4  argument that many of your institutions are structurally different -- they are just a

5  different size, scale with a corporate structure compared to traditional non-profit -- that's

6  actually a distinction that you could claim.

7       Let me turn though to the crux of that which is the future.  Let me

8  characterize it this way.  I have never met any of you, I have no knowledge of you other

9  than in the past hour you seem smart, honest and credible -- why should we as a group

10 trust you?  That's what you are asking -- you are asking us to make a bet that in 12

11 months you can turn this thing around and address these issues.  You have pointed out

12 that you have already started but what you are asking is for us to gamble with billions of

13 dollars of federal money and you are very astute, you are recognizing the past is not a

14 great record for us to trust you based on.

15      So you are saying you are new people you have new rules, you are

16 revising you understand the environment and again think of this I say as a friendly

17 question.  What indicia could you point to and you have already pointed to one -- new

18 people.  So new personnel has come in and two -- you have adopted new rules.  So that's

19 pretty good.

20      But what about the enforcement of those rules because it seems that that

21 may be an area -- actually you have pointed out that you have a new computer algorithm

22 to try to spot the discrepancies in the data, that's good so you have identified a few.  I

1    invite you to list what are the other concrete initiatives under way that should give this

2    body confidence that in the next 12 months if you were given 12 months that this would

3    be taken care of.

4         And in particular I would direct your attention to an issue that caught my

5    eye in reviewing all of the documents -- conflict of interest issues.  Now accreditation is

6    rife with those throughout.  Everyone in higher Ed is connected in some way to some

7    agency or services, a site visit team member or so and so but your conflict of interest

8    issues look more severe.

9         How will that be changed -- so the question is in the future how will the

10   enforcement of the regulations change such that we should recommend let's give them 12

11   more months?

12        MR. LEAK:  Well I'll start with the Board itself.  You know we recognize

13   that there are potential conflicts of interest in Board members that are appointed to

14   govern this agency and we have all consistently, if we have identified those we have dealt

15   with them, but that is not enough.

16        You know we need and we did take steps to establish an Ethics Review

17   Board so that any question that comes up with a conflict we have a third party that looks

18   at that, not us looking at it.  We have a third party independent --

19        MR. WU:  Who is the third party?

20        MR. LEAK:  I'm sorry it's our Ethics Review Board meaning that they are

21   made up the majority are people that aren't affiliated with any of the institutions that we

22   accredit, never have been and they are totally independent public members and so we are

1   taking steps to govern ourselves in that regard so that if there are members of the

2   governing body that have any potential conflict that is addressed and taken outside of the

3   you know the Council's decision-making and left to this independent group that you

4   know we have put in place to settle those conflicts.

5          MR. BIEDA:  So I think it's a reasonable question both on the ethical

6   considerations and also what evidence to fortify what we have already presented that we

7   are worthy of your trust to complete the revamping, the fortification of this organization

8   in the next 12 month.

9          We also mentioned the formation of course the Special Advisory

10  Committee that has the full authority -- I can certainly provide a copy of the executive

11  order and Dr. Leak could probably recite it from heart but it clearly says their authority is

12  to recommend to the Board of Directors every aspect of the organization, including

13  governance, composition and structure of governance including the sufficiency of our

14  standards including the dimensions of the way we operate and apply those standards

15  through methodical and recurring protocols, including data, integrity, verification and

16  including the efficiency of the training of our Commissioners, of our evaluators, of our

17  staff and anybody else that is involved with developing the accreditation record.

18          So that is the second area and it will not bear fruit immediately but it will

19  take a little bit of time to put that group together, get them going and then develop

20  recommendations for the Council to encounter.

21          MR. LEAK:  And we are committed to making those recommendations

22  from the special advisory group public so that everyone knows what they have found so

1    that it is clear.

2           MR. HARAZDUK:  I think the other part of your question about what can

3    we show that has changed to prove that we are doing it.  We have evidence now we have

4    already implemented these things.  They have been implemented for a number of months

5    now so we have data, we have evidence that we can provide to the Committee to show

6    that we are doing the things that we said with the call for comment.

7           So I think we recognized some of the weaknesses where we weren't

8    finding information and getting enough information and are now acting upon that with a

9    call for comment for students, faculty and administrators.  As I said we have had 4,000

10   comments already come in for that.  We have an at-risk institution group that has already

11   done a number of special visits that is certainly going to continue.  I'm somebody that

12   works in the weeds of these things so I can tell you having done those visits and having

13   seen those institutions and gone out and written those reports I will continue to do.

14          And the data integrity review we have already made over 3,000 calls to

15   students to verify placement so we have the resources and we are implementing these

16   things already so.

17          MR. WU:  That's all I have.

18          MS. PHILLIPS:  Moving to questions for the Agency by Committee

19   members I have Cam, Simon, Art, Jill and Bobbie so far.

20          MR. STAPLES:  Thank you Susan.  I'd like to ask you questions about the

21   letter from the Attorney's General that we received and that you have received I'm sure.

22   I think you would agree it is a pretty devastating reflection of a lack of confidence and

1    trust in your agency by significant public officials.

2            And the concern that I want to pursue in the letter is around your response

3    to litigation, legal actions, anything in the public view that raises concerns about the

4    conduct of the institutions you accredit.  And as you know in the letter there are several

5    references to instances where the Attorney's General claims you did not take any action

6    with respect to the institutions that were subject to their litigation or the case of some

7    investigations by the AG's office.

8            And I guess I have also read the correspondence from the institutions or

9    the entities named in the letter and one of the things I want to understand from you is

10    what do you consider to be an appropriate trigger for you to conduct an investigation into

11    a school that you accredit based on any sort of public information or whether it is

12    settlement or pending litigation.

13            What in your mind triggers your responsibility independent of the entities

14    that are pursuing their own investigations?

15            MR. BIEDA:  Thank you I am going to let my colleague Ian respond to

16    that because I think it is more responsive to talk about what we are doing now.

17            MR. HARAZDUK:  So we have an at-risk institution group that looks at a

18    number of factors.  What you are saying is what we typically would refer to as adverse

19    information so information from a third party and an oversight agency that we didn't get

20    from someone specific not from a faculty or student or administrator.

21            We would consider those complaints that we would review so we certainly

22    take those into account, we have our at-risk institution group have now done

1    investigations visits, unannounced visits based on that information whether it be from an

2    oversight agency or a media report.

3              We really do review all of these and where there are issues with our

4    standards I mean obviously we have to determine whether the institution is meeting our

5    standards or not and as it has been mentioned I mean I think our standards are strong and

6    that has been mentioned and we have updated those where needed.

7              So we have other time where we would look at it or other factors that are a

8    part of that aside from just adverse I mean if there is poor student achievement indicators

9    that could be a reason, if there is poor financial stability, if there is excessive growth at an

10   institution or extensive changes happening at an institution -- all of these we have about 8

11   I don't know if I named them all right now, factors of what we look at at this at-risk

12   institution group and then that group makes a determination of an investigatory action

13   that takes place to put information and findings and we already have as I said 7 of those

14   with an average of 10 findings per campus that will go before the Council in August to

15   make a decision on whether that institution is worth of accreditation.

16             So we will obviously get the responses back from the institution on those

17   findings.

18             MR. STAPLES:  And the letter from the Attorney's General claims you

19   have taken no action in response to some fairly significant issues such as the 100 million

20   dollar settlement in one particular case and the letter from the company that settled said

21   there is no admission of wrong-doing or finding of wrong-doing.  Do you consider that to

22   be that sort of resolution of the case to be sufficient enough not to conduct your own

1    investigation?

2              MR. HARAZDUK:  Not with this at-risk institution group.  I mean if there

3    is any sense that the institution may not be meeting our standards certainly something as

4    serious as that we will do our own investigation.  So we obviously can't take an action

5    just based on what another entity that is not -- you know stating our standards has said

6    explicitly, but we will do a review and have done reviews of those institutions and will

7    make determinations on whether there are findings and have made determinations thus

8    far on findings of those.

9              MR. STAPLES:  So I guess I just want to ask you is this letter inaccurate?

10   Have you actually taken -- I mean this says that there has been no action taken in about 3

11   particular instances.  As I mentioned there are letters of explanation that I don't find to be

12   sufficient from your perspective.

13             I understand that the institutions are saying we settled no claim of

14   wrongdoing, don't blame us, don't blame our accreditor but that is not really relevant to a

15   review of your standards and whether the conduct that came to light whether it was

16   fraudulent or not or whether the claims were -- that's not necessarily relevant to where

17   they are violating your standards.

18             So I guess what I am trying to understand is they are claiming pretty

19   strongly that you have taken no enforcement action in several instances and that's why

20   they have no confidence in you and that is why they are recommending that we not

21   continue your recognition.  So I guess I would like a more specific response to those

22   claims.

1          MR. BIEDA:  So the -- I think as I mentioned earlier from the first

2   Attorney General investigation that we became aware of.  Sometimes we were informed

3   of those by the Attorney General, sometimes we were informed of those by the school,

4   sometimes we learned about those from the media.

5          So from the beginning those schools were subject to heightened

6   monitoring at least three times a year to update us on what information they had

7   provided, what was the basis for the claim and all of that information was provided to our

8   Council so that they could take that into consideration regarding any other accrediting

9   action -- accreditation decision that was pending.  That happened in many of these cases

10  for numerous years while the court cases played out, why there was additional legal

11  procedure.

12         In no case did we have outreach from the Attorney General that said that

13  based on our investigation here is evidence that is the basis for our claim that there has

14  been some violation of for example a state consumer protection statute and ACICS you

15  should take this into consideration.

16         We are sharing it with you so you can take it into consideration regarding

17  the accreditation worthiness of the institution -- that did not happen.  And I'm not sure

18  that we would have had access to that information because in most cases the information

19  that was requested for those investigations was information that we already had in hand

20  which was namely the accreditation record of those institutions that we provided to the

21  Attorney's General.

22         There was nothing coming back to us that said that now that we have done

1    our own investigation ACICS here's some additional things you should consider.  I just

2    want to be clear that those exchanges of information never occurred.

3              MR. STAPLES:  But absent that -- I mean absent them sending you a nice

4    neat file of documenting what they found didn't you feel an independent obligation to

5    make your own investigation?  Here is a settlement for 39 states Attorney's General

6    resulting in 100 million dollar settlement -- I would be very curious if I was in your shoes

7    as to what was underneath that agreement to the extent that you could find that out.

8              But I think -- I guess I'm just asking there is certainly concern that you are

9    not taking action even after the conclusion of their investigation.  I'm wondering when do

10   you think it is appropriate for you to do your own investigation around violations of your

11   standards?

12             MR. HARAZDUK:  Well I can say with respect certainly to the Attorney

13   General's report that was certainly information from the past.  We have taken action

14   since then and had taken action at the April meeting for one of those institutions and put

15   that institution on show case that's a matter of public record.

16             And I can definitively say we are not waiting for you know a matter of this

17   to be resolved in the court before we take our own investigation action.  It will be a

18   matter of that investigation and the information that we find based on our own resources

19   and our own tools to determine whether the institution you know is meeting our standards

20   or not.

21             We will obviously take into account other information and are happy to

22   work with those oversight partners to hear that information but particularly for the at-risk

1    institution group we are making sure that we are doing our own investigation to see if we

2    can find or that we find these you know instances of not meeting our accreditation

3    standards.

4          MR. STAPLES:  In your earlier discussion about your expanding your list

5    of partners based on your historical experiences and I was led to believe and I might be

6    mistaken that you didn't consider your Attorney's General to be your partners prior to

7    this that you were looking perhaps at other state agencies to other actors, is that a fair

8    statement or is that did I misunderstand you?

9          MR. BIEDA:  No that's true.  I think based on our experience we have had

10   to expand the definition of our oversight partners to include state Attorney's General who

11   we really had prior to the last couple of years absolutely no contact with.  As you

12   probably know every state has its own state approval authority or organization and those

13   state approval authorities are considered a part of the triad and in every case those state

14   approval authorities get their legal representation from the state Attorney General's

15   office.

16         So our assumption is if there was to paraphrase some of the criticism if

17   there was smoke the fire would have been discernable through interactions or discourse

18   with the state approval authorities, those are the folks like us that are boots on the ground

19   that visit the campuses, that interact on the basis of new programs, new campuses, other

20   substantive changes and also have to process student complaints, employee complaints,

21   community complaints.

22         There was not an alignment of those two sources of information in any

1    case that I am aware of.  So now rather than waiting to see if the primary source of

2    information is from the state approval authority we have expanded to include state

3    Attorney's General.

4             I want to make sure that there is clarify that this is not meant to be a

5    perspective hypothetical -- we have made formal outreach in the last 6 months to the

6    various state Attorney General's organizations to open a dialogue about how we can be

7    more effective in our communications about institutions that are exhibiting some of these

8    risk factors.

9             Those conversations have not borne fruit yet but they are open to that

10   dialogue.  We want to learn more about what are the more problematic aspects of state

11   consumer protection law that they are investigating relative to career colleges and schools

12   so that we can also be more aware of when we do a site visit or we review through the at-

13   risk group what are the specific factors.

14            What do their findings or allegations mean?  That is work yet to be done.

15            MR. LEAK:  I also would like to add that in addition to those groups that

16   we are reaching out to and as I mentioned in my opening remarks we have a number of

17   schools that have these enrollments and we are now reaching out to officials at

18   Immigration and Customs so that we can better understand what are the risk factors they

19   look for.

20            And we want to incorporate those risk factors in our thinking as we

21   monitor those institutions.

22            MR. HARAZDUK:  I can also speak specifically as Tony mentioned with

1    state approval agencies we have been in close contact with them you know we are

2    reaching out to them we have always contacted them and asked for their participation and

3    involvement in the process and with this at-risk institution group in at least one case we

4    have done a site visit in conjunction with them to make sure that both oversight agencies

5    are reviewing this information and you know agreeing or understanding each other's

6    standards and agreeing with one another.

7              MS. PHILLIPS:  Just a reminder to all we will have an opportunity to

8    interact with the Agency again after the third party commenters so I am going to move

9    along in our agenda.  I have Simon next and on my list here thereafter is Art, Jill, Bobbie,

10   Kathleen and Ralph.

11             MR. BOEHME:  Thank you Madame Chair and thank you for your

12   presentation.  I have learned a great deal but as is often the case where with NACIQI

13   meetings I am not pleased.  I am not happy.  I think for those of you who do come to

14   NACIQI meetings and I am going to sound a little redundant in front of my colleagues

15   but accreditation and this lethargic process and this lack of urgency from what I see in

16   your presentation I think ACICS embodies that.

17             And as you said that the real issue today we believe is the issue of whether

18   we can come into compliance within one year.  I think the real issue today is confronting

19   some mistakes that you have made, owning up to that and then also looking towards the

20   future which ultimately my question will hopefully address that future, but I think first

21   we have to glean and look into the past.

22             And I think I am following from Cam's question, is we have to look at

1   what's happened in the past.  The ITT failing fiscal responsibility test and documents you

2   submitted to NACIQI it showed that you knew about the problems back in 2014 and that

3   document was the business notes, the fast train using strippers for recruiting as was

4   raided by the FBI and the school shut down, the Michigan Jewish Institute, my home

5   state.

6               The Department of Education outlined more than 2,000 cases where PELL

7   grant funds were sent to the school to pay for students who were in Israel studying and

8   never took one class and that is by the Detroit Free Press.  And I could go on about

9   Corinthian, but I really want to dig deep into Northwest Polytechnic University and there

10  was a pretty damning Buzz Feed article about that which many people may not know

11  about this school but I went on your website and I typed in Northwest Polytechnic and

12  there it is it is accredited until 2018 so if I was a potential student it has your brand on it,

13  6,000 students 99% of them are from overseas and there is no full-time faculty.

14              Buzz Feed discovered that they actually hired a fake librarian when

15  ACICS went to review on their site visit.  I'm not done -- this you know a fake librarian,

16  there are no full-time faculty and when ACICS did not impose any sanctions on the

17  university allowing it to maintain its full accreditation and this was the statement that you

18  guys had released.

19              "Deeply troubled by the serious allegations confronting NPU and it takes

20  quality assurance of its accredited institution seriously and will condition or withdraw

21  accreditation from schools that fail to comply with Council standards or with local, state

22  or federal laws."  That was your response to Buzz Feed.

1          And the icing on the cake was the faculty member from that university

2    was due to speak at your conference I believe it already happened in Fort Worth, Texas

3    on May 11th through the 13th and that faculty member withdrew from the conference after

4    these allegations came about.

5          And I guess when I hear the response from Cam's or my colleague's

6    question which he is absolutely right is at what point do accreditors start to take action?

7    And this is where I really struggle with accreditation because we are moving into the 21st

8    Century where competition is increasing, where students have new needs you know --

9    there is so much going on crushing that load.

10          This is why I was in favor of the actions taken against ABA yesterday is

11    that we have to start addressing the needs of students and ACICS is not living up to that

12    challenge and so I guess while I acknowledge this adverse action group but it just sounds

13    like you are creating a committee, frankly and you are going to come back in another five

14    years and we are going to have similar issues and I am tired of having this rubber stamp

15    where people accreditors and I am not doing this to you.

16          If you are a follower of NACIQI I beat up on many other accreditors and

17    because we have to start putting students first and the consumers first.  And so I am

18    encouraging the Committee to really think deeply about you know are we going to

19    continue the cycle where we give everyone 12 months to figure it out?

20          And I think you guys are great people I like this action plan but we dig

21    into the past about what's happened I need to hear more than you are creating a

22    committee, you are going to potentially look to the New York Times and the Wall Street

1   Journal and the Washington Post to address these kinds of things.

2          And I think my question piggy-backs off Cam of how many problems

3   does it take for ACICS to kick off some sort of internal investigation?  Because it is

4   reported in your business notes which you submitted to NACIQI that you are aware of

5   these issues but nothing seems to happen and we cannot be the best higher education

6   system when accreditors are doing nothing.

7          And so I am worried, I am not happy and I am sure you guys are eager to

8   answer my question about that but I think essentially I want to push Cam's question even

9   further and I'm not convinced to your response to him.  When is action going to be

10  taken?

11         MR. BIEDA:  So I will let my colleague Ian respond to that in detail but to

12  answer your broader question our tolerance for those kinds of activities or allegations has

13  gotten very, very low.  We have to be more sensitive, we have to be more responsive we

14  get that, that's very important.  Ian would you like to talk more in detail?

15         MR. HARAZDUK:  Sure and I am happy to speak in depth, very in depth

16  about Northwestern Polytechnic University.  The reason we gave the answer that we gave

17  to Buzz Feed is because we were working on an investigatory action that took place --

18  that has now taken place since so one of that adverse institution group visits that I

19  mentioned was an unannounced visit to that institution.

20         We looked into that institution we had 7 findings that have come from that

21  -- some of them corroborated the information that was given so we not only had that

22  media article we also had information of a complaint specifically that came to us in late

1    May of 2016 this year and within three weeks or so we were at the campus reviewing it,

2    have a report prepared and being sent to the institution for a response that has you know

3    serious concerns that will require a response.

4         Obviously it is a pending current process so we can't say what action will

5    be taking place but it will be before the August meeting and you know that report has

6    been prepared and will be sent so I will be happy to answer any other specific questions

7    you have certainly about that institution I am very familiar with it.

8         MR. BOEHME:  But my question was how many problems moving

9    forward because I acknowledge I think you have a plan, I don't know if I agree with it

10   but you have to convince me and you are not convincing me yet and I don't know maybe

11   I'm just the stubborn goat on the Committee and I probably am.

12         How many problems does it take you know -- when does this Committee

13   get activated and I know and maybe it's great that Northwest Polytechnic -- the only

14   thing comparable to that is Trump University and it is accredited by you and that is --

15   that's a scam.

16         I mean it is to some extent a diploma mill, Northwest Polytechnic.

17         MR. HARAZUK:  But have you visited that school?

18         MR. BOEHME:  No but I would love to go.

19         MR. HARAZUK:  I have.

20         MR. BOEHME:  I'd love to go.

21         MR. HARAZUK:  So go.

22         MR. BOEHME:  So I think again how we move forward is that action

1  needs to be taken and I am not convinced that from looking at your past practices that

2  you guys can keep up with the demands.

3         MR. HARAZUK:  And just to answer your question directly and then I

4  will let Tony.  It will take one issue we have proven that, we have information it can take

5  just one adverse information report, one complaint from a student, we have a number of

6  those visits that came from one complaint from a student that we will go and investigate

7  as part of an interim review of the institution.

8         So we are not going to wait until you know the institution expires as it

9  does in 2018, we will go do an interim review that could be unannounced that could be

10  limited announced.  The at-risk committee has already you know provided action will

11  continue and if given the chance we are happy and willing to give evidence of over the

12  next 12 months what results have been produced from that committee.

13         MR. BIEDA:  And just for the record we do not accredit Trump

14  University.

15         MS. PHILLIPS:  Thank you.  I have Art –

16         MR. BOEHME:  Wait, wait I did not say that you accredited Trump

17  University.  Let me be very clear I am equating Northwestern Polytechnic University as a

18  diploma mill and I think the Buzz Feed article and I would encourage everyone here to

19  read that report, because what that reporter discovered should not be happening in the

20  United States.

21         And why I brought up Trump University is because and obviously there is

22  all sorts of politically charged statements when it comes to that, but in essence that is also

1   a diploma mill and we have to start taking actions to prevent these in what I would call a

2   scam university.

3         MS. PHILLIPS:  Moving on I have Art, Jill, Bobbie, Kathleen and Ralph

4   so far.

5         MR. KEISER:  Mr. Bieda I have a couple of questions but the first is a

6   comment and I promise I won't be as long as Simon.  I have been doing this for 38 years

7   -- 40 years and 38 years ago you applied for accreditation.  The first thing I learned is that

8   you don't tell them what you will do -- you tell them what you have done.

9         And you are judged on what you have done and what they can see the

10  evidence of and I hear a lot of what will be done and that's a big issue here and it is a

11  concern.  One of the issues that were brought up where you did not meet the standards

12  was an administrative capability and the staff mentioned that you had replaced Albert

13  Gray.  I am happy to see how effective you have been able to communicate with us but

14  does and the concerns that have been continued echo -- does ACICS have the

15  administrative capability to engage and it's your issues not our issues necessarily because

16  there are more issues brought up -- ethics committees which is not required, all kinds of

17  stuff that you are talking about.

18        The broad base change in culture, broad base change in processes -- can

19  you do that?  Do you have the administrative, financial capability to accomplish this

20  task?

21        MR. BIEDA:  Yes I believe we do and I believe it is not a matter of

22  perspective.  The Council has taken action not all of those actions have borne fruit yet but

1    it has already taken action including a change in executive leadership, including the

2    development and publication and enforcement of new standards including the

3    appointment of the Advisory Committee that has the authority to bring back

4    recommendations they get to the depth of how to strengthen and enhance the

5    organization.

6           MR. KEISER:  Now Mr. Porcelli mentioned that you may or may not

7    have gone before the membership because many of the standard changes require

8    membership approval -- has that occurred?

9           MR. LEAK:  That has occurred.  The Board met in May and actually we

10    adopted the changes at our April meeting.  Put those changes out for public comment, the

11    public comment was received and the Board met in May to adopt those and so they are

12    effective July 1st.

13           MR. KEISER:  The other issue that the group had was a financial

14    capability especially in light of decreasing the membership.  I looked at your financials I

15    did not have that concern but may you can you know you have like 14 million dollars in

16    reserves and could you explain what was the concern or how you responded to the

17    concern that with declining membership you would have an economic challenge of being

18    able to continue forward?

19           MR. BIEDA:  Yes the staff analysis regarding administrative capacity of

20    ACICS including its financial capacity was an interesting finding and it was interesting

21    because it puts us I believe in an unenviable position where there is in some case

22    acknowledgement by the staff that because the Council has made more rigorous its

1    standards and has put in place processes to enforce those standards more rigorously it is

2    also likely to be -- to see a decline in membership or confront more litigation or push

3    back that would also exhaust those resources.

4              All I can tell you is I think that is a hypothetical situation that for which

5    the Board is reasonably prepared but if goes to an extreme level I am not sure any

6    accrediting body could prepare for that hypothetical.  We do have sufficient reserves to

7    sustain our operations at a level of more than a year's worth of operating costs and we

8    also have sufficient liability insurance including that which would cover legal costs for

9    those other outcomes.

10             Is it -- could it be ultimately exhausted in a worst case scenario?  Yes.

11             MR. KEISER:  The third area Frank brought up was the issue of conflict

12   of interest.  In reading the staff report the conflict of interest was focused on your IRC

13   which is an Intermediate Review Committee, what is that and where does that fit in the

14   place?

15             It doesn't have to do with your Board and you will tell me how many

16   public members you have and all of that but what is an IRC and why were you able not to

17   get an appropriate attestation letter done at the time of the first review and then the

18   second review?

19             MR. HARAZDUK:  The Intermediate Review Committee is a committee

20   that meets after a visit has taken place.  It reviews the team reports and responses that

21   come from institutions and provides a recommendation to the Council where by the

22   Council would make an action based on that.  We did provide sample conflict of interest

1    documents for the next upcoming IOC which for us meets in July so we have participants

2    which are experienced evaluators that work on that committee that have already provided

3    conflict of interest.

4         Also our process before was when an individual became an evaluator we

5    had them sign a conflict of interest document and we did an attestation.  We did training

6    based on conflict of interest each time the IRC Committee met so we didn't ask for a

7    specific conflict of interest every time IRC met because we already have the evaluator

8    one on file.

9         However, obviously moving forward we have already provided evidence

10   that we will be doing that now and we will obviously continue to do that.

11        MR. KEISER:  Well again as professional process makers which you are

12   it is really important that you be able to respond exactly to the response of the staff.

13        The final issue I have is again a concern Simon had but in a difference

14   sense.  How many and you have done analysis of at-risk schools, how many institutions

15   do you have categorized today as at-risk?

16        MR. HARAZDUK:  I don't have a specific number.  I mean we have up to

17   30 you know schools that have information either from adverse information or

18   complaints or other issues that are considered at risk so.

19        MR. KEISER:  And is that 30 institutions or 30 campuses?

20        MR. HARAZDUK:  30 campuses.

21        MR. KEISER:  So you do it so a Corinthian would be one of the 30?

22        MR. HARAZDUK:  Well Corinthian --

1          MR. KEISER:  Oh I know I understand but let's say ITT which is still

2    accredited is that one institution or each campus is separately accredited?

3          MR. KEISER:   It would be 130 campuses because it is technically 2

4    Institutions, they have two main campuses for us.

5          MR. KEISER:  So of the 30 complaints or the 30 at-risk --

6          MR. HARAZDUK:  That's 30 different institutions.

7          MR. KEISER:  But numbers of accredited institutions would be much

8    greater than that be closer to 200 - 300?  Is that accurate?  How many failed grants or

9    probationary letters over the last well just even the last two years has the Commission

10   offered where they have taken a negative action that is reported to the feds?

11         MR. BIEDA:  I don't know about the last two years, would you go for the

12   last five -- that was the data we provided.

13         So we looked at 2012 to 2016 and some of this was preparation to answers

14   from the request from NACIQI that was in the federal register.  In terms of adverse

15   actions in that time frame 2012 to June 2016 this Council issued 40 show cause

16   directives, 11 student achievement show cause directives in addition to the 40 that were

17   for other reasons, 35 show cause directives that were related to financial issues, lack of

18   financial capacity, 7 show cause directives that were based on adverse information such

19   as those derived such as complaints and adverse information.

20         Applied probation to 15 campuses, withdrew by suspension 7 grants of

21   accreditation and in 4 cases denied accreditation for a new applicant.  So in aggregate

22   whatever those numbers add up to that was the data that we were able to provide.

1        MR. KEISER:  Of the failed grants how many have withstood appeal and

2    have not been litigated?

3        MR. BIEDA:  I'm not aware that any of them have been litigated.  I

4    believe the litigation has been on the denial of renewal grants not on initials but of those

5    denials of renewal grants we have had at least one of recent vintage and probably have a

6    second one that is pending that in fact do reflect that when the Council is emphatic in its

7    request or its demand that an institution perform or face adverse action it recognizes that

8    those actions will likely be unchallenged through the legal process.

9        MS. PHILLIPS:  Thank you I have Jill.

10       MS. DERBY:  Thank you and thank you for being here to answer our

11   questions.  I am going to move away from a granular level because I feel like my

12   colleagues Frank and Ralph and Cam and Arthur and Simon et cetera have asked very

13   probing questions and drilled down so I am going to move up to a 30,000 foot level and

14   ask you a broad question.

15       Understanding that as Frank mentioned trust is critical and when I think of

16   trust track record weighs in more than promises but my question is this, it is hard to avoid

17   a summation of too little too late.  And maybe not too little because the reforms you are

18   laying out sound to me unrigorous, but too late is way too late.

19       I heard one of you say that you are not tone deaf to the voluminous outcry

20   that certainly all of us have heard but I am left with why did it take that?  Why has it

21   really been we are here in April that's only 2 months ago where there was a lot going on

22   in the months and year that preceded it, that's my general question?

1          MR. BIEDA:  So I would like to take a stab at that one.  I think there was

2     a confluence of concerns over the last couple of years some of them derived from

3     external forces, some derived from the changes in the sector itself and changes in the

4     economy and also a recognition that just because we have always done things that way

5     wasn't going to be good enough anymore.

6          And it just took the confluence of those things earlier this year, both when

7     we encountered discussions with the analyst in April and subsequent to that that

8     catalyzed that initiative for change.  A lot of these things have been building but suddenly

9     there was manifest a much more pronounced sense of urgency.

10          MR. HARAZDUK:  If I can respond real quickly too.  I'm only in the

11     weeds so I can give you an in the weeds answer that you asked for a 30,000 foot answer.

12     I think one of the things and I think it was mentioned when questioning the Department

13     staff was that accreditation had been a program improvement model and I think that is

14     accurate and I think we were in that context for a long time and I think we understand the

15     changes now and understand that there is a compliance and you know reviewing

16     institutions and enforcing actions is certainly something important.

17          Whenever we found an issue we always wanted to -- while we did work

18     with the school to make sure that they can improve that process that was something that

19     we had done.  We understand you know that there's -- that accreditation and certainly the

20     Department's view and perhaps this body's view is focused on enforcement and as I have

21     said and continue to say I think we are there and will continue to be there.

22          MR. LEAK:  And I think from a 30,000 foot level the Board has met more

1   this year than it has in my experience and it is important that we as Board members

2   become more engaged with leadership and the staff to provide our direction to what

3   needs to occur to bring about the changes that we have put in place.

4           And to that regard we as an Executive Committee have met weekly with

5   our executive in charge so that we are more in touch with what is going on with our

6   Board and that is in my view very useful and has made at least under you know, in the

7   year that I have been Chair a very important difference in our action and interest in what

8   is going on with our agency.

9           MS. DERBY:  If I could just make a few comments from your comments.

10  And that is certainly a failure of Board engagement and attention is one of the failures

11  that happened in your past and part of that track record and I am glad to hear that there

12  has been a change there.

13          The other thing we understand that the program improvement model is the

14  traditional one that has been in place for so long but I have to say that many other

15  agencies have figured out what their responsibilities are way ahead of you all and again

16  late to come to the game.

17          MS. PHILLIPS:  Thank you I have Bobbie.

18          MR. DERLIN:  I'm almost embarrassed after that great 30,000 foot view

19  to return to the weeds.  But I have some specific questions related.  First to reviewer or

20  your evaluator training -- I would be interested in knowing how many reviewers you have

21  to train, how many have been trained as of today and how you will complete the training

22  of your reviewers?

1          MR. HARAZDUK:  Sure so we -- we are currently in the process of

2   vetting through our evaluators and re-vetting and re-training.  We had upwards of 1500

3   volunteer evaluators we have now have that down to 1100 based on information and

4   updated information that we received.  We have an updated training program that is

5   going to be based on the new policies and new standards that have been discussed so the

6   data integrity review process, the placement verification process moving forward, the at-

7   risk institution group as well as the new standards that will be effective in July with

8   remissions in recruitment and other data integrity policies.

9          So we have a program that will be put in place based on those new

10  standards and these new processes.

11         MS. DERLIN:  And when will the training of the 1100 evaluators actually

12  begin?

13         MR. HARAZDUK:  It has already begun and it will be begin before our

14  next review cycle which is in the fall in September and October.

15         MS. DERLIN:  Right, right so how is the training being accomplished?  I

16  know you had your annual meeting recently I am assuming there was some sort of group

17  grope for evaluators to learn about new things but tell me a bit more about the specific

18  delivery of the training to the evaluators?

19         MR. HARAZDUK:  Currently it happens mainly through webinar, there

20  are self-assessment and a review of our standards and policies and then a live webinar

21  that happens with any evaluator.  We have also provided already documentation and

22  information that slides the evaluators and what we are going to do is have you know life

1   training -- webinar training based on that so that the evaluators could get that

2   information.

3                    We will also supplement that with documentation to all of the evaluators.

4                    MR. BIEDA:  I just want to augment that -- the numbers can be daunting.

5   The number of evaluators that we typically deploy in a given travel cycle is more like 150

6   to 200 so it is those that will be deployed for this fall cycle that will get the most

7   immediate and direct re-training and then as we can we will add other evaluators until we

8   expand it to the full pool.

9                    But in the given cycle we are not using 1100 evaluators, we are using a

10  much smaller pool.

11                   MS. DERLIN:  Thank you for that information and you obviously have

12  already developed a sense of team because from Ian to you -- you have taken me to a

13  transition to my next area of inquiry.  I know you have about 50 or 60 visits, just regular

14  visits scheduled in your fall schedule and I am wondering have those team assignments

15  already been made.  Are those visits scheduled or is that a bit ambiguous given the

16  situation that we are all in today?

17                   MR. HARAZDUK:  Well we haven't changed anything with our process.

18  We are finishing up our spring cycle which will be over at the end of this month and then

19  we will start our fall review cycle.  We start working on that and start planning on that

20  and that will happen in the next couple of weeks and months when we schedule those

21  visits, we find evaluators to go on those visits so nothing has changed in that respect with

22  the upcoming fall cycle.

1          MR. BIEDA:  But to your point there is concern by our institutions based

2   on the staff recommendation that came out a week and a half ago about a denial.  About

3   to what degree will it be business as usual with ACICS and for what length of time and

4   simply all that we can tell them is it is a week until we process and as we know changes

5   in our status that will be communicated.

6          But even for those institutions that are up in the fall cycle if we were to in

7   fact be denied and have to just start that 18 month clock they would want to have a

8   current grant of accreditation from ACICS anyway so that they can more effectively

9   make a transition to a different accrediting body.

10          MS. DERLIN:  Thank you for that clarification and I presumed that there

11   is the challenge of addressing the particulars of the situation along with business as usual

12   in terms of the activities of your agency so I did understand that component but I

13   appreciate the clarification.

14          And then the last thing I would ask and this goes back to some inquiries

15   others have made previously but I am not certain I am quite understanding -- you have an

16   at-risk group, that at-risk group has completed 7 special visits.  Those visits will be

17   finalized and the outcomes of the visits will be known in the next month or so when the

18   Board meets and the interim committee has a chance to make its review.

19          Is the at-risk group also -- well I guess I think the at-risk group is also

20   meeting.  They have identified about 30 institutions which represents may more

21   campuses so what I am trying to get my brain around is how many additional special

22   visits -- do you have any sense for how many of those additional special visits are also

1    going to be coming at you in the fall?

2         MR. HARAZDUK:  I can't give you a specific number and it could

3    change with new information that comes.  I would say that all those 30 that are at-risk

4    institutions in some cases where we will find responses and we will review those

5    responses to determine whether further review is needed including a visit.

6         So not in every case will a visit occur depending what the information we

7    receive are but I can certainly tell you that in the fall cycle there will be additional visits

8    but to give you the number I can't do it right now.

9         MS. DERLIN:  And then last but not least just help me understand how do

10   you handle the situation of multi-campus institutions?  So if I am an institution with

11   multiple campuses and I am selected for a special visit in the fall is that for my multiple

12   campuses and do you visit the corporate office or do you go to all of the campuses?  Just

13   give me a little bird's eye view of that, not quite 30,000 feet that bird's eye.

14        MR. HARAZDUK:  I can't get up that high so.  No I have felt like it since

15   I have been on planes all cycle.  We could do both you know for multi -- in cases of

16   complaints it usually stems from a specific campus and obviously that campus would be

17   at risk and that would be the campus that we would want to see exactly what is going on.

18   When we have the information that comes in we identify what the issues are related to

19   our standards and we always look at the overall performance and effectiveness of the

20   institution but we obviously hone down on certain concerns that have been expressed to

21   us either through a complaint or adverse information or if it is an issue of financial

22   stability we will certainly conduct a review to determine that they have you know,

1    sufficient financial resources on site to make sure that the campus is viable.

2             MS. DERLIN:  Thank you very much.

3             MS. PHILLIPS:  I have Kathleen, Ralph and Paul if that is the conclusion

4    of the initial queries for the regency I will plan to break after Paul again who seems to be

5    always getting that opportunity, sorry, so Kathleen?

6             MS. ALIOTO:  Mr. Bieda thanks to the three of you for your presentation.

7    Mr. Bieda you have indicated that you have concerns with the Department's score card.

8    Do you disagree with any of their figures of approximately 336,000 students that you are

9    the gate-keeper for 336,000 students and 4.76 billion dollars in Title 4 money?

10            MR. BIEDA:  Ma'am I have not had a chance to review that information.

11   I have no reason to believe it is inaccurate but I don't have an authoritative review of the

12   source of their data to be able to say is it low, is it high or something else so I am going to

13   defer.

14            MS. ALIOTO:  Well I assume that the data perhaps we can get a

15   clarification -- I assume that the data comes from the amount of taxpayer dollars that

16   have been sent to the 245 institutions at 674 locations I assume that is what it is.

17   Is that correct?

18            MS. HONG:  That's correct.  This figure -- these numbers are from our

19   Office of Federal Student Aid and that number actually only includes a degree-seeking

20   undergraduate so the figures are actually larger when you include the Department

21   certificate-seeking students and graduate pardon me.

22            MS. ALIOTO:  So if you were going to add the diploma-seeking students

1    that you are overseeing do you have figures on that?

2              MR. BIEDA:  I have not seen those figures ma'am no.

3              MS. ALIOTO:  Well I am kind of curious as accreditors that you would

4    not have control of those kinds of figures when we are talking about billions of taxpayer

5    dollars which makes me and I assume other colleagues wonder about the in depth

6    analysis that you actually do have of the institution that you are now running?

7              MR. BIEDA:  I would just stipulate that we -- our institutions currently

8    enroll in aggregate close to 800,000 students.  Some high percentages of those students

9    also participate in Title 4 PELL grants and federal student subsidized loans.  The exact

10   magnitude of that I'm sorry I just don't have that number.

11             MS. ALIOTO:  As Dr. Keiser and Dr. LeBlanc have both indicated the

12   past is a prologue to the future and the past for me coming from San Francisco involves

13   Corinthian and Heald College and thousands of students.  Heald College students were

14   told that they had 100% rate of employment when they graduated from Heald.

15             As accreditors I would find that very curious if I were on an accreditation

16   board that any school would have that kind of employment statistic and I am curious

17   about why that wasn't a red flag for ACICS at that time?

18             MR. HARAZDUK:  I think it's important to note that we did not accredit

19   Heald College they are accredited by another agency so we didn't have review over that

20   school.

21             MS. ALIOTO:  So Corinthian College all be Corinthian -- I know that

22   WASC was in charge of Heald.  I had thought that you had taken over.

1        MR. HARAZDUK:  No, we have never accredited Heald College.

2        MS. ALIOTO:  Okay but the other Corinthian institutions?

3        MR. HARAZDUK: Yes we had other Corinthian that were named Everest

4    College.  And another accrediting also oversaw.

5        MS. ALIOTO:  Well I guess I am thinking about the colleges that you

6    were overseeing and what that says to us as people who are going to at least suggest to

7    the Department of Education how they should proceed in regards to your being in charge

8    of I would gather if you have 800,000 students with 336,000 it's 4.76 billion that with

9    800,000 we are at least talking about 6 billion dollars here if not more.

10        MR. BIEDA:  Yes again I stipulate that ACICS institutions enroll a high

11    percentage of students who are participating in federal student aid and that we have a

12    very serious obligation to protect the federal treasury, the investment of taxpayers in that

13    education as a Title 4 gatekeeper.

14        MS. ALIOTO:  So I would have thought that when Corinthian went belly

15    up over a year ago that you did not at that point start looking at your policies and it was

16    only this year that you put everything into high gear maybe that was because of your

17    leadership.  Can you tell me why that didn't happen a year ago or a little over a year ago?

18        MR. BIEDA:  Reflecting back we should have taken more of those risk

19    factors into consideration and that is one of the reforms that we have put in place with the

20    at-risk group that my colleague Ian has mentioned is that our tolerance for those types of

21    indicators of problems has to go to a very small amount so that we can integrate that

22    more effectively into our review of institutions.

1      MS. ALIOTO:  My final question could you tell me what your overall

2  budget is?

3      MR. BIEDA:  I believe our current operating budget is around 10 million

4  dollars.

5      MS. ALIOTO:  Okay and Dr. Keiser had gone into some of that before so

6  thank you very much.

7      MS. PHILLIPS:  Ralph?

8      MR. WOLFF:  Thank you.  In the interest of full disclosure as a former

9  President of WASC I can say that Heald College had long been accredited by the WASC

10  Community College Commission, ACCJC and then it transferred to the Senior College

11  Commission in 2012 maybe 2013 because of its desire to initiate bachelor's level

12  degrees.

13      We focus heavily on retention and graduation did not have standards on

14  placement.  So I will say full disclosure learning a lot here.  And it is more difficult for a

15  large university with multiple degree programs where placement is but I think the

16  increasing emphasis that we have been discussing the last two days -- seems like a week

17  but the last two days I think raises questions -- what role do all of these benchmarks,

18  retention, graduation, completion and placement have in large institutions but I think it is

19  important to state that I was involved with Heald.

20      But I was not involved at the point which the closure occurred, I had left

21  WASC.  I have several questions just trying to find out informally the additional campus

22  locations and the institutions.  You have 245 campuses, 700 plus additional locations.  If

1    a problem is found at a campus how does it -- do you act on the campus, do you act on

2    the whole institution, how do you connect the dots between the two?

3         MR. HARAZDUK:  It would be dependent upon the issue.  Some issues

4    are campus specific so we could and would take an action based on the campus and have

5    done that however there are some issues that my colleagues could speak to too that are

6    kind of systemic to all campuses and the institution and therefore we have taken actions

7    and have shown that we have taken actions on the entire institution and system.

8         MR. WOLFF:  Thank you.  I have been trying to read through your

9    criteria, particularly around decisions so let me just say at WASC we had a standard on

10   institutional integrity and a provision that where there was fraud or serious violations of

11   institutional integrity that we made public the ability to act to impose a sanction or even

12   terminate or withdraw accreditation based on fraud or serious violations of institutional

13   integrity.

14        And we were advised by our counsel that we didn't have to go through a

15   multi-year process where there were serious actions and I will tell you under my watch

16   we did take action very quickly when we found serious cases of fraud.

17        I think Simon if I can rephrase what Simon was asking is what does it take

18   to terminate accreditation at ACICS and if I look at you know the public issues beyond

19   the staff report the way it looks at from the public perspective is here there are a lot of

20   these major multi-campus publically traded institutions who are found to be defrauding

21   students, this is the way the public would describe -- through very active

22   misrepresentation of placement rates, inadequate information provided or in fact

1    misleading information provided on the recruitment side.

2           So on the front end misrepresentation is made and the incapacity of

3    students to complete their jobs.  This information comes out and then it looks like ACICS

4    is sitting on its hands and not taking action.  What I understand is that you have put into

5    place multiple procedures in the future.

6           What I also understand is that the very active court decision or legal

7    settlement on its own would not be a basis for you to withdraw or any agency to

8    withdraw accreditation absent some kind of review and due process provided by the

9    Agency.

10          So I want to stick with the question what does it take to lose accreditation

11   or to have it terminated and when I looked at your decision tree and when I read the staff

12   report going back to that I am trying to understand that show cause again looks like it is

13   not a substantive action.  It is notice that some further action might be taken.  I would like

14   you to walk through what would it take to terminate accreditation if a team or your own

15   data matrix found that there were serious cases of systemic misrepresentation and fraud?

16          How long would it take?  What would the process that you would go

17   through -- would you show cause, probably to one year take action which could be much

18   longer or do you have the capacity and have you enacted something on a much more

19   accelerated timeframe?

20          MR. HARAZDUK:  Yes we have I can speak of specific instances and to

21   answer your question specifically what would it take -- sometimes it is the egregiousness

22   of a specific standard -- obviously they have to not meet our standard but it could be

1    something where it is so serious like an integrity issue.

2            We have evidence that we you know, that information was seen at

3    institution that was you know, we did have a serious finding of integrity, we show cause

4    at institution had a hearing based on that and took action within a few months to

5    withdraw accreditation.  There are other instances where it could be a numerous amount

6    of findings and the institution cannot you know provide information or evidence that they

7    can come into compliance with our standards so it would take action based on that.

8            We have another one which I think has been mentioned previously going

9    through a legal action that we denied accreditation because of not only serious but

10   numerous amounts of findings.  That total took approximately 6 months and the

11   institution argued that even that wasn't enough time to provide an answer and obviously

12   the court agreed but the Council disagreed.

13           MR. WOLFF:  Thank you the second question for me and I think I just

14   have one more but relations with the Department -- in the staff report it would appear at

15   least in going through this process over the last several years that the I don't know if the

16   right term would be that ACICS was uncooperative or not providing information when

17   the Department shared information.

18           I would say the Michigan Jewish Institute would be a case where the

19   Department and under 602.27 there are Title 4 responsibilities in both directions.  You

20   are responsible to act when the Department gives you information and you are supposed

21   to notify the Department when you have information so can you describe going back a

22   little bit to the past this whole issue of failure to cooperate, failure to act on let's just say

1    that kind of information directly from the Department and your relationships with the

2    Department in providing information where you find Title 4 violations, past and present

3    thank you.

4            MR. BIEDA:  Yes Michigan Jewish Institute of course is still pending

5    before us they are facing an expenditure cause directive and will be before our Council in

6    August for a final determination.  That particular case involved many complexities I think

7    as was outlined in the staff report.  Probably the most salient issues that we encountered

8    when we did our last review which I think was in 2013 was the degree to which their

9    programming fully complied with our scope of recognition as an accreditor.

10           So because their program is a mix of religious programming, religious

11   content as well as secular content if we can call business administration and IT secular

12   content.  There was a question about do they still not their quality -- but do they still meet

13   eligibility to be accredited by ACICS?

14           We went through a fairly arduous and long process that involved -- that

15   not only renewal visit but also a special visit and a lot of subsequent back and forth on

16   documentation and requests for information before the Council finally was satisfied and I

17   think the Department staff was in some cases taking issue with that decision but was

18   satisfied that in fact the mix of programming at MJI still allowed them to be eligible for

19   our accreditation which I think is a threshold question.

20           It's only after that then you say okay and are the programs that they are

21   providing of sufficient quality to meet our standards.  Beyond that was the third issue

22   which was to the degree that we encountered the fact that a great deal of their enrollment

1   was participating in Title 4 programs or PELL grants.  Did we uncover any evidence or

2   sufficient evidence that caused us concern that needed to be reported to the Department?

3            I think there is great ambiguity there and I think the staff's report has some

4   credibility that we could have done more or should have done more but it wasn't because

5   we were trying to withhold anything.  The way that that Title 4 money was being utilized

6   by students who were in fact mostly attending participating in overseas' programs in

7   some cases defied our ability to really be able to figure out was this in fact Title 4 as we

8   know it or was there some other considerations that need to be brought forward.

9            So that was a huge issue for us.  I am still not convinced that we have

10  totally got our arms around that.  It is certainly a situation that was unique to that

11  particular campus but no we have made phone calls in the past to the Department.  We

12  don't do emails and we don't do correspondence when we believe there is an instance of

13  fraud or abuse of Title 4 money.  We make those phone calls to the Title 4 folks in the

14  FSA division and that is our policy we will continue to follow that.

15           MR. WOLFF:  Thank you and one other question.  I'm looking at your

16  website it is clear that you denied accreditation to institutions.  You have a number of

17  sanctions and I look at it and it says operations suspended, campus closed and you have a

18  whole list of institutional closures.

19           So what responsibility or how do you get involved in protecting studies or

20  working with students both when a campus closes of a larger institution and when the

21  whole institution closes?

22           MR. HARAZDUK:  So we have policies on requirements for campus

1    closure and teach-out.  Our process is that when an institution determines that they need

2    to -- that they will close, that they made a voluntary decision to close their institution that

3    they need to notify us as soon as possible.

4              We have an application form and that requires a substantive amount of

5    evidence for the institution to provide that for each student they are providing an

6    appropriate outcome whether that be providing a refund of that student, whether it be a

7    teach-out agreement with another institution.

8              Sometimes if it is a specific campus of a multi-campus institution they

9    could transfer that student to another campus.  In some instances they are transferring --

10   students are providing transfer arrangements with other institutions to ensure that all of

11   these students are providing an appropriate outcome.

12             In cases where that doesn't happen which has happened and you will also

13   see on our website there are cases of that the Council can take action to debar the

14   individuals or governing Board members or entities that are overseeing that agency when

15   they don't provide an appropriate teach-out plan and we have done that and have

16   evidence of de-barring them.

17             MR. WOLFF:  I appreciate that having worked with teach-out myself and

18   I know in the staff report there is that you need to clarify language and make it fully

19   corresponding to the statute.  But that is a separate issue for me of these instant we are

20   going out of business closures where there is no notice to anybody and an institution

21   shuts down or where you know the case of Corinthian is huge in terms of follow-up but

22   when a whole institution shuts down either with or without notice it is not a teach-out

1    situation it is a real closure situation which your leverage is completely different.

2              There is no continuing relationship and if any your relationship is with the

3    students who were affected not with the entity which has gone out of business and in

4    some cases gone out of sight.  How do you work with those in those situations?

5              MR. BRIEDA:  My colleague Ian is being way too modest.  If we went

6    down the list of campuses, particularly single campuses or the small institutions that have

7    closed precipitously in the last five years where basically Ian and some of his colleagues

8    have had to put on their fire hat and go and try to help in real time, the state approval

9    authority, any programmatic accreditors and institutions that we accredit that are in close

10   proximity that might be eligible to take some of those students in transfer.

11             If I could down the list of the times that has happened you would be

12   amazed but that is pretty much what has to happen and so it starts out with whether or not

13   their teach-out plan was approved or the teach-out plan is being followed.

14             At that point it is everybody roll up your sleeves and figure out how we

15   can minimize the damage to students and that is always our response.

16             MR. LEAK:  And from the Council Board level we go after those owners

17   and as Ian indicated we have had those owners before us in the debarment hearings to bar

18   those people from being ever in the business for a certain period of time and we do that.

19             We take teach-out and the responsibility for making sure those students

20   have a way of continuing their education -- very seriously.

21             MR. WOLFF:  Do you also work with the Department to -- and I'm not

22   quite sure in the post Corinthian era where there is forgiveness of the loans and the like is

1    that purely done by the Department or are you continuing to work in the follow-up of

2    cases like Corinthian or others.  Or is that just it is a cut-off and you are out of the picture

3    and they are working on the loan forgiveness issue and the like?

4             MR. BIEDA:  I'm not sure Mr. Wolff that we have had an inquiries about

5    the loan forgiveness issue as it relates to Corinthian or otherwise but I can tell you we do

6    work closely with Title 4 folks.  In terms of the timing of the withdrawal of accreditation

7    to make sure that again a precipitous closure doesn't result in a precipitous accrediting

8    decision that then leaves students who are in their last semester, for example, without the

9    ability to graduate and acquire that degree.

10            So we do coordinate the timing of all of these actions very closely with

11   Title 4 and with the state approval authority so that it is done in an orchestrated and

12   deliberate sequence of events so that it minimizes the collateral damage to students.

13            MR. WOLFF:  Thank you.

14            MS. PHILLIPS:  Thank you,  I have Paul and Federico gets the last word -

15   - mindful of the time anybody who would like to speak after that I will put you first on

16   the next opportunity to speak with the Agency, so Paul.

17            MR. LEBLANC:  I am just going to build the next narrative is it fair to

18   say and I don't mean to recite the events of the last few years but it is not a pretty picture.

19   It is filled like as I described it earlier a kind of systematic failure with AG's and lawsuits

20   and Corinthian's closure and strippers and other things it is a pretty disastrous little run

21   that we find ourselves culminating in kind of unprecedented as I understand it -- staff

22   recommendation and certainly a dramatic one to not continue.

1          I mean we would agree on that.  We could differ on how that happened

2     how it came to be.  I said I was a student of disasters I also was a student of turn-arounds

3     and have presided over a couple of them.

4          And what you have described going forward is a pretty dramatic

5     turnaround right, substantial I think people have said that we have repeated it.

6     Those who may be a little more skeptical are saying yep if you could deliver then that's

7     huge.  Here's my issue and I don't think I'm being unfound in this but we could talk

8     about processes and Steve at one point said you know on paper these standards are great.

9          Great teams can do good things with bad processes and effectual teams

10    can have poor performance with the best of processes.  Are we being asked to trust that

11    the team that was largely in place over this bad run is the team that will now do this

12    traumatic turnaround in an in-ordinarily short period of 12 months?

13         If I'm not wrong and I didn't realize until I was looking I said wait a

14    second I thought you came in from the outside but you have actually been part of this

15    agency since 2008?

16         MR. BIEDA:  Since 2008 yes.

17         MR. LEBLANC:  You've been compliance manager since 2012?

18         MR. BIEDA:  Correct.

19         MR. LEBLANC:  You were a VP of accredited operations that have been

20    in place since 2014, you are senior accreditation coordinator since 2013 -- these are

21    people's livelihoods and people who I will give the benefit of the doubt but at the end of

22    the day you have to look at the past performance and say fundamentally we are being

1  asked to take a leap of faith and that leap of faith in my view is that the team that was part

2  of this colossal failure in my view, let's not be overdramatic.

3       The team that was part of the systematic failure more fairly is now going

4  to be the team that can turn this thing around and do incredibly hard work, the very

5  substantial work if delivered on and to do it in a very short period of time.  Am I being

6  unfound saying that that is what we are being asked to do?

7       MR. BIEDA:  No I think you raise a legitimate question so I want to

8  emphasize a prior response in the context of that question.  So number one when we

9  commissioned this Special Advisory Committee, this blue ribbon panel when the Board

10  did that and granted them the authority it includes every aspect of the operation including

11  the composition and the structure of the Council, the Board of Directors itself.

12       It includes all of the current personnel so human resources has to be

13  looked at, sufficiency of training and sufficiency of skills and it also includes something

14  that we already put in place which I think is really the core of our accreditation enterprise

15  and that is a reset button for evaluators.

16       So the evaluator re-screening and re-training that we are going through

17  and that we are requiring will in and of itself screen out evaluators who are no longer

18  interested in participating in that process for a variety of reasons.  Maybe they have been

19  deployed too much in recent years and they have burned out.  Maybe they are not

20  interested in submitting their resumes to a currency test, maybe they don't want to go

21  through the new training, maybe they don't want to be submitted to a different evaluative

22  tool.

1        For whatever reason we believe there will be going forward very

2   immediately substantially different people involved in every aspect of this operation to

3   your point.  It does involve that level of depth and breadth in order to pull this off.

4        MS. PHILLIPS:  Federico last word.

5        MR. ZARAGOZA:  Yes and I will be brief.  I have two basic questions.

6   One of them is basically a follow-up to Paul's observation in the amount of work that

7   needs to be done, over 20 items that must be addressed in 12 months plus basically

8   continuing to function as an accredited entity.

9        And I just want to clarify so capacity is going to be an issue?  And in the

10  staff report it was noted that this is projected to be a tough year for the organization with

11  about 20 million dollars in predicted losses and a predicted expenditure budget of

12  reductions of 1 million dollars.

13       And so staff raised the concern of possible staff reductions so I just

14  wanted to get some clarification on your end with all of these additional work that needs

15  to be done where are you in that capacity issue and will there be additional staff added or

16  status quo or will there be reductions?

17       MR. BIEDA:  We are in the process of putting together and finalizing our

18  fiscal year 2017 budget which runs July 1st of this year through June 30th of next year.

19  Based on what we know now with current level of schools and the demand for team visits

20  and the sustaining fees that they pay once a year as part of our fee structure, we believe

21  that we can scale our operations appropriately without profoundly displacing folks and

22  accomplish that level of review within that fiscal cycle.

1        But as I also mentioned earlier we cannot plan for every hypothetical

2   possibility so I can't offer you that with a guarantee only based on what we currently

3   know.  We believe we have a very strong chanced of being able to apply resources

4   necessary to continue our accreditation program at the level that meets all of those

5   requirements.

6        MR. ZARAGOZA:  My second question the Attorney Generals also kind

7   of voiced their observation that ACICS's representatives of problem schools on its Board

8   and committees raised serious questions about potential conflict of interest and therefore

9   ACICS's ability to impartially evaluate those in other schools.  My question is very

10  simple -- do you have policies in place that would limit the engagements of ad-risk

11  school representatives on the Commission itself and thereafter on committees?

12       MR. LEAK:  As a member of the Board we do look at those issues very

13  seriously when we entertain new members for the Board and so we definitely do a

14  thorough analysis of the individuals that we invite on the Board so that there is no

15  inherent conflict of interest that we are introducing to the governance body.

16       Secondly we do from time to time recognize that issues come up with

17  members that are on the Board and the schools that they work at and we make sure that

18  that conflict is articulated and talked about and in the past we have put people off of the

19  board because of that and brought on new members.

20       But with the introduction of our Ethics Review Board we are taking an

21  additional step to make sure that we are doing this the proper way and so not that -- we

22  just want an independent set of eyes on how we do this and so it is very important that we

1    don't create conflicts and it is very important that when the conflicts arise and we

2    recognize them and deal with them immediately.

3           MR. ZARAGOZA:  In the current composition of the Commission Board

4    are there any at-risk schools represented?

5           MR. LEAK:  No, in fact at the April meeting we had put a school on

6    probation and a member -- for student achievement -- and a member from that school was

7    on the Board and that member was asked to submit his resignation.

8           MR. ZARAGOZA:  Thank you.

9           MS. PHILLIPS:  We have one clarification from Jen?

10          MS. HONG:  Yes a point of clarification on that accreditor dashboard -- so

11   the Title 4 volume that is encompassing of -- that's the total title for volume of all

12   institutions and their programs.  However the number of degree-seeking undergraduates

13   and the corresponding metrics about repayment and completion rates apply only to

14   degree-seeking undergraduates.

15          So hopefully that clarifies things and that is why we had the volume for

16   the American Bar Association as well, where all the other metrics showed zero.

17          MS. PHILLIPS:  Okay it is now 1:30 we are going to take a break for

18   lunch.  I am going to ask everybody to be back at 2:30 at which point we will begin the

19   third party comment and I will see you at 2:30.

20          (Whereupon a lunch recess was taken, to be reconvened at 2:30 p.m. on

21   this same day.)

22

1

2

3

4

5               A F T E R N O O N  S E S S I O N

6               MS. PHILLIPS:  Welcome back to our post-lunch portion of our agenda

7     today.  As you all know the schedule is a bit off of what we had anticipated.  Nonetheless

8     we want to make sure that we have time for a fulsome discussion and hear from all of the

9     third party commenters as well as the staff and the Agency itself again for the ACICS and

10    for the rest of our agenda.

11               So this afternoon I am going to keep on the strict but not rude way of

12    doing the third party comments.  I have got a bit of an expedited process for you to

13    consider.  We begin now with the third party commenters for the ACICS Petition.  For

14    each of these commenters they will have three minutes to speak just a reminder you press

15    to talk, you will see your three minutes will bing on the item before on the box on the

16    table indicating that the time is up and in advance I will thank you for your help in

17    keeping it from being necessary for me to be rude to interrupt you.

18               To help us move along I am going to not only ask for commenters to be up

19    towards the front to be able but I am going to ask one commenter to be at one end of the

20    table and the next one to be at the other.  We will then replace so that we don't have

21    transit time in between.  We will see how this works, it is a bit of a choreography

22    challenge but with that in mind our first commenter is Robert Shireman and our second is

1    Christopher Madaio with Ben Miller on deck.

2         So what I would ask is Robert Shireman or who is speaking before him to

3    be at one mic, Christopher to be at the other and Ben to be on deck, thank you Ben.  I'm

4    sure I am going to stumble in this choreography so forgive me now.  Speaking for Robert

5    Shireman.

6         MR. KABARSH:  Tara Kabarsh.

7         MS. PHILLIPS:  Thank you very much.  Again we have three minutes you

8    will hear that little box in front of your colleague just a reminder we aren't able to accept

9    additional materials at this time but let me welcome you and thank you for coming and

10   sharing your comments for Dr. Shireman please proceed.

11        MR. KABARSH:  Thank you.  My name is Tara Kabarsh I am a Policy

12   Associate at the Century Foundation and today I am representing Mr. Shireman as he was

13   unable to travel.  I have brought copies of his written statement but will summarize.

14        Because ACICS decided not to provide visiting team documents I have

15   also brought with me reports from 17 California campuses.  Their yes/no checkboxes are

16   a very simplistic approach to accreditation as if the entire form was designed to eliminate

17   any possibility of critical thinking.

18        There is no curiosity or nuance allowed.  This has produced a pattern at

19   the very least of negligence and at worst of collusion and corruption.  Let's look at

20   recruitment as an example.  In 2010 ACICS used only yes/no questions to evaluate

21   student recruitment.

22        The next year one short answer question was added to describe the process

1    and ethics.  While still simplistic this short answer created an opening for evaluators to

2    look into the possibly problematic area yet there was still no evidence of a quality check.

3    This is important because the Senate Committee investigation also revealed at that time

4    that training manuals for ITT and Kaplan recruiters encouraged pain funneling techniques

5    to enroll students.

6           Despite these revelations teams visiting ITT campuses just three months

7    later continued treating the recruitment question and everything else as a checkbox

8    exercise.  One team dedicated all of two sentences to recruitment.  Their only analysis

9    was in the response to the question are practices ethical simply answered yes.

10          The other two reviewed were suspiciously similar to one another.  They

11   described initial contact with a student, an interview, a tour, taking a wonderlic test,

12   providing financial aid information.  Is the process ethical?  Again -- simply yes.

13          One year later three more ITT campuses were up for review and the

14   descriptions are again remarkably similar.  One team even answers the question with a

15   bulleted list:  contact, tour, interview, financial aid, wonderlic, is it ethical -- yes.

16          This odd repetition was not just an ITT phenomenon.  In September 2012

17   at Le Cordon Bleu Pasadena the same process was described.  That same month ACICS

18   held an accreditation workshop in Chicago that was attended by executives from all

19   Kaplan Higher Education campuses in order to switch to a less stringent process.

20          Evaluation teams then visited two Kaplan campuses in California.  Can

21   you guess what their processes were described as?  Contact, interview, tour, wonderlic,

22   financial aid, are they ethical -- they still said yes.  And just last year when another ITT

1    campus came up for review the visiting team described the same structure.

2            How can we trust an accreditor that does not demand detailed and rigorous

3    analysis of high quality practices?  It is difficult to tell whether ACICS is just poorly run

4    or a corrupt organization -- either way it is evident that these documents and that the

5    process is not a serious attempt to promote quality and higher education.  In fact it is not

6    even a serious effort to prevent bad quality therefore we recommend that ACICS should

7    not be renewed for recognition thank you.

8            MS. PHILLIPS:  Thank you Committee member questions for this

9    speaker?  Hearing none, I'm sorry Frank Wu?

10           MR. WU:  So we have heard from the Agency which has acknowledged

11   that mistakes were made and they are determined to do better.  Why are you skeptical?

12           MR. KABARSH:  I think that over the years that we have seen same

13   practices, checkboxes over and over there has been no real change to improve the quality

14   at the institutions.  No real actual checks -- and I think that to completely change the

15   process that we have seen time and time again at over a dozen institutions just here along

16   in one state.

17           There are hundreds of other institutions that are also being checked in the

18   same way.  It would be extremely difficult to completely up end that process in a year's

19   time and expect better results.

20           MS. PHILLIPS:  Arthur?

21           MR. ROTHKOPF:  Do you believe that any for profit institution should be

22   accredited?

1          MR. KABARSH:  Am I under investigation here?  I think there are good

2    for profit actors and those who meet the qualifications of a rigorous quality check should

3    have some level of accreditation.  There's no problem with that.

4          MR. ROTHKOPF:  Thank you.

5          MS. PHILLIPS:  Other Committee questions?  Thank you for joining us.

6          MR. KABARSH:  Thank you.

7          MS. PHILLIPS:  Our next speaker is Christopher Madaio, Ben can move

8    to the table and Steve Gunderson is on deck, next speaker Steve Gunderson if you could

9    be at the side of the room thank you.  Welcome thank you for joining us.  We have a mic

10    problem try the next one over.

11          MR. MADAIO:  Good afternoon Miss Chairman and members of the

12    panel.  My name is Chris Madaio from the Consumer Protection division of the Maryland

13    Attorney General's office speaking on behalf of the other state Attorney Generals

14    referenced in the letter dated April 8th and I believe you have all seen.

15          The reason I think our testimony holds some extra weight perhaps is that

16    accrediting standards you could say sing from the same hymnal as consumer protection

17    standards and we believe that the state Attorney General's analysis of issues related to

18    misrepresentations to students and that is what this really should be about is the students

19    is relevant to the analysis that ACICS did and more importantly what it failed to do.

20          It is clear to us the state Attorney's General that ACICS failed to follow

21    the monitoring and enforcement standards as the gate-keepers to billions of dollars of

22    student aid.  Accrediting schools is a judgment call and ACICS has exhibited such lax

1   enforcement in the past in the largest schools in the largest contexts that it is clear that it

2   is excuse me -- not deserving of any trust in the future.

3          ACICS's attempts to change their standards at this late point after the

4   horse is out of the barn you could say is acumen simply to rearranging deck chairs on the

5   Titanic.  It may look better sitting here but it won't have any practical affect and it

6   certainly will have no affect for the thousands of students who have been defrauded by

7   the schools under ACICS's purview.

8          I want to make clear one point that was discussed earlier.  When a state

9   AG files a case or a lawsuit against a school like what has occurred in Corinthian, ITT,

10  Brown Mackey Art Institute campuses, West Wood to name the larger ones, vast

11  amounts of resources have been expended in investigation, collection of complaints,

12  analysis of documents and interviewing witnesses.

13         State AG's do not take this lightly.  To even initiate an investigation

14  beyond just bringing a complaint is not something that states take lightly.  However

15  ACICS has shown that it does not take substantial action when it knows or should know

16  that either an investigation has been initiated, a case is filed or the public inclusion of a

17  case where even without a finding of guilt or an admission of guilt there is still any

18  indication of a problem.

19         Schools aren't going to settle and forgive millions of dollars in debt, pay a

20  penalty, agree to high injunctive provisions and make other measures if there is not

21  something there and it is at least worth it for ACICS to investigate.  It was at least worth

22  it for them to look at Corinthian which they didn't do.  They maintained accreditation

1    until Corinthian's collapse.

2         So our point is a settlement with the state AG may not be an admission of

3    guilt but it is an analysis that something is needed.  ACICS cannot fix itself in 12 months

4    it does not deserve your trust, the past is prologue as many have said here and it deserves

5    not to be renewed, thank you I will take any questions.

6         MS. PHILLIPS:  Thank you Frank?

7         MR. WU:  So in more concrete terms why shouldn't we believe credible

8    sincere honest appearing people who are professionals with a lengthy background in

9    higher Ed who appeared before us and told us about dozens of changes.  I know you have

10   said it is too late, the horse is out of the barn but what if we found them credible and

11   reasonable and would like to give them a chance -- what would you say to that.

12        MR. MADAIO:  To that I would say that there are agencies that have been

13   doing this right for years ACICS has proved that it doesn't understand how to do this for

14   the largest of schools and for thousands of students.  I think it is evidenced a little bit by

15   when they tell you their role only used to be program improvement -- well even if that

16   was the case program improvement should involve encouraging misrepresentations and

17   fraudulent behavior not to occur as compared to enabling such behavior.

18        MR. WU:  And could you tell us about your office or the other offices that

19   you are speaking on behalf of?  Do you have any current pending actions that you are

20   able to describe involving institutions overseen by ACICS?  At this moment -- I'm not

21   talking about prior cases I mean right now.

22        MR. MADAIO:  Well certainly ITT is one that is a publicly filed lawsuit

1    by the CFPB and ITT has stated in its 10K and 8K's that it is under investigation by state

2    Attorney's General, that certainly is one that is long standing conduct that I believe only

3    now when it feels the pressure ACICS feels the pressure on itself is it bringing a show

4    cause against ITT however it never did so in the years -- over a year or two years in

5    which the public lawsuit was filed by the CFPB and over a similar amount of time that

6    the investigations have been going on by the states.

7              So it appears almost transparent this is a safe itself mode as compared to a

8    legitimate investigation.

9              MS. PHILLIPS:  I have Ralph and Anne?

10             MR. WOLFF:  Thank you.  Looking at the letter that the Attorney General

11   signed and in reference to page 2 you actually cite a number of settlement findings and

12   the like.  Could you help us understand were the documents sealed -- I mean the press at

13   least reported there was a settlement of this amount or the like but help us understand -- I

14   mean you are citing information here let's day Day Mark College employed dozens of

15   unqualified faculty determined by the Kentucky Council and the Kentucky Attorney

16   General, the post-secondary education Council.

17             ACICS took no action -- I mean each of these items that you cited what

18   kinds of specifics were made available at the time the settlement -- I am trying to

19   understand when the -- was there a sealing of the documents when an agreement is made

20   and saying we admit to no wrongdoing, help us understand what is publicly available to

21   be known?

22             MR. MADAIO:  Thank you Mr. Wolff.  Well first of all Attorney

1   General's settlements consent orders, things in court are public many of which list a long

2   laundry list of allegations made against the school yes.  And most if not all of the

3   settlements also contain a denial of liability.  But there is at least often pages of

4   allegations related to misconduct that was investigated and alleged by the state Attorney's

5   General.

6          So that is certainly one piece of it.  Obviously there are injunctive

7   provisions relating to certain of those allegations which again can be read as something

8   the school was taking some action that it clearly wasn't doing before or is agreeing to do

9   and that relates to some conduct.

10          And I think our point is with the settlements ACICS it should be the first

11   piece of a long road of investigation.  It shouldn't be the final piece of simply reading a

12   settlement, not seeing any finding of liability and saying well they must be fine.  There

13   should be a lot more to it of them requesting information relating to the allegations.

14          Requesting information unrelated to the allegations -- I mean if there is a

15   settlement with the state Attorney's General we believe that should trigger some serious

16   monitoring and deep investigation by ACICS.

17          MR. WOLFF:  Thank you really helpful.  Secondly the Agency indicated

18   that either during or after the investigations or upon the settlement no comment was made

19   with the Agency.  So I am curious how are these settlements made public?  Obviously the

20   press reports them, do you send them out to relevant parties or is it just on your website

21   that people would need to have access to but do you have any formal contact with the

22   accreditor when these particular findings are made?

1          MR. MADAIO:  So I'm sorry I can't speak for every single case.  I think

2    certainly settlements are made known to the media, are made known and posted on

3    Attorney's General web pages are filed in court as most attorneys known there are ways

4    to track court filings, there are ways to track Attorney General's settlement filings.

5          As far as it being mailed directly to accrediting agencies I guess that I

6    can't speak to however state Attorney's General think that accrediting agencies like

7    ACICS shouldn't sit and wait for our letter before doing anything.  There's much more of

8    a proactive role that they have as a member of the triad whereas consumer protection

9    divisions aren't enforcement agency to correct harms that were done to consumers.

10          Accrediting agencies should be preventing harms proactively.  So there

11    are certain steps that they need to take that are much more in depth, proactive and

12    widespread than waiting for us to mail them something and then reading it.

13          MR. WOLFF:  Thank you one more question.  In the settlements at least

14    you know about is there follow-up action from let's say your department or is it just left -

15    - I mean once the institution agrees to stop doing something and pay a settlement what

16    type of typical follow-up would be done?

17          Is there further monitoring that's done or is that expected of other third

18    parties?

19          MR. MADAIO:  Of course that depends on every settlement as the

20    lawyer's answer but certainly many settlements include a monitor, an administrator

21    related to claims, most of them include claims have to be made by students, they include

22    monitoring as far as injunctive provisions related to the changes that go on either in the

1    school's recruitment, financial aid practices or what have you.

2              So yes many of them do involve some aspect of follow-up and continued

3    follow-up by state Attorney's General and we think again that is something that ACICS

4    and the accreditors need to be following and be aware of again not because the monitor

5    reaches out to them but because they are taking their own pro-active steps which ACICS

6    has shown is not and does not do.

7              MS. NEAL:  I want to follow-up with that on Frank's question.  Has the

8    Maryland AG brought a suit or taken any specific legal action of its own against any of

9    these schools in the state?  And I don't want the CFPB I'm asking about Maryland.

10             MR. MADAIO:  And you are talking about schools accredited by ACICS?

11             MS. NEAL:  Yes.

12             MR. MADAIO:  Okay so as publicly in ITT's 10K's there are

13   investigations going on by Maryland into ITT.  Maryland has been involved in the EDNC

14   action, the Art Institute and Brown Mackey College.

15             MS. NEAL:  In what way have you been involved?

16             MR. MADAIO:  So states are a part of the negotiation of any settlement

17   part of the investigation, parts of the way that state Attorney's Generals work together,

18   divide ourselves into leadership groups, Maryland takes leadership roles in many of these

19   groups.

20             MS. NEAL:  But you have not specifically in Maryland taken any action

21   by yourselves?

22             MR. MADAIO:  Separate and apart from any other state Attorney

1    General?

2              MS. NEAL:  Yes.

3              MR. MADAIO:  I guess I can't speak to that personally.  I am not aware

4    there may be.

5              MS. NEAL:  But you don't know of any?

6              MR. MADAIO:  I will have to get back to you with that information.  I

7    think that it is important to state that when -- the reason that states group together in

8    multi-state actions is because these are large national campuses taking similar things

9    against students in all 50 states so I don't see a difference between a state acting on its

10   own and a state acting in a multi-state context, especially as Maryland often acts as a

11   leadership role in those contexts.

12             MS. NEAL:  Did I hear you correctly that as a member of the AG's office

13   that when you look at accreditors you effectively feel that they are Consumer Protection

14   Bureau's in and of themselves?

15             MR. MADAIO:  I wouldn't say that.  I certainly would say that

16   accrediting standards have similar consumer protection standards that consumer

17   protection UDAP unfair deceptive acts and practices have.  That was the point I was

18   trying to make and why state Attorney's General to me when they are bringing an action

19   against a school, investigating a school or settling with a school is something that should

20   be of a special interest to accrediting agencies.

21             MS. NEAL:  So do you think accrediting agencies need to have subpoena

22   powers and all sorts of additional legal authority in order to be able to do the kinds of

1    things that you do?

2              MR. MADAIO:  Well no I don't I think they have all the power that they

3    would need.  I think they have the authority that they need to be able to go into the

4    schools and request information and do site visits because of their relationship with the

5    schools.  I don't think that anything needs to be changed in that regard I just think that

6    accrediting agencies need to follow their own regulations and insure adherence by the

7    schools to those regulations thank you.

8              MS. PHILLIPS:  Cam?

9              MR. STAPLES:  Thank you, were you hear earlier for the testimony that

10   was around this subject?

11             MR. MADAIO:  Yes.

12             MR. STAPLES:  And you -- I don't know how much you were aware of

13   changes they have made since your letter, the letter in April.  The made some changes

14   more recently in their procedures have you had a chance or anybody had a chance to look

15   at the actions they have taken to modify their monitoring and compliance procedures?

16             MR. MADAIO:  I mean I have heard about them today.  I think we are

17   generally aware as much as public but we don't feel that that is sufficient especially as far

18   as what has happened in the past.  We have no confidence that they will effect and

19   implement those standards in a way that will solve the problems that they have created

20   before and will create in the future we don't think they can fix what's happened in the

21   next 12 months.

22             MR. STAPLES:  And I assume that nothing you have heard from them

1   today changes that impression?

2            MR. MADAIO:  Correct.

3            MR. STAPLES:  Thank you.

4            MS. PHILLIPS:  Simon?

5            MR. BOEHME:  What's the Attorney General's response to the potential

6   fall out of thousands of students who do not go to an accredited university?  I think

7   sometimes when we have this debate we oversimplify the idea that it is just very easy to

8   find a new accreditor when realistically it could be a very hard and difficult process and

9   thousands of students could be left behind.

10           Especially when we get into details if ACICS schools accredited to a

11   master's degree program there may be national accreditors that don't have the capacity

12   not only in personnel but have the scope to take on these types of programs.

13           MR. MADAIO:  First I would say certainly the Attorney's General are

14   concerned about the students, number one.  Number two, accrediting shouldn't be easy --

15   gaining accreditation should not be an easy thing it should be something that the

16   worthwhile and performing schools that meet the standards are able to obtain and schools

17   that don't meet the standards need to either get to those standards or not.

18           Or if they don't they should not be able to obtain accreditation.  I think

19   that the Department of Education can work with the schools and work with the students

20   to ensure that the transition goes smoothly for students but the state Attorney's General

21   are confident that the triad can work and that there are accreditors that can accept schools

22   that are worth of accreditation and for schools that aren't we think that speaks to why

1    ACICS is such a big problem.

2              If there are thousands and thousands of students in such a high number of

3    schools that will not be able to find accreditation anywhere else clearly that's a problem

4    with ACICS and those students perhaps need to obtain relief.

5              MS. PHILLIPS:  Art?

6              MR. KEISER:  If the Attorney General in Maryland has not done a

7    specific investigation do you have primary knowledge or specific knowledge of the

8    failures of ACICS or is it more just from the numerous reports and articles that have been

9    written.  Do you have specific knowledge any, especially in Maryland any issues that

10   have shown a failure by this agency?

11             MR. MADAIO:  I want to make it very clear that we have been involved

12   in specific investigations.  I was clarifying before that there was none to my mind

13   personally where which no other state was involved however a multi-state investigation is

14   an investigation by the state of Maryland into those schools and Maryland has been

15   involved and is involved in the ITT case as well as excuse me the Education Management

16   company related to Brown Mackey and Art Institute.

17             MR. KEISER:  But has the Maryland AG done a specific investigation

18   whether it be go to a campus or to do a review of the activities of ACICS that you are

19   aware of?

20             MR. MADAIO:  Our role is to investigate consumer fraud so we do not do

21   site visits, at least the consumer protection division.  I mean obviously there are

22   differences between the consumer protection division and Attorney's General who may

1       be counsel to a Maryland regulatory body which I think was referenced before.

2               But speaking as the consumer protection division our only ability and role

3       is to subpoena, investigate, review documents, speak to witnesses, obtain complaints,

4       investigate those complaints and litigate when necessary.

5               MR. KEISER:  Has the Maryland licensing agency taken action about any

6       of the ACICS schools based on the documentation that you are talking about?

7               MR. MADAIO:  I can't speak to that I don't know.

8               MS. PHILLIPS:  Other questions of this speaker?  Thank you very much

9       for joining us.

10              MR. MADAIO:  Thank you very much members of the panel.

11              MS. PHILLIPS:  Our next speaker is Ben Miller with Steve Gunderson

12      joining us at the front and Seamus Ware on deck.

13              MR. MILLER:  Thank you.  By every available measure ACICS has

14      demonstrated a repeated pattern of failure and neglect and this is about much more than

15      Corinthian.  For starters look at the sea of red on the repayment rates and earnings on the

16      score cards the Department gave you.

17              Look at the choice to laud fast train colleges and honor roll school a year

18      before the FBI raided it over recruitment practices that ACICS should have caught

19      sending its President to jail for 6 million dollars in federal fraud.

20              Look at the decision to do nothing when told by a whistle blower in 2014

21      that Northwestern Polytechnic University was a contempt college and even stranger

22      invite an adjunct faculty member to speak at its 2016 conference.  Look at the inability to

1    catch two completely fraudulent employers when verifying the job placement rates at

2    Computer Systems Institution.

3           Look at how an accredited West Wood and Kaplan campuses who ran

4    from other accreditors who were setting and enforcing tougher standards and look at how

5    it has the weakest student achievement measures of all but one main national accreditor.

6           The decision you make today on ACICS though is not just about this one

7    agency.  It affects the credibility of the entire quality assurance system.  Kicking the can

8    down the road here with yet another compliance report and 12 month extension is an

9    admission the Committee will tolerate even the most egregious instances of failure.

10          It would further erode public confidence in accreditation and more

11   importantly be an insult to the accreditation agencies that are enforcing and trying to set

12   high standards.  In the fact of damning evidence of its negligence, ACICS is engaged in a

13   series of cosmetic reforms that are little more than last minute promises of half-baked

14   changes.

15          Almost none of them have been implemented and many have zero

16   substance behind them right now.  They still don't even touch fundamental problems like

17   low thresholds and measures for student achievement.

18          ACICS had years to get better.  If these reforms are so serious why did

19   they only start two months ago and why should the public or this committee trust that

20   ACICS will do what it says?  There were over a dozen problems with it in 2011, NACIQI

21   gave it a year and said it was fine now it is back with over 20 problems some of which

22   are in the exact same regulatory areas as before.

1          It made promises and then it turned out those promises were too

2    expensive.  What happens if that happens again?  Now ACICS and its defenders will

3    appeal to you in terms of the agency's size.  They argue it is too big to fail.  But its size

4    makes your action all the more urgent to prevent more students from being harmed and

5    millions if not billions of taxpayer dollars from being wasted.

6          And while I 100% agree that questions of transitions are important, Ed has

7    already signaled awareness of this issue and the desire for an orderly process and it

8    contains the ability to extend that 18 month clock so that it doesn't start until later giving

9    schools more time.

10          The Committee's mandate with ACICS is clear.  You must decide whether

11    it is suitable for federal recognition.  For the sake of students, taxpayers and the

12    credibility of the entire accreditation system you must send a decisive signal by

13    terminating its recognition, thank you.

14          MS. PHILLIPS:  Thank you questions for this speaker?  Go ahead Frank.

15          MR. WU:  So I would like to ask you the same question I have asked

16    some of the other third party commentators.  Why are you not persuaded they came to us

17    and offered concrete examples of a dozen different changes in their governance, their

18    processes, how they monitor employment rates, they appear to be reasonable, contrite,

19    honest individuals -- why not give them one more chance to get this right.

20          MR. MILLER:  So let's talk about words and let's talk about actions.  So I

21    visited the ACICS annual conference this year and I realize my pen is from that

22    conference right now.  While I was there they had a session where an individual from

1    Day Mark College which settled with the Kentucky Attorney General and the lawyer

2    representing it spoke for about 90 minutes talking all about how to defeat the AG's in

3    settlements.

4             They talked about how AG's go home at 5, they don't know what they are

5    doing, they have no idea what is happening -- that to me is a very strong signal about

6    your actions right?  You are making all of these promises of contrition and then people

7    speaking to your members in a key note session are all about ways to avoid problems

8    with the AG's.

9             But let's even talk a little bit more about the substantive standards right --

10   so to be clear what ACICS is saying now is that they could request the independent

11   verification of things -- it is not requiring it in advance and up front.  That is different

12   from how other agencies operate.

13            So for example you will hear later today from ACCSC.  ACCSC for years

14   has required 50% independent verification prior to the arrival of the team visit.  So that

15   means when the team gets there they have a little box that says this is the person that was

16   paid to this work, this is how many we verified, how many we knew were right, things

17   like that.

18            Here we are talking about basically having someone whose job is not to do

19   trained calls, they are going to give them some sort of training but that is not their day job

20   to sit in a room for two to three days and make two calls.  One to the student and one to

21   the employer to try to verify it -- what happens if they happen to call while the student is

22   not on shift or they don't answer the phone?  Your guess is as good as mine.

1          And so I just think like it all has the veneer of change but it is not

2    implemented and it is still not going as far as what other agencies do.  Again this agency

3    uses a retention rate for student achievement, four the main national accreditors use a

4    graduation rate which is tougher.  It has lower thresholds for placement and retention

5    than others that use those measures.  It is not touching those things.

6          MR. WU:  So after a half a dozen of years I just returned to being a law

7    professor so I am going to do what law professors do.  I am going to proposed a

8    hypothetical to you, alright -- let's suppose and I am not saying this I am just saying

9    hypothetically let's suppose I believed that the new standards that this agency has put

10   forth are actually pretty good and I said that to you.

11          I said you know I've looked at this which I have done, this actually looks

12   like an improvement it looks different it might not be the best but it is in the ballpark, it is

13   in the range and on some specifics they are actually going pretty far and would be

14   comparable to other agencies.

15          So let's say I said that to you, what would your response to that be?

16          MR. MILLER:  I would disagree with you on a few issues.  For example

17   again they aren't touching the student achievement measures, so they are still not as

18   strong as those used by other agencies.  The other thing that we haven't got into here but

19   they are still accepting attestations from students that they have a high school diploma as

20   sufficient evidence they have a high school diploma.

21          That is why people have gone to jail for fraud.  It is often around faked

22   high school diplomas, they haven't touched that and they are still allowing it.  The

1    ACCSE in particular explicitly bans that practice so I would say to you that I think it

2    sounds great but some of the nitty-gritty things that actually affect opening the door to

3    fraud in the bars you are holding schools to have not been changed.

4            MR. WU:  Okay but let's just take something specific were I to look at the

5    new rule compared to the old rule that they have and I say this one is pretty good.  I

6    understand you are saying we haven't addressed all of these other things but as to the

7    handful of things that they have done let's say a conflict of interest, that's pretty good,

8    they have a third party you know -- not bad at all.  What would your response be to those

9    specific revisions that they shared?

10           Why is that not persuasive and indeed indicative of a broader change?

11   Institutions do change -- this is an institution there is tremendous public scrutiny and

12   pressure in this little world of higher education accreditation is quite well-known now,

13   they are being watched, presumably they will not continue to behalf the way that they

14   have in the past.

15           MR. MILLER:  So I would say a couple of things.  So one on the sort of

16   Ethics Board in particular -- one of the things important to note they use the word

17   independent and what they really mean by that is its  public members of their Board, not

18   actually like members who have nothing to do with the organization at all.

19           Because that's how I tweeted -- so anyway they will answer and talk about

20   it later so you know again this is an agency that doesn't currently have an Executive

21   Director, the person running it and making all of these changes is someone who has been

22   at the agency for years.

1       You know we don't see a replacement of top leadership besides that

2   person, we don't really see major changes in terms of the Board apart from the one

3   individual who was removed, the Board sets the standards -- you are talking about

4   changing the ship on a ton of things in a very, very short amount of time and you don't

5   even have the executive director who is supposed to come in and set the rules on all of

6   these things right now.

7       MR. WU:  One more question.  What if we did something that I presume

8   would be really sub-optimal from your perspective -- what if we said they need a little

9   more time, we will give them a couple of years -- you are really saying it is not just they

10   can't do it in 12 months you are suggesting that for some reason this institution cannot

11   and should not be given time to make these changes?

12       MR. MILLER:  Yes.

13       MR. WU:  And you should infer nothing from my questions, just genuine

14   questions.

15       MR. MILLER:  Yeah of course.

16       MR. WU:  I want to know what evidence can anyone point to that would

17   lead a reasonable neutral, open-minded observer to conclude, yeah they just can't do it?

18   Even if we gave them two or three years if we gave them more time it would just get

19   worse right?  What evidence is there of that?

20       MR. MILLER:  So I think here you have to go back to what happened in

21   2011 and 2013 where there were promises made to you all about how they were going to

22   implement all of this great verification stuff and as I believe Mr. Porcelli said earlier it

1    started out pretty well then they decided it was too expensive and when sort of the

2    spotlight was gone they said alright well it's too expensive we are just going to bring it

3    into the house and we are going to do it differently.

4            And you know that's the problem.  This is a body that meets twice a year,

5    they only debate around agencies you know every few years and so the scrutiny will fade

6    and they know that.  That is why they are asking for a year because they know the more

7    they kick the can down the road the less the attention will be paid on it.

8            I mean I would ask you how many times have you all given someone a

9    compliance report and then come back and really continue to put the screws to them and

10   continue the scrutiny?

11           MR. WU:  Just a final question.  There is an aspect of this to what you

12   submitted which has not only been read by me but I believe read by everyone in the room

13   so that's what third party comments should do, they should cause people to pause and

14   think.

15           There is an aspect of it though that gives me pause.  It is I would not feel

16   quite right saying or thinking hmm we need to make an example of them because

17   otherwise it is an indictment of all of the higher education accreditation system of

18   NACIQI itself and so on.

19           That argument far from being persuasive to me strikes me as an

20   inappropriate basis for our action.  That is that we would pick one agency out of 6 dozen

21   and say this is the agency we are going to make an example of and boy this is going to

22   show everyone.

1           So tell me why this agency and not x y or z?

2           MR. MILLER:  Yeah to be clear I see it less as the example and more as

3    this one you will not find a better example of a place with so many clear problems so it is

4    just that I think that you have faith in a lot of tough challenges.  I am just saying in my

5    mind I don't think this one is a hard call.  I think this one is clearer.

6           The other thing I would just say is I think if you are going to think about

7    this in terms of the example part of things it is also then worth thinking about how do you

8    then build in the calculus about the agency's size?

9           Because I would argue that if the concern is not about this as an example

10   then I would argue the concern about its size is also somewhat irrelevant to your decision

11   too because your concern is about the application of the standards and things of that

12   nature.

13          MS. PHILLIPS:  I have Cam and Rick, Ralph and Rick, sorry, Ralph?

14          MR. WOLFF:  I have to return to becoming a law professor again with

15   hypothetical words and the like.  I refer to your report as the Ben Miller report so earlier

16   today -- I have a few questions about the data that you have gathered because you are

17   correct they came up ACICS came up in 2011 and when I read the transcript a number of

18   promises were made.

19          I don't know what happened in 2013 but it was given a clean bill of health

20   it would appear.  Your data largely, not entirely but largely is 2009, 2010 around such

21   things as the honor roll versus sanctions.  You have one with Globe University 2012 and

22   then you go forward with other actions around Corinthian and the reconstituted data.

1     The claim that is made by the Agency is that we got the message I'm not

2     quite sure when that message was gotten but we got the message and we have already

3     started to implement changes.  I'm just wondering if your data analysis went into 2014-

4     2015 or you know how current it would be and if so, did you notice any change in the

5     kinds of things that you are describing here?

6     MR. MILLER:  Sure so to be clear there are a lot of different data sources

7     going on here.  So the placement rate data where it talks about how this was like the

8     reported one and the real one, all of that came from a press release in the Department of

9     Education's website between the Department and Kamala Harris the Attorney General

10    from California.  So that is basically limited to the time period in which they had it so I

11    don't have access to that, that's just from there.

12    The honor roll data I went all the day to 2015 so for example I can tell you

13    that there were several campuses from Corinthian colleges that were named to the honor

14    roll in I believe November 2014 -- for those of you keeping track of the calendar the

15    Department's action against Corinthian and its failures to place in like June, July 2014.

16    So actually after all of that had been exposed and had been going down

17    campuses were named to the honor roll.

18    In terms of the cohort default rate data and things like that I used that from

19    the most recently available year at the time which I believe because I did that analysis

20    originally in the fall of 2015 it would have been the three year rates for students who

21    entered repayment in the 2011 federal fiscal year.

22    There has since been released federal fiscal year 2012 but I have not read

1   the numbers on them.  So I can just tell you that in every instance I used the most recently

2   available data at the time and you know some of these things are just indicators.

3          So for example we are going to get FY13 cohort default rates in the fall.  I

4   used the most recently available repayment rates, everything like that.

5          MR. WOLFF:  Then going on let me ask in your report you actually

6   compare ACICS schools versus other accreditors and I just wonder what did you include

7   in the universe of the other accreditors for comparative purposes.

8          MR. MILLER:  So those are the -- it depends a little bit on the measure

9   but so in terms of default rates and default rates is basically everybody who is a main

10   institutional accreditor with the exception of AB pass just because they are kind of both

11   so I didn't want them in there.

12          In terms of repayment rates and graduation rates and things like that I

13   believe it is just the main national accreditors again without AB pass included.

14          MR. WOLFF: And I have just one other question -- Frank asked in a very

15   general way I would like to make it a much more concrete way to the extent you may

16   have knowledge, what we heard this morning was there is a new algorithm for actually

17   not just placement data but there are a number of steps taken not just the onsite reviewer

18   that the agency said has been recently been put into place.

19          And I just wonder in -- have you -- other than hearing it been able to see

20   or study these kinds of actions, the algorithm, the new processes that they put into place

21   not just for the placement data to verify it -- you have commented on that briefly just

22   earlier but also on the other data about completion or graduation not just retention as well

1    as placement.

2            MR. MILLER:  So first of all some of these things can't be studied

3    because they don't really exist yet but second of all I had a short conversation with Mr.

4    Bieda at the annual conference about some of their algorithm stuff but nothing more than

5    that.

6            MR. WOLFF:  Thank you.

7            MS. PHILLIPS:  Rick.

8            MR. O'CONNELL:  Ben, thank you.  Earlier I heard staff comment they

9    thought the standards of ACICS were fairly good and they may be getting better.  I take it

10   from your comments you think their standards aren't very good, particularly compared to

11   other national accreditors.  I would just be curious on your take why did you not include

12   any regional accreditors because they don't have student achievement standards and

13   would you advocate that regional accreditors and others who accredit public institutions,

14   non-profit institutions and many in my case which have very low student achievement

15   should have student achievement standards so NACIQI and the Department could hold

16   the creditors accountable for enforcing those standards?

17           MR. MILLER:  So yes you are correct.  There are no as far as I am aware,

18   no clear bright line standards for student achievement at all of the originals.  I have not

19   checked that 100% but I believe that is right I think they should adopt them.

20           MR. O'CONNELL:  Thank you.

21           MS. PHILLIPS:  I have Simon and then Arthur.

22           MR.BOEHME:  Like I asked the last speaker what is your response to the

1    students being placed and you are very familiar with the accreditation system and you

2    know that it is not as easy as you know -- there's all different limitations, the scope

3    especially ACICS they accredit all different types of degree granting programs that COE

4    for example they may not be able to absorb some of these institutions and other regionals

5    may not be able to take them on, what is your response to that and what would you

6    recommend to us when thinking about you know our vote?

7           MR. MILLER:  You know I would say you should as much as possible

8    focus your vote about do you think this is a reputable agency and I think you should send

9    a strong signal to the Department of Education that you will be watching its work in

10   terms of working on this transition issue because it has the staff and the time to be

11   assisting with that as much as possible.

12          I would say I think it is worth keeping in mind that this is not a one size

13   fits all transition question right so you have some students who are currently enrolled in

14   short term programs who will easily complete their programs during the 18 month

15   window.  The second thing is as noted by the Department earlier it has the ability during

16   an appeal to the Secretary to allow that clock to run as long as possible so the faster you

17   send a strong signal that you would like the Agency to be terminated the sooner schools

18   have certainty and they can know to start looking.

19          I think if you leave them in sort of this in between place of should we look

20   or not it is arguably worse.

21          Third, I think it is worth looking at who the actual schools they accredit

22   are.  You know some of them are part of corporate entities that do have accreditation

1   form other accreditors and I would imagine the move there is a little bit different.  I mean

2   we already saw this when West Wood and Kaplan campuses ran to ACICS because of

3   problems that the movement when you already have accreditation from some of your

4   campuses might be slightly different here.

5           And also keep in mind you know of the 200 and some odd campuses some

6   of them are owned by a single corporate entity so they are all going to move in mass and

7   it is a little bit different than saying there are 250 mom and pops that are all going to

8   move individually.

9           MR. BOEHME:  And going to Northwest Polytechnic which has been

10  accused of changing grades, I call it a diploma mill read the article and make your own

11  decision -- you heard their response and the back and forth.  I have a pre-standing invite

12  to visit the university.

13          Do you feel confident in this new action committee and their game plan to

14  proactively prevent or start to tackle these very serious issues that happened at northwest

15  and are potentially happening elsewhere?

16          MR. MILLER:  I don't think there is any evidence to draw that

17  conclusion.  I mean I think it is clear that they are going to take action against Northwest

18  because they have been called out by Buzz Feed on it and so the optics of it are such they

19  have to take action.

20          I think that is what we are seeing now right the schools that have gotten

21  the most scrutiny are the ones that are being placed on show cause and things like that

22  right now because optically it matters.  The ones that fly under the radar like what is the

1    Michigan Jewish Institute or what is the next Northwestern Polytechnic I don't think

2    anybody in this room knows who they are so I don't know that we would have any faith

3    in whether they would catch them.

4                MR. BOEHME:  But you don't have confidence that these new measures

5    would be able to catch them under the radar?

6                MR. MILLER:  I don't see how they would especially with the VISA

7    problem so for example when I was at the annual conference there was the whole back

8    and forth about the placement rates and things like that and someone from Northwestern

9    Polytechnic actually asked the question like just to be clear people who are here on a

10   VISA you don't include in the placement rates right?

11               And so I mean that one is going to have a hole in it kind of no matter what

12   I think.

13               MR. BOEHME:  Thank you.

14               MS. PHILLIPS:  Arthur?

15               MR. ROTHKOPF:  I know that you have done a good deal of research in

16   this area and have looked at various institutions and I think a very excellent and complete

17   job there.  Are there other accrediting agencies that you would suggest should get the

18   same treatment as ACICS based upon your analysis of what these agencies have done

19   over the past several years?

20               MR. MILLER:  I think there probably are but I will be honest I have spent

21   most of my time looking at the comparison between ACICS and ACCSC because they

22   seem to have the most number of schools in common and are closest in size to each other

1    and I would say in that case I did see demonstrable differences in terms of the level of

2    thought put into the standards, the verification processes, the standards they used and

3    things like that.

4              I do think there are probably questions to be asked about some of the

5    others you know they are not up now, I plan to continue to do this work and I think there

6    are ones coming down the pike in a few years that are worth investigating further.

7              MR. ROTHKOPF:  Thank you.

8              MS. PHILLIPS:  Any final comments, questions for Ben Miller, Anne?

9              MS. NEAL:  Ben I will second Arthur's comment that you are definitely a

10   student of accreditation and I think we can both agree that students have been disserved

11   in this case but would you not agree with me as well that the monopoly on poor quality --

12   this particular accreditor doesn't have a full monopoly on poor quality institutions?

13             MR. MILLER:  No of course not.  I think the thing that surprised me here

14   though was sort of the plethora of actually not the big chains because those are sort of

15   spread throughout but the number of ones that people have sort of never heard of that

16   landed here.

17             So Fast Train, Computer Systems Institute, Northwestern Polytechnic,

18   Michigan Jewish Institute, Anamarc College, there's kind of bunch of those also here

19   which struck me as a little bit strange.  I don't necessarily know what to make of it but I

20   really agree with you.

21             I mean there are problems in the public sector, there are problems in the

22   non-profit sector, there are problems with other accreditors it is just that it seems that

1    when you look at the confluence of standards and results here it is worse here than

2    elsewhere.

3            MS. NEAL:  Now I know you have set out in your report various aspects

4    of the data that you researched and I looked at some of that data and I mentioned this this

5    morning and ACICS and while you take it that they have some problems but it is also

6    possible to look at the data and to conclude that they accredit only 6.6% of institutions in

7    the bottom third compared to SACS with 23% or HLC with nearly 32% and I think it is

8    also possible to take a look at that data and to conclude that ACICS institution's single

9    digit graduation rates which are 13 are less than half accredited by Middle States which

10   has 34 or HLC with 51 or SACS with 35.

11           So having looked at that and knowing that we have to grantors of

12   educational quality and that these issues go directly to that is there any justification for us

13   to continue extending renewal to the regionals?

14           MR. MILLER:  So the first thing I would say on the data -- I would

15   actually suggest cutting it a slight different way which is rather than look at the number

16   of schools across the different agencies that are in that status because they are all

17   different sizes I would say within that agency was is the percentage breakdown of how

18   they fare.

19           So for example if you look at ACICS according to the data from the

20   Department 82% of its schools are in the bottom one-third nationally for repayment rate,

21   62% are in the bottom one-third nationally for earnings.  So I think we should be asking

22   tough questions about what the regionals are doing here but I would say in this case the

1  regionals do not have nearly as large a percentage of their schools in the bottom as this

2  agency does.

3           MS. NEAL:  And when we look at that and we look at the repayment rates

4  should we also take into account that in most instances ACICS was dealing with PELL

5  recipients and low income students to a greater degree in many respects than the

6  regionals and that yes while they do have higher debt in fact that does not take into

7  account the fact that when we are looking at the regionals and the non-profits there are

8  vast amounts of subsidies that are going there so is that entirely fair?

9           MR. MILLER:  So I think the problem here right is you can't input adjust

10  how much money you make the students pay back.  You can let them go on income base

11  repayment but they still have to pay it regardless if they are a PELL student or not and so

12  in this case I would say it is not sensible to bake in kind of how the rest of the system

13  struggles on things like repayment rate because there are real people behind those

14  numbers who have to pay those back.

15           And so if you just inflation adjust it you will sort of wave away abysmal

16  repayment rates and say that's okay just because everybody does poorly here.

17           MS. NEAL:  And again when we are asked to review accreditors it says

18  reliable grantor of educational quality and it's a difficult task we have when we look at

19  the regionals which thankfully have no real quality reference whereas obviously the for-

20  profits do have bright lines.

21           And so when we try to hold entities accountable we have a set of entities

22  that have bright lines that they put forth and then must abide by and then we have a set of

1   far larger regional accrediting bodies with in-precise diffuse, undefined standards, and no

2   repayment rates or other instances.  So in this world it seems pretty hard to be fair.

3          MR. MILLER:  I think the issue here is that again I agree with -- I don't

4   think the problems with accreditation are not a zero-some game.  There are issues

5   throughout the system.  There are massive incentive problems, there are massive

6   problems about sort of what is the role, how do they operate things like that.  I 100%

7   agree with that but I don't think that sort of this decision is saying -- oh the regionals -- if

8   we say ACICS is bad then it means the regionals are okay, that is not what this decision

9   says.

10         This decision says this is an instance of an accreditor  behavior beyond the

11   pale and we are going to take action here and then when the regionals are up we are going

12   to give them the same level of scrutiny because you know now you have got these score

13   cards.  You can ask the regionals how they did, you know you can ask them about the

14   patterns of problems and why they didn't catch anything and things like that.

15         My understanding is several years ago when there was problems with

16   HLC you all did do that and the challenge is that they are just not up right now.

17         MS. PHILLIPS:  Last call for questions for Ben Miller.  Thank you very

18   much for joining us.  Our next speaker is going to be Steve Gunderson.  I'm not sure if

19   Mr. Ware is here if not then I am going to go with the next one up is Aaron Shenck to

20   invite you to the table and on deck if you could be sitting on the side of the room is Doug

21   Seelbach -- so coming back to Steve Gunderson thank you for your patience, thank you

22   for joining us.

1     MR. GUNDERSON:  Members of the Committee thank you for the

2     opportunity to share the views of Career Education Colleges and Universities

3     representing a sector of just over 3 million students involved in post-secondary career

4     education.

5     Personally I come to you both as a former member of Congress serving 16

6     years on the Education Committee and as a graduate of this sector's schools.  The

7     recommendation of the Department to no longer recognize ACICS has the potential of

8     dislocating 800,000 students at 850 campuses in the next two years.

9     This one bold action by the Department has the potential of reducing our

10    sector by 25%.  Now I have been told a normal accreditation review will cost the school

11    between 50 and 100 thousand per campus.  Using the conservative $50,000 cost for these

12    850 schools to seek accreditation elsewhere is a minimum of 42.5 million dollars.

13    National creditors require a minimum of 18 to 24 months for such a

14    process meaning if the Department gave the schools a full 18 months to find a new

15    accreditor and you need to know that language is discretionary, he doesn't have to give

16    anybody 18 months.  Others don't have the capacity to handle such a request in this time.

17    No sector of higher education has been confronted with greater challenges,

18    economic, political and regulatory than our sector.  Accreditors have been challenged to

19    insure academic quality in the face of unprecedented growth during and after the

20    recession, unprecedented enrollment declined with no recovery of middle skilled jobs and

21    a dramatically changing employment skill demand.

22    Our sector has been asked to change its focus from one of access to one of

1    outcomes.  ACICS may have deficiencies.  The Department has recommended however

2    that every other accreditor with deficiencies including one with 17 such deficiencies be

3    given 12 months to come into compliance.

4                The accreditor's score card produced by the Department for your meetings

5    puts all of this in proper perspective.  The graduation rates of 60% or higher is achieved

6    by 21% of the regionally accredited schools, 40% of ACICS schools and 65% of all

7    nationally accredited schools.  38% of the students at regionally accredited schools are

8    PELL recipients compared to 64% at nationally accredited schools and 74% at ACICS

9    schools.

10               Students of color comprised 39% of the students at regionally accredited

11   schools, 55% at nationally accredited schools and at ACICS.  Such statistics make clear

12   that ACICS serves more at-risk students with better academic outcomes than regionally

13   accredited schools.  How then can they be set up as the sole target for elimination?

14               My hope is that you will place the academic interests and outcomes of the

15   students in the front of your deliberation.  They don't know what NACIQI is, they don't

16   know what accreditation is, they are just pursuing their career academic skills.

17               ACICS and those student deserve 12 months to make the changes that

18   have been suggested, thank you.

19               MS. PHILLIPS:  Thank you questions for this speaker?  Thank you very

20   much I'm sorry -- Ralph, I'm sorry.

21               MR. WU:  So I would like to ask you the opposite of the question that I

22   have asked some of the other third party commentators who have been skeptical that we

1    should trust the leadership of this agency.  Is there anything concrete that you could point

2    to not just what we have seen here but what would you point to in concrete terms that

3    would give us confidence that if they have 12 months that they would not just have the

4    standards but enforce them in an appropriate manner?

5          MR. GUNDERSON:  It's a great question and I think the most important

6    thing to understand is two dynamics.  Number one our sector has been asked to change its

7    focus from academic access to academic outcomes.  That's now the mission of our

8    accrediting agencies -- that becomes very, very important.

9          The second one is to understand the dynamics of what has happened since

10   the recession.  Our sector grew exponentially in the recession we saw a similar decline

11   when there was no recovery of middle skilled jobs -- our sector has moved from open

12   access to very careful I know very few schools if any that today pursue any kind of open

13   enrollment so they are focused on those academic outcomes.

14         You are now seeing from the accrediting agencies the mechanics that

15   reflect that programmatic focus change.

16         MR. WU:  Could I follow up with a question about this sector -- ACICS

17   noted that its accreditation challenge might be different because so many of the

18   institutions that it looks at have a corporate structure whether they are for-profit or not,

19   their scale is different, many campuses et cetera.  What's your view of that, is this a

20   fundamentally different accreditation process or is it the same?

21         MR. GUNDERSON:  It is different because the constituency and the

22   programs are different.  For the most part our schools are not what you and I would call

1   four year liberal arts programs.  They are primary two years some up to four years but

2   primarily two year and less programs that are focused on career skills.

3            The second thing that becomes really important here because I have talked

4   to some of my members who are accredited by ACICS over the last 10 days and because

5   they are a private sector school they are not able to even seek accreditation today with a

6   regional accreditor because many of those regional accreditors have requirements that

7   governance structures such as Board composition et cetera, have to be in place up to two

8   years before you can seek that regional accreditation.

9            So the opportunity for these schools to go elsewhere is very narrow.

10           MR. WU:  One last question I don't mean to ask you to speculate but since

11   you do represent an entire sector what would happen do you think if for whatever reason

12   ACICS just went up in a puff of smoke, what would happen?

13           MR. GUNDERSON:  I think you heard the answer to that this morning.  A

14   few of those schools would be easily accepted by somebody else but no other accreditor

15   is going to accept anyone quickly without appropriate due diligence in the current

16   environment.

17           So if you are a school that is challenged at all in terms of outcomes and I

18   plead with you look at the outcomes of our sector from 2012 to now -- everything before

19   then was a different business model of open access, open opportunity not focused on

20   outcomes and so as a result of that we would have -- I would say a significant decline in

21   our sector.

22           When you combine that and to give you some sense between 2010 and

1   2014 our sector on an annual basis decreased by 572,000 students but we increased in

2   academic awards by 20,000.  That is the best set of numbers I know that reflects the

3   changing focus programmatically of this particular sector.  But you take that 572 you add

4   let's say 50,000 from Corinthian you are at 625 you look at this with the potential of up

5   to 800,000 -- you are going to see and this doesn't count -- gainful employment which the

6   Department says will reduce 24% of our programs and defends the repayment which will

7   probably reduce a similar number of schools.

8          You can combine all of these efforts and you will see the elimination of

9   post-secondary career education in this country.

10          MR. WU:  Thanks.

11          MS. PHILLIPS:  Ralph?

12          MR. WOLFF:  Thank you let me play the other side.  We have asked

13   people who would like to see revocation occur you know what's good or what could be

14   done.  Let me take this position -- first I want to saw that the shift to outcomes I don't

15   think is as recent as you would say.  In law school we put outcomes in our standards in

16   1988 and have been moving forward in that without benchmarks or precise lines but --

17   ACICS itself committed itself on placement in 2011 so how long given the findings --

18   how long do you think any responsible reviewing agency should give an agency to make

19   that commitment real?

20          Because we are now in 2016 and being asked to be given 12 to 15 months

21   more and I think by the Agency's own admission and certainly by the Department's

22   findings they did not implement and fully enforce what existing standards they had.

1          MR. GUNDERSON:  First of all the Department would be the first one to

2     tell you that we have to come up with a common metric definition of placement.  We

3     don't have one.  Everybody defines it differently which is part of the problem.

4          Second if you look at what happened during the recession we lost 9.1% of

5     middle skilled jobs.  In the 4 years after the recession we had a 1.9% recover of middle

6     skilled jobs.  You know to be honest with you some of these schools who had placement

7     projects in their marketing and advertising based on traditional economics probably were

8     accurate for what had happened previously economically.

9          But wouldn't happen when we have seen no recover of middle skilled jobs

10    and we have seen a 1 to 2% GNP in the last two quarters.  I mean there is a lot of this that

11    is beyond a school or accreditor's control and we have to find a way to quit the fights and

12    all work together for the common interest here of the students.

13         MR. WOLFF:  I share your concern about the larger economy and the

14    need for jobs and particularly for under-represented students.  At the same time what is at

15    issue here one could argue is misrepresentation of statistics, fraudulent representation to

16    students by enough institutions to a significant category or quantity of students to move

17    this from an individual institution to a question of whether it was systemic or endemic to

18    the ACICS process.

19         So I don't think it is a larger economic issue it's a question about failure

20    the allegation of serious failure to act when appropriate information was available.  So

21    while I appreciate the larger economic situation we are dealing with findings at least on

22    the part of the Department, some acknowledgement by the Agency itself that it did not --

1    if failed to act rapidly enough and effectively enough where there were clearly stated

2    evidences of fraud and misrepresentation by more than one or two institutions.

3         So I want to kind of set aside the larger economic side and to ask would

4    not the failure to act create a distinctive with respect to this agency than the larger

5    question of what are good placement statistics and metrics.

6         MR. GUNDERSON:  I don't really think so because there was as

7    referenced this morning the guidance letter from the Department on accreditation to

8    accreditors came out in what April of this year -- and I think that was the first time that

9    we have seen the Department officially communicate with accreditors to say here are the

10   metrics that you ought to be using moving forward and specifically those of you who are

11   doing either occupational programming or nationally accredited you need to look at what

12   your colleague accrediting agencies are using for their metrics because we need to have

13   some kind of consistency in those metrics.

14        I think moving forward from April makes a lot of sense.  I would tell you

15   that as recently as Monday in a conversation with the Under Secretary in his office this

16   issue of defining what constitutes placement is still a very real concern for them and for

17   us.

18        MR. WOLFF:  Thank you.

19        MS. PHILLIPS:  I have Art and Kathleen and we just want to make a

20   comment about the time.  At the moment the clock shows 3:49 p.m. and we still have 25

21   public commenters.

22        MR. KEISER:  Mr. Gunderson the Wall Street Journal today had an article

1    about this particular hearing and kind of it said very specifically that this is kind of -- part

2    of a program to hurt the career education sector.  Could you comment on that?

3            MR. GUNDERSON:  I can only comment on the experience I have had in

4    the last 4 years as President of this Association and you need to know that Monday was

5    the first time in those 4 years that we were able to have a meeting with the Under

6    Secretary to discuss these issues.

7            I don't think it is being political to say that there is an ideological belief in

8    this town today that believes the private sector ought not be involved in the delivery of

9    education at any level and in particular at the post-secondary career level.  And so I think

10   when you combine all of the issues I have mentioned earlier and you look at gainful

11   employment 24%, you look at the defense to repayment and what's going to be impacted

12   by that, you look at the ACICS and you begin to bring all of these things together and

13   you know in all due respect to the Attorney Generals I mean we admire should I say the

14   strategic collaboration that has occurred by those who are opposed to this sector.

15           We know they meet and they say you go after that school, I'm going to go

16   after this school, you go after that school, I'm going to go after this school -- we know

17   that all is happening.  Some people have said to me this is a war on your sector.  I have

18   tried to avoid that use of terms because I think there is something on a positive proactive

19   which is as community colleges deal more and more with articulation agreements, with 4

20   year liberal arts programs -- if you eliminate this sector those students, those adults, those

21   citizens most dependent on some type of post-secondary education as a career path to a

22   real job with real wages and a chance for the middle class will be non-existent and that's

1    my passion.

2              MS. PHILLIPS:  Kathleen?

3              MS. ALIOTO:  You're very articulate.  I'm wondering in terms of your

4    association of private sector colleges and universities how many community colleges are

5    you representing?

6              MR. GUNDERSON:  Well not enough.  And it's a really great question

7    because we used to be called the Association of Private Sector Colleges and Universities.

8    I could tell you a great story over a beer of how that happened but I won't use the time

9    now.  But the reality is that we changed the name and the by-laws of the Association

10   because we don't want to be known by the corporate structure any school, we want to be

11   known by the mission of who we are and what we do.

12              A large number of our schools that were private sector have converted to

13   non-profit.  The academic programming has not changed one bit, they are still dealing

14   with post-secondary career education, they belong with us.

15              I will probably give the first 10 community colleges that want to join my

16   Association free membership just so that we can begin to have one place and one frankly

17   post-secondary institution or association that deals with this issue of career education.

18              MS. ALIOTO:  When you talked about the 24% are those schools

19   represented by ACICS, did I get that mixed up?  How many of your colleges and

20   universities accredited by ACICS?

21              MR. GUNDERSON:  30 of my members with 100 different schools

22   represented by or accredited by ACICS today.

1        MS. ALIOTO:  So is that -- what is the percentage of those I mean what

2   numbers of students are we talking about?

3        MR. GUNDERSON:  That would be 20% of my current membership.  My

4   membership has declined by over 50% in the last four years.

5        MS. ALIOTO:  And why is that?

6        MR. GUNDERSON:  Well that's because of the economic, regulatory and

7   political attacks on the sector resulting in most schools either downsizing or economic

8   problems so that they can't afford membership in any way.

9        MS. ALOIOTO:  And the final -- let's see what was my final question.

10  Oh when you said that open enrollment is gone well I don't think that's true of

11  community colleges?

12        MR. GUNDERSON:  No and you know when I was interviewed for this

13  job I told my Board my 16 years on the House Education Committee made me a strong,

14  passionate advocate of every sector of higher education.  Our diverse economy and

15  diverse population demands the diversity of our post-secondary system.  I told my Board

16  I will never, ever criticize any other sector of higher education and for 4 ½ years I have

17  never done that.

18        But I will tell you that if you look at the Department's data on graduation

19  rates you will see that our sector does far better than any other sector including the public

20  2 year system.

21        MS. PHILLIPS:  Thank you for joining us.  Our next speaker is Aaron

22  Shenck.  I would invite Doug Seelbach to join us at the table and Allan Hancock to be on

1    deck.  Again we have three minutes and I do want to remind everyone about the clock.

2    Okay -- Mr. Shenck.

3              MR. SHENCK:  My name is Aaron Shenck I am the Executive Director of

4    PAPSA we are a state-wide association in Pennsylvania that represents about 150 career

5    colleges and other post-secondary technical schools.  PAPSA represents a broad range of

6    institutions including both for-profit and non-profit schools and we have everything from

7    very large technical institutes to very small career schools in every size and shape in

8    between.

9              Our schools focus on a huge diversify of careers just to name a quick few,

10   age fact welding, construction, allied health, culinary arts, auto mechanics, CDL and

11   many, many, many more.  What I came here to talk about today is my visits to some of

12   these schools.

13             I joined the Association approximately 2 years ago as the Executive

14   Director.  I made it my primary mission for at least the first year and onward to visit as

15   many campuses as possible.  I have been to approximately 100 different schools in the

16   state of Pennsylvania over the last two years and out of those visits approximately 25 of

17   them are ACICS accredited schools.

18             I would like to -- the rest of my testimony is focused on some of the

19   observations of those visits, I want to side track briefly to a conversation that I heard

20   about five hours ago.  When the Department staff was testifying one of the panelists

21   asked him a question of have they ever gone with an ACICS visit team to a school.

22             If I heard things correctly I heard yes one time the staff member testifying

1    said they were on a visit.  The follow-up question was what was your experience was it

2    good or bad, what did you see and the response was essentially what they saw was very

3    good and they said but that was a good school.

4              I am here today to tell you that a large, large majority of the schools are

5    good schools.  I am not naïve nor ignorant to think that every single one has no issues and

6    there may not be problems with some institutions but overall on par the schools -- the

7    career and technical schools that will focus on that the ACICS accredits -- a very large

8    majority of them are good schools.

9              Now back to what I want to talk about today.  I have personally been to as

10   I said about 100 campuses, 25 of them ACICS accredited I have walked the halls and

11   spoken to hundreds if not thousands of students and I can tell you they overwhelming tell

12   me all of the positive experiences they have had.

13             These are student populations many of which come from low economic

14   backgrounds, minority, maybe single moms trying to raise a family as they go to school

15   part time.  You name the issue, the case and these schools are helping those students with

16   a better path forward.  I have also spoken at some of the schools I have spoken to many

17   of the faculty.  They tell me the good culture, the good atmosphere of many of these

18   schools and I can tell you one question I ask every single visit I go to -- to the faculty I

19   said just a general question of how long have you been here and usually the answers I get

20   back are 5 years, 10 years, 15 years, 20 years, 25 years -- it's long tenured people.

21             And these are people that are at-will employees, could go to other schools,

22   could do other things but they like the school and they choose to educate there.  I have

1    also sat in many employer round tables.  I can tell you without a doubt the employers

2    have told me overwhelmingly the graduates of these schools are employees they seek

3    regularly.

4                    Should I stop?

5                    MS. PHILLIPS:  Thank you.

6                    MR. SHENCK:  Thank you.

7                    MS. PHILLIPS:  Questions for this speaker?  Oh Hank sorry.

8                    MR. BROWN:  What were you about to say?

9                    MR. SHENCK:  I have two other observations if you defer me the time to

10   give them I can be quick if that is okay.  I was going to basically say also that I talked

11   about the employers and they tell me that what they commonly say is the graduates of

12   these schools are not only trained in the skill in the career field that they have been taught

13   in but they are employable individuals.

14                   These career schools teach them about soft skills, about being dependable.

15                   MS. PHILLIPS:  Quickly, thank you.

16                   MR. SHENCK:  Okay the last comment I will say and last point I have

17   also sat in many veteran's roundtables our sector educates a high, high number of

18   veterans the veterans tell me they choose our schools a large number of times for very

19   specific reasons.  There used to being in the military with hands-on technical based and

20   they transfer those skills in to an educational career that is hands-on technical based.

21                   They like the flexibility of the schools, the calendars are a little different

22   and candidly many of them tell me in their 20's and 30's when they leave service that

1  they would rather go to a career school as opposed to a 4 year school with a lot of 18 year

2  olds and 19 year olds so I have a few other things I want to say but I know you are short

3  on time so I will leave it at that, unless there are other questions.

4        MS. PHILLIPS:  Thank you very much, other questions for this speaker?

5  Thank you very much for joining us.  Our next speaker is Doug Seelbach.  Allan

6  Hancock I would invite you to join the table and Joshua Renicker on deck Mr. Seelbach

7  welcome?

8        MR. SEELBACH:  Well apparently I walk a different path than everybody

9  else that has spoken in front of me so I guess you could say I am an Ambassador of the

10  ITT student graduate classes.  My story is a little bit simpler a little bit -- not nearly as

11  exciting as everyone else that has spoken so far so -- in short the ITT staff is the most

12  caring staff I have ever had the luxury of encountering.

13        From the very beginning they were there for me with warm open arms and

14  asked me how my classes were every single day.  They always asked me if I needed

15  anything, if there was anything that they could do.  The faculties were outstanding and

16  always had everything that I needed to grow.  While attending ITT I learned skills that I

17  never fathomed existed from a highly qualified faculty that truly cared about my personal

18  well-being, excuse me.

19        They taught me to believe in myself and apply myself.  It is because of

20  them that I have thrived post-college in almost every aspect of my life.  ITT taught me

21  the principles of 3-D design and the fundamentals of the manufacturing.  Because of the

22  principles that they taught me I have a job designing factory machinery of which

1    sometimes becomes integrated within robots, it is also so globally.

2              As not to waste my talent I found an outlet to give back to the world as

3    much as I feel ITT has given to me.  I work part-time for UPS designing small plastic

4    items for customers.  It doesn't sound like much but today I am able to print pictures that

5    the blind can now see.

6              I proudly say that I am an ITT graduate.  The echoes of the classes that I

7    have taken and the information that I have learned will forever be a part of me, that's it.

8              MS. PHILLIPS:  Thank you very much, question Ralph -- Frank, sorry?

9              MR. WU:  I am flattered to be confused with Ralph.  Thank you I am glad

10   that we hear from students and the voice of students that is so important.  And I am glad

11   that your training has worked out so well.  I do have a question it is just a normal

12   question that a lawyer would ask of a witness in a circumstance such as this -- the

13   question is --

14             MR. SEELBACH:  I don't feel intimidated at all.

15             MR. WU:  It's very straight forward it is just what brought you here today.

16   Were you asked to testify or did you of your own accord decide?

17             MR. SEELBACH:  It was all on my own.  They asked if anybody would

18   like to do it and I submitted a paragraph or two and I think it was about 900 people that

19   had submitted they had chosen a few people and said if you would like to go, good.  Here

20   I am, a fish out of water.

21             MR. WU:  When you say they who would they be?

22             MR. SEELBACH:  That would be ITT Corporate of Indianapolis.

1          MR. WU:  Okay thank you.

2          MS. PHILLIPS:  Other questions?  The real Ralph?

3          MR. WOLFF:  Just call me Frank.  I actually -- I just want to make a

4    statement and thank you for your comments that whatever action this Committee takes

5    and really whatever action the Department of Education takes doesn't mean that every

6    student was either defrauded or misrepresented.

7          MR. SEELBACH:  I absolutely agree.

8          MR. WOLFF:  And that's just true for Corinthian as well.  Some may

9    have been and I think we need to acknowledge that we are trying to deal with not every

10   student but systems but I think it is important to acknowledge there are many, many

11   schools that are providing the services that you received so thank you for coming.

12         MR. SEELBACH:  I couldn't agree more that was easy.

13         MS. PHILLIPS:  Thank you very much for joining us.  To all of you yes

14   we are trying to do something about the temperature.  It seems to be a challenge.  Our

15   next speaker is Allan Hancock with Joseph Renicker joining at the table and Mark

16   Lunghofer on deck -- Mr. Hancock?

17         MR. HANCOCK:  Thank you very much I am also coming from a

18   different perspective.  I'm here as a volunteer for a career college under ACICS

19   accreditation.  I'm Allan Hancock, owner of the Hancock Group a financial service

20   organization and as a business owner for over 50 years I have served as a volunteer on

21   numerous boards, educational, community, charitable, professional, retirement, nursing

22   home boards, some were local, some state, some national, some international.

1    I served as Mayor of Altoona and traveled to many foreign countries to

2    help those in need.  I have three points.  The need for private career education, 2 --

3    students need to have options of all types of education, 3 -- vocational technical career

4    education in my opinion is the backbone of America.

5    As an Advisory Board member of a private career college for over 15

6    years I have had the opportunity each year to sit in on classes, observe the instruction,

7    meet with graduates, attend graduation, meet with faculty members and staff to discuss

8    curriculum and speak to students in classes.

9    Many of the graduates are the first in their family to graduate from

10   college.  It is exciting for me to see education and actions, students learning, changing

11   and being transformed into professionals who are eager to join the work force or in many

12   cases get back into the work force.

13   Being involved with the faculty administration who care about their

14   students, their graduates and the employers is very rewarding.  This college puts a high

15   priority on having Advisory Board meetings throughout the year.  At one of the Board

16   meetings the graduates are all invited to attend and the Advisory Board members are able

17   to interview them about their current employment, the value of their education and what

18   improvements the college can consider for future graduates.

19   Witnesses the impact of these students now graduates have in our

20   communities is encouraging, it is a tremendous impact.  It is so important to have

21   students have a choice in selecting the education that works for them and enables them to

22   succeed in their careers.

1          Education is not one size fits all, private colleges offer the opportunity for

2    students who want hands-on skills training in order for them to become employed.  I

3    believe the American dream.  ACICS is before this Department of Education for renewal

4    recognition.  I strongly encourage the Department to consider renewal of the recognition

5    because of the positive impact they have had on hundreds of institutions of higher

6    education, accredited by them, the thousands of students in our nation currently pursuing

7    their education and thousands of successful graduates who have benefited from private

8    career education.

9          There are advantages and benefits in both private and public education.  I

10   think competition is still very healthy and I believe that if ACICS lose their renewal

11   application -- if they lose it it will be a very harmful situation for not only the students but

12   also for the communities in which these colleges are located thank you very much.

13          MS. PHILLIPS:  Thank you questions for this speaker?   Bobbie?

14          MS. DERLIN:  Thank you for being here and I just wanted to ask have

15   you as a volunteer at the college been involved in preparing for a site visit from the

16   accrediting agency in any way?

17          MR. HANCOCK:  No I haven't but I was speaking to our President just

18   yesterday and she has just gone through one and she said it was the most intensive,

19   difficult one she has ever faced and she believes it is because of the scrutiny that is going

20   on that they really are lowering the hammer that was yesterday.

21          MS. DERLIN:  Thank you for that insight.

22          MS. PHILLIPS:  Thank you very much for joining us.  Our next speaker is

1   Joshua Renicker with Mark Lunghofer joining the table.  I also have Larry King on deck.

2   Mr. Renicker?

3              MR. RENICKER:  My name is Joshua K. Renicker I am in attendance

4   today to give testimony regarding the education I received from ITT Tech and how the

5   approach has changed my life.  I earned my Bachelors of Applied Science and Technical

6   Project Management in 2007 as well as my MBA in 2011 through the ITT tech campus

7   and online programs.

8              Being a non-traditional student finding a school that could support a full-

9   time work schedule was paramount in me furthering my education and in turn my career.

10  I will offer my testimony on four main ideals including education, classroom setting,

11  support excuse me and leadership.

12             Education -- the education material I learned in the classroom was relevant

13  and taught by professionals in the field who brought real world daily experiences into the

14  classroom to relate them to the material that was all part of the curriculum of the program

15  of study.

16             The discussions in the classroom setting revolved around what was

17  happening in the world not just what a textbook was written to share.

18             The classroom -- classrooms at ITT tech closely represented diversity and

19  challenges of the work place.  People in ITT classrooms come from sorted and diverse

20  backgrounds, educations, experiences and generations much like the work place these

21  students brought a different dynamic to the classroom based on the day's experiences and

22  challenges of living a non-traditional student life.

1    Support -- the campus and online setting allowed for resources of support

2 related to finding gainful or more gainful employment through career service teams that

3 worked tirelessly to better our resumes, show our value to potential employers, in fact my

4 last two opportunities for employment were gained directly through ITT Tech.

5    Leadership -- the classroom setting allowed for autonomy and leadership

6 to blossom.  I found myself taking ownership of projects and the instructors allowed this

7 to occur organically.  Nothing ever felt forced -- much like the work place the leaders led

8 and the followers followed.  I feel that my experiences in the classroom directly relate to

9 my successes in business since I started attending ITT Tech.

10    While attending classes in Indianapolis I found that the education I was

11 gaining far outweighed the value of the degree I earned at the end.  I found myself

12 applying what I learned sometimes within hours of learning it in real time in my position

13 at work.

14    During my time at ITT Tech I grew in business from a draftsman to

15 quality manager to operation's manager, to direct and now COO.  This happened

16 organically and 100% due to what I gained as experience through the ITT Tech approach

17 to education.  ITT Tech taught me valuable skills that I used to grow.

18    At ITT Tech I got an education not just a degree, thank you.

19    MS. PHILLIPS:  Thank you very much questions for this speaker?  Thank

20 you very much for joining us.  Our next speaker is Mark Lunghofer.  I don't see Larry

21 King so I am going to move to the next one to join us Quirt Marlon Collins with Jim Bare

22 on deck, Mr. Lunghofer.

1        MR. LUNGHOFER:  Good afternoon.  My name is Mark Lunghofer I am

2    the Production Manager at Sensit Technologies.  I would like to stress how valuable ITT

3    and its graduates have been to our company -- the students who come from ITT show

4    more commitment and are far more prepared for jobs in electronics manufacturing than

5    graduates from traditional colleges.

6        I have been hiring and managing employees for 18 years and my

7    experience with ITT graduates has been positive and extremely rewarding.  Traditional

8    schools do a wonderful job teaching their graduates.  ITT on the other hand in my

9    experience is very adept at training its graduates to be ready to succeed in the careers that

10   they have chosen to pursue.

11       Within the last 4 to 5 years I have hired 5 ITT graduates, 2 of those

12   through my promotion had been promoted to enter departments 1 of our engineering and

13   1 through our product development.  The other 3 remain in electronics manufacturing and

14   1 of those has been promoted to my production engineer, I believe this because ITT's

15   instructors and career service personnel do such a great job nurturing these non-

16   traditional student's passions.

17       When it is time for me to hire new employees I prefer ITT grads because

18   they are excited to work and are interested in learning every aspect of our products and

19   the manufacturing of it.  When promotions are available in the company I am the first to

20   champion their abilities to other department heads such as service and engineering.  They

21   aren't just here to collect a paycheck until something better comes along they continue to

22   work here because ITT career service personnel do a great job at matching their students

1    with companies like Sensit Technologies.

2    They are able to do this because they know their student's passions and

3    match them with companies that will nurture them in the learning and career just as ITT

4    did.  I am quite impressed with ITT as an educational organization.  Their focus is not

5    only on educating their students but preparing them for the work force, including

6    reaching out to industries like my own to help them find employment.

7    I believe so highly in ITT that for the last 4 to 5 years I have volunteered

8    my time to do mock interviews for their students and I sit on the Advisory Committee.

9    While traditional colleges prepare students for many career paths, I believe ITT takes

10   their students one step further.

11   MS. PHILLIPS:  Thank you very much, questions for this speaker -- Frank

12   or Ralph?

13   MR. WU:  Just we are the same -- just the same question that I asked of

14   the first student speaker which is how did you come to be here today?

15   MR. LUNGHOFER:  I was approached and asked if I would be willing to

16   do this.  I basically gave them this and said this is what I would be willing to do and so

17   here I am.

18   MR. WU:  That's great thank you, it's moving -- it is great to know that

19   the programs have worked for some students and they have found gainful employment

20   and it is great that it has worked out for you as well, thank you so much.

21   MR. LUNGHOFER:  Thank you.

22   MS. PHILLIPS:  Bobbie?

1          MS. DERLIN:  You mentioned you served on an Advisory Committee for

2     the collect?

3          MR. LUNGHOFER:  Correct.

4          MS. DERLIN:  And it sounds like you have been involved with them for

5     some time.  Can you tell me -- were you ever invited or did you ever just have an

6     opportunity to participate in any of the accreditation or self-study activities of the

7     college?

8          MR. LUNGHOFER:  No ma'am.

9          MS. DERLIN:  Okay thank you.

10         MR. LUNGHOFER:  You're welcome.

11         MS. PHILLIPS:  Thank you very much for joining us.

12         MR. LUNGHOFER:  Thank you.

13         MS. PHILLIPS:  I am guessing that you are Mr. Collins?

14         MR. COLLINS:  Yes I am.

15         MS. PHILLIPS:  Okay one moment please.  Our next speaker will be Mr.

16    Quirt Marlon Collins with Jim Bare joining us at the front table and James Harsh on

17    deck.  Mr. Collins, welcome.

18         MR. COLLINS:  Thank you very much for having me here.  I am also a

19    graduate from ITT Tech.  I graduated in December of '13 -- December of 2015.  I started

20    in 2013 and I came here from a background of being I was in the service.  I studied

21    electronics while I was in the service and I spent 18 years doing electronics.

22         When I got out of the service my guess was that I would be able to go

1   right into the public and get a great job in the electronic field which didn't happen.  It

2   turns out that the civilian populous does not recognize the education that we receive in

3   the military as accredited though I have had a lot of background in that field and worked

4   in that field for the 18 years that I was in.

5   I gave up.  Though I gave up my wife pushed me and urged me to

6   continue forward and try to do something.  I finally decided that I would try ITT because

7   I knew ITT had a reputation for electronics and through the courses that I experienced

8   there I was given an opportunity for many different jobs and stood many different

9   interviews of accredited jobs that I was very interested in and I have presently started

10  employment with Hela Electronics which is a German based company and we work on

11  most of the vehicles that most of you probably have driven here or drive when you get

12  home.

13  And we are responsible for those things working safely and they do.  I am

14  very happy to be a part of a large electronics field that is so involved with the

15  advancement of technology.  My dream had been research and development which was

16  far beyond the reaches that I could have ever acquired other than having gone through

17  ITT in order to get the paperwork that said that I could do the electronics that I had been

18  trained for.

19  So the staff that I have experienced at ITT -- have been people that are

20  working in the field and have been for years, most of them have a Master's Degree.  I

21  was very impressed with their willingness to help, stay after class, even at times when

22  they had to go to work right afterwards.

1              So it has been nothing but a great experience for me.  Thank you for the

2      opportunity.

3              MS. PHILLIPS:  Thank you, Federico?

4              MR. ZARAGOZA:  Thank you for your words.  Can you tell me a little

5      bit about the process kind of by which you were approached to become a student -- their

6      recruitment?  And then secondly the tuition how much tuition, how long was your

7      program and do you have a student loan, those three things?

8              MR. COLLINS:  Okay I'll address the last first because it is the easiest for

9      me to remember.  Yes I do have student loans.  I am presently not going to school at ITT

10     I have taken a break.  The student loans -- I have government loans as well that are

11     helping me along with my education and I do foresee in the future continuing my

12     education.

13             MR. ZARAGOZA:  Tuition amount?

14             MR. COLLINS:  Tuition amount -- actually I don't know what my tuition

15     is.

16             MR. ZAROGOZA:  Any idea, high -- low?

17             MR. COLLINS:  It's an affordable one, one that I definitely would not

18     have been able to afford going to a university because I do have a family and I also have

19     jobs and I am trying my best -- they don't pay you a lot in the military contrary to popular

20     belief they don't pay you enough that I would have been able to spend the time to go to a

21     university.

22             So having something like ITT was a blessing for me and it made it

1   possible for me to get the credibility the credentials for the jobs that I was looking for.

2   MR. ZAROGOZA:  And the first question was how did you become

3   aware of ITT the recruitment process?

4   MR. COLLINS:  When I was younger there used to be a lot of ITT

5   commercials and throughout my life --

6   MR. ZARAGOZA:  Yes there are.

7   MR. COLLINS:  And throughout my life I have seen that that's a place to

8   go and in actuality when I went to ITT I was not expecting to get a job.  I had already

9   given up and fallen into the routine of okay you go to work, you do the best you can and

10   you come home.  I just went to ITT to see that my education that I had experience before

11   was something that was valid and once I did go to ITT and found that yes indeed you are

12   valid, now you also have the paperwork to show it, that opened up doors beyond belief

13   for me.

14   MR. ZARAGOZA:  Thank you so much.

15   MS. PHILLIPS:  Bobbie?

16   MS. DERLIN:  Thank you very much for being here.  I wanted to ask one

17   question.  In terms of your being admitted to ITT and the fact that you had prior

18   experience through your military service which we thank you for -- how was that

19   reflected in terms of your academic progress at ITT?

20   Were you given credit for prior military experience or was it just

21   something good to have?

22   MR. COLLINS:  Well unfortunately like I said before a lot of the things

1    that we did was not considered as far as the civilian life goes but there were some classes

2    that they did take.  My education and experience did help me through academically

3    however going through the course and learning from people that were actually practicing

4    in the electronic field was greatly beneficial to my education.

5              It brought me up to speed and I got out of the service in 2000 and this was

6    2013 so a lot of things had changed if you know the electronic field so it was very

7    beneficial for me.

8              MS. DERLIN:  Thank you very much.

9              MS. PHILLIPS:  Thank you very much for joining us and thank you for

10   your service.  Our next speaker is Jim Bare, with James Harsh joining us up front  and on

11   deck is Xavier Ferguson -- Mr. Bare thank you for joining us.

12             MR. BARE:  Thank you Miss Chairman.  As a graduate of National

13   College and a member of my campus Advisory Board and Coordinator of internships for

14   students to a variety of education institutions I know first-hand that National College

15   students receive an excellent education.

16             The preparation of the students, the professionalism of the faculty and

17   staff and the success of our graduates more than validate the effectiveness of ACICS as

18   an institutional accreditor.  I graduated with an Associate's Degree in 2014 majoring in

19   Medical Assistant Administration from Balamy Tech.  I currently work with a

20   community health center serving the uninsured and poor.

21             I am currently going back to school after taking a year off to get my

22   Bachelor's in health care management.  I could have chosen any other school that I

1    wanted to go to for my Bachelor's but I chose to go back to National simply for their

2    small classroom sizes and the professionalism of our faculty.

3            MS. PHILLIPS:  Thank you questions for this speaker?  Thank you so

4    much for joining us.  Our next speaker is James Harsh with Xavier Ferguson, Mr.

5    Ferguson, Mr. Harsh, thank you -- Mr. Ferguson to join us if Mr. Ferguson is not -- is this

6    Mr. Ferguson -- okay and Kevin Gratz on deck, Mr. Harsh welcome.

7            MR. HARSH:  Thank you.  I would like to thank the Committee here for

8    allowing me the opportunity to speak.  My name is James Harsh I am a proud graduate

9    and employee of ITT Technical Institution.  I began my pursuit of an Associate's Degree

10   in network systems administration in September of 2013.

11           I graduated in June of 2015.  During this time I had the privilege of

12   attending the classes of some very qualified instructors, many of whom are still working

13   in the IT field.  This brings real work experience to the classrooms.  Each course taken on

14   the way to a degree provided valuable tools that can be utilized for the rest of your life,

15   whether it be the core classes or course that is designed to develop soft skills such as

16   composition and communication.

17           These tools have enabled me to continue learning in the ever-changing

18   field of IT.  Mine is a rather unique story -- during my time as a student I was presented

19   with the opportunity to be a federal work study.  This position allowed me to work

20   alongside and shadow the current system support technician at Charlotte North Campus

21   in North Carolina.

22           I gained valuable experience in this role, both through interaction in the

1    corporate network as well as being able to assist other students that may arise.  In

2    February of 2015 the SST at the North Campus who was also in the Navy Reserve

3    received orders to deploy for a duration of 13 months.  This opened up a temporary full-

4    time position as the SST at this campus.

5           I was still attending classes at the time and had one and one-half quarters

6    until graduation but I was able to be hired on to fill this position.  In November I was

7    offered a permanent full-time position at the South Campus in Charlotte and I am very

8    fortunate that those two campuses are only approximately 18 ½ miles apart and I have

9    been supporting both campuses from November until the beginning of May.

10          I attribute my success in this field partially to my interest in it but mostly

11   to the training and the instruction that I received at ITT.  I'm looking forward to returning

12   for a Bachelor's Degree in information systems and cyber security and that will be

13   starting up in September of this year.

14          MS. PHILLIPS:  Thank you, questions for this speaker?  I have Simon and

15   Frank.

16          MR. BOEHME:  Thank you for your service and thank you for coming.

17   It's interesting to me that we have quite a few ITT people here.  When ACC I believe,

18   there was a negative action taken against a school the City College of San Francisco,

19   many students showed up.

20          And if ACICS were to lose their accreditation ITT could potentially apply

21   through a different accreditor.  And so I guess my question to you is, why are you -- and I

22   appreciate your comments and I echo what Frank has to say about these third party

1    comments, but what do you have to specifically say about ACICS that we can use in our

2    deliberations when discussing the merits of this accreditation agency?

3                MR. HARSH:  Well, being that I am also an employee of ITT I have had

4    many run-ins, many of our meetings around the campus involve ACICS requirements so I

5    am sitting in the meetings of a lot of these and I have found that lately I don't know, like

6    I said I have only been an employee of theirs since February of 2015 but the more recent

7    inspections by ACICS have been more strenuous.  I know they applied a lot more I'm not

8    even sure -- I'm sorry they have put more thought and more effort into meeting the

9    requirements that ACICS has brought to them.

10               So as far as if they lose their accrediting ability and ITT being able to go

11   somewhere else I don't have an answer to that.  I really wasn't aware of what was

12   happening here today when I was asked to come and speak I'm sorry.

13               MR. BOEHME:  But you feel confident and it sounds like you have very

14   positive experiences of ITT that if ACICS were to lose their accreditation that you feel

15   confident from your experience, your personal experience, that they would easily get

16   accreditation elsewhere?

17               MR. HARSH:  I don't know how easily like I said I was not sure what was

18   involved with what was going on here today.  I don't know what is involved in finding

19   accreditation from another Council.  I would hope that they would be able to get

20   accredited from someone else.

21               MR. BOEHME:  Thank you.

22               MS. PHILLIPS:  Frank?

1          MR. WU:  Just a few quick questions.  As a graduate and someone who

2     now works at the school I am just curious what is your understanding of what

3     accreditation means?

4          MR. HARSH:  Well it is my understanding that you are looking to make

5     sure that the instructors are qualified to teach, that the information as far as the placement

6     goes when a student graduates and they are placed in a career or a job in the field that the

7     information is being reported correctly.

8          That there is no falsifying of records and that financial student aid is not

9     misleading the students.

10         MR. WU:  And just one more question.  Things have worked out very well

11    for you.  You have been trained, you have a new skill set you have a new job how typical

12    are you of your classmates?  The people that you started school with, are there others

13    who work there on campus now or have other types of jobs -- did many drop out, the

14    friends that you made, where are they now?

15         MR. HARSH:  Many of the people that graduated with my class are

16    working in the field at other companies.  I have found that across the United States at

17    other campuses for ITT a lot of the SST's the people that are in my position are also

18    former graduates.

19         I had electronics experience -- I was in the Marine Corps back in '89 to

20    '93 and I had electronics experience there but I waited so long from that time until I

21    started going back to school that none of that transferred into college credit hours and I

22    really didn't want to go into the electronics fields again anyway so that's why I went to

1    ITT.

2              MS. PHILLIPS:  Any further questions for this speaker?  Thank you very

3    much for joining us and for your service.  Mr. Xavier Ferguson is our next speaker with

4    Kevin Gratz joining us at the front table and Bobbie Casteel on deck.  Mr. Ferguson

5    welcome.

6              MR. FERGUSON:  First I would like to preface my comments by saying

7    thank you for allowing me the opportunity to be here and it is an honor to be in the

8    presence of so many successful people.  My name is Xavier Ferguson, I am a full-time

9    student currently at ITT Tech local institute in Kennesaw, Georgia two terms away from

10   completing my Bachelor's program.  Also I am a full-time worker at Labor Ready, a true

11   blue company I am a marketing recruiter coordinator, also a full-time father and currently

12   in the Reserves I did 12 years active and you know I am in the Reserves still.

13             After I arrived on the campus of ITT in March of 2014 I immediately

14   noticed a high level of professionalism.  After exploring a bevy of options I knew that I

15   had found a home.  I was introduced to every staff member in the building and I received

16   a complete tour of the entire facility.

17             I have been a student at ITT since the spring of 2014 and I can personally

18   attest that this educational institution truly cares for its student.  The staff here at ITT

19   Tech is committed to excellence.  I love the hands-on approach that is taken involving

20   each and every individual.  Because it is more of a hands-on environment it also allows

21   the instructors the flexibility to apply real world business scenarios to their teaching

22   curriculum.

1        Every instructor professor will go above and beyond to assist his or her

2    students.  All of this is made possible because of the leadership at the top levels to

3    include the Director and the Dean they will go do whatever is necessary to accommodate

4    their students and facility what is necessary to accommodate their students and facilitate

5    the learning process.

6        Last but not least certainly there is the career service department.  This

7    program is the reason why I am currently employed.  The amount of time and dedication

8    to duty is truly amazing.  They made sure that I had a professional resume built that

9    proved to be instrumental in my success and to enter today's competitive business sector.

10        The Kennesaw branch is lucky to have such experienced personnel

11    running its career service department and I will be forever indebted to this wonderful

12    institution.

13        MS. PHILLIPS:  Thank you.  Questions for the speaker, Simon?

14        MR. BOEHME:  Thank you for coming and like you I also value strong

15    vocational programs and it sounds like you had a great experience.  But I am going to be

16    blunt and I appreciate your honesty.  Were your expenses paid for?

17        MR. FERGUSON:  Yes they were.

18        MR. BOEHME:  Thank you.

19        MS. PHILLIPS:  Other questions for this speaker, Federico?

20        MR. ZARAGOZA:  So from the student perspective you have had a very

21    valuable experience at ITT because they are currently accredited by ACICS.  Would it

22    matter to you as a student consumer if the ITT was accredited by a comparable

1    accrediting entity?

2              MR. FERGUSON:  I don't believe that it would because the institution

3    has a foundation of dedication to their students so I don't think it would be that difficult

4    for ITT to get picked up by another accrediting agency.

5              MR. ZARAGOZA:  Thank you.

6              MS. PHILLIPS:  Any other questions for this speaker?  Thank you for

7    joining us and thank you for your service.

8              MR. FERGUSON:  Thank you for having me.

9              MS. PHILLIPS:  Our next speaker is Kevin Gratz with Bobbie Casteel

10   joining us at the table and Terrence Smith on deck, Mr. Gratz?

11             MR. GRATZ:  Thank you for allowing me to speak to you today.  My

12   name is Kevin Gratz and I am Talent Acquisition Specialist for Dean Clinic part of SSM

13   Health located in Madison, Wisconsin.  Dean Clinic has experienced a dramatic shortfall

14   of qualified medical assistants our public non-profit schools are unable to produce

15   enough graduates to meet the demands of the area.

16             At the same time we are increasing the number of medical assistants that

17   we are trying to hire making the shortfall larger.  This has allowed us to go to extreme

18   measures including hiring of more expensive LPN's and RN's this raises the cost of

19   health care.

20             We work closely with Globe University in Madison.  They produce about

21   40 medical assistant graduates in Madison each year and honestly I wish they would

22   graduate three times that number.  Their graduates come ready to hit the ground working.

1    Globe University offers options that our public schools do not including smaller class

2    sizes and an evening option.

3            This option allows someone working full-time during the day to still go to

4    school to learn skills to further their career and help them earn a living wage.  Globe

5    University is not the right option for everyone but for some it is the perfect option.  The

6    medical assistant graduates are highly sought after in the greater Madison job market,

7    most of their graduates are finding good jobs with strong wages including hiring bonuses.

8            Many are hired before graduation.  If Globe University was forced to close

9    their doors in Madison it would hurt an already weak labor pool for these trained medical

10   professionals, once again thank you for your time.

11           MS. PHILLIPS:  Thank you questions for this speaker?  Thank you very

12   much for joining us.  Our next speaker is Bobbie Casteel with Terrence Smith joining us

13   at the table, not seeing Terrence Smith I am going to invite Joshua Mann to join us at the

14   table, not seeing Joshua Mann I am going to invite Stefany Ward to the table.  Not seeing

15   Stefany Ward I am going to invite Lovell Walls to the table.  Not seeing Lovell Walls I

16   am going to invite Joseph Fernandez to the table.  Not seeing Joseph Fernandez I am

17   going to invite Mendi Goble to the table.

18           Not seeing Mendi Goble I am going to invite Deanna Henley to the table.

19   Miss Goble okay thank you and that means that Deanna Henley on deck and Paul Mazza

20   to follow.  Okay with that in mind Mr. Casteel thank you for joining us.

21           MR. CASTEEL:  Thank you everyone for having me.  My name is Bobbie

22   Casteel.  I am also a former student of ITT Tech.  I am an instructor at ITT Tech as well

1     and I received my Bachelor's from ITT Tech in information security and cybersecurity.

2              Myself, and my employer, Perkins Cybersecurity & Advisory Service all

3     feel very strongly about vocational schools.  You know we really like the hands-on

4     approach the vocational schools have out in the real world.  They seem to -- you seem to

5     be able to get more hand-on experience from vocational schools than you do from

6     standard community colleges or universities.

7              And that was one of the problems that I even had when I approached

8     looking for a college is that when I looked at community colleges or universities I

9     couldn't get the hands-on experiences that I could get when I was in the Marine Corps

10    four years before I started college.

11             So it was a journey just to find a vocational school that was able to give

12    you the hands-on experience and I feel that that is one of the major players in today's

13    market especially in the technology market is that most employers want that experience,

14    they want the hands-on experience not just the theory based experience that you get from

15    your standard, more traditional colleges.

16             They want that more what have you done, can you set this up, can you

17    administer this -- it's what can you do right now because most employees do not have

18    that time to sit and train you from the ground up in order to get you up to speed or get

19    everyone else up to speed and I feel that is what a vocational school comes in good play

20    with and I feel that you know I have different stances that I feel if ITT Tech did lose its

21    accreditation from the ACICS is that I am not saying that they wouldn't get another

22    accreditation but I would say it would be another black mark against the school.

1    Even though it is the accrediting body that lost it -- it could also impact the

2 school in a negative way because then they lost their accrediting body.  And then also

3 thinking about it from just an outsider looking in perspective -- you know if the ACICS

4 has a plan laid out and the plan -- no plan is perfect.

5    I work in cybersecurity and I see risk assessment plans all day.  I do a lot

6 of HEPA assessments and you know I don't think I have ever seen a company 100%

7 HEPA compliant and I would say it is the same with accreditation.  It is going to be a

8 long road but if there is the foundation in place and the foundation is there then allow

9 someone to grow on that foundation, just don't let them crumble, thank you.

10    MS. PHILLIPS:  Questions for this speaker?  Art?

11    MR. KEISER:  Thank you for your service and thank you for being here.

12 You were in the service and you went to school why did you choose ITT and secondly

13 did the approach at ITT work well with you as a veteran and did you use your veteran

14 benefits at that school?

15    MR. CASTEEL:  So I did use my veteran's benefits at that school and

16 their approach was that I had approached them and they actually laid out in my campus

17 they laid out everything in front of me including what the cost of the program was going

18 to be and I do know the standard costs of what the Association for my Associate Degree

19 cost and also the total of what my Bachelor's Degree costs in conjunction with my

20 Associates.

21    It is honestly not a -- it is priced a little higher than probably some

22 community colleges that are out there but I feel that the trade-off of that price and the

1    experience you get, you get farther.

2                    MR. KEISER:  Did ITT serve you and meet your expectations as a

3    veteran?

4                    MR. CASTEEL:  Yes, 100%.

5                    MS. PHILLIPS:  Other questions for this speaker?  Thank you for joining

6    us and thank you for your service.

7                    MR. CASTEEL:  Thank you for having me.

8                    MS. PHILLIPS:  Are next speaker is Mendi Goble.  Inviting Deanna

9    Henley if here to join us at the table, not seeing Deanna Henley -- Paul Mazza could you

10   join us at the table?  Carrie Wofford?  Sara Nolan Collins?  Walter Ochinko?  Okay --

11   thank you.  Back to Mendi Goble thank you for joining us welcome.

12                   MS. GOBLE:  Thank you very much for having me.  Hello my name is

13   Mendi Goble and I am the Executive Director of the Richmond Chamber of Commerce in

14   Richmond, Kentucky.  Why in the world would I fly all the way to Washington, DC to

15   speak on behalf of American National University?

16                   It is to tell you about the impact that this university has on our community.

17   ACICS accredited institutions provide the education Chamber members need and their

18   employees if the ultimate measure of institutional quality is how well their graduates

19   perform in the work force then in Richmond we see this every day.

20                   A&U has been a key player in the Richmond community since its

21   inception.  Their leadership has always understood the importance of what community

22   means and in turn how being a part of your community makes you a better university as

1      well.  From a Chamber standpoint A&U is involved in our organization because they

2      truly understand the concept of when the tide rises, all boats rise.

3                      They have always focused on improving the business climate of our town

4      and they recognize that these businesses are what make them successful.  American

5      National University is an asset to Richmond, Kentucky as they educate and train their

6      students, our citizens to be able to place them in our local work force.

7                      One of our Chamber members a major manufacturer of industrial

8      absorption equipment has had a long-standing partnership with A&U and their Human

9      Resources Director works closely with A&U's career center when looking for new

10     employees.

11                     Another Chamber member a local pharmacy that was new to the area

12     quickly discovered the value of working with A&U and the two organizations have a

13     partnership that provides externship opportunities for A&U pharmacy technician students

14     as well as employment opportunities for graduates.

15                     The pharmacy benefits by getting the chance to see perspective employees

16     on the job through the externship program a win/win for our local economy.  A third

17     Chamber member the local office of our state Kentucky center career benefits in a

18     different way.

19                     Work study students from the local A&U Campus provide administrative

20     support to the center's staff giving the students an opportunity to work toward their

21     education while gaining valuable experience in a professional work environment while

22     assisting the center in its mission to match job seekers with available positions within a

1     local economy.

2            In fact the work force development specialist at the Kentucky career

3     center is a graduate of A&U.  I'm not an educator.  What I do know is that ACICS

4     accredited institutions like American National University and provide our community

5     with valuable resources in many ways.  That to me would seem to be the ultimate

6     judgment of institutional quality.

7            MS. PHILLIPS:  Thank you, questions for this speaker?  Thank you very

8     much for joining us.  You will have to help me with your name at this point I'm not quite

9     sure who is on deck.

10            MR. MITCHELL:  My name is Matt Mitchell I am speaking on Carrie

11     Wofford's behalf.

12            MS. PHILLIPS:  Okay so our next speaker is Carrie Wofford in multiple

13     identities we would invite Sara Nolan Collins to join us at the table and Walter Ochinko

14     to be on deck okay.

15            MR. MITCHELL:  So my name is Matt Mitchell.  I come at this issue

16     from a couple of different perspectives.  I am formerly a recruiter for ITT Technical

17     Institute.   I worked there for 8 months prior to attending Brown Mackey College also

18     accredited by ACICS as a student in the nursing program.

19            The reason I was only employed at ITT Tech for 8 months is after the

20     unethical behaviors that were requested of me I had to leave the organization.  We were

21     consistently trained on how to go verbally around the requirements of ACICS in our

22     recruitment practices on a regular basis.

1       There were meetings on verbiage and while this doesn't exactly mean this

2   it implies this.  This is what you can say -- this is what you can't say.  So there was a lot

3   of training and weekly sessions to that effect.

4       Veterans -- it's no surprise that ITT brought a lot of veterans here today

5   because veterans statistically have the integrity and work ethic to complete a program no

6   matter how hard it is, that is what we are trained to do.  Also they come with a GI Bill

7   most of the time and we were definitely asked to pursue veterans specifically because

8   they were an easy close.  It is an easy close when you can look at somebody and say,

9   "The VA is paying for it what do you care how much it costs," whether it be 50 grand, 56

10  grand, whatever the cost may be per program.

11      When asked about statistics of employment basically just show them a

12  vague Bureau of Labor statistics map of similar jobs in that field and they make about

13  this -- so it implies that you are going to make that.  Whether or not we are physically

14  saying it, it is taken that way and as recruiters many of them would do more unethical

15  things.

16      And when the ACICS came to investigate or not investigate but go

17  through their accreditation review at the campus we knew when it was coming, certain

18  individuals were not scheduled on that day, only individuals that could do the interviews

19  and recruiting by the letter were working on that day.

20      As a student of Brown Mackey College I went through the recruiter I

21  knew the questions to ask.  I asked about accreditation and of course they said ACICS.  I

22  was familiar with the standards and held them to it during their interview process with me

1    letting them know that I was fully aware of what those standards were.

2          I did ask in regards to the nursing program if they were accredited and I

3    was told absolutely.  They told me that they have many students working in the nursing

4    field that graduated from their program.  What I found out six months into my program is

5    that we had a provision accreditation through the Board of Nursing in St. Louis and that

6    never came to a full accreditation and actually we were pressured as students to not bring

7    up too many issues when the Board of Nursing came around as it could cause issues for

8    us down the road.  So it was put on the student not the school.

9          In addition to that I would say they promised to pay for boards they did

10    not do so and also charged me and another student a different amount than they charged

11    the traditional non-VA students.  There was a discrepancy when we compared our

12    tuitions after we graduated.

13          There was only 12 of us and we were very close for 2 years.

14          MS. PHILLIPS:  Thank you, questions for this speaker?  Anne?

15          MS. NEAL:  When these things happened did you make a complaint?

16          MR. MITCHELL:  At Brown Mackey are you saying?

17          MS. NEAL:  At any of these?

18          MR. MITCHELL:  Well I was an employee of ITT so I was trying to -- I

19    mean I was only there 8 months trying to go with the flow until I decided to leave.  If you

20    are talking about Brown Mackey yes -- not only did I make a complaint on numerous

21    visits to the Director's office who previously worked for ITT Tech -- I also filed a

22    complaint through the VA for misuse of funding and Sara can probably speak more to

1  that when she talks and then also the Department of Ed as well.

2             MS. NEAL:  And do you live here in town?

3             MR. MITCHELL:  I live in Baton Rouge, Louisiana at this current time

4  and am fighting to get my nursing licensure because of the lack of accreditation.

5             MS. NEAL:  And did you pay for your own way here today?

6             MR. MITCHELL:  No I did not.

7             MS. NEAL:  Who did?

8             MR. MITCHELL:  Veteran's Education Success.

9             MS. NEAL:  Thank you.

10            MS. PHILLIPS:  Thank you for joining us and thank you for your service.

11  Our next speaker is Sara Nolan Collins with Walter Ochinko on deck.  I'm not seeing

12  anybody who looks like a Walter joining us right now.  Following this is Nicole

13  Hosprung and Alyssa Pickard -- that's Nicole?  Okay.  Alright Miss Collins, welcome.

14            MS. COLLINS:  Hello my name is Sara Nolan Collins and I am the Legal

15  Services Director of Veterans Education Success.  We help more than 800 military and

16  veteran clients who were deceived by ACICS accredited schools about accreditation,

17  cost, job prospects and more.

18            The education they received was unacceptably poor with unqualified

19  teachers, classes that were sub-par that sometimes encouraged cheating and had regularly

20  shoddy course and class materials.  Although accreditation is intended to be an indication

21  of quality it is clear that ACICS has failed this mission.

22            Veterans are especially at risk because the Department of Veterans Affairs

1   relies on accreditation for GI bill approval.  We urge you to clean up America's

2   accreditation system and immediately withdraw ACICS's authorization.  Please consider

3   the impact on veteran's lives.

4          For example Janelle went to West Wood College after being hounded by

5   recruiters who promised her loans wouldn't be high and she would make so much more

6   money when she got out that she could pay it off quickly.  She asked about credits

7   transferring and was told her credits were 100% transferrable, the classes were horrible

8   and she was learning very little.

9          She then started noticing her loans were increasing in number even though

10  she wasn't signing up for new loans.  She finally had to quit, none of her credits had ever

11  transferred.

12         Timothy graduated from Stanford Brown College.  Recruiters promised

13  the credits would transfer to another institution for his Bachelor's Degree.  It was not

14  true.  None of his credits will transfer.  Even worse Stanford Brown's sonography

15  program is not recognized by ARDMS so he can't work as a licensed sonographer and

16  employers tell him Stanford Brown has a bad reputation and they would prefer not to hire

17  from there.

18         Jude attended Kaplan University.  The recruiter had promised his credits

19  would transfer to any other school.  He specifically asked her, "Will the credits transfer to

20  the University of Alabama," and she assured him they would.  When he returned from

21  Iraq and had finished his courses there he found that the credits were worthless.  They

22  wouldn't even transfer to a local community college in Birmingham.

1          Jenna graduated from Brown Mackey with an Associate's Degree as a

2   medical assistant.  Their recruiter promised her Associate's Degree would enable her to

3   continue her education as a nurse.  She graduated in 2013 and applied to nursing schools

4   but was told she would have to start over because none of her credits would transfer.

5          She tried to get a job and found her Brown Mackey degree was worth the

6   same on the job market as no degree at all or a six month certificate.

7          And Charles graduated from ITT Tech.  He later found out his credits

8   can't transfer despite ITT's promises.  ITT's job placement assistance was sub-par to say

9   the least and the really didn't help him find any employment which they promised they

10   would help him with.  He is now stuck with a loan that he is struggling to pay.

11          I have 800 of these stories, you might not -- I told you some here.  These

12   men and women who serve our country in dangerous war zones should not return to only

13   have their hard-earned GI Bill money stolen from them by schools that should not be

14   accredited, thank you.

15          MS. PHILLIPS:  Thank you, questions for this speaker, Federico?

16          MR. ZARAGUZO:  Can you just tell us a little bit more about the

17   organization that you represent?  Are you a non-profit?

18          MS. COLLINS:  We are a non-profit.  We work to help insure the promise

19   of the GI Bill.  A lot of my work is taking in complaints that veterans or service members

20   have about their schools and advocating with bringing their complaints to Attorney's

21   General -- the VA and now the Department of Ed with their complaint system, and trying

22   to help them find recourse.

1          MR. ZARAGOZA:  So you work with various higher education

2     institutions not just the ACICS approved?

3          MS. COLLINS:  Yes.

4          MR. ZARAGOZA:  How does the complaint if you were doing a

5     proportion what percent would be part of the ACICS and what would be a non-ACICS?

6          MS. COLLINS:  So I am not as well versed in who accredits everyone on

7     my list and what I get.  I would say ACICS probably contains about 40% of ours but I

8     would have to check to get a more specific number.

9          MR. ZARAGOZA:  That helps.

10         MS. PHILLIPS:  Thank you, I have oh Frank, Frank over here, then

11    Ralph.

12         MR. WOLFF:  I'm not -- if you could identify first of all where is your

13    organization located?

14         MS. COLLINS:  We are located in DC.

15         MR. WOLFF:  And so when you refer to these particular institutions,

16    West Wood, ITT they are national -- are you saying this is specific campuses?

17         MS. COLLINS:  So we tend to get the broader more national schools.  I

18    think it is a function of our reach, it is easier for us to talk about it in outreach and we can

19    -- if we are hearing about a national school we can do more outreach and sort of see what

20    the problems are and see if we can help.

21         Veterans tend to refer other veterans.  So our reach tends to be national, I

22    can't say we get a lot of just one campus schools.  I think it is just a function of where we

1    are located and how we do outreach and what sort of veterans we get and the schools

2    veterans choose which tend to be larger national campuses for a variety of reasons.

3            MR. WOLFF:  Thank you does your organization assist the veterans to

4    file a complaint either with the institution that they are attending or with their accreditor

5    like ACICS?

6            MS. COLLINS:  We don't do accreditor complaints and most of our

7    students if they are coming to us they feel like they have been abandoned by their

8    institution and lied to and they don't particularly want to deal with them which is a

9    concern I have -- which is a concern I understand.  So we tend to deal with governmental

10   agencies just because the complaint process is one that a student can get behind and

11   understand and hopefully receive an automatic at least response to.

12           MS. PHILLIPS:  Art?

13           MR. KEISER:  That's interesting.  I think all schools are required to have

14   a grievance process.  Why would you not try to resolve the problem at a local level which

15   is really in the best interest of the student?

16           MS. COLLINS:  Again as Matt said a student's first instinct is to do that

17   before they contact us.  So if they are contacting us and getting this whole complaint

18   resolved either the school didn't resolve it at all or the student didn't trust the school to

19   do it.

20           My job as an advocate is to respect those instincts and governmental

21   agencies don't require that they go through the school first and as an advocate I want to

22   ensure that I give the most respect to my client and help them the best I can while still

1    respecting their wishes.

2              MR. KEISER:  How are you funded?  Are you funded by the veterans

3    paying you or are you funded --

4              MS. COLLINS:  No, no, no.

5              MR. KEISER:  Or are you funded by donations?

6              MS. COLLINS:  Donations yes.

7              MR. KEISER:  Who is your primary source of revenue?

8              MS. COLLINS:  I don't have that information I'm sorry.  I'm the Legal

9    Services Director I can get it for you but I don't have that.

10             MS. PHILLIPS:  Thank you for joining us.  I am going to assume that

11   Walter Ochinko is not --

12             MS. COLLINS:  No, he is not.

13             MS. PHILLIPS:  That means our next speaker is Nicole Hosprung and I

14   believe this is our last speaker, welcome.

15             MS. HOSPRUNG:  Thank you my name is Nicole Hosprung on behalf of

16   the 1.6 million members of the American Federation of Teachers I join others here today

17   in applauding the staff recommendation to cease recognition of the Accrediting Council

18   for Independent Colleges and Schools.

19             As a union of teachers and as the nation's largest union of faculty we are

20   particularly concerned about ACICS's lack of investigation into the quality of student's

21   educational experiences because this inquiry is the most fundamental job of an accreditor.

22   The buck stops with accreditors there is no other entity in a position to review the

1  academic quality of an institution with the same rigor, with the same stakes and with the

2  same level of detail.

3          I was going to at this point describe the situation at Northwestern

4  Polytechnic University but since it has been discussed at length I am going to jump

5  forward a little into ACICS's response.  ACICS's member directory and NPU website

6  still list Northwestern Polytechnic as an accredited institution.  The fall semester

7  application deadline should anyone here care to enroll is June 25th.

8          A whistle-blower -- when ACICS received a whistle-blower letter

9  documenting NPU's abuses in 2014 it performed no meaningful investigation.  Instead

10  the accreditor asked the Institution for "data sheets and job descriptions for librarians and

11  full-time faculty" which NPU of course dutifully provided.  No sanctions were issued.

12  Again the deadline for application to NPU is coming up on June 25th but I honestly doubt

13  that any of us in this room would willingly direct a family member to Northwestern

14  Polytechnic.

15          So it is unconscionable that we would dutifully play a role in NPU and

16  ACICS's continuing to defraud students and taxpayers yet the Education Department's

17  blog posts on the staff recommendations to close ACICS advises NPU students and

18  others don't panic -- that chain of events to play out next will take at a minimum more

19  than 18 months.

20          As I am sure you all know and all remember this is not the first time that

21  the AFT has raised concerns in this forum about the unconscionable delay that

22  characterizes the handling of failed accreditors.  Our members, the students, the

1      community of San Francisco and the state of California have been held hostage in the last

2      four years by another accreditor that has sanctioned high-performing institutions while

3      allowing others including several of the failed Corinthian colleges to maintain blemish-

4      free accreditation until the day these closed.

5              The Chief Executive Officers of the community colleges of California

6      voted in March, 2016 to move on from ACCGE and form a new accreditation agency

7      capping the series of events that demonstrates conclusively that the Agency lacks the

8      wide acceptance accreditors are meant to have.

9              But the overwhelming reaction of this panel has been resignation to the

10     idea that accreditors like the multi-national for-profit educational enterprises ACICS

11     accredits are simply too big to fail.

12             When the stakes are this high a lack of imagination cannot be allowed to

13     prevent progress. The too common sanction of extending to accrediting agencies an

14     additional year to address compliance issues must stop at some point.  Since I am out of

15     time I guess I will simply say you know as Ben Miller said earlier this is not a close call.

16             MS. PHILLIPS:  Thank you questions for this speaker, Art?

17             MR. KEISER:  Since today was the first day I have ever heard of the NPU

18     situation and apparently it was written up in an article by Buzz Feed, is that where you

19     are getting for information or is it coming from direct knowledge of the circumstances, I

20     assume --

21             MS. HOSPRUNG:  My information about NP was based mostly on that

22     Buzz Feed article and conversation with the reporter who did the investigation.  I have

1   not visited NPU, I just thought it was an interesting example of an accreditor failing to

2   actually take that additional step and look at student work and meet with faculty and meet

3   with you know librarians and try to assess the reality of the education that was going on

4   there.

5           MR. KEISER:  Let me ask -- no I will leave it at that.

6           MS. PHILLIPS:  Other questions for the speaker?  Anne?

7           MS. NEAL:   You referenced the too big to fail something that we have

8   heard often but in fact in California if WASC Jr. had been de-certified and as I think the

9   schools themselves in California have avowed, there is really no place for them to go is

10  there because of the regional cartels?

11          MS. HOSPRUNG:  Well not to you know take us back in time but we

12  were here with many allies kind of laying out a roadmap of what we might do in the

13  event that ACCJC became de-listed as an accreditor I think that is you know kind of we

14  will see when ACCJC comes back up after having their 12 months extension on

15  compliance, you know I am certain that we will be here to address that at length but this

16  is not the case with ACICS which is in front of us right now.

17          So I think we are kind of comparing apples to oranges there and I bring

18  this up and I brought ACCJC up as you know -- what we have heard is that there isn't

19  someone willing to think through what happens next after an accreditor is de-listed and if

20  not ACICS then who?

21          If not a Potenkin College it just seems like we are driving really fast on

22  this highway here and there is no guardrails and NACIQI is not pulling anyone over.

1           MS. PHILLIPS:  Other questions for the speaker?  Thank you very much

2    for joining us.

3           MS. WOFFORD:  I'm sorry so my name is Carrie Wofford and I thought

4    that Matt was taking Walter Ochinko's spot so when you were calling for Walter I

5    thought so anyway do you mind if I use Walter's spot because I'm Carrie.  I had to run

6    and get his luggage because he has to catch a flight so I wasn't here when you called.

7           MS. WOFFORD:  So I'm Carrie Wofford from Veteran's Education

8    Success and I am happy to answer any questions about Veteran's Education Success

9    works for me.  I am the Executive Director.  The one -- we had another veteran who came

10   from North Carolina and he was here most of the day his name is Howard Toler and he is

11   an ITT student and he had to drive back to Raleigh he just couldn't wait because he was

12   supposed to on before noon.

13          But he left with me what he typed up and he is very articulate so I am

14   going to read to you what he was going to say.

15          "My name is Howard Toler and I attended ITT Technical Institute for

16   almost two years in pursuit of an Associate's Degree in computer networking systems.

17   I chose the ITT based on their claims that they were an excellent school and had the

18   ability to guarantee that I would be able to find employment after my degree was

19   completed.

20          Instead I got sub-par instruction and doctored grades.  Almost all of the

21   instructors that I was assigned during my time at ITT used the same methodology in their

22   instruction.  They would display a slideshow that they would read from followed by an

1   assignment from the book.  When I would ask for assistance understanding something I

2   was told to look it up.

3         I seldom thought I had an adequate understanding of the material but the

4   teachers continued to give me passing grades.  When I asked about this I was told that the

5   instructors were paid bonuses based on student grades.  Once I got past the initial

6   introductory courses I was completely lost and made several complaints to the school

7   administrator about the quality of instruction I was receiving.

8         After several months and numerous attempts to rectify the situation I

9   chose to withdraw.  There was no way I could complete the degree with no understanding

10  of the subject matter.  I then attempted to attend college at a local community college.  I

11  was informed that none of the credits would transfer due to ITT's bogus accreditation.  I

12  honestly feel I have wasted a large portion of the GI bill benefit that I earned.  ITT has

13  stolen it and given me nothing but worthless credits in return.

14        I simply ask that you review this college along with many of the other

15  schools that are using predatory and deceptive practices to take advantage of unaware

16  veterans.  It is essential that we implement better safeguards against these practices."

17        And Howard is one of about 2800 veterans and service members who have

18  come to us for free legal services and free assistance.  You had asked Sara what percent

19  of ACICS is accredited -- 800 of the 2800 went to schools that are accredited by ACICS

20  so I don't know what percent that is but 800 out of 2800.

21        Howard served two tours in Iraq.  Many of the veteran's reserves served in

22  Iraq and Afghanistan the vast majority and we spend a lot of time on the phone with these

1    guys and women -- you would be heartbroken when you hear what happens to them.

2    They have suffered terribly for their country, they paid for that GI bill with their bodies

3    and then they come back and the schools are lying to them.  I mean they lie about -- ITT

4    lied to a lot of our veterans about having an accredited nursing degree.

5          They graduate they can't work as a nurse because they can't get a license

6    that's just not fair and you waste their one shot at the GI Bill which is their ticket to a

7    successful civilian career.  It is what America has set up -- right?  To help military move

8    into a civilian career and then it is getting wasted at these programs.

9          They tell us that the classes are a joke.  They tell us that they show up and

10   the people who are the teachers were a student from the last semester just one semester

11   ahead so thank you.

12         MS. PHILLIPS:  Thank you, questions for this speaker?  Thank you very

13   much for joining us.  With an eye to the clock I want to call a brief break I don't know if

14   I am going to make that an aspirational ten minutes to stretch your legs, do what other

15   things you need to do.

16         We come back and our next stage is to have the opportunity for the

17   Agency to respond to the third party comments.  And after that will be the Department

18   response to the Agency and to the third party comments followed by our discussion as a

19   Committee.  Being mindful of the clock -- yes?

20         MR. WOLFF:  Is there a mandatory end time or will we go as long as --

21   I'm just trying to for those of us who have dinner plans to move them back or complete

22   them or breakfast plans for tomorrow?

1          MS. PHILLIPS:  I don't have a close time in mind.  I would like to

2    complete this action today.  That includes many hours possible, okay with that in mind I

3    would like to see us back in business at 5:20 if possible.

4          (Whereupon a recess was taken, to be reconvened at 5:20 p.m. this same day.)

5          MS. PHILLIPS:  I want to invite the Committee to rejoin the table and I

6    would like the Agency to join us at the front table thank you.  Alright if I could ask you

7    to conclude your conversations we are inviting the Agency to respond -- thank you.

8          Welcome back to the conversation at this time we would like to give you

9    the opportunity -- excuse me could we have quiet in the room thank you -- I would like to

10   give you the opportunity to respond to the third party comments.  You may find that the

11   Committee may have questions of your response.

12         MR. BIEDA:  Good afternoon, Tony Bieda again for ACICS and I just

13   wanted to respond to the last group of speakers dealing with the Veterans Education

14   Success organization and take to heart the criticism and observations they offered about

15   students who they are advocating for that apparently attend some of our colleges and

16   schools.

17         During the break I did reach out to the organization and I have also sent

18   them an email.  We would like to know more information, more details about the

19   concerns of veterans that are attending ACICS institutions who are having sub-standard

20   experiences and are raising their concerns with this particular organization.  We have not

21   dealt with the organization before but it is time for us to reach out and establish a broader

22   list of contacts and we are going to do that.

1     Other than -- so let me stop there and see if there are any questions.

2     MS. PHILLIPS:  Hank?

3     MR. BROWN:  I would be interested, if you cared to share the process

4 that you use to identify or locate misrepresentations on the part of colleges when you do

5 your accreditation visit?

6     MR. BIEDA:  Thank you so this goes back to the -- I believe the first

7 speaker who was offering some critique about the sufficiency of our team report review

8 of those elements of the operation and with that I will defer to my colleague Ian

9 Harazduk who can get into it a little bit more both in terms of the recent policy

10 enhancement that the Council improved and how that translates into the thoroughness of

11 our review of those factors on site, Ian?

12     MR. HARAZDUK:  So we have had some policy changes where we are

13 requiring and this goes effective July we are requiring institutions to maintain evidence of

14 their oversight of recruitment activities therefore when we go on site we will review these

15 activities not only to make sure that they are appropriate but to make sure that they are

16 maintaining documentation that they are having oversight of these recruiting personnel.

17     I would like to say some of the initiatives we have already taken like the

18 call for comments and the at-risk institution group has already allowed us to see this.  In

19 one case we did receive a complaint -- actually ironically or maybe not ironically from

20 Brown Mackey College that was one of the visits that we did an unannounced visit to that

21 where we uncovered 12 findings at that institution.

22     I'm not sure if it was the same complaint from the veterans since hadn't

1    worked with them or they hadn't told us but we did do a visit to that, an unannounced

2    visit and we did have findings based on that.

3            MR. BROWN:  Do you review the records of an OMB office in the event

4    they have one?

5            MR. HARAZDUK:  No.  I mean we have grievance procedures and we do

6    review those.

7            MR. BROWN:  You review those records?

8            MR. HARAZDUK:  Correct.

9            MR. BROWN:  I'm assuming that you have sessions on campus where

10    students are invited to come and share their concerns as well as faculty?

11            MR. HARAZDUK:  Yeah we don't only have sessions we go into

12    classrooms without telling the institution which classes we are going particular on these

13    unannounced visits that's the first thing we do -- we want to hear from students we want

14    to ask direct questions about their recruitment you know their recruitment practices all

15    our policies, but certainly recruitment and admissions is a very important part of that

16    interview with the students.

17            MR. LEAK:  I'd like to if I could on the third party comments related to

18    the Board and the meeting practices of the Board.  The Board meets more than twice a

19    year.  The Board meets three -- we have three Council meetings where we consider

20    actions against schools, we have one Council meeting devoted to policies and policy

21    changes that we want to implement and we also have a meeting where we have a meeting

22    with the members of our association it is our business meeting.

1          The Board Executive Committee meets with Tony as I said earlier, we

2     meet weekly and we also have a monthly call to handle the business of the Association

3     and so the Board is committed to meeting more often and we are very much engaged in

4     the policies that we have adopted to reform our practices and we know that they are in the

5     early stages of implementation and we are going to be engaged and focused to see that

6     those activities are implemented correctly.

7          We have data to gauge their effectiveness and we are committed to

8     making any other changes to our accreditation criteria as needed.

9          Yes one other comment about the Board is that we have three Board

10    members that will be ending their terms at the end of this year.  I said earlier we had one

11    Board member in April whose school was put on probation, had to resign from the Board

12    and so that makes a fourth opening that we have three in December, one right now and

13    we want to expand the number of public members that are on our Board.

14         We currently have three we actually have four and we could go probably

15    as high as six.  That's absolutely correct, Mr. Bieda pointed out my comments earlier

16    about our Ethics Review Board and two of the three members of that Board are going to

17    be public as well.

18         MR. BIEDA:  Independent and not former public ACICS Commissioners.

19    So in that case when we say independent we mean folks that have had no prior affiliation

20    with ACICS either as a public member or a member of the Council let alone with a

21    member institution just to clarify that and get it on the record.

22         MS. PHILLIPS:  Thank you questions, Frank?

1       MR. WU:  So I have two questions.  The first is you have described all of

2   these changes essentially you have presented yourself as a new agency entirely unlike the

3   agency of say a year ago.  What do you member schools think of that -- that's the first

4   question.  It occurs to me that some of them one might imagine would be deeply unhappy

5   about the sweeping set of changes both because they are changes and also because they

6   are changes that will from the school's perspective be onerous, risky, expose them to risk

7   of sanctions to accreditation scrutiny et cetera.

8       So the first question is if you could represent to the best of your ability and

9   neutrally what is going on with the schools you accredit when you announced this.  The

10  second is hypothetically and again this doesn't signal anything about my thinking or

11  anyone else's thinking let's pretend -- let's suppose you got 12 months and you came

12  back what would be different 12 months from now, I am just curious I want to look down

13  the road.

14      So let's say that you got what would probably be the best possible

15  outcome you could get 12 more months so we are all gathered here in 2017 it is hot out

16  and actually probably it would be 18 months from now given the time lag so probably in

17  December of 2017 it is cold out we are all gathered here, we all look at one another and

18  we say what do you have to show us, could you predict what would you do with 12

19  months that would be noteworthy?

20      MR. BIEDA:  Well let me offer two things.  In the first regard I have

21  encountered directly conversations with many of our school owners and school directors

22  in the last four to six weeks as we have put these more stringent requirements in place,

1    we have deployed evaluation teams to apply them directly and have prepared all of the

2    relevant parties for the discussions and decision-making that will ensue at the August

3    Council meeting and I have been emphatic that this change means we will be tougher,

4    more stringent on the application of these credentials going forward.

5            That if the institutions feel obliged to push back to complain or to whine in

6    any way regarding that, that it will not hurt my feelings but number three it will not

7    change our decisions either.

8            On your second topic and by the way in every case I have had that

9    conversation, the school owners almost unanimously have said, what have you been

10   waiting for?

11           MR. LEAK:  I just might add on the changes that we put in place all of the

12   changes, the policy changes or changes to our accreditation standards went out for public

13   comment and the public comment we didn't have any pushback from that regard either.

14           MR. BIEDA:  So in terms of what would it be like a year from now I

15   believe that it is important for us to thank you for giving us the opportunity to use our

16   imagination a little bit but the imagination in terms of 12 months really goes like this.

17           What additional evidence of the application of these standards and of the

18   changes that we have put in place and that need to continue to evolve will be in evidence

19   at the August Council meeting so the end of the current cycle that we are currently in.

20           Because some of these changes were put in at mid-cycle it won't be a

21   complete record but at least it will give us some indication and anybody that we would

22   share that with I think would see some substantial changes both in terms of the quality of

1  the decisions being made, the amount of evidence that is behind them and also the

2  stringency the severity of the scrutiny and subsequent decisions.

3           The second cycle will be the fall cycle and between now and then we will

4  have the ability to fully train all of the cadre of evaluators, make additional changes to

5  our site visit protocols including enhancements to the team template, the team report

6  template as necessary and also integrate better into that integration process all of the

7  many risk factors that my colleague Ian has talked about derived from the at-risk

8  integration group and probably some other factors that will be derived from the

9  preliminary recommendations of our Special Advisory Committee.

10          Then after that and with the evidence provided to the December Council

11  meeting then we would be looking forward to what additional changes can we put in

12  place so that by the April Council meeting so two and a half full accreditation cycles for

13  now we can really evaluate how much of these changes have had enduring impact on the

14  way we review schools and on the standards to which we hold them, that would be the

15  general description of the evidence that we would like to see -- like to have the

16  opportunity to provide in response to your question.

17          MR. HARAZDUK:  If I can add to that I would also like to say you know

18  I know this has been a long day and you know it is not unlike a site visit that I go to that

19  we are here but we are willing and prepared to go down each of the 21 items and state

20  what we are willing to -- will do within 12 months and we believe, other people have said

21  a lot of third party commenters including the Department of Staff has said you know we

22  don't have the capability to do that.

1          Well we are ready and here and willing to go down each one of the 21

2     items that we have looked at and tell you what we are going to do for each of those and if

3     allowed the opportunity we will take the time to go through those because I think it is

4     important.

5          I work with standards I understand them I know you guys do as well. It is

6     important to get into the details and I understand whether schools you know it is different

7     to go hear a media report or you know hear a Twitter feed about a school rather than

8     actually go to a school, apply the standards and enforce them.

9          So I would like to and hope you provide the opportunity for us to go down

10    those standards and tell you what we are going to do.

11         MR. WU:  Thanks just a comment.  I think it is not just the standards

12    themselves as written but how they are actually applied.

13         MR. HARAZDUK:  Well the enforcement actions we will take as well,

14    the procedures that we have as well.

15         MR. WU:  So thank you for the answer it is very useful.  Here's how I see

16    12 or 18 months from now -- it is always dangerous to try to predict but if we all return to

17    this room there will be many, many more observers, commentators and critics.  We will

18    be several billion dollars down the road in terms of spending, there will be hundreds

19    actually thousands of students some of whom will have great outcomes, some of whom

20    will have less than great outcomes.

21         And there are two scenarios -- so one scenario is the one where you come

22    back and the three of you gentlemen are heroes where you come and show us amazing

1   results and third party commentators also come in and say, "Wow this was an amazing

2   turnaround.  These folks should be commended we have never seen anything like this,

3   this is a model of best practices other accrediting authorities should do what they do."

4   That's one possibility.

5          The other possibility is you come back and you are not heroes and those of

6   us on NACIQI look at best like morons and worse like we are complacent in villainy

7   because we have allowed 12 or 18 months to pass with the billions of dollars and

8   hundreds of thousands of students enrolled and people will say, "Well you sat here in

9   June of 2016 and you allowed this to happen."

10          So I guess for me this is just me speaking personally and in a few minutes

11   will turn to deliberating part of what you are asking is for me to bet and to commit my

12   own judgment, my good name to the proposition that when the three of you come back in

13   12 or 18 months you will be heroes and I will then bask in the glow of your heroic effort

14   and it will just be really unhappy all around if that is not the situation, that's all.

15          MS. PHILLIPS:  Ralph?

16          MR. WOLFF:  Thank you.  Reference was made to Northwest Polytechnic

17   and I know you referred to it but I would like to give you the opportunity to respond more

18   concretely.  Both the Buzz Feed article and the assertion was made that you were

19   provided information -- very damaging information by a whistle-blower and no action

20   was taken.  I think that would be a fair statement both the article and the assertions.

21          I know you indicated earlier that there currently is an investigation but

22   apparently the whistle-blower situation was some time ago so could you at least bring the

1    record straight in terms of was there whistle-blower information received and what action

2    was taken.

3            MR. HARAZDUK:  Sure we did receive a complaint where the institution

4    or where a complainant who we believe to be the librarian had a concern about the

5    institution provided that information we asked for a response.  It was approximately 500

6    pages naturally we reviewed that response -- we had closed that case at that point

7    however we had also had an extensive monitoring growth on that institution.

8            They had grown exponentially over a card period.  We received a

9    complaint as well and with our new at-risk institution group in place we conducted an

10    unannounced visit that had 7 findings based on that institution.  I know it sounds like the

11    people in some of the audience and third party comments would like us to shut that

12    school right down right after the visit happened however per your process and the

13    Department policies we require the institution to provide us a response and based on the

14    report and the response to take action which we are prepared and will do in August

15    depending on what the response and deliberation is and the ultimate you know

16    discussion.

17            MR. WOLFF:  Thank you.  Let me move on.  One of the questions raised

18    was the adequacy of your response and one of the speakers addressed the issue that even

19    with your new on-site evaluator that you are still dealing with information on-site versus

20    another agency that has it prepared in advance.

21            So a couple of questions that are related to that -- what about the issue that

22    could still be a problematic response of having to deal with it currently -- are you

1    gathering information in advance?  Do you use secret shoppers on your unannounced

2    visit but do you also -- how do you verify recruitment information -- so let me just ask

3    how do you work with both -- the assertions that were made, that even this process is not

4    yet adequate and how are you verifying recruitment information?

5              I know you have the survey but beyond that.

6              MR. HARAZDUK:  So it sounded like two different questions.  One

7    related to placement and one related to recruitment.  For recruitment we have a policy in

8    place whereby we will require the institution to provide its own oversight activities which

9    we will then review.  We also have the option and in certain circumstances where

10   students state that there are issues with recruitment we can certainly have secret shoppers

11   as a process so we can you know, there are multiple avenues that we can take to a thorny

12   issue of recruitment and admissions.

13             It's obviously -- sometimes a difficult issue to get out.  Exactly what was

14   told to the student and exactly the information given but we require the institution will

15   require come July 1st the institution to have data on oversight activities which we will

16   then review and take action if they are not doing it and also if there is any unethical

17   behavior happening in those recruitment activities that again we have standards based on

18   that -- good standards as I think based on that and there are other opportunities as well.

19             I can certainly respond to the placement question as well and the

20   information of what the verification process for that is going forward because I think

21   there hasn't been full information provided on what our process was and what our

22   process will be as far as placement verification.

1    So I am willing to do that now if you would like.

2    MR. WOLFF:  If you can do it very briefly.

3    MR. HARAZDUK:  It's a complex issue as you not or as you may not

4 know but I can say we are certainly -- we are automating the process whereby we have

5 taken 2 years to conduct a study of placement verification which is a complicated issue.

6    We have strengthened our definition for placement which has been said

7 here that the Department hasn't given specific definitions of placement.  But what we

8 will plan to do is have an automated process whereby we will take the monthly process

9 that we are doing now known as the placement verification process and expand that into

10 the yearly process where we will have timely information where we can automate

11 responses from students and employers to verify whether those graduates were placed in

12 that job.

13    And it will be real time and it will be you know a process where we get

14 specific information back from the graduate and the student.  We felt that was more

15 verifiable than a third party doing it which is why we are doing an in-house process and

16 have and will scale that up to a yearly process whereby we will be looking at all schools

17 to verify that placement.

18    MR. WOLFF:  I have one other question.  I would normally do this in

19 private but we are in a public agency -- but one of the issues is confidence in the new

20 leadership.  I'm not quite sure when the Harkin hearings were but it did raise serious

21 questions about recruitment activities -- I believe it was 2009 maybe '10.  The Corinthian

22 action was in 2010 as I recall.

1      There were certainly a lot of information -- this has gone on for we are in

2  2016 if I am not mistaken your position as the new head of ACICS is as recent as April.

3      MR. BIEDA:  Correct.

4      MR. WOLFF:  What took you so long I have made this direct to the Board

5  -- I mean I have asked many an institution what the heck took you so long to address the

6  leadership issue to bring the kind of leadership in that was going to provide and

7  regardless of the competence of the individual but to bring confidence that you had gotten

8  the message and that change was needed.

9      MR. LEAK:  I will say and you know working with the leadership of the

10  past we were as a Board we were listening to him very carefully and you know we were

11  told a certain view of how things were going with our relationship with the Department

12  and how we were handling all the different allegations from the Attorney Generals.

13      And you know we didn't have any reason to doubt that but I will tell you

14  for me personally that at our April meeting, April 2016 we had the opportunity to have

15  Mr. Porcelli at our Board meeting all week.  It was the first time that many of us on the

16  Board had actually had engagement with a Department representative.

17      Mr. Porcelli made comments to us on three or more different occasions as

18  a sitting Board.  And on the last day of our meeting, our meetings start generally on a

19  Monday we end on Friday -- on Friday I asked Mr. Porcelli to give his perspective on

20  what he has observed all week he has been in and out of meetings and hearings and just

21  you know observing our practices.

22      And when he gave his statement you could hear a pin drop in that room.

1    He gave us his unvarnished assessment of what the Department thought of us and it was

2    the first time for me as a Board member and for my Board member colleagues to hear

3    first-hand from a senior office at the Department was they thought of us.  It was sobering,

4    it was jolting and it was not consistent with what we were thinking we were at with the

5    Department.

6              And so it was very important for us to engage into a conversation with the

7    current leader at the time and you know what happened is a matter of record.  We met as

8    a Board to begin the process of taking a hands-on approach with how we could resurrect

9    our good name and our good standing in the accreditation community and we have put in

10   policies and initiatives to begin that work.

11             And we have the full commitment of the Board to be behind us, you have

12   my personal commitment as the Chair that we will stay on this until we earn your trust

13   and your respect and you know I am a public member.  I don't have to do this but it is my

14   obligation as a Board member I have a duty of care and that is very important to me

15   personally and professionally and I am really steadfast in my belief that we under the

16   people that we have here at the table and the staff back at the office and the

17   Commissioners who also give of their time to this Board you have our commitment that

18   we will put the energy and the effort to earn your respect and bring the documented

19   demonstrated results that we are hoping that our new policy initiatives and policy

20   direction will bring us.

21             We also have our Special Advisory Group to the Board and with their

22   recommendations as I said earlier we will make those recommendations transparent and

1    we will act on them.

2              MR. WOLFF:  Thank you for your candor.

3              MS. PHILLIPS:  I have Anne, Rick --

4              MS. NEAL:  I want to start with a question and then I have a matter of fact

5    that I would like for you to help clarify and I think it is because I have been sitting with

6    Frank all day I am going to do a hypothetical question.  I don't know about other people

7    in this room but it just seems to me that the elephant in the room is Corinthian whatever

8    that is.

9              I mean we all know that the Department took action against Corinthian,

10   we have a sense of what they did, maybe why they did it, maybe we don't have a sense of

11   why they did it, maybe we think it was the right thing maybe we don't know if it was the

12   right thing but we do know that it happened and that at the very least it seems to me you

13   are the direct damage if not the collateral damage from all of that.

14             So my hypothetical question to you is if the Department of Education

15   weren't the prosecutor, judge and executioner would you have looked at these various

16   issues and problems and instead of lying down and saying we will do better perhaps

17   argued on occasion with those findings if it were not the situation you find yourselves in?

18             MR. BIEDA:  From my perspective the only responsible thing to do from

19   a leadership perspective is to regularly test the outcomes of the entire accreditation

20   process for its rigor and for its authenticity and not to accept that in fact just because all

21   of the normal processes are being followed the outcomes are necessarily valid or reflect a

22   full evaluation of the strengths and weaknesses of the institution.

1    For my perspective that has to go on methodically and it needs to be

2    driven from the leadership of the organization -- not to provoke anxiety with the

3    accreditation staff but more importantly to have confidence at the leadership level that the

4    results that we are delivering are fully defensible primarily in terms of preserving the

5    interests of students.  So hypothetically if Corinthian had not melted down would there

6    have been a pre-cancer an opportunity other than that to go back and say okay we had

7    about 50 -- I believe Corinthian institutions that we had reviewed through site visits in the

8    prior three to four years prior to the controversy emerging.

9    And of those about half of them there were zero or very few findings.

10   Does that in fact indicate that we were preforming due diligence or does that in fact

11   indicate that there was some weaknesses in our method of review that need to be

12   strengthened?

13   The reason I say all of that is because I believe that the primary impetus

14   for the leadership of this organization or any organization is to look for either imposed or

15   self-generated opportunities for reorganization and organizational effectiveness.  We

16   have the circumstance as a recognized accreditor that every five years that requirement is

17   imposed on us any way so the right -- the correct way to look at it is an opportunity a

18   pretense to step back from all of your normal processes and say -- okay we are a year or

19   18 months away from preparing our petition with the Department.

20   What have we done in the last 3 ½ years that is strong, that is defensible

21   and effective?  What are the things that we are continuing to do that have marginal value

22   and let's attack those now so that by the time we are in front of this body we have taken

1    care of the organizational effectiveness issues that just happened to grow up organically

2    and naturally.

3    　　　　MR. HARAZDUK:  If I can speak from a process standpoint I think and

4    being in the weeds as I am I think we you know -- certainly Corinthian I think serves as

5    an elephant in the room.  Certainly there was not confidence with their placement you

6    know verification and that is why we are not -- why one of the reasons we are enhancing

7    the placement verification process.

8    　　　　One of the reasons why there are issues that arise we will take our own

9    investigatory actions.  I think you have heard you know the media or other oversight

10   agencies have their own ways of determining whether a school is quality or not, we have

11   our processes and what we plan to do and have done and as I have said throughout this

12   meeting is that we have put these in place where we will do our own investigations and

13   put those enforcement actions before the Board when they have the full amount of

14   information before them.

15   　　　　MS. NEAL:  We heard from Bob Shireman and Ben Miller and I wanted

16   to read from something -- "Looking in all the wrong places" that they wrote along with

17   Elizabeth Bayland and I will just read this and you can tell me if this is accurate:

18   　　　　In April, 2015 as Corinthian's searched for ways to sell some of the

19   campuses it had been unable off-load the Department announced a fine of nearly 30

20   million against the chain's Heald College campuses.  After review found that many grads

21   that the company reported as successfully placed had in fact not found meaningful

22   employment.

1              Did I understand you to say earlier that those schools were not accredited

2      by you?

3              MR. BIEDA:  That is correct they were not accredited by ACICS.

4              MS. NEAL:  Who does accredit them?

5              MR. HARAZDUK:  Well they were -- they are no longer in business but

6      they were accredited by WASC I believe, Heald, WASC, Jr.

7              I also think there might have been some information given that the

8      Department took action in June 2014 and I am not sure that that is entirely correct of

9      what action -- I believe the action that was being spoke of was the action that you said on

10     2015 which was around or after the institutions closed, so I just wanted that to be a point

11     on the record.

12             MS. NEAL:  Thank you.

13             MS. PHILLIPS:  Rick?

14             MR. O'DONNELL:  I have a question just one of the staff's comments

15     and at one point in all the 21 recommendations I think this is number 11 regarding 602.16

16     subsection A-1-10 where they say that they don't think you can be responsive within the

17     time given for a compliance report particularly in view of the Agency's weak record in

18     monitoring and failure to document enforcement and prior lack of cooperation with the

19     Department.

20             Could you speak to a little bit about your perspective on if you have not

21     been cooperative with the Department in the past?

22             MR. BIEDA:  I think as I have mentioned in my comments earlier today

1    to the degree that certain documents that were requested were not provided.  It is my

2    understanding that they weren't provided because they didn't exist.  Either we couldn't

3    find them or they just simply didn't exist.  To the degree that that illustrates some lapse

4    on our part of documenting -- fully documenting our review of institution we have to

5    accept full responsibility for that.

6              But I would argue that in no case did we knowingly withhold any

7    information that the Department has requested.  In fact over the last six months between

8    the full application we provided in January the supplemental request for information part

9    1 that was provided on April 1st the supplemental information request part 2 that was

10   provided on May 16 and then the response to the analyst's draft report that was provided

11   on June 3rd we have done every -- taken every effort possible to make sure every part of

12   the record -- every part of our documentation has been provided in response to that.

13             So I am at a loss to explain it beyond that.

14             MR. HARAZDUK:  I will say that since I finally have taken actions as

15   having been said and as a matter of public record against ITT Technical Institution,

16   Education Management Corporation, Delta Education and Zenith Education which is

17   now the new owner over Everest we have taken a show cause action against all of those

18   and have copied the Department on those actions so they are well aware of the actions

19   that we have taken and even copied the letter so that they know the specific issues and

20   findings that we have and concerns about those institutions.

21             MS. PHILLIPS:  I have Simon, Anne and Frank.

22             MR. BOEHME:  Thank you again and I appreciate your comments to the

1   third party commenters.  As it seems that there is new leadership coming in and correct

2   me if I am wrong you kind of feel it is a restart button in some regards is that correct?

3               MR. BIEDA:  Correct.

4               MR. BOEHME:  And looking back at the past and I have obviously

5   brought up some pretty egregious things that our Committee can kind of agree on the

6   community and from the third party commenters are not happy about -- do you wish to

7   say sorry and to kind of set that restart button potentially that may be something you are

8   interested in saying and if so this may be a good venue.

9               So I wanted to offer that opportunity to you or at least hear what your

10  feelings are in terms of maybe explaining to NACIQI and the accreditation community as

11  a whole in regards to this restart button and saying sorry if you wish.

12              MR. LEAK:  Well as Chair of the Board I want to say that it is not

13  pleasant sitting here.  It is not pleasant listening to the third party commenters talking

14  about their perceptions about this Agency.  It is very, very difficult to hear, it is

15  embarrassing and it is not the position that we want to be in.

16              To the degree that we are here, we are here to face you eye to eye and to

17  answer any questions that you have.  We are not pleased with our predicament.  It is not a

18  place that I would wish on anybody.  This is my first NACIQI hearing.  I hope to have

19  many more but not like this.

20              And you have my commitment to each and every one of you that we are

21  very serious about the changes that we are in.  Mr. Boehme you were asking for us to

22  apologize -- I apologize for being in this predicament.  Yes it is not a place I want to be.

1          Having said that I accept full responsibility for sitting in this seat and

2     that's very important for me to be here to address your questions and to lend credence to

3     our efforts to turn this thing around promptly.

4          MR. BIEDA:  I would just second the remarks of our Chair and sincerely

5     express regret that we are in this position for a variety of reasons.  But I want to be clear

6     that I am looking you in the face, eye to eye to tell you that I am committed that we will

7     be in compliance within 12 months, that is my purpose that is my commitment that is my

8     reason for being with the organization at this point.  I am giving you that personal

9     commitment.  We will be in compliance within 12 months.

10         MS. PHILLIPS:  Frank?

11         MR. WU:  This is actually a good follow-up.  I was actually going to

12    thank the three of you.  You have been remarkably calm, patient, reasonable I don't think

13    it is pleasant for anyone to sit in a public setting in front of hundreds of people with the

14    media here and listen to allegations in some instances fairly serious evidence of past

15    transgressions which you personally may not have been responsible for.

16         So I just wanted to say thank you for being candid and answering all the

17    questions.

18         MR. LEAK:  Thank you.

19         MS. PHILLIPS:  Any further questions for the Agency?  Kathleen?

20         MS. ALIOTO:  Dr. Leak you said that when Mr. Porcelli made the

21    presentation to you in April that you were shocked or it wasn't the way you had been

22    thinking at all?

1          MR. LEAK:  I did say that.  That was my personal perception of what

2   happened during that entire week but more importantly what happened on the very last

3   minutes of that Board meeting when Mr. Porcelli made his comments about his

4   perception of the Agency it was personally for me it was the first time -- and I believe I

5   speak on behalf of the entire Board -- the first time that we have heard -- had an

6   opportunity to meet or hear from an individual from the U.S. Department of Education.

7          And it was not the portrayal that I was expecting to receive and so and

8   that's just my personal perception.

9          MS. ALIOTO:  I wondered how you could have that perception after what

10  had happened at Corinthian more than a year before.

11         MR. LEAK:  Remember Corinthian was accredited by a number of

12  different agencies, okay and so the schools that we accredited out of that group yes it was

13  a part of that entire organization and yes it was very, very troublesome to hear.  But the

14  overall pattern that Mr. Porcelli portrayed to us was bigger than all of that and so that's

15  what I am referring to.

16         MS. ALIOTO:  Thank you.

17         MS. PHILLIPS:  Paul?

18         MR. LEBLANC:  We had a letter from five senators I am not sure I've

19  made it in time to make it to the database but one of the things that they contend is that a

20  third of Commissioners work at schools that are facing consumer protection lawsuits.

21  Can you either confirm or refute that?

22         MR. BIEDA:  Without seeing the letter and looking at the time frame is it

1    current Commissioners?

2             MR. LEBLANC:  Yes they are current Commissioners and the letter is a

3    week old so I think I'd take on your current list of Commissioners.

4             MR. BIEDA:   I'm not aware of that at all for current Commissioners.  I

5    would like to see the letter that would be fair.

6             MR. LEBLANC:  Could I say that your comments about the Board and

7    feeling sort of the full weight of this when Steve visited and did his final report strikes me

8    as heart-felt and genuine.  And on the other hand I have to say it is a little shocking

9    because it wasn't just Corinthian right it was Curred and Kaplan and Lincoln Tech and

10   Salta and Computer Systems Institution and 17 colleges and chains that are under

11   investigation.

12            And when I think about institutions that I have seen go to failure almost

13   inevitably the Board is complicit and while we would say forgive me for the

14   colloquialism of being asleep at the wheel but how could you not know?

15            And I think I join some of my colleagues in how could you not know the

16   criticism level at the Agency are not new, they have been around for a while -- if one

17   were paying attention I would expect a real awareness of this and I have to return to my

18   senses that there is genuine resolve to get this right but I don't know if what I have heard

19   convinces me that this is the fresh team of people and actors who can be that much

20   different than they have been while presiding over a fairly disastrous X number of years

21   and failures of schools.

22            And for me it is the bet that Frank evokes.  During the day this is the sense

1    of would I bet on this team and I'm not sure with what I have heard today makes me feel

2    more confident that this is -- and I apologize, don't take that personally I sense your

3    resolve, heart-felt but it is a talent and capability question and to some extent it is a

4    culture question.

5          That you are blowing up the culture because in some ways I think the

6    culture of this agency needs to be blown up and reinvented.

7          MR. BIEDA:  Excuse me I would just reiterate that the authority of this

8    blue ribbon panel, I don't want to harp on that too much because you probably heard

9    enough about it and you don't want to hear it mentioned again but clearly the authority of

10   the blue ribbon panel is to make recommendations in a timely manner to the current

11   Board that includes the issue you just raised -- the composition and structure of the

12   current Board of Directors which also serves as the accrediting Council.

13         The rest of the work we do.  The rest of the work I do throughout the rest

14   of the organization will be diluted if that particular element is also not addressed and that

15   is the voluntary initiative of this Board of Directors.

16         MS. PHILLIPS:  Last call for questions for the Agency.  Our next

17   opportunity is to invite the staff to return to the table for any comment or response to the

18   third party comments or to the Agency.  Welcome back we invite you to make any

19   comments you would like to make in response to the third party comments or to the

20   Agency's response at this time and then I am sure that there will be questions by the

21   Committee.

22         MS. MCLARNON:  Thank you. We would like to respond to one of the

1    third party comments that this was just another effort by the Department to do harm to the

2    for-profit sector.  This is emphatically not the case for us.  This is about rigorous

3    oversight and it is about monitoring institutions via accreditors.

4          Our review of ACICS is based on our normal cycle.  They were up for

5    their five year review.  We took them through the customary steps as well as considering

6    the legal issues facing their institution's involvement of various state Attorney Generals.

7    I think it is fair to say we had unprecedented access to information and feedback on their

8    performance.

9          And what we found gave us deep pause.  We found significant areas of

10   concern that we don't believe can be turned around in a 12 month period.  We have heard

11   before from this Agency that they would turn things around and they did not make good

12   on their commitments.  We don't have confidence at this point that they will make good

13   on this commitment.

14         This is an agency that basically is fighting for its life.  We found areas of

15   concern in student achievement, in monitoring, in enforcement standards and I would

16   turn to my colleagues in the accreditation group to provide the details on that but I would

17   say that our findings were deeply concerning again and I think our analysis speaks for

18   itself.

19         Our position continues to be that to not terminate this Agency would be

20   sanctioning egregious behavior and it would be putting students and taxpayers in harm's

21   way.  I would ask my colleagues to add to my comments if they have anything to add,

22   Herman, Sally or the accreditation group.  But we continue to believe that what we found

1   cannot be turned around in 12 months.

2          We don't have confidence that the Agency can accomplish what they have

3   committed to accomplish to you and that's our position.

4          MS. PHILLIPS:  Thank you other staff comments?

5          MR. PORCELLI:  Just to put clarity I think on the table -- a little more.

6   As Gail has just mentioned there are several areas of non-compliance I would discourage

7   you from getting into the counting game because some areas have a branch like for

8   example because of the falsification of records that brought in like three or four other

9   criteria so if you fix that it fixes three or four other criteria.

10         There are enough serious issues without making them seem larger.  And

11  then the other point just as a personal observation when probably late '80's when I first

12  started the asset was before you being ready to be cut off and Roger Williams had taken

13  over the head of that Agency and turned them around so I was just personally blown

14  away by the fact that he would be directing them -- I didn't learn that until this morning

15  directing them as how to fix things.

16         And Alise Gamland has certainly an impeccable understanding of our

17  process so it is too bad they didn't do that sooner but then I don't know the other two

18  people on their blue ribbon panel.  I just want to point that out to you thank you.

19         MS. PHILLIPS:  Thank you questions for staff, I have Rick and then

20  Ralph?

21         MR. O'DONNELL:  You know it is not a question for staff but it is a

22  comment and I actually disagree with my colleague Anne about the elephant in the room.

1    I don't think it is Corinthian I think the elephant in the room is the question is the

2    Department doing this because it has something against for-profits.  In the 3 or 4 years I

3    have been on NACIQI I have never known the Under Secretary to open a meeting saying

4    that he supports all of the staff recommendations.

5            That struck me as very odd and it strikes me as odd that someone who is

6    not on the accreditation staff is leading the rebuttal but someone from the policy staff and

7    I am not impugning any integrity but it is very different and obviously this is an

8    important issue and I just find it you know I think people can legitimately question

9    including the way this process seems to have played out.

10           There are other agendas that work here than just the peer review this

11   NACIQI body today.

12           MS. PHILLIPS:  Ralph?

13           MR. WOLFF:  I would like to ask a question in other cases have been

14   asked of your staff.  It seems to me that what we have heard today is a general and

15   meaningful acceptance of the findings of the Department with respect to non-compliance

16   in the past.  I think that they have acknowledged that there has been mistakes made and

17   lack of oversight -- these are my words but I think that part of the staff's report has not

18   been contested let's put it that way and I would say -- arguably and I believe accepted.

19           The second part of what the staff has basically said is that based on what

20   you knew when you wrote the staff report that you did not believe that this Agency would

21   be able to come into compliance within 12 months.  We heard a lot today, some of which

22   at least all of which is new to me.  Some of which is new to you such as the Advisory

1    Committee so my question is and I am going to focus on what has been said today change

2    or impact your judgment that they could not come into compliance within 12 months.

3             MR. MULA:  I'll try to answer that Mr. Wolff.  When reviewing the

4    standards and looking at the documentation that they presented and the documentation

5    that we needed you had to go back, he kept taking us back to a certain point in time then

6    the evidence disappeared.  In reviewing standards and trying to make a determination on

7    compliance especially if you are thinking about a compliance report -- you have to try to

8    figure out if everything happened the way it should happen and everything fell into place

9    and they had the right circumstances, the right amount of staff, the right amount of

10   resources what amount of time would it take to demonstrate compliance in that standard

11   and have the evidence to back it up.

12            Honestly I can't see that happening in one year.  I want to say this with all

13   my heart.  I have seen the revised standards and they are good standards and I think that

14   they will be able to apply those standards but not in a year's time.

15            MR. WOLFF:  If I could press on the you as a collective you in this case

16   all of you and on that point as I heard the staff earlier this morning and I am going to

17   preface it with saying I am not prepared to say there is any political agenda here --

18   whether there is or not I feel a responsibility to say we are dealing with an agency in front

19   of us and whether it is in compliance and whether we have confidence it can come into

20   compliance.

21            But I heard this morning that two separate things -- one is that many things

22   were just new and we certainly heard for example that light bulbs went on quite recently

1   and that therefore that was underpinning your belief that they could not come into

2   compliance within a year.

3          What I heard from the Agency was there has been a pilot test of this new

4   algorithm that there are activities that are already underway that are in place that will be

5   part of the visits that are already occurring now, that there will be new training in the fall

6   and that there would be results so I just want to try to just oppose the findings of what

7   this new and I recognize there is a lot new -- but it is more than just the standards.

8          And what I heard was that there are in fact some things in place that are

9   already implemented and so it would just help your frame or it would help us understand

10  where you see that is in terms of the 12 month timetable.

11         MR. MULA:  If you look at the requirements of 602.19B which is the

12  monitoring requirements and follow that down to the timeframe requirements that an

13  Agency has to fulfill when they have an adverse action.  If you begin with initial

14  monitoring of that institution and you give according to your policies all the due process

15  that that institution is allowed, including the timeframes up to 18 months or 2 years for

16  the length of the program.

17         You don't have enough time in 12 months in the compliance report to

18  show demonstration of that standard.

19         MR. WOLFF:  I have one more question.  I went back and read the 2011

20  transcript that was provided and the materials and while it is true I think I said in the

21  outset that I believe there were 12 sections of non-compliance that were cited.  When I

22  read the transcript a lot of it was focused around the issue of doctoral education.  There

1  was some and actually I wrote a quote if I may here -- Albert Gray said, "ACICS's

2  student retention and placement thresholds are transparent, bright lined, institutional level

3  standards by which we hold all of our colleges and schools accountable on an annual

4  basis."

5          I could not get from that transcript anything close to the level of severity

6  of what we are talking about today.  Now I would say in between there have been some

7  shameful, shocking I think extremely significant intervening actions but I wasn't here in

8  2011, the Secretary's letter or the senior Department's official letter did cite those 12 but

9  it was a typical you know here are the areas that you are in non-compliance and I heard

10 you saying earlier that there were commitments made by the Agency and that you see just

11 going back one more time they won't -- so I am in a sense asking I mean I think there is

12 public notice that they should have taken action but I am trying to go back and saying in

13 terms of the Department's notice to the institution not having been in 2011 and maybe

14 there were some members of the Committee.

15          But you know I couldn't get a sense how significant these issues were in

16 terms of and the nature of the commitment made by the institution based on reading of

17 the transcript.  So I wonder if you could give a little context because one of the claims

18 that is made is they made commitments for four and they haven't realized them in fact

19 one might argue they have gone way backwards and can we trust them going forward.

20          So even though it is ancient history could you give a little context of what

21 message was communicated to this Agency in 2011?

22          MR. PORCELLI:  I was the analyst for that and I didn't re-read the

1    transcript so just from memory the process at that time was business as usual.  You come

2    before the National Advisory Committee, we find what the areas are that they need to fix,

3    they tell us how they are going to fix them, you get 12 months you come back and show

4    it.

5            So it wasn't a dramatic -- there was no drama at that time.  In 2013 when

6    they came in with the compliance report at that time they were making those

7    improvements.  I think the one area that and I mentioned this earlier that they seemed to

8    backslide a bit on was the verification which in hindsight was there you know, it's just

9    killing them.

10            So I wouldn't say that they backslid on a lot of the stuff it was just that

11    one they told us they were going to do this third party verification, they tried it for a

12    while and in the interim they found it wasn't working for them the way they wanted or

13    maybe it was too expensive, whatever and that was the main issue.

14            So then since that was a surprise that they didn't keep that up or notify us

15    that's what is part of the disturbance on staff's part now that you know you said you were

16    going to do this and you altered it without letting us know.

17            MR. WOLFF:  Thank you I think we are also in a very changed

18    environment for all accrediting agencies with the pilot questions and other issues that we

19    are raising but that this was an issue I think it is clear this was an issue particularly

20    placement matters and the like.

21            I would just make an observation so much attention is on placement.  For

22    me much of it is on institutional integrity and whether this process is able to fair it out.

1    The integrity of institutions is insurance of its manner of doing business in terms of

2    student representation, recruitment -- as we heard not only in the settlements but some of

3    the cases today and I just don't want to get focused on placement rates at least in my own

4    thinking.

5            These are real issues, this process is it a reliable indicator of quality and

6    integrity, thank you.

7            MS. PHILLIPS:  I have a speaking order of Art, Bobbie, Cam and Frank.

8            MR. KEISER:  That was very interesting conversation so help me

9    understand -- in the 2011 there were not, it was basically just a response to the concerns

10   identified by the Committee rather than a -- the impression I got from the conversation

11   was very strict specific promises were made in 2011.  They came up with a progress

12   report in 2013, they demonstrated an attempt or a process and a beta testing of a

13   verification process but because they found that it didn't work and they went to a

14   different process we can't trust them?

15           MR. PORCELLI:  That was our staff report as a number of people had

16   contributed to that so we tried to incorporate the view of all the different staff members

17   so that is why that is in there.

18           MR. KEISER:  But the line that Ralph just took us through does not seem

19   to make the Agency unreliable when in fact they did a beta test, when in fact they

20   continue the verification process and I'm not even aware that we require a verification

21   process and I'm not even aware that we require placement data.

22           So we have an agency that goes beyond what most of the agencies have

1    done by establishing a bright line placement, have invested in staff to do the verification,

2    have come up with a new plan that will have a data person on the analysis and I don't see

3    where we have the challenge with this institution in this area.

4              I mean it's one of many areas but this area which really is where the trust

5    issue is and that is part of what our concern is if we were to not follow the direction of the

6    staff.  Am I missing something in my analysis here?

7              Chuck I love working with you and I have worked with you closely and

8    you said let's not count -- well I did count and there are 12 areas which will require

9    documentation and according to the way the analysis reads and I can give you the

10   numbers it is basically you are doing it but we don't have the analysis, we don't have the

11   documentation.

12             So 12 of the concerns could be dealt with next week if there was a process

13   to do that.  Then there are and I have 8 that clearly would require some kind of visit or

14   some kind of action by the Commission to take and 2 which I wasn't sure of.  But when

15   Steve said earlier he didn't know whether they had made those changes because of the

16   requirements to go before the membership that was cleared up, the Commission has

17   promulgated the standards.

18             The Commission has gotten approval from its membership and they have

19   installed all of these things in here.  Considering the fact that it takes the Secretary at least

20   90 days or less to make a decision and then 12 months plus you have a couple of months

21   -- you make your report 30 days after the 12 months and then you have probably another

22   7 months before the meeting why is that timeline and the one that I agree with you would

1    be the biggest issues -- let's say student achievement they are going to be able to show

2    that because they have visits that are going on.

3            Fiscal administration -- they will be able to do that.  Student complaints --

4    they should be able to do that.  On-site review -- they are going to have many of those

5    because they have a couple they have August coming up.

6            Monitoring is the one which would be the issue that I think where there

7    would be some time issue but they are going to have two or three cycles to be able to

8    demonstrate but we always have when -- if monitoring is the only one we have many

9    institutions over the years that we have done this for and we ask them to continue the

10   monitoring.

11           But the vast majority of the concerns can be dealt with before they would

12   come before us again is that -- am I missing that?

13           MR. MULA:  No, you are not missing anything.  Actually what has

14   happened is my determination was based on experience in dealing with compliance

15   reports and monitoring and the amount of time it takes to complete that -- in the review of

16   their standards when I was doing this evaluation when I mentioned that I came up against

17   a wall where there was no documentation they were basically cited because we couldn't

18   tell when they started this process.  Did they start it at the time that the requirements --

19   that the criteria require them to do so?

20           We couldn't find that, otherwise parts of the documentation was there so

21   my determination is made on practices of other agencies coming into compliance with

22   time frame requirements in the criteria.  If this Committee determines that there is a

1    possibility that they can do this then that's your opinion.

2              My job is to provide this organization with a technical expert

3    determination based on the procedures in 602 and that's exactly what I did.

4              MR. KEISER:  Thank you.

5              MS. PHILLIPS:  I have Sally and Herman to insert into the conversation

6    and then I will get back to my speaking order.

7              MS. MORGAN:  Just a quick note on the verification issue.  The 2011

8    analysis and Agency input was that they were going to begin verifying 20% during 20%

9    of placements and that was in 2011 I believe.   It's possible it was 2013 but I think it was

10   2011 and then we have an agency document dated January 2016. We are going to start

11   our 20% verification.

12             MS. PHILLIPS:  Herman?

13             MR. BOUNDS:  Yes that was one of the things I was going to bring up.  I

14   think there were some issues back in those reports regarding some licensure rates and

15   licensure requirements that didn't have any follow through but the point I want to make is

16   kind of what Chuck just stated.

17             So collectively as we look at this report and I just really want to talk about

18   why we say that collectively we did not think that the Agency could demonstrate

19   compliance within 12 months and I am not you know, the Agency says they can -- we are

20   just saying that based on our experience from what we have seen in the past.  We have

21   had agencies with far less issues have serious trouble with meeting those standards in the

22   12 month time.

1        So we are looking at being able to evaluate a systematic approach to fix

2  things.  We want to verify and make sure that their placement verification processes are

3  working.  We want to look at the monitoring, we want to look at you find an institution

4  out of compliance, we want to look at those actions taken whether it be adverse or you

5  just decide that the institution has made substantial change and you continue their

6  accreditation.

7        So those are things in the total process that we just thought would be tough

8  to do.  I mean I don't want to say that what they say -- I don't want to call anybody -- I

9  don't want to say that what they believe is what they believe -- I just want to reiterate

10  how we came up with our determination -- it was based on, I mean Chuck has been here a

11  lot longer than I have.

12        I think he has been doing this 30 years.  Steve has been doing this 30 years

13  and we consulted with other folks on our staff so that's what we came up with then.  That

14  there is just a lot of things, a lot of items that we would have to verify to make sure this

15  works and you know I don't know if we would have to come back and award a good

16  cause extension to say that you hadn't fixed anything, I just don't know.

17        So our determination we just didn't think -- we thought it would take

18  longer than a year to get those things fixed and corrected and that's how we came up with

19  that with our recommendation.

20        MS. PHILLIPS:  Thank you I have got Bobbie, Cam, Frank, Simon and

21  Jill not Jill right now.

22        MS. DERBY:  I just want to ask are we still in the place where we are

1    asking our staff questions not the agency?

2         MS. PHILLIPS:  That's correct this is still questions of the staff.  We will

3    move to our own internal discussion after we have concluded this portion if your question

4    isn't of the staff --

5         MS. DERLIN:  And so I want to just go past me because I want to answer

6    the question about confidence of accomplishing things in a year not ask the staff

7    questions about it.

8         MS. PHILLIPS:  Okay Cam?

9         MR. STAPLES:  Thank you.  I don't think it's just a 12 month issue

10   though for us.  I think as we have discussed -- I mean that is one big issue but I think the

11   second question is on what basis would we have confidence that the Agency will change

12   its practices.

13        And I think we have had a number of people from the Agency who I think

14   are sincere but when you see a three year history of a failure to monitor and enforce and

15   then you see a several month period immediately preceding a hearing on your recognition

16   when everything becomes stirred up and all the commitments are made.  To me it is not --

17   there's a genuine question about whether we should -- based on that history of inaction be

18   confident that anything substantive would happen in 12 months in the areas that matter

19   most.  And I think that's I don't think we can lose track of that.  We have to base our

20   assessment on evidence not just based on words.

21        I mean there's not an agency that we recognize that wouldn't come before

22   us on the day of their recognition hearing and profess to correct every deficiency

1    identified but where is the evidence that it was even on their radar screen until Steve met

2    with them two months ago and they seemed to wake up to the reality that they were at

3    risk and I think that's to me that has to be part of our calculus.

4              I think what Paul said a few minutes ago I find it hard to understand with

5    the history that played out that it really took the Department to focus them on the fact that

6    they weren't doing their job correctly.

7              So I guess I want to pose the question is that still part of your analysis?

8    The question as to whether you can confidently suggest -- I mean I think Herman's point

9    is a very good one that many of these things would take longer to play out than 12

10   months almost regardless of how quickly they did them.

11             But do you have a confidence to say to us that you think we could rely on

12   a complete change of heart with the Agency regardless of the statements of the people

13   before us?

14             MR. PORCELLI:  The only thing I would point out is it is very difficult to

15   get through to an agency if the head holds the reins so tight and the information so tight

16   and that was the only -- I thought too was this a false conversion you know how could

17   you all be that naïve that you are in this much trouble and from speaking to many of the

18   Commissioners because you don't often get to speak directly to them, we go through the

19   Agency staff and it wasn't getting through and I think you saw Chairman Leaks heartfelt

20   that he really and he wasn't putting that on he has too much integrity to do that.

21             There was a block of information and should they have known?  I think

22   they should have.  I mean I think it's like I don't know how you could be that naïve but

1    anyhow that's -- once you get rid of the captain it is a lot easier to get through to the

2    people actually running this ship you know, anyhow.

3            MR. MULA:  I would like to make a comment and talk about the dragon

4    in the basement.  It is your job to make determinations and it is our job to make

5    determinations.  Our job is based on a very strict structured process.  So when we do this

6    correctly we are not allowed to think about confidence in the leadership, we are not

7    allowed to think about the makeup of the Commission the Advisory Board of anything

8    else.

9            The only thing that we are allowed to do is determine if they are out of

10   compliance with a technical issue.  The rest of it is well above my pay grade and I'm glad

11   that you can make that decision because I don't have to.

12           MR. PORCELLI:  And also we only have the 12 month rule in the regs

13   that's what we follow -- the regs.  Whether you want to grant an extension for good cause

14   after 12 months if you are thrilled to death with what's happened we can't gamble on that

15   we can't assume on that -- we just work with the 12 months and in 12 months it would be

16   very difficult to fix all of these problems that was what our analysis was based on.

17           MS. PHILLIPS:  Thank you I have Frank and Simon and a reminder that

18   this is an opportunity to ask a question of the staff and after that we will then move to the

19   Committee discussion and statements so Frank.

20           MR. WU:  This is a question that I have asked before but it feels more

21   urgent in this case so it is a question of all staff including of the lawyers.  I can identify

22   three options here and I am just trying to lay out the options and my question is going to

1    be is this it or is there a 4th or 5th or 6th option that I am not thinking of that is permissible

2    under the statue and the regs?

3                    MS. PHILLIPS:  So I think that's a Sally question and it would be during

4    our discussion.

5                    MR.WU:  Well I'm happy to hold on to it because it is sort of a framing

6    question.

7                    MS. PHILLIPS:  Yes, Simon?

8                    MR. BUEHME:  I'll pass.

9                    MS. PHILLIPS:  Okay any other questions for the staff before us?

10   Thank you very much.  We now move to the opportunity for the Committee to having

11   been engaged in their own discussion.  We may also want to query the Department

12   Council issues at hand.

13                   I would say in going into this period of time that it has been a long day

14   and that it's been important that it be a long day.  It's been a very rich opportunity to

15   learn about the perspectives of the Agency, the Department, the third parties and our own

16   conversations.  I hope that that has been truly an opportunity for the Committee members

17   to now move into their own deliberative process and we will move towards concluding

18   this this evening.

19                   After we do conclude this assuming we do conclude this I have just a

20   couple of housekeeping announcements and requests so I just want to make sure that that

21   is on your radar as we go forward.

22                   Okay so we are now in the stage of Committee discussion and potentially

1    a motion and vote.  I would open the floor to Frank who is going to pose the set of

2    parameters to start us off as a Primary Reader.

3             MR. WU:  So this is actually a question.  Is there something that I am not

4    listing here?  There are at least three options that are conventional that we have gone over

5    and we as a body have lamented I think that there isn't some other option.   But I am

6    wondering is there something permissible under the law, under the statute that governs us

7    and that gives us authority under the Department regs.

8             So the three options I can think of are yes we recommend re-approval; no

9    we don't recommend that this Agency be re-authorized or what we often do come back in

10   12 months.  Yes, no, come back those are the three options so my question is is there a

11   4th, a 5th, a 6th is there some way to tinker with this so that it's and it is not just this

12   Agency just in general it is sort of frustrating when it is yes, no, come back you know.

13            Life is complicated and having only those three options as a decision-

14   making body I think has caused us to express frustration in the past.  This might be a

15   good opportunity and I believe when I was not in the room there was discussion of

16   possibilities.  Is there some other thing that can be done?  That's it just a question.

17            MS. MORGAN:  You can do various reporting requirements.  You could

18   do some coupled with a limitation -- you could do a severe limitation if you wanted.

19            MR. WU:  So let me follow-up on that.  That's a variation of come back,

20   so it is come back and then with some constraints, limitations of various sorts, report on

21   this, address that, you can't do these things which is accredit new institutions -- could you

22   offer just a few examples of the range from light to heavy of constraints, restrictions,

1    reporting that you have seen since you have been the lawyer for some time.

2    What's the range?

3    MS. MORGAN:  As far as what I have seen?

4    MR. WU:  Or what you could imagine is permissible so I am not talking

5    about things that would be inappropriate but in the permissible range that you could as a

6    lawyer say we could go from here to here, what might that look like?

7    MS. MORGAN:  We considered various alternatives before coming up

8    with this particular deny.  The one that we considered most strongly would have involved

9    severe reporting requirements and severe limitation.  We would have limited recognition

10   for a maximum of three years not to be renewed absent a demonstration by the Agency of

11   complete compliance with an effective application of all criteria, limit the scope so that

12   they couldn't accredit any new institutions, delivery modes, programs or campuses,

13   substantive changes, directives that the Agency require written notice of the limitation to

14   each of its institutions.

15   Require each of its institutions to provide us with a teach-out plan, limit

16   the scope so that in the first -- from the get go 33% of their institutions would be outside

17   the scope of recognition and then further down the road another 33% and so at the end of

18   the time they weren't compliant that would be at zero.

19   The reporting requirements included things such as the operations and

20   decisions of their new Ethics Committee, information received from the Agency of any

21   investigation by a state or federal authority they would have to report that to us or any

22   lawsuit alleging systemic misconduct with respect to students by a school and a

1   description of the actions taken by the Agency in response.

2              A description of their reasons for imposing or lifting any deferral warning,

3   ammunition, show cause, probation, adverse action, any sort of action that ordinarily

4   wouldn't be public, documentation of a complete review and decision-making cycle with

5   respect to any institution that we ask them about those are the kinds of things we

6   considered.

7              MR. WU:  That was the best answer you have ever given, thank you.  That

8   was great, what a list thank you.

9              MS. PHILLIPS:  Jill?

10             MS. DERBY:  Yes I wanted to bring up a couple of things that I don't

11  think have been considered but I would like to invite my colleagues to consider.  I am one

12  of the Primary Readers for the next agency to come up which won't come up this

13  evening, ACCSC quite comparable to the one that we are discussing now in terms of the

14  kind of accreditation they do, mostly career and vocational schools.

15             Many and most of those may be for-profit but that is the sector that we are

16  talking about.  And the contrast couldn't be more stark in that this Agency which is in

17  many ways comparable and I am sure there are some differences as well -- we will

18  probably be able to discuss in about five or ten minutes because it is very squeaky clean

19  when it comes to its compliance.  I think there is one very narrow definition that has to

20  come into compliance.

21             And as we have been talking about this Agency it struck me that were we

22  to out of the testimony we have heard today and the sincere expressions that we have

1    heard from the Agency go with the choice of come back in 12 months it would seem to

2    me that there's an irony here and almost a travesty in terms of culpability of how we

3    respond to agencies.

4              In other words what the staff is recommending for this other one is the 12

5    month come into compliance because of one rather small issue.  And then there are many

6    very serious and egregious failures of compliance that we are dealing with at Agency.  So

7    I just wanted to bring out what seemed to me a very uneven way of treating one agency in

8    terms of how we treat others and I think it's important that we think of the larger context

9    about what our standards are and applying the same sort of general standard to our

10   response and our decision-making around agencies.

11             So that's one of the things I wanted to point out.

12             Another one is that there is almost the way that the day has gone has been

13   that more of the time has been spent listening to the defense of the Agency and those that

14   have come to testify accordingly.  And what we had and read in advance or could read

15   was of course the report of the staff but I checked with Chuck about how much time was

16   put into this by the staff and it was really amazing to me that at least four people worked

17   pretty full-time for three or four weeks and probably put hundreds and hundreds of hours

18   in.

19             And I think in fairness to our staff whose professional judgment I really

20   respect it is important I think to hold that in consideration so it isn't mostly what we

21   heard today although we did hear from our staff at the very beginning, their reasons for

22   making the recommendation that they are making.

1        And they also made clear and I'm sure we all realize that they recognize

2    that the recommendation they are making was one that is unusual for this Department to

3    make and very bold and almost extreme in terms of our record of the kind of

4    recommendations we make in terms of agencies.

5        I'm sure they had that in mind so I think what I am coming to is they had a

6    very good justification for making the recommendation they did mindful of how it might

7    be received and of course the kinds of pushback there would be to that and fair enough

8    we have listened to that today and I think we have listened to it very objectively.

9        But I think it is important to keep in mind the hours that our staff has put

10   in and the professional judgment they bring out of that extended time period.  But you

11   probably haven't heard as much of today as we have -- the side of the defense so I just

12   wanted to make that point in terms of our process today and how that plays out.

13       And finally I come back to a point that I made earlier so I will make it

14   quickly and that is looking back at what has gone on before, listening to the promises that

15   were made today I find myself more persuaded by track record than I do by promise.

16       MS. PHILLIPS:  Thank you Jill.  It occurs to me that it might be helpful

17   for the Committee to have a brief briefing quickly on what happens with the staff

18   recommendation.  It does go forward to the senior Department official separately.

19       That recommendation does go forward separately from ours, ours and

20   their go forward together.  The staff is actually not a NACIQI staff it is Department staff.

21   We actually have as NACIQI two staff and they are of course put in an enormous amount

22   of effort and bring to it considerable expertise but it would be probably not accurate to

1    consider it our staff.

2         I have Anne, Ralph and Bobbie and Art.

3         MS. DERBY:  Just a further question of Sally in thinking about various

4    options since as I look at this I certainly am in favor of some serious sanction.  Whether

5    or not I am in favor of the nuclear option I am not at all sure.  In looking at various

6    options deferral is that something that is possible and if so what is it?

7         And if you would also explain again for us when a new Petition is

8    requested what is the thinking behind that option.

9         MS. MORGAN:  A new Petition would involve I mean you could add that

10   -- in other words if you granted a certain -- if you found the Agency compliance but

11   wanted to give them a short period of recognition because you weren't that certain of

12   them you could do that.

13        You could also require them to file a new Petition for example in the

14   recommendation I gave you presumably the Agency would have had to file a new

15   Petition in three years but it could be shorter than that.

16        Deferral is not really an option.  We used to have something called

17   deferral but that is really the same as a progress report.  The Agency is either compliant

18   or it is not.  We can't say we are going to decide that later.

19        MS. PHILLIPS:  I have next Ralph?

20        MR. WOLFF:  I would like to make a statement and then a Motion.  At

21   least get something on the floor so that we can work with it.  I feel a bit like the Talmudic

22   issue of somebody comes in and says you're right and then the other person comes in and

1    says you're right and they say well you said they are both right and you say you're right.

2            There are no easy answers here.  I have really tried to focus to stick my

3    head down and focus on what is the evidence and then what is the right thing and you

4    won't often hear me quote Paul Ryan but I think everyone has to vote their conscience

5    here.

6            I will say that there is no question in my mind that the issues which the

7    Agency was charged to have failed to address are really serious and substantive.  They

8    are about corruption, systemic corruption on the part of a number of institutions, not all,

9    by any means but on a number of institutions which affected many students.

10           And misrepresentation things like claims that are made about placement

11   are things that students rely on, salaries are things that people rely on to take out loans.

12   And so I cannot ignore that this is -- there was a period of at least several years in which

13   the Agency failed to pay attention to, to address, to sanction to deeply dive into systemic

14   problems at a number of institutions and my concern is that one could look with hindsight

15   about Corinthian and say how did we get to where it got to.

16           I want to look beyond or outside of Corinthian because the circumstances

17   for that really didn't come out of the financial withdrawal that dropped their house of

18   cards down.  But there are a series of other findings from the state Attorney General's

19   from the court cases that reflect settlements, decisions that needed to have been

20   investigated because of the findings that they represented and they were not addressed.

21           So as I have said before I think this is much deeper and more significant

22   than just the metrics of placement.  It is really about the quality and the reliability of the

1    Agency.  So for me I can find validation in the serious finding that the Agency has been

2    in non-compliance with 602.16 - 17 - 18 - 19 and 20 and in particularly those that are

3    organized around the application of its standards, the monitoring and the enforcement of

4    its standards.

5              I would also say that I was quite impressed by the candor and the

6    commitment of the leadership and I will say I was stunned that the Board was to use

7    Paul's words "asleep" or "unaware" until just recently which would suggest that whether

8    the Agency was aware of the situation it was in the students who were being affected, the

9    institutions that were acting improperly -- whether there was certain staff who might have

10   known that it is certainly clear that the Board was operating under a very different set of

11   assumptions and as a consequence decisions were being made or not made that were

12   problematic.

13             As much as I would like to put my faith in the leadership and I think there

14   would be reason to do that I would like to cite an example of a single institution that

15   came before my Commission which misrepresented admissions criteria and

16   misrepresented whether or not their medical degree would be accepted in the U.S.

17   Students spent years only to come to the U.S. and find that that degree was not accepted

18   and the Commission was debating and the question was what would it take to terminate

19   accreditation of an institution if it wasn't fraud to students?

20             And my question is, what would it take to revoke the recognition of an

21   accrediting agency if it were not multiple instances of misrepresentation and fraud that

22   affect thousands of students? Not all by any means -- the 800,000.

1          So it is not just I that would say that I am torn and like to give hope I will

2    move for the revocation of recognition on the basis that this Agency failed to act in an

3    appropriate and timely manner and that the leadership as committed as it may be has only

4    recently been installed with the directives only in the last couple of months when this

5    situation has certainly been in the public arena for much longer than the Agency took

6    awareness of.

7          I can go back to the 2011 -- I don't feel that the Agency was put on notice.

8    I will say of the seriousness that we now have before us in 2011 I can't speak there was

9    no record other than a letter from 2013 so I can't say that it didn't -- from the

10   Department's standpoint that the notice came from the 2011 action but I would say that

11   one could not ignore multiple findings from courts, from Attorney Generals, from public

12   media, from statements of students, from complaints and the variety of data flow that

13   came from multiple sources to this Commission that were not acted upon.

14         So it is with a very serious heart that I at least put this motion on the floor

15   so that we can discuss it and to determine whether as a group we determine that is the

16   appropriate action to take, thank you.

17         MS. PHILLIPS:  Okay the Motion has been made and seconded.

18   Opportunity for discussion I'm going to pick up my speaking order which is Bobbie if

19   you would like to speak now and then Frank.

20         MS. DERLIN:  I was just going to ask if we were going to get a Motion on

21   the floor and we have.

22         MS. PHILLIPS:  Okay thank you, Frank?

1        MR. WU:  I have two questions probably mainly for Sally but also for

2   other staff.  The first question is if we assume this Motion passes and the reason I am

3   assuming that is I think it will help people understand if they understand the

4   consequences.  Could you just explain what happens next both in terms of what happens

5   with this decision within the Department and what would happen with the institutions and

6   with the students, just describe what does the world look like for the next year if we vote

7   in favor of this, that's the first.

8        And the second is could this Agency come back in a year -- so let's say

9   they have ample reserves, let's say that the Department sustains the staff

10  recommendation, to seek the recommendation, the recommendation is withdrawn and

11  let's say the Agency decided we are going to use the millions of dollars we have to

12  reform ourselves and present ourselves as brand new.

13       Could they come back?  I'm just wondering.  So if you could just describe

14  what does the world look like for the next year and might it involve resurrection or is this

15  it?

16       MS. MORGAN:  As most of you know well first of all there would be a

17  decision by the senior Department official within 90 days.  Then if the Agency appeals

18  there's no particular limit on the time when the Secretary would decide that -- the appeal.

19  If the final decision of the Department either at the SDO level if there was no appeal or at

20  the level of the Secretary if there was, if the final decision of the Department was to

21  withdraw recognition -- from that date institutions would have 18 months to find another

22  recognized accreditor.

1           They would be put on provisional certification with the Department.

2    Complicating it a little bit is that some states I believe have required -- premise state

3    authorization on being accredited by an institution recognized by the Secretary of that

4    agency.

5           So in those states the loss of participation would be much quicker.  It

6    would not -- it would be immediate unless the state -- immediate upon the final decision

7    of the Department unless the state changed those laws.  So that's that part.

8           As far as -- I'm going to let Herman talk about scheduling and such but as

9    far -- there would be no bar against the Agency coming back and reapplying and there's

10    just a timing issue of how fast they could put together a Petition and when it could be

11    scheduled so I will turn it over to you.

12           MR. WU:  Before that just one follow-up.  In cases like this I assume the

13    Agency after exhausting the remedies within the Department could file suit in federal

14    court?

15           MS. MORGAN:  They certainly could and if the court were to enter a

16    preliminary injunction for example recognition would stay in place unless the judge was

17    to lift it.

18           MR. BOUNDS:  I was just going to add Sally is right the Agency could

19    come back in two years and apply for recognition at that time, they would be considered

20    a new Agency you know, brand new and we would look at their 2 years of accrediting

21    experience just like they had if they had not been here before.

22           MR. WU:  And just to clarify something that I think was already said.  In

1    no way would this decision even if it became final drive this entity into bankruptcy.

2    They could do all sorts of other things, they could actually continue to do what they do

3    just not as a Title 4 federally authorized gate-keeper.

4              MS. MORGAN:  It wouldn't necessarily do so it depends on how many of

5    their institutions rely on them solely for Title 4 access to Title 4 that could put them in a

6    bad financial situation.

7              MR. WU:  Right but they were performing a valuable peer review service

8    it is conceivable or overseas there are people who pay for this even if it is not a Title 4

9    gate-keeper?

10             MS. MORGAN:  Absolutely.

11             MS. PHILLIPS:  Continuing discussion on the Motion at hand, yes?

12             MR. WOLFF:  Sally just to also add could you go through the appeal

13   process is there one level, two levels or appeal just go through that before.  What does it

14   take for a decision to become final?

15             MS. MORGAN:  There's one step I forgot to mention it is within 10 days

16   of NACIQI's decision the Agency could file comments with the senior Department

17   official, written comments commenting on your recommendation.  Within 90 days of the

18   meeting the senior Department official or it could be sooner but not later, the senior

19   Department official makes the decision and that decision is final unless within 10 days of

20   that particular decision the Agency files a Notice of Appeal.

21             And then if they do file the Notice of Appeal within 30 days of the Notice

22   of the SDO's decision the Agency would file a brief and supporting exhibits which are

1   limited to the administrative record.  And then the Department would have well the lower

2   parts of the Department the office of Post-Secondary Education would file a brief in

3   response so it is a 60 day briefing process.

4             And then it would be submitted to the Secretary and as I said there is no

5   particular deadline on the Secretary making a decision.

6             MR. WU:  One last procedural question -- and it's just a question it

7   doesn't imply anything whatsoever about my view of partisan politics.  What if for some

8   reason there were a change of administration that occurred?

9             MS. MORGAN:  If the matter had been decided before there was a change

10  of administration you know the matter is decided.  If the matter hadn't been decided the

11  new Secretary would have to decide it.

12            MS. PHILLIPS:  Other procedural questions for Sally?

13            MR. STAPLES:  Just one question I can't recall what the instance was

14  around the decision that took 2 years but was that 90 day decision that took 2 years?  Oh

15  it was not, so what happens if there is no decision in 90 days?

16            MS. MORGAN:  Nothing in particular but I believe that our senior

17  Department officials and keep in mind the 90 day requirement has only been in place

18  since about I guess 2010, 2010 is when -- but the 2 year period probably was an appeal to

19  the Secretary so the 90 days was met but then the Secretary let it sit.

20            MR. STAPLES:  Okay thank you.

21            MS. PHILLIPS:  Continuing discussion on the Motion that is on the floor

22  Art?

1    MR. KEISER:  Madame Chair I would like to speak against the Motion.

2    It's a very severe Motion and a very severe action and Frank this is not about

3    unfortunately the Agency this is about 250 schools and again the numbers of students

4    have been varied from 250,000 students to 800,000 students but I don't know which one

5    it is but this is what we are talking about it has nothing to do really.  The Agency is the

6    Agency and whether it continues or not is not of concern to me.

7    It is the issue of the havoc this will place in the higher education

8    community.  The regional accreditors will be not playing in this train-out.  I have been

9    involved in a lot of train-outs and train-outs are very difficult and you could easily

10   identify 50 to 60% of the schools and not be able to get a new accreditation in the 18

11   months.

12   That would mean that each one of those schools would close or most

13   probably close which would cost the taxpayers billions and billions of dollars as the

14   students have a right to challenge you know, go to the Department and say I want my

15   money back because it is a closed school situation.

16   The other agencies will be hard pressed to take any of the schools because

17   it will be in a rush environment and it will be a very difficult process to bring schools into

18   a different culture, different accrediting rules where they have been in some cases for 50,

19   60 years.

20   So it is a serious decision that we make that will have dramatic impact.

21   There are a couple of things that really stand out to me, one when the staff talks about the

22   people they say they are good people, they are educated people, they are qualified people

1    and they could probably do a lot of good work.

2              When they talk about the standards of the Agency they are good standards,

3    the standards meet the requirements and they have you know especially the new

4    initiatives they have demonstrated a commitment to meet the requirement.  In the areas of

5    trust the big question that came out in trust was the issue of whether the Agency had

6    made promises that were not kept and frankly the last conversation I did not hear that that

7    was an issue anymore as the fact that the promises were not made but from what I could

8    tell what representations were made were kept, whether it be through a third party

9    validation or internal validation.

10             We do not have a standard that speaks on the verification process or for

11   that matter even placement.  The institutions are the ones that have the problems not the

12   accrediting agencies.  The institutions are the ones that had the allegations and I am going

13   to consistency defend the fact that we do not hold people accountable for allegations, we

14   inspect, we discuss but most of these things have been based on allegations.  The only

15   Attorney General decision that I am aware of is in California where the Attorney General

16   went to court and Corinthian was not there because they went bankrupt and they had no

17   representation and there was no defense and the judge issued a summary judgment.

18             So it's very frustrating to hear that because of institutions like Corinthian

19   which the Department allowed to be broken up and sold this Agency is going to take it on

20   the chin.  I don't believe that is correct.  The impact is too much, the number of the

21   ability to come into compliance is I think doable and since it is going to take because it

22   will be in the courts for years it certainly makes a whole lot of understanding to help this

1 institution bring it into compliance rather than to affect so many students like the young

2 lady yesterday with Pacifica College who felt her whole world has crashed because the

3 institution lost its accreditations.

4    This is very serious business to very serious and important kids like some

5 of the students that we saw today from ITT.

6    MS. PHILLIPS:  Thank you I have Cam?

7    MR. STAPLES:  Thank you Susan.  I agree with Art.  It is about the

8 students and I think that is our responsibility it doesn't really matter in the larger scheme

9 of things, obviously to the individuals of the agency it matters but the real issue for us is

10 not the Agency I don't think it is the institutions and it's the students.

11    And we are in an unfortunate circumstance where either action that we

12 take puts students in jeopardy.  If we withdraw their recognition a lot of students who are

13 getting a good education have to find other locations.  But if we do nothing in the face of

14 an agency that I think has a fairly clear track record of not pursuing -- not just Corinthian

15 but several circumstances of significant concerns, allegations and they are allegations but

16 there was no effort in any substantial way by the Agency to investigate whether those

17 allegations related to their standards and violated their standards.

18    And if it one thing for the Attorney General's Office to negotiate a

19 settlement where they can't prove wrongdoing but it is another circumstance for the

20 Agency not to look at that record and say wrongdoing aside is there a quality education

21 that is occurring here, are there violations of our standards?

22    To cite the gentlemen from the Maryland Attorney's General Office you

1    don't pay 100 million dollars if you have done everything exactly right.  That's a fair

2    statement and I think the lack of diligence on the part of this Agency, consistently, not

3    just in one instance but in several instances substantially jeopardized the rights of the

4    students at the institutions effected.

5         So the choice for us is do we take an action because there are a lot of

6    students that are at great risk of an agency that is not diligent in pursuing whether there is

7    fraud occurring or do we take an action that will have an awful lot of other students have

8    to find an alternative educational experience and I think it is a tough choice but I am on

9    the side of the Motion I speak in favor of it.

10        I think we really have no choice based on the history and the evidence

11   before us.

12        MS. PHILLIPS:  Other discussion of the Motion at hand, Hank?

13        MR. BROWN:  I'm one as I look at this find that the accreditor has fallen

14   short of what we had hoped for and in some areas very seriously short.  The Department

15   has some outstanding attorneys, we have been blessed with fine legal advice here and I

16   know the Department itself has some outstanding attorneys to I won't presume to be their

17   equal in terms of legal advice on how you handle this.

18        But I have had a little experience in a variety of areas.  To me the

19   underlying problem is that we have adopted the fox guarding the chicken house structure

20   for accreditation.  We shouldn't be surprised that accreditors have difficulty disciplining

21   their own people.

22        And any of you who are surprised at that I think you have some interesting

1    years ahead of you.  My own sense is that while this accreditor has fallen seriously short

2    in a number of areas that those problems exist throughout accreditation under most of the

3    people that we approve and if you look at the standards that are in place our staff tells us

4    that those are good.

5          If you look at the benchmarks that we look at I think you will find that

6    many accrediting agencies don't do as well with the people they accredit in terms of the

7    benchmarks as the case that is before us.  My guess is when this is litigated and I suspect

8    it would be that the Agency could very well point out that they have a better record in

9    many respects than other people who have been approved by us, some of whom who

10   have been given a time to remedy their problems.

11         My impression of what the courts will do under those circumstances is ask

12   the question is have they been treated as other people have been treated or if they have

13   been singled out for special treatment that others who had serious problems were not

14   treated that way.

15         So at least in terms of our responsibility to advise the Department my

16   advice to the Department would be to take strong action but to build a record in a case

17   that is defensible in court.  Having a practice of giving people a time to remedy their

18   short-comings I'm not sure is the best practice -- I don't think it is the best practice but it

19   is what we have done and my sense is that by taking the precipitous action you have left

20   yourself a record that can be overturned and my sense about it is that you need to follow

21   the precedents you have set with others as you go through this.

22         MS. PHILLIPS:  Thank you I have Federico?

1          MR. ZARAGOZA:  I want to commend staff for their report, for their

2    competence and for their courage in terms of all of these issues that have evolved.  They

3    have been very respectful but at the end of the day they made a very difficult

4    recommendation and I could sense that.  But I think the evidence was there.  I also want

5    to recall kind of the testimony we heard from the 800 veterans who were caught up in this

6    and that and their situation.

7          So there are a lot of students that are being hurt now.  It was clear at least

8    from my perspective that there was a lot of sincerity and really I too was impressed with

9    the corrective action and the plans and progress that's been made.  But I was very

10   uncomfortable not having had verification that they were not going to be downsized, they

11   have already spoken about a 1 million dollar induction to capacity to me was an issue.

12         So even when they were talking about all of these new advisory

13   committees and sustaining the work that they were already doing the evidence just wasn't

14   there.  So again from my perspective I don't think I've got much of a choice to make, I

15   think that the staff has made the recommendation, I think the evidence if before us and I

16   think we need to go on with the Motion.

17         MS. PHILLIPS:  I have Kathleen and Anne.

18         MS. ALIOTO:  I sympathize with Hank's statement and understand how

19   tricky accreditation is and how difficult it is to do a good job and to help institutions

20   improve and meet the standards.  I do not think that ACICS has done that.  I think that

21   they as a gate-keeper of 4.76 billion dollars that they have not taken their responsibilities

22   seriously and the fact that they were startled by Mr. Porcelli's analysis in April of this

1    year and not before that to me is an appalling indication of a lack of commitment to the

2    800,000 students that they are supposed to be serving.

3              So I with pain because I know that this is going to disrupt human lives but

4    I think hopefully in the long run that this vote of this Committee will send out a signal to

5    accreditors to take seriously the fact that they are there to help institutions.  They are

6    there to help institutions to meet these standards, the standards are very difficult and

7    when you have students who are poor and impoverished, there are huge challenges there

8    in helping those people succeed.

9              But we have you Hank and we have Paul and we have Dr. Keiser

10   managing to do that with students and it can be done and I would hope that other

11   accreditation agencies will continue to do that and will improve on what they are already

12   doing.

13             MS. PHILLIPS:  Thank you Anne.

14             MS. NEAL:  Paul and I have been agreeing here over here the last few

15   days but no matter what we will leave this room angry and unhappy.  And I must say it is

16   an excruciating decision to be made and I have for many years been asked to determine

17   whether or not an accreditor is a reliable grantor of educational quality and I will say that

18   generally I do not give accreditors any benefit of the doubt.

19             I think that this accrediting body deserves a serious sanction and the

20   strongest message we can but I must confess I am not prepared to vote for the denial

21   because of serious questions about the integrity of the process, unsupported allegations of

22   guilt and a lack of confidence that this is a consistent application of standards which I

1    think we have to do as a body if we want to rightfully engender the public confidence.

2             I think shutting down this accreditor would in many respects satisfy our

3    desire to see action taken and to see improvement in an area that we know desperately

4    needs improvement but I think in doing so we would really wrongly suggest that this is

5    the way to make a difference, this is the way to improve accreditation when in fact I think

6    the problems are not just of an individual accreditor.

7             They are structural problems they are problems that insist on quality

8    improvement as well as enforcement.  Those two things do not go together.  It's a system

9    that has a different standard for profits than it does for regionals and I think I am faced

10   with a decision that any way you look at it as unsatisfying but in this case I would err on

11   the side of giving the benefit of the doubt to the accreditors because of the various

12   problems that I see.

13            MS. PHILLIPS:  Further discussion on the motion, Simon?

14            MR. BOEHME:  Thank you Madame Chair the question that my

15   colleague Art brings up claims is certainly something that when you read through the

16   articles in the media, the materials that we have been provided it and I know it is on all of

17   your minds as well as what happens to these thousands of students and it is scary.

18            And we are entering into a great unknown but something that I have

19   firmly believed since I joined this Committee and I also try to be very consistent and I

20   appreciate all of your patience and all of you teaching me but you know I firmly believe

21   that students have gotten the short stick in our current climate.

22            And I think Hank brings up an excellent point, Cam and Ralph and Art

1    that ACICS is not the only organization that does it.  I think of UNC one of the public

2    universities and for as well as its 16 years they ran a program within one of their

3    departments handing out -- cheating was rampant and you know there are so many issues.

4            But ultimately for me Ralph's comment when fraud is involved where is

5    the line drawn in the sand?  And you know I don't want to support this motion because I

6    worry very much about students and I feel as the student member I have an obligation

7    almost to even though I think ACICS is not so great and from my line of questioning I

8    respect them and I appreciate what they are doing.  I think they are heading in the right

9    direction but it is too late.

10           And I have always been a big proponent and pushing this Committee to

11   take a bold step and to send a message to the accreditation community that enough is

12   enough and so I hope that Anne is wrong that this process was you know filled with

13   integrity and the Department head and senior official will you know, as Madame Chair

14   pointed out, they will look through all of these materials and I bet you they will because

15   this is a huge decision but ultimately I do have to -- I will support the Motion and I think

16   it is time as a Committee we take these steps necessary to start putting accreditation to

17   make it more responsive for students and consumers.

18           MS. PHILLIPS:  If there are no further points of discussion for this I will

19   call a question.  We will do this by a raise of hands those in favor of the Motion -- the

20   Motion was to deny not necessarily to keep the staff report but to deny the

21   recommendation.  Those in favor of the Motion on the screen --10 those opposed --3 the

22   motion carries.  **"NACIQI RECOMMENDATION."** That concludes our business for

1    the agency review today.  Thank you all for your indulgence in a very fulsome discussion

2    a very difficult discussion.

3            Basically this has taken a bit of a different path in our schedule than we

4    had imagined and so I want to give you a bit of information about what is going to

5    happen tomorrow.  If members have no objection then we will take up tomorrow the

6    health group ABHES, the veterinary group AVA, the theological group, HES.  We may --

7    will certainly do those.

8            We do have some issues I expect to run into some issues of losing the

9    quorum.  If we don't we will continue with North West and TEAC.  The remaining

10   agencies we will need to take at a later time via a telephonic meeting which we will

11   announce via the Federal Register and the NACIQI website.  Federico?

12           MR. ZARAGOZA:  Madame Chair is there any procedural way that we

13   could accelerate some of those that have no issues and that otherwise have got a consent

14   agenda?

15           MS. PHILLIPS:  I have been exploring that for the last let's see 12 hours

16   and the answer unfortunately at this point is no.  So otherwise if you have no objections

17   we will proceed on that route tomorrow get as far as we can and do the remainder on a

18   telephonic call.  With that I want to conclude our conversation today, see you tomorrow

19   morning at 8:30 and wish you a good evening and thank you for your indulgence and

20   hard work today.

21   (Whereupon the meeting was adjourned at 7:36 p.m. to reconvene at 8:30 a.m., June 24,

22   2016)

# EXHIBIT 8

To Declaration of Allyson B. Baker



UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

July 15, 2016

***By Email Transmission***

Ms. Emma Vadehra
Senior Department Official
US Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

> Re:   Comments on behalf of the Office of Postsecondary Education
> regarding the pending petition for re-recognition of the Accrediting
> Council for Independent Colleges and Schools as a nationally recognized
> accrediting agency under Section 496 of the Higher Education Act of 1965
> and 34 C.F.R. Part 602

Dear Ms. Vadehra:

On behalf of the Department Staff of the Office of Postsecondary Education, and in

response to comments filed with the Senior Department Official ("SDO") in the above-

referenced matter by the Accrediting Council for Independent Colleges and Schools ("ACICS")

under 34 CFR § 602.35(a), the undersigned provides the following responsive comments as

permitted under 34 CFR § 602.36(c)(2).

In its June 2016 Final Staff Analysis ("Final Analysis") and Final Staff Report ("Final

Report"), the Department of Education Staff ("Department Staff") concluded that the

Accrediting Council for Independent Colleges and Schools ("ACICS" or "Agency") was out of

compliance with twenty-one areas of the regulatory criteria.  The Department Staff further

determined in its judgment that given the nature of the non-compliance, ACICS would not be

able to come into compliance during the maximum twelve month timeframe set forth in 34

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.*

C.F.R. § 602.36(e)(3)(i).  Accordingly, the Department Staff recommended that the Secretary withdraw ACICS's recognition. ("Staff Recommendation").

The National Advisory Committee on Institutional Quality and Integrity ("NACIQI") conducted a hearing and deliberations on ACICS's re-recognition on June 23, 2016. ("Hearing").  The Hearing included numerous third party commenters. Transcript of Hearing ("Tr.") at 145:7 – 231:15.  At the conclusion of its review, NACIQI concurred with the Staff Recommendation, and recommended that the Secretary withdraw ACICS's recognition. ("NACIQI Recommendation").  (The Staff Recommendation and the NACIQI Recommendation are hereinafter collectively referred to as "the Recommendations").

ACICS submitted its written comments ("Comments") to you as the SDO on July 5, 2016.  ACICS also submitted three alternative proposed decisions pursuant to 34 C.F.R. § 602.35(b)(3).[1]  In submitting this response pursuant to 34 C.F.R. § 602.35(c), the Department Staff respectfully requests that the SDO adopt the Recommendations, and withdraw ACICS's recognition.

## I.    ACICS's NON-COMPLIANCE WITH THE RECOGNITION CRITERIA

The areas of non-compliance set forth in the Final Report and the Final Analysis are as follows:

| | | |
|---|---|---|
| 1 | 602.13 | Acceptance of ACICS by others |
| 2 | 602.15(a)(1) | Staffing/Financial Resources |
| 3 | 602.15(a)(2) | Competency of Representatives |
| 4 | 602.15(a)(3) | Academic/Administrator Representatives |
| 5 | 602.15(a)(5) | Public Representatives |
| 6 | 602.15(a)(6) | Conflicts |

---

[1] The alternative proposed decisions included: unqualified recognition; continued recognition with a 12-month compliance period; continued recognition with return of ACICS's petition to the Department Staff for reconsideration, and resubmission to NACIQI for consideration at the December 2016 meeting.

| 7 | 602.16(a)(1)(i) | Student Achievement |
|----|----|----|
| 8 | 602.16(a)(1)(v) | Fiscal/Administrative Capacity |
| 9 | 602.16(a)(1)(vii) | Recruiting and Other Practices |
| 10 | 602.16(a)(1)(ix) | Student Complaints |
| 11 | 602.16(a)(1)(x) | Title IV Responsibilities |
| 12 | 602.17(a) | Mission and Objectives |
| 13 | 602.17(c) | On-Site Reviews |
| 14 | 602.18(d) | Reasonable Assurances of Accurate Information |
| 15 | 602.19(b) | Monitoring |
| 16 | 602.20(a) | Enforcement Timelines |
| 17 | 602.20(b) | Enforcement Action |
| 18 | 602.21(a)(b) | Systematic Review of Standards |
| 19 | 602.22(a)(3) | When New Evaluation Required |
| 20 | 602.24(c)(1) | Teach-out plan Triggers |
| 21 | 602.27(a)(6)-(7), (b) | Fraud and Abuse |

As set forth in the Final Report, and in the remarks of the Department Staff at the Hearing, the Department Staff, based on its reasoned judgment and experience, concluded that ACICS would not be able to come into compliance with all of these criteria within twelve months. NACIQI reached the same conclusion, and accordingly, the Department Staff respectfully requests that ACICS's recognition be withdrawn .

## II.    THE RECORD SUPPORTS THE FINDINGS OF NON-COMPLIANCE

The Recommendations are strongly supported by the evidence of record, contrary to ACICS's contention in its Comments. The Department Staff obtained detailed  information about the agency's operations, not only by providing specific institutions and circumstances which ACICS was directed to address in its petition for renewal of recognition, but by reviewing substantive third party comments and prior agency submissions, and including in the record documentation collected in the ordinary course of the Department's administration of the federal student aid programs that is illustrative of ACICS's ineffectiveness as a quality control gatekeeper.    Although these Comments do not repeat all of the areas of noncompliance

3

identified in the Final Analysis and Final Report, some areas of ACICS's noncompliance are so egregious that they are nothing short of the most fundamental violation of ACICS's authority and responsibility to ensure the quality of the institutions it accredits.

ACICS's accreditation of Michigan Jewish Institute (MJI) provides a telling case in point. As detailed in "FSA denial letter to Michigan Jewish Institute," (attached to the Final Analysis at 29), MJI is an institution ultimately shown by the Department to have operated primarily by recruiting and awarding Pell Grants to individuals who openly sought the funds to finance ineligible religious studies at ineligible foreign institutions, rather than for meaningful engagement in any of the eligible programs MJI purported to be providing. Early in its investigation, however, the Department contacted ACICS regarding (i) whether MJI's programs were designed to educate students for professional, technical or occupational careers as required both by ACICS's own published policies and by ACICS's scope of recognition from the Department; and (ii) whether the institution's contractual arrangements with foreign institutions met ACICS and Department requirements. *See* ACICS Exhibit 98. At that point, ACICS -- privately professing concern about a "huge" increase in enrollments, especially online, an apparent lack of transferability of credits, and that the "school does not frequently place students," *see* ACICS Exhibit 71 -- dispatched a special review team. Among other things, the site review team reported to ACICS that:

- Students were "made to enroll" dually in a certificate program and a bachelor's program, but that MJI did not document this dual enrollment;

- Placement rates were being computed using a methodology that ensured the rate stayed at 100 percent and involved only self-reports by students;

- The site team could not verify MJI's retention and placement rates;

- In spite of rapid enrollment growth, the institution allegedly had no active recruitment process;

4

- Different administrators gave the team different responses;

- Most of the staff was in Israel but could not be termed MJI employees under Israeli law;

- The institution could not identify anyone who bore responsibility for career counseling and placement assistance;

- It was difficult to adequately evaluate all administrative and academic activities of MJI in Michigan, given the level of the institution's purported activities in Israel;

- Advertising reviewed had "a number of irregularities or information that could not be verified," including claims as to the transferability of credits;

- MJI had no surveys of its graduates.

ACICS Exhibit 64.  ACICS's special review also showed the agency that "a vast majority of the institution's students" were enrolled in a program of religious studies outside of ACICS's scope of recognition, and that in violation of ACICS' published policies, MJI had routinely entered into scores of contracts with schools abroad without ever having submitted the contracts to ACICS for review and approval. *See* April 17, 2013 Special Visit Final Report letter ("Michigan Jewish Institute Documentation" at 6-9, attached to Final Analysis at 51); *see also* ACICS Exhibit 71.

Notwithstanding this pervasive indicia of academic and financial aid fraud, a year after the site visit, ACICS in April 2014 granted renewal of accreditation to MJI.  The agency did so while in the same letter demanding copies of thirteen contracts that MJI still had not provided. *See* New Grant Approval letter with Admonishment ("Michigan Jewish Institute Documentation" at 24-25, attached to Final Analysis at 51).  Thereafter, in July 2014, ACICS wrote the Department to "respond to question that we have been advised that the Department of Education representative . . . raised during a recent program review at [MJI] regarding ACICS's approval of certain education abroad activities of MJI."  July 23, 2014 Education Abroad Activities letter ("Michigan Jewish Institute Documentation" at 26-27, attached to Final Analysis

at 51). The ACICS letter to the Department said nothing about the indicia of fraud the agency had uncovered, nor about its finding that the "vast majority of the institution's students" had been enrolled in religious studies programs outside the scope of the agency's recognition by the Department. Instead, ACICS's July 2014 letter recited that MJI had been subject to "comprehensive on-site reviews, in which MJI's international partnership agreements were specifically examined to determine their compliance," and that "MJI's international partnership agreements and education abroad activities have previously been and, under the new grant of accreditation remain approved in compliance with applicable Accreditation Criteria."

The MJI case epitomizes ineffectiveness in an accreditor. Although ACICS, as required by 34 CFR § 602.16(a)(1)(i), purports to have student achievement standards, in its case turning on retention and placement, the agency remained unable, or unwilling, to apply them throughout the accrediting process. Its monitoring processes, such as its annual report (CAR), did not glean meaningful data for the agency to use to meet the monitoring requirements of 34 CFR § 602.19. Because the agency did not require submission of accurate data, as required by 34 CFR § 602.18(d), it could not enforce its student achievement standards as required by 34 CFR § 602.20. The agency had written procedures for reviewing institutional contracting-out of educational services, as required by 34 CFR § 602.22(a)(2)(vii), but imposed no consequence for the institution's ongoing failure to comply with them. Either its personnel lacked the skill and training required by 34 CFR § 602.15 to act on the pervasive evidence of institutional misconduct before them, or its processes were such as to prevent them from doing so. In either case, the agency was ineffective in its accrediting role. And those personnel, in failing to report agency findings in response to a direct request from the Department, either intentionally

breached, or were oblivious to, ACICS's fiduciary responsibilities as a Title IV gatekeeper, in violation of 34 CFR § 602.16(a)(1)(x) and 34 CFR § 602.27(a)(7).

Fundamental failures of accrediting process such as ACICS's failure with respect to MJI are not susceptible to characterization as mere mistakes. And regardless of the quality of individual ACICS-accredited schools, or lack thereof, the record indicates that such failures by ACICS are the rule, rather than the exception.

By way of further example, a letter from the State of Wisconsin to Everest College (attached to the Final Analysis at 29), details a five month process in 2012 in which the Wisconsin Educational Approval Board (EAB), alarmed by reports of constant staff turnover and poor placement and retention at an Everest College in Milwaukee, discovered, through their own hands-on monitoring, that the institution's dropout and placement rates placed it far below ACICS's standards. The EAB set out in this letter, copied to ACICS, the institution's abysmal performance and failures to meet the commitments made to the EAB, as well as the involvement of the parent company, Corinthian Colleges, in the broken promises Everest made to the EAB.[2] Yet it was the State, not ACICS, that acted against the school. ACICS, in contrast, represented to Congress that the agency's subsequent re-accreditation of Corinthian-owned schools was fully warranted, *see* Third party comment of Ben Miller at 19 n. 11, and has incorrectly suggested in this recognition proceeding that the placement rate falsifications uncovered at Corinthian pertained only to Corinthian institutions accredited by other agencies, not it. *See, e.g.,* ACICS Exhibit 244. *See also* report-special-master-borrower-defense-3(5), attached to the Staff Analysis at 77 (documenting findings by the Department and the California Attorney General of

---

[2] At several places in its Comments, ACICS complains that the Department Staff and NACIQI have unfairly held them to the standards of an attorney general or other investigative body, and that the agency does not have the resources or responsibility to meet that standard. Of course, ACICS is not being held to that standard, but the Everest College situation demonstrates that ACICS failed to act even when it was expressly provided evidence of fraud by external regulators.

falsification of placement rates by Everest Colleges, warranting relief to federal student aid borrowers).

Another example is the case of Computer Systems Institute ("CSI") -- an institution ultimately denied recertification to participate in the federal student aid programs based on falsified placement rates -- the Department discovered that ACICS had re-accredited the institution despite the agency having discovered that "the majority of the contact information provided to [ACICS] to verify employment for graduates as placed on the [then-current annual monitoring report] is inaccurate and not current." FSA denial letter to Computer Systems Institute, attached to the Final Analysis at 29. ACICS took action against the school only after the Department denied recertification, notwithstanding ACICS's own, pre-existing knowledge of the unreliability of the data which CSI had been submitting in purported satisfaction of the agency's student achievement standards. Again, ACICS provides no explanation for its failure to require compliance with its own standards – nor for deficiencies in its processes that have enabled noncompliance. *See, e.g.*, ACICS letter to FSA re third-party verification, attached to the Final Analysis at 29 (indicating that ACICS's requirements that institutions provide contact information for employers for purposes of agency verification of placement are limited to the placements reported on the then-current annual monitoring report).

More broadly, a letter signed by thirteen state attorneys general, submitted as a third party comment, attests that:

> As consumer advocates in our respective states, our offices have investigated many ACICS accredited schools based on complaints from students, and found a fundamental lack of substantive oversight for student outcomes by the accreditor. Lapses that we have encountered include a failure to take action when improper placement statistics are reported, inadequate job placement verification processes, and a lack of transparency and cooperation with investigations into student outcomes.

8

*See* Third party comment submitted on the letterhead of Massachusetts Attorney General Maura Healey, at 2.   This letter reflects the signatories' first-hand experience with ACICS's ineffectiveness.   While ACICS disagrees that it has failed to cooperate with investigations, ACICS Exhibit 127, these attorneys general are best situated to evaluate ACICS's helpfulness, or lack thereof, in their investigations, and are entitled to a presumption of trustworthiness by virtue of their public service, whereas ACICS's evaluation of the facts inevitably is colored by self-interest.

Written third-party comments from two consumer advocacy groups echo charges by the attorneys general that ACICS has remained passive in spite of a steady procession of consumer-related government investigations, litigation, and high-dollar settlements involving ACICS-accredited schools and occurring throughout the agency's most recent period of recognition. *See* third-party comments attached as "M Thompson" and "ACICS Ben Miller." Most of the investigations, lawsuits and settlements these commenters reference are a matter of public record. Although some of the institutions involved, understandably, have offered self-justifications, *see* ACICS Exhibit 238, and although ACICS repeatedly points out that a number of the settlements include disclaimers of liability, *see, e.g.,* ACICS Exhibit 127 at 14, ACICS cannot explain away the number and amounts of these settlements as nuisance litigation, as that impugns the integrity of the attorneys general that brought the cases, and in some cases the competence of defense counsel. However, in the last analysis, ACICS's actions speak for themselves. In the face of this constant stream of legal actions, the agency's failure to even begin its placement verification process -- promised to the Department in 2013 -- until January 2016, when its petition for renewal of recognition was due (*see* ACICS letter to FSA re third-

party verification at 4, attached to the Final Analysis at 29),[3] reflects an ineffectiveness that is wholly inconsistent with renewal of recognition as a reliable authority as to the quality of postsecondary education.

The Staff Analysis and the Final Report describe pervasive noncompliance with the regulatory criteria, and the record fully supports the recommendations of the Department Staff and NACIQI to withdraw recognition.

## III.   DEPARTMENT STAFF AND NACIQI REASONABLY CONCLUDED THAT ACICS COULD NOT COME INTO COMPLIANCE WITHIN TWELVE MONTHS

If the SDO "concludes that an agency *will demonstrate or achieve compliance* with the criteria for recognition *and effective application* of those criteria within 12 months or less, the senior Department official *may* continue the agency's recognition" pending submission of a compliance report. 34 C.F.R. § 602.36(e)(3)(i) (emphasis added). Allowing the extended period for compliance is, by the plain language of the regulation, a discretionary act. Both the Department Staff and NACIQI Recommendations are based on their respective judgments that ACICS would not be able to meet the requirements of § 602.36(e)(3)(i), and therefore, continued recognition to allow ACICS to come into compliance and demonstrate "effective application" of the criteria would not be appropriate.[4]   The Department Staff respectfully submits that the Comments and exhibits submitted by ACICS do not provide evidence to allow the SDO to

---

[3] On page 11 of its Comments, ACICS claims that the Recommendations "ignore" evidence of alleged agency effectiveness resulting from the agency's use of algorithms designed to verify job placement data. But although the agency implies that the usage has been ongoing for several years (*see, e.g.*, ACICS Exhibit 121 at 2 ), the algorithms are part of the agency's "Placement Verification Program," (*see* Final Staff Analysis at 8 (Agency Response)), not introduced until January 2016. ACICS has no basis for contending that this belatedly adopted tool establishes that the agency will be any more effective going forward than it has been in the past, and especially in view of its failure to follow through on commitments made to the Department in 2013 that it was instituting independent verification of placement data.

[4] Transcript references to the discussion relating to the twelve month compliance period are set forth in the discussion below.

conclude that the ACICS will demonstrate both compliance with, and effective application of the criteria within a year.

### A.   ACICS's Past Performance Is the Best Evidence of Future Compliance

ACICS asserts that the Department's review of ACICS's petition for recognition was "markedly different from the manner in which Department Staff applied the federal recognition standards to ACICS during its last renewal when it was found to be in full compliance with the standards." ACICS Comments at 17.  ACICS's contention is not supported by the record, and calls attention to ACICS's track record of noncompliance.  The last review of ACICS's request for renewal of federal recognition was in June 2011, at which time the Department Staff found ACICS noncompliant with fourteen of the Secretary's criteria for federal recognition. As described below, many of these very same issues – including student achievement, monitoring, and enforcement – have reemerged and are at the center of the present Recommendations to withdraw ACICS's recognition, despite promises made by ACICS in its 2013 compliance report. As Mr. Porcelli described at the June 2016 Hearing:

> [After ACICS's 2013 compliance report] they were going to … do all of these verifications and it started off strong and then kind of it didn't meet what we thought it was going to do that … I can't say with confidence that these things would be effectively put into place…you can put anything on paper and promise it but it is the implementation that is really how we can judge an Agency.

Tr. 18:3-11.  *See also* Tr. at 160:18 – 161:5 (Third Party Oral Comments/Miller)("it made promises and those promises were too expensive.").

*1. Student Achievement – Licensure Rates.*  By way of example only, and as discussed in the Final Analysis, in the Agency's 2013 compliance report, ACICS "stated that programs that involve a license to become employed would need to demonstrate at least a 60% first attempt pass rate on the relevant licensure exams, and to be in compliance with all State or national

11

requirements." Final Analysis at 29 (regarding 602.16(a)(1)(i), Student Achievement). Despite this requirement, the Campus Effectiveness Plan ("CEP") provided in the petition does not include a reporting requirement for licensing exam rates. Moreover, ACICS did not provide any documentation regarding its decision not to require reporting on these rates, nor did it provide any documentation as to how, if, or when, the licensing exam rate data in the Campus Accountability Report (CAR) is reviewed by ACICS. Because licensing exam rate information is not included in the Accreditation Criteria thresholds, it is unclear if this outcome is being reviewed. *See* Final Analysis at 29; CEP (ACICS Exhibit 46); Accreditation Criteria (ACICS Exhibit 180 at § 3-1-11).

Additionally, as further stated in the Final Analysis, in response to the Draft Staff Analysis ("Draft Analysis"), ACICS provided "documentation concerning how it utilizes licensure rates. (Section 2-1-809). The licensure rate information is reviewed annually through the [CAR]. If the CAR reflects performance that does not meet the Council's student achievement standard for licensure at 60% the institution will be placed on an Improvement Plan as part of its CEP." Final Analysis at 29. However, in the Accreditation Criteria most recently adopted (effective July 1, 2016), the CEP focuses on six data elements, including "student learning outcomes." While licensure is included as an example for ways to measure those outcomes, specific licensure rates are not required. *See* ACICS Exhibit 180 at 144 (and discussed further immediately below). As a result, is unclear whether licensure has ramifications for accreditation status; and there is no explanation of how licensure rates are calculated. *Id.*

Thus, despite its promises to the Department to do so in 2013, ACICS's own accreditation manuals demonstrate that the agency has failed to establish *licensure benchmarks.* The Accreditation Criteria, effective January 1, 2016, provided as follows:

> Whenever possible, the Council encourages institutions to utilize standardized tests and industry-recognized licensure or certification examinations as direct assessment of student learning.

ACICS Exhibit 1 at 118 (Appendix H). The more recently adopted Accreditation Criteria, effective July 1, 2016, provides:

> 3-1-502. Programs Requiring Certification or Licensure. For institutions offering programs in which state certification, licensing, or registration is mandatory in order to become employed in a specific career field, curriculums must contain the necessary course work to afford students the opportunity to obtain the minimum skills and competencies in order to become certified, licensed, or registered in that career field.

ACICS Exhibit 180 at 47. Neither of these provisions actually establish licensure benchmarks.

Thus, although in 2013 ACICS promised to establish a precise licensure policy, it did not follow through with an enforceable policy established in its Accreditation Criteria manual.

Also, ACICS's current policy regarding licensure does not include a requirement for tracking national licensure rates. As a result, students who are in occupational fields that require national licensure are not tracked and the Agency is not held accountable for monitoring their success. The recent "Memorandum to the Field," dated May 20, 2016 (ACICS Exhibit 206), does finally include a directive to collect licensure rates, and this directive is included in a new standard contained in the July 1, 2016 Accreditation Criteria. *See* ACICS Exhibit 180 at 52 (§ 3-1-704). It is important to note that this standard appears to have been adopted following the 2016 review of the Agency's petition, and in anticipation of the June 2016 NACIQI meeting. Thus, the change to the standard seems to be a reaction to the noncompliance noted in the Draft Analysis, rather than demonstration of a change that the Agency stated it was going to make in 2013.[5] Moreover, although ACICS has provided documentation that shows that other student achievement standards (retention, placement, pass rates) were specifically approved by the

---

[5] A June 2013 memorandum from Kay Guilcher (former Director of the Department's Accreditation Group) advised accrediting agencies that the implementation of standards need to be demonstrated in multiple examples.

council, it has provided no evidence to demonstrate that the Agency actually voted on, and approved the collection of licensure rates. *See* ACICS Exhibit 214 at Table B.

   *2. Student Achievement - Job Placement Rates.* As described in the Final Analysis, ACICS also represented in 2013 that it was initiating an employment verification process, having previously relied on spot checks of self-reported placement data. *See* Final Analysis at 29. In 2013, ACICS reported that it was "now moving to regular independent verification by pre-approved third party auditors. Initially, 20% of campuses will be randomly selected to have their rates independently verified each year, while all institutions coming up for renewed accreditation will be independently audited for the accuracy of their submitted student achievement data." *Id.* (describing ACICS's 2013 compliance report). In the 2016 review however, the Department Staff determined that ACICS was just beginning to explore third party verification: "ACICS has not documented implementation of such changes. Documentation indicates that ACICS did not follow through on these commitments & only recently began experimenting with verification." Final Analysis at 30 (discussing noncompliance with 602.16(a)(1)(i) (student achievement)).

   Despite its 2013 promises, ACICS representatives stated at the Hearing that the agency took "2 years to conduct a study of placement verification" and that "we felt that was more verifiable than a third party doing it which is why we are doing an in-house process and have and will scale that up to a yearly process whereby we will be looking at all schools to verify that placement." Tr. at 243:5, 243:15-17. ACICS's lack of urgency in regard to job placement rates is stunning when measured against the reality of placement rate fraud made public by the state Attorneys General and in other litigation. *See, e.g.,* Final Analysis at 29-30.

   Beyond its failure to meet its 2013 promises on job placement verification, the evidence relating to this issue illustrates the impossibility of demonstrating compliance in a twelve month

14

period. Even at the Hearing, Agency representatives spoke of "plans": "what we will plan to do is have an automated process whereby we will take the monthly process that we are doing now known as the placement verification process and expand that into the yearly process where we will have timely information where we can automate responses from students and employers to verify whether those graduates were placed in that job." Tr. at 243:7-12. Given the amount of time that it will take to establish the verification process, to train individuals to perform the verification, and the collection of data over a sufficient period of time, it is unlikely that the agency would be able to demonstrate that they have both standards and have successfully implemented the related processes within the twelve month period that would be required for compliance.

### B.    ACICS Will Not Be Able to Demonstrate Compliance With All Criteria Within Twelve Months

### 1.    Current ACICS management is responsible for the noncompliance.

NACIQI member Cameron Staples was representative of many of his colleagues in expressing his skepticism that given the ACICS's past history, NACIQI could trust that the current management would be able to bring the agency into full compliance within twelve months:

> I think we have had a number of people from the Agency who I think are sincere but when you see a three year history of a failure to monitor and enforce and then you see a several month period immediately preceding a hearing on your recognition when everything becomes stirred up and all the [then] commitments are made. … [T]here's a genuine question about whether we should -- based on that history of inaction be confident that anything substantive would happen in 12 months in the areas that matter most. … I don't think we can lose track of that. We have to base our assessment on evidence not just based on words.

> I mean there's not an agency that we recognize that wouldn't come before us on the day of their recognition hearing and profess to correct every deficiency identified but where is the evidence that it was even on their radar screen until [Department Staff Analyst

Porcelli] met with them two months ago and they seemed to wake up to the reality that they were at risk and I think … to me that has to be part of our calculus.

Tr. at 269:13 – 270:3. *See also* Tr. at 67:8-10 (LeBlanc) ("track record in my mind is still the best predictor of future performance and I just don't see the evidence that given the widespread systemic failures of this agency that [they] can turn this around").

Much of NACIQI's concern was based on the fact that the management in place had not really changed. Following the departure of former ACICS President Gray following the April 2016 Board meeting, Anthony Bieda has served as the executive in charge of ACICS's operations, as well as the agency's relationships with the Department, state approval agencies, and member institutions. Tr. at 73:7-12 (Bieda). Mr. Bieda is not new to the Agency however; he has been employed by ACICS since 2008, and has been its compliance manager since 2012. Tr. at 139:13-18. As NACIQI member LeBlanc pointed out in a colloquy with Mr. Bieda: You were a VP of accredited operations that have been in place since 2014, you are senior accreditation coordinator since 2013 … fundamentally we are being asked to take a leap of faith and that leap of faith in my view is that the team that was part of this colossal failure in my view, let's not be overdramatic... . The team that was part of the systematic failure more fairly is now going to be the team that can turn this thing around and do incredibly hard work, the very substantial work if delivered on and to do it in a very short period of time."

Tr. at 139:19 – 140:6; *see also* Tr. at 164:20-22 (Third Party Oral Comments/Miller) ("this is an agency that doesn't currently have an Executive Director, the person running it and making all of these changes is someone who has been at the agency for years").

Not only has Mr. Bieda played a central role during the period of systemic failure, the Board is essentially the same, and it was that same Board[6] whose Chairman, Dr. Lawrence Leak, was "shocked" in April 2016, when Mr. Porcelli of the Department Staff told the Board about ACICS's deficiencies. Tr. at 252:20 – 253:8 (Leak). Indeed, Board Chairman Leak readily acknowledged that the Board was unaware (or claimed to be) of the Agency's failures, having put unquestioning confidence in the former president, even as to how ACICS was "handling all of the different allegations from the Attorney Generals." *See* Tr. at 244:9-12 (Leak). Thus, when Mr. Porcelli addressed the Board:

> [Y]ou could hear a pin drop in that room. He gave us his unvarnished assessment of what the Department thought of us and it was the first time for me as a Board member and for my Board member colleagues to hear first-hand from a senior office[r] at the Department was they thought of us. It was sobering, it was jolting and it was not consistent with what we were thinking we were at with the Department.

Tr. 244:22 – 245:5 (Leak). In its Comments at page 25, ACICS refers to this same statement by Chairman Leak, and citing the same transcript excerpt, ACICS substitutes its own words, and its paraphrase reveals volumes about its fidelity to accuracy and truth. Citing the excerpt quoted above, ACICS describes Mr. Porcelli's words as follows: "At that meeting, Mr. Porcelli addressed the Council, and emphasized how political pressure was dictating treatment of ACICS's Petition; he told the Council: I don't think you understand what trouble you are in."[7] This recounting of the meeting is woven from whole cloth, as the actual quote from Chairman Leak makes abundantly clear – he makes no mention of Mr. Porcelli talking about political pressure.

---

[6] *See* Tr. at 165:1-6 (Third Party Oral Comments/Miller) (there have not been "major changes in terms of the Board apart from the one individual who was removed").

[7] Although ACICS cites to a few more lines in the passage (*i.e.,* Tr. at 244:17 – 245:15), those additional lines do not support its assertion.

Another factor that supports the Recommendations is the agency's financial condition in light of the great effort and expense involved in reaching compliance with all of the criteria in a short period of time. In its review of the financial capability criterion (34 C.F.R. § 602.15(a)(1)), the Department Staff asked ACICS for specific details to describe how it planned to operate efficiently and effectively in light of reduced revenue, given the contraction of the private career college sector. *See* Final Analysis at 14-15. Following receipt of the agency's audited financial statements for the year ended June 15, 2015, the Final Analysis expressed the Department Staff's concern "that a greater-than-expected contraction could adversely affect the agency's already questionable effectiveness when it comes to monitoring and enforcement issues." *See* Final Analysis at 15. ACICS was found out of compliance on this criterion because it needed to submit its FY 2015-2016 audit, and its FY 2016-2017 budget, and demonstrate that its reserves and planning "can weather highly-probable long-term decreases in budgeted revenue." Final Report at 1; *see also* Final Analysis at 15. Whatever the voiced intentions of Messrs. Bieda and Leak, it was reasonable for the Department Staff to conclude that economic constraints are inevitably going to impact the agency's ability to effect wide and deep change.

A true barometer of the Agency's sincerity on "turning the ship around" is perhaps best exemplified by what happened at this year's ACICS's annual conference, as reported by Third Party Commenter Miller, who visited the conference. Mr. Miller described a presentation by a representative of Daymar College (which had reached a $12.4 million settlement with the Kentucky Attorney General, Final Analysis at 43) and its attorney. Mr. Miller recounted: "[At this NACIQI Hearing, ACICS is] making all of these promises of contrition and then [at the annual conference] people [are] speaking to [its] members in a key note session ... all about ways to avoid problems with the [state attorneys general]." Tr. at 161:20 – 162:8.

18

2.     **The areas of noncompliance require the application of new standards, processes and protocols, and compliance cannot be demonstrated in twelve months.**

Mr. Porcelli of the Department Staff stated during the Hearing:

[W]e believe that the Agency could not satisfactorily demonstrate compliance with all of the cited issues within the 12 month period provided by the regulations to do so.

This is particularly the case in view of the Agency's very recent circulation of numerous revisions to its standards and practices that have not been fully approved by its members or implemented and proven effective.  As well the Agency's weak record in monitoring enforcement of its member institutions is a pressing concern.

Tr. at 9:21 – 10:6.  As discussed at the Hearing by NACIQI, Department Staff, and ACICS, there are some areas of non-compliance that ACICS can remedy by providing certain documentation, other areas might require a new policy or procedure, but implementation could potentially be accomplished within the year.  Nevertheless, there are several criteria for which ACICS will be unable to demonstrate compliance within twelve months, because it will be unable to show effective implementation of its standards, particularly in situations where it has adopted (or has promised to adopt) a new standard, policy or procedure.[8]  The Department Staff has determined that ACICS will not be able to meet the twelve month limit to accomplish the necessary corrective measures to demonstrate compliance in the following areas:

602.13 Acceptance of the agency by others - The agency still needs to address how well graduates of its institutions succeed on those licensing exams that are required for employment, especially by using data specific to each licensing exam. In addition, the agency still needs to provide documentation of continued positive relationships with state licensing-related entities and nurse accrediting agencies, especially by providing current documents.  (Final Report at 1; *see also* Final Analysis at 6-9).

The ACICS petition failed to provide current evidence of wide acceptance by state licensing authorities.  Final Analysis at 9.  In addition, the Agency's current policy only requires tracking of state licensure (ACICS Exhibit 180 at §§ 3-1-502 and 3-1-503), and the Department Staff

---

[8] This is because of the demonstration of multiple examples that are now required for renewal of recognition. *See* n. 5, *supra.*

determined that it was out of compliance for not tracking licensure exam results that are required *for employment*, not just for state licensure. This would require a policy change and time to collect the results of licensure exams and evaluation of that data and follow-up actions, which the Department Staff reasonably concluded cannot be accomplished within the twelve month maximum period.

\*\*\*

> 602.15(a)(2) Competency of Representatives- The agency needs to document how its revised training program for all volunteers provides more focus on consistently recognizing problems and questionable practices at institutions, particularly concerning student achievement. In addition, the agency needs to document that each volunteer has undergone the improved training process before being permitted to fulfill the tasks assigned to them. Furthermore, the agency needs to document the membership and activities of its new Ethics Review Board. It needs to document the integrity and sufficiency of its data verification regime, both in design and implementation. (Final Report at 1; *see also* Final Analysis at 19-20).

Although ACICS could possibly document training alone in one year, it would also need to review documentation from several institutional reviews to evaluate the efficacy of its new policies and activities. As set forth in the Final Analysis and above, since falsification of employment data was so widespread in some ACICS-accredited institutions, documentation would need to be provided for several years of verifiable data, and accordingly, the Department Staff reasonably concluded it would take more than one year to establish compliance with this criterion.

\*\*\*

> 602.16(a)(1)(i) Student Achievement- The agency must effectively demonstrate that it has resolved issues of widespread placement rate falsification. The agency must explain its delay in implementing verification it promised to begin performing in 2011. The agency must specifically explain what actions it took with respect to each pending or settled State or federal lawsuit initiated for the benefit of students against ACICS-accredited institutions in the last 5 years to demonstrate that its actions were appropriate and effective. The agency must also demonstrate that it took follow up action on evidence it had that placement rate data submitted by institutions was unreliable. The agency must

also provide current documentation policies/practices to address the non-compliant issues. (Final Report at 2; *see also* Final Analysis at 29-30).

602.18(d) Reasonable Assurance of Accurate Information - The agency must have a reasonable basis for determining that the information it relies on for making accrediting decisions is accurate. The agency must clarify how the agency holds institutions accountable for ensuring integrity in their data submissions and explain their verification processes. The agency must provide documentation demonstrating that they have applied their standards (such as an onsite visit Final Report). (Final Report at 2; *see also* Final Analysis at 70-71).

Given ACICS's past history, the Department Staff reasonably concluded that compliance with these criteria within a year is simply not possible. ACICS was found noncompliant as a result of its egregious lack of vigilance about placement rates, even as information became publically available by virtue of state and federal investigations and litigation. As discussed above (and below) in the context of promises made in 2013 that were not met, the Department Staff determined that ACICS had just begun to explore third party verification of institutional placement rate information. "ACICS has not documented implementation of such changes. Documentation indicates that ACICS did not follow through on these commitments & only recently began experimenting with verification." Final Analysis at 30 (discussing noncompliance with 602.16(a)(1)(i) (student achievement)); Final Analysis at 70-71 (discussing noncompliance with 602.18(d)(reasonable assurance of accurate information)). Because they are among the most critical areas of noncompliance, and given the nascent stage of the Agency's verification plan, the Department Staff reasonably determined that compliance with these criteria could not be demonstrated within one year.

Additionally with regard to 602.16(a)(1)(i), ACICS has provided inconsistent information to the Department Staff relating to the student achievement information that it is collecting. In December 2015, the Institutional Effectiveness Committee ("IEC") voted to remove "graduation rates" as a benchmark of student success. *See* ACICS Exhibit 217 (Committee Minutes). Yet, in

21

its January 1, 2016 Accreditation Criteria, "graduation rates" is identified as one of six elements

that are evaluated for institutional effectiveness. *See* ACICS Exhibit 1 at 48-49, 92. However, in

its new Accreditation Criteria (effective date July 2016), "graduation rates" are specifically

removed from the document as a required element, and replaced with "level of graduate

satisfaction." *See* ACICS Exhibit 180 at 152, 154, 155. Clearly, "graduate satisfaction" only

measures information from those that actually complete the program, and is a different measure

from the traditional "graduation rates" that are commonly included in the accreditation process

by recognized accrediting agencies. Thus, the Department Staff viewed this as "a significant

retreat in accountability of the agency's institutions." *See* Final Analysis at 30. Now, ACICS's

position on requiring graduation rates to be measured appears seems to be evolving even further

– at the Hearing, ACICS representative Mr. Brieda stated that "we do not currently have a

graduation rate but we are working to add that to the portfolio." (Tr. at 86:9-10). Thus, given

this ever-shifting position, it remains unclear how ACICS is systematically evaluating the

institutions that it accredits if it saying one thing in documentation, but communicating another

to NACIQI.

***

> 602.16(a)(1)(v) Fiscal/Administrative Capacity- The agency needs to fully implement its
> plans to more consistently review and identify at-risk institutions. In addition, the agency
> needs to develop and implement its strengthened expectations for visiting teams to more
> consistently uncover institutional fiscal and administrative problems while on-site. (Final
> Report at 2; *see also* Final Analysis at 38-39).

The Department Staff noted that the Agency did not provide any plans to enhance the focus of

this area during site visits. ACICS did however, recently create an "At-Risk Institution"

committee, and developed some "paper reviews" to better evaluate institutional financial and

administrative capacity. Final Analysis at 38-39. Although these are positive changes, they

22

would have to be fully implemented, and ACICS would have to demonstrate application and actual results in identifying fiscal and administrative problems in its institutions. Final Analysis at 39. This is something which ACICS has been unable to do consistently over the past few years. Thus, the Department Staff reasonably concluded that effective implementation of its new plans and protocols to evaluate financial and administrative capability, evidenced by actual documentation from multiple institutions, could not be accomplished within one year.

\*\*\*

602.16(a)(1)(vii) Recruiting & Other Practices- The agency needs to fully implement its new and strengthened initiatives regarding misrepresentations to prospective students and abusive recruiting. In addition, the agency needs to regularly verify that each institution's recruitment process is complying with the new ACICS requirements. (Final Report at 2; *see also* Final Analysis at 43-44).

The crux of ACICS's noncompliance in this area is its repeated failure to take action to launch its own inquiry, even when information was publically available regarding job placement rate misrepresentations at ACICS-accredited institutions. *See* Final Analysis at 43-44. ACICS's new protocols for placement rate verification have not been fully developed or implemented, and the Agency would need to obtain documentation from numerous institutions to verify the effectiveness of its new measures, and to verify that each institution's recruitment process is complying with the new ACICS requirements. (*See* discussion above regarding 34 C.F.R. § 602.16(a)(1)(i)). That documentation would need to include evidence of a review of compliance with ACICS's policy at each of its accredited institutions, as well as documentation of any necessary follow up action for those institutions that are found to be out of compliance. As stated above, given the seriousness of the past institutional violations, and the relative newness of the verification plan, the Department Staff reasonably concluded that compliance with this criterion could not be accomplished within a year.

23

\*\*\*

> 602.16(a)(1)(ix) Student Complaints- The agency needs to continue implementing its strengthened process for obtaining and evaluating the record of student complaints for each institution. In addition, the agency needs to compile evidence that its strengthened process is effective in practice. (Final Report at 2; *see also* Final Analysis at 48-49).

The exhibits submitted by ACICS include examples of efforts to address student complaints, and ACICS describes new protocols for addressing this criterion. ACICS Exhibits 220-22, 224-25 are dated during March, April and May 2016; ACICS Exhibits 61, 71 and 73 reflect earlier complaint reviews for only two institutions. Citing its "Executive Directive and Memo to Evaluators" (Exhibit 245), ACICS asserts that "[i]n the event immediate additional review and enforcement is merited, ACICS effectively responds at the administrative level in a decisive, effective manner." Final Analysis at 48. As with many of ACICS's other plans and protocols, this one too is very recent: it is dated June 3, 2016. Again, there is simply not enough time to demonstrate the effectiveness of ACICS's current efforts to address student complaints within the twelve-month timeframe.

\*\*\*

> 602.16(a)(1)(x) Title IV Responsibilities- The agency does not meet the requirements of this section of the criteria. The Department cannot see how the agency could apply these revisions in such a way as to document effectiveness in monitoring in the time it would be given to respond in a compliance report, particularly in view of its weak record in monitoring and failure to document enforcement, and prior lack of cooperation with the Department. (Final Report at 2; *see also* Final Analysis at 50-51).

> 602.27(a) (6-7), (b) Fraud and Abuse- The agency's Accreditation Criteria provided fail to comply with the requirements of this section and as a response for this item are not effective until July 1, 2016. (Final Report at 3; *see also* Final Analysis at 131).

The Department Staff properly analyzed ACICS's performance in respect to the Title IV criteria in the context of its noncompliance in other areas, including student achievement, monitoring, and enforcement. In particular, the Department Staff considered ACICS's failures with regard to

MJI, and the fact that ACICS failed to disclose to the Department its own findings regarding MJI's serious violations of Title IV. The Department's own investigation of MJI later revealed what ACICS knew or should have known: that the institution operated primarily by recruiting and awarding Pell Grants to individuals who sought the funds to finance ineligible religious studies at ineligible foreign institutions rather than using them to study in programs that MJI purported to offer. *See* Final Analysis at 51 (referring to MJI Letters, dated February 25, 2016 and April 15, 2016, included in the "Michigan Jewish Institute Documentation," which is attached to the Final Analysis at 51).

As the Department Staff concluded: "While the agency has provided its revised multi-faceted approach to monitoring which will target and apply increased monitoring/reporting of specific schools that are not meeting agency standards/expectations, the Department is concerned regarding whether the agency will be able to demonstrate and provide documentation that it collects information in the appropriate time lines and follows up on a variety of reporting areas including for example, financial, student achievement, retention, and job placement data along with the institution's Title IV responsibilities." Final Analysis at 52. Thus, given its past performance with regard to MJI, combined with the other areas of noncompliance for which ACICS would have to demonstrate compliance, the Department Staff reasonably concluded that ACICS would not be able to demonstrate compliance with its responsibilities under 34 C.F.R. §§ 602.16(a)(i)(x) and 602.27(a) (6-7), (b) within the twelve-month timeframe.

***

> 602.17(a) Mission & Objectives- The agency does not meet the requirements of this section. The agency must clarify its policies and procedures relative to its new data integrity standards and new team reviewer. The agency must also demonstrate that it has applied these standards. (For example, in a site visit Final Report). (Final Report at 2; *see also* Final Analysis at 56).

25

> 602.17(c) On-Site Review- The agency needs to provide evidence that its regular on-site visit process currently and consistently obtains sufficient information to determine if the institution complies with ACICS standards. (Final Report at 2; *see also* Final Analysis at 59-60).

As with the other areas of noncompliance, ACICS would need to provide documentation of site-visit reports from numerous institutions to document its review of institutions under the new standards and protocols it has recently implemented to strengthen review of these criteria. *See* Final Analysis at 56 (602.17(a)), 60 (602.17(c)). Given that these criteria are now governed by updated standards, *see* ACICS Exhibits 203, 206, 235, it will take a sufficient number of site visits to different institutions over several accreditation cycles to ensure that the updated standards and protocols are effective, and to establish ACICS's compliance. Indeed, the data integrity standard is not even effective until August 1, 2016. Final Analysis at 56. Thus, compliance within twelve months cannot be reasonably demonstrated.

***

> 602.19(b) Monitoring- The agency must demonstrate that it could apply revision in such a way as to document effectiveness in monitoring in the time it would be given to respond in a compliance report, particularly in view of its weak record in monitoring and failure to document enforcement. Also, the agency must demonstrate that it provided the appropriate information and documentation of the use of all monitoring mechanisms included in the agency's narrative as requested in the staff draft analysis. (Final Report at 2; *see also* Final Analysis at 75-77).

Implementation documentation will have to be submitted to reflect the complete cycle of events for ACICS to demonstrate the effective application of its policy, because of the agency's well-documented failure in monitoring its institutions. For the same reasons identified with regard to 602.16(a)(1)(i), ACICS would not be able to demonstrate compliance with 602.19(b) within twelve months, for the simple reason that its new Accreditation Criteria were not effective until July 1, 2016, and they include a revised set of monitoring and evaluation protocols. *See* ACICS Exhibit 180. The complete cycle would include evidence of monitoring and collecting of the

26

information, and the agency's review, assessment and action relative to the collected data/ information.

*** 

602.20(a) Enforcement Timelines- The agency's response to the documentation requests regarding enforcement of timelines was insufficient. In addition, the agency's proposed language revisions are insufficient and have not been finalized and implemented, and the agency has been ineffective in past efforts to bring itself into compliance. As a result, the agency cannot be found in compliance with the requirements of this section. (Final Report at 2; *see also* Final Analysis at 82-84).

602.20(b) Enforcement Action- The agency's proposed policy language regarding good cause extensions does not include a maximum time period, as requested. In addition, the agency did not provide the requested documentation demonstrating ACICS took immediate adverse action when an institution did not bring itself into compliance within the specified time period. As a result, the agency cannot be found in compliance with the requirements of this section. (Final Report at 2; *see also* Final Analysis at 85-86).

ACICS's policies relative to enforcement remain problematic as noted in the Final Analysis at 83-84:

Ambiguities and inconsistencies remain, such as the timeframes for enforcing student achievement standards, as well as the significance of agency "admonitions" and their consistency with this criterion. In addition, the revisions do not address the action of "accreditation deferred," and include exceptions to enforcement for "significant progress." These exceptions appear to enable multiple extensions based on unquantified improvement, negating the effectiveness of the standard. All of this precludes a determination that the revised policies would comply even if other policies were conformed with them.

As with its other revised standards, ACICS's enforcement standards are a work in process. Final Analysis at 83 (citing Exhibit 121 (regarding new enforcement initiatives)). ACICS's noncompliance on enforcement, as with monitoring, has to be viewed in the context of its significant failures over the past years. In addition, ACICS was asked to provide complete documentation to demonstrate that it initiated immediate adverse action or enforced the required time period for an institution found to be out-of-compliance with any standard. ACICS failed to provide the requested documentation with regard to ITT Technical Institutes, and

Westwood Colleges, and ACICS's response to state and federal investigations. Final Analysis at 83. The Agency was cited on noncompliance with enforcement in 2011, and the fact that it remains out of compliance "undercuts confidence in … its documentation of initiatives to revise its policies." *Id.* Thus, to come into compliance, ACICS would have to provide documentation demonstrating the application of its policies relative to each of the enforcement timelines required by 602.20(a) (1 year, 18 months, and 2 years). Because of those benchmarks, ACICS could not possibly demonstrate the complete cycle of review (initial identification of the noncompliance issue; assessment; commission decision; and follow up actions) within the twelve month compliance period provided for in the regulations.

As to most of the above areas, ACICS does not even seriously contend it is not out of compliance, but rather, once again, promises that it can and will bring itself into compliance within twelve months. *See* ACICS Comments at Exhibit B. Despite ACICS's proffer of promises, there is sufficient evidence in the record, as outlined above, for the SDO to reasonably conclude that ACICS cannot fully comply within a twelve month period as required by 34 C.F.R. § 602.36(e)(3). Accordingly, the Department Staff respectfully requests that the SDO adopt the Staff and NACIQI Recommendations and withdraw ACICS's recognition.

## IV.  THE REVIEW CONDUCTED BY THE STAFF AND NACIQI HAS BEEN LAWFUL AND APPROPRIATE

Unhappy with the result of the Staff's and NACIQI's deliberations, ACICS in its comments attempts to identify some type of impropriety in them. Thus, it complains that it was subjected to new standards, and a "politicized" process, Comments at 13-15 and 24-26; implies that no Department personnel other than Department Staff should have been permitted to play a role in the proceedings, Comments at 3, 20-22, 26; that the Staff and NACIQI erred in considering the high incidence and nature of lawsuits against ACICS-accredited schools, and

28

thereby subjected ACICS to inappropriate expectations that it assume the role of a prosecutor or inspector general, Comments at 11-12, 17, 23-24; and that, in view of the Department's monitoring of Corinthian schools, the Department Staff and NACIQI erred in viewing the agency as accountable for its accreditation of those Corinthian schools it accredited, Comments at 18-20. These contentions fail in fact and in law.

Section 496(n)(2) of the HEA, 20 U.S.C. § 1099b(n)(2), directs the Secretary to "place a priority for review of accrediting agencies or associations on those agencies or associations that accredit institutions of higher education that participate most extensively in [Title IV, HEA programs] and on those agencies or associations which have been the subject of the most complaints or legal actions." Of the agencies under review and on the agenda for the June 2016 NACIQI meeting, ACICS institutions had the highest Title IV volume[9] and the most complaints received in the form of public comments of any Title IV gatekeeper. As shown in the accreditor dashboards made available to NACIQI in advance of the June 2016 meeting, ACICS institutions drew down $4.76 billion in Title IV aid in Award Year 2013-2014. Institutions accredited by Accrediting Commission of Career Schools and Colleges ("ACCSC") drew down $2.97 billion in Title IV aid during Award Year 2013-2014, and the Department Staff also reviewed ACCSC with extra scrutiny and asked similar supplemental questions. None of the other agencies under review during this cycle oversee even $1 billion in annual Title IV participation. Based on the information available and the amount of Title IV dollars at risk, the Department not only had the authority, but in fact the statutory obligation, to undertake the kind of rigorous review it did. There was nothing unfair or discriminatory about the process.

---

[9] Northwest Commission on Colleges and Universities institutions drew down $6.04 billion in Title IV aid, but that agency was before NACIQI for review of a compliance report, not a renewal of recognition.

### A. ACICS has not been Subject to New Standards

ACICS identifies no instance in which new standards were applied to it.  Contrary to the claims of ACICS (Comments at 13-14), all of the standards for recognition discussed in the January 20, 2016 memorandum from Lynn Mahaffie and the March 29, 2016 blog from Undersecretary Ted Mitchell have long existed in statute and regulation.  *See, e.g.*, HEA §§ 496(a)(4)(A), (*l*), (n)(1), (n) (3); 34 CFR §§ 602.17(a); 34 CFR § 602.3 (definition of recognition); 602.16(a); 602.19(b); 602.31(a)(2); 602.32(b).  Similarly, the April 22, 2016 letter from the Under Secretary, cited by ACICS on page 15 of its Comments, is not only bereft of new standards, but is neither cited in, nor relied upon, in any of the Staff, NACIQI or Department analyses of ACICS presented in these proceedings, and ACICS does not, and cannot, show otherwise.  The NACIQI pilot, referred to on pages 14-15 of ACICS's Comments, likewise contains no new standards, but instead, on its face, is intended to bring a more "systematic" (i.e., standardized) quality to the NACIQI's development of the record through testimony elicited in recognition proceedings.  Because the pilot contains no new standards, there has been no occasion for NACIQI to seek public comment on it, but it has been posted on the NACIQI web site at the Department since NACIQI adopted it at the December, 2015 NACIQI hearings, and it was applied to all agencies at the June, 2016 NACIQI hearings, rather than to ACICS alone.

In truth, ACICS's arguments regarding "new standards" are not focused on standards at all, but instead apparently oppose the application of "rigor" by Staff and NACIQI in conducting recognition proceedings.  *See* Comments at 13-15.  But ACICS is not entitled to a lack of rigor. The statute charges the Department with conducting a "comprehensive review and evaluation of the performance" of accrediting agencies seeking recognition," and with considering "all

available relevant information."   HEA § 496(n)(1), (n)(3).  The rights at issue in recognition proceedings are not those of agencies seeking recognition but instead those of the taxpayers and students who invest their money and, in the case of students, years of their lives, in pursuing credentials at educational institutions in reliance on the quality assurance provided by recognized accreditation.  The Department is duty-bound to apply the highest level of rigor it can bring to bear in conducting the comprehensive review required to determine whether agencies seeking recognition are performing at an acceptable level with respect to all of the parameters the statute and implementing regulations provide for it to consider.

### B. The Recommendations were not the Result of Improper or Unfair Political Pressure

ACICS's claims that its recognition proceedings were politicized fare no better.  The Department Staff's recommendation that ACICS would not be able to come into compliance within the one year maximum timeframe was based on the number of compliance issues, the scope of those issues, the newness of its revised standards, policies, and protocols, and the realities of implementation during the upcoming accreditation cycles – not political pressure.

Experience, not political pressure, guided the Department Staff, and they reviewed the compliance issues with the benefit of decades of experience in analyzing recognition petitions. *See, e.g.* Tr. at 267 (Bounds) (both Mr. Mula and Mr. Porcelli have been "doing this [for] 30 years").  Those years of experience – in analyzing this petition and many others before it -- reasonably led them to conclude that ACICS's noncompliance was so pervasive that it would not be cured within twelve months. *See* Tr. at 9:21 – 13:21 (Porcelli); Tr. at 48:5-10 (Porcelli) ("I have no confidence that they could do this in 12 months. … the judgment is [that] there are so many things and they are so deep rooted and if there were more time that would be great but there isn't"); Tr. at 49:1-10 (Bounds) (standards revisions came too late and took a "reactive

instead of a proactive" approach); Tr. at 52:12-15 (Porcelli) ("they don't meet the criteria at this point and … I don't have confidence that they could meet them in the 12 month period"); Tr. at 259:3-14 (Mula) (nothing that was said at the Hearing would change or impact his judgment and he "[h]onestly, cannot see [compliance] happening in one year"); Tr. 260:11-18 (Mula) (not enough time in a 12 month compliance period to demonstrate effectiveness of new monitoring standards because of due process timeframes for institutional compliance in the event of an adverse action); Tr. at 265:13 - 266:3 (Mula); Tr. at 266:13 - 267:19 (Bounds) ("based on our experience from what we have seen in the past.  We have had agencies with far [fewer] issues have serious trouble with meeting those standards in the 12 month time"); Tr. at 270:12-16 (Porcelli). *See also,* Tr. at 256:9-13 (McLarnon) ("We have heard before from this Agency that they would turn things around and they did not make good on their commitments.  We don't have confidence at this point that they will make good on this commitment").

Members of NACIQI brought their own experience and judgment to the twelve month compliance issue, and particularly focused on ACICS's "track record" of non-compliance in the past. *See, e.g.,* Tr. at 36:3-13 (Staples)("it really is a judgment as to how deep and how profound and how significant the issues are … [and] it is not just a matter of their capacity but it is whether you have confidence that they are even capable of implementing the standards as you described); Tr. at 67:2 – 10 (LeBlanc)("track record in my mind is still the best predictor of future performance and I just don't see the evidence that given the widespread systemic failures of this agency that [they] can turn this around [in twelve months]"); Tr. at 268:17-19 (Staples) ("there's a genuine question about whether we should -- based on that history of inaction be confident that anything substantive would happen in 12 months in the areas that matter most"); Tr. at 275:12 – 276:15 (Derby) (recognizing the amount of time spent by the Department Staff in

reaching their conclusions, and importance of the Staff's professional judgment, and noting with regard to the promises made by ACICS during the Hearing, "I find myself more persuaded by track record than I do by promise").

Although ACICS complains about a report issued by Senator Elizabeth Warren, Comments at 24-25, this report was not even included in the record until ACICS cited it in its brief. Moreover, NACIQI members neither can, nor are expected to, close their eyes to information they are exposed to day-to-day by virtue of that expertise; their expertise is the reason they are part of the process. *See* HEA § 114(b)(2).

More broadly, however – and notwithstanding the comments of CHEA President Judith Eaton, quoted at Comments at 26 -- the complaint of "politicization" flies in the face of the statute. In the 2008 reauthorization of the HEA, Congress provided for a diversity of political viewpoints just as it provided for a variety of other types of expertise to be represented on NACIQI. HEA § 114(b)(1). [10] The issue is whether the Recommendations are tied to and comport with the evidence of record regarding ACICS's performance that is pertinent to the statutory and regulatory requirements for recognition. They are and do, and ACICS does not attempt to show otherwise. The comments from Department Staff member Steve Porcelli at the Board meeting (albeit incorrectly reflected in the Comments at 25[11]) by no means establishes that "political pressure was dictating treatment of ACICS' petition," *see* Comments at p. 25. To the contrary, Porcelli testified throughout the hearing in support of withdrawal of recognition based on noncompliance with the criteria for recognition and the Agency's likely inability to come into

---

[10] Although ACICS quotes a statement from NACIQI member Ann Neal regarding the "need for 'due process to apply,'" Comments at 25, due process is not at issue here. ACICS has made no effort to show it has a constitutionally protected liberty or property interest, and ACICS has had the benefit of an extensive hearing process that has allowed it a meaningful opportunity to be heard. *In the Matter of Accrediting Commission for Community and Junior Colleges, Western Association of Schools and Colleges*, No. 14-10-O (Decision of the Secretary of Education, 4 January 2016) ("*In Re ACCJC*"), at 12-13.

[11] *See* discussion at page 17, *supra*, describing what Mr. Porcelli actually said.

compliance within the twelve month time frame, as detailed above. The statement attributed to Porcelli instead illustrates ACICS's continued obliviousness to its own lack of effectiveness throughout the expiring period of recognition, underscoring the soundness of the Recommendations to withdraw recognition.

Furthermore, contrary to ACICS's complaints, Comments at 25, it has been valuable, rather than improper, for State Attorneys General to participate in these proceedings. As members of the HEA "triad," states have an important role in ensuring accountability in HEA programs, *see, e.g.*, HEA § 496, and State Attorneys General are reliable sources as to academic bad actors and accreditor effectiveness in dealing with them. Indeed, § Section 496(n)(1)(A) of the HEA, 20 U.S.C. § 1099b(n)(1)(A), directs the Secretary to include in the evaluation of accrediting agencies "the solicitation of third-party information concerning the performance of the accrediting agency or association." As Department Staff made clear at the Hearing, in response to a question about inconsistency of reviews, the amount of information received regarding ACICS was much greater than any other agency under review: "it was such a deluge of information about ACICS that the information is found throughout the staff analysis and we didn't get a deluge of information about any other accrediting agency to this extent." Tr. at 44:10-12.

## C. The Involvement of Other Department Offices was Not Improper

ACICS cites no support for its position that the involvement of Department personnel in recognition proceedings must be limited to staff members of the Accreditation Group in the Office of Postsecondary Education, Comments at 3, 20-22, 26, and there is none. It is true that the Under Secretary and his Office participated in the efforts of the Department Staff to develop the record on the ACICS matter, and that the Under Secretary in a public statement at the

opening of the NACIQI meeting referenced the need in recognition proceedings to hold accrediting agencies accountable where appropriate. *Id.* As discussed above, however, the Department is charged by statute with conducting a "comprehensive analysis" in recognition proceedings, so it is entirely appropriate that knowledgeable personnel throughout the Department participate to the maximum extent possible whenever possible, and develop the record as fully as possible. This is especially so where, as here, Department Staff was faced with the almost unprecedented circumstance of what appeared to be pervasively ineffective performance on the part of a major accreditor.[12] As the SDO is aware, the Under Secretary and his office are not participating in any way in the SDO's decision-making process. Hence their involvement is wholly immaterial to the merits of this case.[13]

### D. The Department Staff and NACIQI Properly Considered Investigations and Litigation Involving ACICS Accredited Institutions

ACICS charges that the consideration by Department Staff and NACIQI of suits and settlements against ACICS-accredited institutions was improper, and somehow set the agency up in an inappropriate, "quasi-prosecutorial," role, are off the mark. It is quite true that accrediting agencies are not inspectors general or prosecutors, charged with uncovering fraud at large. They are, however, accountable for assuring compliance with their accrediting standards, which are expected to *effectively* address the topics listed in HEA § 496(a)(5) and the corresponding regulation, 34 CFR § 602.16(a). Those topics include success with respect to student achievement, as well as recruiting and admissions practices, publications, advertising, and

---

[12] ACICS' apparent expectation that each recognition proceeding will be conducted in cookie-cutter fashion is incorrect. "Recognition is an individualized and discretionary process." *In re ACCJC*, at p. 10.

[13] The suggestion that the will of NACIQI members could somehow have been overborne by the Under Secretary's remarks (Comments at 22) is frivolous. The Under Secretary made no reference to ACICS, none of the NACIQI members are accountable to him, and each NACIQI member has been selected based on his or her individual "experience, integrity, impartiality, and good judgment," as well as his or her "technical qualifications, professional standing, and demonstrated knowledge in the fields of accreditation and administration in higher education." HEA § 114(b)(2)(A), (C). As the Secretary has noted, "the recognition process is highly discretionary and relies on the professional experience and common sense of individuals at each level of the process." *In re ACCJC*, at p. 6

student complaints. And ACICS's chosen standards of student achievement look to placement and retention rates. The lawsuits considered in this proceeding are limited to those that have made claims directly pertinent to the accredited institution's compliance with such standards. That made them ACICS's business.

When such a lawsuit is filed, a recognized accreditor is expected to inquire into the institution's compliance with all accrediting standards implicated. The agency can, and should, obtain an accounting of the litigation from the accredited institution and perform such further investigation as is necessary to make a compliance determination. Those responsibilities do not end with a settlement to the litigation; accreditors can, and should, inquire of accredited institutions why the settlement was agreed to. The fact that a finding of non-compliance could lead to litigation, and that an inadequately supported finding could result in an adverse judgment, Comments at 12, are, in ACICS's words, "inherent to the role of accrediting agencies," and challenges other agencies are able to manage.

The extensive history of consumer-protection litigation brought against ACICS-accredited institutions, and their resolution in myriad high cost settlements, was a topic entirely appropriate for review in considering ACICS's petition for renewal of recognition. The fact that ACICS had so little to say about these cases during review by the Staff and NACIQI, and that it has so little to say about them now, supports the conclusions below that ACICS has not demonstrated the effectiveness required of a recognized accrediting agency.

## E. It is Reasonable to Hold ACICS's Accountable for Its Accreditation of Corinthian-Owned Schools

ACICS argues that in view of the Department's monitoring of Corinthian schools, it had no responsibility for its accreditation of those schools beyond "providing information as requested regarding the accreditation status of" ACICS-accredited Everest Colleges. Comments

at 18-20.  This position epitomizes ACICS's passive and ineffective performance as a recognized accreditor.  At no time did the Department advise ACICS that the agency was absolved of any of its responsibilities as a recognized accreditor with respect to those schools.  ACICS's assertion that "the Department was in charge of all Corinthian-related matters and investigations" (Comments at 19) is patently false and without support in any statement from the Department. Indeed, other regulators continued to perform their oversight activities, including ACCSC and state authorizing agencies.  The fact that the Department took the trouble to keep ACICS and others accreditors apprised of its actions was far from a reasonable basis for ACICS to assume that posture; had it inquired of the Department, it would have learned as much.  ACICS stood by passively, notwithstanding the ever unfolding-evidence of corporate-wide institutional fraud violative of its standards.  While ACICS is incorrect in suggesting that its failures of record are largely limited to the Corinthian-owned schools, the agency's lack of action with respect to those schools is certainly emblematic of the problems the Staff and NACIQI found.  ACICS is correct that it was not the only accreditor of Corinthian-owned schools, and the Department intends to inquire fully into the performance of each of those accreditors as they appear for re-recognition.

## V. CONCLUSION

NACIQI was clearly and justifiably troubled by whether the Agency could be trusted to turn the ship around, given its lack of urgency over the past years. As Ms. Derby commented, "too late is way too late ... . Why has it really been we are here in April that's only 2 months ago where there was a lot going on in the months and year that preceded it, that's my general question?" Tr. at 120:18-22.[14] In response, Mr. Bieda acknowledged that there had been "a confluence of concerns *over the last couple of years* some of them derived from external forces, some derived from the changes in the sector itself and changes in the economy... . And it just took the confluence of those things earlier this year, both when we encountered discussions with [Mr. Porcelli] *in April and subsequent to that* that catalyzed that initiative for change. A lot of these things have been building but suddenly there was manifest a much more pronounced sense of urgency." Tr. at 121:1-9 (emphasis added). It was at that point – years after these problems began and were widely publicized -- that ACICS apparently finally recognized that "just because we have always done things that way wasn't going to be good enough anymore." Tr. at 121:4-5.

History shows that it was not good enough in the recent past, it is clearly not good enough now, and it will not be good enough in the future. The SDO should withdraw recognition.

Respectfully submitted,

Counsel for the Staff
of the Office of Postsecondary Education

---

[14] *See also* Tr. at 160:18-20 (Third Party Oral Comments) (Miller) ("ACICS had years to get better. If these reforms are so serious why did they only start two months ago and why should the public or this committee trust that ACICS will do what it says?")

cc: ABieda@acics.org
abbaker@venable.com
KIngram@wtplaw.com
Jennifer.Hong@ed.gov
Herman.Bounds@ed.gov
Steve.Porcelli@ed.gov

# EXHIBIT 9

To Declaration of Allyson B. Baker

**ACICS's Response to OPE Letter to SDO of July 15, 2016**

**Via E-mail**

Emma Vadehra
Senior Department Official
U.S. Department of Education
400 Maryland Avenue SW
Washington, D.C. 20202

Re:   *ACICS's Response to Comments of the Office of Postsecondary Education to the Senior Department Official dated July 15, 2016*

Dear Ms. Vadehra:

This letter responds to the Comment submitted to the Senior Department Official (SDO) on July 15, 2016 by the Staff of the U.S. Department of Education's Office of Postsecondary Education (OPE) (below, "OPE Comment").  As you know, the OPE Comment was submitted in reply to the Comment of the Accrediting Council for Independent Colleges and Schools (ACICS or the "Agency") (below, "ACICS Comment") dated July 5, 2016.

We respectfully renew our request to have a meeting in person with you and your office to address the Staff and NACIQI recommendations as to ACICS's Petition for Continued Recognition.

In addition, ACICS takes the opportunity to point out some of the inaccurate statements contained in the OPE Comment.  We want to ensure that the SDO has the benefit of receiving information that is necessary and relevant to the important and precedential decision regarding the future of ACICS.

1.      The OPE focuses anecdotally on actions and decisions related to a handful of schools as a justification to deny ACICS accreditor recognition.  For example, the OPE holds out Michigan Jewish Institute as a "telling case in point" and "exemplar" of how ACICS violated its "authority and responsibility to ensure the quality of the institutions it accredits." OPE Comment at 4. The OPE's presentation fails to account for the fact that ACICS has operated for over 100 years and considered hundreds of schools for accreditation.  In each instance, the Agency has reviewed a school's accreditation status, and it has then actively followed its policies and procedures in place at that time.  In the case of MJI, for example, ACICS reviewed MJI compliance under existing ACICS standards, reached independent decisions about the institution's accreditation worthiness, and communicated those findings to the Department, the public and other oversight partners (including the State of Michigan). Yet, with 20/20 hindsight, OPE staff has substituted its judgment for that of an accreditor to turn the unfortunate sequences of events of one institution into a narrative that unfairly and inaccurately characterizes ACICS.

The OPE Comment also cites – incorrectly – the Computer Systems Institute ("CSI") as an example of ACICS's failure to act as a qualified accreditor. However, as was clearly outlined in the ACICS Comment, those CSI placement practices that the Department uncovered occurred years before ACICS granted accreditation to the institution, and the first time ACICS learned that CSI's placements from prior years involved irregularities was when the Department disclosed its investigation in January 2016. By April 2016, ACICS had revoked CSI's accreditation.

By labeling areas of MJI and CSI non-compliance with ACICS standards as "indicia of fraud," OPE has wrongly suggested that ACICS facilitated fraud; nothing, of course, could be further from the truth. OPE states that ACICS "complains" that it is being unfairly held to a standard of an attorney general or other investigative body. OPE makes the conclusory statement that "of course" ACICS is "not being held to that standard." Yet, OPE fails to demonstrate what alternative standard ACICS is being held to, and how that standard actually differs in any manner from the conduct expected of – and engaged in by – a formal investigative body. Despite unclear expectations from the Department, as stated in the ACICS Comment, ACICS is taking steps to adjust to a heightened expectation of fraud detection as part of the accreditation function.

2.     The OPE Comment, at pages 9 and 34, also relies heavily on a "deluge" of third party comments, including those of Ben Miller from the Center for American Progress (CAP), in an attempt to demonstrate ACICS's purported "passivity" concerning the schools that it has accredited. Mr. Miller and CAP, however, have had no interaction with ACICS regarding its accreditation standards or practices other than receiving from ACICS responses to CAP's limited requests for information. It is unclear why OPE gives Mr. Miller's comments such disproportionate weight.

OPE also ignores the fact that 33 of the 40 third party comments that were filed were solicited by a single third party called the Debt Collective; these comments are not tied to any accreditation criteria violation. Indeed, the Final Staff Report, pages 27-29, even acknowledges that "most of the [third party] commenters did not tie their areas of alleged noncompliance to specific sections of the Secretary's Criteria for Recognition" and were focused on allegations of institutional misrepresentation to students in various forms, none substantiated by the Department or any other body. As the Final Report states, "it is not clear that all of the issues raised in the comments would indicate noncompliance with the Secretary's Criteria for Recognition by the agency." Nevertheless, OPE uses the number of third party "complaints" filed as a justification for the Department's more rigorous review of ACICS's Petition. The OPE Comment simultaneously ignores the many positive comments that employers, schools, students and others filed regarding ACICS.

3.     OPE fails to acknowledge that establishing a meaningful and well-executed placement verification process (PVP), as ACICS has done, takes substantial time. Instead, the OPE Comment opines –without any basis for doing so – that ACICS has delayed its establishment of a PVP and that the fact of this delay "is wholly inconsistent with renewal of recognition as a reliable authority as to the quality of postsecondary education." OPE Comment at 9. Here, too, OPE ignores the actual facts and holds ACICS to a standard that no other accrediting agency has

been held to during its recognition or continued recognition process.

4.      The OPE Comment inaccurately argues that "past performance is the best evidence of future compliance."  OPE Comment at 11. This conclusion, which is not supported by recognition criteria, allows the OPE to minimize or disregard all of the information provided by ACICS to date to demonstrate changes in policies and procedures, and to focus instead on a licensing benchmark issue, which even the OPE Comment recognizes is being addressed by ACICS. OPE Comment at 13 ("The recent 'Memorandum to the Field,' dated May 20, 2016 (ACICS Exhibit 206) does finally include a directive to collect licensure rates, and this directive is included in a new standard contained in the July 1, 2016 Accreditation Criteria").  The OPE Comment also ignores the fact that since 1956, the Department has recognized ACICS as a reliable authority concerning the quality of education and training offered by the institutions that it has accredited.

5.      OPE appears to be concerned that ACICS has established and communicated a licensure benchmark through information posted on its website, but not explicitly memorialized in an accreditation criteria document. Comment at 11-14.  ACICS licensure/certification are elements of the "student learning outcomes" data element and are clearly explained as such in its ACICS Criteria.  However, none of the student achievement benchmarks (numerical thresholds) are specified in the Agency's Criteria by design. If ACICS decides to adjust those thresholds up or down in a given year, the Agency should not have to append the Criteria document in order to do so. Instead, ACICS conveys bright line benchmarks through means other than the Criteria to reflect the need for flexibility and responsiveness to changing conditions.  For OPE to look only to the past and to minimize progress that has been made to date mischaracterizes the hard work accomplished by ACICS between 2013 and 2015.

        Further, the OPE Comment attempts to minimize ACICS's compliance progress due to a conclusion that changes in ACICS standards "seem" to be in reaction to noncompliance noted in the OPE Draft Report.  OPE rests its argument on the "past is prologue" conclusion by criticizing the timing of new ACICS standards, which, once again, completely ignores ACICS's progress on these accreditation criteria.

6.      The OPE Comment also unfairly and inaccurately represents that ACICS will not be able to demonstrate compliance because of its current management.   Comment at 15.  Among other things, OPE misunderstands Mr. Bieda's history with ACICS.  Between 2008 and April 2016, he served as primary liaison for ACICS to the Department, state education agencies, Congress and other oversight partners in the capacity of Vice President of External Affairs.  He was not involved in setting or reviewing the Agency's accreditation process, its standards, practices or determining which resources would be deployed in that regard.  Rather, Mr. Bieda was previously responsible for communicating ACICS policies and procedures to stakeholders.

        Indeed, his first opportunity to engage in the operations side of ACICS began on April 15, 2016, and within a month of his appointment he undertook numerous changes.  For example, he engaged the professional services of a respected and veteran accreditation expert (Roger Williams) as a consultant on accreditation matters.  Mr. Bieda also has recruited and established a special advisory committee who will augment the program of reforms and enhancements to the Agency's accreditation review process.

7.      The OPE Comment also misrepresents a break-out session that occurred at the ACICS annual conference. Comment at Page 18.  The presentation in question involved one that a school and its attorney gave about how to handle State Attorneys General investigations.  Such a presentation was intended to be informative and a responsible way for the Agency to provide its members with a best practices approach for responding to civil investigative demands from law enforcement agencies.  And, of course, the content of any such meeting has no relationship to stated recognition criteria.  Furthermore, the OPE Comment relies on a third-party's one-sided representation of that break-out session; this, too, is hardly a stand-in for a reliable and probative assessment of ACICS's intentions and capabilities, which have been described in great detail in its numerous responses to the Department, NACIQI and in its Comment to the SDO.  It is these capabilities that the SDO should review and consider, not the unreliable observations of a third-party concerning conduct that has no relationship to recognition criteria.

8.      The OPE Comment also unfairly asserts that ACICS "will be unable to demonstrate compliance within twelve months, because it will be unable to show effective implementation" of new standards that it has promised to adopt in order to comply with the Department's findings.  Comment at 19.  Taken to its natural conclusion, such logic means that no agency – including, but not only, ACICS -- could ever demonstrate compliance within 12 months when that agency implements new or enhanced policies.  Further to this point, the OPE supports this apparent conclusion by explaining that "this is because of the demonstration of multiple examples that are ***now required*** for renewal of recognition," a clear acknowledgement that the Department is also imposing a new set of standards on ACICS.  Comment at 19 n. 8 (emphasis added).

9.      OPE also erred in stating that the ACICS data integrity standard is "not even effective until August 1, 2016."  In fact, that standard became effective July 1, 2016 along with many other reform standards approved by Council in April 2016; shared by ACICS with the field in May 2016; adopted as final in May 2016; and effective on July 1, 2016.  This error was in the original ED Staff report, and the OPE Comment incorrectly replicates this error.

10.     OPE asserts that the Department's review has been lawful and appropriate, and that there has not been any "unfair political pressure." Comment at 31.  But the record belies this assertion, as noted throughout ACICS's Comment to the SDO.  Indeed, prior to the current recognition cycle of ACICS, OPE would be hard pressed to show any example of intervention by elected officials (such as members of the U.S. Senate and State Attorneys General) in writing, on the record, in advance of (1) the issuance of a Staff Report or 2) deliberations by NACIQI. That is because the recognition process -- by design and intent -- is non-political; it is only fair to expect that any elected official will participate in any recognition decision-making process at arm's-length, regardless of that official's political affiliation.


        We thank you for the opportunity to provide this additional information and look forward to meeting with you in person to discuss further ACICS's Petition for Continued Recognition.

Respectfully submitted,

/s/ Allyson B. Baker
Allyson B. Baker
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone:  (202) 344-4000
Facsimile:  (202) 344-8300
Email:  abbaker@venable.com

Kenneth J. Ingram
Whiteford Taylor Preston, LLP
1800 M Street, NW
Suite 450N
Washington, DC 20036
Phone: 202.659.6790
Fax: 202.327.6140

***Counsel, Accrediting Council for Independent
Colleges and Schools***

# EXHIBIT 10

To Declaration of Allyson B. Baker



# UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, DC 20202

September 22, 2016

Roger J. Williams, Interim President
750 First Street, NE, Suite 980
Washington, DC 20002-4241
rjwilliams@acics.org

Dear Mr. Williams,

I am writing to inform you of my decision regarding the recognition of the Accrediting Council for Independent Colleges and Schools (ACICS, or the agency). Department of Education staff and the National Advisory Council on Institutional Quality and Integrity (NACIQI) have each made recommendations to me. These recommendations were made under Sections 114 and 496 of the Higher Education Act of 1965 (HEA), as amended, and pursuant to relevant statutory and regulatory provisions.

Both the Department staff and NACIQI recommended that I deny ACICS's petition for recognition and terminate ACICS's recognition as a nationally recognized accrediting agency.

As required, I considered the full record related to this matter—including ACICS's petition for renewal, the final staff report from Department of Education staff, the transcript of the agency's appearance before NACIQI on June 23, 2016, NACIQI's recommendation, and the comments submitted under 34 C.F.R. §602.35 by both ACICS and Department staff after the NACIQI meeting.

Having reviewed the record before me, I concur with the recommendations of Department staff and NACIQI. Accordingly, I am terminating the Department's recognition of ACICS as a nationally recognized accrediting agency.

ACICS was found to be in violation of numerous regulatory criteria. Department staff reviewed a large amount of information from a variety of sources, and in the final staff report identified 21 areas where ACICS was out of compliance with the applicable regulations. I agree that ACICS is out of compliance in these areas—specifically:

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

34 C.F.R. §602.13  
34 C.F.R. §602.15(a)(1)  
34 C.F.R. §602.15(a)(2)  
34 C.F.R. §602.15(a)(3)  
34 C.F.R. §602.15(a)(5)  
34 C.F.R. §602.15(a)(6)  
34 C.F.R. §602.16(a)(1)(i)  
34 C.F.R. §602.16(a)(1)(v)  
34 C.F.R. §602.16(a)(1)(vii)  
34 C.F.R. §602.16(a)(1)(ix)  
34 C.F.R. §602.16(a)(1)(x)  

34 C.F.R. §602.17(a)  
34 C.F.R. §602.17(c)  
34 C.F.R. §602.18(d)  
34 C.F.R. §602.19(b)  
34 C.F.R. §602.20(a)  
34 C.F.R. §602.20(b)  
34 C.F.R. §602.21(a)-(b)  
34 C.F.R. §602.22(a)(3)  
34 C.F.R. §602.24(c)(1)  
34 C.F.R. §602.27(a)(6)-(7), (b)  

Under the law, an accrediting agency that is out of compliance cannot have its recognition renewed. Agencies may, however, be given up to 12 months to come into compliance. The Department of Education staff report concluded that ACICS could not remedy many of the serious deficiencies identified and therefore come into full compliance within 12 months. During the NACIQI meeting, citing their judgment based on many years of experience, Department staff and multiple NACIQI committee members echoed the report's conclusions, despite recognizing that ACICS could likely remedy some of the deficiencies in 12 months.

At the NACIQI meeting and in its comments submitted after the NACIQI meeting, ACICS argued that it will be able to comply with each of the regulatory criteria within 12 months. ACICS points to a number of recent actions the agency has taken to address areas of non-compliance. I acknowledge that the agency has made recent efforts to address some of the deficiencies identified—including by revising various policies and restructuring internal governance bodies. Further, I recognize that it is possible for ACICS to fix some of the 21 compliance problems within 12 months. But overall, I agree with Department staff and NACIQI that ACICS could not come into full compliance within 12 months.

These violations reveal fundamental problems with the agency's functions as an accreditor. For example—and this list is not exhaustive—the staff report outlines major problems with: the rigor of the agency's accreditation and preaccreditation standards and its application of those standards (34 C.F.R. §§ 602.16(a) and 602.17); its monitoring of the institutions that it accredits (34 C.F.R. §602.19(b)); and the enforcement of its own accrediting standards (34 C.F.R. §602.20).

ACICS's track record does not inspire confidence that it can address all of the problems effectively. Many of the problems identified in the staff report are serious and long-standing. The agency still has not fully addressed issues originally identified in 2013, such as its verification of placement information from institutions. And most of the remedial efforts currently underway began in earnest just several months ago, despite having reason to take action long before that.

Finally, as made clear in 34 C.F.R. §§ 602.32(b) and 602.36(e), demonstrating compliance in this case requires more than just new policies that address the issues identified by Department staff; it requires evidence of effective application and implementation of those new policies, practices, and governance structures, which the agency simply cannot provide for all of these criteria within 12 months.

In sum, the evidence establishes that the recommendation of Department staff and NACIQI is reasonable and well-justified. I concur with that recommendation.

Pending any appeal to the Secretary under 34 C.F.R. §602.37, my decision to withdraw and terminate the Department's recognition from ACICS is the final decision of the Department.

Sincerely,

Emma Vadehra
Chief of Staff

# EXHIBIT 11

To Declaration of Allyson B. Baker

**ACICS's Request for Reconsideration of the SDO's September 22, 2016 Decision**

<u>**Via E-mail**</u>

Emma Vadehra
Senior Department Official
U.S. Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

Re:    *ACICS's Request for Reconsideration of the SDO's September 22, 2016 Decision*

Dear Ms. Vadehra,

The Accrediting Council for Independent Colleges and Schools (ACICS or the

"Agency") requests reconsideration of your September 22, 2016 decision as the Senior

Department Official (SDO) regarding continued recognition of ACICS as a nationally

recognized accrediting agency.  ACICS bases its request on new evidence that concerns: (1) the

Agency's new leadership; (2) its implementation of new policies; and (3) improvements to the

Agency's implementation of existing accreditation policies and procedures.  The new evidence

(either alone or when combined with the evidence already in the record) supports the conclusion

that ACICS should be re-recognized because the Agency can demonstrate and achieve

compliance with the criteria for recognition within twelve months.  In the alternative, ACICS's

Petition for Continued Recognition (the "Petition") should be returned to Department Staff

and/or NACIQI.  Further, ACICS respectfully requests to have a meeting in person with you and

your office to address your decision as to ACICS's Petition.

Moreover, the Agency accredits schools that enroll at least 580,000 students.  If ACICS's

recognition is withdrawn, it is possible – indeed, likely – that a significant number of the schools

that ACICS accredits will be unable to obtain accreditation from another agency during any 18

month grace period, if at all.  In the alternative, in order to move to obtain accreditation from

1

another agency, schools could be required to discontinue certain programs.  As a result, a significant number of students who attend schools that ACICS accredits could lose access to Title IV funding.  *See, e.g.*, Transcript of the June 23, 2016 NACIQI Panel Hearing ("NACIQI Tr.") at 38:11-19 (comment of NACIQI member Cam Staples) (noting that "even a good institution that finds an accreditor may go through a window of time where students don't have access to Title 4 funds").  In addition to Title IV funding, many students also could lose other benefits that stem from accreditation; these benefits would be lost immediately, once ACICS is denied recognition, including some of the following benefits:

- Funding for student financial aid programs other than Title IV programs (e.g. funds accessible through the Department of Defense or the Department of Veterans Affairs);

- The ability to transfer credits or satisfy degree requirements upon transfer;

- Eligibility for state licensure or certification and/or exams;

- Eligibility for programmatic accreditation, which may be required for professional licensure or certification;

- Eligibility for tuition reimbursement programs, including through private entities; and

- Eligibility for employment with certain federal or state employers.

For these reasons alone, we ask you to reconsider your decision to deny recognition to ACICS and grant ACICS continued recognition status.

**Background And Legal Standard For Reconsideration**

The gravamen of your September 22, 2016 decision appears to be a concern that ACICS may not be able to come into full compliance with the Department's recognition criteria within twelve months.  *See* Sept. 22, 2016 Letter from Emma Vadehra to Roger Williams ("Sept. 22,

2

2016 Letter") at 2.  However, "the vast majority of concerns can be dealt with" relatively quickly.  NACIQI Tr. at 265:11-12.

ACICS's ongoing actions demonstrate substantial compliance progress in key areas. Below, we describe some of these ongoing actions, including some developments that post-date ACICS's July 5, 2016 Comment to the SDO and July 25, 2016 Response to the Office of Postsecondary Education's ("OPE") July 15, 2016 Comments to the SDO.  Specifically, on August 1, ACICS appointed new leadership and has continued to implement changes to the Agency's standards and procedures.  These changes, among many other ongoing efforts, demonstrate ACICS's ability to comply with the Department's recognition criteria within 12 months, and also its resolve to strengthen its accrediting process.

An SDO's decision may be reconsidered.  Department regulations provide that "Department staff may review the compliance of a recognized agency with the criteria for recognition *at any time* . . . based on *any information* that, as determined by Department staff, *appears credible and raises issues relevant to recognition*."  34 C.F.R. § 602.33(a) (emphasis added).  Further, "the Department staff analyzes the agency's application for . . . renewal of recognition . . . to determine whether the agency satisfies the criteria for recognition, *taking into account all available relevant information* concerning the compliance of the agency with those criteria and in the agency's effectiveness in applying the criteria."  34 C.F.R. § 602.32(b).[1]

---

[1] Federal Rules of Civil Procedure 54 and 60 also provide for an analogous request for reconsideration based on new evidence.  *See* Fed. R. Civ. P. 54(b) (providing that a court may reconsider any interlocutory order or decision at any point prior to a final adjudication); Fed. R. Civ. P. 60(b)(2) (providing that a court may reconsider a final order, judgment, or proceeding based on new evidence); *Ferring Pharm. v. Burwell*, 2016 WL 4734333, at *7-*10 (D.D.C. Sept. 9, 2016) (granting motion for reconsideration pursuant to Rule 54(b) based on new evidence); *West v. Holder*, 309 F.R.D. 54, 56-58 (D.D.C. 2015) (recognizing that a motion for reconsideration based on new evidence is permitted under Rule 60(b)(2)); *Stewart v. Panetta*, 826 F. Supp. 2d 176, 177 (D.D.C. 2001) (explaining that courts consider "an intervening change in the law," "the discovery of new evidence not previously available,"

These regulations make clear that the Department has a continuing opportunity to evaluate information relevant to recognition.[2]

### A.   ACICS Changes In Leadership And Appointment Of A New Chief Executive Officer And President

The Board of Directors of ACICS made significant leadership changes in the weeks prior to and immediately following the June meeting of the National Advisory Committee on Institutional Quality and Integrity (NACIQI).  Six (6) former senior leaders including the President and five (5) Vice Presidents are no longer employed by ACICS.  The Board has also recently added three (3) new public members to the Board, bringing the total number to six.[3]  In addition, the Board appointed Roger Williams as the new Interim Chief Executive Officer and President effective August 1, 2016.  *See* Ex. 1, Aug. 1, 2016 ACICS Press Release.  Mr. Williams has nearly twenty-five years of experience in the management of higher education accreditation.  Importantly, through his previous role as Executive Director of the Accrediting Council for Continuing Education and Training (ACCET), Mr. Williams is uniquely qualified to guide ACICS as it implements substantial improvements.  Mr. Williams has a proven track record, having transformed ACCET from nearly losing its recognition with the Department and near bankruptcy, into a highly-regarded agency with a stable future.  Further, Mr. Williams led

---

and "a clear error in the first order" in deciding whether justice requires reconsideration of a previous order pursuant to Rule 54(b)).

[2] Similarly, the law imposes an affirmative obligation on ACICS to submit to the Department, on an ongoing basis, certain information regarding compliance with the criteria for recognition.  Specifically, 34 C.F.R. § 602.27, entitled "Other information an agency *must* provide the Department," (emphasis added), provides in relevant part: "(a) the agency must submit to the Department… (4) any proposed change in the agency's policies, procedures, or accreditation or pre-accreditation standards that might alter its (i) scope of recognition … or (ii) compliance with the criteria for recognition."  Further, 34 C.F.R. § 602.21 requires ACICS to "maintain a systematic program of review that demonstrates that its standards are adequate to evaluate the quality of education."  ACICS continues to engage in this critical self-review, and, as such, the SDO should include ACICS's ongoing actions as part of its reconsideration.

[3] As Board member vacancies occur, ACICS intends to seek out and appoint directors with background and experience in higher education that will lend support and expertise to its ongoing reform efforts.

ACCET to become the only U.S. Department of Education recognized accrediting agency to be certified by the International Organization for Standardization (ISO9001) as a Quality Management System.  Indeed, Department Staff member Steve Porcelli commented during the NACIQI Panel hearing that he was "personally blown away" when he learned that Mr. Williams would be joining ACICS's then-existing Special Blue Ribbon Panel.  NACIQI Tr. at 257:10-15. Mr. Porcelli further elaborated that in the "late '80's when I first started . . .  Roger Williams had taken over the head of that Agency [ACCET] and turned them around, so I was just personally blown away by the fact that he would be directing [ACICS] – I didn't learn that until this morning – directing them as to how to fix things."  *See id*.  Mr. Williams's appointment is a prudent and positive step as ACICS continues to revitalize its operations and oversight capacity.

**B.   ACICS Continues Implementation Of Its New Accrediting Standards And Review Procedures**

ACICS continues to implement its recent changes to its accrediting standards and review procedures.  The recent examples discussed below (each of which involved actions by ACICS after ACICS's July 5, 2016 Comments to the SDO) regarding implementation are relevant and probative instances of ACICS's unwavering commitment to carry out its oversight responsibilities effectively in accordance with the Department's recognition criteria. Specifically:

- DuBois Business College: ACICS took immediate adverse action regarding an institution that was found to be out of compliance with ACICS's standards, including standards that concern the Agency's Title IV-related responsibilities.  ACICS visited the school in May and June 2016.  The visit resulted in findings that, among other things, the school lacked administrative capability; these findings stem directly from ACICS's new procedures that require an initial survey of students, staff, and faculty prior to any site visit.  In addition, as described in

the Denial Letter, sent to the institution with a copy to the Department, and posted on the

Agency's website, ACICS uncovered institutional practices that implicate the Agency's Title IV

responsibilities, including the school's offering of unapproved modes of delivery, errors in the

school's satisfactory academic progress (SAP) policy and implementation, and the school's

inaccurate awarding of credits and credit hours.  That institution decided not to appeal these

findings, and it closed on September 22, 2016.  ACICS's action as to DuBois Business College is

another example of how the Agency takes immediate adverse action if a school is significantly

out of compliance with ACICS's standards.  In addition, as in this example, ACICS notifies the

Department if an institution is not fulfilling its Title IV responsibilities.

- ACICS's actions between April and August 2016 (culminating well after

ACICS's July 5, 2016 Comments to the SDO) concerning ITT Technical Institute further

demonstrate ACICS's proactive application and enforcement of ACICS's accreditation standards

and policies.  *See generally*, Ex. 2, ITT Technical Institute - Summary of Investigation.  In

particular, ACICS's At-Risk Institutions Group engages in enhanced monitoring efforts that are

intended to address immediately instances of non-compliance or potential non-compliance at

accredited schools.  *See generally*, *id.*  For example, in August 2016, ACICS staff made

unannounced visits to nine (9) ITT campuses; these unannounced visits, which were planned

before the Department's August 25, 2016 letter to ITT, yielded additional evidence of non-

compliance.  *See id.* at 2-3.  Specifically, ACICS's At-Risk Institutions Group and its Council

analyzed ITT's responses to ACICS' show-cause directive reviewed at the Council's August

2016 meeting, and ACICS determined that a series of nine unannounced visits should be

conducted in order to assess the level of compliance across a broad spectrum of the school's

campuses.  *See id.* at 1.  Moreover, ACICS's analysis and review were based on campuses that

had open complaints and/or poor student achievement outcomes.  *See id.* at 2.  Here, too, is another example of how the Agency is addressing the Department's concerns about the rigor of its monitoring practices.

- ACICS took action in July and August 2016 concerning MedTech College.  *See generally,* Ex. 3, MedTech College & Radians College – Summary of Investigation.  For example, ACICS's At-Risk Institutions Group determined that three (3) unannounced visits were necessary as a result of its analysis and examination of MedTech's placement and student achievement data.  *See id.* at 1.  ACICS requested that the school submit ACICS placement data through the Agency's Placement Verification Program (PVP).  *See id.*  Further, ACICS took these actions as to MedTech College immediately after learning that the Department had denied recertification to affiliated schools, accredited by the Council on Occupational Education ("COE"), for misrepresenting placement data.  *See id.*  ACICS quickly conducted several unannounced on-site visits and, in collaboration with state representatives, investigated placement, licensure, and retention rates for compliance with ACICS's standards.  *See id.* at 2. Here, too, ACICS's actions directly address Department concerns about monitoring and enforcement.

- In another example, ACICS issued a show-cause directive in September 2016 to Globe University to show why ACICS should not suspend or condition Globe's accreditation. *See* Ex. 4, Globe University/Minnesota School of Business Adverse Information, at 4.  Specific to that action, ACICS requested that the school provide ACICS with a teach-out plan based on the State of Minnesota Office of Higher Education's stated intent to revoke authorization for the school to operate in that state.  *See id.*  ACICS's actions reflect its commitment to ensuring that accredited institutions have the ability to provide quality educational services to their students,

and, in turn, reflect application of ACICS's standards and procedures in a manner that directly addresses Department Staff and NACIQI concerns.

- In addition, ACICS has recently instituted a Secret Shopper process.  For example, in response to a recent complaint received against Stevens - The Institute of Business and Arts in Saint Louis, Missouri, ACICS commissioned a third-party agency to conduct mystery telephone shops of the institution's recruitment practices.  The institution has been informed in a September 28, 2016 letter that it must respond to all allegations outlined in the complaint and statements made by admissions representatives to the secret shoppers. *See* Ex. 5, September 28, 2016 Letter to Stevens - The Institute of Business and Arts.

- ACICS has moved quickly to a process in which every reported placement is confirmed monthly for every campus through its PVP system.  For the August review cycle, ACICS incorporated a Data Integrity Reviewer (DIR) on each on-site evaluation visit and increased the requirement to attempt confirmation for all placements.  For the upcoming December 2016 review cycle, ACICS has directed the use of more recent placement information and is verifying the information through the PVP program and the DIR while on-site.  In addition, for the 2017 Campus Accountability Report (CAR) period (which began on July 1, 2016) ACICS is requiring that all placements are confirmed via ACICS's PVP system.

## C.    ACICS's Improved Accreditation Policies And Procedures Have Addressed The Department's Concerns

ACICS's recent actions are the natural extension of ACICS's ongoing improvements to its accreditation policies and procedures.  During the re-recognition process, ACICS has repeatedly asked the Department to explain what specific information ACICS must present in order to demonstrate to the Department that the Agency has the capacity to come into compliance within twelve months.  The Department has not informed ACICS about the specific

8

ways that ACICS could indicate or otherwise demonstrate its capacity in this regard.  In fact, the Department has only stated that given the accreditation timeline of certain school programs, there is no way that ACICS can show compliance within twelve months.  Here, specifically, ACICS seeks guidance about what actions might indicate that ACICS is on the right path in working toward compliance.  Moreover, and as discussed more fully in ACICS's July 5 Comments to the SDO following the NACIQI recommendation and ACICS's July 25 Response to OPE's Comments, ACICS has the capacity to comply – and demonstrate compliance – with each of the regulatory criteria addressed in the Department Staff's report, the June NACIQI Panel hearing, and your decision.  The new instances described in this letter are the most recent examples of ACICS's compliance progress, with additional instances forthcoming as ACICS enters its Fall 2016 accreditation cycle.  Specifically, as described in ACICS's Executive Summary to its July 5, 2016 Comment, Exhibit B (attached here as Exhibit 6), many of the 21 findings addressed in the Staff report and echoed in your decision have already been addressed, and the findings can be categorized as follows:

- Category A Findings (5 of 21 Findings):  for which *only the provision of additional documentation or the effective date of a new policy or standard was cited as a lack of demonstrable evidence*, meaning that upon the effective date compliance is achieved.  ACICS's revised standards became effective July 1, 2016.  *See* Ex. 6 at 2, 8-10.  These standards are currently applicable to all ACICS campuses and programs.

- Category B Findings (6 of 21 Findings): for which a *demonstration of effective implementation is the primary barrier to demonstrating compliance*.  ACICS implemented and

9

applied its enhanced processes or procedures to campuses and programs during the Spring 2016

accreditation cycle (April – May – June) and reviewed the resulting reports at its August 1, 2016

meeting.  *See id.* at 2-3, 10-18.  The outcomes of those decisions, including those discussed in

this letter, are and will continue to be shared with the Department and the public through

www.acics.org.  At its August 2016 meeting, ACICS took actions that affected more than 300

campuses accredited by ACICS based on the review of information generated during 136 in-

person site visits.  Following that meeting, ACICS also started the practice of posting the

Agency's show-cause letters on its website along with the distribution of those letters in

conjunction with the longstanding practice followed for adverse action letters being sent to state

and federal authorities.  *See* Ex. 7, ACICS Council Actions Effective August 5, 2016.


- Category C Findings (10 of 21 Findings): for which *ACICS is acting pursuant to
an achievable timeline to establish new policies and procedures and demonstrate effective
implementation to demonstrate compliance*.  ACICS adopted revised standards and other policies
at its August 1, 2016 meeting, with a call-for-comment currently underway including additional
and revised student achievement standards with responsive Council actions to be considered at
thee December 2016 meeting.  ACICS will review student achievement on an ongoing basis.
2016-2017 student achievement will be reviewed first at the April 2017 meeting.  ACICS will,
thus, be able to provide additional evidence of implementation after its Fall 2016 accreditation
cycle and again after the Winter 2017 accreditation cycle.  *See* Ex. 6 at 3, 17-30.


More than half (11) of the 21 findings noted in your decision were remedied on July 1,

2016 (the effective date of new policies and standards) or have been seriously addressed based

10

on the Council's actions following the August 2016 meeting.  With respect to the Category C

Findings, ACICS will be able to demonstrate full implementation of recent standard and policy

revisions after the Fall 2016 accreditation cycle (September – October – November 2016) given

the requirements and procedures inherent in the accreditation calendar and institutional review

process that are largely outside of ACICS's control.  ACICS started implementing additional

revisions to established policies or procedures during its Fall 2016 accreditation cycle and will

continue to do so during its Winter 2017 cycle (January – February – March 2017).  Moreover,

ACICS will be conducting computational analysis for error checking on the annual CAR data,

due to ACICS on November 1, 2016.  This data will be analyzed under ACICS's criteria and will

be presented for Council review at the December 2016 Council meeting.  Based on that review,

ACICS will pursue appropriate actions (adverse, probation, compliance warning) for campuses

and programs that have not been able to demonstrate compliance with student achievement

standards within the established Council timeframes, and ACICS expects it will be able to

demonstrate implementation of its revised criteria and requirements to the Department no later

than the completion of the Winter review cycle (January – April 2017).  This is a reasonable

implementation period such that ACICS will be able to demonstrate compliance well within the

12-month period.

The new evidence discussed in this letter illustrates the effective application, monitoring,

and enforcement of ACICS's revised standards and policies, and thus warrants reconsideration in

light of all of the improvements ACICS has implemented during the last several months.  For all

of the foregoing reasons, ACICS respectfully requests that you reconsider your decision and

continue the Agency's recognition, because ACICS has demonstrated that it can come into

compliance within twelve months.

Respectfully submitted,


Dated: October 4, 2016                    By: /s/ Allyson B. Baker
                                          Allyson B. Baker, Esq.
                                          VENABLE LLP
                                          575 7th St., N.W.
                                          Washington, D.C. 20004
                                          Phone: (202) 344-4000
                                          Fax: (202) 344-8300
                                          Email: abbaker@venable.com

                                          Kenneth J. Ingram
                                          Whiteford Taylor Preston, LLP
                                          1800 M Street, NW
                                          Suite 450N
                                          Washington, DC 20036
                                          Phone: (202) 659-6790
                                          Fax: (202) 327-6140

                                          *Attorneys for Accrediting Council For*
                                          *Independent Colleges and Schools*

# EXHIBIT 12

To Declaration of Allyson B. Baker



## UNITED STATES DEPARTMENT OF EDUCATION

### OFFICE OF THE GENERAL COUNSEL

October 17, 2016

***By Email Transmission Only***

Ms. Emma Vadehra
Senior Department Official
United States Department of Education
400 Maryland Avenue, SW
Washington, D.C. 20202

**Re:    Accrediting Council for Independent Colleges and Schools –
Department Staff Response to Request for Reconsideration**

Dear Ms. Vadehra:

I am writing on behalf of the Department Staff in the Office of Postsecondary Education

("Department Staff") in reference to the "Request for Reconsideration" submitted to you by the

Accrediting Council for Independent Colleges and Schools ("ACICS") (hereinafter "Request").

The Request seeks reconsideration of your September 22, 2016 decision ("SDO Decision"), and

asks you to review and consider new evidence not previously submitted as part of the record.

ACICS argues that the new material provides evidence of changes to the agency's personnel,

practices, standards and procedures that have occurred since the Department Staff submitted its

June 2016 Final Staff Analysis ("Final Analysis") and Final Staff Report ("Final Report"), and

further argues that the evidence demonstrates that it is, or will be within a year, in compliance

with the recognition criteria.  The Department Staff requests that you decline to consider

ACICS's request for reconsideration, as there is no authority in the regulations to grant the relief

that ACICS seeks.

The regulations mandate a two-step comment process prior to the SDO rendering a decision, and do not provide for any opportunity to later seek "reconsideration" of the decision. *See* 34 C.F.R. § 602.35(a)-(c).   Thus, following the SDO Decision, the regulations provide for an appeal to the Secretary, and the SDO has no further jurisdiction.  *See* 34 C.F.R. §§ 602.36 and 602.37.  Moreover, 34 C.F.R. § 602.36(g) and (h) explicitly prohibit the agency from submitting new information that was not contained in the record (the "record" is defined in 34 C.F.R. § 602.36(a)).  There is no basis to ignore that proscription.  Without that safeguard, the recognition process would be unending, with agencies submitting additional and new materials, claiming that they have fixed their non-compliance long after the Staff and NACIQI review and recommendation process, including the process for submission and consideration of public comments.

ACICS itself points to the proper approach for evaluation of an agency's changes: submission of the materials to the Department Staff for review and full investigation under 34 C.F.R. § 602.33.  *See*  Request at 33.  Contrary to ACICS's contention however, the Department Staff review process does not implicate "reconsideration" of the SDO Decision *by the SDO*. ACICS has chosen its path here:  it has appealed the SDO Decision to the Secretary.  There is nothing left for the SDO to do.

ACICS seeks to analogize its Request to the relief available to federal court litigants under Rules 54(b) and 60(b)(2) of the Federal Rules of Civil Procedure.   There is no basis for such an analogy.   The SDO is not a federal judge.  Regarding Rule 54(b), there has been no "adjudication of fewer than all the claims … or as to fewer than all the parties."  The purpose of Rule 54(b) is to allow a federal court judge to specifically determine that an adjudication of fewer than all claims in an action is nevertheless final for purposes of immediate appeal, and

absent that determination, the adjudication is subject to revision.  The rule is completely inapposite here – ACICS is not a party in the middle of a federal court proceeding where some claims have been adjudicated and others have not.  Nor does Rule 60(b) provide a useful analogy.  That rule allows relief from a final judgment or order under certain limited circumstances, including in situations where a movant presents "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial … ." Fed. R. Civ. P. 60(b)(2).  ACICS has not submitted "newly *discovered* evidence … that could not have been discovered [previously]."   Rather, ACICS attempts to circumvent the established recognition process by submitting evidence of its *recent attempts* to cure its substantial non-compliance.

There is no mechanism for ACICS to present new evidence at this late point in the recognition process. All that remains is for the Secretary to determine ACICS's appeal based on the record before the SDO, and the appeal briefs that will be submitted by ACICS and the SDO, as provided under 34 C.F.R. § 602.37.  The Department Staff respectfully submits that the SDO should decline to consider ACICS's request for reconsideration.

Sincerely,

Donna S. Mangold
Counsel for Department Staff
Office of Postsecondary Education

**cc:**
abbaker@venable.com
KIngram@wtplaw.com

# EXHIBIT 13

## To Declaration of Allyson B. Baker



# UNITED STATES DEPARTMENT OF EDUCATION

WASHINGTON, DC 20202

October 18, 2016

Roger J. Williams, Interim President
Accrediting Council for Independent Colleges and Schools
750 First Street, NE, Suite 980
Washington, DC 20002-4241
rjwilliams@acics.org

Dear Mr. Williams,

I write regarding the Request for Reconsideration of my September 22, 2016 recognition
decision as the Senior Department Official (SDO) submitted by the Accrediting Council for
Independent Colleges and Schools (ACICS) on October 4, 2016. Department of Education staff
submitted a Response to the Request for Reconsideration on October 17, 2016.

As you know, my decision as the SDO concurred with the recommendation of Department of
Education staff and the National Advisory Council on Institutional Quality and Integrity and
terminated ACICS's recognition as a nationally recognized accrediting agency.

I decline to reconsider that decision. The applicable regulations do not permit an accrediting
agency to submit a Request for Reconsideration of a recognition decision to the SDO. Further,
under 34 C.F.R. § 602.36(g) and (h), an agency may not submit additional information to the
SDO in the form of a Request for Reconsideration.

Rather than requesting reconsideration by the SDO, 34 C.F.R. § 602.37 gives an accrediting
agency the option to appeal the SDO's decision to the Secretary of Education. Such an appeal
must be filed within 30 days from the date of the SDO's decision.

I wish to clarify that because the regulations do not provide for a Request for Reconsideration,
the timeline for filing an appeal of my decision as the SDO is unaffected by ACICS's request.
Accordingly, pending any appeal to the Secretary under 34 C.F.R. § 602.37, my September 22,
2016 decision to withdraw and terminate ACICS's recognition is the final decision of the
Department.

Sincerely,

Emma Vadehra
Chief of Staff

cc:   Donna Mangold (donna.mangold@ed.gov)
      Allyson B. Baker (abbaker@venable.com)
      Kenneth J. Ingram (kingram@wtplaw.com)

# EXHIBIT 14

To Declaration of Allyson B. Baker

In the matter of:

**ACCREDITING COUNCIL FOR
INDEPENDENT COLLEGES
AND SCHOOLS**

Docket No. 16-44-O

**ACCREDITING COUNCIL FOR INDEPENDENT COLLEGES AND SCHOOLS'
APPEAL TO THE SECRETARY OF EDUCATION OF THE
SENIOR DEPARTMENT OFFICIAL'S SEPTEMBER 22, 2016 DECISION**

'16 OCT 21 PM3:41

## Table of Contents

I.    INTRODUCTION ........................................................................................... 1

II.   BACKGROUND ............................................................................................ 3

III.  LEGAL STANDARDS .................................................................................. 6

IV.   ARGUMENT ................................................................................................. 7

    A.    ACICS Can Comply With All Criteria Within Twelve Months ........................... 8

        1.    ACICS Either Has Already Remedied The Cited Criteria Or Has Substantially Improved Such That It Will Demonstrate Compliance Within Twelve Months ................................................................................. 9

            (a)    Category A Findings (5 of 21 Findings) ............................. 9

            (b)    Category B Findings (6 of 21 Findings) ......................... 12

            (c)    Category C Findings (10 of 21 Findings) ........................ 16

        2.    ACICS's Changes In Leadership ............................................................ 27

        3.    ACICS Continues Implementation Of Its New Accrediting Standards And Review Procedures .................................................................... 28

    B.    The Recommendations Of Staff And NACIQI And The SDO's Decision Are Arbitrary And Capricious ........................................................... 30

        1.    The Facts In The Record Do Not Support The Recommendations Or The SDO's Decision ................................................................. 31

            (a)    The Staff Report ............................................................. 31

            (b)    NACIQI's Recommendation ........................................... 34

             (c)    The SDO's Decision ....................................................... 35

        2.    The Staff Report, OPE Letter, And The SDO's Decision Lack Specificity Regarding Areas Of Noncompliance And Do Not Consider The Relevant Factors ........................................................... 36

        3.    The Department And NACIQI Only Recently Revised Their Approach To Key Recognition Criteria On Which ACICS Has Been Evaluated ..... 39

        4.    Numerous Procedural Irregularities Marred The Petition Process .......... 41

        5.    Similarly Situated Agencies Have Not Been Held To The Same Standards That Are Now Being Imposed On ACICS .............................. 44

        6.    The Petition Process Has Been Unfairly Politicized ............................... 47

        7.    Irreparable Harm To Students Cannot Be Justified ................................. 49

V.    CONCLUSION ............................................................................................. 50

Pursuant to 34 C.F.R. § 602.37(a), the Accrediting Council for Independent Colleges and Schools ("ACICS" or "the Agency") respectfully submits this appeal to the Secretary of Education ("the Secretary") of the September 22, 2016 decision ("Decision") of the Senior Department Official ("SDO") of the United States Department of Education ("Department" or "ED") to terminate the Department's recognition of ACICS as a nationally recognized accrediting agency. *See* September 22, 2016 Letter From Emma Vadehra (SDO) to Roger J. Williams (Chief Executive Officer and President of ACICS).

## I.    <u>INTRODUCTION</u>

The SDO Decision to terminate ACICS's status as a recognized accrediting agency is wrong.  The Decision is not supported by substantial evidence and is unwarranted based on the facts.  Additionally, the Decision is arbitrary, capricious, represents an abuse of discretion, and is otherwise not in accordance with the law.  Withdrawal of the ACICS's recognition also will have irreparable and harmful effects on currently-enrolled students.  Accordingly, the SDO Decision should be reversed.

First, the facts establish that ACICS should be given twelve months to demonstrate and achieve compliance with the required regulatory criteria for recognition.  ACICS can demonstrate and achieve compliance with all pertinent criteria within this timeframe. Specifically, ACICS has already demonstrated compliance with more than half of the areas of purported noncompliance identified in the SDO's Decision while the remaining criteria in need of demonstrated application or improvement can be remedied within twelve months.

Second, the SDO Decision is based on a process that reflects an arbitrary and capricious application of the criteria for recognition.  Specifically, the process surrounding the findings and recommendation contained in the Department's Final Staff Report on Recognition Compliance Issues ("Staff Report") and the recommendation of the National Advisory Committee on

Institutional Quality and Integrity ("NACIQI") had procedural irregularities and inherent unfairness. The irregular and unfair process led directly to an abuse of discretion and an arbitrary and capricious SDO Decision.

Third, withdrawal of ACICS's recognition would result in profound, irreparable, and substantial harm to students presently attending ACICS-accredited institutions. ACICS accredits schools that enroll an estimated 580,000 students. A significant number of the schools these students attend are unlikely to obtain accreditation from another agency during any eighteen-month grace period, as the process of gaining initial accreditation can, and often does, take longer than two years. Many of these schools will be required to discontinue existing programs in order to fit within the mission and scope of an alternate accrediting agency; this will impact students as programs are discontinued and teach outs are implemented. Additionally, a decision by the Secretary withdrawing the recognition of ACICS will have irreparable and harmful ripple effects on students currently enrolled at accredited institutions. This impact could interrupt veterans' education benefits,[1] workforce investment funds, state grant aid, employer or other tuition reimbursement programs, transfer of credit, eligibility for state licensure or certification qualification or exams, and programmatic accreditation status essential for professional licensure or certification, among other potential harms. The Department cannot assure students that these impacts will not result despite an eighteen-month transition period allowed by Department regulation after a final decision. Indeed, any eighteen-month transition period fails to ensure that

---

[1] Veterans' education benefits may only be used at higher education institutions that are accredited by a federally-recognized accrediting agency. Although recent legislation allows the Secretary of Veterans Affairs to continue veterans' benefits for up to eighteen months following the withdrawal of recognition of an accrediting agency, abrupt closure of an institution or failure of an institution to obtain alternate accreditation within the eighteen-month grace period could result in benefits interruptions.

schools will be able to obtain accreditation on a going-forward basis and that their students will remain eligible for Title IV funding into the future.  Many students attending schools accredited by ACICS will inevitably suffer substantial harm.

Neither the SDO Decision nor the Staff Report and NACIQI recommendation provide legally sufficient facts and evidence to affirm the SDO Decision and deny ACICS the recognized option of a twelve-month period to demonstrate compliance with all pertinent regulatory criteria. Therefore, the SDO's Decision should be reversed, and (1) the Secretary should continue recognition of ACICS because the record contains abundant evidence that ACICS can come into compliance with all regulatory criteria within twelve months; or, alternatively, (2) ACICS's Petition for Continued Recognition (the "Petition") should be returned to Department Staff and/or NACIQI for reconsideration.

## II.     BACKGROUND

On January 8, 2016, ACICS submitted its Petition to the Department, pursuant to 34 C.F.R. § 602.31(a).

The Department initiated a supplemental information gathering process that lasted from March 3, 2016 to May 16, 2016.  On March 3, the Department sent the Agency a Supplemental Request for additional information.[2]  On March 10, ACICS sought an extension of time to respond to the Supplemental Request, because the request required that the Agency supplement or replace more than 30 narrative responses, and more than 100 exhibits to the Petition already submitted.  This effort also required that ACICS provide the Department with more than 80

---

[2] The Department explained this Supplemental Request as being "a set of question[s]" that the Office of the Under Secretary "want[s] to ask ACICS during the recognition process," further noting that "we have tied these questions to the recognition process" and that ACICS will have 30 days to respond.  *See* March 3, 2016 email from H. Bounds to A. Gray, Exh. D. to ACICS's July 5 Comments.

additional documents.  In a March 15 email, ACICS received an extension of time to respond to

Section II of the March 3 Supplemental Request, but not Section I.  *See* March 15, 2016 email

from H. Bounds to A. Gray, Exh. D to ACICS's July 5 Comments.  On April 1, ACICS

submitted its responses to Section I of the Department's March 3 Supplemental Request which

concern "Overall Questions."

On May 4, the Department provided ACICS with a draft staff analysis in response to the

Petition.  The Department required that ACICS submit any response to the draft staff report on

June 3.  In a June 3 letter, the Agency reiterated its request for additional time to respond to that

draft staff analysis, and in a response sent the same day, the Department denied that request for

an extension of time and also denied ACICS's request that NACIQI defer consideration of the

Petition until its December 2016 Meeting.  *See* June 3, 2016 letter from H. Bounds to T. Bieda,

Exh. D to ACICS's July 5 Comments.

On May 16, 2016, ACICS submitted its responses to Section II of the Department's

March 3 Supplemental Request concerning "Questions related to specific standards in Jan. 2016

submission."  Notably, Mr. Bounds's March 15 email granting ACICS an extension of time for

responding to Section II of the March 3 Supplemental Request noted that "given that information

received as late as May 16, 2016 would not allow Department staff the time to fully review and

analyze it in time for the June NACIQI Meeting, ACICS should be prepared to return at the fall

NACIQI meeting for further discussion as warranted."  *See* March 15, 2016 email from H.

Bounds to A. Gray, Exh. D to ACICS's July 5 Comments.

On June 15, 2016, the Department issued its Final Staff Report to the SDO.  This report

included a recommendation to deny the Agency's Petition for renewal of recognition based on

the Staff's conclusion that "the agency could not remedy its compliance issues."  The Staff

Report included substantive errors that evidence a rush to meet a deadline of presenting the report to the SDO in time to be evaluated at the June 23 NACIQI meeting.

On June 23, 2016, the NACIQI, relying heavily on the Staff Report as evidenced in testimony, voted 10-3 to recommend to the SDO withdrawal of the Agency's recognition, without giving the Agency twelve months to demonstrate compliance.  *See* NACIQI Transcript, June 23, 2016 (hereinafter "NACIQI Tr.") at 293:21-22.

On July 5, 2016, ACICS submitted a comment to the SDO following the NACIQI recommendation pursuant to 34 C.F.R. § 602.35(b), which is incorporated herein by reference ("ACICS's July 5 Comments").   On July 15, 2016, the Office of Postsecondary Education (OPE) submitted responsive comments to the SDO (the "OPE Letter").   On July 25, 2016, ACICS submitted to the SDO a response to the OPE Letter, which is incorporated herein by reference ("July 25 Response").

On September 22, 2016, the SDO wrote a letter to Roger J. Williams, Interim President of ACICS, informing him of her decision to terminate the Department's recognition of ACICS as a nationally recognized accrediting agency.  The Decision by the SDO – who is the Chief of Staff to the Secretary and a political appointee serving the Secretary and the President – is less than three pages of conclusory statements relying on the Staff Report, NACIQI recommendation and OPE Letter, but notably failing to include any statement or analysis of the factual and evidentiary basis for the SDO's unprecedented Decision.  Indeed, the Department's failure to provide any analysis to support its unprecedented decision is particularly notable, given the substantial consequences that this decision will have on an estimated 580,000 students who attend schools accredited by ACICS.

On October 4, 2016, the Agency submitted to the SDO a Request for Reconsideration of the SDO's September 22, 2016 Decision (the "Request for Reconsideration") based on new evidence regarding the Agency's new leadership, implementation of new policies, and improvements to existing policies, incorporated herein by reference, relevant to the Agency's ability to demonstrate compliance with all applicable criteria within twelve months.  On October 17, 2016, the Department Staff submitted a response to ACICS's Request for Reconsideration. On October 18, 2016, the SDO declined to reconsider the SDO Decision.[3]

## III.   **LEGAL STANDARDS**

On appeal from the SDO's Decision, the Secretary makes a recognition decision *de novo* based on the regulations.  *See* 34 C.F.R. § 602.37(d) ("The Secretary renders a final decision after taking into account the senior Department official's decision, the agency's written submissions on appeal, the senior Department official's response to the appeal, if any, and the entire record before the senior Department official.").  The regulations authorize the Secretary, on appeal, to continue an agency's recognition if the Secretary concludes that the agency "will demonstrate or achieve compliance with the criteria for recognition and effective application of those criteria within 12 months or less," pending submission and review of a compliance report.  *See* 34 C.F.R. § 602.36(e) (incorporated by reference into 34 C.F.R. § 602.37(d)).

Action by the Department will be held unlawful and set aside if it is found by a court to be arbitrary, capricious, and/or an abuse of discretion or otherwise not in accordance with law; in excess of statutory authority; without observance of procedure required by law; unsupported by substantial evidence or unwarranted on the facts.  *See* 5 U.S.C. § 706.

---

[3] The SDO denied ACICS's Request for Reconsideration purely on technical, procedural grounds.  The SDO did not provide any analysis of the substantive evidence and legal argument that ACICS presented in its Request for Reconsideration.

IV.     **ARGUMENT**

      The Secretary should grant ACICS's continued recognition for twelve months and reverse the Decision of the SDO for several reasons.  Specifically:

- First, ACICS should be given twelve months to demonstrate and achieve compliance with all necessary criteria because the record is replete with evidence that ACICS can and will do so within that timeframe.  In contrast to the terse, conclusory, and vague Decision of the SDO, ACICS provided specific documentation of its capacity to come into compliance with all relevant criteria identified by Department Staff and NACIQI, substantially changed and implemented numerous policies and procedures including those described in ACICS's Request for Reconsideration, which is incorporated by reference herein and described below, and will be able to demonstrate compliance in the coming months with all remaining criteria as the Agency continues its upcoming accreditation cycles.  Specifically, the SDO's Decision does not take into account "all available relevant information," consideration of which demonstrates ACICS's ability to comply with the Department's recognition criteria within 12 months, nor the seriousness of its resolve to strengthen its accrediting process.

- Second, the SDO's Decision is arbitrary and capricious and an abuse of discretion because the SDO's Decision is not supported by the record, fails to consider relevant factors, and holds ACICS to previously unannounced regulatory standards.  Further, the SDO Decision and process leading up to the SDO Decision, including the findings and recommendations of the Staff Report and the NACIQI, were marred with procedural irregularities and inherent unfairness.  The irregular and unfair process violated due process and principles of equal protection by treating ACICS differently than similarly-

situated agencies.  Moreover, the process has been prejudicially tainted by political influence.

### A.    ACICS Can Comply With All Criteria Within Twelve Months

The facts establish that ACICS should be given twelve months to demonstrate and achieve compliance with all required regulatory criteria for recognition.  ACICS can demonstrate and achieve compliance with all pertinent criteria within this timeframe.  Specifically, ACICS already demonstrated compliance with more than half of the areas of purported noncompliance identified in the SDO's Decision, and the remaining criteria in need of demonstrated application or improvement can be remedied within twelve months.

Throughout this proceeding, ACICS repeatedly asked the Department to provide the *specific information* ACICS must present to the Department in order to demonstrate to the Department that it has the capacity to come into compliance within twelve months.  The Department failed to inform ACICS about the specific manner in which ACICS could demonstrate its capacity in this regard.  Rather, the Department consistently relied on vague and conclusory statements such as "ACICS's track record does not inspire confidence that it can address all of the problems effectively."  *See* SDO Decision at 2.  The Department failed to communicate what steps ACICS must take to "inspire confidence" or "address problems effectively."  In fact, the Department only stated that there is no way that ACICS can show compliance within twelve months given the accreditation timeline of certain school programs.  *See id.*  Despite this lack of clarity and specificity from the Department, ACICS provided the Department with abundant evidence that it will come into compliance with all necessary criteria within twelve months.

1.    **ACICS Either Has Already Remedied The Cited Criteria Or Has Substantially Improved Such That It Will Demonstrate Compliance Within Twelve Months**

To date, ACICS is either already in compliance with the cited criteria or has – and continues to – make changes and enhancements to ACICS standards, policies, and procedural protocols to further demonstrate compliance with the criteria. *See* ACICS's July 5 Comments, July 25 Response, and Request for Reconsideration. The SDO herself acknowledges that ACICS "has made recent efforts to address some of the deficiencies identified – including by revising various policies and restructuring internal governance bodies." SDO Decision at 2. The record supports the conclusion that ACICS has the capacity to achieve compliance with each criterion for recognition and to produce evidence of effective application of the criteria within twelve months.

Specifically, more than half (eleven) of the twenty-one findings noted in the SDO's Decision were remedied on July 1, 2016 (the effective date of new policies and standards) or have been seriously addressed based on the Council's actions following its August 1-5, 2016 meeting. To clearly articulate the inventory of progress ACICS has made toward addressing each of the criteria identified in the Staff Report, the Agency has organized these criteria into categories A, B, and C. *See* ACICS's Request for Reconsideration, attached hereto as **Exhibit A**, and ACICS's July 5 Comments and Executive Summary ("July 5 Executive Summary").

(a)    **Category A Findings (5 of 21 Findings)**

This category concerns those findings for which only the provision of additional documentation or the effective date of a new policy or standard was cited by ED Staff as a lack of demonstrable compliance. Accordingly, compliance is achieved on the effective date for these policies. ACICS's revised standards became effective July 1, 2016. *See* July 5 Executive

Summary at 2, 8-10.  These standards are currently applicable to all ACICS campuses and programs.

The evidence in the record concerning findings in this category demonstrate that ACICS has already achieved compliance:

- **Administrative and Fiscal Capacity** (34 C.F.R. § 602.15(a)(1)):  With respect to the Staff's finding that ACICS must have the administrative and fiscal capability to carry out its accreditation activities, the Staff Report contained numerous positive statements about ACICS's staff and finances.  *See* July 5 Executive Summary at 8.  The Staff Report requested that ACICS submit its FY 2015-2016 audit and FY 2016-2017 budget in October 2016.  ACICS presented evidence that its FY 2016-2017 budget adopted by ACICS balances expenditures with anticipated revenues, including anticipated contingencies and reflecting an expected contraction of business activity.  ACICS also presented documentation from an independent third party attesting to the adequacy of ACICS's financial reserves, including a supplement identifying how ACICS can gain access to sufficient liquidity if needed.  *Id.*  ACICS presented ample evidence to demonstrate compliance with this criterion.

- **Public Members** (34 C.F.R. § 602.15(a)(5)):  In Response to the Staff's finding that ACICS needed to provide documentation verifying that members of its decision-making bodies include both public and non-public members, ACICS revised its attestations and had the members of ACICS's Review Board clearly delineate their public and academic roles pursuant to 34 C.F.R. § 602.15(a)(5).  *See id.* at 8-9.  ACICS has demonstrated compliance.

- **Conflicts of Interest** (34 C.F.R. § 602.15(a)(6)):  The Staff also made a finding that ACICS needed to provide documentation that all members of ACICS's Intermediate Review Committee (IRC) signed a conflict of interest attestation.  *See id.* at 9.  In response, ACICS provided information showing that ACICS had clear and effective policies and controls against conflicts of interest.  *See id.*  Additionally, its IRC members were aware of ACICS's conflict of interest policy and had signed statements that applied to their roles at ACICS in any capacity including on the IRC.  *Id.*

- **Substantive Change Requests** (34 C.F.R. § 602.22(a)(3)):  In another example, the Department Staff found that ACICS needed to develop a written policy enabling ACICS to consistently determine whether a new comprehensive evaluation is required if an institution submits a proposed substantive change to that institution.  *Id.* at 9-10.  ACICS submitted evidence that the Agency has current standards in place to satisfy this criterion, has a written policy utilizing a matrix to evaluate substantive changes that are presented to the Council for consideration prior to approval of any substantive change, and demonstrated effective implementation of this policy by providing specific examples of institutions reviewed in response to substantive change requests.  *Id.* at 10.

- **Teach-Out Plans** (34 C.F.R. § 602.24(c)(1)):  With respect to the Staff Report's finding that ACICS needed to revise its teach-out plan policies, the Agency provided specific evidence that it requires teach-out plans in a variety of circumstances, including limitation or termination of Title IV eligibility, withdrawal of accreditation, institutional closure, and revocation or impending revocation of authorization by a state licensing agency.  ACICS also revised its Accreditation Criteria to consolidate all references to teach-out policies.  The documents in the record evidence how ACICS's policies and

procedures demonstrate current compliance and effective implementation of this criterion.  *Id.* at 10.

As the evidence in the record demonstrates, ACICS is currently in compliance with these criteria, will continue to be in compliance, and can provide additional documentation if so requested by the Department.

**(b)      Category B Findings (6 of 21 Findings)**

This category concerns those findings for which demonstration of effective implementation is the primary barrier to demonstrating compliance.  ACICS implemented and applied its enhanced processes or procedures to campuses and programs during the spring 2016 accreditation cycle (April – May – June) and reviewed the resulting reports at its August 2016 meeting.  *See id.* at 2-3, 10-18.  The outcomes of those decisions have and will continue to be shared with the Department and the public through www.acics.org.  At its August 2016 meeting, ACICS took actions that affected more than 300 campuses accredited by ACICS based on the review of information generated during 130 on-site visits and other actions that the Agency took. Following that meeting, ACICS also started the practice of posting the Agency's show-cause letters on its website along with the distribution of those letters in conjunction with the long-standing practice followed for adverse action letters being sent to state and federal authorities. *See* ACICS Council Actions Effective August 5, 2016, attached as Exhibit 7 to ACICS's Request for Reconsideration.

ACICS implemented numerous other reforms to address cited criteria in this category. ACICS is or will be in compliance with criteria in this category within twelve months.  These substantive improvements are detailed more fully in ACICS's July 5 Comments and summarized below:

12

- **Fiscal and Administrative Capacity – At Risk Institutions** (34 C.F.R. § 602.16(a)(1)(v)):  In response to the Staff finding that ACICS needs to fully implement its plans to consistently review and identify at-risk institutions, ACICS took the critical step to establish an At-Risk Institutions Group (ARIG).  *See* July 5 Executive Summary at 12.  For example, the ARIG proactively investigated at least 22 campuses and engaged in numerous special site visits.  The ARIG's reviews are highly detailed and examine a broad range of potential operational issues at institutions, especially ones that concern student placement data.  These reviews are based on ACICS's independent analysis, media reports, publicly available information about state and federal actions, and enrollment growth issues.  *See id.*  The Council reviewed the reports from the ARIG and, as noted above, took actions affecting numerous campuses.  The facts show that ACICS has demonstrated compliance with this criterion.

- **Misrepresentation** (34 C.F.R. § 602.16(a)(1)(vii)):  ACICS also initiated reforms to address the Staff's finding that the Agency needs to improve oversight of the recruiting and admissions practices of accredited institutions.  *See id.* at 12.  Notwithstanding ACICS's concern articulated in its July 5 Comments that the Department changed its interpretation and application of this criterion, ACICS implemented new standards that apply to recruiting practices requiring institutions to consistently monitor recruiting and to publish campus and program level student achievement rates.  *Id.*  Further, ACICS's ARIG specifically evaluates recruiting practices during on-campus visits.  ACICS also improved student outreach during its spring 2016 review cycle, reviewing approximately 3,000 student comments on key issues such as explanation of tuition and fees, appropriateness of resources, transferability of credits, and course scheduling.  *Id.*

ACICS also instituted a "Secret Shopper" program and recently commissioned a third-party agency to conduct mystery telephone shops of recruitment practices. *See* Ex. A at 8. Here, too, the facts, including ACICS's new policies and actions to implement these policies, demonstrate compliance.

- **Student Complaints** (34 C.F.R. § 602.16(a)(1)(ix)): ACICS continues to be in compliance with this regulation, which concerns the Agency's process for obtaining and evaluating student complaints. As noted in the Staff Report, only three student complaints had been submitted to the Department and ACICS was found to have responded appropriately to each complaint. *See* July 5 Executive Summary at 14. Nonetheless, ACICS initiated enhanced reviews of student complaints, including an online complaint system to solicit comments from students, faculty, staff, and others prior to site visits, in an effort to address Staff's vague concern that ACICS needs to compile evidence of its strengthened process as to student complaints. *See id.* Specifically, ACICS's ARIG uses an online complaint process, which enables enhanced monitoring through actions such as unannounced on-site visits. Although the nature of the Staff's concern as to this criterion is demonstrably vague and unsupported, ACICS has nevertheless implemented new policies and taken measurable, affirmative steps to demonstrate its continued compliance. The facts show that ACICS has demonstrated compliance with this criterion.

- **Achievement of Stated Objectives** (34 C.F.R. § 602.17(a)): ACICS implemented a new Data Integrity Standard effective July 1, 2016 with respect to the Staff Report finding related to student outcomes. *Id.* at 14-15. Further, starting with the spring 2016 review cycle, ACICS requires that every evaluation team include a Data Integrity Reviewer

(DIR); this has allowed ACICS to test the integrity of 84% of all reported placements and 100% of all documentation supporting those reported as "not available for placement." *Id.* at 15.  The DIRs yielded 23 findings relating to campuses' inability to verify data, insufficient supporting documentation, or inaccuracy in Campus Accountability Report data.  *Id.*  The Council reviewed these findings at its August 2016 Council meeting and evaluated the results using its enhanced rubric and tools.  *Id.*  As a result, the Council took action affecting numerous campuses.  The facts show that ACICS has demonstrated compliance.

- **Reasonable Basis for Accuracy of Information** (34 C.F.R. § 602.18(d)):  ACICS had and will continue to have procedures that demonstrate its compliance with regulations that concern the use of reasonable processes designed to determine the accuracy and reliability of student placement rate and institutional retention rate data.  *Id.* at 15. ACICS enhanced its process of on-site random sampling of placement documentation by adding a dedicated DIR to every campus review.  *Id.*  This enhanced process now involves a review of all available back-up documentation of student placement outcomes, and not only randomized samples.  As a result of this enhanced focus on data integrity, the Council made dozens of findings based on campus inability to verify data, and directed numerous campuses to conduct independent third party reviews of all reported data for multiple years.  Further, ACICS implemented an enhanced data integrity algorithm to its IT platform and added a robust Placement Verification Program (PVP) that establishes random monthly testing of institutions' placement data.  *Id.* at 16.  The enhanced algorithm tests document submissions for inaccurate or missing data, and ACICS's ARIG uses the data to identify at risk institutions and patterns of concern.  *Id.* at

17.  ACICS enhanced its already robust data integrity processes and procedures and has demonstrated effective application of this criterion.

- **Out of Cycle Review** (34 C.F.R. § 602.21):  ACICS's submissions and recent reforms also address the Staff's finding that ACICS must show that it has a systematic process to identify problematic institutions outside of its regular review process.  *Id.* at 18.  Specifically, ACICS submitted a Campus Effectiveness Plan – which was not referenced, at least in the Staff Report, – that shows ACICS's systematic review of institutional data (enrollment, retention, placement, financial information) on an annual basis.  *Id.*  Further, as noted above, ACICS's At-Risk Institutions Group closely monitors and acts on information received from a variety of sources, including media reports, complaints, financial information, and other adverse information.  ACICS has complied with this criterion and has demonstrated effective application through documentary submissions and through its recent actions taken at the Agency's August meeting.

ACICS took substantial steps to demonstrate compliance with the findings in this category, including the broad range of actions taken by the Council at its August 2016 meeting, described further below.  In addition, ACICS will continue to provide additional information demonstrating ongoing compliance based on its fall 2016 and winter 2017 accreditation cycles.

### (c)      Category C Findings (10 of 21 Findings)

This category includes those Staff Report findings for which ACICS has been acting pursuant to a timeline to establish new policies and procedures and demonstrate effective implementation of those new policies within twelve months.  As described in ACICS's July 5 Comments, ACICS proceeded with adopting revised standards and other policies at its August 2016 meeting, with a call-for-comment currently underway, including additional and revised

student achievement standards along with responsive Council actions to be considered at the December 2016 meeting. ACICS will review student achievement on an ongoing basis. Student achievement data reported for the 2015-2016 period will be reviewed at the upcoming fall 2016 meeting. Therefore, ACICS will be able to provide additional evidence of implementation of recently revised policies and procedures after its fall 2016 accreditation visit cycle (September-October-November 2016) and also following the winter 2017 accreditation visit cycle (January-February-March 2017). *See* July 5 Executive Summary at 3, 17-30.

Moreover, ACICS will be conducting computational analysis for error checking on ACICS member school annual Campus Accountability Report (CAR) data, which is due to ACICS on November 1, 2016. This data will be analyzed under ACICS's criteria and will be presented for Council review at the December 2016 Council meeting. Based on that review, ACICS will pursue appropriate actions (adverse, probation, compliance warning) for campuses and programs that have not been able to demonstrate compliance with student achievement standards within the established Council timeframes. ACICS expects it will be able to demonstrate implementation of its revised criteria and requirements to the Department no later than the completion of the winter 2017 review cycle. As a result, based on this reasonable implementation period, ACICS will be able to demonstrate effective implementation of changes in policy and full compliance with each Category C criteria well within the twelve month period**.**

The specific, measurable steps ACICS has taken toward implementing its new processes and procedures to address the Staff Report findings in this category are provided in detail in ACICS's July 5 Comments and summarized below:

- **Acceptance of the Agency by Others** (34 C.F.R § 602.13): The SDO Decision states that ACICS is out of compliance with this criterion such that its recognition should be

denied, but offers no explanation.  But, ACICS implemented reforms to address the Staff

Report concerns that the Agency demonstrate acceptance of the Agency by others,

including evidence of student success on licensing exams and documentation of positive

relationships with state agencies and other educational institutions and agencies.  *See*

ACICS's July 5 Executive Summary at 18-20.  ACICS has addressed in detail the steps

that it has taken and is in the process of taking to address the Staff Report findings.  *See*

*id.*  Therefore, the SDO has no facts on which to base denial of re-recognition as to this

criteria.  Further, since 2010, seven accrediting agencies had final Staff report findings

under this criterion that did not lead to denial of recognition.  For example, in June 2016,

the AOA Commission on Osteopathic College Accreditation (AOA COCA) had a similar

staff finding and submitted no new evidence to show that employers and practitioners

widely accept its standards, but the Department granted this agency re-recognition.  *See*

ACICS's July 5 Comments, Exhibit C.  In December 2013, the Accrediting Commission

for Community and Junior Colleges (ACCJC) faced evidence that multiple educational

institutions formally questioned this agency's ability to meet this criterion, but the

Department concluded nonetheless that ACCJC could resolve those issues within twelve

months.  *Id.*  The SDO Decision to deny re-recognition of ACICS based on this criterion

is arbitrary, capricious, and unwarranted based on the facts.

- **Adequacy of Volunteer Training** (34 C.F.R. § 602.15(a)(2)):  The SDO Decision states

   that ACICS is out of compliance with this criterion such that its recognition should be

   denied, yet offers no explanation.  ACICS has addressed in detail the steps that the

   Agency has taken and continues to take to address the Staff Report findings regarding

   enhanced training for volunteers, Council members, Institutional Review Committee

(IRC) members, and accreditation coordinators focused on application of ACICS data integrity standards related to student achievement data, enhanced focus on Title IV compliance, student achievement performance, admissions/recruitment activities, and the integration of at-risk institutions metrics into the campus review process.  These policy changes go far beyond any training program in place at other accrediting agencies.  This training has already been implemented and ACICS has demonstrated how evidence of implementation of these changes can be demonstrated within twelve months.  *See* July 5 Executive Summary at 20-22.  Therefore, the SDO has no facts on which to base denial of re-recognition as to this criterion.

Further, since 2010, nineteen accrediting agencies had findings under this criterion that did not lead to denial of recognition.  *See* ACICS's July 5 Comments, Exhibit C.  For example, in June 2016, the American Bar Association failed to provide required information under this criterion about members of a Data Policy and Collection Committee, but that agency was granted re-recognition.  *See id.*  Also in June 2016, the Transnational Association of Christian Colleges and Schools failed to provide policies required under this criterion for distance education.  No accrediting agency has had this criterion applied to require that the agency train volunteers to detect questionable or fraudulent behavior at accredited institutions nor has any agency been denied re-recognition for failure to meet such standards under this criterion.  Despite being held to a new and higher standard, ACICS has demonstrated a strong response as to this criterion, and within 12 months, ACICS will be able to demonstrate robust training of all ACICS evaluators, Council members, committee members, and staff regarding their responsibilities including the identification of questionable or fraudulent activity and

19

student achievement data.  *See* July 5 Executive Summary at 20-22.  Therefore, the SDO

Decision to deny re-recognition of ACICS based on this criterion is arbitrary, capricious

and unwarranted based on the facts.

- **Academic and Administrative Personnel** (34 C.F.R. § 602.15(a)(3),(4)):  The SDO

    Decision states that ACICS is out of compliance with this criterion such that its

    recognition should be denied, yet offers no explanation.  ACICS has addressed the

    actions it has taken and is taking to demonstrate effective implementation of changes in

    policy to address this criterion within twelve months.  *See* July 5 Executive Summary at

    22-23.  The Staff Report contains many positive statements about ACICS's compliance

    with this criterion.  In response to residual concerns, however, ACICS enhanced its

    procedures for obtaining and verifying information related to the roles, qualifications, and

    experience of those selected to serve on the Agency's evaluation teams and decision-

    making bodies and can demonstrate compliance within twelve months.  *See id.*

    Therefore, the SDO has no facts on which to base denial of re-recognition as to this

    criterion.

    Further, Department Staff applied this criterion more strictly to ACICS than to

other accrediting agencies.  For example, in June 2016, a final staff report found similar

issues with ensuring academic qualification of individuals doing on-site evaluations for

AOA COCA, yet that issue did not prevent re-recognition, nor was that agency required

to "clarify and document its entire process for the recruitment, selection, and verification

of the qualifications and experience possessed by those selected to serve on the agency's

evaluation teams and decision-making bodies," as ACICS was required to do here.  *See*

ACICS's July 5 Comments, Exhibit C.  AOA COCA was only required to "provide

information and documentation to demonstrate that its site-visit teams include academics.

The agency must also demonstrate that a single individual fulfills one defined

category/role at a time on the site review teams.  The agency policies and procedures

must be amended to meet the requirements of the criteria."  *Id.*  The criterion requires

qualified persons to evaluate schools, and neither agency allegedly met the Department's

criterion.  Yet, ACICS is held to a much higher standard in justifying its entire selection

process.  Therefore, the SDO Decision to deny re-recognition of ACICS based on this

criterion is arbitrary, capricious, and unwarranted based on the facts.

Similarly, in December 2013, with regard to the Accrediting Commission for

Community and Junior Colleges (ACCJC), the final staff report concluded the agency

was not using qualified on-site evaluators.  *See id.*[4]   Yet, the ACCJC suggested remedy

was not denial of re-recognition, but redefining what an academic is:

> [T]he Department does not require the use of any one definition for an
> academic, but does expect that the agency's definition be comparable with
> the generally accepted policies and practices within the accrediting agency
> and wider higher education community. Department staff note that the
> inclusion of student services staff as academic representatives does not
> meet the generally accepted definition of such representation within the
> accrediting agency community, nor the spirit of the regulation.

*See id.*  Here, the Staff Report shows that the Department recognized the qualification of

the individuals conducting ACICS reviews.  Nevertheless, the Department heightened the

compliance threshold for this criterion only as to ACICS.  Therefore, the SDO Decision

---

[4] Staff stated that "The agency has not provided a policy or other guidance as to what would
qualify a person to be identified as either primarily an academic, or primarily an administrator,
nor did the agency provide any biographical information of the current commissioners to
demonstrate that those individuals meet the qualifications for the category noted."

to deny re-recognition of ACICS based on this criterion is also arbitrary, capricious, and unwarranted based on the facts.

- **Title IV Compliance of Accredited Schools** (34 C.F.R. §602.16 (a)(1)(x)):  The SDO Decision states that ACICS is out of compliance with this criterion such that recognition should be denied, but it offers no explanation.  *See* SDO Decision at 2.  This criterion requires ACICS to demonstrate that its accreditation standards effectively evaluate an institution's record of compliance with its program responsibilities under Title IV of the Higher Education Act, including through cohort default rate data, audits, program reviews and other information provided to ACICS by the Department.  The Staff Report focused primarily on ACICS's alleged failure to appropriately respond to information provided by the Department regarding Michigan Jewish Institute (MJI).  *See* July 5 Executive Summary at 23-24.  The Department's expectation was that ACICS inform the Department about its agency findings regarding MJI's conduct in relation to ACICS standards.  *See id.*  The Department alleged that ACICS "concealed" from the Department information and concluded that "the agency does not effectively apply its standards and policies regarding compliance with Title IV."  *Id.*  In response, ACICS, as acknowledged in the Staff Report, made strides in implementing a "revised multi-faceted approach to monitoring which will target and apply increased monitoring/reporting of specific schools that are not meeting agency standards/expectations."  Staff Report at 17. Yet, Department Staff stated that "the criteria required the agency to have been doing this all along."  *Id.*  That ignores, however, that agencies are permitted twelve months to come into full compliance even where the Department determines they should have been taking action "all along."  ACICS provided a detailed response regarding how ACICS has

22

met this criterion and has demonstrated, and continues to effectively demonstrate, effective implementation of this criterion with greatly enhanced procedures for detecting and reporting Title IV related issues.  *See* July 5 Executive Summary at 23-24. Therefore, here, too, the SDO has no facts on which to base denial of re-recognition.

In contrast, in June 2016, the AOA COCA's final staff report concluded that the agency did not meet this criterion.  *See* ACICS's July 5 Comments, Exhibit C.  The agency was required to "provide additional full cycles of review from other programs/institutions they accredit for the review of compliance and consistency with agency standards, policies and procedures as well as Department criteria for this section." *Id.*  Nevertheless, AOA COCA was not denied re-accreditation on this basis, even though that agency did not even have in place those safeguards established by ACICS to date. Therefore, the SDO Decision to deny re-recognition of ACICS based on this criterion is arbitrary, capricious, and unwarranted based on the facts.

- **Sufficiency of Team Visit Process (Past Placement Rate Issue)** (34 C.F.R. § 602.17(c)):  The SDO Decision states that ACICS is out of compliance with this criterion, but offers no explanation.  This criterion requires ACICS to have effective mechanisms for evaluating an institution's or program's compliance with the agency's standards including through on-site visits.  The Staff Report focused on "widespread placement rate falsification" and "prevalent actions by state and federal authorities for recruiting abuse and misrepresentation" as the basis for non-compliance.  ACICS provided a full response regarding the many significant steps that the Agency has taken and continues to take that will demonstrate effective application of new policies and procedures within twelve months.  *See* July 5 Executive Summary at 24-25.  Further, no other accrediting agency

has been cited for a violation of this criterion in a final staff report, let alone a basis for denial of re-recognition.  Therefore, the SDO has no facts on which to base denial of re-recognition as to this criterion and cannot import new, allegedly unattainable requirements into this criterion for the purpose of denying ACICS recognition.

- **Institutional Review Processes** (34 C.F.R. § 602.19(b)):  The SDO Decision states that ACICS is out of compliance with this criterion, but offers no explanation.  *See* SDO Decision at 2.  This criterion requires ACICS to monitor and reevaluate accredited institutions and programs to identify problems with an institution's or program's continued compliance with agency standards.  The Staff Report concludes that ACICS cannot possibly meet the criterion within twelve months.  ACICS provided a detailed response regarding all steps taken to date and that will be taken to demonstrate compliance within twelve months.  *See* July 5 Executive Summary at 25-26.  Indeed, ACICS has demonstrated the implementation of policy and procedural changes necessary to meet the Department's standards for demonstrating effective implementation and compliance within twelve months.  *See id.*  The SDO has no facts on which to base denial of re-recognition as to this criterion.

In contrast, in June 2016, AOA COCA's final staff report found the agency not in compliance with this criterion and simply required the agency to "provide evidence of completed mid-cycle, annual reporting and commission actions taken on findings of these reports for the same institution(s) for Department staff to assess for compliance with the criteria for this section."  *See* ACICS's July 5 Comments, Exhibit C.  The agency provided no evidence of its "review and assessment of institutions/programs for compliance with its standards," yet the SDO permitted that agency twelve months to

24

demonstrate compliance.  *Id.*  Therefore, the SDO Decision to deny re-recognition of ACICS based on this criterion is arbitrary, capricious, and unwarranted based on the facts.

Similarly, in December 2013, ACCJC failed to demonstrate compliance with this criterion, specifically failing to provide "information and documentation to demonstrate that it requires additional information from an institution when student achievement data, or any other key data or indicators do not meet the agency's standards."  *See id.*  In fact, ACCJC provided the Department with "a blank annual report that appears to collect key data and indicators, including measures of student achievement . . . it did not provide a completed annual report nor a review of individual institution's data to demonstrate that the annual report enables the agency to analyze and identify problems with an institution's continued compliance with agency standards."  The agency also "did not provide any information or documentation to demonstrate that it requires additional information from an institution when student achievement data, or any other key data or indicators do not meet the agency's standards," yet the SDO did not deny re-accreditation.  Therefore, the SDO Decision to deny re-recognition of ACICS based on this criterion is arbitrary, capricious, and unwarranted based on the facts.

- **Enforcement standards and maximum timeframes for compliance** (34 C.F.R. § 602.20(a), (b)):  The SDO Decision states that ACICS is out of compliance with this criterion such that recognition should be denied, but offers no explanation.  *See* SDO Decision at 2.  The Staff Report stated that ACICS was not enforcing its policies against schools.  ACICS responded by providing detailed information about changes it has made to its policies and procedures to comply with this accreditation criterion, and its plans for

demonstrating effective implementation at the August 2016 and subsequent ACICS meetings.  *See* July 5 Executive Summary at 26-28.   ACICS can demonstrate within twelve months the effective application of those new procedures to monitor institutions. *See id.*  Therefore, the SDO has no factual basis for denying re-recognition based on this criterion.

In contrast, in June 2016, the final staff report for AOA COCA found that "the agency's standards, policies and procedures must be amended to ensure that immediate action is taken when the Commission determines the [institution] is out of compliance with agency standards.  *See* ACICS's July 5 Comments, Exhibit C.  The agency must also provide evidence of the full cycle of review in order for Department staff to assess for compliance with this criterion."  *Id.*  Even though both ACICS and ACA COCA did not provide evidence of the "full cycle of review" to demonstrate compliance, and both ACICS and ACA COCA gave schools a full year to come into compliance once they find a compliance problem, ACA COCA was not denied re-accreditation based on this criterion.  *Id.*  Further, in December 2013, ACCJC was found to have failed to consistently enforce the time periods in its policies for institutions to come into compliance with its standards.  *Id.*  ACCJC was not denied re-accreditation.  Therefore, the SDO Decision to deny re-recognition of ACICS based on this criterion is arbitrary, capricious, and unwarranted based on the facts.

- **Fraud and Abuse** (34 C.F.R. § 602.27(a)(1)(6-7)):  The SDO Decision states that ACICS is out of compliance with this criterion such that recognition should be denied, but it offers no explanation.  *See* SDO Decision at 2.  This criterion requires ACICS to provide the Department with the name of any institution or program it accredits that the

agency has reason to believe is failing to meet its Title IV, HEA program responsibilities or is engaged in fraud or abuse, along with the agency's reasons for concern about the institution or program and any related information the Secretary may request.  The Staff Report concluded that new ACICS standards effective July 1, 2016 are not sufficient to allow ACICS to demonstrate effective implementation of the new standards for compliance with the criterion.  ACICS provided a detailed response to the Department regarding its revised standards meeting this criteria.  *See* July 5 Executive Summary at 28-30.

The Agency's current Appendix G language meets this specific criterion, and ACICS is working to further strengthen that language.  ACICS also is undertaking other initiatives to obtain better information about how well institutions comply with the Agency's standards, including their efforts to identify and respond to potential fraud or abuse.  *See id.*  ACICS has not been and is not now out of compliance with this criterion, but even if it was, ACICS has taken additional significant steps with demonstrated evidence of implementation within twelve months.  The SDO has no factual basis to conclude that ACICS cannot demonstrate full compliance with this criterion within twelve months.

## 2. ACICS's Changes In Leadership

ACICS made significant leadership changes in the weeks leading up to and immediately following the June NACIQI Meeting.  Indeed, during the NACIQI Meeting, there was a question posed about whether "anything substantive would happen in 12 months," and about the fact that the "culture of this agency needs to be blown up and reinvented."  NACIQI Tr. 255: 5-6; 268:13-20.  During the three months following the NACIQI meeting, the President, and five Vice Presidents, are no longer employed by ACICS.   The Board doubled the number of public

members; this, in turn, ensures that there is added independent oversight.  The Board also

appointed Roger J. Williams – a 25-year veteran of management of higher education

accreditation – as the new Interim Chief Executive Officer and President.  *See* **Exh. A**, ACICS's

Request for Reconsideration, Ex. 1, Aug. 1, 2016 ACICS Press Release.  Upon hearing that Mr.

Williams would be assisting with a then-Blue Ribbon Committee established to facilitate

ACICS's efforts, Mr. Porcelli remarked during the NACIQI Meeting that he was "personally

blown away by the fact" of Mr. Williams's involvement, and that was before Mr. Williams was

appointed to his current position at ACICS.   Mr. Williams is uniquely qualified to guide ACICS

as the former Executive Director of the Accrediting Council for Continuing Education and

Training (ACCET).  Mr. Williams transformed ACCET from nearly losing its recognition status

with the Department into one that garnered praise for its demonstrated focus on holding schools

accountable for clearly-defined student achievement outcomes.  That agency was also the only

U.S. Department of Education recognized accrediting agency to be certified by the International

Organization for Standardization (ISO9001) as a Quality Management System.

### 3.    ACICS Continues Implementation Of Its New Accrediting Standards And Review Procedures

ACICS continues to take aggressive action to implement recent changes to its accrediting

standards and review procedures, including specific adverse actions the Agency took against

institutions in the time leading up to and following ACICS's July 5 Comments.  These ongoing

efforts evidence that ACICS will be able to demonstrate full compliance within twelve months,

particularly in the areas that appear to be of concern to the SDO, including the Agency's rigorous

application of its standards (34 C.F.R. §§ 602.16(a) and 602.17), monitoring of institutions (34

C.F.R. § 602.19(b)), and enforcement of its standards (34 C.F.R. § 602.20).   ACICS has and will

continue to take concrete, measurable steps toward compliance in these key areas, as demonstrated in ACICS's Request for Reconsideration and as summarized below.

- **ACICS Takes Immediate Adverse Action:**  Following on-site visits to its three locations in May and June 2016, ACICS took immediate adverse action at the August 2016 Council meeting regarding DuBois Business College, which was found to be seriously out of compliance with ACICS's standards, including those relating to student achievement and standards that concern the Agency's Title IV-related responsibilities.

- **ACICS's Monitoring Is Rigorous:** After analyzing ITT Technical Institute's responses to ACICS's show-cause directive at the August 2016 Council meeting, ACICS scheduled and conducted nine unannounced on-site visits to assess the level of compliance across a broad spectrum of ITT's campuses, particularly those with open complaints and/or poor student achievement records.

- **ACICS's Enforcement Is Robust:**  After learning that the Department had denied recertification to Council on Occupational Education-accredited schools affiliated with MedTech College due to misrepresentations of placement data, ACICS conducted three unannounced site visits whereupon a number of compliance issues (including inaccuracies in reported placement data) were identified, and directed MedTech to submit ACICS placement data through the Agency's Placement Verification Program.

- **ACICS Is Committed to Evaluating Accredited Institutions' Capabilities:** ACICS issued a show cause directive to Globe University and the Minnesota School of Business in September 2016 requiring that the schools demonstrate why ACICS should not suspend or condition Globe's accreditation and, most importantly, directing the

institution to provide a teach-out plan, in conjunction with the State of Minnesota Office of Higher Education, in the event of its subsequent closure.

- **ACICS's Response to Complaints Is Swift:**  In response to a recent complaint regarding Stevens – The Institute of Business and Arts in St. Louis, Missouri, ACICS instituted a "Secret Shopper" process to examine the institution's recruitment practices and issued a letter to Stevens on September 28, 2016 that it must respond to allegations regarding statements made to secret shoppers.

- **ACICS Has Moved to Confirm All Placements:**  ACICS has incorporated a Data Integrity Reviewer (DIR) on each on-site evaluation visit; has directed the use of more recent placement information, which is verified through its PVP and the DIR; and all placements must be confirmed through the PVP system for the 2016-2017 Campus Accountability Report period.

This evidence further demonstrates that ACICS will be able to achieve compliance with all Department criteria within twelve months.

> **B.**     **The Recommendations Of Staff And NACIQI And The SDO's Decision Are Arbitrary And Capricious**

The findings and recommendation of the Staff Report, NACIQI, and the SDO Decision are arbitrary and capricious.  The recommendations and Decision are not supported by the record, do not consider the relevant factors as set forth in the regulations, and hold ACICS to regulatory standards that were not previously announced and about which ACICS did not receive adequate prior notice.  Additionally, the recommendations and Decision are the result of procedural irregularities and violate the most elementary principles of equal protection of the law, because the Staff, NACIQI, and the SDO have treated ACICS differently than similarly-situated agencies.  Furthermore, these proceedings were prejudicially tainted by political

influence both upon and within the Department.  As a result, ACICS faces unprecedented and

draconian sanctions for its purported failure to function as a quasi-prosecutor with plenary

investigative authority over schools – a standard that greatly exceeds the responsibilities imposed

on an accrediting agency by the Department's regulations.

### 1.     The Facts In The Record Do Not Support The Recommendations Or The SDO's Decision

ACICS repeatedly and consistently presented evidence of its ongoing compliance efforts

and its capacity to achieve compliance going forward within twelve months.  Accordingly, the

recommendations and decision are not supported by substantial evidence, nor do their

conclusions derive from a "reasoned path from the facts."  *Am. Fed'n. of Gov't Emps., Local*

*2924 v. Fed. Labor Relations Auth.*, 470 F.3d 375, 380 (D.C. Cir. 2006).

### (a)     The Staff Report

The Regulations specifically require that the Department Staff "take[] into account all

available relevant information concerning the compliance of the agency with those criteria and in

the agency's effectiveness in applying the criteria." 34 C.F.R. § 602.32(b).  The Staff Report

does not reflect reasoned consideration of "all available information."  In many instances, the

Report findings are merely conclusory, and without any evidentiary support.  This observation

was echoed by several NACIQI Panel members, one of whom noted that she "was surprised that

the presentation [of the Staff Report] was more conclusory than it was explanatory."  Comment

of Anne Neal, from the American Council of Trustees and Alumni, NACIQI Tr. 28:8-9, cited in

ACICS's July 5, 2016 Comment at 8.

The Staff Report contains a litany of examples of conclusions derived from speculation

and in direct conflict with explicit facts in the record.  *See* ACICS's July 5 Comment at 7-10.

These examples are summarized below.

31

- Regulation 34 C.F.R. § 602.15(a)(1) requires that ACICS have the "administrative and fiscal capability to carry out its accreditation activities in light of its requested scope of recognition."   Regarding this criterion, the Staff Report states that "no complaints have been received at the Department indicating that there have been staffing problems," and that "when Department staff visited the agency's offices in April 2016 several staff members were interviewed and the administrative processes were observed to be functioning efficiently."  Staff Report at 6.  The Staff Report notes that the Agency demonstrated that it "has adequate administrative staff and financial resources to carry out its accrediting responsibilities."  *Id*.  Nonetheless, the Report concludes, without any basis or explanation, that "the recent departure of the executive director, with no permanent replacement, seems to indicate that the agency has staffing concerns."  *Id*. There is no evidence to support this finding.  The Report further makes the unsupported and broad assertion that Staff is "concerned that [ACICS's] lack of effective monitoring approaches for its institutions reflects inadequate staffing."  *Id*.  There is, however, no evidence to support this finding.

- Further, Regulation 34 C.F.R. § 602.15(a)(1) requires that the Agency have "adequate . . . financial resources to carry out its accrediting responsibilities."  The Staff Report acknowledges that the audited financial statements ACICS already provided "confirmed that the agency was maintaining sufficient resources to continue operating as it had been" and "demonstrates that ACICS had the financial reserves capable of handling 'unanticipated, short-term ebbs in budgeted revenue.'"  Report at 6.  Despite these acknowledged demonstrations of financial solvency, the Staff Report still found that ACICS was unable to demonstrate compliance with this section because it has not yet

submitted an audit that the Staff acknowledges is not available until October 2016, so that it can demonstrate its ability to weather predicted reductions as a result of a contraction of private career colleges. These decreases are based on the Staff's prediction that "a greater-than-expected contraction of private career colleges could adversely affect the agency's already questionable effectiveness when it comes to monitoring and enforcement issues." *Id.* Thus, the Staff is basing its conclusion of ACICS's non-compliance not upon the evidence that is actually in the record, but on its own speculation that the contraction of private career colleges will be "greater than expected."[5]

- Regulation 34 C.F.R. § 602.27(a)(6)-(7) establishes that an agency must notify the Department if it has "reason to believe" that any of the institutions that it accredits are violating Title IV by engaging in fraud and abuse. The Staff Report discounts this, instead concluding that ACICS is noncompliant because it has not provided documentation that it "consistently notified the Department regarding suspected Title-IV-related fraud and abuse, or to attest that it had not found any occasion to do so," further noting that "there have been instances of fraud and abuse discovered at several ACICS-accredited institutions within the last few years." *Id.* at 28. The fact that ACICS had unearthed no fraud at the time of the Staff Report, which is – by nature – difficult to detect, does not support a finding of noncompliance.[6] In fact, professional Title IV

---

[5] In fact, the June 30, 2016 fiscal year-end audit is expected to be completed by November 1, 2016 with the anticipated conclusion that ACICS has the financial reserves necessary to sustain an anticipated contraction in membership.

[6] In September 2016, ACICS took action regarding Penn Commercial Business Technical School's ("Penn Commercial") eligibility to continue to receive Title IV funding. *See* September 9, 2016 Letter from ACICS to Ron Bennett, School Eligibility Service Director, Program

auditors have also failed to detect fraud at those same ACICS-accredited institutions, a problem recognized by the Department with its recent action to update a 19-year-old Title IV program audit guide to finally provide clearer expectations of auditors for the procedures to be used to detect fraud.  To hold ACICS accountable for Title IV fraud that professional auditors, utilizing the Department's own standards, failed to detect is an unfair and arbitrary measurement of ACICS's performance as an accreditor.  It also imposes on ACICS a standard to which other accrediting agencies have not been held.

### (b)     NACIQI's Recommendation

NACIQI's recommendation is not supported by the facts in the record.  For example, Department Staff repeatedly referenced ACICS's ongoing efforts to improve upon policies and procedures during the NACIQI Meeting.  Chuck Mula of the Department stated that "the agency has provided revised standards that are in compliance with our requirements for those standards." NACIQI Tr. 48:14-16.  Mr. Porcelli noted that "our role is not to punish [ACICS] for their past sins but what are they going to do going forward and yes they have what really looks like good operation to go forward."  *Id*. 57:7-9.  Mr. Porcelli further echoed these sentiments and dispelled the rhetoric that ACICS is "an evil agency," as he acknowledged that its personnel and Council members have worked hard to arrive at the right conclusions.  NACIQI Tr. 24:5-9.  The NACIQI Meeting featured commentary from other Panel members underscoring how the recommendations are inconsistent with the record.  NACIQI member Art Keiser, chancellor of Keiser University, stated that ACICS's standards "are good standards, the standards meet the

---

Compliance of the Department of Education, attached hereto as **Exhibit B**.  Specifically, ACICS notified the Department when it had "reason to believe that there is evidence of a member institution's failure to comply with its Title IV responsibilities." *See id.*  ACICS's actions as to Penn Commercial reflect application of ACICS's strengthened policies, and also demonstrate ACICS's continuing commitment to its Title IV function.

requirements and they have … demonstrated a commitment to meet the requirement." *Id.* 286:2-4.  Similarly, NACIQI member Anne Neal noted that she was "not prepared to vote for a denial because of serious questions about the integrity of the process, unsupported allegations of guilt and a lack of confidence that this is a consistent application of standards." *Id.* 291:20-22.

**(c)     The SDO's Decision**

Pursuant to 34 C.F.R. § 602.36(e)(2)(ii), if the SDO "terminates recognition, the senior Department official *specifies the reasons for this decision, including all criteria the agency fails to meet and all criteria the agency has failed to apply effectively*" (emphasis added).  The SDO did not meet this standard.  The SDO's Decision is a mere three pages long, despite the fact that this proceeding has been ongoing since January 2016, and includes a substantial record.   Indeed, the SDO's "reasons" for terminating recognition are nonspecific and without any support.  The SDO acknowledges that the agency "has made recent efforts to address some of the deficiencies identified – including by revising various policies and restructuring internal governance bodies." SDO Decision at 2.  Furthermore, the SDO concedes that "it is possible for ACICS to fix some of the 21 compliance problems within 12 months." *Id.*  Nonetheless, the SDO concludes that "ACICS could not come into full compliance within 12 months," but the SDO never identifies those criteria for which ACICS purportedly will never be able to achieve compliance.  *Id.*

Further, the SDO states that she "agrees that ACICS is out of compliance" with *all* of the 21 criteria identified in the Staff Report.  *Id.*  But this conclusion ignores the undisputed fact ACICS has already come into compliance with numerous criteria.  *See*, Section IV(A)(1), *supra*.  Further, the SDO notes purported "major problems" with several criteria, but engages in no analysis and does not cite any evidence to support her Decision.  The SDO Decision fails to specify that criteria which the SDO contends that ACICS will never be able to satisfy and, as a

35

result, the SDO's Decision also is arbitrary and capricious, unsupported by substantial evidence

and unwarranted based on the evidence.

> ### 2.    The Staff Report, OPE Letter, And The SDO's Decision Lack Specificity Regarding Areas Of Noncompliance And Do Not Consider The Relevant Factors

The SDO relies heavily on the Staff Report, including the subsequent OPE Letter, but

neither is the result of reasoned consideration.  It misapplies the relevant regulations to determine

whether an accrediting agency should be recognized.  Specifically, the Staff applies the wrong

criteria to ACICS and then makes unsupported findings based on those criteria.  *See* ACICS's

July 5 Comments at 10-13.

Regulation 34 C.F.R. § 602.16(a)(1)(i) requires that an agency "address the quality of the

institution or program" by looking to "[s]uccess with respect to student achievement in relation

to the institution's mission, . . . including, as appropriate, consideration of course completion,

State licensing examination, and job placement rates."  The Staff Report ignores the clear

evidence that ACICS complies with this criterion, including the Agency's use of error-checking

algorithms designed to further verify job placement data that is furnished by the schools it

accredits.  Staff Rep. at 11-12.  Mr. Porcelli even took note of this system during the NACIQI

Meeting, as he noted that ACICS had "started using an algorithm to catch fraudulent

representations from the schools and [that] . . . falsified placements just dropped dramatically."

*See* NACIQI Tr. 57:16-20

The Report, however, applies factors not relevant to this specific criterion and makes an

unsupported conclusion of noncompliance as to ACICS's assessment of placement rates.  The

Report takes note of "many investigations and lawsuits were brought against ACICS-accredited

institutions for falsified placement rates in the last five years, resulting in many judgments/high

dollar settlements."  Staff Rep. at 12.  Specifically, the Staff Report references two settlements,

two consent decrees and one default judgment, all of which, of course, involve non-adjudicated findings of facts.  Nevertheless, the Report concludes that "[i]n response ACICS should explain what actions it took with respect to each pending or settled State or federal lawsuit initiated for the benefit of students against ACICS-accredited institutions in the last five years."  *Id.*  Again, the Report misapplies the guidance to arrive at an unsupported conclusion.

Accordingly, although lawsuits and investigations are not dispositive of liability and ACICS is not a prosecutor, the Staff Report appears to suggest that there are recognition criteria that contemplate such a role where none exists.  There is similarly no criteria requiring that an agency establish its compliance by noting how it has responded to a lawsuit or a confidential investigation about which an agency might only learn through media reports.[7]  These misplaced criteria similarly ignore the plain reality that, like similarly situated agencies, if ACICS took adverse actions against the schools it accredits, those actions could be – and often have been – litigated and overturned by courts.  *See* Remarks of Anthony Bieda, ACICS Executive in Charge, at NACIQI Meeting, NACIQI Tr. 81:10-13 ("[U]ntil those investigations produce not only a finding of wrong-doing but actually evidence of a wrong-doing or a fraud or abuse that we can get access to[,] we are pretty limited in being able to use those allegations as a basis to take formal adverse action.")

The Staff Report again holds ACICS to a standard more akin to a prosecutor when it addresses ACICS's compliance with Regulation 34 C.F.R. § 602.16(a)(1)(vii), which concerns the "[r]ecruiting and admissions practices, academic calendars, catalogs, publications, grading and advertising," of a school.  The Staff Report notes that:

---

[7] ACICS often learned about investigations of those schools that it accredits through media reports or securities filings if the school was part of a publicly-held multi-campus system.

> The materials viewed by Department Staff showed that the agency's visiting team evaluates the self-study and reviews evidence including the transfer of credit policy, recruitment materials and advertisements, copies of catalogs and handbooks, the academic calendar and class schedules, and student records including grades.  As a result, the petition narrative notes that ACICS has applied a substantial number of sanctions to large multi-campus systems based on deficiencies in these categories.

*See* Staff Rep. at 15.  Nevertheless, the Staff Report concludes that because "a significant number of State attorneys general and others have obtained sizeable recoveries against ACICS-accredited institutions based on misrepresentations to prospective students and abusive recruiting," the Agency is "not effective in ensuring academic quality."  *Id.*  Again, this is not a relevant factor delineated by the regulation, and even if it were, the Staff Report actually cites facts that demonstrate compliance by taking note of the "substantial number of sanctions" handed out by ACICS.

The Staff's OPE Letter also invokes irrelevant factors that are not supported by the recognition criteria, by arguing that "past performance is the best evidence of future compliance," which essentially allows the Staff to discount all the progress ACICS has made to date.  OPE Letter at 11.  For example, the OPE Letter acknowledges that ACICS's May 20, 2016 Memorandum to Field includes a directive to collect licensure rates.  *Id.* at 13.  However, the Staff appears to expressly minimize this improvement by noting that the change "seems to be a reaction to the noncompliance noted in the Draft Analysis . . . ."  *Id.*

Additionally, the OPE Letter misrepresented the contents of a break-out session at ACICS's annual conference regarding best practices in State Attorneys General investigations.  To begin, the contents of this session have nothing to do with the stated recognition criteria, and the OPE Letter does not even attempt to suggest that it does.  Regardless, the OPE Letter states – via a description of the event by a third-party commenter – that the breakout session was "all

38

about ways to avoid problems with the [state attorneys general]." *Id.* at 18.  In fact, the session was intended as a responsible and informative session providing members with a "best practices" approach to respond to civil investigative demands from law enforcement agencies.  However, the OPE Letter seeks to muddy the waters by citing to the unreliable observations of a third-party commenter as a means of suggesting a negative reason for the event that again, has nothing to do with the recognition criteria.  The Staff Report and OPE Letter, and therefore the SDO Decision, lack specificity regarding areas of noncompliance and do not consider relevant factors.  As a result, the SDO Decision is arbitrary and capricious and otherwise fails to conform to the law required for SDO decisions.

### 3. The Department And NACIQI Only Recently Revised Their Approach To Key Recognition Criteria On Which ACICS Has Been Evaluated

It is well-documented that the Department and NACIQI substantially changed their guidelines and standards for evaluating accrediting agencies in the midst of ACICS's recognition cycle.  This deprived ACICS of fair notice.   Indeed, these changes were articulated by high-level staff at the Department on numerous occasions throughout these proceedings.  *See* ACICS July 5, 2016 Comments at 13-15.

Lynn Mahaffie, who had been delegated the Duties of Assistant Secretary for Postsecondary Education, stated in a January 2016 memorandum that "we recommend that the Department continue to work over the next 120 days to identify opportunities to increase the rigor of the Department's processes to determine whether an agency is 'effective.'"  *See* Jan. 20, 2016 Memorandum from L. Mahaffie to incoming Acting Secretary John King at 3-4 (emphasis added)).   She noted that "[a]lready we are pursuing differentiated, risk-based Department reviews of accreditation agencies . . . ." *Id.*

Under Secretary Ted Mitchell noted that the Department is "increasing the rigor of our fact-finding process with the accreditors coming up for review this summer, as well as in other review and recognition processes going forward." *See* "Strengthening Accreditation to Protect Students," March 29, 2016, *available at* http://blog.ed.gov/2016/03/strengthening-accreditation-to-protect-students/.  He went on to describe a series of new requirements:

> This process includes requiring responses to questions about how the accreditor's standards, policies, and practices allowed such poor and problematic performance to develop and continue; the specific actions an accreditor took and when; and how the accreditor plans to changes its practices to prevent those same situations from arising with similar institutions. This information will inform the Department's decisions regarding recognition for accrediting agencies.

*Id.*

Also in March, NACIQI announced its plan adopted at its December 2015 meeting "to pilot a more systematic approach to considering student achievement and other outcome and performance metrics in the hearings for agencies that come before it for consideration of their petition for recognition renewal at its June 2016 meeting."  *See* http://www2.ed.gov/about/bdscomm/list/naciqi-dir/2016-spring/pilot-project-march-2016.pdf. ACICS was measured against NACIQI's new "pilot" – or experimental – program not only without notice prior to it submitting its Petition, but also without the benefit of the customary feedback and relief from penalties that accompanies a pilot program when determining its propriety for widespread use.

On April 22, 2016, Under Secretary Mitchell sent a letter to all accrediting agencies recognized by the Department calling on them to devote greater resources (and in a more flexible manner) to their review of colleges and universities, particularly for-profit colleges.  The letter provides detailed new guidance on how accreditors should examine schools, with an emphasis on

using quantitative measures such as retention, graduation and student loan default rates to evaluate quality. The Staff Report for ACICS, applying these heightened review standards, was issued on June 15, 2016 – less than two months after this letter was sent.

The OPE Letter also acknowledged that the Department was imposing a new set of standards on ACICS by stating that the Agency will be unable to demonstrate compliance within twelve months, because it will be unable to show effective implementation of new standards it has promised to adopt. OPE Letter at 10. The OPE supports this conclusion by explaining that "this is because of the demonstration of multiple examples that are ***now required*** for renewal of recognition." *Id.* (emphasis added).

The Department, NACIQI, and the SDO have clearly changed the standards in the middle of ACICS's recognition cycle, without notice to ACICS, resulting in a demonstrably unfair process and arbitrary result.

### 4.    Numerous Procedural Irregularities Marred The Petition Process

Numerous procedural irregularities accompanied the drafting of the Staff Report and the conduct of the NACIQI Meeting that have tainted the validity of the SDO decision. Specifically, the drafting of the Staff Report appears to have been subject to irregular and unprecedented involvement from offices in the Department outside of the Accreditation Group. At the NACIQI Meeting, Mr. Porcelli stated that although he has written "hundreds" of staff reports during his 30-year career, this Report drafting process was different (*see* NACIQI Tr. at 61:5-10), he "could not personally handle all of the material by myself," and that "in the past a staff person would be able to do that." *Id.* at 61:11-18. Finally, he acknowledged that he "received advice from outside" the Department's Accreditation Group, but then he stated that he did not "want to comment on that" advice. *Id.* at 52:17-19. Mr. Porcelli's comments implied his discomfort with the propriety of the advice that he had received, as that step was a deviation from usual protocol.

41

Nearly two months after ACICS had submitted its Petition, the Accreditation Group of the Department sent ACICS a voluminous Supplemental Response for additional information, and granted only a partial extension of time for responding.  ACICS's July 5 Comments at 3. The Department denied ACICS's request that NACIQI defer consideration of the Petition until its December 2016 meeting to allow for time to consider this additional information.  *See* June 3, 2016 letter from H. Bounds to T. Bieda, Exh. D to ACICS's July 5 Comments.  The Accreditation Group then informed ACICS that the May 16 response to the Supplemental Request would not be considered in the deliberations about ACICS's Petition.  *See* May 18, 2016 email from H. Bounds to T. Bieda, Exh. D to ACICS's July 5 Comments.  The issued Department Staff Report, containing typographical, formatting and substantive errors, was clearly the result of a rushed review process.

Additionally, the NACIQI Meeting was marred by its own procedural irregularities.  On June 22, Under Secretary Mitchell issued a formal statement at the opening of the NACIQI Meeting that clearly informed NACIQI Panel members of the outcome that the Department wished the NACIQI Meeting to reach.  He made an apparent reference to ACICS and noted that "the truth is that some agencies need to up their game, and occasionally, agencies demonstrate such wide and deep failure that they simply cannot be entrusted with making the determinations we, you, and the public count on."  *See* June 22, 2016 NACIQI Meeting Transcript 4:13-10:2. This statement undoubtedly undermines the self-regulatory principle on which the review of accrediting agencies is based, and is an obvious denial of due process.  Frank Wu, one of ACICS's Primary NACIQI Readers, seemed to tacitly acknowledge as much, stating that he "would not feel quite right saying or thinking . . . we need to make an example of" ACICS. NACIQI Tr. 166:15-16.  In fact, another member of the NACIQI Panel expressed concern about

42

the unprecedented nature of the public statements made by the Department in advance of that Meeting. *See id*. 258:2-11, Comment of NACIQI Member Rick O'Donnell ("I think the elephant in the room is the question: is the Department doing this because it has something against for-profits.")

Nevertheless, there were numerous instances during the NACIQI Meeting when ACICS was implicitly held accountable for conduct concerning schools it never accredited (*e.g.* Trump University and Heald College) and for broader concerns with the accreditation community at large. *See* ACICS's July 5 Comments at 22-23. The Meeting also included comments from numerous third party commenters, many of whom offered testimony that had little or no connection to the specific recognition criteria at issue.[8] One commenter, an Assistant Attorney General from Maryland, mentioned the "vast amounts of resources" expended by states in lawsuits against schools and noted that even if the subject of a settlement neither admits nor denies liability, "there is still a problem" that accrediting agencies should know to address. NACIQI Tr. 149:8-18. In addition to being wholly outside the realm of the criteria at issue and improperly suggesting liability before any finding of wrong-doing, his comments sought to impose on ACICS the same law enforcement obligations that the Maryland Attorney General (and all other State Attorneys General) has as a matter of law. He further mentioned the fact of consumer complaints relating to schools, which, in the absence of any effort to substantiate the complaints, let alone identify how those complaints concern conduct arising from a failure of ACICS's accrediting process, provides no actual evidence that could reasonably inform consideration of ACICS's Petition.

---

[8] The Staff Report even acknowledged that "most of the [third party] commenters did not tie their areas of alleged noncompliance to specific sections of the Secretary's Criteria for Recognition." *See* Staff Report at 27-29.

In the final comment before the NACIQI Chair called a vote, a student Panel Member termed the vote regarding ACICS as a referendum on the entire higher education accreditation community, stating that "I have always been a big proponent and pushing this Committee to take a bold step and to send a message to the accreditation community."  NACIQI Tr. 293:10-11.

Additionally, during the Meeting, the Agency stated that it was prepared to "go down each one of the 21 items [identified in the Staff Report] that we have looked at and [to] tell you what we are going to do for each of those [21 items] and if allowed the opportunity we will take the time to go through those" items.  *Id.* 239:1-4.  But, ACICS was not allowed that opportunity to explain in detail how it intended to and how it already had responded to each of the twenty-one findings identified in the Staff Report.

Finally, the Department's SDO review process has been marred by the fact that the SDO is a political appointee and Chief of Staff to the Secretary, a direct report to the Secretary, and the Secretary will review her decision.  This evaluation and review process does not protect the independence of the SDO as a decision-maker that would be expected of even the most rudimentary and low stakes administrative review and appeal process.  Unfortunately, in this case as to ACICS the stakes are extremely high for tax payers, schools, and students.

**5.      Similarly Situated Agencies Have Not Been Held To The Same Standards That Are Now Being Imposed On ACICS**

The SDO's decision to deny ACICS's Petition and withdraw its recognition, without providing ACICS with an opportunity to resolve outstanding issues is unprecedented.  This decision reflects a lack of due process, especially since Department Staff, in reaching their findings, included numerous new interpretations of existing standards with which ACICS was

found to be in compliance only three years ago.[9]  ACICS is being held to a higher standard than other accrediting agencies – a standard akin to a special prosecutor.

Although the OPE Letter stated that "[o]f course, ACICS is not being held to that standard," (*see* OPE Letter at 7 n.2) neither OPE, the Department nor NACIQI has articulated how the standard currently applied to ACICS is different from that of a prosecutorial body.  This revised prosecutorial standard is made plain in the numerous references to law enforcement investigations and settlements throughout the proceedings, seemingly intended to suggest that ACICS failed to function as a prosecutor.  Indeed, the Staff Report, as well as comments during the NACIQI meeting, leave the impression that ACICS's failure to discover fraudulent activities and other wrongful conduct at schools subject to such investigations and lawsuits is *ipso facto* conclusive evidence of "weak monitoring," a "failure to document enforcement" and that ACICS's data verification and other compliance efforts were "ineffective."  *See e.g*., Staff Rep. at 12, 16, 22; NACIQI Tr. at 149:8-18.  Similarly, if the Department is seeking to impose a Title IV compliance auditor function on ACICS in order to ensure that the Agency can detect and report fraud, such a heightened standard is new and now being imposed on ACICS without notice.  Moreover, it is clear from the record that this standard is being applied only to ACICS.

Neither the Staff Report nor the NACIQI Meeting mentioned that many of the higher education holding companies cited as examples in the Staff Report as "problem" companies also owned and operated schools that were accredited by other agencies.  ACICS's July 5 Comments at 17-20.  During the NACIQI Meeting, many of these agencies, as well as several other programmatic accrediting agencies, were up for renewal of recognition and oversaw the same

---

[9] ACICS has been continuously recognized by the Secretary since 1956 and subjected to numerous periodic reviews by Department Staff since that time and has never before been subject to an effort to withdraw recognition.

"problem schools" as ACICS.  However, these agencies were not questioned or challenged –
either by the Staff or during the NACIQI Meeting – about any failure to prevent alleged
fraudulent or improper conduct or to institute investigations.

In particular, the Staff Report and the NACIQI Meeting specifically focused on the
events surrounding Corinthian Colleges, and criticized ACICS for continuing to accredit
Corinthian's schools until Corinthian ceased operations and declared bankruptcy.  These
criticisms ignore the actual facts.  *See* ACICS's July 5 Comments at 18-20.  Eight months before
Corinthian closed its schools and filed for bankruptcy, the Department announced that it had
entered into an unprecedented and sweeping operating agreement with Corinthian while it
worked to either sell or close its schools.  During that time period, the Department was in charge
of all Corinthian-related matters and investigations and conducted weekly teleconferences to
provide status reports and updates to accrediting agencies, including ACICS.  At no point during
the time period that the Department was overseeing the wind-down of Corinthian did the
Department ever indicate that ACICS's oversight of Corinthian had not been in accordance with
Department expectations or regulations.

ACICS is not a government law enforcement agency, but, nevertheless, it commenced
investigations of the schools involved in the alleged fraudulent conduct.  ACICS also was not the
only accreditor of Corinthian's schools or of schools that are owned by other holding companies
of multi-campus locations referenced in the Staff Report and at the NACIQI Meeting.  It would
be profoundly unfair and a denial of equal protection to single out ACICS, given all of the other
agencies that also accredited Corinthian schools, for example.

ACICS provided with its July 5 Comments a chart summarizing the 70 re-recognition
renewal petitions that have been before NACIQI since December 2010 in which an agency was

found to have one or more violations of the federal standards.  *See* Exhibit C of ACICS's July 5

Comments.  Of those 70 petitions, 22 agencies presented between seven and 15 violations; 6

agencies presented between 14 and 21 violations; and 15 agencies had 22 or more violations,

with 4 presenting more than 40 violations.  In all but one of those matters,[10] Department staff and

NACIQI recommended that the institution be given more time to bring the outstanding violations

into compliance.  Furthermore, 11 of the agencies where Department staff found more than 21

violations of the federal standards were Title IV gatekeepers -- that is recognized for Title IV

purposes.  As to each of these Title IV gatekeepers, NACIQI recommended that those agencies

be given twelve months to come into compliance with recognition criteria.

### 6.    The Petition Process Has Been Unfairly Politicized

The Staff's and NACIQI's consideration of ACICS's Petition has been unfairly

politicized, which has precluded the Agency's Petition from receiving fair consideration.

Specifically, in advance of the NACIQI meeting, Senator Elizabeth Warren (D-MA), issued a

report condemning ACICS and exhorting the NACIQI Panel and Department to deny ACICS's

recognition.  The report announced that "[i]f NACIQI members and the Department of Education

officials want to restore public confidence in their own review process, they must demonstrate

that they understand the devastating consequences of ACICS's long record of failure."  *Rubber*

*Stamps:  ACICS and Troubled Oversight of College Accreditors*, prepared by Staff of Sen.

---

[10] In June 2012, the Puerto Rico State Agency (subsequently renamed the Puerto Rico State
Agency for the Approval of Public Postsecondary Vocational, Technical Institutions and
Programs (PRHRDC)) was denied re-recognition in the face of 33 violations of standards.
However, the Secretary, on appeal, rejected NACIQI's recommendation and granted PRHRDC
recognition. At a subsequent NACIQI meeting two years later in June 2014, the panel reviewed a
compliance report required by the Secretary and found that PRHRDC still did not meet all of the
criteria, but rather than again recommending that it be denied recognition, NACIQI gave
PRHRDC six additional months to come into compliance with the areas that had been
noncompliant since 2012. The Secretary agreed with this recommendation.

Elizabeth Warren, at 2.  The report spends seventeen pages singling out ACICS, for example,

stating that "[e]ven in the crowded field of accrediting failures, ACICS deserves special

opprobrium."  *Id*. at 4.  This report, which was followed by a press conference, received

extensive media coverage, making it increasingly difficult for ACICS to receive a fair

consideration at the NACIQI Meeting, especially as the Panel members are appointed by

Congress.  Indeed, Media outlets also have focused intensely on the Agency's Petition.

In addition, in May, more than a dozen State Attorneys General signed a letter to the

Department encouraging denial of the Agency's Petition, and, as noted above, a representative of

those State Attorneys General offered extensive third-party comments at the NACIQI Meeting.

*See* ACICS's July 5 Comments at 24-26.  The politicized nature of ACICS's Petition and the

political pressure on the Department to "send a message" first became clear to ACICS itself in

April 2016, during its Council meeting.   *See* NACIQI Tr. 148:11-159:10.

The OPE Letter also relies heavily on third-party comments, disproportionately focusing

on those of Ben Miller from the Center for American Progress (CAP)[11] to demonstrate ACICS's

purported "passivity" concerning the schools it accredits. *See* OPE Letter at 9.  However, Mr.

Miller and CAP have had no interactions with ACICS other than receiving the Agency's

response to CAP's limited requests for information.  Indeed, it is difficult to conceive of a reason

other than politicization for giving Mr. Miller's comments such disproportionate weight.[12]

---

[11] Although CAP bills itself as "an independent nonpartisan policy institute," it has been
described as "the Democratic answer to the Heritage Foundation," founded by John Podesta, the
current chairman of the 2016 Hillary Clinton Presidential Campaign.  *See* Bob Dreyfuss, *An Idea
Factory for the Democrats*, THE NATION, Feb. 12, 2004, *available at*
https://www.thenation.com/article/idea-factory-democrats/.

[12] CAP's political agenda was again referenced in a recent *New York Times* editorial,
demonstrating the continued media attention to the SDO's decision and ACICS's appeal.  *See*
Editorial, *College Accreditors Need Higher Standards*, N.Y. TIMES, October 20, 2016 *available*

The unfairly politicized nature of the process was acknowledged by several NACIQI Panel Members.  Ms. Neal reiterated the need for "due process to apply," and stated she was "not sure" that ACICS "is being given a fair shake" in the Staff Report.  NACIQI Tr. 28:22-29:4.  Arthur Rothkopf, President Emeritus of Lafayette College, explained his process concerns surrounding the involvement of Department offices other than the Accreditation Group and how that could functionally give the Department "two bites at the apple" and render the process irregular.  *Id.* 50:20-51:4.  Judith Eaton, President of the Council for Higher Education Accreditation (CHEA) explained that "[j]ust as accreditation has been federalized, the ACICS decision makes clear the extent to which both NACIQI – and accreditation – have been politicized."  *See* ACICS's July 5 Comments at 26, June 24, 2016 Statement to from J. Eaton, CHEA President, *available at* http://www.chea.org/Research/president-letters/2016-06-24-naciqi-statement.html.

Indeed, written comments by state attorneys general and a U.S. Senator in advance of the issuance of a Staff Report or deliberations by NACIQI undermine the fact that the recognition process is designed to be an impartial and non-political process.  It is not unreasonable to expect that as a matter of fundamental fairness, elected officials will participate in any recognition decision process at arm's length.  That is not what has occurred here.

### 7.    Irreparable Harm To Students Cannot Be Justified

The facts and evidence in the record do not support the SDO Decision to withdraw ACICS's recognition; withdrawal of this recognition would result in profound, irreparable and substantial harm to students presently attending ACICS-accredited institutions.  ACICS accredits

---

*at* http://www.nytimes.com/2016/10/20/opinion/college-accreditors-need-higher-standards.html?_r=0

schools that enroll an estimated 580,000 students.  A significant number of these students'

schools are unlikely to obtain accreditation from another agency during any eighteen-month

grace period, as the process of gaining initial accreditation can take two years or longer and is

also predicated on the capacity of other agencies to accredit additional schools and programs.

Further, many of these schools will be required to discontinue existing programs in order to fit

within the mission and scope of an alternate accrediting agency, resulting in disruptions to

students and potential additional costs to taxpayers through program discontinuation and teach

out.  And significantly, a decision by the Secretary withdrawing the recognition of ACICS will

have irreparable and harmful ripple effects on currently-enrolled students.  Those impacts

include potential interruption in veterans' education benefits, workforce investment funds, state

grant aid, employer or other tuition reimbursement programs, transfer of credit, eligibility for

state licensure or certification qualification or exams, and programmatic accreditation status

essential for professional licensure or certification, among other potential harms.  The

Department cannot assure students that these circumstances will not result despite an eighteen-

month transition period allowed by Department regulation after a final decision.  The record does

not support denying ACICS twelve months to demonstrate full compliance with all applicable

criteria when the consequences of failing to provide that limited time frame would prevent many

irreparable consequences to students.

## V.   <u>CONCLUSION</u>

For all of the foregoing reasons, as well as in light of all of the materials previously

provided to the Department, ACICS respectfully submits that the Secretary should continue the

Agency's recognition as permitted by 34 C.F.R. § 602.37(d).  Any other action by the Secretary

would be an abuse of discretion and contrary to the federal recognition regulations governing

accrediting agencies.

Dated:  October 21, 2016           Respectfully submitted,

/s/ Allyson B. Baker
Allyson B. Baker
Venable LLP
575 7th Street, N.W.
Washington, DC 20004-1601
Telephone:  (202) 344-4000
Facsimile:  (202) 344-8300
Email:  abbaker@venable.com

Kenneth J. Ingram
Whiteford Taylor Preston, LLP
1800 M Street, NW
Suite 450N
Washington, DC 20036
Phone: 202.659.6790
Fax: 202.327.6140

***Counsel, Accrediting Council for Independent Colleges and Schools***

## CERTIFICATION OF SERVICE

I hereby certify that on the 21st day of October, 2016, I caused a copy of the foregoing Appeal To The Secretary of Education Of The Senior Department Official's September 22, 2016 Decision to be filed by hand-delivery as follows:

The Secretary of Education
c/o Docket Clerk
Office of Hearings and Appeals
U.S. Department of Education
Potomac Center Plaza
550 12th Street, S.W.
Washington, D.C. 20202


/s/ Andrew T. Hernacki
Andrew T. Hernacki, Esq.



# UNITED STATES DEPARTMENT OF EDUCATION

OFFICE OF THE GENERAL COUNSEL

November 21, 2016

Frank Furey
Director, Office of Hearings and Appeals
550 12th Street, S.W., 10th Floor
Washington, DC  20202

Dear Mr. Furey:

Enclosed for filing in the above-referenced case please find the Brief on Behalf of Senior Department Official in Opposition to Accrediting Council for Independent Colleges and Schools' Appeal, and in Support of Decision to Deny Renewal of Recognition.  I can be reached at 202 401-6291.

Sincerely,

Sarah W. Morgan
Counsel for the Senior Department Official

Cc:    Allyson Baker, Esq.
       Kenneth Ingram, Esq.

400 MARYLAND AVE. SW, WASHINGTON, DC 20202-2100
www.ed.gov

The Department of Education's mission is to promote student achievement and preparation for global competitiveness
by fostering educational excellence and ensuring equal access.

# BEFORE THE SECRETARY OF THE U.S. DEPARTMENT OF EDUCATION

In re: )
)
)
**ACCREDITING COUNCIL FOR** )      No. 16-44-O
**INDEPENDENT COLLEGES AND** )      (Accreditation Recognition Proceeding)
**SCHOOLS** )

---

**Brief on Behalf of Senior Department Official
In Opposition to Accrediting Council for Independent Colleges
and Schools' Appeal, and in Support of Decision
to Deny Renewal of Recognition**

---

November 21, 2016

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.  THE PROCEEDINGS BELOW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A. Proceedings Before Department Staff and NACIQI on ACICS's Recognition . . . . . . . . . . . 5
    B. The SDO's Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

I.   LEGAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.  The Record Does Not Support Continuing ACICS's Recognition . . . . . . . . . . . . . . . . . . . . 11

    A. ACICS Has Not Progressed Towards Adopting Effective Enforcement, Coherent Student
       Achievement Standards or Responsible Title IV Oversight . . . . . . . . . . . . . . . . . . . . . . . 12
       1. Enforcement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
       2. Student Achievement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
       3. Title IV Responsibilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
       4. Systematic Review of Effectiveness of Agency Standards . . . . . . . . . . . . . . . . . . . . . . 19
    B. ACICS Will Not Be Able to Demonstrate by the End of 12 Months that the New Standards,
       Processes and Protocols It Has Adopted Operate Effectively . . . . . . . . . . . . . . . . . . . . . 22
       1. Falsified Placement Rate Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
       2. Failure to Identify Abuse at Accredited Institutions . . . . . . . . . . . . . . . . . . . . . . . . . 23
       3. Unqualified Commissioners and Site Visitors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
       4. Lack of Agency Access to Licensure Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
       5. Structural Impediments to Timely Implementation of Promised Reforms . . . . . . . . . . . . 28
    C. ACICS Does Not Keep the Commitments It Makes in Recognition Proceedings . . . . . . . . . . 29
    D. ACICS Cannot Rely on Post-Hearing Allegations and Improper Evidentiary Submissions to
       Obtain a Continuance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    E. The Findings Are Too Numerous for ACICS to Address in 12 Months . . . . . . . . . . . . . . . . 35

III. The Review Below Was Lawful and Appropriate . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    A. The Department Acted in Accordance with Law in Applying Rigorous Scrutiny and Judging
       ACICS's Application for Renewal on Its Own Merits . . . . . . . . . . . . . . . . . . . . . . . . . . 37
    B. ACICS Has Not Been Subject to New Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
    C. ACICS' Claims of Procedural Irregularities are Meritless . . . . . . . . . . . . . . . . . . . . . . . 41
    D. It Is Appropriate to Hold ACICS Accountable for Its Accreditation of Corinthian-
       Owned Schools, and to Consider Litigation Involving ACICS-Accredited Institutions . . . . . . 43
    E. The Reviews of ACICS Did Not Result from Improper or Unfair Political Pressure . . . . . . . . 45

IV. ACICS Lacks Any Standing to Determine or Assert Student Interests . . . . . . . . . . . . . . . . . . 48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

On behalf of the Senior Department Official ("SDO"), who has been delegated the authority to make initial decisions for the Department on the recognition of accrediting agencies under 34 C.F.R. § 602.36 and Section 496 of the Higher Education Act of 1965 ("HEA"), the undersigned responds to the appeal filed by the Accrediting Council for Independent Colleges and Schools ("ACICS" or "the Agency") from the SDO's September 22, 2016 decision denying ACICS's application for renewal of recognition, as follows:

## INTRODUCTION

The SDO's decision denying renewal of ACICS's recognition should be affirmed.  The record documents ineffectiveness and non-compliance on the part of ACICS that is pervasive, and indeed ACICS in its appeal does not claim that its recognition should be renewed at this time.  What ACICS does argue is that the Department is somehow impelled to exercise discretion to continue its recognized status for 12 months so that it can attempt to remedy the 21 findings of non-compliance cited in the SDO's decision.  These findings were initially proposed in June, 2016 by the staff of the Office of Postsecondary Education ("Department staff") in a Final Staff Analysis and a Final Staff Report; were seconded after a thorough hearing by an independent advisory committee, the Nationally Advisory Committee on Institutional Quality and Integrity ("NACIQI"); and were ultimately adopted by the SDO following a review of the record.

ACICS's invitation to continue its recognition should be rejected.  As shown below, the record does not support continuing it, and ACICS's claims of legal error are baseless.  In addition, contrary to its claims, ACICS lacks standing to assert the interests of the students it has failed to protect, and its position that its recognition must be maintained to serve those interests

1

would make a mockery of the HEA's recognition provisions. The SDO's decision should be affirmed and the relief ACICS seeks in its appeal should be denied.

## I. Statutory and Regulatory Background

By statute, the Department of Education is forbidden from policing directly the academic quality of institutions receiving federal tax dollars. 20 U.S.C. §§ 1232(a), 3403(b). Instead, the HEA vests the task of ensuring academic quality in private accrediting agencies. HEA §§ 101(a)(5); 102(b)(1)(D), (c)(1)(B). This means that the Department's oversight of academic quality occurs entirely through the Department's process of periodically determining whether applicant accrediting agencies should be "recognized," or continue to be recognized, by the Department as "reliable authorit[ies] as to the quality of postsecondary education." HEA §§ 101(c); 496. Under the Title IV federal student aid programs, and a number of other federal programs, only institutions accredited by an accrediting agency recognized by the Department may draw down federal dollars. HEA §§ 101(a)(5); 102(b)(1)(D), (c)(1)(B).

HEA § 496, together with implementing regulations at 34 CFR Part 602 ("Criteria for Recognition"), govern the Department's recognition process. Under this statute, the Department cannot grant recognition for a period in excess of five years. HEA § 496(d). The statute charges the Department with, among other things, requiring agencies to "consistently appl[y] and enforce[] standards . . . that ensure that the courses or programs of instruction, training or study offered by the institution of higher education . . . are of sufficient quality to achieve, for the duration of the accreditation period, the stated objective for which the courses or the programs are offered." HEA § 496(a)(4).

Moreover, under the statute and regulations, accrediting agencies seeking recognition or re-recognition are judged not only based on the written accrediting standards and policies they

adopt, but on the effectiveness of their accrediting process as they have applied it. See HEA § 496(*l*), (n)(3); 34 CFR §§ 602.31(a)(2); 602.32(c); 602.36(e)(2); 602.37(d). Indeed, because the effectiveness of an agency's accrediting process is directly in issue, recognition regulations require an agency to have had two years of accrediting experience before seeking initial recognition. 34 CFR § 602.12(a)(2). For a currently recognized agency, the statute directs that if the Department determines an agency to be ineffective, the Department, after a hearing, "shall" either limit, suspend or terminate recognition, or require the agency to take appropriate action to come into compliance within a timeframe not to exceed 12 months. HEA § 496(*l*).

Before acting on an accrediting agency's request for recognition or renewal of recognition, the Department is required to "conduct a comprehensive review" -- an "independent evaluation" -- of the agency's performance to determine whether the agency meets the recognition criteria set forth in the statute and in the implementing recognition regulations. HEA § 496(n)(1). This review is to include site visits and solicitation of third-party information on agency performance. HEA § 496(n)(2). Moreover, each of the regulatory recognition requirements makes clear that the burden of proof is on the agency throughout to "demonstrate," through documentation, that the agency complies with, and is effective with respect to, every recognition criterion. See 34 CFR Part 602, Subpart B.

The Department has wide discretion in deciding what information should be assembled for evaluating an agency for recognition. See 34 CFR § 602.32(b)(2). Furthermore, because the sole purpose of recognition is to enable an applicant agency to serve as a gatekeeper with respect to the academic quality of institutions participating in federal programs, and given the unique nature of each agency's accrediting process, performance record, and member institutions, recognition is an inherently "individualized and discretionary process." *In re*

*Accrediting Commission for Community and Junior Colleges, Western Association of Schools and Colleges*, No. 14-10-O (Decision of the Secretary of Education, 4 January 2016)*("In re ACCJC")*, at p.10.

An accrediting agency that seeks recognition or renewal of recognition begins the process by filing an application with the Department staff. 34 CFR § 602.32. After the staff has completed the "comprehensive analysis" described above, including analysis of third party information, and has provided a recommendation on recognition, the agency, Department staff, and third party commenters testify in a recognition hearing conducted before NACIQI. NACIQI is an independent advisory committee, established under the Federal Advisory Committee Act, 5 U.S.C. App., with each member selected based on his or her individual "experience, integrity, impartiality, and good judgment," as well as his or her "technical qualifications, professional standing, and demonstrated knowledge in the fields of accreditation and administration in higher education." HEA § 114(b)(2)(A), (C). At the conclusion of the hearing, NACIQI makes its own recognition recommendation, based not only on the testimony received but on the agency application and supporting documentation, the Department staff analysis and supporting documentation, the accrediting agency's response to the draft Department staff analysis, any written third party comments timely received, any agency response to written third party comments, and any other information presented by Department staff. 34 CFR § 602.34.

After the NACIQI hearing, the recognition matter goes to the SDO for decision. 34 CFR §§ 602.35, 602.36. The SDO is the senior official within the Department holding delegated authority to report directly to the Secretary regarding recognition. 34 CFR § 602.3. Then, if an agency is dissatisfied with the SDO's decision, the agency may appeal to the Secretary. 34 CFR § 602.37. In either case, the Department's final decision, whether of the SDO or Secretary, is

made based on the evidentiary record developed up through the NACIQI hearing, as supplemented by submission of written arguments. 34 CFR §§ 602.35; 602.36(a); 602.37(a), (b), (d). Neither the agency nor the Department staff can submit new evidence to the SDO (with very limited exceptions not applicable in this case), nor on appeal can either the accrediting agency or the SDO submit new evidence to the Secretary. 34 CFR § 602.35(c)(1); 602.37(c). The closing of the evidentiary record is vital to ensure the Department can reach a final recognition decision in a timeframe commensurate with Congress's directive in HEA § 496(*l*) that recognition of a non-compliant agency should not continue unless the Department concludes the agency will be able to document it has achieved effectiveness in 12 months or less.

During the pendency of a proceeding for renewal of recognition, recognition of the agency continues until the Department reaches a final decision. 34 CFR § 602.36(i), (j). If the Department's final decision is to withdraw recognition, HEA Title IV provides that agency's accredited institutions up to 18 months to obtain accreditation from another recognized accrediting agency before federal student aid institutional eligibility is revoked. HEA § 498(h)(2). Institutions facing these circumstances must continue to meet all other Title IV eligibility requirements, and their federal student aid participation is only provisionally certified during that period. Id.

## II. The Proceedings Below

### A. Proceedings Before Department Staff and NACIQI on ACICS's Recognition

ACICS's most recent recognition was a three-year grant, scheduled to expire in 2016. Accordingly, ACICS was instructed to file its renewal application and supporting exhibits between January, 2016 and April 1, 2016, so as to enable it to appear before NACIQI in June, 2016. The schedule comported with regulatory requirements and established practice. See 34

CFR § 602.32(f)(3), (f)(5).  In early March, 2016, with almost a month left before ACICS was due to finalize its application, Department staff directed ACICS to address four additional questions in the application.  The staff explained that the questions were asked in light of major investigations and lawsuits brought against ACICS-accredited schools in recent years, including schools owned by Corinthian Colleges, Inc. (collectively, "Corinthian"), Career Education Corporation schools ("CEC"), ITT Technical Institutes ("ITT"), Michigan Jewish Institute ("MJI"), Westwood College, Lincoln Tech, and Globe University.  See ACICS Exhibit 121 at 13-14.  Department staff had previously instructed ACICS to be sure to include in its application documentation pertaining to its accreditation of Corinthian, ITT and MJI.

The ACICS application, when finalized, consisted of 33 substantive narratives and 261 exhibits from the Agency.  In addition, thirty-two members of the public submitted written comments.  Department staff submitted a number of exhibits, as well as its analysis of the Agency's narratives, Agency exhibits, and written third party comments.  All of these materials were incorporated into the Final Staff Analysis, which Department staff did not finalize until after sharing a draft of it with ACICS and taking the Agency's response into account.  As finalized, the Final Staff Analysis recommended that ACICS be found out of compliance with 21 of the regulatory criteria for recognition, specifically:

| 1 | 602.13 | Acceptance of ACICS by others |
|---|---|---|
| 2 | 602.15(a)(1) | Staffing/Financial Resources |
| 3 | 602.15(a)(2) | Competency of Representatives |
| 4 | 602.15(a)(3) | Academic/Administrator Representatives |
| 5 | 602.15(a)(5) | Public Representatives |
| 6 | 602.15(a)(6) | Conflicts |
| 7 | 602.16(a)(1)(i) | Student Achievement |
| 8 | 602.16(a)(1)(v) | Fiscal/Administrative Capacity |
| 9 | 602.16(a)(1)(vii) | Recruiting and Other Practices |
| 10 | 602.16(a)(1)(ix) | Student Complaints |
| 11 | 602.16(a)(1)(x) | Title IV Responsibilities |
| 12 | 602.17(a) | Mission and Objectives |

| 13 | 602.17(c) | On-Site Reviews |
| 14 | 602.18(d) | Reasonable Assurances of Accurate Information |
| 15 | 602.19(b) | Monitoring |
| 16 | 602.20(a) | Enforcement Timelines |
| 17 | 602.20(b) | Enforcement Action |
| 18 | 602.21(a)(b) | Systematic Review of Standards |
| 19 | 602.22(a)(3) | When New Evaluation Required |
| 20 | 602.24(c)(1) | Teach-out plan Triggers |
| 21 | 602.27(a)(6)-(7), (b) | Fraud and Abuse |

With respect to each of these 21 recommended findings, the Final Staff Analysis discussed specific deficiencies found in the narratives and documentation provided by the Agency. With the Analysis, Department staff in June, 2016 issued its Final Staff Report, consolidating the staff's evaluation of the Agency as set forth in the Final Staff Analysis and setting forth Department staff's recommendation on recognition. The recommendation was that ACICS's application for renewal of recognition be denied. At the June 23, 2016 NACIQI hearing on ACICS's application, veteran staff analyst Steve Porcelli explained why Department staff recommended denial:

> [W]e believe that the Agency could not satisfactorily demonstrate compliance with all of the cited issues within the 12 month period provided by the regulations to do so.

> This is particularly the case in view of the Agency's very recent circulation of numerous revisions to its standards and practices that have not been fully approved by its members or implemented and proven effective. As well the Agency's weak record in monitoring enforcement of its member institutions is a pressing concern.

NACIQI Transcript ("Tr.") at 9:21 – 10:6.

After having reviewed the Final Staff Report and the Final Staff Analysis -- including the narratives and exhibits from both ACICS and Department staff, as well as the written third party comments -- NACIQI spent an entire day listening to testimony from the Agency, Department

Staff, and oral third party commenters.  NACIQI members questioned the witnesses closely regarding, e.g., Department staff's proposed findings and what NACIQI should recommend with respect to recognition.  At the conclusion of the hearing, NACIQI voted to concur in Department staff's proposed findings of noncompliance and its recommendation to deny renewal of recognition.  The Final Staff Report and Final Staff Analysis (incorporating the draft staff analysis, all narratives and exhibits  from ACICS and Department staff, and all third party written comments), together with the transcript of the hearing before NACIQI, constitute the evidentiary record in this recognition proceeding.

Subsequently, the matter went before the SDO for decision.  ACICS availed itself of the opportunity provided under 34 C.F.R. § 602.35 to file written comments on the NACIQI recommendations with the SDO, and a response was filed on behalf of Department staff ("OPE Comments").  Notwithstanding the regulations prohibiting it from doing so, see 34 C.F.R. § 602.35(c)(1), ACICS appended to its comments several new items of evidence it desired the SDO to consider.

## B.  The SDO's Decision.

On September 22, 2016, the SDO issued her recognition decision.  In it, she noted that she had considered "the full record related to this matter," as required, and had found ACICS to be out of compliance with each of the 21 regulatory requirements in the staff report.  SDO Decision, at 1.  In so finding, the SDO remarked on the "large amount of information from a variety of sources" subsumed in the staff report.  Id.  She further noted that the 21 findings of noncompliance precluded her from renewing ACICS's recognition.  SDO Decision, at 2.  While recognizing that the law nonetheless does permit the Department to continue the recognition of a non-compliant agency for up to 12 months, and that ACICS "has made recent efforts to address

8

some of the deficiencies involved," and even though, in her judgment, it would be "possible for ACICS to fix some of the . . . problems" in that period of time, she concluded that ACICS would not be able to come into compliance within 12 months. SDO Decision at 2.  The SDO gave give five reasons why she had reached that conclusion:

- the judgment of Department staff and "multiple NACIQI committee members," based on "many years of experience," that ACICS "could not remedy many of the serious deficiencies identified and therefore come into full compliance within 12 months." SDO Decision at 2.

- the nature of ACICS's violations, which the SDO viewed as "fundamental    problems with the agency's functions as an accreditor." Id. The SDO included a    non-exhaustive list of what she considered to be the major problems uncovered by the staff: "the rigor of the agency's accreditation and preaccreditation standards and its application of those standards (34 C.F.R. §§ 602.16(a) and 602.17); its monitoring of the institutions that it accredits (34 C.F.R. § 602.19(b)); and the enforcement of its own accrediting standards (34 C.F.R. § 602.20)." Id.

- that "ACICS's track record does not inspire confidence. . . . Many of the    problems are serious and long-standing.  The agency still has not fully addressed issues originally identified in 2013, such as its verification of placement information from institutions." SDO Decision at 2.

- that most of ACICS's remedial efforts currently underway "began in earnest just several months ago, despite having reason to take action long before that." Id.

- that demonstrating compliance would require more than new policies. ACICS would have to provide evidence of effective application and implementation of the new policies, practices, and governance structures – a task the SDO concluded the Agency simply could not achieve for all 21 findings within 12 months. SDO Decision at 3.

The SDO concluded that the Department should deny ACICS's application for renewal, ending the Agency's recognition. Id. ACICS filed a motion for reconsideration, improperly appending more new evidence. As the procedural regulations provide no opportunity for reconsideration, the SDO denied ACICS's motion. ACICS brought this appeal.

9

## ARGUMENT

### I. LEGAL STANDARDS.

Recognition is a privilege for the agencies that seek it -- not an entitlement. Because recognition's only function is to provide academic quality control for purposes of federal funding of postsecondary education and other federal programs, and because of the wide variety among applicant agencies in terms of, e.g., accrediting standards, processes, and practices; types of institutions and programs accredited; recognition history; agency performance; application content, etc., recognition determinations are highly individualized and discretionary. *In re ACCJC*, at 6, 10. No two agencies are comparable in terms of their level of compliance or the severity or breadth of their deficiencies, if any; each agency must demonstrate it qualifies for recognition on its own terms. As noted above, the Criteria for Recognition at all times expressly place the burden of proof on the applicant accrediting agency to demonstrate compliant policies and effective performance with respect to each criterion. Meanwhile, within the Department, the recognition process "relies on the professional experience and common sense of individuals at each level of the process." *In re ACCJC*, at p. 6.

Throughout its Brief ("Br."), ACICS implies, and sometimes baldly asserts, see, e.g., Br. at 22, that the law entitles a non-compliant agency to a 12 month continuance of recognition. This assertion is erroneous as a matter of law. At its discretion, the Department *may* grant a continuance, for up to 12 months, but only if it concludes that the applicant agency will be able to achieve compliance in that time. See 34 C.F.R. § 602.36(e)(3)(i) (stating, based on HEA §496(*l*), that if the Department "concludes that an agency *will demonstrate or achieve compliance* with the criteria for recognition *and effective application* of those criteria within 12 months or less, the senior Department official *may* continue the agency's recognition" pending

submission of a compliance report) (emphasis added).   This is the legal standard that must be applied.  Where an agency fails to meet its burden of proof, the Department must abide by this standard and deny recognition.

## II.   The Record Does Not Support Continuing ACICS's Recognition.

In its appeal, ACICS references a flurry of policies, protocols and actions initiated by ACICS at the last minute, while its recognition hung in the balance, and even after the SDO denied recognition.  According to ACICS, these materials allegedly demonstrate that the Agency is deserving and well on its way to resolving any compliance issues within 12 months.  See Br., at 8-28, and Exhibits A and B appended thereto; see also ACICS's purported post-hearing "exhibits" 262.1, 264-271 (appended to the Comments ACICS filed July 5, 2016 with the SDO under 34 C.F.R. § 602.35).

The picture ACICS paints is untrue, and the Agency cannot simply disown its noncompliant, ineffective performance as displayed throughout the course of its now-expiring term of recognition.  That history is documented by the record.  As discussed below, what the record shows is that ACICS has not begun progressing towards compliance on the major issues of enforcement, student achievement, and Title IV responsibilities.   It also shows that the Agency's recent initiatives on other critical areas of non-compliance are too new, and address deficiencies of performance too broad, to enable the Department to conclude the Agency will be able to achieve compliance within 12 months.  In addition, as discussed below, even if the level of improvement ACICS promises were possible – which it is not – it would not be reasonable to rely on those promises, given the Agency's repeated failure to follow through on commitments made in earlier recognition proceedings.   And the changes ACICS describes having made

already come too late in these proceedings, and in the context of too many serious findings, to support the Department granting a continuance.

## A. ACICS Has Not Progressed Towards Adopting Effective Enforcement, Coherent Student Achievement Standards or Responsible Title IV Oversight

The Criteria for Recognition mandate that recognized agencies enforce their accrediting standards -- including the rigorous standards they are required to have with respect to student achievement -- and that they serve effectively as members of the "triad" (i.e., Department, States, and accreditors) with respect to Title IV oversight responsibilities. 34 C.F.R. §§ 602.16(a)(1)(i); 602.16(a)(x); 602.20(a), (b); 602.26(a)(5), (6). They also require agencies to identify and correct accrediting policies that stand in the way of complying with these and other recognition requirements. 34 C.F.R. § 602.21(a), (b). Each of these requirements is key to achieving and retaining the privilege of recognition. But the record fails to demonstrate that ACICS is moving toward compliance with them. Because there has been no real movement on any of these areas of noncompliance, ACICS has not established a colorable basis for asking the Department to continue its recognition.

These failures are in themselves sufficient to believe that ACICS cannot come into compliance in the coming twelve months.

## 1. Enforcement. 
Department staff provided ACICS with a unique opportunity to address enforcement by specifically asking it about its accreditation of Corinthian's "Everest" schools, CEC schools, ITT, MJI, Westwood College, Lincoln Tech, and Globe. ACICS Exhibit 121, at 13-14. ACICS's response comprises only 14 pages, and much of it is not particularized by institution or campus. The response does reflect numerous government investigations and lawsuits -- based on claims of consumer and Title IV fraud, recruiting and lending abuses, misrepresentation, and falsified ACICS placement rates -- against no fewer than 245 ACICS-

accredited campuses. Id., at 4-5. By and large the state and federal actions against these schools had been pending for years, and culminated in large consumer protection settlements, and sometimes closing of the institutions. Id. Nonetheless, according to ACICS, none of these 245 campuses had faced withdrawal of accreditation, and only three had been placed, belatedly, on the public sanction of probation. Id., at 7; see also ACICS Exhibit 229 (ACICS placing three Everest campuses on probation in April, 2016).[1] Otherwise, actions taken by ACICS in the wake of the government investigations and litigation against the subject schools consisted only of "heightened monitoring," deferral of decisions,[2] and "compliance warnings." ACICS Exhibit 121, at 4-7; see also ACICS Exhibit 127 at 9-14; ACICS Exhibit 194 at 1-4. ACICS continued to accredit its Corinthian schools as of the day the company declared bankruptcy. ACICS Exhibit 121, at 4.

ACICS also submitted as exhibits a few actions taken by the Agency this year – for the most part very recently, when the deadline for final submission of its recognition application was imminent. See ACIC Exhibit 123, pp. 4-7 ("show cause" directive against MJI); ACICS Exhibit 227, pp. 4-7 (suspension of Computer Systems Institute)("CSI"), ACICS Exhibit 229, pp. 4-7 (probation imposed on Dewey University); ACICS Exhibit 249 ("financial show cause" directives to Art Institutes, Zenith Education and Delta Career Education; show cause directive to ITT); ACICS Exhibit 260 (denial of renewal of accreditation of Bristol University). Two of these actions – the "show cause" directive against MJI, and the suspension of CSI -- came only after the Department had already barred the schools from participation in the federal student aid

---

[1] ACICS also submitted documentation that in January, 2016 it had placed these three Everest campuses on "show cause." ACICS Exhibit 6.

[2] Under ACICS standards, a deferral is without negative import, and signifies only that the Agency needs more information. ACICS Exhibit 1, at 2-3-210.

programs based on school abuses, including placement rate fraud. <u>See</u> "FSA Denial Letter to Michigan Jewish Institute" and "FSA Denial Letter to Computer Systems Institute," attached to Final Staff Analysis at 29. In addition, ITT was already on severe "heightened cash monitoring" with the Department when ACICS's actions came. <u>See</u> ACICS Exhibit 249, Letter of April 20, 2016 to ITT, at 2, 3. And notwithstanding the serious nature of ACICS's findings against Bristol University, <u>see</u> ACICS Exhibit 260, a federal district court enjoined ACICS from discontinuing accreditation, based in part on provisions of ACICS's current policies which the Court concluded mandated a prolonged, multi-step process before taking such an action, and what the Court considered to be the inconsistent and unexplained nature of ACICS's earlier decisions regarding the institution. <u>Bristol University v. ACICS</u>, No. 1:16-cv-307 (E.D. Va. April 25, 2016)(Slip Op. at 11-15)(appeal pending).

ACICS has attempted to deflect attention from its non-enforcement record by portraying itself as unaware of its accredited institutions' misconduct, and characterizing Department staff, NACIQI and the SDO as unfairly expecting it to "act like a government law enforcement agency." ACICS Br. at 36-38, 43, 45-46. As discussed below, these arguments are fallacious for many reasons; however, they are especially off-point as applied to the Department's findings on ACICS's lack of enforcement. As the record makes clear, ACICS avoids taking significant enforcement action even when it is well aware of violations of its standards. For example, a letter from the State of Wisconsin to Everest College (attached to the Final Analysis at 29), details a five month process in 2012 in which the Wisconsin Educational Approval Board (EAB), alarmed by reports of constant staff turnover and poor placement and retention at an ACICS-accredited Everest College in Milwaukee, discovered, through its own hands-on monitoring, that the institution's dropout and placement rates placed it far below ACICS's

standards.   The EAB set out in this letter, copied to ACICS, the institution's abysmal performance and failures to meet the commitments made to the EAB, as well as the involvement of the parent company, Corinthian, in the broken promises Everest made to the EAB.  Yet it was the State, not ACICS, that took action against the school, ultimately forcing its closure.  Despite the involvement, documented to ACICS, of the parent company in violations of ACICS standards, ACICS did not inquire further as to the compliance of the Everest chain.  Instead, ACICS has continued to maintain, to the Department and even to Congress, that it had known nothing that warranted enforcement about the Corinthian schools it accredited.  ACICS Exhibit 127, at 10;  http://www.help.senate.gov/hearings/reauthorizing-the-higher-education-act-evaluating-accreditations-role-in-ensuring-quality.  Similarly, as discussed below (at 18-21 & n.6), rather than taking enforcement action against CSI and MJI after learning of their violations of ACICS requirements, ACICS granted initial and renewed accreditation to these institutions anyway.  See, e.g., Final Staff Analysis at 29, 51 and attached Department Exhibits.

In the Final Staff Analysis, Department staff, reviewing ACICS's policies on enforcement, discussed at some length the confusing nature of ACICS's policies on enforcement, and the fact that they both permit accreditation of non-compliant institutions, and provide multiple opportunities for the agency to continue that status indefinitely,  particularly with respect to non-compliance with the agency's student achievement standards.  Final Staff Analysis, at 82, 83-84, 85-86.  The Court's decision regarding Bristol University, and the dearth of instances of enforcement by ACICS, accords with Department staff's analysis.  Nothing in the record, see id., or stated in ACICS's Brief, reflects a plan for overhauling the Agency's enforcement policies to enable effective enforcement.

At the NACIQI hearing, ACICS leadership opined that a cause of the Agency's difficulties had been its preference for a "program improvement model" over enforcement. Tr. at 120:3-14. Based on the Agency's enforcement record, and its deficient enforcement policies, which it has not been shown to have substantially reformed, the Agency appears to remain mired in a model of inaction, notwithstanding the unprecedented exposure of misconduct among its accredited institutions. In any case, while a program improvement role may have some value, recognition has a different purpose: to position an accrediting agency as a gatekeeper for Title IV and other federal programs, setting standards of acceptable academic quality and behavior and taking action against institutions that fail to meet them. ACICS's non-enforcement history and its failure to address the causes is inconsistent with continuing its recognition.[3]

**2. Student Achievement.** ACICS demonstrated incoherence throughout the proceedings below as to what its alleged student achievement standards are or should consist of. For example, in the Agency's January 1, 2016 Accreditation Criteria, "graduation rates" are identified as one of six elements that are evaluated for institutional effectiveness. See ACICS Exhibit 1 at 48-49, 92. However, in ACICS's newest Accreditation Criteria (effective date July 2016), "graduation rates" are removed from the document as a required element, and replaced with "level of graduate satisfaction." See ACICS Exhibit 180 at 152, 154, 155. "Level of

---

[3] See also third party written comment of Massachusetts Attorney General Maura Healey and 12 other state attorneys general, at 2 (noting a "lack of transparency and cooperation [by ACICS] with investigations into student outcomes"). ACICS has denied that it fails to cooperate with investigators, see ACICS Exhibit 127; however, the 13 attorneys general signatories had first-hand knowledge of ACICS's lack helpfulness, and are entitled to a presumption of trustworthiness based on their public service, whereas ACICS's evaluation inevitably is colored by self-interest. Healey's letter provides specifics, e.g., id., at 2: "In the Illinois Attorney General's investigation and subsequent litigation with Westwood College, the office found that ACICS was not annually verifying even a sample of job placements reported by the institutions it accredits. When asked by the attorney general's office, ACICS would not commit to formally outline their verification process in an affidavit. This type of obfuscation hinders regulatory cooperation between the 'triad' that oversees higher education in the United States, the federal government, the states, and accreditors."

graduate satisfaction" is inherently incomprehensible as a standard; moreover, since such a standard could only measure information from those who actually complete the program, Department staff accurately termed the change as a "significant retreat in accountability of the agency's institutions." See Final Staff Analysis at 30. At the NACIQI hearing, then-ACICS representative Anthony Bieda testified that ACICS does not "currently have a graduation rate [but] we are working to add that to the portfolio." Tr. at 86:9-10.

Similarly, in its application, ACICS was non-responsive when Department staff asked whether there was a licensure component in ACICS's student achievement standards. See Final Staff Analysis, at 29-30.[4]  Now, however, buried on pp. 19 and 20 of the "Executive Summary and Detailed Background of ACICS Resolution of the Department's Staff Report," attached as Exhibit B to the Comments ACICS filed with the SDO on July 5, 2016 ("Executive Summary"), ACICS has acknowledged that at this time it is only "move[ing] toward" such a standard, with "the process as described require[ing] until the December 2016 Council meeting to complete this process fully, with evidence of enforcement of these new requirements" now promised by April, 2017.

Nowhere in the Agency's narratives, exhibits or brief does ACICS accurately describe what its student achievement standards look like now, or what they will look like in the future. The content of the standards, and who decides what that is, appears to fluctuate for convenience, and among various publications, individuals and decision bodies. See Final Staff Analysis, at 30. No doubt for this reason, ACICS does not even address this area of noncompliance – 34 C.F.R. §

---

[4] As discussed below, at 31-32, ACICS's avoidance in its application of the licensure issue likely resulted from the fact that it had promised the Department in its last recognition review that it would include this component in its student achievement standards.

602.16(a)(1)(i) [5] – in arguing, on brief (at 8-27), that it should be afforded 12 months to come into compliance, despite the fact that the effectiveness and enforcement of student achievement requirements is one of the most significant areas of deficiency as found by Department Staff, NACIQI, and the SDO, see Final Staff Analysis, at 29-30.

Not surprisingly, ACICS's enforcement record with respect to its elusive student achievement standards is particularly weak. In addition to the Agency's informed decision not to proceed against Everest (Milwaukee) or its co-owned campuses for placement rate falsifications, as described above, ACICS also knowingly failed to proceed against CSI in similar circumstances. The Department discovered that ACICS had accredited CSI despite the Agency having discovered that "'the majority of the contact information provided to [ACICS] to verify employment for graduates as placed on the [then-current annual monitoring report] is inaccurate and not current.'" FSA denial letter to Computer Systems Institute, attached to the Final Analysis at 29. Ultimately, ACICS took action against the school only after the Department had denied recertification, notwithstanding ACICS's own, pre-existing knowledge of the unreliability of the data which CSI had been submitting in purported satisfaction of the agency's student achievement standards. [6] As discussed below, at 20 & n.7, ACICS similarly ignored placement

---

[5] While evidently ACICS considers this area of noncompliance as falling within its self-described "Category C Findings" – otherwise "Category C" would not include 10 findings, as alleged by ACICS, see ACICS Br. at 16 – § 602.16(a)(1)(i) is nowhere mentioned. ACICS Br. at 8-27. ACICS's Executive Summary, referred to in ACICS's brief as the more detailed source for this portion of ACICS's argument, simply skips from Category C "Finding 3" to "Finding 5," enabling the agency to avoid factoring 34 CFR 602.16(a)(1)(i) into its projections. See Executive Summary (Exhibit 6 to ACICS's October 4, 2016 Request for Reconsideration), at 17, 22-23.

[6] In attempting to disavow its non-enforcement stance with respect to CSI, ACICS asserts in its Executive Summary, at 29, that it had not been "notified" of CSI's misconduct until 2016, two years after it had accredited the school in August, 2014. While the Department did issue its recertification denial in 2016, ACICS's explanation ignores the fact that the statement the Department quoted in the letter to the effect that the contact information provided by CSI to verify employment was inaccurate and not current came from an ACICS "Evaluation Team Report – Initial Grant Evaluation Report," forwarded to the school by ACICS in *February, 2014* – before ACICS accredited the school. See "FSA denial letter to CSI, at 14-15 & nn. 9 &10 (attached to the Final Staff Analysis at 29).

rate falsifications it had uncovered at MJI when it renewed that institution's accreditation in 2014.

The Final Staff Analysis (at 82, 83) notes that ACICS's enforcement policies are particularly weak with respect to the Agency's student achievement standards. Other documentation in ACICS's application is more straightforward than ACICS's policies with respect to this issue. ACICS informed the Department in a May 16, 2016 letter that it initiated "enforcement actions including compliance warnings and show cause directives" based on failure to meet performance thresholds for retention, placement or licensure only if monitoring reports demonstrated "*profound* non-compliance with standards, or *protracted* inability to remedy deficiencies." ACICS Exhibit 127, at 5 (emphasis added). Along similar lines, ACICS informed Congress in 2015 that "in no event would an institution that fell below the improvement threshold for placement or retention, absent any other information, be deemed to be of low quality by the Council or subject to negative or adverse actions." ACICS Exhibit 110 (letter of July 16, 2015 to Senator Lamar Alexander, at 1-2). See also id., at 1 ("the integrity of institutional data, utilized by ACICS, is assumed to be sound").

Because ACICS has not articulated even a plan for meaningful reform of its student achievement deficiencies, the Department has no basis for extending the Agency's recognition.

**3. Title IV Responsibilities.** The record shows ACICS also has a history of failing to apprise the Department of clear evidence it uncovers of consumer and federal student aid fraud occurring at institutions it accredits. ACICS's accreditation of MJI provides a case in point. As detailed in "FSA denial letter to Michigan Jewish Institute" (attached to the Final Analysis at 29), MJI is an institution ultimately shown by the Department to have operated primarily by recruiting and awarding Pell Grants to individuals who openly sought the funds to finance

19

ineligible religious studies at ineligible foreign institutions, rather than for meaningful engagement in any of the eligible programs MJI purported to be providing. Early in its investigation, the Department contacted ACICS regarding (i) whether MJI's programs were designed to educate students for professional, technical or occupational careers as required both by ACICS's own published policies and by ACICS's scope of recognition from the Department; and (ii) whether the institution's contractual arrangements with foreign institutions met ACICS and Department requirements. See ACICS Exhibit 98. At that point, ACICS -- privately professing concern about a "huge" increase in enrollments, especially online, an apparent lack of transferability of credits, and that the "school does not frequently place students," see ACICS Exhibit 71 -- dispatched a special review team. The site team uncovered unmistakable evidence that the institution was a fraud, had drawn down millions of dollars of federal student aid funds unlawfully, and was in violation of ACICS requirements. See ACICS Exhibit 64 (ACIC Site Team Report);[7] see also April 17, 2013 Special Visit Final Report letter ("Michigan Jewish Institute Documentation" at 6-9, attached to Final Analysis at 51); ACICS Exhibit 71. Nevertheless, a year after the site visit, ACICS in April 2014 granted renewal of accreditation to

---

[7] Among other things, the site review team reported to ACICS that: students were "made to enroll" dually in a certificate program and a bachelor's program, but MJI did not document this dual enrollment; placement rates were being computed using a methodology that ensured the rate stayed at 100 percent and involved only self-reports by students; the site team could not verify MJI's retention and placement rates; in spite of rapid enrollment growth, the institution allegedly had no active recruitment process; different administrators gave the team different responses; most of the staff was in Israel but could not be termed MJI employees under Israeli law; the institution could not identify anyone who bore responsibility for career counseling and placement assistance; it was difficult to adequately evaluate all administrative and academic activities of MJI in Michigan, given the level of the institution's purported activities in Israel; advertising reviewed had "a number of irregularities or information that could not be verified," including claims as to the transferability of credits; MJI had no surveys of its graduates; in violation of ACICS' published policies, MJI had routinely entered into scores of contracts with schools abroad without ever having submitted the contracts to ACICS for review and approval; and "a vast majority of the institution's students" were enrolled in a program of religious studies outside of ACICS's scope of recognition. ACICS Exhibit 64.

MJI.[8]  Thereafter, in July 2014, ACICS wrote MJI an exculpatory letter to "respond to questions that we have been advised that the Department of Education representative . . . raised during a recent program review at [MJI] regarding ACICS's approval of certain education abroad activities of MJI." July 23, 2014 Education Abroad Activities letter ("Michigan Jewish Institute Documentation" at 26-27, attached to Final Analysis at 51).  The ACICS letter said nothing about the indicia of fraud the agency had uncovered, nor about its finding that the "vast majority of the institution's students" had been enrolled in religious studies programs outside the scope of the agency's recognition by the Department.  Instead, ACICS's July 2014 letter recited that MJI had been subject to "comprehensive on-site reviews, in which MJI's international partnership agreements were specifically examined to determine their compliance," and that "MJI's international partnership agreements and education abroad activities have previously been and, under the new grant of accreditation remain approved in compliance with applicable Accreditation Criteria."   ACICS never reported its site team findings and associated financial aid concerns to the Department, despite requirements that it do so. See 34 CFR § 602.16(a)(x); 602.27 (a)(6), (a)(7).  Similarly, ACICS did not report the findings of placement rate fraud it discovered at CSI, as discussed above.

The Final Staff Analysis reflects, at 52, 131 that ACICS made some policy changes in response to Department staff findings with respect to the Agency's Title IV responsibilities. However, the Department staff also noted that these policies are "significantly weaker" than the regulations require, and that ACICS had not explained its failure to report the fraud it had found with respect to MJI, CSI and others to the Department.  Id.  The Title IV oversight requirements

---

[8] The agency did so while in the same letter demanding copies of thirteen contracts that MJI still had not provided to ACICS, in violation of ACICS's Accreditation Criteria.  See New Grant Approval letter with Admonishment ("Michigan Jewish Institute Documentation" at 24-25, attached to Final Analysis at 51).

21

are pivotal; they encapsulate the reason the recognition requirements exist.  And in response to the statement by Department staff in the Final Staff Analysis that accreditor compliance with Title IV responsibilities has been required all along, ACICS asserts only that "agencies are permitted twelve months to come into full compliance" (Br. at 22), as if the Department is impelled to continue recognition, which as discussed above, at pp. 3-4, 10, it is not.  ACICS's stance is particularly ironic in view of ACICS's disclaimers that it lacks the powers of a "government law enforcement agency."  The Department, as a law enforcement agency, cannot act on information recognized agencies uncover, but fail to report.  And in making recognition decisions, the Department is obliged to take into account that in most cases it will never know whether an agency that has withheld information in the past is continuing that practice.

Continuation is available only in the Department's discretion, and must not be exercised where unwarranted.  Id.  The gross nature of ACICS's misconduct with respect to MJI, the overly-narrow nature of the policies adopted in response to the draft staff analysis on the criteria related to Title IV oversight responsibilities, see Final Staff Analysis at 52, 131 and ACICS's grudging attitude towards those responsibilities, leave no basis for continuing recognition.

4. **Systematic Review of Effectiveness of Agency Standards**.  The record fails to show that the prevalence of consumer claims – state, federal and private – against many of ACICS's largest schools prompted initiatives within the Agency to improve the effectiveness of its standards.  While ACICS has now at least proposed some changes, those measures -- as yet undocumented as far as implementation and effectiveness, see infra, at 25-26 -- appear to have been undertaken in response to these recognition proceedings, rather than reflecting initiatives on the part of the Agency.  See, e.g., Final Staff Analysis at 43-44, 87-88 (recruiting standards). When conducting its review of the Agency's application, Department staff challenged the

Agency to develop processes for addressing issues of Agency effectiveness on its own; ACICS, however, had nothing to offer. Id., at 87-88. Absent a proposal by ACICS for making its review of its standards effective, the Department lacks a basis for continuing the Agency's recognition at this time.

## B. ACICS Will Not Be Able to Demonstrate by the End of 12 Months that the New Standards, Processes and Protocols It Has Adopted Operate Effectively

Recognition requires more than publication of accrediting policies. As discussed infra, at 2-3, it requires documentation from the accreditor that agency policies, standards and procedures, *as implemented,* are effective. See HEA § 496(*l*), (n)(3); 34 CFR §§ 602.31(a)(2); 602.32(c); 602.36(e)(2); 602.37(d). This is pertinent because while ACICS offered essentially nothing on the findings discussed above, the Agency in its brief touts a number of policies and protocols it adopted in purported satisfaction of the many other serious findings of noncompliance identified by Department staff, NACIQI and the SDO. But ACICS's arguments, even as to the findings they purport to address, are unavailing because in the experienced judgment of Department staff and NACIQI, in which the SDO joined, ACICS's policies and protocols are too new, or not even yet developed, and address performance issues too broad, to permit the Agency to document in 12 months that it satisfies the Criteria for Recognition, as would be required to permit the Department to exercise its discretion to continue ACICS's recognition. This considered judgment at all levels of the recognition decision making process, based on years of experience and broad expertise, is also a conclusion mandated by the record, as shown below.

1. <u>Falsified Placement Rate Data</u>. The longstanding and widespread incidence of placement rate falsification at ACICS-accredited schools (see, e.g., ACICS Exhibit 121 at 4-5), establishes ACICS as out of compliance and ineffective with respect to a large number of the

Criteria for Recognition. It precludes ACICS from showing that its placement rate student achievement standards are effective. 34 C.F.R. § 602.16(a)(1)(i); Final Staff Analysis at 29-31. It bars efforts by the Agency to show acceptance of the Agency by employers, and to demonstrate the competence, knowledge and training of its site visitors. 34 C.F.R. §§ 602.13, 602.15(a)(2); Final Staff Analysis at 7-9, 17-20. It undercuts the adequacy of the Agency's standards regarding institutional capacity and student complaints. 34 C.F.R. §§ 602.16(a)(1)(v), (a)(1) (ix); Final Staff Analysis at 38-39, 48-50. It conflicts with the Agency's responsibilities under 34 C.F.R. §§ 602.17(a) and 602.17(c) to effectively evaluate the level of success of an institution in meeting the institution's stated objectives, and to obtain sufficient information during site visits to determine institutional compliance. Final Staff Analysis, at 55-56, 59-60. It contravenes the requirement in 34 C.F.R. § 602.18(d) that a recognized agency have a reasonable basis for determining that the information the agency relies on for making accrediting decisions is accurate. Final Staff Analysis at 70-71. It establishes the Agency's monitoring regimen, required by 34 C.F.R. § 602.19(b), as ineffective. Final Staff Analysis, at 74-77. Clearly, ACICS would need to establish implementation of a reasonably effective means for identifying placement rate falsifications, and as well as effectiveness in taking action on them when found, before the Department could renew the Agency's recognition.

ACICS has taken some steps to change its accrediting policies and practices to address the falsification problems: specifically, it has introduced a new data integrity standard, and has begun to use an algorithm to identify inaccurate student achievement data in annual reports it receives from its schools, as well as to include a data integrity reviewer on its teams of site visitors. But it has fallen far short of showing it will be able to implement and establish the effectiveness of these measures within 12 months. Final Staff Analysis at 17-20, 28-30, 55-57,

59-60, 70-71, 74-77; ACICS Exhibit 121.  As Department staff has rightly pointed out, there is

no documentation that the data verification processes and policies have been fully developed yet,

much less fully implemented, nor that they are effective.  Id, at, e.g. 30 ("ACICS has not

documented implementation of such changes. Documentation indicates that ACICS did not

follow through on these commitments & only recently began experimenting with verification.");[9]

see also, e.g., Executive Summary at 21 (projecting that the Agency would decide in August,

2016 "how to use data derived from team reports to apply the new data integrity standard and

how to determine if the available information constitutes a breach").   It will take a significant

amount of time to implement the verification process, to train individuals to perform the

verification, and to see the impact of this process and of the new data integrity standard as far as

enabling the Agency to obtain and use student achievement data that is accurate in its accrediting

activities, and to take appropriate action with respect to submission of inaccurate data.  The

timeframe to implement these reforms and demonstrate their effectiveness far exceeds 12

months.

    **2.  Failure to Identify Abuse at Accredited Institutions**.  The record shows significant

incidence of consumer and Title IV fraud at ACICS-accredited institutions.  See, e.g., ACICS

---

[9] ACICS has claimed that the Final Staff Analysis wrongly "ignores" evidence of the Agency's use of
algorithms. Br. at 36. That is incorrect; the Analysis discussed them. See, e.g., at 30, 71. In addition, the Agency
makes no showing that it knows how to formulate an effective algorithm or effectively utilize data received.
Moreover, the practice appears to be new. The algorithms are part of the agency's "Placement Verification
Program" (see Final Staff Analysis at 8), which was not introduced until January 2016. See Page 4 of "ACICS letter
to FSA re Third Party Litigation," attached to Final Staff Analysis at 29; see also ACICS Exhibit 121 at 10, "Table
J:  Impact of Student Achievement Data Integrity Reforms, 2012-2016 (indicating that at least as of the date of the
preparation of the Exhibit the PVP review had pertained to only "a small sample of placements").   Even at the
NACIQI hearing, Agency representatives spoke of "plans": "what we will plan to do is have an automated process
whereby we will take the monthly process that we are doing now known as the placement verification process and
expand that into the yearly process where we will have timely information where we can automate responses from
students and employers to verify whether those graduates were placed in that job." Tr. at 243:7-12.  In its July, 2016
Executive Summary, at 26, ACICS "acknowledges that self-reported student achievement data were not verified in
the past to the extent now required by ACICS."  Since the process is new, it cannot be viewed as demonstrating the
Agency's effectiveness.

Exhibit 121, at 4-5. ACICS's failure to uncover or investigate such problems, despite their high incidence, reveals the ineffectiveness of the Agency's standards on admissions, recruitment, institutional financial and administrative capability, and student complaints, as well as of its site visits and site visitor training, and its monitoring regime. 34 C.F.R. § 602.15(a)(2); § 602.16(a)(1)(v), (a)(1)(vii), (a)(1)(ix); § 602.17(c); § 602.19(b).

Here again, ACICS has responded by developing several new policies and plans; here again, it has failed to show that it will be able to implement them and establish their effectiveness within 12 months. The policies and plans in question consist of the establishment of a new standard on recruiting and a new "At Risk Institution Group"; increased outreach to students; and new training of site visitors on detecting fraud. See Executive Summary at 11, 12, 13, 21, 24-25; 26. However, ACICS has not shown the implementation or impact of these reforms, because they are new; nor is their effectiveness going to be evident at the close of a 12 month period. Final Staff Analysis at 17-20, 38-39, 42-44, 48-50, 59-60, 74-77.

Indeed, the ultimate utility of at least some of these initiatives, if actually implemented, appears problematic. The new recruiting standard merely requires each institution to document that it is consistently monitoring its own recruitment practices. See Final Staff Analysis, at 44. If institutional self-oversight were sufficient to deter recruiting abuses at institutions that benefit from them, there would be no problem for ACICS to address. Moreover, rather than instituting its own investigation when charges of institutional misconduct arise, ACICS's practice over the years instead has been simply to require updates from institution on the progress of the dispute, and to view costly settlements -- indeed, anything short of a final judgment in a court of law -- as exoneration of the school. See, e.g., Tr. at 37. It continues to take that position to this day, complaining of litigation risk and that the Department staff, NACIQI and the SDO expect too

much of it. See Br., at 37. Nonetheless, even if the steps ACICS has begun taking could ultimately lead to reasonably effective oversight of institutional abuses, that will take far more than 12 months to accomplish and document; the noncompliance will not have been cured in that period.

3. **Unqualified Commissioners and Site Visitors.** As stated in the Final Staff Analysis, at 18, Department staff became aware over the last year that a significant number of individuals then serving as the agency's decision makers were affiliated with institutions that were themselves the subject of serious concern to the agency. See also third party comment of Massachusetts Attorney General Maura Healey, at 3 ("It should be noted that ACICS has representatives of these problem schools on its board and committees, raising serious questions about potential conflicts of interests and therefore ACICS's ability to impartially evaluate those and other schools. For example, ITT, Corinthian Colleges, and National College all had representatives on the ACICS Board of Directors/Commissioners during the pendency of these enforcement actions or the events leading thereto"). In addition, in response to Department staff's draft analysis of its application, ACICS reported having had to "purge[] its evaluator pool of individuals who did not provide current, accurate substantiating evidence of their experience," stating that "these individuals will not be allowed to serve as evaluators." Final Staff Analysis, at 22. Those "purged" apparently numbered approximately 237, with 196 others apparently sidelined with reviews pending. Id. These facts establish clear noncompliance with ACICS's responsibilities to appropriately staff its accrediting processes. See 34 C.F.R. § 602.15(a)(2), (a)(3); Final Staff Analysis, at 17-20, 21-22.

In May, 2016, ACICS announced that it had adopted changes to its bylaws, establishing an Ethics Review Board and providing that a commissioner employed by an institution under

scrutiny shall immediately resign. Final Staff Analysis at 19; ACICS Exhibit 206. It has also apparently developed a "revised Attestation Form", and is "developing a new on site composition procedure that requires the review of the attestation and the CV on file." Executive Summary, at 23. However, Department staff noted that "Whether or not [the Ethics Review Board] will exercise its power diligently, effectively and consistently remains to be seen." Final Staff Analysis at 20. It further noted that "The results of the review and purging of the agency's evaluator pool, while certainly laudable, does raise questions as to the qualifications of those who served as evaluators up to that point. The inconsistent and unreliable process that resulted from the unknown percentage of unqualified or poorly vetted evaluators obviously cannot be repeated." Final Staff Analysis at 22. And the Agency's as yet untested Attestation Form, and the site team composition process it envisions but has not yet developed, must be considered in light of the staff's comment that "requesting an 'attestation' of qualifications is quite different from reviewing 'documented experience.'  It is not clear the extent to which ACICS relies on attestations versus actual documented experience in assigning its evaluators to specific tasks." Id. That comment remains true, despite the unreviewed innovations ACICS contemplates putting in place. ACICS will not be able to demonstrate the effectiveness of its Ethics Review Board in 12 months, nor has it shown a basis for concluding that its problems with unqualified site visitors will be resolved in that time.

4. **Lack of Agency Access to Licensure Data.** The Agency's materials contain scattered references to licensure rates, and to Agency consideration of them. See, e.g., ACICS Exhibit 195. This is not surprising: the statute and regulations contemplate accreditor consideration of such information, see HEA § 496(a)(5)(A); 34 C.F.R. § 602.16(a)(1)(i), as would be expected with respect to education offered for the avowed purpose of enabling students

28

to obtain gainful employment in occupations requiring licensure to enter.   Yet, as discussed above, ACICS apparently has no standard regarding licensure, and it appears to concede that at present it lacks the State and occupational contacts and data to incorporate licensure into its accreditation decision making.  See Executive Summary, at 18-19.  ACICS provides no basis for concluding that these problems will be resolved within 12 months.

   **5. Structural Impediments to Timely Implementation of Promised Reforms.**  As described above, to come into compliance, ACICS would have to implement its many new policies, and develop and implement even more.  As also described above, its accrediting activities are implemented only through the efforts of a large number of individuals, including over 1,000 site visitors.  The Agency would have to train all of these individuals in the application of its many new and to be developed policies and processes, once those processes are finalized, and the training would need to be thorough enough to ensure careful and consistent application of them.   See 34 C.F.R. §§ 602.15(a)(2); 602.18(b), 602.18(c).  That is not an effort that could be documented as complete as of the end of 12 months.  In addition, ACIC's 2016 budget – the latest available -- projects an operating deficit and states that "ACICS's financial plan calls for balancing expenditures with revenues *in subsequent years* through scaling operations to match resource levels."  ACICS Exhibit 21 (emphasis added).  ACICS further explains that in 2015, ACICS "maintain[ed] its capacity by reducing operating expenses and curbing various projects."  Id.  This information fails to document that ACICS will have the resources to take on the "various projects" necessary to come into compliance – at least not within 12 months.

### C.   ACICS Does Not Keep the Commitments It Makes in Recognition Proceedings

The last review of ACICS's request for renewal of federal recognition was in June 2011, at which time the Department Staff found ACICS noncompliant with fourteen of the Secretary's criteria for federal recognition.   However, many of these very same issues – including student achievement, monitoring, and enforcement – reemerged in the current proceedings, as a result of ACICS's failure to follow through on representations it made in a 2013 compliance report submitted to obtain its now-expiring grant of recognition.

For example, as described in the Final Staff Analysis, at 29, ACICS had represented to the Department in 2013 that it was initiating an employment verification process, having previously relied on spot checks of self-reported placement data.   Specifically, ACICS reported in 2013 that the agency was "now moving to regular independent verification by pre-approved third party auditors.   Initially, 20% of campuses will be randomly selected to have their rates independently verified each year, while all institutions coming up for renewed accreditation will be independently audited for the accuracy of their submitted student achievement data."   Id. (describing ACICS's 2013 compliance report).   This representation by ACICS was pivotal, given the continuing incidence of investigations, litigation and settlements on allegations of placement rate falsification at ACICS-accredited schools.   As it turns out, however, ACICS never implemented third party verification,[10] and, as discussed above, only began efforts to improve data quality recently, when its application for renewal of recognition was being submitted.   Id., at 30 (discussing noncompliance with 602.16(a)(1)(i) (student achievement)).   At the NACIQI

---

[10] In ACICS Exhibit 121 at 10, "Table J: Impact of Student Achievement Data Integrity Reforms, 2012-2016," ACICS indicates that third party verification was only ever required of CEC schools.   Moreover, while in the Table ACICS appears to take credit for this "reform," the same exhibit, at 4, reveals that third party verification was imposed on CEC schools as a condition of settlement of litigation brought against CEC by the New York Attorney General.

hearing ACICS representatives acknowledged as much.  Tr. at 243:5, 243:15-17 (ACIC

representatives stating that the agency took "2 years to conduct a study of placement

verification" and "felt that was more verifiable than a third party doing it which is why we are

doing an in-house process and have and will scale that up to a yearly process whereby we will be

looking at all schools to verify that placement").  See also testimony at NACIQI meeting of

Department Staff analyst Steve Porcelli, Tr. 18:3-11 ("[After ACICS's 2013 compliance report]

they were going to ... do all of these verifications and it started off strong and then kind of it

didn't meet what we thought it was going to do that ... I can't say with confidence that these

things would be effectively put into place...you can put anything on paper and promise it but it is

the implementation that is really how we can judge an Agency."); Tr. at 160:18 – 161:5 (Third

Party Oral Comments/Miller)("[ACICS] made promises and those promises were too

expensive.").

Another example of the ACICS commitments that have not been kept relates to licensure

rates.  As discussed in the Final Staff Analysis, in the Agency's 2013 compliance report, ACICS

"stated that programs that involve a license to become employed would need to demonstrate at

least a 60% first attempt pass rate on the relevant licensure exams, and to be in compliance with

all State or national requirements."  Final Analysis at 29 (regarding 602.16(a)(1)(i), Student

Achievement).  However, as discussed above, ACICS acknowledges that this promise has not

been kept.  Id., at 29-30; see also Executive Summary, at 19; ACICS Exhibit 180 at 47, 144;

ACICS Exhibit 1 at 118 (Appendix H).  Thus, although in 2013 ACICS promised to establish a

precise licensure policy, to date it has not followed through with an enforceable policy established in its Accreditation Criteria manual.[11]

As a result of these and similar experiences, the Department has no basis for anticipating that ACICS will follow through on promises it makes in these proceedings in seeking continuance of its recognition.

In addition, as discussed above, at 14-15, ACICS has a history of disregarding its own existing written policies, in terms of enforcement, which makes it unlikely that it will enforce new written policies it touts now. NACIQI, for one, was clearly and justifiably troubled by whether the Agency could be trusted to turn the ship around, given its lack of urgency over the past years. As Ms. Derby commented, "too late is way too late." Tr. at 119:18-22.[12] In response, then-Executive Director Anthony Bieda acknowledged that there had been "a confluence of concerns *over the last couple of years* some of them derived from external forces, some derived from the changes in the sector itself and changes in the economy…. And it just took the confluence of those things earlier this year, both when we encountered discussions with [Mr. Porcelli] *in April and subsequent to that* that catalyzed that initiative for change. A lot of these things have been building but suddenly there was manifest a much more pronounced sense of urgency." Tr. at 121:1-9 (emphasis added). It was at that point – years after these problems

---

[11] A "Memorandum to the Field" not issued until May 20, 2016 just starts to collect licensure rates, and this directive is included in a new standard contained in the July 1, 2016 Accreditation Criteria. See ACICS Exhibit 180 at 52 (§ 3-1-704). This standard appears to have been adopted following Department staff's 2016 review of the Agency's petition, and in anticipation of the June 2016 NACIQI meeting. So it appears to be a reaction to the noncompliance noted in Department staff's 2016 Draft Analysis, rather than belated and partial follow through by the Agency on a change it had stated it was going to make in 2013.

[12] See also Tr. at 160:18-20 (Third Party Oral Comments) (Miller) ("ACICS had years to get better. If these reforms are so serious why did they only start two months ago and why should the public or this committee trust that ACICS will do what it says?")

began and were widely publicized -- that ACICS apparently finally recognized that "just because we have always done things that way wasn't going to be good enough anymore." Tr. at 121:4-5.

Department Staff, NACIQI and the SDO had to take ACICS's track record into account in reaching a judgment on the Agency. This should be done in review of the record on appeal as well.

## D. ACICS Cannot Rely on Post-Hearing Allegations and Improper Evidentiary Submissions to Obtain a Continuance.

Clearly ACICS's recent history provides no basis for concluding that the Agency will come into compliance within 12 months. On brief, however, ACICS argues that the Department nevertheless should grant it the additional time because (1) in the aftermath of the NACIQI hearing, "the [ACICS] President, and five Vice Presidents, are no longer employed by ACICS," Br. at 27; (2) the ACICS Board "doubled the number of public members"; (3) the Board also appointed Roger Williams as the new "Interim Chief Executive Officer and President"; and (4) ACICS has continued its accrediting activities since the NACIQI meeting, taking actions which it characterizes as "immediate," "rigorous"; "robust"; and "swift." Br., at 27-30. The Agency has continued, post-hearing, to submit evidence it asks the Department to consider, including with its July 5, 2016 Comments filed with the SDO; its October 4, 2016 Request for Reconsideration; and now its appeal Brief (see Exhibit B thereto).

ACICS's arguments are without merit. Neither Department staff nor NACIQI has reviewed any of ACICS's new evidence or allegations, and ACICS's decision to submit it violates Department rules discussed supra, p. 5. Mr. Williams' appointment is "interim," and he is a single individual, who does not vote on accreditation decisions or policies. The Department has no information about the new public members now allegedly serving as ACICS Commissioners, nor about ACICS's replacements, if any, for the six departed vice presidents.

Other than the addition of the new public members, the ACICS Board apparently is the same, which is hardly encouraging.[13]  Moreover, an accrediting agency appealing a denial of renewal of recognition may continue its accrediting activities in the meantime, but the Department knows nothing about the quality or context of those activities, other than what ACICS alleges in its brief.  The Department has no way of determining whether any action taken reflects a change of direction throughout the Agency or instead no more than acceptance for the time being of the need to produce evidence in support of the Agency's effort to obtain continued recognition.  These are the types of reasons the Department wrote its regulations to close the evidentiary record upon the conclusion of the NACIQI hearing.  Without setting and abiding by a finish line, the Department's recognition proceedings would become a meaningless, continuous loop – emulating the defects in ACICS's enforcement approach.  If ACICS desires to make a clean break from the past, it has the option of waiting two years and showing it is, in effect, a new agency.  See 34 C.F.R, § 602.12(a)(2).  It could show actual experience with compliant policies and effective implementation at that time.

---

[13] See Tr. at 165:1-6 (Third Party Oral Comments/Miller)(there have not been "major changes in terms of the Board apart from the one individual who was removed").  At the NAICIQ meeting, ACICS Board Chairman, Dr. Lawrence Leak, testified that he was "shocked" in April 2016, when Department staff analyst Steve Porcelli told the Board about ACICS's deficiencies.  Tr. at 252:20-253:8 (Leak).  Indeed, Chairman Leak readily acknowledged that the Board was unaware (or claimed to be) of the Agency's failures, having put unquestioning confidence in the former president, even as to how ACICS was "handling all of the different allegations from the Attorney Generals."  Tr. at 244:9-12 (Leak).

A more accurate barometer of the level of desire throughout the Agency to "turn the ship around" may be evident in what happened at this year's ACICS annual conference, as reported by Third Party Commenter Miller, who visited the conference.  Mr. Miller described a presentation by a representative of Daymar College (which had reached a $12.4 million settlement with the Kentucky Attorney General, Final Analysis at 43) and its attorney.  Mr. Miller recounted: "[At this NACIQI Hearing, ACICS is] making all of these promises of contrition and then [at the annual conference] people [are] speaking to [its] members in a key note session … all about ways to avoid problems with the [state attorneys general]."  Tr. at 161:20 – 162:8.

## E. The Findings Are Too Numerous for ACICS to Address in 12 Months

Trying to justify a 12 month continuance, ACICS alleges that it has "*already demonstrated compliance with more than half of the areas of purported noncompliance.*" Br. at 1 (emphasis added). However, this contention is demonstrably false. Of the 11 areas ACICS apparently refers to – i.e., what is described in its Brief as five "Category A Findings," *plus* its six so-called "Category B Findings" – ACICS admits that "demonstration of effective implementation" is lacking with respect to all six of the findings in Category B. Br., at 12. So the agency in fact has not, *already demonstrated compliance* in over half of the areas of noncompliance. As discussed above, evidence of effective implementation is a prerequisite to any finding of compliance – particularly with respect to an agency like ACICS for which endemic ineffectiveness is the overarching issue.

Moreover, in addition to the fact that ACICS admits it has not implemented its alleged fixes for any of the "Category B" Findings, it does not pretend to have achieved compliance with the third category it has identified – so-called "Category C Findings." The Agency acknowledges that it has not yet even finished establishing the policies needed to address these ten findings, much less begun to implement them. See Executive Summary, at 2. ACICS also acknowledges that "the dissemination of information regarding new policies and standards, and the subsequent adoption of those requirements by ACICS accredited institutions, requires adequate lead time in order to be effective," and also that "in fairness to the institutions . . . a reasonable period of notice for implementation must be provided." Id., at 3. It is unclear on what basis ACICS relies in asserting that it will be able to demonstrate compliance within 12 months based on what its brief essentially claims will be phenomenally swift and effective implementation of policies it has not yet adopted. Moreover, as discussed above, at 17-18 & n.5,

ACICS has omitted any discussion of coming into compliance with respect to the student achievement criterion, § 602.16(a)(1)(i), so the many deficiencies noted by the Staff on that criterion apparently have not been factored into ACICS's timelines. It is quite significant that Department staff, with its decades of experience regarding what number and kinds of findings an accrediting agency can reasonably be expected to remedy within 12 months, concluded that ACICS's problems could not be addressed effectively in that time period.

Finally, even with respect to its "Category A" Findings, ACICS's contentions that it has achieved compliance are false. As a careful comparison of ACICS's claims in its brief with the Final Staff Analysis shows, ACICS on appeal does not identify any evidence of actual compliance that Department staff did not see regarding "Category A" findings. Instead, such a comparison shows only that ACICS apparently tacitly disagrees with Department staff, NACIQI and the SDO that it would need to take on the compliance tasks set out in the Final Staff Analysis to be found compliant in these areas. ACICS's approach is concerning, because the first step in rectifying a deficiency is acknowledging that it exists. Just because these "Category A" deficiencies might – or might not -- be quickly remedied by an agency willing to address them, does not mean they are trivial and need not be addressed.[14]

---

[14] For example, it is important that the Agency have used controls to ensure that its Institutional Review Boards -- which play a vital role in its accreditation decision making -- were not compromised ethically or tainted by conflicts of interest with respect to the specific matters they were reviewing. 34 C.F.R. § 602.15(a)(6). ACICS did not show it had done so. Final Staff Analysis, at 25-26. It is also important that, as required of any recognized accrediting agency, ACICS put in place and consistently use a process to ensure that it does not, through balkanized approvals of an accredited institution's so-called "substantive changes," accredit what is essentially a new institution without having ever conducted a comprehensive review (self-study, site visit, etc.). 34 C.F.R. § 602.22(a)(3). ACICS has not shown it has those controls. Id., at 94-95. Likewise, it is important that ACICS's policies and procedures regarding the need for failing institutions to develop plans for the "teachout" of enrolled students clearly and cohesively provide, at a minimum, the protections required by federal law. 34 C.F.R. § 602.24(c)(1); Final Staff Analysis at 110-111. While ACICS alleged that it contemplated accomplishing this in August, 2016, see Executive Summary at 10, ACICS's allegations remain unreviewed. It is also important to put into place effective controls to ensure that the volunteers participating in the Agency's accrediting processes represent an acceptable range of

In sum, ACICS has not demonstrated compliance with any of the 21 areas of noncompliance – much less half. The Agency's call for the Department to grant a continuance cannot be squared with the fact that 21 significant findings remain outstanding.

## III.  The Review Below Was Lawful and Appropriate

Unhappy with the result of the staff's, NACIQI's and the SDO's reviews, ACICS in its Brief attempts to identify some type of impropriety in them. Throughout its Brief, it alleges that it has been treated more harshly than other accreditors, and subjected to unreasoned decision making. See Br. at, e.g., 5, 8, 14, 18, 19, 20-21, 23, 24-26, 35, 46-47. In addition, it complains that it was subjected to new standards and unfair procedures, Br. at 36-43; that the staff, NACIQI and SDO should not have held the Agency accountable for its accreditation of Corinthian-owned schools, in view of the Department's monitoring of Corinthian schools, and erred in taking into account the high incidence and nature of lawsuits against ACICS-accredited schools, Br. at 44-47; and that the results of the proceedings below stemmed from improper or unfair political pressure, Br. at 47-49. These contentions fail in fact and in law.

### A.  The Department Acted in Accordance with Law in Applying Rigorous Scrutiny and Judging ACICS's Application for Renewal on Its Own Merits

Section 496(n)(2) of the HEA, 20 U.S.C. § 1099b(n)(2), directs the Secretary to "place a priority for review of accrediting agencies or associations on those agencies or associations that accredit institutions of higher education that participate most extensively in [Title IV, HEA programs] and on those agencies or associations which have been the subject of the most complaints or legal actions." Of the agencies under review and on the agenda for the June 2016

---

viewpoints – i.e., those of public members, academics and administrators, see 34 C.F.R. § 602.15(a)(5), and yet ACICS failed to show that its controls were effective. Final Staff Analysis at 23-24.

NACIQI meeting, ACICS institutions had the highest Title IV volume[15] and the most complaints received in the form of public comments of any Title IV gatekeeper.  As shown in the accreditor dashboards made available to NACIQI in advance of the June 2016 meeting, ACICS institutions drew down $4.76 billion in Title IV aid in Award Year 2013-2014.  Institutions accredited by Accrediting Commission of Career Schools and Colleges ("ACCSC") drew down $2.97 billion in Title IV aid during Award Year 2013-2014, and the Department Staff also  reviewed ACCSC with extra scrutiny and asked similar supplemental questions.  None of the other agencies scheduled for review at the June, 2016 NACIQI meeting oversee even $1 billion in annual Title IV participation.  Based on the information available and the amount of Title IV dollars at risk, the Department not only had the authority, but in fact the statutory obligation, to undertake a rigorous review.  Contrary to ACICS's claims, there was nothing unfair or discriminatory about the process.

Likewise, the fact that there are other agencies that have been found non-compliant on one or more of the same Criteria for Recognition as ACICS without being denied renewal of recognition has no relevance.  As discussed above, at 3,10, each accrediting agency is different; each has different standards and procedures; each has a different record of effectiveness; each is different in terms of the content of its application for recognition.  Likewise, each agency presents a different picture in terms of not only the number of findings but the nature and history of non-compliance demonstrated, if any.  In each case, the ability to come into compliance within 12 months will be different, because the problems are different.  Department staff noted the unprecedented quantity of negative information about ACICS amassed during these proceedings.  Tr. at, e.g., 43.  Upon consideration of it, the staff, NACIQI and the SDO had little

---

[15] Northwest Commission on Colleges and Universities institutions drew down $6.04 billion in Title IV aid, but that agency was before NACIQI for review of a compliance report, not a renewal of recognition.

choice but to arrive at the conclusions they did.  ACICS had no entitlement to a more favorable decision.

Likewise, ACICS's complaints that the analysis below was unexplained or unsupported are made out of whole cloth.  The Final Staff Analysis is exceptionally detailed in laying out the deficiencies in ACICS's application and explaining why Department staff made the recommended findings it did; however, neither the staff nor the SDO were responsible for defining for ACICS what the Agency would need to do to begin performing effectively.  Nor was there any necessity for the SDO to replicate the Final Staff Analysis and Final Staff Report in her decision.  After reviewing it, she agreed with it, and adopted the findings recommended. By that act, she incorporated all of the analysis of the Agency's submissions and its failure to demonstrate compliance with the Criteria for Recognition.  In her decision, she also explained why those findings and the record as a whole compelled her decision to deny renewal of recognition.  Nothing more was required.

## B. ACICS Has Not Been Subject to New Standards

Its complaints on brief notwithstanding, ACICS identifies no instance in which new standards were applied to it.  Contrary to the claims of ACICS (Br. at 39-41), all of the standards for recognition discussed in the January 20, 2016 memorandum from Lynn Mahaffie and the March 29, 2016 blog from Undersecretary Ted Mitchell have long existed in statute and regulation.  See, e.g., HEA §§ 496(a)(4)(A), (l), (n)(1), (n) (3); 34 C.F.R. §§ 602.17(a); 34 C.F.R. § 602.3 (definition of recognition); 602.16(a); 602.19(b); 602.31(a)(2); 602.32(b).  Similarly, the April 22, 2016 letter from the Under Secretary, cited by ACICS on page 40 of its Brief, is not only bereft of new standards, but is neither cited in, nor relied upon, in any of the Staff, NACIQI, Department or SDO analyses of ACICS offered in these proceedings, and ACICS does not, and

cannot, show otherwise. The NACIQI pilot, referred to on page 40 of ACICS's brief, likewise contains no new standards, but instead, on its face, is intended to bring a more "systematic" (i.e., standardized) quality to the NACIQI's development of the record through testimony elicited in recognition proceedings. Because the pilot contains no new standards, there has been no occasion for NACIQI to seek public comment on it, but it has been posted on the NACIQI web site at the Department since NACIQI adopted it at the December, 2015 NACIQI hearings, and it was applied to all agencies at the June, 2016 NACIQI hearings, rather than to ACICS alone. Contrary to ACICS's claims, Br. at 41, the reference in the OPE Comments to multiple examples "now required for renewal" was not to impose a new requirement, but instead referred to Department guidance issued in 2013.   OPE Comments, pp. 13 n.5, 19 n.8.

In truth, ACICS's arguments regarding "new standards" are not focused on standards at all, but instead apparently oppose the application of "rigor" by staff and NACIQI in conducting recognition proceedings.   See Br. at 40-41. But ACICS is not entitled to a lack of rigor.   The statute charges the Department with conducting a "comprehensive review and evaluation of the performance" of accrediting agencies seeking recognition," and with considering "all available relevant information."   HEA § 496(n)(1), (n)(3).   The rights at issue in recognition proceedings are not those of agencies seeking recognition but instead those of the taxpayers and students who invest their money and, in the case of students, years of their lives, in pursuing credentials at educational institutions in reliance on the quality assurance provided by recognized accreditation. The Department is duty-bound to apply the highest level of rigor it can bring to bear in conducting the comprehensive review required to determine whether agencies seeking recognition are performing at an acceptable level with respect to all of the parameters the statute and implementing regulations provide for it to consider.

## C. ACICS' Claims of Procedural Irregularities are Meritless

As its first claim of "procedural irregularities," ACICS takes the position that staff members of the Accreditation Group in the Office of Postsecondary Education alone can participate in the development of the record regarding an applicant accrediting agency's qualifications for recognition. Br. at 3 n.2, 41-44, 49.  However, ACICS cites no support for that position, and there is none.  The Under Secretary and his Office participated in the efforts of the Department staff to develop the record on the ACICS matter, and the Under Secretary in a public statement at the opening of the NACIQI meeting referenced the need in recognition proceedings to hold accrediting agencies accountable.  Id.  As discussed above, however, the Department is charged by statute with conducting a "comprehensive analysis" in recognition proceedings, so it is entirely appropriate that knowledgeable personnel throughout the Department participate to the maximum extent possible whenever possible, and develop the record as fully as possible. This is especially so where, as here, Department Staff was faced with the almost unprecedented circumstance of what appeared to be pervasively ineffective performance on the part of a major accreditor.[16]  The Under Secretary and his office did not participate in any way in the SDO's decision-making process, and obviously is not participating in consideration of ACICS's appeal; both the SDO and, separately from the SDO, the Secretary, have been completely walled off.  Tr. at 49-50.  Hence the involvement of the Under Secretary and his office is wholly immaterial to the merits of this case.[17]

---

[16] ACICS' apparent expectation that each recognition proceeding will be conducted in cookie-cutter fashion is incorrect.  "Recognition is an individualized and discretionary process."  In re ACCJC, at p. 10.

[17] The suggestion that the will of NACIQI members could somehow have been overborne by the Under Secretary's remarks (ACICS Br. at 42), or by stray remarks at the NACIQI meeting, id. at 43, is frivolous.  The Under Secretary made no reference to ACICS, none of the NACIQI members are accountable to him, and, as discussed above, each NACIQI member has been selected based on his or her individual "experience, integrity, impartiality, and good judgment," as well as his or her "technical qualifications, professional standing, and demonstrated knowledge in the

Equally unsupported and unsupportable is ACICS's contention that there was some error in the fact that "the SDO is a political appointee and Chief of Staff to the Secretary, a direct report [sic] to the Secretary, and the Secretary will review her decision." Br. at 44. The HEA expressly provides that recognition appeals are to the Secretary, and to be conducted in accordance with regulations procedures prescribed by him. HEA § 496(o). As noted above, the Department's regulations, negotiated with the accrediting community and in place since 2010, specify that the SDO is the "senior official in the U.S. Department of Education who reports directly to the Secretary regarding accrediting agency recognition." 34 CFR § 602.3 (definition of "Senior Department Official"). It is entirely appropriate that the decision of the SDO – potentially the final decision of the Department on the vital issue of recognition, 34 CFR § 602.36(j) – is made by a high level, politically accountable official. In addition, as the Secretary is aware, like the SDO, he has been walled off from these proceedings, and from discussion of ACICS's recognition, including from discussions of this matter with the SDO either before or after her decision.

---

fields of accreditation and administration in higher education." HEA § 114(b)(2)(A), (C). As the Secretary has noted, "the recognition process is highly discretionary and relies on the professional experience and common sense of individuals at each level of the process." *In re ACCJC*, at p. 6.

In addition, contrary to ACICS's claims, Br. at 44, it had an unfettered opportunity to speak at the NACIQI meeting, including not only to correct any oral statements it viewed as erroneous, but to "explain in detail" if it wished "each of the 21 items" of non-compliance discussed in the Final Staff Analysis, at a hearing unprecedented in terms of the length of time specifically devoted to ACICS's application for recognition. Tr. at 67-140, 231-254. If the Agency now wishes it had said something more, or different, than it offered at the time, see Br., at 44, including correcting any "substantive errors" it had found in the Final Staff Report, id., at 42, that is not a fault of the Department's process.

**D.  It Is Appropriate to Hold ACICS Accountable for Its Accreditation of Corinthian-
Owned Schools, and to Consider Litigation Involving ACICS-Accredited Institutions**

ACICS attempts to shed responsibility for its failure as an accreditor with respect to its

Corinthian-owned schools by asserting that "the Department was in charge of all Corinthian-

related matters and investigations."  Br. at 46.  This contention is patently false and without

support in any statement from the Department.   At no time did the Department advise ACICS

that the Agency was absolved of any of its responsibilities as a recognized accreditor with

respect to the Corinthian schools ACICS accredited.  Indeed, other regulators continued to

perform their oversight activities, including ACCSC and state authorizing agencies.  ACICS's

position that the Department's activities, or those of State agencies, mooted the agency's own

accrediting responsibilities epitomizes ACICS's passive and ineffective performance as a

recognized accreditor.  The fact that the Department took the trouble to keep ACICS and others

accreditors apprised of its actions (see Br. at 46) was far from a reasonable basis for ACICS to

assume that posture; had it inquired of the Department, it would have learned as much.  ACICS

stood by passively, notwithstanding the ever unfolding-evidence of corporate-wide institutional

fraud violating its standards.  While ACICS is incorrect in suggesting that its failures of record

are largely limited to the Corinthian-owned schools, the agency's lack of action with respect to

those schools is certainly emblematic of the problems the staff, NACIQI and the SDO found.

ACICS is correct that it was not the only accreditor of Corinthian-owned schools, and the

Department intends to inquire fully into the performance of each accreditor that had substantial

dealings with Corinthian as they appear for re-recognition – just as it did with respect to ACCSC

at the June, 2016 NACIQI meeting.  The fact that ACCSC is not now facing loss of recognition

reflects a showing by that agency of sufficiently effective performance with respect to its

Corinthian and other accredited schools – in stark contrast to ACICS.

ACICS' broader charges that the consideration by Department Staff, NACIQI and the SDO of suits and settlements against ACICS-accredited institutions was improper, and somehow set the agency up in an inappropriate, "quasi-prosecutorial," role, see Br. at 44-46, are off the mark. Accrediting agencies may not be inspectors general or prosecutors, charged with uncovering fraud at large, but they are accountable for assuring compliance with their accrediting standards, which are expected to *effectively* address the topics listed in HEA § 496(a)(5) and the corresponding regulation, 34 C.F.R. § 602.16(a). Those topics include success with respect to student achievement, as well as recruiting and admissions practices, publications, advertising, and student complaints. And ACICS's chosen standards of student achievement look to placement and retention rates. The lawsuits considered in this proceeding are limited to those that have made claims directly pertinent to the accredited institution's compliance with such standards. That made them ACICS's business, and a direct challenge to ACICS's case for being recognized.

When such a lawsuit is filed, a recognized accreditor is expected to inquire into the institution's compliance with all accrediting standards implicated. The agency can, and should, obtain an accounting of the litigation from the accredited institution and perform such further investigation as is necessary to make a compliance determination. Those responsibilities do not end with a settlement to the litigation; accreditors can, and should, inquire of accredited institutions why the settlement was agreed to.[18] The fact that a finding of non-compliance could

---

[18] See Tr., at 148 (third party commenter representing the Maryland Attorney General testifying that "When a state AG files a case or a lawsuit against a school like what has occurred in Corinthian, ITT, Brown Mackey Art Institute campuses, West Wood to name the larger ones, vast amounts of resources have been expended in investigation, collection of complaints, analysis of documents and interviewing witnesses. State AG's do not take this lightly. To even initiate an investigation beyond just bring a complaint is not something that states take lightly . . . Schools aren't going to settle and forgive millions of dollars in debt, pay a penalty, agree to high injunctive provisions and make other measures if there is not something there and it is at least worth it for ACICS to investigate. . . So our point is a settlement with the state AG may not be an admission of guilt but it is an analysis that something is

lead to litigation, and that an inadequately supported finding could result in an adverse judgment, Br. at 38, are inherent to the role of accrediting agencies, and challenges other agencies are able to manage.

The extensive history of consumer-protection litigation brought against ACICS-accredited institutions, and their resolution in myriad high cost settlements, was a topic entirely appropriate for review in considering ACICS's petition for renewal of recognition, and would be for any similarly-situated accreditor, as it was in the Department's review of ACCSC, as discussed above.  The fact that ACICS had so little to say about these cases during review by the Staff, NACIQI and SDO, and that it has so little to say about them now, supports the conclusions below that ACICS has not demonstrated the effectiveness required of a recognized accrediting agency.

### E. The Reviews of ACICS Did Not Result from Improper or Unfair Political Pressure

ACICS's claims that its recognition proceedings were politicized (Br. at 47-50) fare no better.  The Department staff's recommendation that ACICS would not be able to come into compliance within the one year maximum timeframe was based on the number of compliance issues, the scope of those issues, the newness of even those revised standards, policies, and protocols that it has adopted, ACICS's prior performance, and the realities of implementation during the upcoming accreditation cycles -- not political pressure.

Experience, not political pressure, guided the Department staff, and they reviewed the compliance issues with the benefit of decades of experience in analyzing recognition petitions.  See, e.g. Tr. at 267 (Bounds) (both Mr. Mula and Mr. Porcelli have been "doing this [for] 30

---

needed.)"  ACICS cannot explain away the number and amounts of these settlements against its accredited schools as mere nuisance litigation; that would impugn the integrity of every attorney general who brought such a case, and in some cases the competence of defense counsel as well.

years"). Those years of experience – in analyzing this petition and many others before it --

reasonably led them to conclude that ACICS's noncompliance was so pervasive that it would not

be cured within twelve months. See Tr. at 9:21 – 13:21 (Porcelli); Tr. at 48:5-10 (Porcelli) ("I

have no confidence that they could do this in 12 months. ... the judgment is [that] there are so

many things and they are so deep rooted and if there were more time that would be great but

there isn't"); Tr. at 49:1-10 (Bounds) (standards revisions came too late and took a "reactive

instead of a proactive" approach); Tr. at 52:12-15 (Porcelli) ("they don't meet the criteria at this

point and ... I don't have confidence that they could meet them in the 12 month period"); Tr. at

259:3-14 (Mula) (nothing that was said at the NACIQI hearing would change or impact his

judgment and he "[h]onestly, cannot see [compliance] happening in one year"); Tr. 260:11-18

(Mula) (not enough time in a 12 month compliance period to demonstrate effectiveness of new

monitoring standards because of due process timeframes for institutional compliance in the event

of an adverse action); Tr. at 265:13 - 266:3 (Mula); Tr. at 266:13 - 267:19 (Bounds) ("based on

our experience from what we have seen in the past. We have had agencies with far [fewer]

issues have serious trouble with meeting those standards in the 12 month time"); Tr. at 270:12-16

(Porcelli). See also Tr. at 256:9-13 (McLarnon) ("We have heard before from this Agency that

they would turn things around and they did not make good on their commitments. We don't

have confidence at this point that they will make good on this commitment").

Members of NACIQI brought their own experience and judgment to the twelve month

compliance issue, and particularly focused on ACICS's "track record" of non-compliance in the

past. See, e.g., Tr. at 36:3-13 (Staples)("it really is a judgment as to how deep and how

profound and how significant the issues are ... [and] it is not just a matter of their capacity but it

is whether you have confidence that they are even capable of implementing the standards as you

described); Tr. at 67:2 – 10 (LeBlanc)("track record in my mind is still the best predictor of

future performance and I just don't see the evidence that given the widespread systemic failures

of this agency that [they] can turn this around [in twelve months]"); Tr. at 268:17-19 (Staples)

("there's a genuine question about whether we should -- based on that history of inaction be

confident that anything substantive would happen in 12 months in the areas that matter most");

Tr. at 275:12 – 276:15 (Derby) (recognizing the amount of time spent by the Department staff in

reaching their conclusions, and importance of the staff's professional judgment, and noting with

regard to the promises made by ACICS during the NACIQI hearing, "I find myself more

persuaded by track record than I do by promises").

Although ACICS complains about a report issued by Senator Elizabeth Warren, Br. at

47-58, this report was not even included in the record until ACICS cited it in its brief. Moreover,

NACIQI members neither can, nor are expected to, close their eyes to information they are

exposed to day-to-day by virtue of that expertise; their expertise is the reason they are part of the

process.  See HEA § 114(b)(2).

More broadly, however – and notwithstanding the comments of CHEA President Judith

Eaton, quoted at Br., p. 48 -- the complaint of "politicization" flies in the face of the statute. In

the 2008 reauthorization of the HEA, Congress provided for a diversity of political viewpoints

just as it provided for a variety of other types of expertise to be represented on NACIQI. HEA §

114(b)(1). [19] In addition, as discussed above, at 4, by statute, NACIQI is subject to the Federal

Advisory Committee Act. HEA § 114(d)(4). The purpose of FACA is to involve the public in

---

[19] Although ACICS quotes a statement from NACIQI member Ann Neal regarding the "need for 'due process to apply,'" Br. at 49, due process is not at issue here. ACICS has made no effort to show it has a constitutionally protected liberty or property interest, and ACICS has had the benefit of an extensive hearing process that has allowed it a meaningful opportunity to be heard. *In Re ACCJC*, at 12-13.

all aspects of the activities of a federal advisory committee such as NACIQI.  See 5 U.S.C. App.

The Department can no more exclude from consideration by Department staff, NACIQI and the

SDO timely submitted written and oral comments from any member of the public than it can

exclude the accrediting agency itself.  So political viewpoints, and participation of any member

of the public who timely registers, are typical of any NACIQI meeting considering any

accrediting agency application.[20]  The only issue here is whether the recommendations and

decision made below are tied to and comport with the evidence of record regarding ACICS's

performance that is pertinent to the statutory and regulatory requirements for recognition.  They

are and do, and ACICS does not attempt to show otherwise.

ACICS's charges of "politicization" are wholly without merit.

## IV.  ACICS Lacks Any Standing to Determine or Assert Student Interests.

ACICS contends, lastly, that the Department should not deny it renewal of recognition in

view of the harm this could cause to students.  Br. at 2-3, 49-50.  It points out the challenges

students may face as a result of the decision with respect to, e.g., their participation in state and

local programs, including federal student aid.

The Department of course is vitally concerned about student welfare, and was mindful of

it at all times in making the decision below.  See, e.g., Tr., at 36-39, 272.  ACICS, however,

lacks standing to speak for students and cannot bootstrap its way to recognition by purporting to

represent their interests.  Had ACICS been acting in their interests instead of leaving its

accredited institutions rudderless and without oversight in terms of academic quality and

---

[20] Furthermore, contrary to ACICS's complaints, Br. at 48, it has been valuable, rather than improper, for State Attorneys General to participate in these proceedings.  As members of the HEA "triad," states have an important role in ensuring accountability in HEA programs, see, e.g., HEA § 495, and State Attorneys General are reliable sources as to academic bad actors and accreditor effectiveness in dealing with them.

integrity, the Agency would not find itself where it is today.  The Department personnel who were involved in the proceedings below remain optimistic that ACICS-accredited institutions will weather the transition successfully.  For the most part, that has been the experience in the past.  Id.

Furthermore, ACICS apparently misunderstands that the 18 month period it references, Br. at 50, is a creature of statute, not merely of regulation.  See HEA 498(h)(2).  Obviously Congress considered 18 months to be appropriate and sufficient for purposes of its recognition scheme and federal student aid.  If some dislocation does occur, the Department of course will do anything it can to help.  And just as important, the Department at least can take comfort in the fact that it would have been no kindness to students to maintain indefinitely the recognition of an accrediting agency that fails to qualify as a reliable authority as to the quality of postsecondary education, and that cannot demonstrate if or when it will qualify.  Clearly that was not what Congress had in mind when it put the recognition requirement in the HEA.  ACICS has no argument to make based on student interests.

## CONCLUSION

For the reasons stated above, and by the SDO, and for the reasons given by Department staff in the findings the SDO adopted from the Final Staff Analysis and Final Staff Report, ACICS's appeal, and its request for renewal of recognition, should be denied, and the decision of the SDO affirmed.

Respectfully submitted,

Sarah Morgan
Office of General Counsel

COUNSEL FOR THE SENIOR
DEPARTMENT OFFICIAL

49

CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of November, 2016, I caused a copy of the foregoing Brief on Behalf of Senior Department Official In Opposition to Accrediting Council for Independent Colleges and Schools' Appeal, and in Support of Decision to Deny Renewal of Recognition, to be served on the Accrediting Council for Independent Colleges and Schools by depositing it with UPS, addressed as follows:

Allyson B. Baker
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004-1601

Kenneth J. Ingram
Whiteford Taylor Preston LLP
1800 M Street, N.W.
Suite 450N
Washington DC 20036

**Sarah Morgan**

# EXHIBIT 16

## To Declaration of Allyson B. Baker

**ACICS's Response To The SDO's Brief In Opposition To ACICS's Appeal**

November 30, 2016

**VIA OHA E-FILING SYSTEM**

John King, Jr.
The Secretary of Education
c/o Docket Clerk
Office of Hearings & Appeals
U.S. Department of Education
Potomac Center Plaza
550 12th Street, SW
Washington, D.C. 20202

> Re:   **ACICS's Response To The SDO's Brief In Opposition To ACICS's Appeal No. 16-44-O (Accreditation Recognition Proceeding)**

Dear Secretary King:

The Accrediting Council for Independent Colleges and Schools (ACICS or the "Agency") submits this letter:  (1) in response to the Senior Department Official's Brief in Opposition to ACICS's Appeal and In Support of Decision to Deny Renewal of Recognition (the "SDO Opposition"); and (2) to renew its request for a hearing before the Secretary to present further argument regarding this matter.

The SDO's Opposition attempts to convert the premise that "recognition determinations are highly individualized and discretionary" into a broad license to disregard its obligations under the Administrative Procedure Act.  *See* SDO Opposition at 10.  But, the Department may not violate ACICS's due process rights, fail to provide a proper explanation for why it deviated from prior precedent, and fail to observe proper procedure, all in the name of agency discretion.

I.      **The Department Elevates Form Over Substance In Stating That ACICS May Not Rely On Evidence Submitted "Post Hearing"**

The Department's position that ACICS may not rely on any evidence that it submitted "post-hearing" (*see* SDO Opposition at 33) reflects a fundamentally flawed elevation of form over substance, particularly in light of the procedural irregularities that have marred this proceeding from the outset.

The Secretary is obligated to "consider *all available relevant information* concerning the compliance of the accrediting agency or association with the criteria provided for in this section, including any complaints or legal actions against such agency or association." *See* 20 U.S.C. §1099b(n)(3) (emphasis added).  Ignoring or otherwise refusing to consider evidence that ACICS submitted after the NACIQI hearing would mean: (1) developments regarding ACICS's progress would be disregarded simply because they took place after the hearing; and (2) the already procedurally flawed process by which ACICS has been denied the opportunity to fully articulate its case would be further compounded.  *See*, *e.g.,* ACICS's July 5 Comment at 21-22 (noting that the Department granted ACICS only a partial extension of time to respond to its Supplemental Request, and ultimately informed the Agency that its response to the Supplemental Request would not be considered.)

Furthermore, the SDO tacitly acknowledged that the recognition process is not a static one in recognizing that ACICS "made recent efforts to address some of the deficiencies involved – including by revising various policies and restructuring internal governance bodies." *See* SDO Decision at 2.  Presumably, this is the policy behind allowing an agency 12 months to remedy its deficiencies.

2

## II.     The SDO's Allegations Of ACICS's Inability To Revise And Implement Policies Within 12 Months Are Conclusory

The SDO makes a series of conclusory assertions regarding ACICS's purported inability to revise and implement new policies within 12 months to justify her decision to terminate ACICS's recognition.  But, the SDO's assertions are wrong and do not justify termination. Many of the SDO's allegations of ACICS's purported inability to revise and implement its new and revised policies within 12 months lack evidence and rely on vague justifications about exercising the Department's discretion and judgment.  For example, the SDO states that "in the experienced judgment of Department staff and NACIQI," ACICS's policies "are too new, or not even yet developed, and address performance issues too broad, to permit the Agency to document in 12 months that it satisfies the Criteria for Recognition, as would be required to permit the Department to exercise its discretion to continue ACICS's recognition."  *See id.* at 23. However, the SDO offers no articulable metric by which it has concluded that ACICS's policies are simply "too new" and address issues that are "too broad," to be successfully implemented within 12 months.  Moreover, in many instances, the SDO ignored further evidence of how ACICS already successfully implemented certain policies that speak to the Staff's and the NACIQI Panel's stated concerns.

Similarly, the SDO argues that "[i]t would take a significant amount of time" for ACICS to implement its new data integrity standard, train users, take action in the event of inaccurate data, and observe the impact of the new process.  *See id*. at 25.  The SDO concludes, without explanation, that: (1) "the timeframe to implement these reforms and demonstrate their effectiveness far exceeds 12 months" (*see id.*);  and (2) the effort required for ACICS "to implement its many new policies, and develop and implement even more," is not one "that could be documented as complete as of the end of 12 months."  *See id*. at 29.  These conclusions: (1)

3

are bereft of any explanation as to *why* such implementation could not be completed in 12 months; and (2) rely on determinations made by the Staff, which did not address ACICS's revised data integrity standards.  *See id.* at 25.

Furthermore, the SDO's dispute regarding the efficacy of ACICS's changes goes well beyond the contents of the SDO's September 22, 2016 decision to terminate the Department's recognition of ACICS (the "SDO Decision,") which did not specifically discuss any of these changes.  Referring broadly to ACICS's recent actions, the SDO stated that "I acknowledge that the agency has made recent efforts to address some of the deficiencies identified – including by revising various policies and restructuring internal governance bodies."  *See* SDO Decision at 2.

### III.     The SDO Arbitrarily Discounts ACICS's Management Changes

The SDO arbitrarily discounts the appointment of Roger J. Williams as Interim Chief Executive Officer and President because he is "a single individual, who does not vote on accreditation decisions or policies."  *See* SDO Opposition at 33.  However, the record itself establishes that the Department's representative, Steve Porcelli, remarked during the NACIQI Meeting that he was "personally blown away by the fact" of Mr. Williams's involvement in "directing" ACICS.  *See* June 23, 2016 NACIQI Hearing Tr. ("NACIQI Tr.") 257:12-15.

Similarly, the SDO arbitrarily discounts ACICS's management changes as unavailing because "the Department has no information about the new public members" serving as ACICS Commissioners "nor about ACICS's replacements, if any for the six departed vice presidents." *See* SDO Opposition at 33.   These management changes were implemented after the NACIQI hearing.  The three recently added public members of the Board are Dr. Judee Timm, Ms. Elizabeth Guinan, and Ms. Martha Loveman, all of whom have extensive experience applicable to their roles.  Additionally, one of ACICS's current vice presidents is a highly regarded IT

4

professional, whose central role in the development and enhanced functionality of data analytics/verification is key to improving the accuracy of self-reported institutional data.  As such, the Agency's decision-making process is more focused on data-driven outcomes to monitor institutional effectiveness.  Further, a well-respected former associate vice president, with an advanced degree and over nine years of experience, has been promoted to serve as vice president to directly oversee the accreditation function.  ACICS is ready, willing, and able to provide additional information regarding any of these individuals should the Department allow ACICS a fair opportunity to present it.

## IV.    The SDO Arbitrarily Discounts The Influence Of Under Secretary Mitchell's Comments

The SDO also argues that Under Secretary Ted Mitchell's April 22, 2016 letter to Federally Recognized Accrediting Agencies (the "April Letter," attached as **Exhibit A**) was "bereft of new guidance," and cannot have influenced the opinions of the Staff, NACIQI or the SDO because it "is neither cited in, nor relied upon, in any of the Staff, NACIQI, Department or SDO analysis of ACICS offered in these proceedings, and ACICS does not, and cannot, show otherwise."  *See* SDO Opposition at 39-40.  The SDO's characterizations are baseless.

First, by its own terms, the April Letter stated that it was intended to "provide[] clarification for federally recognized accrediting agencies on the flexibility that they have in differentiating their reviews of institutions and programs, and encourages use of that flexibility to focus monitoring and resources on student achievement and problematic institutions or programs."  *See* April Letter at 1.

Second, the fact that neither the Staff, NACIQI nor the SDO cited the letter does not foreclose the possibility that their decisions were influenced by it.  Indeed, the SDO fails to acknowledge the suggestive comments of its own representative, Mr. Porcelli, who

acknowledged that he "received advice from outside" the Department's Accreditation Group, but he did not "want to comment on that" advice.  *See* NACIQI Tr. 52:7-19.  Furthermore, NACIQI member Richard F. O'Donnell described the Under Secretary's opening remarks to the committee as "very odd." *See id*. 258:2-6.  Specifically, Mr. O'Donnell stated that "[i]n the 3 or 4 years I have been on NACIQI I have never known the Under Secretary to open a meeting saying that he supports all of the staff recommendations." *See id.* 258:2-4.

## V.      The SDO Ignores Evidence Of ACICS's Progress

The SDO argues that the record is bereft of ACICS's "plan for overhauling the Agency's enforcement policies to enable effective enforcement." *See* SDO Opposition at 15.  However, this conclusion ignores the evidence of progress ACICS has already made that demonstrate effective enforcement.  Following ACICS's July 5 Comments to the SDO, ACICS took immediate action regarding numerous schools after enhanced monitoring efforts revealed they were out of compliance with ACICS's standards.  *See* ACICS's Request for Reconsideration of the SDO's September 22, 2016 Decision ("ACICS Request for Reconsideration") at 5-8.

The SDO further states that ACICS does not "accurately describe what its student achievement standards look like now, or what they will look like in the future." *See* SDO Opposition at 17; *see also id*. at 19 ("Because ACICS has not articulated even a plan for meaningful reform of its student achievement deficiencies, the Department has no basis for extending the Agency's recognition.").   However, during the last several months, ACICS has revised and strengthened its student achievement standards.  Specifically, a call-for-comment is currently underway that includes additional and revised student achievement standards to be considered at ACICS's December 2016 meeting.  *See* ACICS Request for Reconsideration at 10.  ACICS will review student achievement on an ongoing basis, starting in April 2017, and will be

able to provide additional evidence of implementation after the Fall 2016 accreditation cycle.
*See id.*

In light of the limited relief that ACICS seeks – specifically, the opportunity to demonstrate compliance within 12 months – as well as the existing procedural flaws in this process to date, ACICS respectfully requests that the Secretary consider ACICS's additional post-hearing evidence, and grant a hearing on this matter.

Respectfully Submitted,

By: /s/ Allyson B. Baker
Allyson B. Baker, Esq.
VENABLE LLP
575 7th St., N.W.
Washington, D.C. 20004
Phone: (202) 344-4000
Fax: (202) 344-8300
Email: abbaker@venable.com

Kenneth J. Ingram
Whiteford Taylor Preston, LLP
1800 M Street, NW
Suite 450N
Washington, DC 20036
Phone: (202) 659-6790
Fax: (202) 327-6140

*Attorneys for Accrediting Council For*
*Independent Colleges and Schools*

cc:   Herman Bounds (via email)
      Jennifer Hong (via email)
      Donna Mangold (via email)
      Steve Porcelli (via email)
      Emma Vadehra (via email)

## <u>CERTIFICATION OF SERVICE</u>

   I hereby certify that on the 30th day of November 2016, I caused a copy of the foregoing to be filed via the OHA E-Filing System for delivery to the following recipient:

    The Secretary of Education
    c/o Docket Clerk
    Office of Hearings & Appeals
    U.S. Department of Education
    Potomac Center Plaza
    550 12th Street, SW
    Washington, D.C. 20202

          */s/ Hillary S. Profita*
          Hillary S. Profita

# Exhibit A to ACICS's Letter to the Secretary of Education



UNITED STATES DEPARTMENT OF EDUCATION

THE UNDER SECRETARY

April 22, 2016

Subject: Flexibility in Application of Accrediting Agency Review Processes; and Emphases in Departmental Review of Agency Effectiveness

Summary: This letter provides clarification for federally recognized accrediting agencies on the flexibility that they have in differentiating their reviews of institutions and programs, and encourages use of that flexibility to focus monitoring and resources on student achievement and problematic institutions or programs.

Dear Federally Recognized Accrediting Agencies:

Students, families, employers, and taxpayers depend on accreditation as a critical marker of educational quality. In November 2015, the Department announced a series of executive actions and legislative proposals "to improve accreditors' and the Department's oversight activities and move toward a new focus on student outcomes and transparency." In a January 20, 2016, memorandum, the Department outlined a number of areas for further action, including the need to provide clarification to accrediting agencies on the flexibility they have in applying their standards and review processes. This letter provides that clarification. A separate letter will be issued to federally recognized accrediting agencies in spring 2016 to clarify terminology used by accreditors and provide additional guidance to accreditors on information to report to the Department.

This letter is directed to all accrediting agencies recognized by the Department, whether institutional or programmatic, as applicable.

**Background**

Accrediting agencies have varying practices on how they approach their reviews of institutions and programs and how they apply their standards. Some agencies expend approximately the same resources in their accreditation reviews of each school or program, or require all of their schools or programs to provide approximately equal weight to and evidence for each of the required standards. Other agencies have a base review for all institutions or programs but then spend far more time in their inspections and monitoring of those they consider to have significant problems or that they consider otherwise worthy of increased scrutiny.

This memorandum seeks to provide clarity on two areas: 1) the flexibility that accreditors have, based on specific criteria they establish (aligned with statutory and regulatory requirements), to vary their processes, investment of resources, and requirements of schools or programs; and 2) the statutory and regulatory requirements of particular importance in demonstrating an accrediting

agency's effectiveness, so as to maximize the use of this flexibility to enhance quality and accountability.

The intent of this guidance is not only to assist agencies in reducing burden on institutions and programs, but to encourage accrediting agencies to focus their resources most heavily on standards that are particularly important to student achievement and on institutions of particular concern. All agencies are expected to be in full compliance with statutory and regulatory requirements.

A. Accreditors May Differentiate Their Reviews of Institutions or Programs Based on Differing Conditions

Statute and regulations allow an accrediting agency to focus its resources on institutions or programs with higher risk due to poor performance, size, volume of student aid, or other factors.

Under the Higher Education Act (HEA) and implementing regulations, an agency granting or renewing accreditation or preaccreditation must apply and enforce all of its required standards (HEA § 496(a)(4)(A) and 34 CFR 602.20). However, neither the statute nor the regulations require that the same resources be used for each institution or program, or for each required accrediting standard. The statute does require that the agency apply effectively the criteria for recognition (20 USC 1099b(*l*)(1)), and under the regulations the accreditor must base its decisions on its published standards and have a "reasonable basis for determining that the information [it] relies on for making accrediting decisions is accurate" (602.18(c) and 602.18(d)).

Accrediting agencies may adopt this flexible review process on their own initiative, and subject to 34 CFR 602.27(a)(4), do not need prior approval by the Department. However, the agency's review process, including the specific criteria and risk factors an agency uses to differentiate its processes and requirements, will be analyzed for its effectiveness when accrediting agencies' recognition is before the Department.

The ability of an agency to differentiate its reviews was the subject of discussion when current requirements regarding effective monitoring were added to the implementing regulations. In the notice of final rulemaking, published in the *Federal Register* on October 27, 2009, the Department said:

> The Department recognizes that accrediting agencies and the institutions and programs they accredit are diverse. . . . [W]e expect reasonable and prudent implementation of the statute and regulations by the agencies. For each institution or program accredited, an agency should consider factors such as the size of the institution or program, the number of students, the nature of the programs offered, past history, and other knowledge the agency has about the institution or program, including previous reviews. The regulatory language provides accrediting agencies with flexibility regarding their monitoring of institutions and programs and at the same time ensures they review and analyze key data and indicators.

> . . . [S]tudent achievement is one of several areas that an agency must review when monitoring the institutions or programs it accredits. (74 Fed. Reg. 55418)

2

Section 496 of the HEA and 34 CFR Part 602 provide certain requirements that an agency's accrediting process must consider for each institution or program, including that the agency establishes appropriate measures for student achievement. Measures widely accepted by accreditors provide one factor in determining agency effectiveness in meeting this requirement. For example, most of the national accreditors have benchmarks for the proportion of students who are expected to be retained from year to year, and for the proportion of students who are placed in employment after leaving postsecondary education.

Section 496 of the HEA provides three criteria that may affect the amount of resources that are spent in the review of an institution or program. Pursuant to these criteria, the review must: 1) be sufficient to apply effectively the policies and processes required for recognition (sec. 496(b)(*l*)); 2) "comply with due process procedures," including clear standards and identification of deficiencies (sec. 496(a)(6)), so that an institution or program cannot be held deficient without a sufficient investigation and opportunity to rebut the identified deficiency; and 3) devote sufficient resources for particular factors specified in section 496(c), such as on-site inspections and reviews at regular intervals with well-trained and knowledgeable accreditation team members.

For each of the inquiries required to evaluate an institution or program against accreditation standards in areas the statute requires agencies to address, the accreditor must have a "reasonable basis for determining that the information . . . is accurate" (34 CFR 602.18(d)).

The statute and the regulations reflect that different circumstances may warrant differing degrees of scrutiny and subsequent monitoring. For example, the HEA says that the agency is to consider licensing exam results, course completion, and job placement rates "as appropriate" (HEA §496(a)(5)(A)). The regulations similarly recognize differing circumstances, for example, in allowing differing degrees of monitoring and differing periods of accreditation by taking into account "institutional or program strengths and stability" (34 CFR 602.19 and 602.20).

Because the statute and regulations emphasize educational quality, the Department believes that accrediting agencies should consider allocating resources—and determining the level of resources and evidence to be required of particular institutions or programs—based on those factors in its review process that emphasize quality. In evaluating an agency's effectiveness, the Department can look at the agency's utilization of certain factors that relate closely to "the quality of education or training" (HEA 496(a)). For example, an accrediting agency might look at the rates of student retention from one academic period to the next, graduation rates, some measure of student learning, some measure of postgraduation outcomes, and student loan cohort default rates, as well as metrics of financial responsibility for institutions, to determine the level of resources needed in its review for a particular institution or program, or the relative level of resources or evidence to be required of certain institutions or programs. Track record and verifiability of job placement rates and recruiting practices would be important to consider in making this determination for certain types of institutions or programs. Further discussion of how this flexibility might be applied can be found in section C of this document.

3

**B.** Accreditors May Differentiate Their Review of Individual Standards, with a Focus on Those with Particular Relevance to Student Achievement and Accreditor Effectiveness

Overall, the Department notes that certain requirements in the statute and regulations are indicators of the effectiveness of an accreditor.  In fulfilling his or her responsibilities under the recognition statute, the Secretary is statutorily charged with determining if an agency has applied effectively the statutory and regulatory criteria (HEA 496(*l*)(1) and HEA 496(a)).  Those criteria include specific requirements for the agency, such as in the nature of its on-site visits and in its review of specific elements of an institution or program, as well as the accrediting standards the agency itself establishes.  Section 496(n)(3) requires the Secretary, in the agency recognition process, to take into account deficiencies in performance, and section 496(a) requires the Secretary to determine that the accreditor is a reliable authority on the quality of education offered through measures that the Secretary has promulgated after notice and comment.

While an accreditor must assess institutions or programs for all of the required factors as well as for the agency's own standards and policies, the Department has said that there are certain factors "that we believe are the most relevant to ensuring quality education," and on which the Department will "focus with more depth" (letter from Director, Accreditation Group, Office of Postsecondary Education, United States Department of Education, June 3, 2013).  Below we emphasize those criteria that are most relevant, and supplement this list with some of the processes that are provided for in the regulations and that are particularly important for quality assurance.

1. Certain Statutory and Regulatory Standards Are of Particular Importance in Demonstrating That an Accrediting Agency Is Effective

a.  Standards of Comparable Agencies

One measure of effectiveness, by necessity, involves a comparison against expected results, including comparison with other agencies' actions or standards.  Section 496(*l*)(2) of the HEA states that the Department may find an agency ineffective if it accredits an institution or program that is the subject of any interim action by another accrediting agency—i.e., compared with another agency's action.  Similarly, the Department may consider what standards those other agencies implement and what results they obtain in the aggregate for the standards in the areas that agencies are required by statute to address.  For example, if most of a similarly situated group of accreditors has adopted a particular measure of student achievement but one agency has not, the Department might question the effectiveness of that agency relative to its peers.

> Example: Accreditors of a certain type of institution or program generally look at four outcome measures: retention rates, graduation rates, licensure rates, and job placement rates. Accreditor X does not have a metric for retention.  Accreditor X may be asked to explain how it can be effective, given that it does not consider retention rates when its peers believe that retention is an important factor in gauging institutional or programmatic quality.

> Example: The institutions accredited by agency Y, in the aggregate, show lower levels of student achievement on generally accepted measures of student success, such as completion

4

and cohort default rates, than the schools, in the aggregate, accredited by similar agencies. Accreditor Y may be asked to explain how its standards are effective in terms of the results its schools achieve in the aggregate.

b.   Specific Regulatory Criteria

34 CFR 602.16(a)(1)(i), student achievement: As noted in the Department's June 3, 2013, letter, to remain recognized, an agency must demonstrate that its standards for accreditation are sufficiently rigorous to ensure the agency is a reliable authority as to the quality of education.  To make this demonstration, the agency must show, among other things, that it has a standard or standards that effectively address the quality of each institution's "[s]uccess with respect to student achievement in relation to the institution's mission."

To that end, the agency must show that it has clear standards for success in student achievement in relation to the institution's mission (602.25(a), 602.18(a)), and how it has reviewed institutions according to this criterion (602.31(a)(2)).  Many recognized accreditors, especially national accreditors, have set numerical metrics.  We encourage those agencies that currently have that type of metrics to consider whether additional metrics of student achievement that are accurate and effective can contribute to their standards.  For example, many accreditors look at completion rates; we encourage those currently without this metric to consider adding it.  Similarly, job placement rates have been adopted by many accreditors as a standard of student achievement; success in obtaining employment cannot be ignored in accrediting institutions that offer occupational programs.

Unfortunately, the definition and application of placement standards, along with recruiting practices related to them, have proven to be problematic in many cases.  Agencies must assure that the job placement measure is clearly defined, so that an institution cannot claim it misunderstood the agency requirement and so that the agency is consistent in enforcing the requirement; and the agency must assure that strong processes are in place to certify the accuracy of those outcomes, as required under 34 CFR 602.18(d) and 602.19.

Close scrutiny of institutions' processes to evaluate and validate student learning in meaningful ways is an essential responsibility of all accreditors.  Regional accreditors tend to use qualitative measures of student achievement, and tend not to have numerical metrics.  We encourage them to consider adding objective, transparent, comparable, and actionable quantitative measures.  Important measures, such as retention, graduation, and cohort default rates may be utilized if they are not already.  In addition, because applied, professional, and occupational programs focus on employment as a primary goal, a regional accrediting agency that does not consider licensing and placement rates in its initial or continuing accreditation of institutions that offer such programs may be failing to ensure that the education or training offered by those institutions is of sufficient quality to achieve the institution's stated objective, as required by law.

Regional accreditors must, regardless of the measures used, clearly state their standards for measuring achievement and in recognition proceedings, and must demonstrate how those standards are applied effectively in the agencies' reviews of institutions.

<u>34 CFR 602.17, objectives and degree and certificate requirements</u>: This regulation requires that recognized accreditors demonstrate that they evaluate whether the institution or program has objectives consistent with its mission, is successful in achieving the objectives, and "[m]aintains degree and certificate requirements that at least conform to commonly accepted standards" (34 CFR 602.17(a)(3)).

> Example: School X describes for incoming students the objectives of its liberal arts programs. The accreditor must assure that the amount, nature, and content of the work involved conforms both to the institution's stated mission and to the commonly accepted standards for the respective fields. In addition, the accreditor must ascertain that the institution is successful; this entails assuring that student work conforms to the standards and that students achieve the outcomes that the institution intends for students in the program. That success may be demonstrated by such factors as retention, graduation, and employment, pursuit of graduate studies, and measures of progress in internalizing concepts within the field. There are, of course, other measures that may meet this requirement.

> Example: Program Y describes for incoming students the objectives of its technical or vocational program, both substantively and in the nature of employment that may follow. For instance, the program may describe what coursework or field work is involved, and what proportion of students get jobs and with what types of employers, for a credential in medical technology or computer science, or a credential in retail marketing or civil engineering. In addition to the considerations common with a liberal arts program, the accreditor might also look at factors such as employment rates in the field of study, increase in earnings between pre- and post-educational employment, and third-party (e.g., employer or workforce board) recognition of the qualifications of graduates to gauge whether the program has been successful in achieving its employment-related objectives.

<u>34 CFR 602.21, review and revision of standards</u>: This regulation requires that "[t]he agency must maintain a systematic program of review that demonstrates that its standards are adequate to evaluate the quality of the education . . . and relevant to the educational or training needs of students" (34 CFR 602.21(a)). As conditions change, the standards that an agency uses to evaluate quality may need to change with them. 34 CFR 602.21(c) adds that, "If the agency determines . . . that it needs to make any changes to its standards, the agency must initiate action within 12 months to make the changes." Changes can occur in economic conditions, student academic preparation, occupational requirements, accreditation practice, or other areas. Importantly, this criterion also looks to the educational and training needs of the students, so the accreditor's program of review should ensure that agency standards remain responsive to those needs. It thus requires that all accreditors clarify and clearly state their view of student needs, and that they be ready to charge institutions or programs with updating their objectives and implementation to better assure that institutions or programs are meeting those needs.

Accreditors must regularly assess the effectiveness and validity of their standards in general: Do the standards (and numerical thresholds, if any) effectively ensure quality outcomes for students? If there have been poor outcomes for students or other concerns that have arisen at accredited

6

institutions or programs, does the agency need to revise its standards and processes to identify and address those issues more effectively?

2. Certain Statutory and Regulatory Processes Are of Particular Importance in Demonstrating That an Accrediting Agency Is Effective

In addition to gauging the effectiveness of specific standards as described in section B.1. above, certain accreditation processes are also of particular importance in determining agency effectiveness.

a. Statutory Requirement for Comprehensive Departmental Review

In discussing the Department's analysis of an accrediting agency seeking recognition or renewal of recognition, section 496(n)(3) of the HEA states that the Department is to be "comprehensive" and to consider "all available relevant information concerning the compliance of the accrediting agency . . . including any complaints or legal actions." Therefore, accreditors must respond in a satisfactory way to allegations initially originating outside the recognition process that the agency has not complied with its statutory and regulatory obligations and how it has corrected any deficiencies in that regard.

b. Key Regulatory Processes

In its June 3, 2013, letter, the Department highlighted some of the processes that it believes are most important for accreditors to follow in demonstrating their effectiveness. These include 34 CFR 602.15, 602.19 and 602.20. In this memorandum we also wish to highlight the informational requirements in 34 CFR 602.26 and 602.27.

34 CFR 602.15, 602.18, 602.19: Agencies must pay particular attention to the staffing requirements in §602.15(a) and the requirement in §602.19(b) that they effectively apply a set of monitoring and evaluation approaches that enable them to identify problems with an institution's or program's continued compliance with agency standards. This means assuring that the processes and personnel involved in policymaking, comprehensive reviews, and monitoring can accomplish the task. The agency needs to assure that persons with the appropriate credentials and background are involved. This will often mean that in setting policy, performing site reviews, and monitoring, the agency must involve individuals with expertise in assessing whether an institution or program has appropriately categorized and accurately documented students for retention rates, completion rates, licensure pass rates, and employment status. Under §602.18(d), agencies must have a reasonable basis for determining that the information upon which their accrediting decisions are made is accurate, which would require the skill to audit or verify claims of the institution or program.

34 CFR 602.20: In §602.20(a)(2), agencies must, at a minimum, require a noncompliant institution or program to come into compliance with agency standards within maximum timeframes established by the regulation. If the institution or program does not do so, §602.20(b) requires that the agency must take immediate adverse action, unless the period for compliance is extended "for good cause." Thus, the standard is that ordinarily, periods of time to achieve compliance will not be extended. Some agencies more routinely provide extensions. Agencies must scrutinize the reasons for an institution's or program's noncompliance within the provided regulatory periods to assess whether there is a good

basis for believing that compliance will be forthcoming in light of the applicable regulatory requirement and the gravity of the issue. This is especially the case for violations of major standards, such as those related to student achievement and financial responsibility, for which extensions of time may put students or Department financial aid funds at particular risk.

34 CFR 602.26: Section 602.26 requires agencies to provide to the Department written notification when an agency has terminated the accreditation of an institution or program or placed an institution or program on probation or equivalent status, with specific timeframes described in that section. Agencies must provide decision letters for those actions to the Department to provide necessary information for the Department's oversight activities.

34 CFR 602.27: Section 602.27(a)(6) requires that the agency provide to the Department the name of any institution or program it accredits that it "has reason to believe is failing to meet its title IV, HEA program responsibilities or is engaged in fraud or abuse, along with the agency's reasons for concern about the institution or program." The number of reports of such issues from accreditors is far smaller than the number of such issues identified through other Department processes or by other sources outside the Department. This is remarkable for at least two reasons. First, many of the monitoring activities of accreditors focus on areas that overlap with or that are corollaries to information gathered directly by the Department, so it would be expected that accreditors would find many of the same indicators as the Department. Second, the reporting standard is only that the agency "has reason to believe," which only requires a rational basis for the belief, rather than requiring any level of probability beyond reasonability. The intent of the regulatory requirement is to provide early warning to the Department of issues that it must investigate. Such early warning is vital for the protection of students and the safeguarding of taxpayer funds. Agencies themselves need to be attentive to these issues in order to ensure quality education and be prepared to work with institutions to prepare teach-out plans, as well as to fulfill their role as gatekeepers for federal financial aid funds. The Department views prompt reporting by an accrediting agency as a factor in evaluating the agency's reliability.

C.  Examples of How This Flexibility May Be Applied

The information provided above outlines the flexibility that agencies have in reviewing individual institutions or programs and standards. While agencies have the authority to determine how to implement that flexibility, we offer a few examples here.

- Differentiation of institutional or program review: Based on previous reviews and ongoing monitoring of institutional or programmatic information, risk factors, and other information, an accreditor may ask that the self-study and on-site visit for a particular institution or program coming up for review emphasize a subset of standards, along with certification of continued compliance and no change in practices with regard to the rest of the standards. Similarly, a site visit for one institution or program may be shorter or longer than that for another on the basis of those reviews and monitoring. Or an accreditor may require more evidence on particular standards for one institution or program than it does for another. Regardless, agencies must comply with all the standards in the regulations, as noted in

Section A.

- Differentiation of terms of recognition: An agency may provide a shorter period of recognition (i.e., fewer years) for an institution or program that has met the threshold standards but for which the agency continues to have concerns, and a longer period of recognition for an institution or program that has regularly exceeded the standards with no ongoing concerns.  More frequent monitoring or unannounced visits can be applied for institutions or programs with less satisfactory reviews.  Accreditors may also develop tiers of recognition, with some institutions or programs denoted as achieving the standards at higher or lower levels than others.

The Department looks forward to continuing to work with accrediting agencies to assure the quality of our institutions and programs of higher education.

Sincerely,

Ted Mitchell
Under Secretary
US Department of Education

9

# EXHIBIT 17

To Declaration of Allyson B. Baker

**Supplement To ACICS's Response To The SDO's Brief In Opposition To ACICS's Appeal**

December 2, 2016

**VIA OHA E-FILING SYSTEM**

John King, Jr.
The Secretary of Education
c/o Docket Clerk
Office of Hearings & Appeals
U.S. Department of Education
Potomac Center Plaza
550 12th Street, SW
Washington, D.C. 20202

> Re:   **Supplement To ACICS's Response To The SDO's Brief In Opposition To ACICS's Appeal**
> **No. 16-44-O (Accreditation Recognition Proceeding)**

Dear Secretary King:

As a supplement to its November 30 letter, the Accrediting Council for Independent

Colleges and Schools (ACICS or the "Agency") submits the attached letter as **Exhibit B**.

Respectfully Submitted,

By:  /s/ Allyson B. Baker
Allyson B. Baker, Esq.
VENABLE LLP
575 7th St., N.W.
Washington, D.C. 20004
Phone: (202) 344-4000
Fax: (202) 344-8300
Email: abbaker@venable.com

Kenneth J. Ingram
Whiteford Taylor Preston, LLP
1800 M Street, NW
Suite 450N
Washington, DC 20036
Phone: (202) 659-6790

Fax: (202) 327-6140

*Attorneys for Accrediting Council For*
*Independent Colleges and Schools*

Enclosure

cc:    Herman Bounds (via email)
       Jennifer Hong (via email)
       Donna Mangold (via email)
       Steve Porcelli (via email)
       Emma Vadehra (via email)

# Exhibit B to ACICS's Letter to the Secretary of Education



CHEA
*Our 20th Year*
CHEA International Quality Group   CIQG

Council for
Higher Education
Accreditation

One Dupont Circle NW • Suite 510
Washington DC 20036-1135
tel: 202-955-6126
fax: 202-955-6129
e-mail: chea@chea.org
web: www.chea.org

December 2, 2016

Mr. Roger J. Williams
Interim Chief Executive Officer and President
Accrediting Council for Independent Colleges and Schools
750 First Street NE, Suite 980
Washington, DC 20002

Dear Roger:

At its November 21, 2016 meeting, the Council for Higher Education Accreditation (CHEA) Committee on Recognition met with representatives of the Accrediting Council for Independent Colleges and Schools (ACICS) regarding its CHEA deferral status. As you are aware, at its April 25-26, 2016 meeting, the CHEA Board of Directors requested that the committee review the ACICS deferral response at its November 2016 meeting rather than March 2017.

I am pleased to inform you that the committee is recommending to the CHEA Board of Directors that ACICS be granted recognition for up to three years.

As outlined in its May 10, 2016 letter, the CHEA board also requested that the committee review information regarding ACICS that was not available to the committee at the time of its review in March 2016.  This included how ACICS determined whether information provided to the public by an institution is reliable, as well as the processes by which ACICS addresses the accreditation of poorly performing institutions.

The committee is asking for a report of ACICS' progress since the November 2016 in-person appearance in the areas as described to the committee, including, for example, any further staffing and operational updates, the status of the placement verification program and campus accountability report, any additional enhancements to the on-site evaluation and council action process, any further updates to its transparency protocols and any changes to the accreditation of doctoral degree programs, as well as any other useful information to support ACICS accreditation activities.  As appropriate, please describe how any noted changes demonstrate that ACICS continues to meet CHEA recognition requirements as outlined in the *2010* CHEA *Recognition of Accrediting Organizations Policy and Procedures*.

The report is due on March 1, 2018 for an in-person review by the committee at its June 2018 meeting. CHEA staff are available to work with you if you have any questions or need assistance as you prepare the required progress report.

The *2010* CHEA *Recognition of Accrediting Organizations Policy and Procedures* requires that recommendations from the committee on recognition be transmitted to the CHEA Board of Directors for final action. Please be aware that this recommendation will be reviewed and acted upon by the CHEA Board of Directors at its meeting on January 30, 2017.  Until that action becomes final, the committee's recommendation is an interim determination only.

If approved by the CHEA Board of Directors, the ACICS scope of accreditation will be as follows:

*Accreditation of private postsecondary institutions offering certificates or diplomas, and postsecondary institutions offering associate's, bachelor's and master's degrees in programs designed to educate students for professional, technical or occupational careers including those that offer those programs via distance education or internationally.* (2006)

If you have any questions regarding the committee action or the recognition process, please contact Thomas J. Cornacchia, Vice President for Recognition Services, at 202.372.9254 or cornacchia@chea.org.

Thank you.

Sincerely,

Judith Eaton
President

c: Thomas J. Cornacchia, Vice President for Recognition Services

# EXHIBIT 18

To Declaration of Allyson B. Baker



THE SECRETARY OF EDUCATION
WASHINGTON, DC 20202

---

In the matter of:

**ACCREDITING COUNCIL FOR**
**INDEPENDENT COLLEGES AND SCHOOLS**

Respondent.

**Docket No. 16-44-O**
Accrediting Agency
Recognition Proceeding

---

## DECISION OF THE SECRETARY

    The Accrediting Council for Independent Colleges and Schools (ACICS or agency) has appealed a September 22, 2016, letter (Decision Letter) regarding its recognition status from the Senior Department Official (SDO) at the U.S. Department of Education (Department). In the Decision Letter, SDO Emma Vadehra found ACICS noncompliant with numerous regulatory criteria for departmental recognition and, accordingly, withdrew and terminated the Department's recognition of ACICS as a nationally recognized accrediting agency.[1] ACICS requests that I reverse that decision and exercise discretion to continue the agency's recognition for a period of 12 months or less, or, alternatively, return its petition for recognition (petition) to the Department's staff and/or the National Advisory Committee on Institutional Quality and Integrity (NACIQI) for reconsideration.[2] Counsel for the SDO has filed an opposition brief urging that I uphold the SDO's decision.[3] ACICS also filed a reply brief (and later, supplementary exhibits) in which it for the first time requested an additional hearing to present further argument on this matter.[4]

    After a *de novo* review of the entirety of the record, I find ACICS to be out of compliance with numerous regulatory criteria. Because of the nature and scope of ACICS's pervasive noncompliance, I further conclude that ACICS is not capable of coming into compliance within 12 months or less, even if I renewed its recognition for an additional 12 months. I therefore adopt the SDO decision and withdraw and terminate the Department's recognition of ACICS as a recognized accrediting agency.

---

[1] Decision Letter, p. 3.
[2] Appeal of Senior Departmental Official Decision (ACICS Brief), p. 3.
[3] Brief on Behalf of Senior Department Official (SDO Brief).
[4] ACICS's Response to the SDO's Brief in Opposition to ACICS's Appeal (ACICS Reply Brief), p. 7.

# I.        Legal & Procedural Background

This Office has previously described in detail the recognition process in *In the Matter of Northwest Commission on Colleges and Universities*, Dkt. No. 14-07-O, U.S. Dep't of Educ. (Decision of the Secretary) (Dec. 11, 2014).  Here I briefly summarize legal and procedural background relevant to the case at hand.

The Department does not directly accredit institutions of higher education (IHEs), but instead recognizes agencies that accredit IHEs.  The rules for the Department's recognition process are established in section 496 of the Higher Education Act of 1965 (HEA), as amended, 20 U.S.C. § 1099b (2012), and implemented by regulations at 34 C.F.R. Part 602.[5]  The statute mandates that the Secretary create procedures for the recognition process, but also prescribes specific standards for accrediting agencies.[6]

To begin the recognition process, first the accrediting agency submits a petition to the Department.[7]  Then, Department staff review the application in the context of related data such as site visit reports, public comments, and complaints against the accrediting agency.[8]  Department staff may find the agency in compliance with the criteria for recognition, or, if the staff identifies deficiencies, the staff must provide the agency with 30 days to respond to the findings of deficiency.[9]  Department staff ultimately forward the petition, any related materials, and a recommendation to NACIQI, an independent body composed of 18 appointed members with diverse backgrounds and political viewpoints, chosen specifically for their impartiality and experience with and knowledge of accreditation and administration in higher education.[10]

NACIQI, in turn, considers the Department staff recommendation in the context of the provided materials and holds an open meeting where public comment is accepted.[11]  After that meeting, NACIQI makes its own recommendation and forwards it to the SDO.[12]  Both the agency and Department staff may subsequently submit comments to the SDO, but neither may submit additional documentary evidence unless NACIQI found the agency noncompliant with a criterion not identified in the Department's original analysis.[13]  Finally, the SDO makes a decision regarding recognition, taking into consideration the independent recommendations of the Department staff and NACIQI and any comments submitted by the parties.[14]

---

[5] When reauthorizing the HEA, Congress passed the Higher Education Amendments of 1992, Pub. L. No. 102-325 (July 23, 1992), 106 Stat. 448, which, among other things, added § 496 to the HEA within Part H – Program Integrity.
[6] 20 U.S.C. § 1099b(a)(5), (o) (2012); *see* 34 C.F.R. Part 602, Subpart B – The Criteria for Recognition.
[7] 34 C.F.R. § 602.31.
[8] *Id.* § 602.32.
[9] *Id.* § 602.32(f).
[10] 20 U.S.C. § 1011c (2016).
[11] 34 C.F.R. § 602.34 (e) (providing that NACIQI should "invite[] Department staff, the agency, and other interested parties to make oral presentations during the meeting").
[12] *Id.* § 602.34(g).
[13] *Id.* § 602.35.
[14] *Id.* § 602.36.

The accrediting agency may appeal the SDO's decision to the Secretary. In this appeal, the Secretary makes a recognition decision *de novo* based on the regulations[15] and the entire record before the SDO.[16] Approval of recognition requires that the agency can show that it both complies with, and effectively applies, the criteria for recognition.[17] If the agency is noncompliant with the requirements or fails to effectively apply the criteria, the Secretary will deny, limit, suspend, or terminate recognition.[18] Alternatively, where there is a finding of noncompliance, the Secretary may, in his or her discretion, continue recognition of an agency pending submission of a compliance report, but only if the Secretary "concludes that the agency *will* demonstrate or achieve compliance with the criteria for recognition and effective application of those criteria within 12 months or less."[19]

In the context of this framework, I now consider ACICS's petition for renewal of recognition.

## II.   Factual Background

ACICS is a previously-recognized national accrediting agency with the primary mission of accrediting "institutions that offer programs in professional, technical, and occupational fields . . . through the Master's Degree level."[20] The Department last reviewed ACICS's recognition status in 2011 at which time NACIQI recommended the Department continue ACICS's recognition, but require a compliance report in 12 months to address certain issues.[21] NACIQI accepted the agency's compliance report at its meeting in June 2013 and the agency's recognition continued for the subsequent three years.[22]

In 2016, the Department began considering ACICS's petition to renew its recognition once again. Department staff conducted a review and, in a thorough and detailed analysis, found ACICS in violation of 21 separate recognition criteria set forth in the regulations.[23] Based on the 21 violations, Department staff issued a recommendation to NACIQI to deny ACICS's petition and withdraw ACICS's recognition.[24]

At the June 23, 2016, NACIQI meeting, the committee considered ACICS's petition and the Department staff recommendation, as well as presentations by Department staff, ACICS and

---

[15] *Id.* § 602.37(d).

[16] The Secretary issues a recognition decision using the same standards as the SDO decision. *Id.* § 602.37(d) (citing *Id.* § 602.36(e)). Neither the agency nor the SDO may submit additional evidence on appeal to the Secretary. *Id.* § 602.37(c). In limited circumstances, the Secretary may dispose of the case on alternative grounds if new, relevant, and material information comes to the Secretary's attention during the appeal. *Id.* § 602.37(f). No accrediting agency may submit information, or ask others to do so, to invoke this narrowly applied rule. *Id.* § 602.37(g).

[17] *Id.* § 602.36(e)(1).

[18] *Id.* § 602.36(e)(2).

[19] *Id.* § 602.36(e)(3) (emphasis added).

[20] *See* http://www.acics.org/; *see also* Staff Report to the Senior Department Official on Recognition Compliance Issues (Staff Report), p. 1.

[21] Staff Report, p. 4.

[22] *Id.*

[23] *See generally id.*

[24] *Id.*, p. 1.

third party commenters. During the meeting, which lasted approximately 11 hours from open to adjournment, NACIQI comprehensively reviewed the record and presentations.[25] The committee considered the evidence of pervasive noncompliance by ACICS, including evidence that it had struggled to achieve rigorous and effective implementation of its standards, and the Department staff's findings of violations.[26] There was also extensive discussion of ACICS's assertions of progress toward compliance and request for an extension of recognition to continue these efforts.[27] It also heard opinions from experienced Department staff members, NACIQI committee members, and third party commenters that ACICS could not possibly achieve compliance within 12 months.[28] While certain NACIQI members praised ACICS's efforts or raised questions about the process and the Department staff recommendation, the committee ultimately voted 10-3 to recommend to the SDO that ACICS's petition be denied.[29]

The record reflects that, as required, the SDO considered the full record and further comments from the Department and ACICS. Based on that review, she concurred with the recommendations of both the Department staff and NACIQI. The SDO therefore decided to deny ACICS's request for renewal of recognition and withdrew ACICS's recognition.[30]

I now turn to the merits of ACICS's appeal.

### III.    Analysis

ACICS primarily argues that the SDO erred in three ways. First, ACICS asserts that the Decision Letter "is not supported by substantial evidence." Notably, ACICS does not attempt to argue that it is in full compliance or that it should receive recognition without condition. Instead, ACICS argues, and improperly attempts to introduce new evidence on appeal to demonstrate, that it can come into compliance and demonstrate effective implementation of the criteria within a period of 12 months and that therefore ACICS should be granted such time to achieve full

---

[25] *See generally* NACIQI Transcript.

[26] Typical of the type of observations made at the meeting, one NACIQI member described the list of issues found by Department staff to be "exhaustive" and particularly noted that the problems found by Department staff, "particularly those that are organized around the application of its standards, the monitoring and the enforcement of its standards" raised profound questions about the quality and reliability of the agency. *See id.*, pp. 13, 277.

[27] *See, e.g., id.*, pp. 67–142 (presentation by ACICS and questioning by NACIQI members); *see also id.* p. 274 (NACIQI member noting "the way that the day has gone has been that more of the time has been spent listening to the defense of the Agency and those that have come to testify accordingly").

[28] For example, applying decades of accreditation experience, Department staff members expressed opinions that no agency could implement the standards ACICS intended to implement within the 12 month timeframe required for its compliance report, and they placed particular weight on ACICS's past track record. *See, e.g., id.*, pp. 16, 31, 46, 59–60, 266; *see also id.*, p. 255 ("We found significant areas of concern that we don't believe can be turned around in a 12 month period. We have heard before from this Agency that they would turn things around and they did not make good on their commitments. We don't have confidence at this point that they will make good on this commitment."). Similarly, the majority of NACIQI members expressed views that the efforts to make progress by ACICS were insufficient. *See, e.g., id.* p. 289 (NACIQI member reflecting on ACICS's assertions of progress and noting that "even when they were talking about all of these new advisory committees and sustaining the work that they were already doing the evidence just wasn't there").

[29] *Id.*, p. 292.

[30] Decision Letter, p. 3.

compliance.[31]  Second, ACICS argues that the underlying recognition process contained "procedural irregularities and inherent unfairness," resulting in "an arbitrary and capricious SDO Decision."[32]  Finally, ACICS claims that the Decision Letter "will have irreparable and harmful ripple effects on students currently enrolled at accredited institutions," and thus that the Department should continue ACICS's recognition for the sake of these students.[33]  ACICS also requests an additional hearing.

After a careful review of the entirety of the record and the arguments of both sides on appeal, I find ACICS's arguments unpersuasive.  As detailed below, I not only find that ACICS is currently out of compliance with the full criteria required for recognition, but I cannot conclude that ACICS is capable of coming into full compliance within 12 months or less.  I therefore find no basis on which to exercise my discretion to grant an extension of recognition for ACICS to come into and demonstrate compliance, and no basis on which to grant the request for a hearing.

A.    Sufficiency of the Evidence Supporting the Decision Letter

I must first consider the recommendations of Department staff and NACIQI to make a final decision *de novo* on ACICS's petition.  While the SDO has already made such a decision, ACICS argues that the SDO did not consider all available, relevant information.  ACICS claims the evidence demonstrates its ability to comply with all of the recognition criteria within 12 months.[34]

ACICS argues that the record and new evidence reflect that it has already achieved compliance "with more than half" of the factors with which it was found noncompliant and that it can achieve compliance with all factors within 12 months.[35]  Specifically, ACICS claims its policies enacted on July 1, 2016, brought it into compliance with five recognition criteria.[36]  ACICS also argues that as a result of actions already taken it is, or will be within 12 months, in compliance with and able to demonstrate effective implementation of six additional criteria.[37]  ACICS does not attempt to argue that it is in compliance with the ten remaining criteria, but instead claims that it is in the process of establishing policies and procedures that will eventually

---

[31] ACICS Brief, p. 3.
[32] *Id.*, pp. 1–2.
[33] *Id.*, pp. 2–3.
[34] *Id.*, p. 7.
[35] *Id.*, p. 9.
[36] *Id.*, pp. 9–12, citing Administrative and Fiscal Capacity (34 C.F.R. § 602.15(a)(1)); Public Members (34 C.F.R. § 602.15(a)(5)); Conflicts of Interest (34 C.F.R. § 602.15(a)(6)); Substantive Change Requests (34 C.F.R. § 602.22(a)(3)); Teach-Out Plans (34 C.F.R. § 602.24(c)(1)).
[37] ACICS Brief, pp. 12–16, citing Fiscal and Administrative Capacity – At Risk Institutions (34 C.F.R. § 602.16(a)(1)(v)); Misrepresentation (34 C.F.R. § 602.16(a)(1)(vii)); Student Complaints (34 C.F.R. § 602.16(a)(1)(ix)); Achievement of Stated Objectives (34 C.F.R. § 602.17(a)); Reasonable Basis for Accuracy of Information (34 C.F.R. § 602.18(d)); Out of Cycle Review (34 C.F.R. § 602.21).

enable it to not only achieve compliance with, but demonstrate effective implementation of, those ten remaining criteria within 12 months.[38]

Department staff assembled a detailed and compelling report on which both the Department's and NACIQI's recommendations are based. While that report highlights 21 separate violations of the recognition criteria, I will not delve into every violation here. Rather, I will review in some detail below only a non-exhaustive selection of violations that demonstrate the profound and systemic failure of ACICS to effectively meet the basic Title IV responsibilities of a nationally recognized accrediting agency.[39]

**Standards and Application of Standards.** First, I consider 34 C.F.R. §§ 602.16(a) and 602.17. These regulations require the agency to demonstrate that it has and can effectively apply and evaluate an institution's compliance with rigorous standards for accreditation in areas including: student achievement; fiscal and administrative capacity; recruiting and admissions practices; publications, grading, and advertising; records of student complaints against institutions; and compliance with Title IV responsibilities.[40] With regard to student achievement, Department staff found that not only was this one of the most significant areas of deficiency identified, but despite ACICS's assertions of progress in other areas, its progress in developing and effectively implementing student achievement standards was entirely lacking or incoherent.[41] Department staff noted that the ACICS standards and processes in this area were unclear, and that in the past ACICS had "failed to document multiple reviews of different institutions demonstrating implementation of the student achievement standards."[42] Moreover, the SDO observed that, despite notice of deficiencies in this area, in these proceedings ACICS has not put forward a plan to effectively develop and apply standards for evaluating student achievement.[43] Indeed, the Department notes that the student achievement standards appeared to change at each stage of the proceeding, and that in its newest Accreditation Criteria established July 1, 2016, ACICS has enacted a scheme for evaluating student achievement that replaced the element "graduation rates" with "level of graduate satisfaction." The Department notes that this new standard is "inherently incomprehensible" as a way to measure student achievement, however, because it will by definition only measure information from those students who

---

[38] ACICS Brief, pp. 16–27; *see id.*, p. 16 (noting that for these ten criteria "ACICS has been acting pursuant to a timeline to establish new policies and procedures and demonstrate effective implementation of those new policies within twelve months").

[39] Notably, several of these criteria are ones with which ACICS does not dispute its failure to currently comply. *See id.*, p. 16. These particular areas were also ones which NACIQI members spent considerable time discussing. *See generally* NACIQI Transcript; *see also id.*, p. 13 (NACIQI primary ACICS reviewer commenting "[t]o me going through the staff analysis the nub of the matter seems to be around 602.16 Rigor of the Standards 602.18 Enforcement of the Monitoring and 20 -- Enforcement of the Standards").

[40] Staff Report, pp. 11–19 (citing 34 C.F.R. §§ 602.16(a) and 602.17). While I focus on ACICS's failure on student achievement, as discussed further below I also note that Department staff found multiple failures by ACICS to uphold its Title IV responsibilities, such as in the case of ACICS's renewal of Michigan Jewish Institute's accreditation despite previously finding "unmistakable evidence" of fraud and unlawful appropriation of millions of dollars of federal student aid funds. *See* SDO Brief, pp. 19–21. ACICS also failed to ensure academic quality in institutions and to sufficiently address issues raised by state attorneys general and third party complaints. Staff Report, pp. 13, 15–16, 20–24.

[41] SDO Brief, pp. 16–19.

[42] Staff Report, pp. 12–13.

[43] *Id.*, pp. 12–13; SDO Brief, pp. 17–19, *see also id.*, n.5.

6

complete the program, and thus would ignore student achievement information from those students who do not complete the program.[44] ACICS also appears to lack a standard for licensure, but claims that it will develop and effectively implement one by April 2017.[45] The record thus reflects not only a failure to effectively apply these standards in the past, but lack of sufficient progress in developing and effectively implementing a set of standards that could meet the recognition criteria at some point in the future, much less within 12 months.

**Monitoring.** Next, I consider 34 C.F.R. § 602.19(b). This regulation requires the agency to demonstrate that it has an effective set of monitoring and evaluation approaches supported by data collection and analysis that enable the agency to identify and report problems with institutions' continued compliance.[46] ACICS claimed to have a system in place to comply with this requirement.[47] However, citing multiple substantial settlements agreed to by ACICS-accredited institutions and actions by state attorneys general, Department staff and NACIQI found ACICS's monitoring regime "insufficient to deter widespread misconduct regarding placement, recruiting and admissions."[48] Department staff further found it unlikely ACICS could demonstrate compliance with this requirement in the 12 months it would be allotted to file a compliance report, citing ACICS's "weak record in monitoring and failure to document enforcement."[49]

**Enforcement.** Next, I consider 34 C.F.R. § 602.20. This regulation requires the agency to demonstrate it immediately initiates an adverse action against an institution when it is not in compliance with the agency's standards, and requires the institution to come into compliance within a prescribed time period or face immediate adverse action.[50] In multiple instances, the Department and NACIQI could not find evidence that ACICS took the required action against institutions even when faced with reliable information about violations of its standards from sources including state and federal agencies.[51] Indeed, ACICS's past policy and practice allowed the accrediting of noncompliant institutions.[52] ACICS asserted that it was in the process of revising its policies to come into compliance. However, Department staff found that even ACICS's revised policies contained "ambiguities and inconsistencies"[53] and that ACICS had not made sufficient progress to enable it to demonstrate effective implementation of the policies within 12 months.[54]

---

[44] SDO Brief, pp. 16–17.
[45] *Id.*, p. 17; Staff Report, pp. 11–12.
[46] Staff Report, p. 20 (citing 34 C.F.R. § 602.19(b)).
[47] *Id.*, pp. 20–21.
[48] *Id.*, pp. 21–22; *see also* NACIQI Transcript p. 30 (member noting "application of standards to the point that was rigorous enough to begin monitoring these institutions was a complete failure").
[49] Staff Report, p. 22.
[50] *Id.*, pp. 22, 24 (citing 34 C.F.R. § 602.20).
[51] *Id.*, pp. 22–25. The Department cites and discusses at some length ACICS's failure to act sufficiently in response to fraud and other violations at ACICS accredited institutions such as Corinthian's Everest schools, Michigan Jewish Institute, and ITT. *Id.*; *see also* SDO Brief, pp. 12–14, 19–22.
[52] *See, e.g.*, SDO Brief, pp. 12–16; *see also* NACIQI Transcript, p. 13 (member noting that "oversight agencies acted against ACICS accredited institutions for falsified or low-placement rates" at least three times after ACICS, with "irrefutable evidence" in hand, left the institutions' accreditations intact).
[53] Staff Report, p. 23; SDO Brief, pp. 12–16.
[54] Staff Report, pp. 23–25; SDO Brief, pp. 15–16.

**Review of Standards.** Finally, I consider 34 C.F.R. § 602.21. This regulation requires the agency to maintain a systematic program of review that, through regular intervals and comprehensive analysis, demonstrates its standards are adequate to evaluate the education provided by institutions.[55] In light of ACICS's numerous violations of the criteria, Department staff found that ACICS's program of review did not have an effective mechanism for ensuring the adequacy of its standards outside of its regular recognition cycle.[56] As a result, ACICS could not and did not adapt its standards to adequately respond to the violations and failures of its systematic program for evaluating the quality of the institutions and programs it accredits.[57]

These findings of noncompliance, like the rest of the findings in the Staff Report, are well-documented; ACICS has not significantly refuted the Department staff's findings. Therefore, I find no basis to grant ACICS full recognition.

Now I turn to ACICS's request for a temporary renewal of recognition so it can demonstrate compliance within 12 months. Such a temporary renewal is not an agency's right, but is an option available to the Secretary at his or her discretion when warranted by the circumstances.[58]

As outlined above, ACICS has exhibited a profound lack of compliance with the most basic Title IV responsibilities of a nationally recognized accreditor. The failure by ACICS to develop and effectively implement a comprehensive scheme necessary to establish, apply, effectively monitor, and enforce the required standards, and its lack of progress toward effectively doing so, strongly indicates that ACICS cannot meet its ambitious promises to come into compliance within 12 months. Despite its well-documented and ongoing violations, and while not attempting to categorically refute the Department's finding that it is not fully compliant with the requirements for recognition, ACICS asserts that its current progress in addressing the violations suggests that it is capable of coming into compliance within 12 months. ACICS first highlights that it has undertaken major changes in leadership which it claims addresses NACIQI's concerns about the agency's ability to meet its responsibilities.[59] Additionally, ACICS indicates that it has enacted and/or plans to enact, and then plans to effectively apply, the new accrediting standards and review procedures that it needs to come into compliance, and it attempts to introduce new evidence to demonstrate that it has taken immediate adverse actions against certain institutions such as DuBois Business College.[60]

I recognize, however, that the SDO, Department staff, and NACIQI already considered ACICS's assertions of progress. While acknowledging the ACICS leadership changes, Department staff nonetheless indicated a lack of confidence that ACICS can or will come into compliance during a 12 month extension.[61] Similarly, despite ACICS's move toward new

---

[55] Staff Report, p. 25 (citing 34 C.F.R. § 602.21).

[56] *Id.*, pp. 25–26.

[57] *Id.*

[58] *See* 34 C.F.R. § 602.36(e)(3)(i).

[59] ACICS Brief, pp. 27–28.

[60] *Id.*, pp. 28–30; *see also* ACICS Reply Brief.

[61] SDO Brief, pp. 23–25.

leadership, NACIQI was not persuaded to recommend a temporary renewal.[62]  Regarding enactment of new policies, the SDO raised concerns that ACICS had not yet made all needed improvements to its policies (or that some new policy changes are insufficient to address the identified deficiencies) or demonstrated an ability to effectively apply the new and revised policies.[63]  For instance, in attempting to address its deficiencies related to student achievement standards, ACICS removed graduation rates as a measure, which, as discussed above, fails to address the violation.[64]  ACICS also appears to have no standard regarding licensure, which is required for recognition.[65]  Further, the comprehensive and systemic failure of ACICS's monitoring and enforcement scheme weighs heavily against granting a 12 month renewal.  I am also unpersuaded by the new evidence submitted by ACICS in this appeal.[66]

The lack of evident progress in addressing the violations is particularly problematic in light of what the record reveals with respect to ACICS's track record.  ACICS's past failures are well documented and were discussed at length by the Department staff in its analysis and by NACIQI members at the meeting.[67]  For example, ACICS renewed the accreditation of Michigan Jewish Institute despite previously finding "unmistakable evidence" of fraud and unlawful appropriation of millions of dollars of federal student aid funds.[68]  In another instance ACICS admitted it at no time uncovered anything warranting enforcement in the matter of Everest Colleges, a Corinthian Colleges, Inc. institution.[69]  In that case, ACICS failed to take action despite a warning from the Wisconsin Educational Approval Board that a five–month long investigation uncovered alarming dropout and placement rates, findings that prompted the State of Wisconsin itself to take action against the institution.[70]  In another example, in 2013 ACICS committed to implement new data verification procedures to address serious failures to meet recognition criteria during the last recognition cycle.[71]  Yet rather than timely implementing the

---

[62] For example, one NACIQI member expressed doubt as to whether ACICS, even with a "fresh team of people" had the "talent and capability and . . . culture" to achieve compliance in the face of the challenges accumulated over a number of "disastrous . . . years and failures of schools." NACIQI Transcript, p. 253.

[63] Department staff opined that ACICS could not meet the requirements of 34 C.F.R. § 602.19(b) in fewer than 18 months to two years because the Department would have to see both a period of monitoring and subsequent due process for the monitored institutions. NACIQI Transcript, pp. 258–59.

[64] SDO Brief, pp. 16–17.

[65] Staff Report, pp. 11–12; SDO Brief, pp. 28–29 (citing 34 C.F.R. § 602.16(a)(1)(i)).

[66] ACICS is barred from submitting additional evidence during the appeal to the Secretary. 34 C.F.R. § 602.37(c). Nevertheless, ACICS has submitted evidence regarding its change of leadership and recent enforcement actions, a departmental guidance letter and a letter from the Council For Higher Education Accreditation Committee on Recognition recommending ACICS for recognition by that body. ACICS Brief, Ex. A, B; ACICS Reply Brief, Exs. A, B. Having reviewed these submissions, I conclude that even if this additional evidence were admissible, and, *arguendo*, accepted as true, nothing ACICS submitted overcomes the pervasive compliance problems that are reflected in the existing record and recommendations of Department staff and NACIQI. Further, despite ACICS's ongoing efforts, there is nothing in the additional evidence, even if it were admissible, that would lead me to conclude that it will come into compliance within the 12 month period provided by regulation.

[67] *See, e.g.*, NACIQI Transcript, pp. 65–66. Typical of concerns expressed by a majority of NACIQI members at the meeting, one member noted that "track record in my mind is still the best predictor of future performance" and expressed the view that the failures at ACICS were so widespread and systemic that they could not come into compliance within 12 months. *Id.*

[68] Staff Report, pp. 16–17; *see* SDO Brief, pp. 19–21.

[69] Staff Report, pp. 12–13, 21–22; SDO Brief, p. 15.

[70] SDO Brief, pp. 14–15.

[71] *Id.*, p. 30.

new verification procedures as promised in order to obtain renewal of its recognition, ACICS spent "two years to conduct a study" and only began efforts to improve data quality when it again began seeking renewal of its recognition in 2016.[72] In the context of these examples of failures and others, the profound problems with ACICS's accreditation scheme outlined above, and the lack of progress in addressing those problems in crucial areas, I cannot conclude that ACICS would be able to both revise (or, in some instances, enact) policies and demonstrate its effective implementation of those policies within 12 months as required to come into compliance.

Based on the extensive record, I reach the same conclusion as the SDO: the recommendations from the Department staff and NACIQI are well-founded. Both ACICS's insufficient progress in addressing its areas of noncompliance and past track record weigh against granting a renewal of recognition for 12 months. Rather, I find that ACICS's petition for renewal should be denied and that the Department should withdraw its recognition.

## B.    Fairness in the Recognition Process

I next turn to ACICS's several arguments with regard to the fairness of the recognition process.

First, ACICS asserts that it "repeatedly . . . presented evidence of its ongoing compliance efforts and its capacity to achieve compliance going forward within 12 months."[73] However, according to ACICS, the Department staff report ignored these presentations in violation of the regulatory duty to consider them.[74]

The record reflects that both the Department staff and the SDO properly considered all information provided, including the evidence offered by ACICS which it argued demonstrated progress toward achieving compliance. As discussed above, Department staff at the NACIQI meeting expressly acknowledged ACICS's reform efforts, but offered their expert opinions that they did not believe ACICS could achieve compliance within 12 months. NACIQI committee members, after considering presentations by Department staff, the agency, and third parties, agreed with the Department staff's assessment. Similarly, the SDO's Decision Letter also reflects that the SDO considered all of the underlying evidence alongside the recommendations from Department staff and NACIQI in making her decision. Therefore, I find that the SDO's decision was well-supported by the evidence in the record and extensive expert analysis.

Second, ACICS argues that the NACIQI "recommendation is not supported by the facts"[75] and points in part to selected quotes by NACIQI members that appeared to suggest support of ACICS's recognition.[76] A NACIQI meeting is intended to provide an opportunity for an institution, Department staff, and third parties to present evidence, expert opinions and public comments. Likewise, by design NACIQI members bring a variety of viewpoints and questions

---

[72] SDO Brief, pp. 30–31.
[73] ACICS Brief, p. 31.
[74] *Id.* (citing 34 C.F.R. § 602.32(b)).
[75] *Id.*, p. 34.
[76] *Id.*, pp. 34–35.

to the committee meetings. Here, as discussed above, after weighing all of the evidence and expert testimony NACIQI voted 10-3 to adopt the Department staff recommendation to terminate ACICS's recognition and deny its request for renewal. Any individual statements by NACIQI members prior to the vote do not indicate that the votes by the majority of the members were not based on their expert assessment of the facts. Moreover, as discussed at length in this opinion, the available facts supported the recommendations by the Department staff and NACIQI, as well as the SDO's decision.

Third, ACICS claims that the Decision Letter is too short and conclusory to satisfy the SDO's regulatory obligation to "[specify] the reasons for this decision."[77] ACICS argues that the SDO did not sufficiently cite evidence to support her conclusions, and that those conclusions therefore are arbitrary and capricious.[78] While the Decision Letter is concise, it adopts and incorporates the lengthy analysis and recommendation made by Department staff which exhaustively described the regulations with which ACICS was not in compliance, and which was also approved by NACIQI. Moreover, in this decision I have de novo taken into account all of the prior proceedings and available evidence, including ACICS's arguments on appeal. Therefore, I find that ACICS was given the full benefit of due process, and that the Department's decision in this matter is not conclusory, arbitrary or capricious.

Fourth, ACICS argues that neither the Decision Letter nor Department staff recommendations consider the facts alongside the regulatory criteria with sufficient specificity.[79] As discussed above, I find that the record reflects that both the Department and NACIQI have adequately considered the facts alongside the regulatory criteria. All of this analysis, combined with the analysis herein, constitutes fair and sufficient consideration of ACICS's petition for recognition. The SDO did not need to paraphrase dozens of pages from the Staff Report to adopt its analysis.

Fifth, ACICS argues that the Department and NACIQI changed their guidelines and standards "in the midst of ACICS's recognition cycle," depriving ACICS of fair notice of the standard by which its recognition would be judged, and inappropriately holding ACICS to a higher standard akin to that of a special prosecutor.[80] ACICS also argues that similarly situated agencies have not been held to the same standards imposed in this case.[81]

I have held in the past that accrediting agencies' recognition proceedings are distinct from one another. Each agency is judged on a case by case basis.[82] The law requires, however, that each accrediting agency effectively apply, monitor, and enforce the required standards, and that the Secretary place priority on reviewing accrediting agencies with the most complaints

---

[77] Id., p. 35 (citing 34 C.F.R. § 602.36(e)(2)(ii)).

[78] Id., pp. 35–39.

[79] Id., pp. 36–39.

[80] Id., pp. 39–41; 44–47.

[81] Id., pp. 44–47.

[82] Accrediting Commission for Community and Junior Colleges, Western Association of Schools and Colleges, Dkt. No. 14-10-O, U.S. Dep't of Educ. (Decision of the Secretary), p. 10.

against them, such as ACICS.[83]  In this case, the recommendations fit the facts relevant to ACICS.  I do not find any evidence that the Department staff changed the standards by which ACICS was judged, or held ACICS to an inappropriately higher standard.  Rather, I agree with the SDO that instead of new standards, ACICS faced only the proper application of "rigor" during its review process to assess its compliance with the regulatory criteria, as required by law.[84]  The findings of ACICS's violations are squarely based on the language of the regulations and are properly founded.

Sixth, ACICS complains that "procedural irregularities" in the preparation of the Department staff report[85] and "the conduct of the NACIQI meeting"[86] tainted the validity of the Decision Letter.  ACICS also complains that the SDO did not act with independence because she was Chief of Staff to the Secretary at the time of the decision, and that its recognition process "has been unfairly politicized."[87]

I find nothing in the record to suggest that ACICS was not given the full benefit of a fair and impartial hearing.  Recognition is reviewed in a detail-oriented, multi-tiered process.  ACICS has had the benefit of a review by career professionals from the Department, including an opportunity to respond to staff concerns prior to Department staff issuing a final recommendation.  ACICS had the benefit of an open meeting with NACIQI and the opportunity to provide a response to Department staff's recommendation and to directly respond to NACIQI members prior to the committee's vote.  ACICS then had an opportunity to provide comments on NACIQI's recommendation to the SDO.  Finally, ACICS has the benefit of an appeal to the Secretary for a *de novo* review of the entire record.  The record reflects that each tier of the review process was properly walled off from the previous tier with regard to this matter and made independent, impartial decisions.[88]  For example, the SDO had no involvement in the

---

[83] *E.g.*, 34 C.F.R. §§ 602.17, 602.19, 602.20; SDO Brief, pp. 37–38 (citing 20 U.S.C. § 1099b(n)(2) ("The Secretary shall place a priority for review . . . on those agencies or associations which have been the subject of the most complaints or legal actions.").  For example, Department staff noted before NACIQI that the Department was "deluged" with allegations and evidence of problems with ACICS.  NACIQI Transcript, pp. 45–46; *see also* Staff Report, p. 4.

[84] SDO Brief, pp. 39–40 (citing HEA § 496(n)(1), (n)(3) (20 U.S.C. § 1099b(n)(1), (n)(3)).

[85] Specifically with regard to the Department staff report, ACICS points to a quote from the NACIQI transcript to assert that personnel not usually involved in the accreditation work provided advice to the Department staff.  ACICS Brief, p. 41.

[86] Specifically with regard to the NACIQI meeting, ACICS points to remarks from Under Secretary Mitchell at the start of the meeting which "clearly informed NACIQI Panel members of the outcome that the Department wished the NACIQI Meeting to reach."  ACICS Brief, p. 42.

[87] ACICS Brief, pp. 44, 47–49.

[88] A member of NACIQI raised this issue by questioning whether the Secretary's office involved itself with the Department staff's recommendation.  NACIQI Transcript, pp. 48–49.  Department staff responded that both the SDO and Secretary "have been completely walled off from the discussion of [ACICS] and from the preparation of the staff report."  *Id.*, pp. 49–50.  A member of NACIQI noted that the ACICS recognition matter had attracted outside attention, but recognized that the staff analysis was based on the Secretary's criteria for recognition.  *Id.*, p. 19.  Another member of the Department staff stated the recommendation came from career accreditation staff; the staff considered information from other offices in the normal course of the recognition process, but did not interact with any individuals who were walled off.  *Id.*, p. 50.  Department staff also advised that they approached the recognition review with an "innocent until proven guilty" mentality.  *Id.*, p. 51.  Another NACIQI member noted that an "innocent until proven guilty" standard was higher than required for these proceedings, and praised the Department staff for being "so scrupulous, so ethical" during the process.  *Id.*, p. 63.

Department staff or NACIQI recommendations, and the Secretary had no involvement in the SDO's decision-making process.[89] But neither the regulations nor the proper ethical walls erected in this case prevent Office of Postsecondary Education staff from appropriately receiving input and advice from staff in other offices in an accrediting agency recognition review. Indeed, these questions were raised, discussed, and dismissed by the majority of NACIQI members at the NACIQI meeting.[90] NACIQI's 10-3 vote in favor of the Department staff's recommendation is an implicit rejection of this asserted flaw in the process. For these reasons, I reject ACICS's argument that procedural irregularities or political pressure tainted the review process.

### C.   Additional Issues Raised by ACICS

Last, I turn to several additional issues raised by ACICS. First, ACICS argues that, regardless of its compliance with the regulatory criteria, the Department must renew its recognition because of the potential harm to an estimated 580,000 students enrolled at institutions accredited by ACICS.[91] The interests of students are of foremost concern to me and this Department, but students' interests are best served by proper application of the recognition criteria. That is also required by law. While I note that NACIQI members discussed this issue with Department staff,[92] I agree with the SDO that ACICS does not have standing to raise a request for equitable relief on behalf of students. The appeal before me is limited to the issue of whether ACICS is in compliance with, or capable of coming into compliance with, in 12 months or less, the recognition criteria. I find no basis to set aside those criteria or to ignore their application to ACICS.

ACICS has also in its reply brief requested to hold a hearing to present additional arguments and evidence. An additional hearing is not contemplated by the regulations in the already robust recognition process. ACICS has provided voluminous documentary evidence, testimony, and analysis to Department staff and NACIQI. Then, it provided comments to the SDO and again in the current appeal. The entire process has constituted a hearing allowing ACICS a meaningful opportunity to be heard, which satisfies ACICS's right to due process.[93] I find no basis to conclude that expanding the process with an ad hoc hearing would be productive at this juncture or provide any basis for me to change my conclusion. Therefore, I deny ACICS's request for a hearing.

### IV.   Conclusion

The record before me supports the recommendations of the Department staff and NACIQI and the Decision Letter of the SDO. ACICS has not provided any argument or

---

[89] *See id.*, pp. 48–51.

[90] *See id.*, pp. 48–51, 63.

[91] ACICS Brief, pp. 49–50.

[92] *See, e.g.*, NACIQI Transcript, pp. 36–37; *see also id.*, pp. 38–39 (Department staff noted "Our position is that . . . not to terminate would in the long-term put students and taxpayers in harm's way and we carefully considered the impact of this decision on institutions as well as the students, especially students.").

[93] *See Accrediting Commission for Community and Junior Colleges, Western Association of Schools and Colleges*, Dkt. No. 14-10-O, U.S. Dep't of Educ. (Decision of the Secretary), p. 12 (citing *Mathews v. Elridge*, 424 U.S. 319, 333 (1975)).

evidence that would compel me to reach a conclusion contrary to that arrived at by the SDO. Therefore, on the basis of the entire record before me, I find that ACICS is currently out of compliance with the full recognition criteria and not capable of coming into full compliance within 12 months or less.  I therefore find no basis on which to exercise my discretion to grant an extension of recognition for ACICS to come into and demonstrate compliance.

**ORDER**

ACCORDINGLY, I hereby adopt the SDO Decision Letter and terminate the Department's recognition of ACICS as a nationally recognized accrediting agency.

So ordered this 12th day of December 2016.

John B. King, Jr.

Washington, D.C.

14

## Service List

Greer Armandroff, Esq.
Office of Hearings and Appeals
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, D.C.  20202

Allyson B. Baker, Esq.
Venable LLP
575 7th Street, N.W.
Washington, D.C.  20004-1601

Kenneth J. Ingram, Esq.
Whiteford Taylor Preston LLP
1800 M Street, N.W., Suite 450N
Washington, D.C.  20036

Sarah W. Morgan, Esq.
Donna Mangold, Esq.
Office of the General Counsel
U.S. Department of Education
400 Maryland Avenue, S.W.
Washington, D.C.  20202

# EXHIBIT 19

To Declaration of Allyson B. Baker

# Rubber Stamps: ACICS and the Troubled Oversight of College Accreditors



 **Prepared by the Office of Senator Elizabeth Warren**

# I. Executive Summary

The National Advisory Committee on Institutional Quality and Integrity (NACIQI) will examine the record of the embattled Accrediting Council for Independent Colleges and Schools (ACICS) at its upcoming June 22-24 meeting and determine whether the accreditor's federal recognition should be renewed.[1] This is an important decision.  ACICS and other accreditors serve as gatekeepers of federal funds for colleges – including for-profit colleges.  Students who receive federal grants and loans can use them only at those institutions that have been accredited by a recognized accreditor, which makes accreditation a valuable and profitable stamp of quality and approval for colleges.  Indeed, absent accreditation, schools cannot access taxpayer dollars, and many would not be able to continue operating.

NACIQI serves as a gatekeeper for the gatekeepers.  Its recommendation to the Secretary of Education will help determine whether ACICS is allowed to continue operating as an accreditor and guarantor of the educational quality of the schools it certifies.

Consumer advocates, education groups, veterans advocates, and thirteen state attorneys general have called for NACIQI to recommend denying ACICS's petition for a renewal of recognition, arguing that this accreditor's dismal track record disqualifies it from continuing to serve in this capacity.[2] NACIQI, however, has its own problematic track record, regularly identifying issues with the accreditors it oversees, but rarely using its own authority to hold those accreditors accountable for their failures.  Despite widespread condemnation of the lax standards of accreditation agencies, in the past six years, NACIQI has recommended against renewal of an accreditor in exactly one case, and even that recommendation was ultimately overruled by the Secretary of Education.

This staff report examines ACICS's performance as an accreditor and addresses broader issues of federal oversight of accreditors.  The report finds:

- **ACICS has a history of accrediting schools that have faced investigations, penalties, and settlements for violations of federal and state law.**  ACICS has accredited seventeen institutions that have been sued, investigated

by, or reached settlements with state and federal governments for defrauding students or engaging in other deceptive practices.[3] This history casts doubt on its ability to serve as a responsible gatekeeper of educational quality and taxpayer dollars.

- **ACICS oversight was lax, and warning signs were ignored even when accreditors were confronted with clear evidence of wrongdoing.**  College employees who witnessed ACICS's accreditation processes have questioned the rigor of the accreditor's reviews; one called it a "dog and pony show."[4]  When a whistleblower contacted ACICS about problems, at Northwestern Polytechnic University, ACICS "asked for a thin explanation, accepted it at face value, and issued no sanctions."[5]  These charges were later born out when the school was accused of operating as a visa mill for foreign students and manipulating grades to keep tuition money flowing.

- **ACICS-accredited schools consistently produce astronomical debt levels and terrible outcomes for students.**  Compared to institutions certified by other major accreditors, many ACICS-accredited institutions consistently post some of the worst student outcomes in the country, measured by graduation rates, post-enrollment earnings, and debt burdens.  As a group, students who attend ACICS-accredited colleges have higher debt levels and default rates than students who attend colleges certified by other major accreditors.  A majority of ACICS-accredited colleges also rank among the worst in the country in terms of student earnings ten years after enrollment.

- **NACIQI review processes have consistently failed to address documented concerns about accreditors.**  In nearly 80% of the renewal recommendations NACIQI has made since 2010, the review board initially identified compliance issues with accreditors, but took no immediate action.  Instead, NACIQI simply put more time on the clock – giving accreditors an additional year to address

identified problems and ultimately reapproving the accreditor's recognition in almost every instance.[6]  Even accreditors that fail to fix the problems identified in their reviews within a year are given an additional six months to keep trying.[7]  The board has the authority to force accreditors to improve performance, but the Department fails to act in a meaningful way to protect students and to safeguard the interests of taxpayers.  Biannual NACIQI reviews focus more on technical paperwork violations and 'check-the-box' compliance than on meaningful issues involving students' education or their economic well-being.

- **In its supervision over ACICS, NACIQI has an exceptionally egregious record of failed oversight.**  Some of ACICS's worst failures have occurred in the time since a June 2011 NACIQI review declared it to be in compliance.  In the 2011 review, ACICS's renewal was delayed, but ultimately approved.  ACICS then proceeded to maintain accreditation for more than a dozen questionable schools, despite credible evidence that serious violations of federal and state law had occurred.  Most notably, ACICS continued to accredit Corinthian Colleges until the day the troubled chain of schools closed its doors and declared bankruptcy, and it continued to accredit Northwestern Polytechnic University, the school recently accused of operating as a visa mill for foreign students.[8]

The Corinthian disaster has reverberated throughout the country, undermining the futures of hundreds of thousands of students and potentially costing taxpayers billions of dollars.  As questions about the oversight exercised by Corinthian's accrediting agency have become more serious, ACICS has begun a last-minute effort to improve its image.  Last month, the accreditor replaced its President and CEO and sent ITT Educational Services, Inc. – another embattled for-profit college accredited for more than a decade by ACICS – a "show cause" letter asking the company to submit information and plans to demonstrate that it should be allowed to maintain its accreditation.[9]  ACICS has also announced additional steps to finally improve the accuracy of data from the colleges it accredits.[10]  Then, with less than three weeks to go before their NACIQI review, ACICS announced a

freeze on new applications for accreditation as well as other changes, including the creation of an ethics board to examine conflict of interest issues with ACICS board members and an increased number of on-site reviews for accredited colleges.[11]

These steps, all occurring within weeks of its upcoming NACIQI review, represent the first serious, public indicators that ACICS is even aware of any problems with its existing practices.  They do not, however, prove that there will be any meaningful changes in those practices, and they do not alter ACICS's years-long record of dereliction of its duty to oversee the schools it certifies as accredited colleges eligible for federal student loan dollars.  The seriousness of ACICS's efforts to clean up its act at the last minute was further undercut by the accreditor's hosting – at the same time – a conference "where college administrators learned how to evade attorney general lawsuits."[12]

ACICS has spent years cranking open the spigot to allow taxpayer funds to flow to some of the sleaziest actors in American higher education.  Because ACICS passed out accreditation to these so-called colleges, hundreds of thousands of people who relied on the accreditor to do its job now hold worthless credits and face billions of dollars of debts they may never be able to repay.  If NACIQI members and Department of Education (ED) officials want to restore public confidence in their own review process, they must demonstrate that they understand the devastating consequences of ACICS's long record of failure.

## II. Background

In order for a college to participate in federal student financial assistance programs – including accessing federal student loan dollars, Pell grants, and some military tuition assistance funds – it must be accredited by an approved independent accrediting agency.  The Department of Education delegates to such agencies the responsibility of assessing and overseeing schools.

Federal law contains clear requirements that accrediting agencies must meet if they are to be recognized by the Department of Education.[13]  These requirements are designed to protect students and safeguard federal student aid funds, ensuring that accreditors do their part by carefully monitoring whether schools and educational programs live up to their word when it

comes to providing students with a quality education. They are designed to ensure that all colleges and universities receiving federal dollars maintain at least a minimum level of quality and performance.

The law requires that an accreditor "consistently applies and enforces standards" to ensure that the training offered by an institution of higher education is "of sufficient quality to achieve . . . the stated objective for which the courses or the programs are offered."[14] The accreditor must also demonstrate that it assesses whether the schools it accredits "maintai[n] clearly specified educational objectives," and "maintai[n] degree and certificate requirements that at least conform to commonly accepted standards."[15] It also requires that an accreditor "must demonstrate that it has standards for accreditation . . . that are sufficiently rigorous to ensure that the [accrediting] agency is a reliable authority regarding the quality of the education or training provided by the institutions or programs it accredits." [16] In other words, an accreditor's standards must be high enough that its stamp of approval for a school guarantees that the school is providing quality education and training to students. As part of certifying the quality of a school, the accreditor's standards must assess a school's "success with respect to student achievement in relation to the institution's mission."[17]

NACIQI's periodic reviews are meant to ensure that accrediting agencies are well-equipped to play this role in guaranteeing the quality of colleges and universities. NACIQI's eighteen members are appointed by the Secretary of Education (who appoints six members), the House of Representatives (three recommended by the Speaker of the House and three by the minority leader of the House), and the Senate (three recommended by the Senate majority leader and three by the minority leader of the Senate). According to federal law, members must be chosen from "individuals who are representatives of, or knowledgeable concerning, education and training beyond secondary education, representing all sectors and types of institutions of higher education."[18] Committee members serve in a part-time capacity, and are supported by a small full-time staff.[19] Currently, NACIQI members include college presidents and administrators from both public and private institutions, the head of a chain of for-profit colleges that recently converted to non-profit status, and individuals with direct experience in accreditation.[20]

The current system of accreditation has come under fire for failing to serve the interests of both students and taxpayers. A 2014 study from the Government Accountability Office found that between 2009 and 2014, accreditors terminated the accreditation of only about 1% of schools under their charge.[21] The study also reported that schools with weaker student outcomes were no more likely to be sanctioned by accreditors than schools with stronger student outcomes. Indeed, a *Wall Street Journal* analysis found that eleven colleges had a graduation rate below 10% – and were able to maintain their certification even with such poor outcomes.[22]

The Department of Education has acknowledged that recent years have seen "far too many schools maintain their institutional accreditation even while defrauding and misleading students, providing poor quality education, or closing without recourse to students."[23] Secretary of Education Arne Duncan even went as far as to call accreditors "the watchdogs that don't bark," noting that accreditors have failed to make student outcomes a priority in their work.[24] Calling this situation "inexcusable," the Department has committed to "strengthening its monitoring and review of agencies that have accredited such institutions."[25]

The consequences of accreditation failures loom large for millions of students – and for taxpayers. The federal government spends $129 billion on federal student aid annually.[26] For American taxpayers, this money is an investment in the future: federal aid helps students pay for college so that they can pursue a degree that will allow them to get ahead, find a good job, and support their families. But this taxpayer investment is wasted when student aid funds are funneled to sham colleges – many of which operate as for-profit entities that use federal student aid dollars to enrich top executives. Meanwhile, students are left with a shoddy education and a staggering debt load, unable to rely on their education to secure a job that will help them responsibly repay their loans. Accreditors that repeatedly certify the quality of education at these predatory schools fuel this vicious cycle by keeping the federal money flowing – not only exploding the number of students who could end up financially ruined for trying to invest in their education, but also exposing taxpayers to massive liabilities when these fraudulent schools fail, allowing students to assert their legal rights to have their federal student loans cancelled and refunded.

# III. Findings

## 1. ACICS Has a History of Accrediting Schools Accused of Numerous Violations of Federal and State Law

ACICS continued to provide accreditation to Corinthian Colleges until the day that the troubled chain of for-profit schools declared bankruptcy.  At its peak, Corinthian was the nation's largest for-profit chain with 120 campuses enrolling well over 100,000 students.[27]  Corinthian posted a $20 million profit in 2010, and paid its CEO $4.5 million.[28]  Meanwhile, in the five years before the company's collapse, students took out roughly $3.5 billion in federal student loans.[29]  Corinthian's business model appeared to be based on scooping up federal financial aid by any means necessary – including fraud.  Before it collapsed, Corinthian was under investigation by over twenty state attorneys general and faced several lawsuits from state and federal authorities, including a successful lawsuit filed by the Consumer Financial Protection Bureau, alleging that Corinthian defrauded students by roping them in using false and misleading information – and then saddled them with crippling debt that would be impossible to repay.[30]  While all of this was happening, ACICS renewed accreditation for seven Corinthian campuses in 2013 and maintained accreditation for another 52 Corinthian campuses, permitting them to suck down billions in federal student loan dollars until the school finally collapsed in 2015.[31]

The Department of Education is currently processing tens of thousands of claims from former Corinthian students to have their federal student loans cancelled under the "borrower defense to repayment" provision of the Higher Education Act.  The true cost of Corinthian's fraud could total in the billions for students and taxpayers, but ACICS has yet to face any accountability for allowing Corinthian to fraudulently rake in billions of dollars of federal aid and guaranteeing that Corinthian students were receiving a quality education until the day its doors were closed.  When asked about its repeated certifications of Corinthian Colleges in a hearing of the Senate Committee on Health, Education, Labor, and Pensions, ACICS president and CEO Albert Gray acknowledged that "accreditors, like any other organization, make mistakes"—but concluded by stating that the decision to continue allowing Corinthian to operate right up

until the moment it collapsed "was not one of those mistakes."[32]

ACICS's glaring lack of oversight with regard to Corinthian Colleges is not an outlier.  Shady and legally questionable business practices are part of a disturbing pattern at ACICS-approved colleges.  ACICS has continued to extend accreditation to *seventeen* institutions that have been sued, investigated by, or reached settlements with state and federal governments (Table 1).[33]  As thirteen state attorneys general wrote in their letter to the Department opposing renewal of recognition for ACICS: "Even in the crowded field of accrediting failures, ACICS deserves special opprobrium."[34]

> *"Even in the crowded field of accrediting failures, ACICS deserves special opprobrium."*

The long list of ACICS-accredited schools under investigation or sued for their practices includes Westwood College, which reached a $7 million settlement with the U.S. Department of Justice in 2009 related to a whistleblower lawsuit alleging that Alta (the company that owned Westwood) and some of its Westwood campuses falsified information allowing it to claim federal student aid.[35]  In March 2012, Westwood reached another settlement, this one with Colorado's attorney general over allegations that the school had inflated job placement rates, provided misleading information about the average wages of graduates, and failed to disclose the terms of its financing program.[36]  Just a few months earlier, in January 2012, the Illinois Attorney General filed a lawsuit against Westwood, asserting that "Westwood officials lied to potential students about almost every aspect of its criminal justice program, from its exorbitant costs to a graduate's slim career prospects," leaving graduates with thousands of dollars in debt and worthless degrees.[37]  Last November, Westwood reached a $15 million agreement with the Illinois Attorney General related to these accusations.[38]

Yet during the entire three-year period, which multiple lawsuits were filed related to Westwood's abusive practices toward students and false claims that allowed it to draw down federal aid dollars, ACICS did not identify any significant problems or levy any meaningful sanctions against Westwood.[39]  Quite the opposite, in fact – remarkably, the accrediting agency instead

named several Westwood campuses to its "honor roll" for schools that "have demonstrated an excellent understanding of the accreditation process."[40]  ACICS did not withdraw accreditation from Westwood's fifteen campuses until March 2016 – on the same day that the college closed its doors for good.[41]

A recent analysis from the Center for American Progress shows that ACICS's conspicuous blind spot with regard to Westwood's abusive practices was not unique.  Of the seventeen ACICS-accredited institutions that have been investigated by state or federal actors, the analysis found that twelve of them had campuses that were celebrated as "honor roll" colleges by ACICS between 2010 and 2015.[42]  In other words, a majority of the ACICS-accredited institutions under investigation – for allegations such as falsifying job placement rates, stealing federal aid, misrepresenting the transferability of academic credits, or engaging in illegal recruitment practices – were also the recipients of ACICS "honor roll" recognition.

### Table 1: Allegations Made Against ACICS-Accredited Schools[43]

| School/Company | Summary of Investigation or Allegation | One or More Campus Named to ACICS Honor Roll |
|---|---|---|
| Alta Colleges (Westwood College, Redstone College) | Falsifying claims for federal aid; abusive marketing practices | * |
| American Commercial College | Theft of federal financial aid; lying about share of school's revenue coming from ED | |
| Anamarc College | Relatives of school owners sued for stealing funds | |
| Career Education Corporation (Brooks Institute, Harrington College of Design, International Academy of Design and Technology, Le Cordon Bleu, Missouri College, Pittsburgh Career Institute, Sanford-Brown) | Falsifying job placement rates, violations of state statutes and regulations; SEC and FTC investigations | * |
| Computer Systems Institute | Falsifying job placement rates | |
| Corinthian Colleges (Everest) | Refusing to comply with ED requests for job placement data; investigations concerning falsification of job placement rates | * |
| Daymar College | Violating the Consumer Protection Act; lying about transferability of credits | |
| Education Affiliates Inc. (Fortis) | Using fake high schools to help students illegally obtain federal student aid | * |
| Education Management Corporation (Art Institutes, Brown College, Brown Mackie College) | Illegal and deceptive recruiting practices | * |
| FastTrain College | Using exotic dancers to recruit students; recruiting students and taking federal aid for students without high school diplomas | * |
| Globe University and Minnesota School of Business | Misrepresenting transferability of credits, abusive marketing practices | * |
| ITT Educational Services, Inc. | Illegal recruitment activities; sued by the Consumer Financial Protection Bureau for issues related to private student loans | * |
| Kaplan Higher Education (Kaplan, TESST College of Technology, Texas School of Business) | Misleading marketing claims and enrollment practices; employing unqualified instructors at some campuses | * |
| Lincoln Technical Institute | Falsifying placement statistics | * |
| National College | Misrepresenting job placement rates | * |
| Salter College | Questionable recruitment tactics; misleading job placement numbers | |
| Spencerian College | Misrepresenting job placement numbers | * |

At its most recent annual conference for college administrators, ACICS even held a session for school officials to train them in how to evade attorney general lawsuits.[44]  This May 2016 session was led by two lawyers for Daymar College – an ACICS-accredited for-profit school that recently reached a $12 million settlement with the Kentucky attorney general over alleged violations of the state's consumer protection laws, including lying to students about the transferability of credits, improperly denying students access to financial aid to buy their textbooks from vendors other than Daymar's high-priced bookstore, and hiring unqualified faculty who lacked the required credentials (Table 1).[45]  By hosting this session, ACICS helped counsel schools on how to skirt state and federal investigations and lawsuits by limiting the access of outside compliance monitors, shoving students into forced arbitration, and using the ACICS seal of approval to persuade judges of a school's legitimacy in the face of attorney generals' claims of wrongdoing.

## 2. ACICS Has Ignored Obvious Signs of Wrongdoing at Schools It Accredits

In late 2014, a whistleblower at Northwestern Polytechnic University (NPU) contacted ACICS about concerns related to the school's practices, sending the accreditor a numbered list of specific problems.  The list identified serious problems with the school's core functions as an educational institution: the college was operating without any full-time faculty members or a qualified librarian, instructors were not qualified to teach certain courses, cheating was "rampant," and a senior administrator was changing large numbers of grades to prevent students from failing classes.[46]

ACICS's response to these dramatic claims was tepid at best.  The accreditor "wrote to the university, requesting that it provide a chart of its enrollment numbers, along with a description of how it was maintaining its programs' 'stability.'  The accreditor also asked for 'data sheets' and signed job descriptions for its librarian and 'all full-time faculty members.'"  ACICS then allowed NPU to maintain its accreditation without sanction – and even invited an NPU faculty member to speak at its annual conference on the topic of how to acculturate foreign students at universities.[47]

This is not the only evidence of lax oversight on the part of ACICS when it engages with the schools it accredits.

A former director of financial aid at a campus of ITT Technical Institute – an ACICS-accredited school – has described ACICS's accreditation process as a "dog and pony show," saying that "ACICS's entire business model is to act as a rubber stamp so that schools engaged in widespread misconduct can continue to profit off of federal student aid."[48]

> *"ACICS's entire business model is to act as a rubber stamp so that schools engaged in widespread misconduct can continue to profit off of federal student aid."*

Other former ITT employees who witnessed ACICS representatives on campus to conduct reviews have noted that the accreditors focused on paperwork, rather than on broader concerns with the quality of education the school offered.  The "ACICS auditors stayed sequestered in a room" examining files, explained a former ITT employee from the Baton Rouge campus.[49]  ACICS teams "spend a week or so in rooms filled with files and papers," wrote another ITT employee who worked for the school in four different states.  All told, "the leaders of the accrediting body establish practices that give the illusion that they are taking the schools through a rigorous accreditation process, but in fact they are not holding to their commitment of protecting consumers by looking deep enough at all levels of the pro-profit business model."[50]

These allegations strongly suggest that ACICS's accreditation process fails to meet minimal federal standards.  Even when directly confronted with evidence of wrongdoing, ACICS seems to have looked the other way, allowing predatory schools to continue operating and putting students' educational and financial future at risk.

> *"ITT knew that ACICS did not take the accreditation process the least bit seriously and behaved accordingly."*[51]

## 3. ACICS-Accredited Institutions Have Poor Student Outcomes

The purpose of accreditors like ACICS is to provide a basic guarantee that the accredited schools are providing a high-quality education.  Judged by this purpose, ACICS is a failure, since the schools it accredits consistently exhibit some of the worst student outcomes in the country.

Graduation rates at ACICS-accredited institutions are substantially lower than at institutions accredited by other agencies. A *ProPublica* analysis found that only about one-third of students (35%) attending ACICS-accredited institutions graduate within six years – making ACICS the only major national accreditor in the country whose approved schools graduate fewer than half of their students.[52]  By comparison, the national average six-year graduation rate for four year colleges is substantially higher at 60% (Figure 1).[53]

Almost three-quarters (73%) of undergraduates at ACICS institutions borrow using federal student loans in order to attend.  This figure is well above borrowing rates at schools accredited by other agencies and

significantly higher than the national average of 47% for all colleges (Figure 1).[54]  Students at ACICS-accredited schools also borrow more to attend these schools than their peers at institutions accredited by other agencies, leaving students to grapple with higher debt loads.  The average student borrower at an ACICS-approved institution takes out loans of nearly $8,000 a year – more than student borrowers at colleges approved by any other major national or regional accreditor.[55]

In addition, students at ACICS-accredited institutions are more likely to default on their student loans than students at institutions accredited by other agencies.  An analysis by *ProPublica* found that 22% of students at ACICS-accredited schools defaulted on their loans

**Figure 1:  ACICS Lags Far Behind National Average on Key Student Outcomes**



within three years.  This default rate is substantially higher than the national average of 14% for all colleges (Figure 1), and the second-highest among the four national ED-approved accreditors.[56]

In addition to the high default rates of students attending ACICS-accredited colleges, a substantial majority of students simply fail to make any progress in actually paying back their loans.  A staggering 60% of students at ACICS-accredited schools had not paid back a single dollar of their loan principal within three years after leaving.  ACICS is the only major accreditor in the nation where a majority of students failed to make any progress on repaying loans after leaving a program.  That non-repayment rate is 23 percentage points higher than the national average for all schools (Figure 1).[57]

Many students choose to attend college in order to improve their earning capacity, and unsurprisingly, the ability of a student to repay his or her loans is related to that student's earnings after graduation.[58]  Department of Education data on the median earnings of students, ten years after their enrollment in an institution, show that 62% of ACICS-approved schools rank in the bottom third nationally.  The Department of Education also tracks the share of students who received federal aid and who, six years after enrollment, have gone on to earn more than the average high school graduate.  Here too ACICS's record is heartbreaking: 57% of its schools have outcomes that rank in the bottom third of all institutions.[59]  Six years later, too many students at these colleges are earning no more than their peers with a high school degree who stayed in the workforce, and must now also struggle with thousands of dollars in student loan debt.  The data are clear – many students at a majority of ACICS-accredited institutions would actually have been better off financially if they had never attended that institution, and instead had simply entered or stayed in the workforce.

Students at colleges with the ACICS seal of approval are more likely to borrow – at higher amounts – to attend school, yet they are less likely to graduate with a degree, less likely to pay back their loans than students at colleges endorsed by other accrediting agencies, and too many go on to earn less than students who attended other schools.  The differences between outcomes for students attending ACICS-accredited colleges and those for students attending institutions approved by

other accrediting agencies are not minor – in fact, they are dramatic and consequential.  These results are not driven by a few poorly-performing institutions that drag down ACICS's overall averages.  Rather, the majority of ACICS-accredited schools rank among the worst in the nation when it comes to key student outcomes.

### 4. Outcomes of NACIQI Review Processes Consistently Fail to Address Demonstrated Concerns About Accreditors

NACIQI is the government watchdog that serves as the gatekeeper for the gatekeepers – reviewing the performance of accreditors and making recommendations to the Secretary of Education on whether such accreditors should be allowed to continue in that role.  Federal law sets forth accreditor responsibilities for ensuring students receive quality education and training – but NACIQI's review process has historically overlooked these requirements and focused instead on whether accreditors are complying with technical bookkeeping criteria.

NACIQI has several options when an accreditor is up for renewal.  It can recommend renewal of recognition; it can recommend denial of recognition; or it can recommend that an accreditor be given a period of months to come into compliance with specific Higher Education Act standards.  Of these options, the most common recommendation that NACIQI makes with regard to the accrediting agencies that come up for review is to simply give them an extra year to address compliance problems.  But this analysis finds that when this happens, most accreditors subsequently secure renewal for the remainder of their term with little additional discussion.[60]  Regardless of the problems that are identified in the review process, NACIQI rarely recommends meaningful restrictions that can prevent troubled accrediting agencies from continuing to certify schools while it responds to identified problems with its accreditation standards.

Since February 2010, NACIQI has acted on 77 renewal requests submitted by 64 accrediting agencies.[61]  In only four cases has the Committee taken any action beyond delaying approval or requiring a compliance report before extending recognition.  NACIQI approved 17 of the overall 77 renewal requests without recommending any delay.[62]  They denied one request outright: the Puerto Rico State Agency for the Approval of Public

Postsecondary Vocational Technical Institutions and Programs.  In this case, NACIQI recommended that the accreditor's petition for renewal be denied – but that rare negative recommendation was later overruled by the Secretary of Education during the Department's review of the recommendation.[63]

This left 59 renewal requests where NACIQI chose to give accreditors extra time to respond to compliance problems that were identified in the renewal process. But in 48 of these 59 cases – over 80% of times in which NACIQI identified problems – NACIQI simply gave the accreditor even more time to comply or required only a compliance report before renewing the accreditation (Figure 2).[64]  Seven more cases are still pending while accreditors prepare their compliance reports.[65]

NACIQI rarely makes use of one of the most serious sanctions it can recommend during these extra time periods: preventing an accrediting agency from accrediting any new institutions while its compliance issues are outstanding.  The Committee has made this recommendation only four times during the past six years.  Two of those accreditors are no longer in operation; one has returned to compliance, and the fourth remains under sanction – that is, not allowed to accredit any new institutions – while it prepares a compliance report.[66]

**Figure 2: Few Accreditors Face Sanctions, Even When Renewal Not Immediately Granted**



Additional Sanctions, 7%
Denial, 2%
Renewal request still pending, 12%
Renewed after a delay, 80%

### 5. NACIQI Has a Record of Failed ACICS Oversight

Evaluated by the standard of student outcomes, as all accreditors should be, ACICS clearly falls short. However, as it has with other accreditors, NACIQI has taken half-steps in its recommendations regarding ACICS – none of which have adequately addressed the accreditor's failures. The Department of Education's staff report on ACICS provided to NACIQI members in advance of its Spring 2011 meeting identified fourteen issues or problems with the accreditor's procedures. But rather than examining the dismal student outcomes at many ACICS-accredited institutions, or the fact that several of its institutions had been investigated by state or federal authorities, the staff report focused on concerns such as the accreditor's documentation of its processes and procedures or its policies for soliciting feedback on its standards.[67]

In response to these identified compliance issues, NACIQI did not recommend termination of ACICS, but instead recommended that the accreditor be given an additional twelve months to come into compliance. Twenty-four months later – after various process-related delays – in July 2013, the Secretary accepted ACICS's response to these compliance issues and granted the accreditor a three-year term of recognition.[68]

Some of ACICS' worst failures occurred during that three-year period. Most notably, ACICS continued to certify the quality of education provided by Corinthian Colleges up until the day the chain of schools filed for bankruptcy in May 2015. However, Corinthian was not the only troubled institution that remained accredited by ACICS during this three-year period. According to the Center for American Progress' analysis, fourteen out of the seventeen cases of ACICS-accredited schools investigated, sued, or settling with state or federal authorities occurred following ACICS's probation and June 2013 renewal of recognition recommended by NACIQI.[69]

## IV. Conclusion

Students and taxpayers depend on a robust system of federal oversight to ensure that accrediting agencies live up to their responsibilities when assessing schools. Like all accreditors, ACICS should be carefully scrutinized to evaluate whether it has met those responsibilities

during the period since its last recognition by the Department of Education. NACIQI members and the Secretary of Education will have a lot to consider: ACICS's record over the past five years is littered with instances of the schools it accredits facing lawsuits, bankruptcies, closures, and poor student outcomes – and a refusal by ACICS to admit that it has made any mistakes.[70] While ACICS has taken several last-minute steps to improve its image as a tough accreditor, it is not clear if these actions will be effective in the long-term and whether ACICS will have any interest in following up once they have made it past their own review period. In any case, a few last minute efforts to look tough do not erase the last five years of failure.

As the Department of Education works to fulfill its pledge of strengthening its monitoring and review of accrediting agencies, it should thoroughly examine its own history of decision-making. NACIQI recommendations rarely depart from a few well-worn and ineffective tracks. In its current form, the advisory committee and department review process focuses largely on technical documentation issues and, when compliance problems are identified, takes no meaningful action. Finally, while the Department publishes data to show how institutions accredited by each accrediting agency perform on a set of student outcomes, NACIQI appears then to ignore objective standards of student achievement in its renewal recommendations.

Students and taxpayers have a right to expect that the federal government has their back when it comes to rigorous monitoring of accrediting agencies. After years of lax oversight, the Department of Education can meet that standard only if it makes immediate changes in how it handles the accreditor renewal process and clearly demonstrates that it understands the devastating consequences of ACICS's long record of failure. These changes must start with ACICS at the June NACIQI meeting.

# Endnotes

1   Department of Education, National Advisory Committee on Institutional Quality and Integrity Meeting, *Federal Register* 81: 53 (March 18, 2016) (online at https://www.gpo.gov/fdsys/pkg/FR-2016-03-18/pdf/2016-06169.pdf), p. 14846-14849.

2   Letter from the Attorneys General of Massachusetts, Illinois, Iowa, Kentucky, Maine, Maryland, Minnesota, New Mexico, New York, Oregon, Washington, and the District of Columbia, and the Executive Director of the Hawaii Office of Consumer Protection, to the U.S. Department of Education (April 8, 2016) (online at https://www.propublica.org/documents/item/2798763-Ag-Multistate-Ltr-to-Usdoed-040816.html).  Letter from education and consumer groups to NACIQI (April 8, 2016) (online at https://www.insidehighered.com/sites/default/server_files/files/Coalition%20Letter%20on%20ACICS.pdf).

3   Ben Miller, *ACICS Must Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/).

4   Letter from Jennifer Cody to Jennifer Hong, Executive Director, NACIQI (May 16, 2016) (online at http://blog.debtcollective.org/itt-whistleblowers-and-debt-collective-oppose-renewal-of-for-profit-accreditors-acics-and-accsc/).

5   Molly Hensley-Clancy, "Making the Grades," *Buzzfeed* (May 26, 2016) (online at https://www.buzzfeed.com/mollyhensleyclancy/inside-the-school-that-abolished-the-f-and-raked-in-the-cash?utm_term=.si8vOYMxxj).

6   Analysis of data compiled from NACIQI meeting reports from Fall 2010 – Fall 2015, available online at: http://www2.ed.gov/about/bdscomm/list/naciqi.html#meetings. Seven renewal requests are still pending while accreditors respond to compliance issues identified during their review, and three other accreditors that came up for review during the period of this analysis became inactive accreditors before receiving renewal of recognition from NACIQI.

7   Seven institutions have received six-month extensions of their original 12-month deadline for addressing compliance issues. Four of these institutions subsequently received a renewal of their recognition, and applications for renewal from the remaining three institutions are still pending as they prepare additional compliance reports.

8   Ben Miller, *Up to the Job? National Accreditation and College Outcomes*, Center for American Progress (September 8, 2015) (online at https://www.americanprogress.org/issues/higher-education/report/2015/09/08/119248/up-to-the-job/). Molly Hensley-Clancy, "Making the Grades," *Buzzfeed* (May 26, 2016) (online at https://www.buzzfeed.com/mollyhensleyclancy/inside-the-school-that-abolished-the-f-and-raked-in-the-cash?utm_term=.djQ3o0bnnv#.si8vOYMxxj).

9   ACICS, "ACICS Leadership Change" (April 18, 2016) (online at http://www.acics.org/news/content.aspx?id=6633).  ITT Educational Services, Inc., "Form 8-K Current Report" (April 20, 2016) (online at https://www.sec.gov/Archives/edgar/data/922475/000092247516000058/form8_k.htm). Data on ACICS accreditation of ITT Technical Institute from ACICS Member Directory Search, online at: http://personify.acics.org/SchoolDirectorySearch/tabid/204/Default.aspx. Eighty-four of the 137 ITT campuses accredited by ACICS have been accredited since 2005 or earlier.

10   Caitlin Emma, "Morning Education," *Politico* (May 12, 2016) (online at http://www.politico.com/tipsheets/morning-education/2016/05/scotus-considers-student-loan-servicer-case-career-colleges-accreditation-the-state-of-preschool-mental-health-on-the-hill-214263).

11   Inside Higher Ed, "Controversial Accreditor Freezes Membership" (June 6, 2016) (online at https://www.insidehighered.com/quicktakes/2016/06/06/controversial-accreditor-freezes-membership).

12   Molly Hensley-Clancy, "College Accreditor Hosts Training Session on Avoiding Government Lawsuits," *Buzzfeed* (May 31, 2016) (online at https://www.buzzfeed.com/mollyhensleyclancy/accreditor-hosts-training-session-on-avoiding-lawsuits?utm_term=.yf8p3rKoom#.sjoNzMy995).

13   20 U.S.C. 1099b and 34 CFR 602

14   20 U.S.C. 1099b(a)(4)

15   34 CFR 602.17(a)(1)-(3)

16   34 CFR 602.16(a)

17   34 CFR 602.16(a)(1)(i)

18   20 U.S.C.1011c(2)(B).

19   Charter, National Advisory Committee on Institutional Quality and Integrity (online at: http://www2.ed.gov/about/bdscomm/list/naciqi-dir/naciqi-charter2015.pdf).

20   Department of Education, "National Advisory Committee on Institutional Quality and Integrity" (online at: http://www2.ed.gov/about/bdscomm/list/naciqi.html#members). Patricia Cohen, "Some Owners of Private Colleges Turn a Tidy Profit by Going Non-Profit," *The New York Times* (March 2, 2015) (online at http://www.nytimes.com/2015/03/03/business/some-private-colleges-turn-a-tidy-profit-by-going-nonprofit.html?_r=0).

21   GAO, *Higher Education: Education Should Strengthen Oversight of Schools and Accreditors* (December 2014) (online at http://www.gao.gov/assets/670/667690.pdf).

22   Andrea Fuller and Douglas Belkin, "The Watchdogs of College Education Rarely Bite," *The Wall Street Journal* (June 17, 2015) (online at http://www.wsj.com/articles/the-watchdogs-of-college-education-rarely-bite-1434594602#:YbZO0oyVURG5xA).

23   Ted Mitchell, "Strengthening Accreditation to Protect Students," Department of Education Blog (March 29, 2016) (online at http://blog.ed.gov/2016/03/strengthening-accreditation-to-protect-students/).

24   Remarks by Secretary Arne Duncan at the University of Maryland-Baltimore County (UMBC) (July 27, 2015) (online at http://www.ed.gov/news/speeches/toward-new-focus-outcomes-higher-education).

25   Ted Mitchell, "Strengthening Accreditation to Protect Students," Department of Education Blog (March 29, 2016) (online at http://blog.ed.gov/2016/03/strengthening-accreditation-to-protect-students/).

26   Federal Student Aid, *Annual Report FY 2015* (November 2015) (online at https://studentaid.ed.gov/sa/sites/default/files/FY_2015_FSA_Annual_Report_official.pdf).

27   David Dayen, "'Chipping Away At My Soul': Insiders Detail The Decline And Fall Of Corinthian's For-Profit College Empire," *The Huffington Post* (June 4, 2015) (online at http://www.huffingtonpost.com/2015/06/04/corinthian-colleges-loan-forgiveness_n_7492908.html).

28   U.S. Senate Health, Education, Labor, and Pensions Committee, *For Profit Education: The Failure to Safeguard the Federal Investment and Ensure Student Success* (July 30, 2012) (online at: http://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf).

29   Michael Stratford, "Debt Relief Unveiled," *Inside Higher Ed* (June 9, 2015) (online at https://www.insidehighered.com/news/2015/06/09/us-will-erase-debt-corinthian-students-create-new-loan-forgiveness-process).

30   Michael Stratford, "Corinthian Dismantling Continues," *Inside Higher Ed* (April 15, 2015) (online at https://www.insidehighered.com/news/2015/04/15/us-fines-corinthian-colleges-30-million-and-effectively-closes-heald-chain).

31   Ben Miller, *Up to the Job? National Accreditation and College Outcomes*, Center for American Progress (September 8, 2015) (online at https://www.americanprogress.org/issues/higher-education/report/2015/09/08/119248/up-to-the-job/). Letter from Albert C. Gray, President and CEO, ACICS, to Senate HELP Committee (June 30, 2015) (online at https://assets.documentcloud.org/documents/2716327/ACICS-Letter-to-Chairman-Alexander-June-30-2015.pdf).

32   U.S. Senate Committee on Health, Education, Labor, and Pensions, "Reauthorizing the Higher Education Act: Evaluating Accreditation's Role in Ensuring Quality" (June 17, 2015) (online at http://www.help.senate.gov/hearings/reauthorizing-the-higher-education-act-evaluating-accreditations-role-in-ensuring-quality).

33   Ben Miller, *ACICS Must Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/).

34   Letter from the Attorneys General of Massachusetts, Illinois, Iowa, Kentucky, Maine, Maryland, Minnesota, New Mexico, New York, Oregon, Washington, and the District of Columbia, and the Executive Director of the Hawaii Office of Consumer Protection, to the U.S. Department of Education (April 8, 2016) (online at https://www.propublica.org/documents/item/2798763-Ag-Multistate-Ltr-to-Usdoed-040816.html).

35   U.S. Department of Justice, "Alta Colleges to Pay U.S. $7 Million to Resolve False Claims Act Allegations" (April 20, 2009) (online at https://www.justice.gov/opa/pr/alta-colleges-pay-us-7-million-resolve-false-claims-act-allegations). Andrew Mytelka, "Proprietary College to Pay $7-Million to Settle Federal Student-Aid Charges," *The Chronicle of Higher Education* (April 20, 2009) (online at http://chronicle.com/article/Proprietary-College-to-Pay-/42773/).

36   Inside Higher Ed, "Westwood College Settles with Colorado for $4.5 Million" (March 15, 2012) (online at https://www.insidehighered.com/quicktakes/2012/03/15/westwood-college-settles-colorado-45-million).

37   Illinois Attorney General, "Madigan Sues National For-Profit College" (January 18, 2012) (online at http://illinoisattorneygeneral.gov/pressroom/2012_01/20120118.html).

38   Inside Higher Ed, "For-Profit Settles with Illinois Attorney General for $15M" (November 6, 2015) (online at https://www.insidehighered.com/quicktakes/2015/11/06/profit-settles-illinois-attorney-general-15m).

39   Ben Miller, *ACICS Must Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/). CAP's analysis notes that in a few cases, ACICS "temporarily postponed its approval decision, but it awarded six new grants of accreditation to Westwood campuses in 2011 and renewed accreditation for several branches in 2014."

40   ACICS, "Honor Roll Institutions" (online at http://www.acics.org/events/content.aspx?id=4127). Ben Miller, *ACICS Must*

*Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/).

41   Letter from Albert C. Gray, President and CEO, ACICS, to Mr. Norman Blome, CFO, Westwood College (March 29, 2016) (online at http://www.westwood.edu/Westwood_Acknowledgement_of_Campus_Closures.pdf).

42   Ben Miller, *ACICS Must Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/).

43   For full references, see Letter from Ben Miller, Senior Director, Postsecondary Education, Center for American Progress, to Members of the National Advisory Committee on Institutional Quality and Integrity and the U.S. Department of Education (online at: http://www.republicreport.org/wp-content/uploads/2016/04/Center-for-American-Progress-Comments-on-ACICS-to-NACIQI.pdf). Ben Miller, *ACICS Must Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/). Some schools listed in the table are accredited by multiple accreditors.

44   Molly Hensley-Clancy, "College Accreditor Hosts Training Session on Avoiding Government Lawsuits," *Buzzfeed* (May 31, 2016) (online at https://www.buzzfeed.com/mollyhensleyclancy/accreditor-hosts-training-session-on-avoiding-lawsuits?utm_term=.yf8p3rKoom#.sjoNzMy995).

45   Kentucky Attorney General, "Attorney General Conway Announces $12.4 Million Settlement with Daymar College" (May 9, 2015) (online at: http://kentucky.gov/Pages/Activity-Stream.aspx?viewMode=ViewDetailInNewPage&eventID=%7BD5A63D9E-4E85-428B-B322-FF8606F0927B%7D&activityType=PressRelease).

46   Letter from "A concerned member of NPU constituent" to ACICS, undated. Molly Hensley-Clancy, "Making the Grades," *Buzzfeed* (May 26, 2016) (online at https://www.buzzfeed.com/mollyhensleyclancy/inside-the-school-that-abolished-the-f-and-raked-in-the-cash?utm_term=.djQ3o0bnnv#.si8vOYMxxj).

47   Molly Hensley-Clancy, "Making the Grades," *Buzzfeed* (May 26, 2016) (online at https://www.buzzfeed.com/mollyhensleyclancy/inside-the-school-that-abolished-the-f-and-raked-in-the-cash?utm_term=.djQ3o0bnnv#.si8vOYMxxj).

48   Letter from Jennifer Cody to Jennifer Hong, Executive Director, NACIQI (May 16, 2016) (online at http://blog.debtcollective.org/itt-whistleblowers-and-debt-collective-oppose-renewal-of-for-profit-accreditors-acics-and-accsc/).

49   Letter from Rick Bueche to Jennifer Hong, Executive Director, NACIQI (May 23, 2016) (online at http://blog.debtcollective.org/itt-whistleblowers-and-debt-collective-oppose-renewal-of-for-profit-accreditors-acics-and-accsc/).

50   Letter from Dawn Lueck to Jennifer Hong, Executive Director, NACIQI (May 5, 2016) (online at http://blog.debtcollective.org/itt-whistleblowers-and-debt-collective-oppose-renewal-of-for-profit-accreditors-acics-and-accsc/).

51   Letter from Jennifer Cody to Jennifer Hong, Executive Director, NACIQI (May 16, 2016) (online at http://blog.debtcollective.org/itt-whistleblowers-and-debt-collective-oppose-renewal-of-for-profit-accreditors-acics-and-accsc/).

52   Annie Waldman, "Who Keeps Billions of Taxpayer Dollars Flowing to For-Profit Colleges? These Guys," *ProPublica* (November 3, 2015) (online at https://www.propublica.org/article/accreditors-billions-of-taxpayer-dollars-flowing-to-for-profit-colleges).

53   National Center for Education Statistics, "Table 326.10: Graduation rate from first institution attended for first-time, full-time bachelor's degree-seeking students at 4-year postsecondary institutions, by race/ethnicity, time to completion, sex, control of institution, and acceptance rate: Selected cohort entry years, 1996 through 2008" (May 2016) (online at http://nces.ed.gov/programs/digest/d15/tables/dt15_326.10.asp). Graduation rate cited is for students entering in the 2008 cohort.

54   Ben Miller, *Up to the Job? National Accreditation and College Outcomes*, Center for American Progress (September 8, 2015) (online at https://www.americanprogress.org/issues/higher-education/report/2015/09/08/119248/up-to-the-job/). National borrowing rate data from the National Center for Education Statistics, "Table 331.20: Full-time, first-time degree/certificate-seeking undergraduate students enrolled in degree-granting postsecondary institutions, by participation and average amount awarded in financial aid programs, and control and level of institution: 2000-01 through 2013-14" (online at http://nces.ed.gov/programs/digest/d15/tables/dt15_331.20.asp). Data is for all institutions, 2013-2014.

55   Ben Miller, *Up to the Job? National Accreditation and College Outcomes*, Center for American Progress (September 8, 2015) (online at https://www.americanprogress.org/issues/higher-education/report/2015/09/08/119248/up-to-the-job/).

56   Annie Waldman, "Who Keeps Billions of Taxpayer Dollars Flowing to For-Profit Colleges? These Guys," *ProPublica* (November 3, 2015) (online at https://www.propublica.org/article/accreditors-billions-of-taxpayer-dollars-flowing-to-for-profit-colleges). National average figure from National Center for Education Statistics, "Student Loan Volume and Default Rates" (May 2015) (online at https://nces.ed.gov/programs/coe/indicator_cug.asp).

57   Annie Waldman, "Who Keeps Billions of Taxpayer Dollars Flowing to For-Profit Colleges? These Guys," *ProPublica* (November 3, 2015) (online at https://www.propublica.org/article/accreditors-billions-of-taxpayer-dollars-flowing-to-for-profit-colleges).

National repayment rate data for all colleges from Executive Office of the President, *Using Federal Data to Measure and Improve the Performance of U.S. Institutions of Higher Education* (September 2015) (online at https://collegescorecard.ed.gov/assets/ UsingFederalDataToMeasureAndImprovePerformance.pdf).

58  Adam Looney and Constantine Yannelis, "A Crisis in Student Loans? How Changes in the Characteristics of Borrowers and in the Institutions They Attended Contributed to Rising Student Loan Defaults," Brookings Papers on Economic Activity (Fall 2015) (online at http://www.brookings.edu/~/media/projects/bpea/fall-2015/pdflooneytextfallbpea.pdf). Jacob P.K. Gross, Osman Cekic, Dan Hossler, and Nick Hillman. 2009. "What Matters in Student Loan Default: A Review of the Research Literature." *Journal of Student Financial Aid* 39: 19-29.

59  Department of Education, "Accreditation: Universities and Higher Education," (online at http://www.ed.gov/accreditation).  Ben Miller, *ACICS Must Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/).

60  Out of the 49 times that an accreditor has come up for review after submitting a compliance report, NACIQI has approved the report through a "consent agenda" vote – meaning that accreditors are considered as a group and not discussed during the committee meeting – on 38 occasions (78%).

61  Analysis of data compiled from NACIQI meeting reports available online at: http://www2.ed.gov/about/bdscomm/list/naciqi. html#meetings. Accreditation agencies submit applications for renewal every five years (or four years for state agencies). This analysis does not examine how NACIQI treated agency requests for expansions of the scope of their accreditation authority. Thirteen of the 77 renewal petitions in this dataset involve an accreditor filing their second request during the period covered by this data.

62  NACIQI's Fall 2015 recommendation related to the Association of Institutions of Jewish Studies was an initial grant of recognition rather than a renewal, but is included in this count

63  Spring 2012 NACIQI meeting. See also pp. 87-88 in the full transcript of NACIQI's Spring 2014 meeting (online at http://www2. ed.gov/about/bdscomm/list/naciqi-dir/2014-spring/naciqi-transcript-06-18-14.pdf). In Spring 2014, the accreditor was granted a six month extension for good cause, required to come into compliance and appear at a NACIQI meeting. However, in Fall 2015, the accreditor's application was deferred to next meeting because of a technical glitch that prevented the accreditor from getting draft report in time to respond. As a result, the renewal request from the Puerto Rico State Agency for the Approval of Public Postsecondary Vocational Technical Institutions and Programs – which NACIQI recommended denying – is still pending.

64  In 42 of the 59 instances when a compliance report was required (71% of all petitions involving compliance issues), NACIQI reviewed the report and then took no further action, recommended renewal covering the remaining term of an agency's recognition. In 6 of these 59 instances, accreditors were given additional six-month extensions for good cause while they continued to come into compliance with outstanding issues. Four out these six cases have already resulted in a renewal of an agency's recognition for the remainder of its term, and two extensions are still pending. Two out of the 59 instances resulted in NACIQI recommending that the accreditor submit an additional report or appear before the advisory committee to report on certain issues.  The Commission on Massage Therapy Accreditation's petition for renewal was considered at the Fall 2010 meeting and NACIQ recommended compliance actions. When the agency's report was considered at the Fall 2012 meeting, NACIQI recommended renewing their recognition for the remaining three years of their term but also asked the agency to submit a follow-up report in six months. At its Spring 2013 meeting, NACIQI also recommended compliance actions for the North Central Association of Colleges and Schools' Higher Learning Commission. When the agency appeared before NACIQI again in Spring 2015, the committee renewed its recognition for 2.5 years but asked the agency to appear again to discuss retention, persistence, and completion rates.

65  In five of these cases, accreditors were only recently required to address compliance issues and have not yet submitted a compliance report for NACIQI's consideration. In one other case, concerning the American Association for Marriage and Family Therapy's Commission on Accreditation for Marriage and Family Therapy Education, the accreditor appeared before NACIQI in Fall 2011, was given twelve months to come into compliance with issues identified by ED staff, but then became an inactive accrediting agency without submitting a compliance report. Department of Education, "Accreditation > Agency List" (online at http://ope.ed.gov/accreditation/agencies/aspx). Finally, the American Veterinary Medical Association's Council on Education is currently on a 12-month extension for new issues identified during a review after the accreditor had already been given a year-long compliance period and an additional six-month extension for good cause.

66  NACIQI recommended preventing the North Central Association's Commission on Accreditation and School Improvement (NCA-CASI) (Fall 2011), the Middle States Commission on Secondary Schools (Spring 2012), and the Commission on Accreditation of Healthcare Management Education (Spring 2013) from accrediting new institutions while they responded to compliance issues. At its Spring 2014 meeting, NACIQI then recommended renewing recognition for the Middle States Commission on Secondary Schools for the remainder of its term. The Commission on Accreditation of Healthcare Management Education has now become an inactive accreditor. In January 2013, NCA-CASI informed the Department of Education that it was no longer seeking a renewal of recognition, and NCA-CASI is no longer an active accrediting agency. At its Fall 2013 meeting, NACIQI recommended that the

Western Association of Schools and Colleges, Accrediting Commission for Community and Junior Colleges, be given 12 months to come into compliance with issues identified in the Department's staff report. At the Fall 2015 meeting, NACIQI then recommended granting a continuance of the agency's recognition for an additional six months while it prepared another compliance report, but also recommended limiting the agency's current recognition to prevent it from accrediting any baccalaureate-level programs during the continuance period.

67   U.S. Department of Education, *Staff Report to the Senior Department Official on Recognition Compliance Issues: Accrediting Council for Independent Colleges and Schools* (June 2011) (online at http://www2.ed.gov/about/bdscomm/list/naciqi-dir/2011-spring/staff-analyses-6-2011.pdf). Department staff also identified one other issue related to ACICS' request to expand its scope of recognition to include accreditation of doctoral programs. ACICS later informed the Department that it was no longer requesting an expansion of scope.

68   Letter from Brenda Dann-Messier, Department of Education, to Albert C. Gray, Executive Director and CEO, ACICS (July 23, 2013) (online at https://opeweb.ed.gov/aslweb/finalstaffreports.cfm).

69   Ben Miller, *ACICS Must Go*, Center for American Progress (June 2016) (online at: https://www.americanprogress.org/issues/higher-education/report/2016/06/06/138826/acics-must-go/).

70   U.S. Senate Committee on Health, Education, Labor, and Pensions, "Reauthorizing the Higher Education Act: Evaluating Accreditation's Role in Ensuring Quality" (June 17, 2015) (online at http://www.help.senate.gov/hearings/reauthorizing-the-higher-education-act-evaluating-accreditations-role-in-ensuring-quality).  Letter from Albert C. Gray, President and CEO, ACICS, to Ben Miller, Senior Director, Postsecondary Education, Center for American Progress (October 16, 2015) (online at http://acics.org/WorkArea/linkit.aspx?LinkIdentifier=id&ItemID=6543&libID=6528).