# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ACCREDITING COUNCIL FOR INDEPENDENT COLLEGES AND SCHOOLS,<br>　　　　　Plaintiff,<br>　　　v.<br><br>BETSY DEVOS,[1] in her official capacity as Secretary of the United States Department of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>　　　　　Defendants. | Civil Action No. 16-2448  (RBW) |

## MEMORANDUM OPINION

The plaintiff, the Accrediting Council for Independent Colleges and Schools (the "Accrediting Council"),[2] brings this civil action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2012), challenging the decision of the Secretary of the United States Department of Education (the "Department") to revoke the Accrediting Council's recognition as an "accrediting agency" for certain institutions of higher education.  See Complaint ("Compl.") ¶¶ 1, 6, 37–42.  Currently before the Court are the parties' cross-motions for summary judgment.  See generally Plaintiff's Motion for Summary Judgment ("Pl.'s Mot."); Defendants' Cross[-]Motion for Summary Judgment ("Defs.' Cross-Mot.").  Upon careful

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary Betsy DeVos has been automatically substituted for her predecessor, former Secretary John B. King.  Although former Secretary King issued the decision that is the subject of this case, because he is no longer a party to this case, the Court's references to the Secretary of the United States Department of Education will refer to Secretary DeVos.

[2] The Court has substituted more descriptive terms for some of the acronyms used by the parties, due to complaints several appellate judges have expressed about the use of acronyms that are not readily recognized, as opposed to readily recognized acronyms like the "FBI."

consideration of the parties' submissions,[3] the Court will grant in part and deny in part the

Accrediting Council's motion, deny the defendants' motion, and remand this case for further

proceedings consistent with this memorandum opinion.

## I.    BACKGROUND

### A.    Statutory and Regulatory Framework

Title IV of the Higher Education Act of 1965 ("HEA") "provides billions of dollars

[every year] through loan and grant programs to help students pay tuition for their postsecondary

education." Ass'n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 433 (D.C. Cir.

2012); see also 20 U.S.C. § 1070 (2012) (stating that the purpose of the Act is to "assist in

making available the benefits of postsecondary education to eligible students . . . in institutions

of higher education by" "providing Federal Pell Grants . . . [,] supplemental educational

opportunity grants . . . [, and] payments to the States to assist them in making financial aid

available"). To participate in these programs, an institution of higher education must have

certain qualifications, including the requirement that it must be accredited by a nationally

recognized accrediting agency or association. See 20 U.S.C. § 1002(a) (incorporating 20 U.S.C.

§ 1001(a)(5)); see also id. § 1099c.

The Secretary of the Department (the "Secretary") determines which accrediting agencies

are nationally recognized for the purposes of the HEA. See id. § 1099b; see also 34 C.F.R.

---

[3] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Plaintiff's Memorandum of Points and Authorities in Support of Motion for Summary Judgment ("Pl.'s Mem."); (2) the Memorandum of Points and Authorities in Support of Defendants' Cross[-]Motion for Summary Judgment, and in Opposition to Plaintiff's Motion for Summary Judgment ("Defs.' Mem."); (3) the Plaintiff's Memorandum of Points and Authorities in Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Further Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Opp'n"); (4) the Reply in Support of Defendants' Cross[-]Motion for Summary Judgment ("Defs.' Reply"); (5) the Accrediting Council's Notice of Supplemental Authority; (6) the Plaintiff's Motion to Supplement the Record ("Pl.'s Mot. to Supp."); (7) the Defendants' Opposition to Plaintiff's Motion to Supplement the Administrative Record ("Defs.' Supp. Opp'n"); and (8) the Plaintiff's Reply in Further Support of Plaintiff's Motion to Supplement the Administrative Record.

§ 602.1 (2016).  To be recognized, an accrediting agency must satisfy certain criteria designated by the HEA and the Secretary's implementing regulations.  See 20 U.S.C. § 1099b(a); see also 34 C.F.R. pt. 602, subpt. B.  Those criteria require an accrediting agency to demonstrate, inter alia, that it: (1) has "standards for accreditation" that effectively address areas such as "student achievement," "[r]ecruiting and admissions practices," and compliance with its responsibilities under Title IV, see 34 C.F.R. § 602.16(a)(1)(i), (vii), (x); (2) has "effective mechanisms for evaluating an institution's . . . compliance with the [accreditation] standards," id. § 602.17; (3) has "a set of monitoring and evaluation approaches that enables the [accrediting] agency to identify problems with an institution's . . . continued compliance with [accreditation] standards," id. § 602.19(b); (4) enforces the accreditation standards against institutions that are not in compliance with them, see id. § 602.20(a); and (5) "maintain[s] a systematic program of review that demonstrates that its standards are adequate to evaluate the quality of the education . . . provided by the institutions," id. § 602.21(a).  The statute provides that in order to determine whether an accrediting agency is in compliance with these criteria, the Secretary "shall conduct a comprehensive review and evaluation of the [agency's] performance," as well as "an independent evaluation of the information provided by [the] agency."  20 U.S.C. § 1099b(n)(1).  Additionally, the statute requires the Secretary to "consider all available relevant information concerning the compliance of the accrediting agency . . . with the criteria."  Id. § 1099b(n)(3).

Pursuant to the HEA, the Secretary has promulgated regulations establishing procedures for the review of an accrediting agency's application for recognition.  See 20 U.S.C. § 1099b(o) (providing that "[t]he Secretary shall by regulation provide procedures for the recognition of accrediting agencies").  First, the staff of the Department's Office of Postsecondary Education (the "Department staff") "analyzes the [accrediting] agency's application . . . to determine

whether the agency satisfies the criteria for recognition, taking into account all available relevant information concerning the compliance of the agency with those criteria and in the agency's effectiveness in applying the criteria." 34 C.F.R. § 602.32(b). The Department staff's analysis includes, inter alia, "[r]eview of [ ] public comments and other third-party information the Department staff receives . . . , [ ] the agency's responses to third-party comments, . . . as well as any other information [the] Department staff assembles for purposes of evaluating the agency." Id. § 602.32(b)(2). Once it completes its evaluation, the Department staff prepares and sends to the accrediting agency "a written draft analysis" that "includ[es] any identified areas of non-compliance and a proposed recognition recommendation" and that "[i]nvites the agency to provide a written response . . . , specifying a deadline that provides at least [thirty] days for the agency's response." Id. § 602.32(f)(1)–(3). Upon receipt of the accrediting agency's response, the Department staff reviews the response and "prepares [a final] written [ ] analysis," which "includes a recognition recommendation to the senior Department official, . . . including . . . a recommendation to approve, deny, limit, suspend, or terminate recognition, [or] require the submission of a compliance report and continue recognition pending a final decision on compliance." Id. § 602.32(f)(4). The Department staff must "[p]rovide [its final written analysis] to the agency[] no later than seven days before the [National] Advisory Committee [on Institutional Quality and Integrity (the "Advisory Committee")] meeting," which is the next step in the process. Id. § 602.32(f)(5).

The Department staff then submits its final written analysis and certain other relevant materials to the Advisory Committee for its review. See id. § 602.34(c).[4] Thereafter, the

---

[4] The Advisory Committee is comprised of eighteen members, six of whom are appointed by the Secretary, six appointed by the Speaker of the United States House of Representatives, and six appointed by the President pro tempore of the United States Senate. See 20 U.S.C. § 1011c(b).

Advisory Committee holds a public meeting to "consider[] the materials provided . . . and invites [the] Department staff, the [accrediting] agency, and other interested parties to make oral presentations during the meeting." Id. § 602.34(e).  At the meeting, the Advisory Committee adopts "a written motion . . . regarding the agency's recognition," id. § 602.34(f), which it then "forwards to the senior Department official" in the form of "a recommendation to[, inter alia,] approve, deny, limit, suspend, or terminate recognition, . . . or to require the agency to submit a compliance report and to continue recognition pending a final decision on compliance," id. § 602.34(g).  "Within ten days following the Advisory Committee meeting, the [accrediting] agency and [the] Department staff may submit written comments to the senior Department official," id. § 602.35(a); however, neither party "may submit additional documentary evidence . . . unless the Advisory Committee[] . . . proposes finding the agency noncompliant with . . . a criterion . . . not identified in the [ ] Department staff['s final] written analysis," id. § 602.35(c)(1).

"The senior Department official [then] makes a decision" on the accrediting agency's application for recognition "based on the record compiled" in the prior proceedings, including all materials submitted to the Advisory Committee, the Advisory Committee meeting transcript, the Advisory Committee's recommendation, and any written comments from the accrediting agency or the Department staff in response to the Advisory Committee's recommendation.  See id. § 602.36(a).  "[I]f the agency either fails to comply with the criteria for recognition, . . . or to apply those criteria effectively, the senior Department official denies, limits, suspends, or terminates recognition" and "specifies the reasons for this decision, including all criteria the agency fails to meet and all criteria the agency has failed to apply effectively." Id. § 602.36(e)(2)(i)–(ii).  However, "if . . . the senior Department official concludes that the agency

will demonstrate or achieve compliance with the criteria . . . and effective application of those criteria within [twelve] months or less, the senior Department official may continue the agency's recognition, pending submission by the agency of a compliance report [and] review of the report." Id. § 602.36(e)(3)(i). The senior Department official must notify the agency of his or her decision in writing "regarding the agency's recognition within [ninety] days of the Advisory Committee meeting." Id. § 602.36(d).

"[An accrediting] agency may appeal the senior Department official's decision to the Secretary." Id. § 602.37(a). On appeal, the Secretary considers the senior Department official's decision, the accrediting agency's and the senior Department official's written submissions on appeal, and the entire record that was before the senior Department official. Id. § 602.37(d). If the Secretary determines that the agency has failed to demonstrate compliance with or effective application of any of the recognition criteria, the Secretary is authorized to take any of the actions available to the senior Department official, see id. (recognizing that "the Secretary makes a recognition decision, as described in § 602.36(e)"), including "den[ying], limit[ing], suspend[ing], or terminat[ing] recognition" or "continu[ing] the agency's recognition, pending submission by the agency of a compliance report [and] review of the report," id. § 602.36(e). If the Secretary ultimately decides to deny, limit, suspend, or terminate an agency's recognition, "[a]n agency may contest the Secretary's decision . . . in the Federal courts as a final decision in accordance with applicable Federal law." Id. § 602.38.

## B.      Factual and Procedural History

The Accrediting Council is a nonprofit organization that was, until recently, recognized by the Department as an accrediting agency for certain institutions of higher education. See Pl.'s Mem. at 1; see also AR 3 ("[The Accrediting Council] is a previously-recognized national accrediting agency[.]"). On January 8, 2016, the Accrediting Council submitted its Petition for

Continued Recognition, which was comprised of a narrative submission and approximately one hundred exhibits. See Pl.'s Mem. at 1; see also AR 9,677–752 (petition); AR 932–7,089 (exhibits). Thereafter, the Department informed the Accrediting Council that its petition would be considered at the Advisory Committee meeting scheduled for June 23, 2016. See Pl.'s Mem., Exhibit ("Ex.") A (Declaration of Anthony S. Bieda ("Bieda Decl.") (Mar. 30, 2017)) ¶ 7.

On March 3, 2016, Herman Bounds, the Director of the Accreditation Group for the Department's Office of Post Secondary Education, emailed Albert Gray, the Accrediting Council's then-President and Chief Executive Officer, informing him "that the Office of the Under Secretary [ ] ha[d] developed a set of question[s] [it] want[ed] to ask [the Accrediting Council] during the recognition process." AR 437. He explained that the questions, which he attached to the email, see AR 438–42, were "tied . . . to relevant recognition criteria," and that the Accrediting Council's petition would be "return[ed] . . . so [that the Accrediting Council] c[ould] respond to the[] questions[] in [its] petition," AR 437. He further informed Gray that the Accrediting Council would be "allow[ed] [ ] up to [thirty] days to respond." Id.

The Under Secretary's questions were divided into two parts: "Overall Questions" ("Part I") and "Questions related to specific standards in [the Accrediting Council's] Jan[uary] 2016 submission" ("Part II"). See AR 438–42. Part I contained questions regarding "[Accrediting Council]-accredited institutions [that] have been the subject of major investigations and lawsuits from multiple federal agencies and state attorneys general," including Corinthian schools, ITT Technical Institute, and the Michigan Jewish Institute. AR 438. Part II requested "further information, and [d]ocumentation as appropriate, on . . . questions related to [the Accrediting Council's] January 2016 submission to the Department." AR 439. Each of the Part II questions sought information related to the Accrediting Council's performance as to particular recognition

criteria, specifically, 34 C.F.R. §§ 602.13, .15–.17, .19–.21, .24, .27–.28, and many of the questions referenced the "problem schools" identified in Part I.  See AR 439–42.

On March 10, 2016, Gray responded to Bounds's email and requested a 45-day extension for the Accrediting Council to submit its response to the Under Secretary's questions, noting that the questions were "substantial" and would require it to "supplement or replace more than [thirty] narrative sections and more than [one hundred] exhibits in [its] petition that was submitted . . . in early January."  AR 435.  On March 15, 2016, Bounds responded to Gray's request, informing him that the Department would deny an extension as to Part I, but would grant an extension as to Part II, which would therefore be due on May 16, 2016.  See AR 434.  The Department further explained that "given that information received as late as May 16, 2016, would not allow [the] Department staff the time to fully review and analyze [that information] in time for the June [Advisory Committee] meeting, [the Accrediting Council] should be prepared to return at the fall [Advisory Committee] meeting for further discussion and possible action as warranted."  AR 434.  Additionally, the Department emphasized that "the information [it] requested is important to the Department's responsibility to monitor and review [the Accrediting Council]'s effectiveness as a recognized accrediting agency."  Id.  The Accrediting Council timely submitted its response to Part I on April 1, 2016.  See AR 10,152–165; see also Pl.'s Mem., Ex. A (Bieda Decl.) ¶ 12.

On May 4, 2016, the Department staff provided the Accrediting Council with a draft analysis and report, in which it found the Accrediting Council noncompliant with multiple recognition criteria and recommended that its petition be denied.  See AR 9,753–894.  The

Department staff instructed the Accrediting Council to respond to the draft report by June 3, 2016.  See id.

On May 16, 2016, the Accrediting Council uploaded its Part II response to the Department's system, but did not technically "submit" the response due to questions it had about the proper method for submission, specifically, its desire "to be sure . . . that [the Accrediting Council would] have the opportunity to submit more information . . . as [pa]rt of [its] response to" the Department staff report.  AR 431.  On May 18, 2016, Steve Porcelli, a member of the Department staff, see Pl.'s Mem. at 25, instructed Anthony Bieda, the then-Executive in Charge at the Accrediting Council, that "[u]nless [he] hear[d] otherwise from [the Department] within the next two hours," he should "hit the submit button," AR 431.  Approximately one hour later, Bounds emailed Bieda, instructing him to "not include the supplemental information in the petition at all," noting that the Accrediting Council could "submit[] [it] to [the Department] on a flash drive."  AR 430.  As the explanation for this decision, Bounds stated that "the Department do[es] not want to mix the responses.  [It] will review the supplemental information . . . separately outside of the recognition process."  Id.  On May 19, 2016, pursuant to Bounds's instructions, the Accrediting Council delivered to the Department a thumb drive containing its Part II response.  See Pl.'s Mem., Ex. A (Bieda Decl.) ¶ 18; see also Defs.' Supp. Opp'n, Ex. 1 (Declaration of Herman Bounds, Jr. ("Bounds Decl.") (Apr. 13, 2017)) ¶ 11.  According to the Accrediting Council, its Part II response contained:

- A 27-page single-spaced narrative responding to each of the Department's questions regarding specific recognition criteria . . . ; and

- Approximately 36,000 pages of documents relating to:

    o [Its] adverse actions taken against dozens of campuses of schools that [it] has accredited;

o Accreditation application materials submitted to [it] by specific institutions identified by the Department, and [its] evaluations of those institutions' applications (including site visit reports); and

o Voluminous email correspondence between [it] and specific institutions identified by the Department.

Pl.'s Mem. at 10.

On June 3, 2016, the Accrediting Council requested an extension of time to file its response to the Department staff's draft analysis and report. See AR 429; see also Defs.' Supp. Opp'n, Ex. 1 (Bounds Decl.), Attachment A. Bounds denied the request in a letter the same day, explaining that "[t]he draft analysis include[d] numerous findings of non-compliance," and, consequently, a "[d]eferral would violate the[] [HEA's] requirements," and in any event, Bounds had "no authority to grant one." AR 429. Bounds additionally explained that "[the Accrediting Council] w[ould] not be compelled to respond at the June[] 2016 [Advisory Committee] meeting to any analysis by the staff of its [Part II] submission," noting that "[t]he delayed submission of th[at] material, and the additional deferral of consideration of it, was an accommodation provided to [the Accrediting Council], and does not postpone the need for [the Accrediting Council] to establish its compliance for purposes of renewal." Id. In other words, the Department staff would not consider the Accrediting Council's petition or the Part II submission at the fall Advisory Committee meeting as it originally suggested. See Pl.'s Mem. at 11 (citing AR 429).

On June 3, 2016, the Accrediting Council timely filed its response to the Department staff's draft analysis and report. See Defs.' Supp. Opp'n, Ex. 1 (Bounds Decl.) ¶ 13; see also Pl.'s Mem., Ex. A (Bieda Decl.) ¶ 20; AR 7,100–9,424. As part of its response, the Accrediting Council detailed various actions it had taken to address compliance issues identified by the Department staff in its draft analysis and report. For example, in response to the Department

staff's finding that the Accrediting Council did not comply with 34 C.F.R. § 602.16(a)(1)(v) because its "fiscal and administrative standards ha[d] failed to identify institutions that were unable to run their programs efficiently," AR 9,873, the Accrediting Council represented that, effective May 1, 2016, it had established an "'At-Risk Institution' committee to review all actions facing an institution, as well as information that calls into question its general operations," AR 829–30, including information related to the institutions' "financial stability[,] [ ] student achievement performance[, and] [ ] adverse information," see AR 830; see also AR 8,430. The Accrediting Council further represented that pursuant to this new system, it had already "conducted three special visits" and "ha[d] authorized four additional special visits in June 2016." AR 830.

On June 15, 2016, the Department staff issued its final report. See AR 763–92; see also Pl.'s Mem. at 12. The report found the Accrediting Council to be noncompliant with at least twenty-one recognition criteria. See AR 763–65. As support for a number of its findings of noncompliance, the Department staff cited various government investigations and lawsuits demonstrating "widespread placement rate fraud" and other misconduct by Accrediting Council-accredited institutions nationwide. See AR 775 (citing the Department's and the California Attorney General's findings of placement rate fraud by numerous Corinthian Colleges campuses); see also AR 774 (citing "investigations from [twenty] different [Attorneys General] regarding, e.g., placement [and] other rates," against ITT Technical Institute campuses); AR 779 (citing the Department's findings of Title IV fraud by the Michigan Jewish Institute). The Department staff concluded that, in a number of instances, the Accrediting Council was aware of misconduct by institutions it had accredited, but failed to appropriately address the misconduct or report it to the Department. See AR 774 ("[The Accrediting Council] had irrefutable evidence of

[falsified or low placement rates], . . . [yet, it] left the institution's accreditation in place or re-accredited it anyway[.]"); see also AR 779 (despite being notified by the Department of concerns regarding Title IV fraud by the Michigan Jewish Institute and subsequently discovering "numerous findings of noncompliance," the Accrediting Council "renewed the institution's accreditation 'with admonishment'" and failed to report its findings of noncompliance to the Department). In the Department staff's view, these failures demonstrated that the Accrediting Council had failed to effectively apply its standards regarding student achievement, recruiting, and Title IV compliance, as well as failed to effectively enforce and monitor institutions' compliance with those standards. See AR 783 (concluding that "the large number of substantial settlements agreed to by [Accrediting Council]-accredited institutions in qui tam actions and actions by State attorneys general indicate that [the Accrediting Council]'s . . . monitoring regime appears insufficient to deter widespread misconduct regarding placement, recruiting[,] and admissions"); see also AR 786 (citing the Accrediting Council's failure "to provide [ ] documentation to demonstrate that it initiated [the required enforcement actions against] an institution found to be out-of-compliance with any standard," including ITT Technical Institute and other institutions subject to state and federal investigations). Consequently, the Department staff recommended that the Department "[d]eny the [Accrediting Council]'s petition for renewal of recognition, and withdraw the [Accrediting Council]'s recognition[,] . . . which would mean [the Accrediting Council] could not remedy its compliance issues." AR 763.

On June 23, 2016, the Advisory Committee reviewed the Accrediting Council's petition at its biannual meeting. See AR 470–762 (transcript of proceedings). The Advisory Committee heard presentations from representatives of the Accrediting Council, the Department staff, and various interested third parties, including the Maryland Assistant Attorney General, who testified

regarding state investigations into schools accredited by the Accrediting Council, including ITT Technical Institute.  See AR 616–27.  At the conclusion of the hearing, the Advisory Committee voted ten to three to revoke the Accrediting Council's recognition.  See AR 761; see also AR 747 (introducing the motion to revoke the Accrediting Council's recognition).

Following the Advisory Committee meeting, in July 2016, the Department staff and the Accrediting Council submitted comments to the senior Department official for her consideration. See AR 361–429.  In its comments, the Accrediting Council argued that it "c[ould] demonstrate compliance with all accrediting agency criteria, and provide evidence of effective application of those criteria, by April 2017, well within the [twelve]-month period the [senior Department official] is permitted to allow [the Accrediting Council] to come into compliance."  AR 398–99. Specifically, it represented that "more than half ([eleven]) of the [twenty-one] problems identified in the [Department s]taff [r]eport were remedied [on] July 1, 2016[,] . . . or will be remedied by . . . August 2016," and that as to the "remaining [ten] findings," the Accrediting Council "[wa]s acting . . . to establish new policies and procedures[,] . . . with evidence of implementation to be established no later than . . . April 2017."  AR 397–98.

On September 22, 2016, the senior Department official issued her decision, in which she found that the Accrediting Council was noncompliant with the same twenty-one recognition criteria identified by the Department staff in its final report.  See AR 314–15.  She ultimately "agree[d] with [the] Department Staff and [the Advisory Committee] that [the Accrediting Council] could not come into full compliance within [twelve] months," reasoning that the Accrediting Council's violations "reveal[ed] fundamental problems with [its] functions as an accreditor," and that its "track record d[id] not inspire confidence that it c[ould] address all of the problems effectively."  AR 315.  She further reasoned that "most of the remedial efforts

currently underway began in earnest just several months ago, despite having reason to take action long before that," id., and, in any event, "demonstrating compliance . . . requires more than just new policies that address the issues identified by [the] Department staff," AR 316. Rather, "it requires evidence of effective application and implementation of those new policies . . . , which the [Accrediting Council] simply c[ould ]not provide for all of the[] criteria within [twelve] months." Id. Based on these findings, the senior Department official "concur[red] with the recommendations of [the] Department staff and [the Advisory Committee, and a]ccordingly, . . . terminat[ed] the Department's recognition of [the Accrediting Council] as a nationally recognized accrediting agency." AR 314. On October 4, 2016, the Accrediting Council filed a request for reconsideration of the senior Department official's decision, see AR 236–313, which the senior Department official denied, see AR 231–32.

On September 23, 2016, the Accrediting Council appealed the senior Department official's decision to the Secretary. See AR 228–30. In its briefings before the Secretary, the Accrediting Council represented that it "continue[d] to take aggressive action to implement recent changes to its accrediting standards and review procedures, . . . [and t]hese ongoing efforts evidence[d] that [it would] be able to demonstrate full compliance within twelve months, particularly in the areas that appear[ed] to be of concern to the [senior Department official]." AR 121. As evidence of these efforts, the Accrediting Council cited the following actions taken after the Advisory Committee meeting: (1) "significant leadership changes," including the fact that as of August 1, 2016, "the President, and five Vice Presidents, [we]re no longer employed by [the Accrediting Council,] [t]he Board doubled the number of public members . . . [, and] [t]he Board also appointed Roger J. Williams – a [twenty-five]-year veteran of management of higher education accreditation – as the new Interim Chief Executive Officer and President," AR 120–

21; and (2) various adverse actions and other enforcement measures, including that it took adverse action against DuBois Business College on August 1, 2016, and that in or after August 2016, it conducted "nine unannounced on-site visits to assess the level of compliance across a broad spectrum of ITT's campuses," AR 122.[5]

On December 12, 2016, the Secretary issued her final decision. See AR 14. Although not addressing all of the recognition criteria as to which the Department staff had found the Accrediting Council noncompliant, the Secretary found the Accrediting Council to be noncompliant with at least five separate recognition criteria relating to the Accrediting Council's standards, application of its standards, monitoring, enforcement, and review of its standards. See AR 6–8 (citing 34 C.F.R. §§ 602.16(a), .17, .19(b), .20–.21). The Secretary additionally determined that

> [i]n the context of the[] examples of [the Accrediting Council's] failures and others, the profound problems with [the Accrediting Council's] accreditation scheme . . . , and the lack of progress in addressing those problems in crucial areas, I cannot conclude that [the Accrediting Council] would be able to both revise (or, in some instances, enact) policies and demonstrate its effective implementation of those policies within [twelve] months as required to come into compliance.
>
> . . . Both [the Accrediting Council's] insufficient progress in addressing its areas of noncompliance and [its] past track record weigh against granting a renewal of recognition for [twelve] months. Rather, I find that [the Accrediting Council's] petition for renewal should be denied and that the Department should withdraw its recognition.

AR 10.

On December 15, 2016, the Accrediting Council initiated this action seeking judicial review of the Secretary's decision and simultaneously seeking immediate injunctive relief from that decision. See generally Compl.; see also Plaintiff's Motion for Temporary Restraining

---

[5] The Accrediting Council also presented this information to the senior Department official in its motion for reconsideration of the senior Department official's decision. See AR 239–43.

Order and Preliminary Injunction (Dec. 15, 2016).  On December 21, 2016, following a hearing, the Court denied the Accrediting Council's request for immediate injunctive relief.  <u>See</u> Order at 1 (Dec. 21, 2016).  Thereafter, on February 22, 2017, following a second hearing, the Court denied the Accrediting Council's motion for a preliminary injunction.  <u>See</u> Order at 1 (Feb. 22, 2017).  This opinion resolves the parties' cross-motions for summary judgment.

## II.    STANDARD OF REVIEW

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.  <u>See, e.g.</u>, <u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>, 401 U.S. 402, 415–16 (1971).  But, due to the limited role a district court plays in reviewing the administrative record, the typical summary judgment standards set forth in Federal Rule of Civil Procedure 56 are not applicable.  <u>Stuttering Found. of Am. v. Springer</u>, 498 F. Supp. 2d 203, 207 (D.D.C. 2007), <u>aff'd</u>, 408 F. App'x 383 (D.C. Cir. 2010). Rather, "[u]nder the APA, it is the role of the agency to resolve factual issues to arrive at a decision that is supported by the administrative record, whereas 'the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'"  <u>Id.</u> (quoting <u>Occidental Eng'g Co. v. INS</u>, 753 F.2d 766, 769–70 (9th Cir. 1985)).  In other words, "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal," and "[t]he 'entire case' on review is a question of law."  <u>Am. Bioscience, Inc. v. Thompson</u>, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (footnote and citations omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). However, "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Nonetheless, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" Id. (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)). "Courts 'will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Pub. Citizen, Inc. v. Fed. Aviation Admin., 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc., 419 U.S. 281, 286 (1974)).

## III.    ANALYSIS

### A.    Reviewability

The defendants assert that the Secretary's decision should be understood as two decisions, and contend that only one of these decisions is reviewable by this Court. According to the defendants, the first decision is the Secretary's determination that the Accrediting Council failed to comply with multiple recognition criteria. See Defs.' Mem. at 1, 3. Although the defendants concede that this decision is subject to judicial review, see id. at 16, they argue that the Accrediting Council does not challenge this decision in this Court, see id. at 1, and in any event, "[g]iven the extensive and undisputed record evidence of [the Accrediting Council]'s pervasive noncompliance[,] including [its] numerous admissions of non-compliance" in the

administrative proceedings, the Accrediting Council "cannot sustain an argument challenging [that decision]," Defs.' Reply at 1. The defendants contend that the second decision is the Secretary's "choice of remedy," i.e., "the decision of whether to deny [federal recognition] or conditionally (and temporarily) extend [it]." Defs.' Mem. at 1–2. According to the defendants, this is the decision that the Accrediting Council is challenging, see Defs.' Reply at 1, but the defendants argue that because this "is a decision that Congress committed by law to the discretion of the Secretary," Defs.' Mem. at 2 (citing 20 U.S.C. § 1099b(a)), it is unreviewable under the APA, id. (citing 5 U.S.C. § 701(a)(2)). Although the Accrediting Council does appear to concede that it does not challenge the Secretary's determination of its noncompliance, it nonetheless argues that "under the Department's own regulations[,] a Secretary's ultimate decision to deny, limit, suspend, or terminate an agency's recognition can be reviewed," Pl.'s Opp'n at 1 (internal quotation marks omitted), and that ultimate decision "necessarily includes the Secretary's 'choice of remedy,'" id. at 2. It further argues that "although the [Secretary] is afforded discretion in discharging [her] recognition responsibilities, that discretion is not unlimited," and "[a] federal agency's decision can be shielded from review only under narrow circumstances, none of which are present[ed] here." Id. at 3.

"[T]he APA explicitly excludes from judicial review those agency actions that are 'committed to agency discretion by law.'" Sierra Club v. Jackson, 648 F.3d 848, 855 (D.C. Cir. 2011) (quoting 5 U.S.C. § 701(a)). However, there is a "strong presumption that Congress intends agency action to be reviewable," which may only be overcome by "clear and convincing evidence of a contrary legislative intent." Amador Cty. v. Salazar, 640 F.3d 373, 380 (D.C. Cir. 2011) (quoting Bowen v. Mich. Academy of Family Physicians, 476 U.S. 667, 671–72 (1986)). "Accordingly, the APA's exception to judicial review is a 'very narrow exception,' reserved for

'those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply,'" <u>Capital Area Immigrants' Rights Coalition v. U.S. Dep't of Justice</u>, 264 F. Supp. 2d 14, 22 (D.D.C. 2003) (quoting <u>Citizens to Preserve Overton Park</u>, 401 U.S. at 410), or when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion," <u>Heckler v. Chaney</u>, 470 U.S. 821, 830 (1985). Nonetheless, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" <u>Heckler</u>, 470 U.S. at 830. "To determine whether a matter has been committed to agency discretion, [courts] 'consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action,'" <u>Sierra Club</u>, 648 F.3d at 855 (citation omitted), as well as "Congress's intent to commit the matter fully to agency discretion as evidenced by, among other things, the statutory scheme," <u>Watervale Marine Co. v. U.S. Dep't of Homeland Sec.</u>, 55 F. Supp. 3d 124, 138 (D.D.C. 2014) (citing <u>Dickson v. Sec'y of Def.</u>, 68 F.3d 1396, 1404 (D.C. Cir. 1995)).

In assessing reviewability, courts in this Circuit must first address the nature of the administrative action, which refers to whether an action falls into certain "categories of administrative decisions" that the Supreme Court and this Circuit have held are unreviewable. <u>See</u> <u>Sec'y of Labor v. Twentymile Coal Co.</u>, 456 F.3d 151, 156 (D.C. Cir. 2006). "Categories of actions committed to agency discretion include: (1) agency decisions to institute enforcement proceedings; (2) an agency's refusal to grant reconsideration of an action; (3) a decision by the CIA to terminate an employee in the interests of national security; and (4) an agency's allocation of funds from a lump-sum appropriation." <u>Capital Area Immigrants' Rights Coalition</u>, 264 F. Supp. 2d at 22 (citing <u>Lincoln v. Vigil</u>, 508 U.S. 182, 191 (1993)). Additionally, "it is

established in this [C]ircuit that 'executive branch decision[s] involving complicated foreign policy matters,'" or "sensitive matters of national security, are nonjusticiable by nature." Watervale Marine Co., 55 F. Supp. 3d at 138 (internal citations omitted) (second alteration in original) (first quoting Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, 104 F.3d 1349, 1353 (D.C. Cir. 1997), then citing Oryszak v. Sullivan, 576 F.3d 522, 526 (D.C. Cir. 2009)). The Secretary's decision to deny the Accrediting Council's application for renewal of recognition does not fit into any of these categories, and therefore, the Court cannot conclude that it is unreviewable simply by the nature of the decision. See id. at 140.

Courts in this Circuit next look to the language and structure of the statute, which "involves applying typical canons of statutory construction to determine whether the statute provides standards for the agency to apply and for the courts to review." Id. at 138 (citing Delta Air Lines, Inc. v. Export-Import Bank of the U.S., 718 F.3d 974, 976–77 (D.C. Cir. 2013)). The HEA provides that

> [i]f the Secretary determines that an accrediting agency . . . has failed to apply effectively the [recognition] criteria . . . , the Secretary shall--
>
> > (A) after notice and opportunity for a hearing, limit, suspend, or terminate the recognition of the agency . . . ; or
> >
> > (B) require the agency . . . to take appropriate action to bring the agency . . . into compliance with such requirements within a timeframe specified by the Secretary, except that—
> >
> > > (i) such timeframe shall not exceed [twelve] months unless the Secretary extends such period for good cause[.]

20 U.S.C. § 1099b(l)(1). The defendants argue that the language of the HEA supports their position that the Secretary's "choice of remedy" is committed to the Secretary's discretion by law because the HEA "do[es] not obligate the Secretary to choose one [remedial action] over the other in any particular circumstance, and it provides no standards whatsoever that a court might

use to judge the Secretary's choice of one remedial action over another." Defs.' Mem. at 15. Additionally, they argue that "the HEA's implementing regulations, which reflect the statutory scheme, contain no standards for determining what severity of sanctions is appropriate . . . and explicitly invoke discretionary language." Id. (citing 34 C.F.R. §§ 602.36(e)(3)(i), 602.37).

Although the Court agrees with the defendants that the HEA does not require the Secretary to conditionally renew an accrediting agency's recognition, "th[is] Circuit has made clear that a grant of broad discretion in a statute, through permissive language or otherwise, does not necessarily mean there are no standards for the court to apply." Watervale Marine Co., 55 F. Supp. 3d at 141 (first citing Amador Cty., 640 F.3d at 381, then citing Dickson, 68 F.3d at 1401–04). Here, other provisions of the relevant section of the HEA provide standards that the Court can apply. For example, the HEA provides that in reviewing an accrediting agency's application, the "Secretary shall consider all available relevant information concerning the compliance of the accrediting agency with the [recognition] criteria," and also that the Secretary "shall not, under any circumstances, base decisions on the recognition or denial of recognition of accreditation agencies . . . on criteria other than those contained in this section." 20 U.S.C § 1099b(n)(3).[6] These standards are judicially manageable. See Am. Petroleum Tankers Parent, LLC v. United States, 943 F. Supp. 2d 59, 69–70 (D.D.C. 2013) (in a challenge to the Maritime Administrator's denial of an application for a loan guarantee, and where "Congress [had] limit[ed] the Administrator to considering factors relevant to particular inquiries, such as the economic soundness of the application," "the [c]ourt ha[d] jurisdiction to review the Administrator's . . . finding that the [p]laintiff's applications were not economically sound").

---

[6] To the extent that the defendants argue that these standards apply only to the Secretary's determination of compliance, and not to her ultimate decision to deny or conditionally extend recognition, that position is undermined by the text of the provision in which these standards are found, which refers broadly to "decisions on the recognition or denial of recognition of accreditation agencies." 20 U.S.C. § 1099b(n)(3).

Furthermore, the Secretary's regulations provide additional applicable standards.  See Twentymile Coal Co., 456 F.3d at 158–59 (citation omitted) ("'[J]udicially manageable standards may be found in . . . regulations as well as in statutes.'").  First, the implementing regulations specifically addressing the actions available to the Secretary provide that

> if a recognized agency fails to demonstrate compliance with or effective application of a criterion or criteria, but the [Secretary] concludes that the agency will demonstrate or achieve compliance with the criteria for recognition and effective application of those criteria within [twelve] months or less, the [Secretary] may continue the agency's recognition, pending submission by the agency of a compliance report [and] review of the report[.]

34 C.F.R. § 602.36(e)(3)(i); see also id. § 602.37(d) (incorporating § 602.36(e)(3)(i)).

Although this regulation, like the HEA, does not require the Secretary to conditionally renew an accrediting agency's recognition in any given case, it does require the Secretary, before continuing recognition on a conditional basis, to make a threshold determination of whether an agency could achieve compliance with the recognition criteria within twelve months.  See id. § 602.36(e)(3)(i); see also id. § 602.37(d).  The Circuit's decision in Menkes v. Department of Homeland Security is instructive.  See 486 F.3d 1307 (D.C. Cir. 2007).  In Menkes, an independent pilot challenged the Coast Guard's decision to not permit him to provide pilotage service pursuant to 46 C.F.R. § 401.720(b).  See id. at 1313.  That regulation provided that "[w]hen pilotage service is not provided by [a designated pool] . . . because of a physical or economic inability to do so, . . . the Director may order any U.S. registered pilot to provide pilotage service."  46 C.F.R. § 401.720(b) (emphasis added); see also Menkes, 486 F.3d at 1310 n.3.  The district court had concluded that the Director's decision under this regulation was unreviewable because it provided no judicially manageable standards by which to review that decision.  See Menkes, 486 F.3d at 1313.  The Circuit disagreed, explaining that

> even if the Coast Guard is entitled to prefer the [a]ssociation over non-member pilots when there is limited demand, a court could still review the Director's

determination with respect to the adequacy of the service provided by the pool-i.e., whether the pool has the physical and economic ability to provide sufficient service. . . . We have often held that standards similar to that set forth in section 401.720(b) are reviewable.  See, e.g., Dickson v. Sec'y of Defense, 68 F.3d 1396, 1401[–]03 (D.C. Cir. 1995) (reviewing decision of military review board where board "may excuse failure to file" if in the "interest of justice"); Marshall [Cty.] Health Care Auth. v. Shalala, 988 F.2d 1221, 1223[–]25 (D.C. Cir. 1993) (allowing review of agency decision to provide exceptions "as the Secretary deems appropriate" because statutory scheme provided sufficient standards to guide review).  To be sure, the Director might be entitled to a good deal of deference in determining whether the pool was physically or economically able to provide adequate service, but that does not mean the Director could make such decisions unreasonably.  For example, it would be presumably arbitrary and capricious for the Coast Guard to ignore an obvious unfilled demand for pilotage service, or to change its standards for determining what level of service is adequate without explanation.  Also dubious would be a refusal to appoint a pilot for reasons not mentioned in the regulations, such as an effort to force the pilot to join the Association.

Id.

Although the Secretary is "entitled" to decline to conditionally renew an accrediting agency's recognition in any given case, in doing so here, she determined that "[the Accrediting Council] would [not] be able to both revise (or, in some instances, enact) policies and demonstrate its effective implementation of those policies within [twelve] months as required to come into compliance." AR 10.  As Menkes instructs, even if that determination is "entitled to a good deal of deference . . . [,] that does not mean the [Secretary] c[an] make such decisions unreasonably."  See 486 F.3d at 1313; see also Am. Petroleum Tankers Parent, 943 F. Supp. 2d at 68 (concluding in regards to a challenge to the denial of a loan guarantee application that "[t]he fact that the Administrator is not by statute commanded to guarantee all eligible obligations does not preclude this Court from reviewing the Administrator's decision to deny an application for a loan guarantee").  And the challenges the Accrediting Council raises here are particularly well-suited for this Court's review in light of the examples provided by the Circuit in Menkes.  See 486 F.3d at 1313 ("[I]t would be presumably arbitrary and capricious for the Coast

Guard to ignore an obvious unfilled demand for pilotage service."). Specifically, the Accrediting Council argues, inter alia, that the Secretary acted arbitrarily and capriciously by failing to consider relevant evidence. See, e.g., Pl.'s Mem. at 20–27. As to this challenge, although the defendants are correct that "even if the Secretary were to determine that a non-compliant accrediting agency was theoretically capable of achieving compliance within a [twelve-]month period, neither the statute nor the regulations would require the Secretary to provide that agency with conditional recognition," Defs.' Mem. at 15–16, that threshold determination, which the Secretary made in this case, see AR 10 ("I cannot conclude that [the Accrediting Council] would be able to both revise (or, in some instances, enact) policies and demonstrate its effective implementation of those policies within [twelve] months as required to come into compliance."), is nevertheless subject to judicial review.

Moreover, the Department's regulations provide additional standards to guide the Court in its review of the challenges the Accrediting Council raises in this case. As already described, see supra Part I.A, the regulations provide a detailed set of procedures that the Department must follow when considering an accrediting agency's application for recognition, see 34 C.F.R. §§ 602.31–.37. As the defendants appear to concede in their reply, the Department's application of these standards is subject to judicial review. See Defs.' Reply at 11 (recognizing that case law supports "the proposition that courts might retain the ability to review . . . whether an agency engaged in procedural impropriety"); see also Ctr. for Auto Safety v. Dole, 846 F.2d 1532, 1535 (D.C. Cir. 1988) (recognizing a "presumption of reviewability of agency compliance with legally binding regulations"); Capital Area Immigrants' Rights Coalition, 264 F. Supp. 2d at 23 ("In the absence of clear congressional intent to preclude review, judicial review is available to hold an [administrative] agency to the procedural and substantive standards contained in its own

regulations governing administrative action, even where the statute grants the agency absolute discretion over administrative decisions").  Additionally, similar to the HEA's requirement that the Secretary "consider all available relevant information concerning the compliance of the accrediting agency . . . with the [recognition] criteria," 20 U.S.C. § 1099b(n)(3), the Secretary's regulations provide that the Department staff must "tak[e] into account all available relevant information concerning the compliance of the agency with th[e recognition] criteria and [ ] the agency's effectiveness in applying the criteria," 34 C.F.R. § 602.32(b).  As discussed below, see infra Part III.B, these regulations form the basis for several of the Accrediting Council's challenges in this case.

Having considered the nature of the administrative action and the language and structure of the statute, the Court finally considers Congress's intent regarding whether judicial review is available, as evidenced by the statute's structure and other factors.  See Watervale Marine Co., 55 F. Supp. 3d at 138–39.  Notwithstanding the "strong presumption that Congress intends agency action to be reviewable," Amador Cty., 640 F.3d at 380, "[c]ompelling legislative history or a law's own structure may manifest a Congressional intent to deny review when the statute itself is silent on the matter," Ctr. for Auto Safety, 846 F.2d at 1535.  The HEA is silent as to whether a Secretary's decision under § 1099b(l) is subject to judicial review; however, the defendants have not identified any "clear and convincing evidence that Congress meant to take th[e] unusual step" of denying review.  Id.  Indeed, at least two other provisions of § 1099b of the HEA suggest the opposite.  First, § 1099b(o) provides that "[t]he Secretary shall by regulation provide procedures for the recognition of accrediting agencies . . .  and for the appeal of the Secretary's decisions."  20 U.S.C. § 1099b(o) (emphasis added).  This provision shows that Congress did not provide absolute discretion to the Secretary, but rather, it intended for the

Secretary's decision be subject to some form of review. And indeed, as the Accrediting Council points out, see Pl.'s Mem. at 17–18, the Secretary promulgated a regulation that explicitly provides that "[a]n agency may contest the Secretary's decision [to deny, limit, suspend, or terminate an agency's recognition] in the Federal courts as a final decision in accordance with applicable Federal law," 34 C.F.R. § 602.38. Although the defendants acknowledge this regulation and generally assert that the Secretary's implementing regulations "reflect the statutory scheme," see Defs.' Mem. at 15, they attempt to dismiss this regulation by arguing that "[n]othing in that provision . . . allows for . . . judicial review of the Secretary's choice of remedy," id. at 16 (emphasis in original). However, the Court agrees with the Accrediting Council that "nothing in the [HEA] or the Department's regulations draws this distinction." Pl.'s Opp'n at 2; see also 20 U.S.C. § 1099b(o) (referring generally to an "appeal of the Secretary's decisions"); 34 C.F.R. § 602.38 (referring to the "Secretary's decision under this part," which includes the decision to "deny . . . [an] agency's recognition"). Second, § 1099b(n)(3) provides that "[t]he Secretary shall not, under any circumstances, base decisions on the recognition or denial of recognition of accreditation agencies . . . on criteria other than those contained in this section." 20 U.S.C. § 1099b(n)(3). Again, this section demonstrates that Congress intended to limit the Secretary's discretion and to subject her decisions to some form of review. See Am. Petroleum Tankers Parent, 943 F. Supp. 2d at 69–70 (concluding that the Maritime Administrator's denial of a loan application was reviewable in part because "Congress [had] limit[ed] the Administrator to considering factors relevant to particular inquiries"). Consequently, even though the HEA does appear to afford the Secretary discretion in determining what action to take upon a finding of noncompliance, the statute's structure suggests

that Congress did not intend for that decision to be fully committed to the Secretary's unfettered discretion.

Additionally, the cases that the defendants cite in support of their position are distinguishable. See Defs.' Mem. at 15–16. First, this Circuit's decision in NTCH, Inc. v. Federal Communications Commission is easily distinguishable because, in that case, the Circuit concluded that the agency action at issue, the Commission's decision not to initiate proceedings to revoke a company's radio license, see 841 F.3d 497, 499 (D.C. Cir. 2016), "was equivalent to a decision not to commence an enforcement action" and therefore, "presumptively unreviewable," id. at 503 (internal quotation marks omitted). As already explained, the Secretary's decision in this case is unlike a decision not to enforce or any other decision recognized by the Supreme Court or this Circuit as unreviewable by its very nature. See Capital Area Immigrants' Rights Coalition, 264 F. Supp. 2d at 22.

Second, the defendants cite Watervale Marine Co. v. United States Department of Homeland Security for the proposition that when "the word 'may' [in a statute or regulation] is coupled with absolutely no guidance as to how the agency should exercise [a discretionary choice], the matter has been committed to agency discretion by law." Defs.' Mem. at 15 (quoting 55 F. Supp. 3d at 143). In Watervale, the plaintiff challenged the Coast Guard's decision to impose nonfinancial conditions on the release of a vessel that the Coast Guard had detained based on violations of various international and environmental laws. See 55 F. Supp. 3d at 127. The relevant statute provided that "clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary." Id. at 143 (quoting 33 U.S.C. § 1908(e)). Although the statute at issue in Watervale was similar to the HEA in that it did not require the Coast Guard to grant departure clearance in any given circumstance, the challenge the plaintiff

raised in that case was notably different from the challenge the Accrediting Council raises here. In Watervale, there was no dispute that the "bond or other surety" condition set forth in the statute had been satisfied, see id. at 143; rather, the plaintiff challenged the Secretary's imposition of additional conditions not provided in the statute, id. at 131–32. The Court concluded that the Secretary's decision was unreviewable because "the statute and its attendant regulations [we]re devoid of any [ ] limits, requirements, or criteria that provide[d] any guideposts by which a court c[ould] measure the Coast Guard's discretionary decision to continue to withhold departure clearance after the owner ha[d] provided a bond (or other surety"). Id. at 143. Here, by contrast, in challenging the Secretary's refusal to grant it temporary renewal of recognition, the Accrediting Council challenges the Secretary's determination that the condition for temporary renewal set forth in the regulations—that the Accrediting Council be able to demonstrate full compliance with the recognition criteria within twelve months—had not been met, see Pl.'s Opp'n at 19 (arguing that evidence presented to the Secretary demonstrated that the Accrediting Council "could be fully compliant with all of the recognition criteria within one year or sooner"). Furthermore, in determining that the Secretary's decision was unreviewable, the court in Watervale relied on additional factors not present here, specifically, "[t]he breadth of the authorized tools that the Coast Guard c[ould] bring to bear" under the relevant statute in response to the suspected violations of the law, 55 F. Supp. 3d at 143 (citing, inter alia, a statutory provision providing that the Coast Guard "shall use all appropriate and practical measures" to deter environmental law violations), and the fact that the relevant statute "provide[d] an alternative avenue for relief for unwarranted detention of a vessel—an action for compensation for unlawful detention," id. at 144. Here, the defendants do not identify any comparable provisions in the HEA.

Finally, the Eleventh Circuit's decision in <u>Forsyth County v. United States Army Corps of Engineers</u>, 633 F.3d 1032 (11th Cir. 2011), also fails to support the defendants' position. <u>Forsyth County</u> involved a statute authorizing the United States Army Corps of Engineers (the "Corps") to lease certain public land for purposes that it deemed were "reasonable in the public interest," but requiring the Corps to give preference to local governmental agencies. <u>Id.</u> at 1035–36. In its challenge to the Corps' decision to award a lease to a private nonprofit organization, the plaintiff county argued that the Corps had failed to properly consider the preference for local government agencies. <u>See id.</u> at 1040. The Corps responded, however, that it had considered the preference, but ultimately decided that the preference was outweighed by other statutory factors. <u>See id.</u> at 1042. The Eleventh Circuit ultimately held that the Corps' decision was unreviewable because "[n]o law provide[d] how the agency should balance these factors in a particular case, or what weight to assign to each factor." <u>Id.</u> at 1041 (internal quotation marks omitted). Thus, in <u>Forsyth County</u>, the plaintiff's position was not that the Corps had failed to consider a relevant factor, but rather, that the Corps had failed to assign the proper weight to that factor. <u>See id.</u> at 1040; <u>see also id.</u> at 1042 ("The [plaintiff] offered no proof that the Corps had wholly ignored the preference clause . . . but . . . asked the district court to second guess the weight accorded that preference amidst a host of other factors[.]"). Here, by contrast, the Accrediting Council's challenges largely center on its claims that the Secretary completely failed to consider relevant evidence. <u>See</u> Pl.'s Mem. at 18–27. Moreover, <u>Forsyth County</u> provides no insight on the reviewability of the Accrediting Council's challenges that the Secretary failed to follow her procedural regulations. <u>See</u> <u>Forsyth Cty.</u>, 633 F.3d at 1040 (only addressing a "regulation [that] repeat[ed] the substantive requirements" of the statutory provision at issue).

In sum, the Court concludes that the Secretary's decision to deny the Accrediting Council's petition is subject to judicial review under the APA because both the HEA and the Secretary's implementing regulations provide judicially manageable standards to guide the Court's review and the structure of the statute suggests that Congress did not intend that the decision being challenged here be totally subject to the Secretary's discretion.

**B.      Arbitrary and Capricious Review**

Having concluded that the Secretary's decision is subject to judicial review, the Court turns to the Accrediting Council's arguments that the decision should be set aside as arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law.  See Pl.'s Mem. at 18.  The Accrediting Council's challenges can be organized into two categories: (1) challenges to the Secretary's decisionmaking process, see, e.g., id. (challenging the Secretary's alleged "fail[ure] . . . to consider all of the available dynamic and relevant evidence"); id. at 33 (arguing that the Department staff report, the Advisory Committee recommendation, and the senior Department official's decision were "each . . . the product of flawed procedures" (capitalization removed)), and (2) challenges to the merits of the Secretary's decision, see, e.g., id. at 30 ("The Secretary's conclusion is not grounded by the record evidence; there is simply 'no rational connection' between the facts found and the 'choice made' by the Secretary." (citing Dickson, 68 F.3d at 1404)).  For the reasons explained below, the Court concludes that the Secretary's decisionmaking process was flawed, and because this conclusion compels it to remand this case to the Secretary, the Court need not consider the Accrediting Council's challenges to the merits of the Secretary's decision.

**1.      Failure to Consider Relevant Evidence**

The Accrediting Council first argues that the Secretary's decision was arbitrary and capricious because it "failed . . . to consider all of the available dynamic and relevant evidence,"

id. at 18, specifically (1) the Accrediting Council's Part II submission, which consisted of "a detailed narrative and tens of thousands of pages of documents," id. at 20–21; (2) evidence of leadership changes it made and adverse actions it took against institutions following the Advisory Committee's meeting, see id. at 22–24; and (3) evidence of its placement verification and data integrity procedures, see id. at 25–27. The Court will address each category of evidence in turn.

### a.     The Accrediting Council's Part II Submission

The Accrediting Council argues that the Secretary's failure to consider its Part II submission violated the HEA's and the implementing regulations' requirement that the Secretary consider all available relevant information, see id. at 21 (citing 20 U.S.C. 1099b(n); 34 C.F.R. § 602.32(b)), as well as the APA's requirement that an agency must "examine the relevant data," id. (quoting PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n, 419 F.3d 1194, 1198 (D.C. Cir. 2005)). The Court agrees.[7]

An agency must not only comply with the terms of its authorizing statute, see Eco Tour Adventures, Inc. v. Zinke, 249 F. Supp. 3d 360, 381 (D.D.C. 2017), but "[i]t is a fundamental principle of administrative law that an agency is [also] bound to adhere to its own regulations," Fuller v. Winter, 538 F. Supp. 2d 179, 186 (D.D.C. 2008) (citing Frizelle v. Slater, 111 F.3d 172, 177 (D.C. Cir. 1997)); see also Steenholdt v. Fed. Aviation Admin., 314 F.3d 633, 639 (D.C. Cir. 2003) ("[F]ederal agencies [must] follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions."). Consequently, "an agency action may be set

---

[7] The Accrediting Council has also filed a motion to supplement the administrative record with its Part II submission. See Pl.'s Mot. to Supp. at 1. In light of the Court's decision to remand this case to the Secretary for consideration of the Part II submission and other evidence, the Court denies as moot the plaintiff's motion to supplement the administrative record. See BFI Waste Sys. of N. Am., Inc. v. Fed. Aviation Admin., 293 F.3d 527, 535 n.6 (D.C. Cir. 2002) (in light of decision to remand, dismissing as moot the plaintiff's motion to supplement the administrative record); see also Calif. Valley Miwok Tribe v. Jewell, 5 F. Supp. 3d 86, 88 n.1 (D.D.C. 2013) (similar).

aside as arbitrary and capricious if the agency fails to comply with its own regulations."  Nat'l

Envtl. Dev. Ass'ns Clean Air Project v. Envtl. Prot. Agency, 752 F.3d 999, 1009 (D.C. Cir.

2014) (internal quotation marks omitted).

    As already explained, see supra Part I.A, the HEA and its implementing regulations

require the Secretary and the Department staff to consider "all available relevant information

concerning the compliance of the accrediting agency . . . with the [recognition] criteria," 20

U.S.C. § 1099b(n)(3); see also 34 C.F.R. § 602.32(b) (requiring the Department staff to "tak[e]

into account all available relevant information concerning the compliance of the agency with th[e

recognition] criteria and in the agency's effectiveness in applying the criteria").  Additionally,

the regulations require the Department staff to review "any [ ] information [the] Department staff

assembles for purposes of evaluating the agency[.]"  34 C.F.R. § 602.32(b)(2).  The defendants

do not dispute that the Accrediting Council's Part II submission was solicited by the Department

and was available to it as of May 19, 2016.  See Defs.' Supp. Opp'n, Ex. 1 (Bounds Decl.) ¶ 11;

see also Defs.' Mem. at 8–9 n.2.  Furthermore, they do not dispute that the submission contained

information relevant to the Accrediting Council's compliance with the recognition criteria.  See

Defs.' Mem. at 8–9 n.2 (arguing only that the Part II submission "w[as] not considered, directly

or indirectly, by any agency decision makers at any point in the administrative process"); see

also Defs.' Reply at 15 (asserting only that the Accrediting Council "does [not] contend that the

contents of the [Part II submission] would have proven its compliance with the [recognition]

criteria" or "altered the Secretary's finding of non-compliance").  Indeed, the Department staff

explicitly tied each of the Part II questions to a particular criterion or criteria, see AR 439–42,

and represented that the questions were "important to the Department's responsibility to monitor

and review [the Accrediting Council]'s effectiveness as a recognized accrediting agency," AR

434. Moreover, the Accrediting Council has represented that the Part II submission "respond[ed] to each of the Department's questions regarding specific recognition criteria" and included numerous materials related to the Accrediting Council's dealings with institutions identified by the Department. See Pl.'s Mem. at 10. And critically, the defendants admit that they did not consider the Accrediting Council's Part II submission at any point in the recognition process. See Defs.' Supp. Opp'n, Ex. 1 (Bounds Decl.) ¶ 11 ("[The Department staff] did not review or otherwise consider, directly or indirectly, the information contained [in the Part II submission] thumb-drive in the course of its review of [the Accrediting Council's] petition, nor did [it] provide the contents . . . to [the Advisory Committee], the [s]enior Department [o]fficial . . . , or the Secretary."); see also Defs.' Mem. at 32 (same).[8] Therefore, the Court concludes that the Secretary and the Department staff violated the HEA and the implementing regulations by failing to consider the Part II submission.

In addition to the Secretary's violation of the HEA and the regulations, both which independently support findings that the APA was violated, see Eco Tour Adventures, Inc., 249 F. Supp. 3d at 381 (concluding that an agency's decision violated the APA because it "was contrary to the plain meaning of the relevant statute and regulations"); see also Nat'l Envtl. Dev. Ass'n's Clean Air Project, 752 F.3d at 1010–11 (holding that agency action was contrary to law in violation of the APA because it was "plainly contrary to the agency's own . . . rules"), the Secretary's failure to consider the Accrediting Council's Part II Submission also violated the APA's mandate that an "agency must examine the relevant data and articulate a satisfactory

---

[8] The Department staff notes that it did consider three of the documents in the Part II submission because the Accrediting Council attached those documents as Exhibits 150, 150-2, and 150-3 to its response to the Department staff's draft report. See Defs.' Supp. Opp'n, Ex. 1 (Bounds Decl.) ¶¶ 14–15; see also Pl.'s Mot. to Supp. at 9 (representing that these documents were included in the Part II submission). However, these exhibits contain only approximately 150 pages, see AR 7,156–314, meaning that they only represent a small fraction of the 36,000-page Part II submission.

explanation for its action including a rational connection between the facts found and the choice made," Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 (citations and quotation marks omitted) (emphasis added); see also PPL Wallingford, 419 F.3d at 1198 ("To survive review under the 'arbitrary and capricious' standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43)). "If an agency fails to examine the relevant data[,] . . . it has failed to comply with the APA." District Hosp. Partners, L.P. v. Burwell, 786 F.3d 46, 57 (D.C. Cir. 2015); see also Butte Cty. v. Hogen, 613 F.3d 190, 194 (D.C. Cir. 2010) ("[A]n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706."). Although an agency "need not address every aspect of [a] plaintiff's [claims] at length and in detail," Mori v. Dep't of the Navy, 917 F. Supp. 2d 60, 65 (D.D.C. 2013) (citing Frizelle, 111 F.3d at 176), it "must provide enough information to ensure the Court that [it] properly considered the relevant evidence underlying [a] plaintiff's request," id. (citing Occidental Petroleum Corp. v. SEC, 873 F.2d 325, 338 (D.C. Cir. 1989)).

Again, there is no dispute that the Accrediting Council's Part II Submission contained data relevant to its compliance with the recognition criteria. See Defs.' Mem. at 8–9 n.2; see also Defs.' Reply at 15; AR 439–42, 434. More importantly, these data are relevant to the Secretary's determination that the Accrediting Council would be unable to come into compliance with the recognition criteria within twelve months. The Secretary concluded that "[b]oth [the Accrediting Council]'s insufficient progress in addressing its areas of noncompliance and [its] past track record weigh[ed] against granting a renewal of recognition for [twelve] months." AR 10. And the Secretary found that the Accrediting Council's "past track record" included its

failures to comply with five categories of recognition criteria identified by the Secretary, see AR 6–8, with particular emphasis on the Accrediting Council's failures to take action against the Michigan Jewish Institute or Everest Colleges, despite knowledge of misconduct by those institutions, see AR 9. The Part II questions sought information relevant to these same recognition criteria and the same institutions, see AR 439–42, and as already explained, the Accrediting Council represents, and the defendants do not dispute, that its 36,000-page Part II submission contained information responsive to those questions, see Pl.'s Mem. at 10 (representing that the submission included "[a]ccreditation application materials submitted to [the Accrediting Council] by specific institutions identified by the Department, and [the Accrediting Council]'s evaluations of those institutions' applications," as well as "[v]oluminous email correspondence between [the Accrediting Council] and specific institutions identified by the Department"). It is undisputed that the Secretary failed to consider this submission. See Defs.' Supp. Opp'n, Ex. 1 (Bounds Decl.) ¶ 11.

Furthermore, the Department staff did not provide an adequate explanation for its refusal to consider this evidence. Although the Department staff, after granting the Accrediting Council's request for an extension to respond to the Part II questions, informed the Accrediting Council that it would not have "time to fully review and analyze [that information] in time for the June [Advisory Committee] meeting," it suggested that it would consider the information at the fall Advisory Committee meeting. See AR 434 ("[The Accrediting Council] should be prepared to return at the fall [Advisory Committee] meeting for further discussion and possible action as warranted."). And at the same time, the Department staff emphasized that "the information [it] requested is important to the Department's responsibility to monitor and review [the Accrediting Council]'s effectiveness as a recognized accrediting agency." Id. Later, when

it informed the Accrediting Council that it would consider the Part II submission "separately outside the recognition process," it provided no explanation for its decision beyond that it "d[id] not want to mix the responses" to the Part II questions and the Department staff's draft report. See AR 430.

The defendants now contend that the Department staff did not consider the Part II submission because doing so "would have obliged the Department [staff] . . . to postpone the [Advisory Committee] hearing on [the Accrediting Council's] application by six months," and in light of "the severity of [the] findings of [the Accrediting Council]'s noncompliance, and the statutory requirement for a re-assessment of whether to continue recognition at least every five years," the Department staff concluded that postponement "would not have been consistent with responsible administration of the statute." Defs.' Mem. at 33. Although this rationale is similar to the one the Department staff gave for denying the Accrediting Council an extension of time to respond to the Department staff's draft report, see AR 429 (explaining that in light of "numerous findings of noncompliance," "[d]eferral would violate the[] [HEA's] requirements, and [the Department staff] ha[d] no authority to grant [deferral]"), as explained above, the Department staff did not provide this or any other meaningful explanation when it informed the Accrediting Council that it would not consider the Part II submission as part of the recognition process, see AR 430. The defendants "cannot fill the holes of [their] decision by providing post hoc explanations in [the] briefs." See Mori, 917 F. Supp. 2d at 66 (citing Camp v. Pitts, 411 U.S. 138, 143 (1973)). Even if this were the Department staff's reason for not considering the Part II submission, as the Accrediting Council correctly notes, see Pl.'s Opp'n at 10–11, the defendants' position that considering the submission would have required postponing review by six months is undermined by the defendants' argument that "[the Accrediting Council] had ample

opportunity to cure any deficiencies it believed existed in the evidentiary record," including "on or before June 3, 2016," the deadline for the Accrediting Council's response to the Department staff's draft report, Defs.' Mem. at 33. This position necessarily assumes that the Department staff would have considered the Part II submission had it been re-submitted as part of the Accrediting Council's response, which directly contradicts the defendants' claim that the Department staff would not have had time to consider the submission before the June Advisory Committee meeting.

The Court is also not persuaded by other counterarguments raised by the defendants. The defendants argue that the Department staff's failure to consider the Part II submission did not violate the Department's regulations because those regulations "do not require the Department to provide unlimited time for the submission of supplemental information." Defs.' Mem. at 33. Relatedly, they argue in their reply that "allow[ing] an applicant nearly unlimited opportunity to disrupt the Department's ability to set and adhere to a schedule of review, [ ] is a particularly serious concern [ ] given that binding statutory and regulatory authority require the Department to comport with specific timelines." Defs.' Reply at 16 (citing 20 U.S.C. § 1099b(d); 34 C.F.R. § 602.31). However, the authority cited by the defendants does not compel the Department staff to complete its review within any set period of time. Rather, it only provides that "[n]o accrediting agency . . . may be recognized by the Secretary for the purpose of this chapter for a period of more than [five] years." 20 U.S.C. § 1099b(d); see also 34 C.F.R. § 602.31(a) ("Each accrediting agency must submit an application for continued recognition at least once every five years[.]"). Indeed, the defendants concede that the regulations provide for at least two occasions in the administrative process when it is appropriate for an accrediting agency to submit (and the Department to consider) supplementary evidence—when an accrediting agency submits its

response to the Department staff's draft report, and prior to or during the Advisory Committee meeting.  See Defs.' Reply at 17.  And the Department received the Accrediting Council's Part II submission on May 19, 2016, see Defs.' Supp. Opp'n, Ex. 1 (Bounds Decl.) ¶ 11, prior to both of those events.  Moreover, it appears that the regulations already account for the defendants' concern, as they explicitly set various deadlines for the parties to ensure that the application review process proceeds expeditiously, see, e.g., 34 C.F.R. § 602.35(a) (requiring the accrediting agency and the Department staff to submit any written comments to the senior Department official "[w]ithin ten days following the Advisory Committee meeting"), and prohibit, except in narrow circumstances, the introduction of new evidence in the later stages of the application review process, see 34 C.F.R. § 602.35(c)(1) ("Neither the Department staff nor the agency may submit additional documentary evidence with its comments [to the senior Department official]" except only in limited circumstances.); see also id. § 602.37(c) ("Neither the agency nor the senior Department official may include in its submission [on appeal to the Secretary] any new evidence it did not submit previously[.]").

Next, the defendants argue that the Accrediting Council "had ample opportunity to cure any deficiencies it believed existed in the evidentiary record," including when it submitted its Petition in January 2016 or "on or before June 3, 2016," when it submitted its response to the Department staff's draft report.  Defs.' Mem. at 33.  This argument is also not persuasive.  Prior to June, the defendants claim that the Department staff had informed the Accrediting Council that it would not consider its Part II submission as part of the recognition process, so it is perplexing that the defendants now claim that the Accrediting Council should have ignored that communication and submitted its Part II submission a second time.  In any event, it is the defendants' responsibility to comply with the HEA, the implementing regulations, and the APA,

and as already explained, those authorities required the defendants to consider the Part II submission.

Finally, the defendants argue that because the Accrediting Council "d[oes] not allege . . . that the contents of [its Part II submission] would have altered the Secretary's finding of noncompliance, it cannot show that any purported procedural error arising from the Department[] [staff's] decision not to consider th[ose] contents . . . was prejudicial." See Defs.' Reply at 15. "In administrative law, as in federal civil and criminal litigation, there is a harmless error rule: § 706 of the [APA] instructs reviewing courts to take 'due account . . . of the rule of prejudicial error.'" PDK Labs. v. U.S. Dep't of Drug Enf't, 362 F.3d 786, 799 (D.C. Cir. 2004) (citation omitted) (quoting 5 U.S.C. § 706); see also Ozark Auto. Distrib., Inc. v. Nat'l Labor Relations Bd., 779 F.3d 576, 582–83 (D.C. Cir. 2015) (collecting cases). Although the defendants are correct that the Accrediting Council does not appear to allege that its Part II submission would have compelled the Secretary to find that it was fully compliant with the recognition criteria, the Court is unable to conclude that no part of the 36,000-page Part II submission would have affected the Secretary's determination that the Accrediting Council could not come into compliance within twelve months of her ultimate decision to deny recognition. As explained above, that determination was based in part on the Accrediting Council's "past track record" of violations, with emphasis on failures to act against certain problem institutions identified by the Department, see AR 6–10, and the Part II submission contained information that was indisputably relevant to assessing those violations, see Pl.'s Mem. at 10 (representing that the Part II submission contained "approximately 36,000 pages of documents relating to[, inter alia,] . . . [a]ccreditation application materials submitted to [the Accrediting Council] by specific institutions identified by the Department and [the Accrediting Council]'s evaluations of those

institutions' applications . . . and [v]oluminous email correspondence between [the Accrediting Council] and specific institutions identified by the Department"). Moreover, the Court is unable to discern from the Secretary's decision what weight she assigned to the Accrediting Council's "past track record," as opposed to its "insufficient progress in addressing its areas of noncompliance." AR 10; see also PDK Labs., 362 F.3d at 799 (declining to find the Deputy Administrator's error harmless where his decision was based on a "totality of the circumstances," the error implicated four of the circumstances "prominently mentioned" by the Deputy Administrator, and "[w]hat weight he gave to those circumstances (or any others) [wa]s impossible to discern"); Level the Playing Field v. Fed. Elec. Comm'n, 232 F. Supp. 3d 130, 143 (D.D.C. 2017) ("The court cannot brush aside this procedural violation . . . and determine that it was harmless error, because there is no way for the court to determine that [the p]laintiffs experienced no harm from having their evidence ignored."); cf. Sugar Cane Growers Coop. v. Veneman, 289 F.3d 89, 96 (D.C. Cir. 2002) ("[A]n utter failure to comply with notice and comment cannot be considered harmless if there is any uncertainty at all as to the effect of that failure."). Therefore, the Court cannot find that the Accrediting Council was not prejudiced by the Secretary's failure to consider its Part II submission.

In sum, the Court concludes that the Secretary's failure to consider the Part II submission violated the APA because it violated the HEA and the implementing regulations, see Eco Tour Adventures, Inc., 249 F. Supp. 3d at 381 (concluding that agency's decision violated the APA because it "was contrary to the plain meaning of the relevant statute and regulations"), and also because it violated the APA's basic tenet that an administrative agency must consider relevant data in rendering its decisions, see PPL Wallingford, 419 F.3d at 1200 (concluding that administrative agency action was arbitrary and capricious in part because the agency "did not

address [the plaintiff]'s evidence at all"). In reaching this conclusion, the Court recognizes that "relevant" is a term that can be broadly construed, and an administrative agency's failure to consider data that could be construed as relevant will not always be arbitrary and capricious or otherwise violate the APA. However, under the circumstances presented here—where the Department solicited the data, represented that it was "important" to the recognition process, and then refused to consider it with practically no explanation—and given the sheer volume of the data and the fact that the defendants do not dispute its relevance, the Court does not have difficulty concluding that the defendants acted arbitrarily and capriciously by failing to consider the Part II submission.

### b. The Accrediting Council's Improvements After the Advisory Committee Hearing

The Accrediting Council further argues that the Secretary acted arbitrarily and capriciously by failing to meaningfully consider evidence that (1) "during the three months following the [Advisory Committee] meeting . . . [the Accrediting Council]'s Board doubled the number of public members, replaced [its] President with Mr. Williams, and others who previously served in leadership roles [ ] left [the Accrediting Council]," Pl.'s Mem. at 23;[9] and (2) the Accrediting Council pursued various adverse actions and other enforcement measures following the June Advisory Committee meeting, id. at 32; see also id. at 26; AR 121–23 (describing, inter alia, adverse action taken against DeBois Business College in August 2016, as well as "nine unannounced on-site visits" conducted thereafter "to assess the level of compliance across a broad spectrum of ITT [Technical Institute]'s campuses"). The defendants respond that

---

[9] Although the Accrediting Council also argues that the Secretary ignored evidence that it "substantially restructured its leadership in the weeks leading up to . . . the [Advisory Committee] meeting," Pl.'s Mem. at 22, it only specifically refers to leadership changes that took place after the meeting, see id. at 22–23 (referring to changes made "during the three months following the [Advisory Committee] meeting"). Thus, the Court will consider only the evidence of leadership changes that took place after the meeting in conducting its analysis.

the Accrediting Council "was not entitled to submit new evidence directly to the [Secretary and] thus, the Secretary was under no obligation to consider [it]," Defs.' Reply at 18 (citing 34 C.F.R. § 602.37(c)), but in any event, the Secretary did consider this evidence, see id.

The Court agrees with the defendants that the regulations did not require the Secretary (or the senior Department official) to consider this evidence. The Department's regulations provide that "[n]either the agency nor the senior Department official may include in its submission [on appeal to the Secretary] any new evidence it did not submit previously in the proceeding," 34 C.F.R. § 602.37(c), nor may the accrediting agency or the Department staff "submit additional documentary evidence with its comments [to the senior Department official]," id. § 602.35(c)(1). In other words, absent exceptional circumstances not applicable here,[10] the factual record that can be considered by the senior Department official and the Secretary is limited to the factual record that was before the Advisory Committee. See id. § 602.36(a) ("The senior Department official makes a decision . . . based on the record compiled [in the prior proceedings]."); see also id. § 602.37(c) (requiring the Secretary to consider "the [ ] record before the senior Department official"). The Accrediting Council did not take these actions until after the Advisory Committee meeting, see Pl.'s Mem. at 23, 26, 32, and the record reflects that it did not submit evidence of these actions until after the senior Department official issued her decision, see AR

---

[10] These regulations provide two limited exceptions, both of which are inapplicable here. First, they permit an accrediting agency to submit "additional documentary evidence" to the senior Department official if the Advisory Committee's "recommendation proposes finding the agency noncompliant with, or ineffective in its application of, a criterion or criteria for recognition not identified in the final Department staff analysis." 34 C.F.R. § 602.35(c)(1); see also id. § 602.36(f)(1). Here, however, the senior Department official found the Accrediting Council noncompliant with the same recognition criteria as found by the Department staff. See AR 314–15. Second, the regulations permit the senior Department official or the Secretary to consider "relevant and material information pertaining to an agency's compliance . . . [that is] not contained in the record, [but that] comes to the senior Department official's [or the Secretary's] attention while a decision . . . is pending," 34 C.F.R. §§ 602.36(g), 602.37(f); however, the regulations expressly prohibit an accrediting agency from "submit[ting] information to the [senior Department official or the Secretary], or ask[ing] others to submit information on its behalf, for purposes of invoking" this exception, id. §§ 602.36(h), 602.37(g).

236–43 (requesting reconsideration of the senior Department official's decision based on this "new evidence"). Therefore, under the regulations, the Secretary was not permitted to consider this evidence. See Fuller v. Winter, 538 F. Supp. 2d 179, 186 (D.D.C. 2008) ("It is a fundamental principle of administrative law that an agency is bound to adhere to its own regulations." (citing Frizelle, 111 F.3d at 177); see also Nat'l Envtl. Dev. Ass'ns Clean Air Project, 752 F.3d at 1009 ("[An] agency is not free to ignore or violate its regulations while they remain in effect." (quoting U.S. Lines, Inc. v. Fed. Mar. Comm'n, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978)).

Nonetheless, the Accrediting Council totally ignores the regulations barring the submission of new evidence to the senior Department official and the Secretary, see Pl.'s Mem. at 22–27; see also Pl.'s Opp'n at 14–15, and simply argues that the HEA and the APA require the Secretary "to consider all relevant evidence," Pl.'s Mem. at 24 (citing 20 U.S.C. § 1099b(n)). However, the HEA mandates that "[t]he Secretary shall by regulation provide procedures for the recognition of accrediting agencies," 20 U.S.C. § 1099b(o), and pursuant to that mandate, the Secretary promulgated the regulations restricting the introduction of new evidence as described above. Notably, the Accrediting Council does not argue that these regulations violate the HEA or the APA or are otherwise unlawful or inapplicable. See Pl.'s Mem. at 22–27; see also Pl.'s Opp'n at 14–15. Moreover, the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness," Fox Television Stations, Inc., 556 U.S. at 513, and it "simply does not confer upon participants in informal adjudications a right to supplement the evidentiary record," New Life Evangelistic Ctr., Inc. v. Sebelius, 753 F. Supp. 2d 103, 119 (D.D.C. 2010) (holding that administrative agency did not err in denying the plaintiff's request to supplement its application with additional materials on remand, where neither the

relevant statute nor the regulations provided the plaintiff the right to do so); cf. Interstate Commerce Comm'n v. Jersey City, 322 U.S. 503, 514 (1944) ("If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening").[11]

The two decisions cited by the Accrediting Council as support for its position are distinguishable. See Pl.'s Mem. at 23–24 (citing Butte Cty., 613 F.3d 190, and Aragon v. Tillerson, 240 F. Supp. 3d 99 (D.D.C. 2017)). Although both cases held that an agency acted arbitrarily and capriciously by failing to consider evidence that only became available after some part of the relevant proceedings had commenced, neither decision referenced or otherwise indicated the existence of regulations expressly barring the agency from considering such evidence. In Butte County, which involved a challenge to the National Indian Gaming Commission's decision approving the use of certain lands for gaming, although the Circuit held that the Secretary of the Interior acted arbitrarily and capriciously by refusing to consider evidence submitted by the plaintiff after the Gaming Commission's decision was rendered, see 613 F.3d at 195–96, it is unclear whether the relevant administrative process had even

_____

[11] The Secretary's decision is not a formal adjudication within the meaning of the APA. "An adjudication is formal only when the decision is 'required by statute on the record after opportunity for an agency hearing.'" Shell Oil Co. v. U.S. Dep't of Labor, 106 F. Supp. 2d 15, 19 (D.D.C. 2000) (quoting 5 U.S.C. § 554(a)). Although the HEA provides that the Secretary shall make her decision to deny recognition "after notice and opportunity for a hearing," 20 U.S.C. § 1099b(l)(1)(a), it does not require the hearing to be "on the record." And, "[w]hile it is not clear what specific statutory language is required by the APA to trigger a formal adjudication," Shell Oil, 106 F. Supp. 2d at 19, this Circuit's precedent suggests that merely requiring an "opportunity for a hearing" is not sufficient, see W. Res., Inc. v. Surface Transp. Bd., 109 F.3d 782, 793 (D.C. Cir. 1997) (finding it "doubtful" that the statutory requirement to "hold a public hearing" required formal adjudicative procedures); Chemical Waste Mgmt., Inc. v. U.S. Envtl. Prot. Agency, 873 F.2d 1477, 1482 (D.C. Cir. 1989) (finding that statutory requirement for a "hearing" did not give rise to presumption of formal adjudication).

commenced, as the Gaming Commission's decision was merely an "advisory" opinion, and in any event, the plaintiff had submitted the evidence nearly two years before the Secretary issued his decision, see id. at 195 & n.3. In Aragon, which involved a foreign service officer's challenge to the Foreign Service Grievance Board's decision denying him tenure, although the Court held that the Board acted arbitrarily and capriciously by failing to consider evidence that did not become available until "after the plaintiff was denied tenure and thus w[as] not seen by the [initial reviewing body] in making that decision," it explicitly recognized that the evidence was "part of the record before the [Board]," 240 F. Supp. 3d at 112, and although it did not explain the latter determination, the regulations applicable to the Board's procedures appear to explicitly permit the introduction of new evidence before the Board, see 22 C.F.R. § 906.7(d), (f) (providing that at any hearing held before the Board, "the parties may offer [ ] evidence" and a "transcript shall be made of [the] hearing and shall be part of the record of proceedings"); see also id. § 907.1(b) (providing that where no hearing is held, "[e]ach party will be offered the opportunity to review and to supplement . . . the record of proceedings, prior to the date fixed by the Board for closing of the Record. The Board shall then consider the case and make a decision based on that Record."); id. § 909.1 ("Decisions of the Board . . . shall include findings of fact[.]").

In any event, the Court agrees with the defendants that the Secretary adequately considered this post-Advisory Committee evidence. In the course of assessing whether the Accrediting Council could come into compliance within the requisite twelve months, the Secretary explicitly acknowledged that the Accrediting Council "ha[d] undertaken major changes in leadership" and "immediate adverse actions against institutions such as DuBois Business College." AR 8. Nevertheless, in light of the Secretary's conclusion that the Accrediting

Council had failed to effectively revise or adopt certain standards, as well as the "comprehensive and systematic failure of [its] monitoring and enforcement scheme," AR 9, the Secretary ultimately concluded that the Accrediting Council had made "insufficient progress in addressing its areas of noncompliance," and that "[b]oth [the Accrediting Council]'s insufficient progress . . . and past track record weigh[ed] against granting a renewal of recognition for twelve months," AR 10.  In other words, the Secretary considered this evidence, but concluded that it was outweighed by other evidence of "insufficient progress" and the Accrediting Council's "past track record."  See AR 10.  Although the Secretary does not, for example, reference the Accrediting Council's new president or name each and every enforcement action that the Accrediting Council had undertaken, and therefore, she "could have explained [her] reasons for rejecting [the Accrediting Council's] arguments in more detail, . . . [a] reviewing court will 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" Frizelle, 111 F.3d at 176; see also Mori, 917 F. Supp. 2d at 65 (recognizing that an agency "need not address every aspect of [a] plaintiff's [claims] at length and in detail" so long as it "provide[s] enough information to ensure the Court that [it] properly considered the relevant evidence underlying [a] plaintiff's request").  Here, the Court finds that it can reasonably discern the Secretary's decisionmaking path, which is further illuminated by her citation to "concerns expressed by a majority of [the Advisory Committee] members . . . , [including] one member's comment that 'track record . . . is still the best predictor of future performance' . . . and the failures at [the Accrediting Council] were [ ] widespread and systemic."  AR 9 n.67 (quoting Advisory Committee Transcript at 65–66).  And, the Court finds no reason to question the reasonableness of the weight that the Secretary assigned to the evidence.  See Nat'l Coal Ass'n v. Hodel, 825 F.2d 523, 532 (D.C. Cir. 1987) (declining to "second-guess" the Secretary of

Interior's determination that its action was in the public interest where that determination "[wa]s one involving a variety of factors, the relative weights of which are left in its discretion"); see also Citizens to Preserve Overton Park, 401 U.S. at 416 (a reviewing court is not "to substitute its judgment for that of the agency"); Burke v. U.S. Envtl. Prot. Agency, 127 F. Supp. 2d 235, 241 (D.D.C. 2001) (finding "substantial evidence in the record to support [the] EPA's assessment of each factor and the relative weight assigned to each factor" because "[w]hile there are some aspects of the record that support [the plaintiff]'s position, [the] EPA's determination that such evidence is outweighed by other evidence in the record is reasonable and must be upheld under the applicable standard of review").[12]

### c. The Accrediting Council's Placement Verification and Data Integrity Procedures

The Accrediting Council additionally argues that the Secretary "ignored" evidence of its placement verification and data integrity procedures, including that it had implemented (1) "a robust [Placement Verification Program] and enhanced data integrity algorithm that establishe[d] random monthly testing of institutions' placement data," Pl.'s Mem. at 25; (2) an "At-Risk Institutions Group," which "use[d] the [placement] data to identify at risk institutions and patterns of concern," id.; (3) an "enhanced process of on-site random sampling of placement documentation through the addition of a dedicated Dat[a] Integrity Reviewer [ ] to every campus

---

[12] The Accrediting Council argues that the Secretary's failure to adequately consider its evidence of leadership changes is demonstrated by the fact that the Secretary's decision "included but one brief reference [to] the Department [s]taff's comments [prior to the Advisory Committee meeting], and thus before [the Accrediting Council] had fully installed its new leadership team." Pl.'s Mem. at 23. However, the Secretary's discussion of this evidence also cited an Advisory Committee's member's comment "express[ing] doubt as to whether [the Accrediting Council], even with a 'fresh team of people' had the 'talent and capability and . . . culture' to achieve compliance in the face of the challenges accumulated over a number of 'disastrous . . . years and failures of schools." AR 9 n.62 (quoting Advisory Committee Transcript at 258–59).

review that [the Accrediting Council] conducts," id.; and (4) a "Campus Effectiveness Plan [which] espoused a comprehensive approach to evaluating student achievement," id. at 29.

As the Accrediting Council notes, see id. at 25, 29, and the defendants do not appear to dispute, see generally Defs.' Mem., this evidence is relevant to the recognition criteria regarding student achievement standards, including monitoring compliance with and evaluation of those standards, see 34 C.F.R. §§ 602.16(a)(1)(i), .17, .19(b).  Moreover, it appears that this evidence was presented to and considered by the Department staff in its final report, and thus, was properly part of the administrative record before the Secretary.  See AR 770 (assessing the Accrediting Council's "addition of a dedicated data integrity reviewer to each site visit"); see also AR 773 (assessing the Accrediting Council's Campus Effectiveness Plan); AR 775–76 (assessing the Accrediting Council's data integrity algorithm, placement verification program, and "establish[ment] of an 'At-Risk Institution' committee to review all actions facing an institution[ and] information that calls into question its general operations").[13]  But, upon review of the Secretary's decision, the Court is unable to conclude that the Secretary considered it, as the Secretary made no reference to it.  Although the Secretary's decision referred broadly to, and rejected, the Accrediting Council's "assertions of progress," AR 6, as well as evidence that the Accrediting Council "ha[d] enacted and/or plan[ned] to enact, and then plan[ned] to effectively apply, the new accrediting standards and review procedures that it needs to come into compliance," AR 8, it does not indicate whether these broad categories of evidence included evidence of the Accrediting Council's placement verification and data integrity procedures. Therefore, because this evidence was "available relevant information concerning the compliance

---

[13] To the extent that the Accrediting Council refers to enhancements to these programs and initiatives that were made and presented to the senior Department official following the Advisory Committee meeting, see, e.g., AR 411 (referring to enhancements to its algorithm that would be made by December 2016), as already explained, see supra Part III.B.1.b, under the applicable regulations, the Secretary was not required to consider that evidence.

of the accrediting agency . . . with the [recognition] criteria," 20 U.S.C. § 1099b(n)(3); see also

34 C.F.R. § 602.32(b), the Secretary violated the HEA and its implementing regulations by

seemingly failing to consider it, which, again, supports finding a violation of the APA.  See Eco

Tour Adventures, Inc., 249 F. Supp. 3d at 381.

Additionally, the Secretary's apparent failure to consider this relevant evidence violates

the basic requirement of the APA that an "agency must examine the relevant data."  Motor

Vehicle Mfrs. Ass'n, 463 U.S. at 43.  The evidence of the Accrediting Council's placement

verification and data integrity procedures is not only relevant to the Secretary's determinations in

this case, but it appears to contradict the Secretary's conclusions regarding the Accrediting

Council's "lack of evident progress" and its "track record," which formed the basis for the

Secretary's determination that the Accrediting Council could not come into compliance within

twelve months, and ultimately, her decision to deny it recognition.  See AR 10 ("Both [the

Accrediting Council]'s insufficient progress in addressing its areas of noncompliance and past

track record weigh against granting a renewal of recognition for [twelve] months."); see also AR

8 (concluding that the Accrediting Council's "lack of progress" was a "strong[] indicat[or] that

[it could not] meet its ambitious promises to come into compliance within [twelve] months").

For example, the Secretary cited as an example of the Accrediting Council's poor "track record"

the fact that "in 2013[, it] committed to implement new data verification procedures[,] . . . [y]et

rather than timely implementing the . . . procedures as promised . . . , [the Accrediting

Council] . . . only began efforts to improve data quality when it again began seeking renewal of

its recognition in 2016."  AR 9–10.  However, the Accrediting Council submitted evidence that it

had implemented a new data integrity algorithm in 2014, see AR 411, and as Department staff

member Steve Porcelli testified at the Advisory Committee meeting, the evidence demonstrated

that "falsified placements dropped dramatically" as a result of the use of the algorithm, <u>see</u> AR 525; <u>see also</u> AR 775 (noting in the Department staff's final report that the Accrediting Council had submitted evidence that its "data integrity algorithm resulted in incidences of data integrity problems dropping from 3,000 in 2011 to 150 in 2015; and that [its] placement verification program resulted in review of 1,137 placements for 85 [Accrediting Council]-accredited campuses in 2016, with a verification rate of 90%"). In addition, as support for the Accrediting Council's "lack of sufficient progress," the Secretary cited the senior Department official's conclusion that "despite notice of deficiencies in th[e] area [of student achievement], in these proceedings[, the Accrediting Council] ha[d] not put forward a plan to effectively develop and apply standards for evaluating student achievement." AR 6–7 (citing the senior Department official's brief on appeal to the Secretary). However, the Accrediting Council presented evidence to the Department staff that it had established an At-Risk Institutions Group, developed a Campus Effectiveness Plan, and taken other steps as part of its Placement Verification Program. <u>See</u> Pl.'s Mem. at 25, 29; <u>see also</u> AR 770, 773, 775–76.

Although the Court is mindful that "an agency's decision [need not] be a model of analytic precision to survive a challenge," <u>Frizelle</u>, 111 F.3d at 176 (alteration in original) (quoting <u>Dickson</u>, 68 F.3d at 1404), it nevertheless must be clear to the Court that an agency has "grapple[d] with" evidence contradicting its position, <u>see</u> <u>Aragon</u>, 240 F. Supp. 3d at 112. Because the Secretary failed to even reference this evidence, the Court simply cannot conclude that the Secretary did that here. <u>See</u> <u>Robinson v. Nat'l Transp. Safety Bd.</u>, 28 F.3d 210, 216 (D.C. Cir. 1994) (finding the Board's decision arbitrary and capricious where the Board's order "d[id] not mention [relevant] testimony, much less explain how the Board evaluated it"); <u>see also</u> <u>Mori</u>, 917 F. Supp. 2d at 64 ("By not discussing [the] plaintiff's evidence, the Secretary leaves

[the] plaintiff and the Court to scratch their heads as to why the Secretary found [the] plaintiff's evidence unpersuasive."); Smith v. Dalton, 927 F. Supp. 1, 10 (D.D.C. 1996) ("[The agency must] show that it has considered all of the evidence before it and . . . state why evidence contrary to the ultimate conclusion reached was disregarded or given lesser weight."). Accordingly, "[w]hile the [Secretary]'s decision [ultimately] may be valid, this Court cannot affirm it because the [Secretary seemingly] did not consider all relevant evidence in the record[.]" Erhman v. United States, 429 F. Supp. 2d 61, 68, 70 (D.D.C. 2006).[14]

The defendants' counterargument that "the Secretary reviewed the entire record de novo, including documents in which [the Accrediting Council] posited its arguments" regarding this evidence, Defs.' Mem. at 27 (citing AR 1), is not persuasive. "The assertion that the Secretary reviewed the administrative record . . . is not nearly enough to satisfy h[er] burden to reveal the decision-making process." Fuller, 538 F. Supp. 2d at 192. Moreover, to the extent that the defendants argue that the Accrediting Council was not prejudiced by any failure to consider this evidence, see Defs.' Mem. at 29, that argument also fails. Because the evidence implicates, and appears to contradict, conclusions upon which the Secretary relied in determining that the Accrediting Council could not come into compliance within twelve months, the Court cannot conclude that consideration of this evidence would not have affected the Secretary's decision. See PDK Labs., 362 F.3d at 799; see also Level the Playing Field, 232 F. Supp. 3d at 143.

## 2. Alleged Failure to Consider Relevant Factors

The Accrediting Council appears to also challenge the Secretary's failure to discuss all of the recognition criteria as to which the Department staff and the senior Department official found

---

[14] Although the Department staff appears to have ultimately found evidence of the Accrediting Council's placement verification and data integrity procedures unpersuasive, see, e.g., AR 775 ("Overall, in the context of documentation of widespread placement rate fraud, [the Accrediting Council]'s statements regarding . . . the effectiveness of its algorithm cannot be credited."), the Secretary does not explicitly adopt this analysis.

the Accrediting Council noncompliant.  See Pl.'s Mem. at 27 ("[T]he Secretary's brief discussion of a handful of [r]ecognition [c]riteria did not provide the depth of analysis required under the APA and did not reflect consideration of all available relevant evidence.").  The Secretary admittedly only considered "a non-exhaustive selection of violations that demonstrate the profound and systemic failure of [the Accrediting Council] to effectively meet the basic Title IV responsibilities of a nationally recognized accrediting agency."  AR 6; see also id. ("While th[e] [Department staff] report highlights [twenty-one] separate violations of the recognition criteria, I will not delve into every violation here.").  Although this failure does appear to be inconsistent with the requirements of the HEA, which requires the Secretary, upon deciding "not [to] recognize any accrediting agency . . . [to] make publicly available the reason for denying recognition, including reference to the specific [recognition] criteria . . . which have not been fulfilled," 20 U.S.C. § 1099b(n)(4) (emphasis added), and the APA, which requires consideration of the relevant data, see Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43, the Accrediting Council has not demonstrated that this error was prejudicial, see 5 U.S.C. § 706.  As to the recognition criteria that the Secretary did consider, the Accrediting Council conceded in the proceedings before the Department that it had not yet fully complied with those criteria.  See AR 410–25 (representing that as to the recognition criteria of 34 C.F.R. §§ 602.16(a)(1)(x), 602.19(b) and 602.20 it was "developing revisions" to its policies and procedures and/or would demonstrate effective application of those policies and procedures "no later than April 2017," and as to the recognition criteria of 34 C.F.R. §§ 602.16(a)(1)(v), (vii), and (ix), 602.17(a), 602.18(d), and 602.21, it would have evidence of effective application of its policies and procedures as of August 1, 2016).  Thus, the Accrediting Council cannot argue that the Secretary would have found the Accrediting Council fully compliant had the Secretary considered the remainder of the

criteria as to which the Department staff found the Accrediting Council noncompliant. Furthermore, the Accrediting Council does not argue that the evidence of the additional criteria would have changed the Secretary's determination that it could not come into compliance within twelve months.  See generally Pl.'s Mem. at 18–33 (only specifically arguing that evidence related to the criteria as to which the Secretary found it noncompliant would have changed that decision).  Therefore, the Court is unable to conclude that the Secretary's failure to consider these additional factors prejudiced the Accrediting Council, and consequently, this failure is not an independent basis for finding a violation of the APA.

### 3. Alleged Procedural Errors by the Department staff, the Advisory Committee, and the Senior Department Official

The Accrediting Council also argues that the Department staff, the Advisory Committee, and the senior Department official committed various procedural errors, and that the Secretary acted arbitrarily and capriciously by "ultimately relying" on their flawed decisions and recommendations.  See Pl.'s Mem. at 33.  The defendants argue in response that these entities' decisions and recommendations were intermediate actions and therefore not reviewable under the APA, which only permits challenges to final agency action, see Defs.' Mem. at 29 (citing 5 U.S.C. § 704), and that, in any event, the procedural errors alleged by the Accrediting Council either did not occur or did not prejudice the Accrediting Council because "at no point does [the Accrediting Council] suggest that, but for those purported errors, the Secretary would have concluded that [it] was compliant," id.

As a threshold matter, the Court rejects the defendants' argument that intermediate agency action is never reviewable, as that position is explicitly contradicted by the APA, which provides that "[a] preliminary, procedural, or intermediate agency action . . . not directly reviewable is subject to review on the review of the final agency action."  5 U.S.C. § 704; see

also <u>Fed. Trade Comm'n v. Standard Oil Co. of Cal.</u>, 449 U.S. 232, 245 (1980) (recognizing that under § 704, a court "reviewing a [final] cease-and-desist order has the power to review alleged unlawfulness in the issuance of a complaint"); <u>Yaman v. U.S. Dep't of State</u>, 634 F.3d 610, 613 (D.C. Cir. 2011) (recognizing that the plaintiff's challenge to the agency's denial of her request for a copy of a hearing officer's findings of fact and recommendation was reviewable because it was part of a case challenging the agency's final decision on the merits); <u>Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.</u>, 730 F. Supp. 2d 157, 174 (D.D.C. 2010) (recognizing that the plaintiff would be permitted to challenge an agency's intermediate action if it were to challenge that agency's future final action). The Secretary's decision denying the Accrediting Council's recognition constitutes "a final decision," <u>see</u> 34 C.F.R § 602.38; <u>see also</u> Defs.' Mem. at 35 (acknowledging that "the Secretary's decision . . . is the final agency action under review in this lawsuit"), and therefore, the Court may review the intermediate decisions that preceded the final decision.

### a.      The Department Staff's Report

The Court has already determined that the Department staff violated the HEA and the Secretary's regulations by declining to consider the Accrediting Council's Part II submission, and thus, it need not address that claim again here. However, the Court must dismiss the Accrediting Council's remaining arguments that the Department staff committed procedural error.

The Accrediting Council first argues that the Under Secretary's request for supplemental information violated the Secretary's regulations because those regulations "do not contemplate involvement of the Secretary or the Secretary's deputies at the [Department staff] review stage." Pl.'s Mem. at 34 (emphasis removed). However, as the defendants point out, <u>see</u> Defs.' Mem. at 30, the Accrediting Council has provided no evidence that the Secretary was involved in the

Department staff's review, and indeed, as the Secretary observed, evidence in the record expressly refutes the Secretary's involvement, see AR 12 n.88 (citing testimony of the Department staff at the Advisory Committee meeting that "both the [senior Department official] and the Secretary 'ha[d] been completely walled off from the discussion of [the Accrediting Council] and from the preparation of the staff report'"). Further, although it is undisputed that the Under Secretary was involved in the Department staff proceedings, see, e.g., AR 355 (stating in the Department staff's written submission to the senior Department official that "[it] is true that the Under Secretary and his Office participated in the efforts of the Department [s]taff to develop the record on the [Accrediting Council] matter"), the Accrediting Council has failed to cite any regulation or other authority for its assertion that the involvement of the Under Secretary, who is "himself a member of the Department staff," Defs.' Mem. at 30, was improper. Nor is the Court persuaded that a Department staff member's vague statement at the Advisory Committee hearing that he did not "want to comment" on "advice [he received] from outside" the Department staff's accreditation office, AR 520 (Advisory Committee Transcript at 51), "suggest[s] that the outside involvement [ ] violated the prescribed regulatory process," Pl.'s Mem. at 35. The Court therefore agrees with the defendants that the Accrediting Council's allegations are insufficient to overcome the "presum[ption] that [public officers] have properly discharged their official duties." Defs.' Mem. at 30 (quoting Riggs Nat'l Corp. v. Comm'r of Internal Revenue, 295 F.3d 16, 21 (D.C. Cir. 2002)).

The Accrediting Council next argues that the Department staff erred when it failed to consider "[i]ts use of algorithms designed to further verify job placement data . . . [from] the schools it accredits." Pl.'s Mem. at 37. However, the Court does not find it necessary to address this claim because it has already determined that the Secretary must consider this evidence on

remand.  See supra Part III.B.1.c.  In any event, the Department staff did address the Accrediting Council's algorithm.  See AR 775 ("Overall, in the context of the documentation of widespread placement rate fraud, . . . the effectiveness of [the Accrediting Council]'s algorithm cannot be credited.").

Finally, the Accrediting Council argues that the Department staff "relied on irrelevant factors by highlighting the investigations and lawsuits against some institutions that [it had] accredited, even though [the Accrediting Council] had nothing to do with those lawsuits[] [and] often did not have knowledge of these investigations."  Pl.'s Mem. at 38; see also id. ("There [ ] are no recognition criteria that require an accrediting agency to establish its compliance by explaining how it has responded to a filed lawsuit against an institution[.]").  Although it is true that an agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider," Puerto Rico Higher Educ. Assistance Corp. v. Riley, 10 F.3d 847, 850 (D.C. Cir. 1993) (quoting Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43), the Court simply cannot conclude that the existence of numerous investigations and lawsuits regarding misconduct by Accrediting Council-accredited institutions is "irrelevant" to the recognition criteria set forth in the HEA, which require the Secretary to assess an accrediting agency's ability to effectively implement and enforce standards to ensure an institution's "educational quality and program effectiveness," 20 U.S.C. § 1099b(c)(1).  Therefore, this final challenge to the Department staff's report is also rejected.

**b.     The Advisory Committee Meeting**

The Accrediting Council also argues for two reasons that the Advisory Committee proceedings were procedurally flawed, neither of which the Court finds persuasive.  First, the Accrediting Council argues that the Advisory Committee permitted the presentation of "[i]mproper [t]hird [p]arty [c]omments" in violation of the Secretary's regulations, which it

asserts only allow "the Department [to] invite [presentations from] parties who submitted written comments 'concerning the agency's compliance with the criteria for recognition,'" Pl.'s Mem. at 39 (emphasis removed) (quoting 34 C.F.R. § 602.34(d)). Specifically, the Accrediting Council takes issue with the presentation of comments from a Maryland Assistant Attorney General regarding state investigations into institutions accredited by the Accrediting Council. See id. The Court agrees with the defendants that "[n]either the statute nor the regulations limit the scope of allowable comments [at the Advisory Committee meetings] in the manner asserted by the [Accrediting Council]," but they rather "contemplate that any interested member of the public may present to [the Advisory Committee], without regard as to whether those commenters previously submitted written comments." Defs.' Mem. at 36. Section 602.34(d), the regulation cited by the Accrediting Council as support for its position, requires the Department to "invit[e] interested parties . . . to make oral presentations before the Advisory Committee," and merely specifies that such parties may "includ[e] those who submitted third-party comments concerning the agency's compliance with the criteria for recognition." 34 C.F.R. § 602.34(d) (emphasis added) ("At least [thirty] days before the Advisory Committee meeting, the Department publishes a notice of the meeting in the Federal Register inviting interested parties, including those who submitted third-party comments concerning the [accrediting] agency's compliance with the criteria for recognition, to make oral presentations before the Advisory Committee."). And, various provisions of the HEA encourage public participation at the Advisory Committee meeting and in the recognition process generally. See 20 U.S.C. § 1011c(d)(2)(B) (providing that at a meeting of the Advisory Committee, "[t]he agenda shall include, at a minimum, opportunity for public comment during the Committee's deliberations"); id. § 1099b(n)(1) (requiring the Secretary to "conduct an independent evaluation" of information including "third

party-information concerning the performance of the accrediting agency"); id. § 1099b(n)(3) (requiring the Secretary to "consider all available relevant information . . . including any complaints . . . against [an accrediting] agency").  The Accrediting Council's claim that the presentations by individuals who did not submit written comments were improper therefore fails.

Second, the Accrediting Council contends that the Advisory Committee was "unduly influenced by politics," Pl.'s Mem. at 41, specifically, by (1) the Under Secretary's comments at the opening of the Advisory Committee meeting "expressi[ng] . . . his preferred outcome of the hearing," id. at 39; and (2) a report issued by Senator Elizabeth Warren two weeks before the Advisory Committee meeting "criticizing [the Advisory Committee] itself and encouraging the panel to recommend revoking [the Accrediting Council]'s recognition," id. at 40.  The defendants respond that "no regulation prohibits the Under Secretary from expressing his views to [the Advisory Committee]" or "authorize[s] [or] obligate[s] [the Department] to prohibit members of the public, including sitting federal politicians, from issuing public statements in the weeks preceding a[n Advisory Committee] meeting," Defs.' Mem. at 36, and with regards to the Under Secretary's comments, that "[the Accrediting Council] cannot show any prejudice arising from those remarks," id. at 37.

The Court concludes that the Accrediting Council has not shown that these events constitute procedural error.  As to the Under Secretary's comments, the Accrediting Council cites no provision of the HEA or rule or regulation that prohibits the Under Secretary from expressing his views at an Advisory Committee meeting.  And although the HEA provides that "[t]he Secretary shall not, under any circumstances, base decisions on the recognition or denial of recognition . . . on criteria other than those contained in th[e] [statute]," 20 U.S.C. § 1099b(n)(3), the Accrediting Council fails to offer any evidence that the Advisory Committee

based its decision, or any part of it, on the Under Secretary's remarks. And, as the defendants note, see Defs.' Mem. at 36, the remarks did not make any reference to the Accrediting Council, see generally AR 9,897–903; see also AR 9,897–98 (reflecting the Under Secretary's statement that "the truth is that some agencies need to up their game and occasionally agencies demonstrate such wide and deep failure that they simply cannot be trusted with making the determinations we[,] you[,] and the public count on."). Furthermore, the Court is not persuaded by the handful of statements from Advisory Committee members that the Accrediting Council claims suggest that the Under Secretary's statements may have jeopardized "the integrity of the Department's evaluation of [the Accrediting Council]'s petition." Pl.'s Mem. at 40 (citing, for example, one member's comment that the opening comments were "very odd"). As the Secretary concluded in her decision, none of these statements show that the Advisory Committee proceedings were compromised by the Under Secretary's comments. See AR 11 ("Any individual statements by [Advisory Committee] members prior to the vote do not indicate that the votes by the majority of the members [against recognition of the Accrediting Council] were not based on their expert assessment of the facts.").

As to Senator Warren's report, the Accrediting Council has not directed the Court to any evidence demonstrating that any of the members of the Advisory Committee even considered the report, let alone that they improperly relied upon it to make their decision. The Accrediting Council merely asserts that the senior Department official's argument on appeal that "[Advisory Committee] members neither can, nor are expected to, close their eyes to information they are exposed to day-to-day by virtue of th[eir] expertise," AR 354, demonstrates that "[the Advisory Committee] members may have been influenced by the report," Pl.'s Mem. at 40 (emphasis added). This speculative statement is not proof that any Advisory Committee member in fact

considered or was influenced by the report.  Nor is the Court persuaded by the statement of "one [Advisory Committee] member expressly acknowledg[ing] the impact of politics on the proceedings," Pl.'s Mem. at 41, as the Accrediting Council has not identified anything in the record as support for this claim, and in any event, the general opinion of one member that politics had some impact on the Advisory Committee proceedings does not persuade the Court that the Advisory Committee's recommendation, or the Secretary's ultimate decision, were improperly influenced by politics.  Finally, the Accrediting Council's reliance on a statement from a third-party observer that "the [Advisory Committee's recommendation] makes clear the extent to which both [the Advisory Committee]—and accreditation—have been politicized" is even less persuasive.  Id. (citing AR 386, statement of Judith Eaton, President of the Council for Higher Education Accreditation).

### c.     The Senior Department Official's Decision

The Accrediting Council's final argument is that the senior Department official's decision was procedurally flawed in two respects.[15]  Similarly, none of these arguments is persuasive.

First, the Accrediting Council contends that the senior Department official's "truncated" decision failed to comply with the procedures set forth in 34 C.F.R. § 602.36.  See id. at 41. That regulation requires only that the senior Department official "specif[y] the reasons for [her] decision, including all criteria the agency fails to meet and all criteria the agency has failed to apply effectively."  34 C.F.R. § 602.36(e)(2)(ii).  The Court agrees with the defendants that the

---

[15] The Accrediting Council also argues that the senior Department official failed to consider "the specific leadership changes that [it] had made" and other evidence of its improvements made after the Advisory Committee meeting. See Pl.'s Mem. at 43–44.  Because the Court has already determined that this evidence was not timely submitted and, in any event, was properly considered by the Secretary, see supra Part III.B.1.b, the Court need not separately address whether the senior Department official failed to consider this evidence.

senior Department official's decision meets these requirements, see Defs.' Mem. at 37–38, albeit just barely. The senior Department official's decision listed each of the twenty-one criteria as to which she found the Accrediting Council noncompliant, see AR 315, and incorporated the Department staff's findings as to those criteria, see AR 314 (indicating that she "agree[d]" with the Department staff report). Further, she provided reasons for her conclusion that the Accrediting Council could not come into compliance within twelve months, including that "[the Accrediting Council]'s track record d[id] not inspire confidence that it [could] address all of [its] problems effectively" and "most of the remedial efforts currently underway began in earnest just several months ago, despite having reason to take action long before that." AR 315. The plain language of the regulation does not require more.[16]

Second, the Accrediting Council argues that "the [senior Department official]'s determination not to allow [the Accrediting Council twelve] months to come into compliance marks a significant break with precedent as to [Department s]taff and [Advisory Committee] recommendations," which required "an adequate explanation" for the break that the senior Department official failed to provide. Pl.'s Mem. at 42. The Accrediting Council cites as "precedent" the fact that, "[i]n all but one" of the "[seventy] petitions for continued recognition heard by [the Advisory Committee] since December 2010 in which an agency was found to have one or more violations of the [r]ecognition [c]riteria," the "Department staff and [the Advisory Committee] recommended that the institution be given more time to come into compliance." Id. 42 n.15 (citing AR 140); see also AR 427. For several reasons this argument must be rejected.

As an initial matter, the Accrediting Council cites no authority for the proposition that the non-final recommendations of the Department staff or the Advisory Committee are precedential,

---

[16] For the reasons explained, infra, the Court does not decide whether the senior Department official's decision satisfies the requirements of the APA.

and it also fails to indicate whether the senior Department official or the Secretary ultimately adopted these recommendations in any of the cases it cites. More importantly, although it is true in some cases that "[a]n agency's failure to come to grips with conflicting precedent constitutes an inexcusable departure from the essential requirement of reasoned decisionmaking," Jicarilla Apache Nation v. U.S. Dep't of Interior, 613 F.3d 1112, 112 (D.C. Cir. 2010) (alteration in original) (internal quotation marks omitted), the Accrediting Council has failed to explain how the senior Department official's (or the Secretary's) decision in this case conflicts with what it has cited as precedent. Cf. LePage's 2000, Inc. v. Postal Regulatory Comm'n, 642 F.3d 225, 234 (D.C. Cir. 2011) (concluding that Commission's order departed from a prior order because it changed the focus of its analysis and considered new factors); Water Quality Ins. Syndicate v. United States, 225 F. Supp. 3d 41, 71 (D.D.C. 2016) (concluding that an administrative agency was required to explain its departure "from prior agency precedent, where the agency ha[d] declined to find gross negligence in circumstances involving more egregious conduct" than the conduct presented). Rather, it only claims that these prior cases involved findings of "one or more violations of the [r]ecognition [c]riteria," and that they resulted in a different outcome at the Department staff and Advisory Committee level. See Pl.'s Mem. at 42 n.15. The Court cannot conclude based on these assertions alone that the Secretary acted arbitrarily and capriciously in failing to address its prior cases. See U.S. Postal Serv. v. Postal Regulatory Comm'n, 842 F.3d 1271, 1274 (D.C. Cir. 2016) (recognizing that an agency is "not required to grapple with every last one of its precedents, no matter how distinguishable" (internal quotation marks omitted)); see also AR 11 (explaining that "[e]ach [accrediting] agency is judged on a case by case basis"). Accordingly, the Court must reject the Accrediting Council's claims that the Department staff's, the Advisory Committee's, and the senior Department official's

recommendations and decisions suffered from procedural flaws beyond those already identified with respect to the Secretary's decision.

### 4. The Accrediting Council's Additional Challenges

The Court must resolve two final matters.  First, as already indicated, the Accrediting Council has challenged the merits of the Secretary's decision, see, e.g., Pl.'s Mem. at 30 ("The Secretary's conclusion is not grounded by the record evidence; there is simply 'no rational connection' between the facts found and the 'choice made' by the Secretary."), as well as the merits of the Department staff's recommendation and the senior Department official's decision, see, e.g., id. at 36 (arguing that the Department staff report "made numerous conclusory findings"); id. at 37 (questioning the soundness of the Department's staff's conclusion that the Accrediting Council did not comply with 34 C.F.R. § 602.15(a)(1)); id. at 44 ("The [senior Department official]'s determinations regarding why [the Accrediting Council] could not demonstrate or achieve compliance within [twelve] months are [ ] conclusory[.]").  However, because the Court concludes that the Secretary procedurally erred by failing to consider various categories of relevant evidence in violation of the HEA, the Secretary's implementing regulations, and the APA, the Court finds it unnecessary to reach these challenges at this time.

"Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards."  PPG Indus., Inc. v. United States, 52 F.3d 363, 365 (D.C. Cir. 1995).  And as here, where a court determines that the flaw in the agency's process is the failure to consider relevant evidence, the proper remedy is to remand the case to the Secretary so that she may consider the evidence in the first instance.  See Jicarilla Apache Nation, 613 F.3d at 1121 ("These are issues for [the agency], not this court, to consider in the first instance."); see also Fuller, 538 F. Supp. 2d at 193

(concluding that where the "deficiencies [identified by the court] concern[ed] only the flaws in the Secretary's decisionmaking process" and not "flaws specific to the substance of the decision that the Secretary reached on the merits," "[t]he appropriate remedy [ ] [wa]s to vacate the Secretary's decision and remand [the plaintiff]'s petition for further proceedings consistent with th[e] [ ] [o]pinion"); Erhman, 429 F. Supp. 2d at 70 (recognizing that "[w]hile the [agency]'s decision may be valid, this Court cannot affirm it because the [agency] did not consider all relevant evidence," and consequently, remanding the case to the agency was the proper course because "th[e] [c]ourt [wa]s not in a position to determine the legitimacy of the remainder of the [agency]'s [d]ecision"); Smith, 927 F. Supp. at 10 (finding remand appropriate in part because "it [wa]s not apparent to the court that the [agency] [ ] had a full opportunity to consider the [relevant] evidence").

Second, the Accrediting Council requests that the Court "return [its p]etition for recognition to [the] Department [s]taff for reconsideration," Proposed Order at 1, ECF No. 55-1 (emphasis added). However, the Accrediting Council cites no authority that compels the Court to do so. See generally Pl.'s Mem.; Pl.'s Opp'n. Because the HEA requires the Secretary to consider an application de novo, see 20 U.S.C. 1099b(n)(1) ("The Secretary shall conduct an independent evaluation of the information provided by [the accrediting] agency . . . ."), the Court finds it appropriate to remand the case to the Secretary for proceedings consistent with this opinion. This is not to say, however, that the Secretary may not decide to return the Accrediting Council's petition to the Department staff. Indeed, the regulations contemplate, although in circumstances not applicable here, that the Secretary may do so if necessary to consider evidence not in the record. See 34 C.F.R. § 602.37(f), (f)(1)(ii) ("If relevant and material information pertaining to an agency's compliance with recognition criteria, but not contained in the record,

comes to the Secretary's attention while a decision regarding the agency's recognition is pending before the Secretary, and if the Secretary concludes that the recognition decision should not be made without consideration of the information, the Secretary . . . [may r]efer[] the matter to [the] Department staff for review and analysis . . . , as appropriate, and review by the Advisory Committee . . . ; and consideration by the senior Department official").  Additionally, although the Court has concluded that the Secretary was not required to consider the evidence of the Accrediting Council's purported improvements made after the Advisory Committee meeting, that is not to say that she may not decide on remand to consider some or all of that evidence, or take into account new evidence.  See PPG Indus., 52 F.3d at 366 ("[T]here is no principle of administrative law that restricts an agency from reopening proceedings to take new evidence after the grounds upon which it relied are determined by a reviewing court to be invalid.  Indeed, the Supreme Court has specifically indicated that a reopening is one of the courses an agency may follow after a reviewing court has determined that the agency's initial determination included an error of law.")

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the Secretary violated the APA by failing to consider the Accrediting Council's Part II submission and evidence of its placement verification and data integrity programs and procedures, and finds that the proper remedy for these violations is to remand this case to the Secretary for consideration of this evidence.  The Court rejects, however, the Accrediting Council's remaining bases for challenging the Secretary's decision in this case.  Accordingly, the Accrediting Council's motion for summary

judgment is granted in part and denied in part, and the defendants' cross-motion for summary judgment is denied.[17]

      **SO ORDERED** this 23rd day of March, 2018.

REGGIE B. WALTON
United States District Judge

---

[17] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.